# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**W.R. GRACE & CO., <u>et al.</u>**

---

| | | |
|---|---|---|
| **Official Committee of Asbestos Personal Injury Claimants, <u>et al.</u>,** | ) ) ) | |
| **Appellants,** | ) | **Civil Action No. 06-689** |
| | ) | |
| **v.** | ) ) | |
| **W.R. Grace & Co., <u>et al.</u>,** | ) ) | |
| | ) | **Bankruptcy Case No. 01-1139** |
| **Appellees.** | ) | **Appeal No. 06-63** |

## <u>BRIEF OF APPELLANTS</u>

Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
3050 K Street, NW
Washington, DC 20007
Telephone: (202) 339-8400

John C. Phillips, Jr. (#110)
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200

*Counsel for David T. Austern,*
*Future Claimants' Representative*

Elihu Inselbuch
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, DC 20005
Telephone: (202) 862-5000

Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900

*Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

Scott L. Baena
Jay M. Sakalo
Matthew Kramer
Bilzin Sumberg Baena Price &
Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-2336
Telephone: (305) 374-7580

Theodore J. Tacconelli (#2678)
Lisa L. Coggins (#4234)
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555

*Counsel for the Official Committee of*
*Asbestos Property Damage Claimants*

Dated: December 1, 2006

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF BASIS FOR JURISDICTION ...................................................... 1

STATEMENT OF ISSUES PRESENTED.................................................................. 1

STATEMENT OF APPLICABLE STANDARDS OF REVIEW ................................ 2

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .............. 3

SUMMARY OF ARGUMENT .................................................................................. 3

STATEMENT OF FACTS ......................................................................................... 9

    I       The Bankruptcy Filing................................................................................ 9

    II.     The Debtors' Repeated Requests for Exclusivity .................................. 10

    III.    The Debtors File An Unconfirmable Plan of Reorganization ............... 13

    IV.    Estimation of Asbestos Liabilities........................................................ 15

    V.     The Debtors Deny Liability For Virtually All of Their Asbestos Liabilities ...... 16

    VI.    The Debtors Seek and Obtain More Extensions of Exclusivity ........................ 18

    VII.    The Plan Amendments That Were Not to Be .................................... 20

    VIII.  The Plan Mediation. .............................................................................. 20

    IX.    Yet Another Extension of Exclusivity.................................................. 21

    X.     "Oh Thank Heaven For Chapter 11." .................................................. 22

    XI.    The Debtors and Their Officers Get Indicted During the Bankruptcy Case ....... 24

    XII.    The Asbestos Committees Recover $1.2 Billion for the Estate Over the Debtors' Objections ........................................................................ 25

    XIII.  No End in Sight...................................................................................... 26

ARGUMENT ............................................................................................................ 26

    I.     Legal Standard For Extensions Of A Debtor's Exclusive Periods To File A Plan Of Reorganization And Solicit Acceptances Thereto............................... 26

          A.    The Keystones of Section 1121 of the Bankruptcy Code. ...................... 26

          B.    A Debtor Has A Heavy And Increasing Burden To Establish "Cause" For Extending The Exclusive Periods ...................................... 29

          C.    Termination of the Debtors' Exclusivity Periods Benefits All Parties.................................................................................................. 29

          D.    Factors Considered by the Courts When Ruling on Exclusivity Extension Motions ............................................................................... 30

II.     The Bankruptcy Court Erred In Holding That "Cause" Existed To Extend
        The Debtors' Exclusive Periods ........................................................................ 31

        A.      The Debtors Have Not Demonstrated the Existence of Good Faith
                Progress Toward Filing A Confirmable Plan .......................................... 31

        B.      The Debtors' Existing Plan is Patently Unconfirmable ........................... 32

        C.      The Debtors Have Not Made Any Progress Negotiating with the
                Asbestos Constituents .......................................................................... 33

CONCLUSION ........................................................................................................... 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re Am. Fed'n of Television and Radio Artists,
30 B.R. 772 (Bankr. S.D.N.Y. 1983) ................................................................... 31

In re Amko Plastics, Inc.,
197 B.R. 74 (Bankr. S.D. Ohio 1996) ................................................................. 27

In re Applied Safety, Inc.,
200 B.R. 576 (Bankr. E.D. Pa. 1996) ................................................................. 32

In re Central Jersey Airport Servs., LLC,
282 B.R. 176 (Bankr. D.N.J. 2002) ................................................................30, 31

Century Grove, Inc. v. First Am. Bank of New York,
860 F.2d 94 (3rd Cir. 1988) ............................................................................... 30

In re Curry Corp.,
148 B.R. 754 (Bankr. S.D.N.Y. 1992) ................................................................. 35

In re Dow Corning Corp.,
208 B.R. 661 (Bankr. E.D. Mich. 1997) ............................................................. 29

In re Express One Int'l,
194 B.R. 98 (Bankr. E.D. Tex. 1996) .........................................................30, 35, 36

Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing
Home, Inc.), 187 B.R. 128 (D.N.J. 1995) .......................................................... 3, 30

In re Gibson & Cushman Dredging Corp.,
101 B.R. 405 (E.D.N.Y. 1989) ........................................................................... 3

In re McLean Indus., Inc.,
87 B.R. 830 (Bankr. S.D.N.Y. 1987) ...............................................................29, 30

In re Newark Airport/Hotel LP,
156 B.R. 444 (Bankr. D.N.J.), aff'd, FGH Realty Credit Corp. v. New Airport/Hotel
LP, 155 B.R. 93 (D.N.J. 1993) ........................................................................... 29

Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re
Henry Mayo Newhall Mem'l Hosp.),
282 B.R. 444 (B.A.P. 9th Cir. 2002) ................................................................. 2, 28

In re Parker St. Florist & Garden Ctr., Inc.,
31 B.R. 206 (Bankr. D. Mass.) .......................................................................29, 36

In re Pub. Serv. Co. of New Hampshire,
  88 B.R. 521 (Bankr. D.N.H. 1988)................................................................. 35

In re Pub. Serv. Co. of New Hampshire,
  99 B.R. 155 (Bankr. D.N.H. 1989)................................................................. 29

Pub. Serv. Co. of New Hampshire v. State of New Hampshire (In re Pub. Serv. Co. of
  New Hampshire), 108 B.R. 854 (Bankr. D.N.H. 1989)..................................... 5

In re Rook Broad. of Idaho, Inc.,
  154 B.R. 970 (Bankr. D. Idaho 1993)............................................................ 30

Safety Nat'l Casualty Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum
  Corp.), 303 B.R. 299 (D. Del. 2003) ............................................................. 2

In re Sharon Steel Corp.,
  78 B.R. 762 (Bankr. W.D. Pa. 1987)..........................................................27, 34

In re Sharon Steel Corp.,
  871 F.2d 1217 (3d Cir. 1989) ........................................................................ 2

In re Texaco,
  81 B.R. 806 (Bankr. S.D.N.Y. 1988).............................................................. 30

In re Texas Extrusion Corp.,
  844 F.2d 1142 (5th Cir.), cert. denied, 488 U.S. 926 (1988) ............................ 33

In re Tony Downs Food Co.,
  34 B.R. 405 (Bankr. Minn. 1983)................................................................... 29

In re USG Corp.,
  290 B.R. 223 (Bankr. D. Del. 2003) ............................................................... 18

United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers
  of Inwood Forest Assocs., Ltd.), 808 F.2d 363 (5th Cir. 1987), aff'd, 484 U.S. 365
  (1988)......................................................................................................... 4, 27

Walker v. Celotex Corp. (In re Hillsborough Holdings Corp.),
  197 B.R. 372 (Bankr. M.D. Fla. 1996) ........................................................... 33

In re Washington-St. Tammany Elec. Coop., Inc.,
  97 B.R. 852 (E.D. La. 1989) .....................................................................27, 36

# DOCKETED CASES

In re Armstrong World Indus.,
    No. 00-4471 (Bankr. D. Del.)................................................................... 10

In re Babcock & Wilcox Co.,
    No. 00-10992 (Bankr. E.D. La.).....................................................10, 36, 37

Combustion Engineering, Inc.,
    No. 03-10495 (Bankr. D. Del.)................................................................... 10

In re Congoleum Corporation, et al.,
    No. 03-51524 (Bankr. D.N.J.)..........................................................36, 37

In re Federal-Mogul Global Inc.,
    No. 01-10578 (Bankr. D. Del.).....................................................10, 36, 37

In re Kaiser Aluminum Corp,
    No. 02-10429 (Bankr. D. Del.)................................................................... 10

In re Mid-Valley, Inc.,
    No. 03-35592 (Bankr. W.D. Pa.)............................................................... 10

In re Owens Corning Corp.,
    No. 00-03837 (Bankr. D. Del.)..................................................................... 9

In re USG Corp.,
    No. 01-2094 (Bankr. D. Del.)..................................................................... 10

In re U.S. Minerals Products Co.,
    No. 01-2471 (Bankr. D. Del.).......................................................10, 36, 37

# FEDERAL STATUTES AND RULES

11 U.S.C. § 524(g).............................................................................*passim*

11 U.S.C. § 524524(g)(2)(B)(2)(B)(i)(III)................................................. 38

11 U.S.C. § 524(g)(2)(B)(ii)(II) ............................................................... 32

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ...................................................12, 33

11 U.S.C. § 524(g)(4)(B)(i) ...................................................................... 12

11 U.S.C. § 1121 ................................................................................*passim*

11 U.S.C. § 1121(2).................................................................................. 26

11 U.S.C. § 1121(b)................................................................................4, 10, 26

11 U.S.C. § 1121(c) ...................................................................................... 4

11 U.S.C. § 1121(c)(3) ...........................................................................26, 27

11 U.S.C. § 1121(d)...............................................................................*passim*

11 U.S.C. § 1126 .......................................................................................... 4

11 U.S.C. § 1126(f) ..................................................................................... 32

11 U.S.C. § 1129(b)(1) ............................................................................ 3, 14

11 U.S.C. § 1129(b)(2)(B) ....................................................................... 4, 14

11 U.S.C. § 1129(b)(2)(B)(ii) ...................................................................... 37

28 U.S.C. § 158(a)(2) .............................................................................. 1, 28

Federal Rule of Bankruptcy Procedure 3001(e)(2) ..................................... 34

## LEGISLATIVE MATERIALS

140 Cong. Rec. H10,752, H10,764 ............................................................. 28

H.R. Rep. 103-835, 103d Cong., 2d Sess. (Oct. 4, 1994),
<u>reprinted in</u>, 1994 U.S.C.C.A.N. 3340................................................. 2, 33

S. Rep. No. 989, 95th Cong., 2d Sess. 118 (1978)...................................... 33

## MISCELLANEOUS

Barry I. Castleman, <u>Asbestos: Medical and Legal Aspects</u>, 634-44 (4th ed. 1996) ..................... 6

*Grace Reports First Quarter Financial Results*, Business Wire, April 25, 2006 ................................. 23

*Grace Reports Fourth Quarter Operating Results; Operating Up 32%, Sales Up 9% Over Prior Year Fourth Quarter*, PRNewswire-FirstCall, January 29, 2001................................................... 23

7 Alan N. Resnick & Henry J. Sommer, <u>Collier on Bankruptcy</u> § 1121.LH[4] ........................ 28

Michael Riley, *Asbestos Grip.  Years After Mining Left Libby, Mont., Hundreds Have Died.  Diagnoses Keep Coming*, Denver Post, Nov. 19, 2006............................................... 24

## STATEMENT OF BASIS FOR JURISDICTION

This is an appeal from the United States Bankruptcy Court for the District of Delaware's (the "Bankruptcy Court") October 3, 2006 order, which granted the Debtors'[1] ninth motion to extend their exclusive periods to file and solicit votes on a plan of reorganization (the "Order").[2] The Order extended the Debtors' exclusive periods until July 2007, over six years after April 2, 2001, the date of the filing of the Debtors' bankruptcy cases. The Bankruptcy Court's Order is interlocutory but this Court has jurisdiction to hear an immediate appeal from that Order pursuant to 28 U.S.C. § 158(a)(2).

## STATEMENT OF ISSUES PRESENTED

David T. Austern, the court-appointed legal representative for future asbestos claimants (the "FCR"), the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee," and together with the FCR and the ACC, the "Asbestos Constituents" or "Appellants") submit that the central issue presented is whether the Bankruptcy Court erred in holding that "cause" existed to extend the Debtors' exclusive periods when, although the Debtors' bankruptcy cases have been pending for five and a half years, the Debtors have so far failed to file a confirmable plan of reorganization even after a recent court-ordered mediation.

---

[1] The "Debtors" or "Appellees" refers to W.R. Grace & Co. and 61 of its affiliates, each of which is a debtor in the underlying chapter 11 proceeding.

[2] A copy of the Order is attached as Exhibit 1 to the Appellants' Record Excerpts and is also available in the Record at R-2394. References to the Record are hereinafter referred to as "R-" and correspond to the exhibit number included in the Appellants' Designation of the Record (D.I. 3). References to the Appellees' counter-designations are hereinafter referred to as "CD-."

## STATEMENT OF APPLICABLE STANDARDS OF REVIEW

As a general matter, district courts conduct a de novo review of a bankruptcy court's conclusions of law, apply a clearly erroneous standard to a bankruptcy court's findings of fact, and break down mixed questions of law and fact, applying the appropriate standard to each component. In re Sharon Steel Corp., 871 F.2d 1217, 1222 (3d Cir. 1989); Safety Nat'l Casualty Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp.), 303 B.R. 299, 302 (D. Del. 2003).

How these standards should be applied to an order extending exclusivity is not well-defined. This is because there was no appeal as of right with respect to interlocutory orders modifying exclusivity until Congress created that right in 1994. See, e.g., Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.), 282 B.R. 444, 449 (B.A.P. 9th Cir. 2002) (reviewing legislative history of section 1121(d)). Neither the Court of Appeals for the Third Circuit nor this Court has addressed this issue but the Bankruptcy Appellate Panel for the Ninth Circuit recently provided a thorough analysis in Henry Mayo Newhall Memorial Hospital. 282 B.R. at 448-452. In that case, the Appellate Panel reasoned that the "extraordinary step" taken by Congress in 1994, in authorizing an appeal as of right to an interlocutory exclusivity order, evinced Congressional intent that exclusivity decisions are to be "resolved on the merits." Id. at 449. The Appellate Panel further reasoned that "[t]he Congressional intention that the appellate court 'carefully consider the circumstances of each case' is not consonant with review for abuse of discretion." Id. at 451 (quoting H.R. Rep. No. 103-835, at 36 (1994), reprinted in, 1994 U.S.C.C.A.N. 3340, 3344-45). Thus, the Appellate Panel concluded that the appropriate standard of review is de novo. Id. [3]

---

[3] In a case that pre-dates Henry Mayo Newhall Memorial Hospital by seven years, the District Court for

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

The Asbestos Constituents appeal the Bankruptcy Court's October 3, 2006 Order, which extended the Debtors' exclusive periods to file and solicit votes on a plan of reorganization until July 2007.[4]   The Asbestos Constituents and others objected to this and prior extensions of exclusivity.[5]  This, however, is the first time the Asbestos Constituents have appealed any of the Bankruptcy Court's orders extending exclusivity.   As such, this appeal is the product of a five and a half year odyssey during which the Debtors have made no tangible progress with their emergence from bankruptcy.  The Asbestos Constituents timely noticed this appeal on October 3, 2006.[6]

## SUMMARY OF ARGUMENT

Chapter 11 of the Bankruptcy Code permits a financially distressed company to reorganize within certain parameters set by Congress.  The exit from chapter 11 is accomplished through a plan of reorganization voted upon by creditors and, if they are "in the money," by shareholders.  To be confirmable, a debtor's plan of reorganization must treat all parties fairly and not discriminate against any particular constituency.   See 11 U.S.C. § 1129(b)(1).   In addition, value can only be provided in a waterfall fashion.  Thus, absent their consent, creditors

---

the District of New Jersey noted that "an order altering the exclusivity period will not be set aside absent an abuse of discretion."  Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home, Inc.), 187 B.R. 128, 131 (D.N.J. 1995) (citing In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409 (E.D.N.Y. 1989)).  However, that Court also concluded that "[t]o the extent that the Bankruptcy Judge rested her conclusion as to the issue of terminating the exclusivity period on legal issues, the [appellate court] shall engage in plenary review of that determination." Id. at 131.  Moreover, the Court reversed the exclusivity order because the bankruptcy court "erred in its legal conclusion that cause existed." Id. at 134.

[4] Record Excerpt, Exh. 1.

[5] R-259; R-304; R-415; R-459; R-460; R- 461; R-483; R-484; R-1877; R-1879; R-1880; R-2034; R-2035; R-2241; R-2261; R-2263.

[6] R-2396.

must be fully satisfied before shareholders are entitled to any return.  See 11 U.S.C. §
1129(b)(2)(B).  This requirement is known as the absolute priority rule.  Creditors have the right
to vote on a plan if their rights are affected – impaired – in any way.  See 11 U.S.C. § 1126.  It is
the role of bankruptcy courts "to effectuate those provisions of the Bankruptcy Code that
Congress has already enacted to protect creditors and to reduce delay."  United Savs. Assoc. of
Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),
808 F.2d 363, 370 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988).

 During the first six months of a bankruptcy, debtors have the exclusive right to file and
solicit votes on a plan of reorganization.  See 11 U.S.C. §§ 1121(b) – (c).  The policy behind this
six-month rule is that a debtor is entitled to a short window of opportunity to propose a
confirmable plan for the reorganization of its business, i.e., one that will be acceptable to both its
creditors and equity.  During this window, creditors are held fully hostage to the bankruptcy
process:  they are barred from proposing their own competing plans and, as a consequence of the
Bankruptcy Code's automatic stay, are also barred from taking any action to recover on their
claims.  Under the Bankruptcy Code, however, once that six-month window expires, Congress
determined that exclusivity may be terminated and creditors can propose and vote on their own
competing plan of reorganization.  Such competing plans, promoted by the debtor on the one
hand and its creditors on the other, commonly result in a consensual plan and early exit from
bankruptcy.

 Some bankruptcies, of course, are sufficiently large and complex that it is simply not
feasible for a debtor to propose a confirmable plan in six months.  Congress provided for this
eventuality by allowing for the extension of the debtor's exclusive periods but only if a debtor is
able to make an affirmative showing of cause.  See 11 U.S.C. § 1121(d).  Cause is not defined in

the Bankruptcy Code.  At bottom, however, it is appropriate to extend exclusivity if it will facilitate the debtor's early exit from bankruptcy.  If the extension will only delay reorganization, cause cannot be shown and exclusivity must be terminated.  <u>See</u> <u>Pub. Serv. Co. of New Hampshire v. State of New Hampshire (In re Pub. Serv. Co. of New Hampshire)</u>, 108 B.R. 854, 891 (Bankr. D.N.H. 1989) (opining that Congress recognized that "reasonable 'promptness' in resolving a corporate reorganization under chapter 11 is important").

Properly enforced, this statutory regime ensures that a debtor is motivated to quickly propose a plan that is fair, and therefore acceptable, to both the debtor and its creditors.  If a debtor fails to propose and solicit votes for such a plan, it faces the prospect that a competing plan will be filed by its creditors and confirmed, over the debtor's objection, by the bankruptcy court.  The statutory regime breaks down if a bankruptcy court routinely extends exclusivity without requiring proof of cause.  In such circumstances, serial extensions of exclusivity only serve to entrench the debtor and marginalize any creditor-led efforts for reorganization.  This upsets the careful balance crafted by Congress, which is designed to protect the right of a debtor to propose its own plan of reorganization in a reasonable timeframe while at the same time ensuring that creditors are not endlessly held hostage by debtors that are unwilling to compromise.  Though not controlling here because the Debtors' bankruptcy cases were filed in 2001, it is noteworthy that Congress amended the Bankruptcy Code in 2005 to provide that the initial exclusive periods may only be extended for an additional maximum period of twelve months (for a total of eighteen months of exclusivity to file a plan and twenty months of exclusivity to solicit votes on the plan).  If the amendment had applied here, the Debtors' exclusivity would have terminated in 2002, over four years ago.

Here, the Debtors are companies that previously manufactured and sold asbestos-containing products. Like many asbestos defendants, the Debtors and their corporate predecessors were aware of the hazards posed by asbestos exposure for many years yet still continued to manufacture and sell asbestos-containing products.[7] Millions of Americans were exposed to the asbestos fibers contained in products sold by the Debtors and other asbestos defendants, and thousands of buildings were contaminated with asbestos from the Debtors' products. As a result, tens of thousands of individuals have contracted mesothelioma, lung cancer or other fatal asbestos-related diseases as a result of the Debtors' wrongful conduct in continuing to sell asbestos-contaminated products for decades after they knew that asbestos was harmful. Due to the long latency period associated with asbestos-related diseases, disease and death caused by exposure to the Debtors' asbestos-containing products will continue for decades into this century.

The Debtors filed for bankruptcy protection on April 2, 2001, now over five and a half years ago. The Order from which the Asbestos Constituents take this appeal is the <u>ninth</u> extension of the Debtors' exclusive periods.[8] That Order extends the Debtors' exclusive periods until July 2007, resulting in seventy-five months, or over twelve six-month periods, of exclusivity. The Bankruptcy Court, however, held there was "cause" to grant the ninth extension based on the stated belief that the Debtors would reach consensus with the Asbestos Constituents and file a confirmable plan before July 2007.

---

[7] <u>See</u> Barry I. Castleman, <u>Asbestos: Medical and Legal Aspects</u>, 634-44 (4th ed. 1996).

[8] Record Excerpt, Exh. 1. The Debtors have filed nine distinct motions to extend their exclusivity, each of which was granted by the Bankruptcy Court. It is significant to note, however, that the Debtors have actually received approximately fifteen extensions of their exclusive periods as a result of various interim extensions and continuances.

Given the passage of time and the Debtors' penchant for delay, the Bankruptcy Court's ruling was in error. The only true hope for achieving a consensual plan and a seasonable resolution of the Debtors' bankruptcy cases is to terminate exclusivity. This is because the Debtors have no incentive to reach consensual agreement with the Asbestos Constituents before July 2007 and, in fact, will not do so. This is evidenced by the fact that although the Debtors filed for bankruptcy in April 2001, they delayed filing a plan of reorganization until November 2004, three and a half years later. And then, instead of attempting to build a consensus, the Debtors filed a plan that is so favorable to their shareholders and other creditors and so discriminates against the Asbestos Constituents that it is non-confirmable as a matter of law. Among other things, the plan not only would improperly limit the funds available to pay asbestos claims, it would also impose that cap on the holders of asbestos claims by denying them their statutory right to vote on the plan. By February 2006, the Debtors belatedly recognized that their plan was non-confirmable but have yet to file any amendment to it or any confirmable plan. In the end, the Debtors' plan is nothing more than a bad-faith offer to the Asbestos Constituents.

It is also clear that the Debtors are not prepared to negotiate to reach a consensus that will give rise to a confirmable plan. In March 2006, the Bankruptcy Court ordered mediation on plan issues. After three months, the Debtors still refused to depart from their position that asbestos claims should be capped and holders of such claims should be denied their right to vote on the Debtors' plan. As a result, in June 2006, the Debtors admitted that there was no "foothold for moving forward with any further [mediation] discussions."[9] Critically, however, the Asbestos Constituents all reached agreement among themselves during the mediation as to their relative treatment under any plan and are ready to move forward with a competing plan. That agreement

---

[9] R-2232 at 4, lines 21-22.

includes consensual treatment of the Zonolite Attic Insulation claims, which could amount to billions of dollars.

The reason for the Debtors' recalcitrance is simple: bankruptcy has been, and continues to be, very good for the Debtors. Every day that they stay in bankruptcy, their cash position improves, their stock price trends upward, and the Debtors' senior executives are handsomely rewarded with generous retention bonuses that are not tied to a successful reorganization. And every day of exclusivity allows the Debtors to focus on programmatic, protracted, and expensive litigation designed to re-engineer the tort system as it applies to asbestos claims. The Asbestos Constituents, however, continue to be held hostage to a bankruptcy process that started five and a half years ago, with no end in sight – in plain contradiction of a statutory regime that is designed to facilitate a debtor's quick exit from bankruptcy. Aside from the obvious inequity of making Asbestos Constituents, some of whom are very sick, wait endlessly for payment on their claims while the Debtors prosper, the repeated and serial extensions of exclusivity have real life and death consequences for many of the Asbestos Constituents. For example, individuals who contract mesothelioma from exposure to asbestos in the Debtors' products rarely live more than eighteen months. Thousands of mesothelioma claims were pending against the Debtors when they first filed for bankruptcy in 2001, and other individuals have developed, or will develop, mesothelioma or other cancers as a result of their exposure to the Debtors' asbestos-containing products. It is likely that thousands of cancer victims of the Debtors' conduct have died while the Debtors' bankruptcy case has been pending, which victims' estates are barred from seeking relief against the Debtors because of the Bankruptcy Code's automatic stay.

In sum, this much is not debatable: (i) the Bankruptcy Court's ninth extension overlooked the legislative goals underlying section 1121 as there was no basis to conclude that

the extension advanced the Debtors' exit from bankruptcy; (ii) the Debtors failed to make any showing in connection with the ninth extension that the filing of a consensual plan is likely to occur; (iii) the ninth extension was granted in the face of an agreement reached among the Asbestos Constituents that would facilitate their filing of a competing plan of reorganization which is entirely consistent with the legislative goals; (iv) the ninth extension facilitates the Debtors' prolonged litigation (as opposed to reorganization) strategies while holding creditors hostage to that ill-gotten process; and, (v) asbestos creditors – not the Debtors – are prejudiced by the delay in the resolution of the Debtors' bankruptcy case.

For this and other reasons, the Asbestos Constituents respectfully submit that the Bankruptcy Court's Order extending exclusivity for the ninth time through July 2007 was in error and should be reversed.

## STATEMENT OF FACTS

### I.    The Bankruptcy Filing.

On April 2, 2001, the Debtors filed for bankruptcy protection under chapter 11 of the Bankruptcy Code.  The Debtors did not file for bankruptcy because financial distress threatened their continued viability.   Per the Debtors, this bankruptcy was filed for the purpose of "managing" their asbestos litigation, i.e., to avoid having to defend and resolve asbestos claims in the same setting as ordinary litigants.[10]  It is now apparent, however, that the Debtors were intent on not only "managing" their asbestos litigation, itself a suspect goal, but also on re-engineering the tort system for so long as they were able to convince the Bankruptcy Court to allow them to hijack the bankruptcy process.[11]

---

[10] R-2 at 2.

[11] R-431 at 126.  It is noteworthy that between 2000 and 2003, numerous other asbestos manufacturers filed for relief under chapter 11 in this and other Districts.  See, e.g., Owens Corning Corp., No. 00-03837

## II.    The Debtors' Repeated Requests for Exclusivity.

The Debtors' original statutory exclusive periods to file a plan and solicit acceptances expired on August 1, 2001 and October 1, 2001, respectively.  See 11 U.S.C. § 1121(b).  To extend those periods, the Debtors filed motions in the early stages of the case.[12]  The ACC and the PD Committee, in recognition of the fact that the Debtors' cases are large and complex, did not oppose any of the Debtors' first four extension motions.  The Bankruptcy Court, in turn, granted each of those motions.[13]

On July 21, 2003, however, two years into their bankruptcy, the Debtors filed their fifth extension motion.[14]  The ACC opposed that motion.[15]  At that point, it had become clear to the ACC that the Debtors' cases had stalled.[16]  In fact, the Debtors had not yet even filed a proposed plan of reorganization.  The Bankruptcy Court, however, granted the fifth motion and extended the Debtors' exclusive period to file a plan until February 1, 2004.[17]  But the Bankruptcy Court

---

(Bankr. D. Del.), Babcock & Wilcox, No. 00-10992 (Bankr. E.D. La.), Armstrong World Indus., No. 00-4471 (Bankr. D. Del.), USG Corp., No. 01-2094 (Bankr. D. Del.), United States Mineral Products, No. 01-02471 (Bankr. D. Del.), Federal-Mogul Global, No. 01-10579 (Bankr. D. Del.), Kaiser Aluminum Corp, No. 02-10429 (Bankr. D. Del.), Mid-Valley, Inc., No. 03-35592 (Bankr. W.D. Pa.), and Combustion Engineering, Inc., No. 03-10495 (Bankr. D. Del.).  All of those manufacturers have completed, or are in the process of completing, their bankruptcy journey via plans of reorganization agreed to by their asbestos creditors.  The Debtors' bankruptcy has been a stark contrast and anything but consensual.

[12] R-47; R-85; R-179; CD-14.

[13] Bankr. D. Del. Docket No. 938; R-108; R-201; R-226.

[14] R-252.

[15] R-259.

[16] R-285 at 18, lines 14-17 (Counsel for the ACC stating that "[t]he fact of the matter here is, that there is nothing, I repeat, nothing going on here to have any prospect of a consensual plan or cram down or any kind of plan to be put on the table for the future.").

[17] R-279.

signaled at that time – in late 2003 – that if there was not any progress toward a consensual plan

soon, exclusivity would be lifted:

> [The] fact that the debtor has exclusivity should not be a disincentive to creditors getting together to see if they can come to some mutual understanding of the kind of plan they'd like to see. At that point, if in fact they have such a plan, then the debtor isn't willing to move forward with that or some other plan, that may be grounds to terminate exclusivity . . . .[18]

Five months later, however, in January 2004, the Debtors had still not made any progress

towards reorganization but, nevertheless, filed their sixth motion to extend exclusivity.[19]  The

Bankruptcy Court granted the extension[20] but again let it be known that it was very frustrated

with the Debtors' lack of progress and posited that it might be time to replace the Debtors'

management team with a trustee:

> Well, then, I need some answers.  This case is now 3 years old.  It's time for the Debtor to know what it's [sic] business plan is, what it's [sic] operational plan is, what it's [sic] reorganization plan, in structure.  I don't expect that you've got all the negotiations done. I understand your need to figure out what the asbestos liabilities are before you can even conclude that piece.  But, I sent you off to talk to all the other constituent groups 2 months ago, and I expect that you're still doing that, so that the basis of a plan can be put together.  It's very long, folks, it's very long, and I'm starting to wonder whether the Debtor-In-Possession, is going to be able to get this done, and if not whether to replace the Debtor.  That's the point I'm at.[21]

Later, in March 2004, the Bankruptcy Court asked the Debtors the fundamental question

whether they intended to seek a Bankruptcy Code 524(g) injunction to address their asbestos

problems.[22]  The Debtors' response was that  "Your Honor, to this day, I can't tell you that it will

---

[18] R-282 at 23, lines 23-25 and at 24, lines 1-3.

[19] R-300.

[20] R-326.

[21] R-308 at 17-18 (alterations added).

[22] R-307 at 47.  The Bankruptcy Code specifically provides for a broad-based injunction against asbestos suits upon the filing of the petition for relief under chapter 11.  However, in order to emerge from chapter 11 and obtain protection from present and future asbestos suits, the Bankruptcy Code requires that any

be a 524(g) plan."[23]  This response demonstrates the Debtors' lack of good faith in the plan

process.  The only way for an asbestos debtor to "buy peace" from future asbestos personal

injury claims through the bankruptcy process is to propose a plan of reorganization which

contains a section 524(g) injunction which channels all present and future asbestos claims to a

claims resolution trust.

The Debtors' response, three years into the bankruptcy, prompted the Bankruptcy Court

to order the Debtors to seek appointment of a future claimants' representative – a linchpin to

reorganization under section 524(g) of the Bankruptcy Code[24] – and again, to castigate the

Debtors for their lack of progress:

> Then let's get a Futures Rep.  I mean, you can't have it both ways.  We either need the pieces in place to get a 524(g) [injunction], or else we need a plan that doesn't have one.  Take your pick.  Let's do it.  It's been a long time.  And, frankly, I'm getting to the point where if I don't lift exclusivity, I'm going to appoint a trustee, and that will cause all sorts of problems, I know, for the debtors lending perspective, if nothing else.  But, this has gone on too long, with too little progress.  Now, last September, I thought I provided some marching orders so that people could start talking.  I'm glad to hear that the debtor has taken that to heart and attempted to try to get the constituents together.  But, I still don't see any progress as a result of it, and that was six months ago.[25]

On May 24, 2004, David T. Austern was approved as the future claimants'

representative.[26]  That same day, but only because they were urged to do so by the Bankruptcy

Court, the Debtors said they would be prepared to file a plan of reorganization within 90 to 120

days, i.e., before October 2004 at the latest.  The Debtors stated that they "hope[d]" that the plan

---

plan of reorganization be approved by 75% of present asbestos claimants.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

[23] R-307 at 47, lines 18-19.

[24] See 11 U.S.C. § 524(g)(4)(B)(i).

[25] R-307 at 48.

[26] R-322.

"will be one that reflects consent and agreement for all of the constituencies, all of the constituencies except the bodily injury constituency."[27]

### III.    The Debtors File An Unconfirmable Plan of Reorganization.

In July 2004, the Bankruptcy Court gave the Debtors "a last period of exclusivity to get this done," i.e., until October 14, 2004.[28]   In so doing, the Bankruptcy Court cautioned the Debtors:  "[I]f I don't have a plan that's on track and headed toward the confirmation arena, if nothing else, I don't think there will be another extension" of the exclusive periods.[29]

Predictably, the Debtors failed to meet the October 14, 2004 deadline to file a plan. Instead, they asked for another one-month extension to November 14, 2004.[30]   The Asbestos Constituents agreed to this short extension because they had the explicit expectation that the Debtors were at last going to reach a fair compromise with the Asbestos Constituents.[31]

On November 13, 2004, over three and a half years into their bankruptcy, the Debtors finally filed their first plan of reorganization and disclosure statement,[32] which was amended on January 13, 2005 (the "Debtors' Plan").[33]   But, as the Debtors must have known, the Debtors' Plan is not confirmable on its face.

The Debtors' Plan does provide for a section 524(g) asbestos settlement trust to administer both asbestos personal injury and asbestos property damage claims (collectively, the "Asbestos Liabilities").  The Debtors' Plan also provides for the Bankruptcy Court to "estimate"

---

[27] R-341 at 52, lines 20-23.

[28] Id. at 68; A-326.

[29] Id. at 70.

[30] R-347.

[31] CD-25; R-348.

[32] R-358; R-359.

[33] A copy of the Debtors' Plan is attached as Exhibit 2 to the Appellants' Record Excerpts and is also available in the Record at R-419.

the amount of Asbestos Liabilities. Both these elements – the trust and the estimation process – are common in asbestos bankruptcies. The Debtors' Plan, however, departs from the norm in a way that makes it non-confirmable because it provides, regardless of the Bankruptcy Court's estimation of Asbestos Liabilities, that the Debtors will arbitrarily cap such Liabilities at $1.6 billion.[34] Thus, by way of illustration, if the Bankruptcy Court determines that the actual allowed amount of Asbestos Liabilities is, for example, $2 billion, the Debtors' Plan makes no provision for the payment of the difference. Despite the foregoing, holders of Asbestos Liabilities are deemed unimpaired under the Debtors' Plan and thus not entitled to vote for or against it.[35] In stark contrast, the Debtors' Plan provides that general unsecured creditors will receive full payment of their allowed claims in any event (including post-petition interest) and equity holders will retain their interests.[36] As such, the Debtors' Plan violates both the rule against discrimination and the absolute priority rule. 11 U.S.C. §§ 1129(b)(1) and 1129(b)(2)(B).

Each of the Asbestos Constituents objected to the treatment afforded by the Debtors' Plan.[37] The Bankruptcy Court conducted a hearing on January 21, 2005 to consider approval of the disclosure statement accompanying the Debtors' Plan.[38] At the disclosure statement hearing, the Bankruptcy Court was troubled by the prospect of asbestos claimants being paid less than the full amount of their claims. As the Bankruptcy Court observed, "That's impairment."[39] The

---

[34] Record Excerpt, Exh. 2 at A-30 §§ 7.6.1(v) and (w).

[35] Id. at A-14 to A-17 §§ 3.1.6 – 3.1.8.

[36] R-418 at 58-60; Record Excerpt, Exh. 2 at A-17 to A-18 §§ 3.1.9 – 3.1.11.

[37] R-393; R-401; R-404.

[38] R-431.

[39] Id. at 62, line 14 and at 75-76.

14

Bankruptcy Court also stated, "[F]rankly, I'm very uncomfortable with a process that imposes a 524(g) injunction that doesn't permit creditors to vote anyway."[40]

## IV.    Estimation of Asbestos Liabilities.

Notwithstanding its concerns, the Bankruptcy Court postponed determining whether the Debtors' Plan was fatally flawed by the omission of voting rights for holders of Asbestos Liabilities.[41]  Rather, upon the Debtors' request, the Bankruptcy Court put that determination off until after all Asbestos Liabilities were estimated in two separate estimation proceedings, one pertaining to asbestos personal injury claims and the other pertaining to filed asbestos property damage claims[42] that did not arise from the installation of Zonolite Attic Insulation ("ZAI") in residences.[43]

The contours of the estimation proceedings have been ill-defined and ever-changing.  The actual estimation hearing in respect of personal injury claims is not presently scheduled to start until June 2007.[44]   In the case of property damage, the Bankruptcy Court bifurcated the estimation into a *Daubert* hearing on the correct methodology to determine the existence of contamination in a building in which the Debtors' asbestos-containing products were installed (the "Methodology Issue") and a hearing to place an estimated value on extant property damage

---

[40] R-431 at 69, lines 9-11.

[41] Id. at 111, 122, 132-33, 140, 153, 155, 167-69.

[42] The PD Committee has not foregone its right to appeal the Bankruptcy Court's determination to conduct an "estimation" proceeding in respect of property damage claims.

[43] At the time of the Debtors' bankruptcy, ZAI litigation was less mature than litigation in respect of the Debtors' other asbestos-containing products although a class of Washington state homeowners had been conditionally certified.  As a consequence, in October 2004, the Bankruptcy Court conducted a *Daubert* hearing concerning the reliability of the scientific means for determining whether ZAI was unreasonably harmful to facilitate the court's determination of whether it ought to permit a class claim to be filed on behalf of ZAI claimants in the Debtors' bankruptcy.  The Bankruptcy Court has yet to issue its opinion from that hearing.

[44] R-2284.

claims ("Phase II").[45]   After numerous fits and starts, the Bankruptcy Court determined in July 2006 that the Debtors should first prosecute their objections to property damage claims before proceeding with Phase II.[46]   The Methodology Issue hearing is presently scheduled to occur in late January 2007 and certain of the Debtors' objections to individual property damage claims are to be heard commencing in late April 2007.[47]

## V.    The Debtors Deny Liability For Virtually All of Their Asbestos Liabilities.

While the use of estimations has become commonplace in asbestos bankruptcy cases, the setting in which they occur in this bankruptcy is very different.  This is because the Debtors have persistently maintained that virtually every sort of asbestos claim asserted against it pre- and post-bankruptcy is meritless.  Thus, with respect to the ZAI claims, the Debtors contend that "claims arising from this newest round of litigation are without merit," and that "ZAI claimants will be unable to meet their *Daubert* burden."[48]   Similarly, with respect to the Monokote-3 property damage claims, the Debtors stated that "those [Monokote-3 claims] that are filed [in the bankruptcy case] will be subject to a statute of limitations defense."[49]   The Debtors also argued that several of the "only seven claims" remaining as of the petition date will be barred by *res judicata* stemming from the Debtors' pre-petition class action settlements, and that the other claims also "will be unable to meet the *Daubert* criteria for establishing reliable, scientific evidence of product risk sufficient to warrant remediation."[50]   Finally, with respect to the bodily injury claims, the Debtors argue that the spike in the number of claims is "unsupported by any

---

[45] R-538; R-1976.

[46] R-2292 at 97-184.

[47] R-2355.

[48] R-2 at 56; R-24 at 4.

[49] R-24 at 6.

[50] R-24 at 10.

principle of science or law," and "bears no relation to the actual trend of disease."[51]  The Debtors maintain further that "[s]tate law uniformly requires that no claim should proceed without credible evidence of exposure to the Debtors' asbestos products," and that "[t]o meet their burden of proof, claimants must present scientific evidence establishing that their exposure to [Debtors'] asbestos products was a substantial causative factor in their developing an asbestos related disease."[52]

As a consequence of the Debtors' abject denial of virtually any legal responsibility for its asbestos-containing products, despite thirty years of unfavorable litigation experiences in the tort system where similar defenses were mounted and failed, the Debtors' bankruptcy cases generally, and the estimation proceedings specifically, have taken on colossal litigation proportions, both in terms of cost and time.

The Asbestos Constituents suggested a more expedient and less expensive path to confirmation of a plan.[53]  They proposed that the Bankruptcy Court limit the estimation exercise to a determination of the estimated value of cancer claims only.[54]  The Asbestos Constituents rationalized that a cancers-only estimation would be a significantly shorter process because there are fewer claims, medical diagnoses are based upon pathology, and there would be no diversion as a result of "suspect" B-readers and other questions raised by the Debtors relating to non-malignant claims.[55]  The Asbestos Constituents further proposed that if the estimated value of cancer claims alone renders the Debtors insolvent, the Asbestos Constituents would be prepared

---

[51] Id. at 12-13.

[52] Id. at 15-16.

[53] R-2241 at 11-12.

[54] Id.

[55] Id.

to agree to a *pro rata* allocation of assets with commercial creditors, without the necessity of expending additional time and resources valuing non-malignant personal injury claims, traditional property damage claims and ZAI claims.[56]    Upon the Debtors' argument, the Bankruptcy Court did not follow the Asbestos Constituents'  proposal.

## VI.    The Debtors Seek and Obtain More Extensions of Exclusivity.

Despite having an unconfirmable plan on file, the Debtors sought a seventh extension of their exclusive periods in November 2004, which the Bankruptcy Court granted over the objections of the Asbestos Constituents.[57]    And then again in May 2005, the Debtors filed their eighth motion for an extension of their exclusive periods,[58] which was opposed by the Asbestos Constituents.[59]

On June 27, 2005, the Bankruptcy Court heard argument on the Debtors' eighth motion and, despite the objections of the Asbestos Constituents, granted a one-month extension of the exclusive periods until July 2005 and required the parties to file briefs to address the effect (if any) that terminating the exclusive periods would have on the Debtors' businesses (the "Business Brief").[60]    The Debtors were hard-pressed to articulate appreciable harm to their businesses that might result from the termination of exclusivity.[61]    The Asbestos Constituents, however,

---

[56] The Appellants' proposal was the same approach Judge Wolin intended to use in the USG bankruptcy case before his recusal.  See In re USG Corp., 290 B.R. 223 (Bankr. D. Del. 2003).

[57] R-366; R-415; R-427.

[58] R-454.

[59] R-459; R-460; R-461.

[60] R-477.

[61] R-478.

demonstrated, through their financial advisors, that termination of exclusivity would have little if any detrimental impact on the Debtors' businesses.[62]

The Bankruptcy Court put off hearing the eighth motion due to the press of other matters. Before the Bankruptcy Court could rule, however, the Debtors filed their ninth motion to extend the exclusive periods.[63]  The ninth motion sought an extension of the Debtors' exclusive right to file a plan through and including the ninetieth day after a final order is issued in the estimation hearing, and an extension of the Debtors' exclusive right to solicit acceptances to that plan through and including a period of an additional sixty days thereafter.[64]  The Debtors argued that "cause" existed to grant the ninth motion because they have made "substantial progress toward confirmation of a plan" and continue to have ongoing "negotiations" between all the parties in interest.[65]  But the truth was that no such progress had occurred and no such global negotiations had taken place.[66]

At the hearing on December 19, 2005, the Bankruptcy Court extended the Debtors' exclusivity until February 21, 2006 and indicated that, if a consensual agreement was not reached by the February 21, 2006 hearing, the Bankruptcy Court would appoint someone to assist in the negotiation process.[67]

---

[62] R-481; R-483; R-484.

[63] R-510 at 207; R-553 at 134, lines 15-16.  A copy of the Debtors' ninth motion to extend exclusivity is attached as Exhibit 3 to the Appellants' Record Excerpts and is also available in the Record at R-1852.

[64] Record Excerpt, Exh. 3.

[65] Id. at A-63 and A-64.

[66] R-1877 at Exh. A.

[67] R-1957 at 110-11.

## VII.    The Plan Amendments That Were Not to Be.

On February 13, 2006, the Debtors filed a Status Report on the Progress of the Case (the "Status Report").[68]  Therein, the Debtors indicated that they have "been hard at work to address the Court's concerns with the plan on file."[69]  Critically, they further stated that they are "ready to file (if necessary) an amended plan that removes the cap on personal injury claims and puts equity at risk."[70]  Thus, not only did the Debtors delay three years in filing a plan, they further delayed over a year and a half before recognizing the obvious truth, namely that their Plan was not confirmable.  The Debtors also stated that they are "preparing amendments that could be used in the event that agreement is reached with the personal injury claimants."[71]  Despite these statements, the Debtors have not filed any amendments or a confirmable plan.  Finally, the Status Report proposed that a mediator be appointed in order to move the parties toward resolution.[72]

## VIII.    The Plan Mediation.

The Asbestos Constituents were heartened by the proposal to remove the cap, the preparation of an amended plan, and the request for a mediator.  Thus, on February 21, 2006, with no objection from the Asbestos Constituents, the Bankruptcy Court extended the Debtors' exclusive periods by sixty days so the parties could commence plan mediation.[73]  The Honorable Sam C. Pointer, Jr. (Ret.) was appointed as the plan mediator.[74]

---

[68] A copy of the Debtors' Status Report is attached as Exhibit 4 to the Appellants' Record Excerpts and is also available in the Record at R-2036.

[69] Record Excerpt, Exh. 4 at A-84.

[70] Id. at A-85.

[71] Id.

[72] Id.

[73] R-2125; R-2081.

[74] R-2125.

The mediation, however, was unsuccessful, at least in terms of reaching consensus with the Debtors.  On June 19, 2006, the Debtors informed the Bankruptcy Court that there no longer appeared "to be any foothold for moving forward with any further [mediation] discussions."[75]

While the Debtors could not reach agreement with their Asbestos Constituents, even with the benefit of a mediator, the Asbestos Constituents were able to reach agreement among themselves for the allocation of distributions between personal injury claimants and property damage claimants, as well as an agreement within the PD Committee concerning the allocation of distributions under a plan between traditional property damage claimants and ZAI claimants.[76]  These asbestos agreements are extremely significant in that they serve as the basis of a consensual plan among the Asbestos Constituents, which resolves, among other things, the potential massive liability posed by the ZAI claims.  The Asbestos Constituents, of course, are unable to file a plan of reorganization while the Debtors retain exclusivity.  The Debtors' reaction to that critical step in the formulation of a confirmable plan of reorganization was to launch yet more litigation by propounding discovery on the Asbestos Constituents, seeking to penetrate the interaction among them relating to the agreement and to decry the agreement as illicit and unenforceable.[77]

## IX.    Yet Another Extension of Exclusivity.

The Debtors' ninth motion for an extension was finally argued before the Bankruptcy Court on September 11, 2006.[78]  At that hearing, the Asbestos Constituents argued that under the

---

[75] R-2232 at 4, lines 21-22.

[76] Id. at 23-24.

[77] R-2339; R-2371; CD-52.

[78] Excerpts from the Bankruptcy Court's September 11, 2006 hearing transcript are attached as Exhibit 5 to the Appellants' Record Excerpts and are also available in the Record at R-2390.  See Record Excerpt, Exh. 5 at A-106 to A-209.

Debtors' current timeline, a confirmation hearing on the Debtors' Plan cannot occur until at least 2008.[79]  Moreover, the Asbestos Constituents argued that the Debtors' Plan presents a Hobson's Choice:  If the Bankruptcy Court estimates the Asbestos Liabilities in an amount above the cap, the asbestos claimants can vote on a Plan that makes no provision for full payment to them; alternatively, if the Bankruptcy Court estimates the Asbestos Liabilities in an amount below the cap, the Debtors' Plan improperly characterizes asbestos claimants as unimpaired and not entitled to vote.[80]

The Bankruptcy Court nonetheless decided to extend the Debtors' exclusivity through July 2007.[81]  The Bankruptcy Court concluded that the Debtors had shown that they can "propose a plan that is feasible and within a reasonable time."[82]  In reaching this conclusion, the Bankruptcy Court reasoned that "[a]t this point in this case it is more important for all parties to focus their efforts on resolving the outstanding issues, than in creating additional fees and expenses for the estate by requiring the filing or redoing or doing of competing plans."[83]

## X.    "Oh Thank Heaven For Chapter 11."

While asbestos creditors have been stymied during the Debtors' bankruptcy, the Debtors have not only enjoyed a more than five year respite from defending against approximately 118,000 asbestos lawsuits, but it has also been "business as usual" for the Debtors, or maybe better than usual.  The Debtors' cash position is such that they do not currently need to borrow any funds for working capital or other cash needs.  As of September 30, 2006, the Debtors had

---

[79] Record Excerpt, Exh. 5 at A-142 to A-143.

[80] Id.

[81] Id. at A-206 to A-209; Record Excerpt, Exh. 1.

[82] Id. at A-208, lines 6-7.

[83] Id. at A-208, lines 11-15.

nearly $453.7 million in available cash and cash equivalents.[84]  During the Debtors' bankruptcy, their revenues have progressively increased from approximately $1.7 billion in 2001 to over $2.6 billion (annualized) in 2006.[85]  Further, during the course of the bankruptcy, the Debtors have bought and sold whole business segments.[86]

Moreover, the Debtors have also been allowed to indulge officers and employees with hugely favorable incentive plans which do not require that the Debtors emerge from bankruptcy by any specified date.  For example, the Debtors have obtained approval of long term incentive compensation programs ("LTIPs") for their executives.  Estimated payouts under LTIPs covering the years 2001-2003 and 2002-2004 totaled $23.6 million.[87]

The Debtors also sought and obtained approval of hefty retention bonuses for the Debtors' former Chief Executive Officer, Paul J. Norris, entitling him to well over a million dollars.[88]  Upon Mr. Norris's resignation as the Debtors' CEO, the Debtors sought and received approval of an annual salary of $425,000 to Mr. Norris as a part-time consultant.[89]  The Debtors also sought and obtained approval of substantial retention and other bonuses for the Debtors' current CEO, Alfred E. Festa.[90]  Indeed, in addition to Mr. Festa's entitlement to annual bonuses totaling 100% of his base salary, Mr. Festa is expected to receive $1,690,000 through his

---

[84] W.R. Grace & Co., SEC Form 10-Q, Quarterly Period ended September 30, 2006, at I-4.

[85] *Grace Reports Fourth Quarter Operating Results; Operating Up 32%, Sales Up 9% Over Prior Year Fourth Quarter*, PRNewswire-FirstCall, January 29, 2001, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=112313&p=irol-newsArticle&ID=252773&highlight=; *Grace Reports First Quarter Financial Results*, Business Wire, April 25, 2006, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=112313&p=irol-newsArticle&ID=847515&highlight=.

[86] R-87; R-124; R-344; R-500; R-504; R-534; R-2161; R-2188; R-2199.

[87] R-22; R-193; R-224; R-225; R-306; R-462; R-464; R-485; R-2229; R-2281.

[88] R-205; R-217.

[89] R-434; R-447.

[90] R-434; R-447.

participation in the 2005-2007 LTIP, and in excess of an additional $1.5 million for remaining as CEO for three years while the Debtors' Plan merely is on file.[91]  The Debtors also sought and obtained authority to remunerate their former General Counsel and Chief Restructuring Officer, David B. Siegel, who will receive $450,000 as a part-time consultant.[92]  Under those agreements, each of the former officers is paid a fixed sum and is economically indifferent to when or whether the Debtors actually reorganize.

## XI.    The Debtors and Their Officers Get Indicted During the Bankruptcy Case.

In February 2005, a federal grand jury indicted the Debtors and several of their current and former senior executives for pre- and post-petition acts, including misrepresenting the asbestos dangers associated with the Debtors' vermiculite mine in Libby, Montana to the Federal Government, industrial customers, workers and the public.  Of the 8,000 people who live in Libby and the surrounding valley, more than 1,500 have asserted that they have asbestos-related diseases.[93]  Victim's groups say more than 250 people have died, counting a small-number of disease-related suicides.[94]

The federal indictment also related to the withholding of important information from the Federal Government in respect of asbestos contamination of ZAI, as well as the Debtors' misrepresentations to the EPA regarding ZAI in its efforts to escape public health warnings about ZAI.  The indictment concerns activities both before and after the commencement of the bankruptcy.[95]  Additionally, on June 1, 2005, the New Jersey Attorney General filed a civil

---

[91] R-434 ¶¶ 11-12; A-447.

[92] R-453.

[93] Michael Riley, *Asbestos' Grip.  Years After Mining Left Libby, Mont., Hundreds Have Died.  Diagnoses Keep Coming*, Denver Post, Nov. 19, 2006, *available at* http://www.denverpost.com/search/ci_4685960.

[94] Id.

[95] R-351; R-354; R-376; R-429.

complaint against the Debtors and two former executives alleging that they falsified documents to state environmental authorities.[96]  The foregoing has triggered costly indemnity and defense obligations for current and former officers of the Debtors, in addition to the attendant defense costs for the Debtors themselves.[97]

## XII.    The Asbestos Committees Recover $1.2 Billion for the Estate Over the Debtors' Objections.

Remarkably, when the Debtors had the opportunity to create more value for their creditors in the course of the bankruptcy they chose not to do so as it did not advance the Debtors' larger litigation agenda.  Specifically, early in the bankruptcy case, the Debtors refused to prosecute and even opposed bringing fraudulent transfer actions against Sealed Air Corporation and Fresenius Medical Care, Inc.[98]  District Judge Wolin thus authorized the ACC and PD Committee to prosecute the actions.[99]  Rather than watch from the sidelines, the Debtors actually intervened in the actions as a party defendant and actively defended against the actions.[100]  Ultimately, those actions were settled.  By those settlements, Sealed Air and Fresenius agreed to pay to the Debtors cash and securities with a current aggregate value of approximately $1.2 billion.[101]  Ironically, economically speaking, the Debtors' Plan does little more than re-circulate the Sealed Air and Fresenius settlement proceeds.[102]  Thus, while the Debtors' Plan provides for a total (and inadequate) asbestos payment of $1.6 billion,[103] $1.2

---

[96] CD-42; R-1981 at 172-188.

[97] R-2320; R-2350.

[98] R-19; R-122; R-123; R-3220.

[99] R-116.

[100] R-3227; R-3231; R-3233; R-3244-46; R-3257; R-3270; R-3276; R-3280; R-3281; R-3287.

[101] R-238; CD-40.

[102] See Record Excerpt, Exh. 2 at A-24 to A-25 § 7.2.2 and at A-30 §§ 7.6.1(r), (t), (u).

[103] See id. at A-30 §§ 7.6.1(v) and (w).

billion of that money is there solely because of the ACC and PD Committee's prosecution of the Sealed Air and Fresenius cases in the face of the Debtors' active resistance to those lawsuits.

## XIII.  No End in Sight.

Some five and a half years after the commencement of the bankruptcy cases, little has changed.  The Debtors have only been able to reach consensus with the commercial creditors and equity holders by agreeing to give each constituency something to which it would not be entitled if the Debtors are insolvent, as the Asbestos Constituents argue, and the Debtors' Plan continues to sit collecting dust as it remains unconfirmable.[104]  Nonetheless, and notwithstanding the Bankruptcy Court's own misgivings about the Debtors' Plan,[105] by virtue of the Bankruptcy Court's latest order extending exclusivity, from which the Asbestos Constituents take this appeal, the Debtors have been granted the exclusive right to continue to promote their ill-conceived and non-confirmable Plan at least until July 2007.[106]

## ARGUMENT

## I.    Legal Standard For Extensions Of A Debtor's Exclusive Periods To File A Plan Of Reorganization And Solicit Acceptances Thereto.

### A.    The Keystones of Section 1121 of the Bankruptcy Code.

Section 1121(a) of the Bankruptcy Code permits a debtor to file a plan of reorganization at any time during the chapter 11 case.  However, section 1121(b) gives the debtor the exclusive right to file a plan during the 120-day period after the start of the bankruptcy.  11 U.S.C. § 1121(b).  If the debtor files a plan during this 120-day period, section 1121(c)(3) grants the

---

[104] While the Debtors now conveniently use the (ill-conceived) estimation and claims objection proceedings as justification for further extensions of exclusivity, it should be noted that it took the Debtors more than four years to ramp up those proceedings.  See Record Excerpt, Exh. 5 at A-128 to A-134, A-174 to A-175.

[105] R-431 at 62, 66; R-477 at 60, 75, 82-84, 88; R-1957 at 37-39, 45-73, 104; R-2036 at 6-7.

[106] Record Excerpt, Exh. 1.

debtor an additional 60 days (for a total of 180 days or six months) to solicit acceptances of the plan. 11 U.S.C. § 1121(c)(3).

Section 1121(d) provides that the court "may" reduce or increase the 120-day or 180-day exclusive periods if it can be shown that "cause" exists for the granting of such reduction or extension. 11 U.S.C. § 1121(d). The use of the term "may" instead of "shall" gives the bankruptcy court discretion in deciding whether to extend the exclusivity periods even when the legal requirement of "cause" is found. In re Sharon Steel Corp., 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) (stating same). Thus, as used in section 1121, these terms converge to produce two undisputed principles: if a debtor does not meet its burden of demonstrating "cause," then the court must deny the request for an extension; however, if the court does find "cause," then it "may," in the exercise of its discretion, but does not have to, grant the request.

By requiring an affirmative showing of cause, "Congress intended to create a balance so as to protect the right of a debtor in possession to propose and obtain the requisite consents to its plan of reorganization while at the same time protecting creditors from abuse of chapter 11 by a debtor unwilling to negotiate in good faith with creditors." In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). In assessing whether cause exists, "[t]he bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." In re Washington-St. Tammany Elec. Coop., Inc., 97 B.R. 852, 855 (E.D. La. 1989) (citing United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 372 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988)).

Congress has taken steps in recent years to ensure that this balance is not upset by the willingness of bankruptcy courts to accede to a debtor's demands for serial, and unwarranted, extensions of exclusivity.  First, in 1994, Congress amended the Judicial Code to give parties an immediate right of appeal of exclusivity orders, even though such orders are interlocutory. 28 U.S.C. § 158(a)(2).  Congress took this action because "there was a perceived abuse in the practice of some courts routinely extending exclusivity without requiring proof of cause, in circumstances that were effectively unreviewable due to the difficulty of obtaining leave to appeal."  In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. at 449.  The House Committee explained that this change permitted parties who felt they were harmed by such orders to obtain immediate recourse with the district court.  See 140 Cong. Rec. H10,752, H10,764 (daily ed. Oct. 4, 1994).  The House Committee noted further:  "The Committee intends that the district court carefully consider the circumstances of each case so appealed with a view to encouraging a fair and equitable resolution of the bankruptcy."  Id.

Second, although not applicable to the Debtors' cases, which were filed in 2001, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amends section 1121(d) of the Bankruptcy Code and provides that a debtor's exclusive periods to file a plan and solicit acceptances may not be extended beyond a total of 18 months and 20 months, respectively.  This change "curtail[ed] the debtor's control and the judge's discretion in extending the debtor's exclusive periods . . . by imposing strict limits for extension of both the 120-day and the 180-day periods."[107]  This change was again in response to perceived abuse by courts routinely extending exclusivity notwithstanding the requirement of cause.  Although not controlling here, this amendment expresses a clear policy of Congress against prolonged or unjustified extensions of

---

[107] 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 1121.LH[4] (15th ed. revised 2006).

exclusivity.  If the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 applied in the Debtors' cases, exclusivity would have terminated, by law, in 2002, i.e., four years ago, and a plan would have been confirmed in short order or the Debtors' bankruptcy cases dismissed.

**B.    A Debtor Has A Heavy And Increasing Burden To Establish "Cause" For Extending The Exclusive Periods.**

The debtor bears the burden of demonstrating the existence of good cause warranting extensions of exclusivity.  In re Newark Airport/Hotel LP, 156 B.R. 444, 451 (Bankr. D.N.J.), aff'd, FGH Realty Credit Corp. v. New Airport/Hotel LP, 155 B.R. 93 (D.N.J. 1993).   In considering that burden, courts may not grant extension requests "routinely" or "cavalierly."  In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (stating same).  Unsupported allegations are insufficient to allow such extensions.  In re Parker St. Florist & Garden Ctr., Inc., 31 B.R. 206, 206 (Bankr. D. Mass.).  Rather, section 1121(d) "requires that an affirmative showing of cause, supported by evidence, be made by the party seeking the extension . . . of time."  Id. (citations omitted) (alteration in original).

Understandably, and especially relevant here in view of the nine extensions of exclusivity over the past five and a half years, the "Debtor[s'] burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts."  In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997).  Concomitantly, the "creditor's burden to terminate gets lighter with the passage of time."  Id.

**C.    Termination of the Debtors' Exclusivity Periods Benefits All Parties.**

Termination of exclusivity does not affect a debtor's concurrent right to pursue confirmation of its own plan.  See, e.g., In re Tony Downs Food Co., 34 B.R. 405, 408 (Bankr. Minn. 1983).  In fact, it is recognized that termination of exclusivity and the filing of competing plans serve as catalysts for compromise and resolution of differences.  In re Pub. Serv. Co. of

29

New Hampshire, 99 B.R. 155, 176 (Bankr. D.N.H. 1989) (same); In re Texaco, 81 B.R. 806, 808-809 (Bankr. S.D.N.Y. 1988) (same); In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 133 (D.N.J. 1995) (competing plans create a meaningful discourse among the various parties-in-interest, which weeds out unfavorable plans and lead to the best possible result for all concerned parties).

The positive dynamic engendered by competing plans has been embraced by the Third Circuit:  "The ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals.  A broad exclusivity provision, holding that only the debtor's plan may be 'on the table,' takes this tool from creditors."  Century Grove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 102 (3d Cir. 1988); see also In re Rook Broad. of Idaho, Inc., 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ("It is in the interest of creditors that they have a choice between competing plans.").

**D.    Factors Considered by the Courts When Ruling on Exclusivity Extension Motions.**

In deciding whether or not "cause" exists, some courts focus on the paramount factor of whether extending or terminating the debtor's exclusivity would facilitate moving the case forward.  Dow Corning, 208 B.R. at 670.  Other courts, however, consider a series of individual factors, which when taken together lead back to the question of whether granting or denying the extension motion will facilitate a timely exit from bankruptcy.  In re Central Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); McLean Indus., Inc., 87 B.R. at 834; In re Express One Int'l, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).  These factors are: (i) the existence of good faith progress toward reorganization; (ii) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (iii) whether the debtor has made progress negotiating with creditors; (iv) whether the debtor is seeking an extension to pressure creditors;

(v) the length of time a case has been pending; (vi) the necessity of sufficient time to negotiate and prepare adequate information; (vii) whether the debtor is paying its debts as they become due; and (viii) whether or not unresolved contingencies exist.  Central Jersey Airport Servs., LLC, 282 B.R. at 184.

## II.    The Bankruptcy Court Erred In Holding That "Cause" Existed To Extend The Debtors' Exclusive Periods.

Applying the factors discussed above, the Asbestos Constituents respectfully submit that the Bankruptcy Court erred in holding that there was "cause" for granting the Debtors' ninth motion for extension of exclusivity:

### A.    The Debtors Have Not Demonstrated the Existence of Good Faith Progress Toward Filing A Confirmable Plan.

The Debtors have failed to demonstrate that they have made any progress toward filing a confirmable plan.  This is because the Debtors have chosen instead to use bankruptcy as a new venue to re-engineer thirty years of largely unfavorable tort litigation in state and federal courts. Despite the passage of years during which the Debtors could have negotiated with the Asbestos Constituents, it was only in November 2004, and then only after the Bankruptcy Court issued its mandate, that the Debtors filed their ill-conceived and divisive plan.  Even the Debtors' promise to amend their Plan to eliminate the asbestos cap and put "equity at risk," as set forth in the Debtors' February 2006 Status Report, has proved to be an empty one.[108]  See generally In re Am. Fed'n of Television and Radio Artists, 30 B.R. 772, 774 (Bankr. S.D.N.Y. 1983) (cause for extension of a debtor's exclusive periods does not exist where the debtor has made no showing that it can successfully reorganize if the exclusive periods are extended).

---

[108] Record Excerpt, Exh. 4.

**B.      The Debtors' Existing Plan is Patently Unconfirmable.**

Buttressing the lack of good faith progress toward filing a confirmable plan, the Debtors' Plan, as currently configured, is non-confirmable.[109]   First, as noted, the Debtors' Plan improperly seeks, for distribution purposes, to cap the Debtors' present and future Asbestos Liabilities.[110]   However, one of the requirements of a section 524(g) injunction (requested by the Debtors) is that the Bankruptcy Court find that the actual amounts, numbers, and timing of future demands cannot be determined.   11 U.S.C. § 524(g)(2)(B)(ii)(II) (same).   Thus, absent consent, an estimation of Asbestos Liabilities cannot be final for distribution purposes and may not serve as a cap on Asbestos Liabilities channeled to a 524(g) trust.

Second, the Debtors' Plan purports not to impair asbestos claims.[111]   Under the Debtors' Plan, however, asbestos claimants will not receive full payment of their claims, in cash, on the effective date.   Rather, the Debtors' Plan proposes to channel asbestos claims to the 524(g) trust, which is required to evaluate and challenge claims under eligibility criteria set forth in trust distribution procedures.   This process could take months or years, a delay that constitutes impairment under section 1124(1) of the Bankruptcy Code.   See, e.g., In re Applied Safety, Inc., 200 B.R. 576, 588 (Bankr. E.D. Pa. 1996) (claim was impaired because plan required creditor to accept payment of claim under a termination agreement, regardless of any valid defenses or causes of action the creditor had to rescind or invalidate that agreement).

Third, based on the false premise of unimpairment, the Debtors' Plan goes on to provide that such claims will therefore be "conclusively presumed to have accepted the Plan" under

---

[109] See generally R-431.

[110] Record Excerpt, Exh. 2 at A-30 §§ 7.6.1(v) and (w).

[111] Id. at A-11 to A-18 § 3.1 and at A-23 § 6.3; R-418 at 4-5, 6-7, 47-49.

11 U.S.C. § 1126(f) and, accordingly, cannot vote against the Plan.[112]  But even if the holders of asbestos claims are unimpaired under the Plan – they are not – section 524(g) of the Bankruptcy Code requires that "a separate class or classes of the claimants whose claims are to be addressed by a trust . . . votes, by at least 75% of those voting, in favor of the plan."  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Thus, section 524(g) requires an affirmative vote on the Debtors' Plan by the Asbestos Constituents.  See Walker v. Celotex Corp. (In re Hillsborough Holdings Corp.), 197 B.R. 372, 378-79 (Bankr. M.D. Fla. 1996) (rejecting the contention that the 75% voting requirement is dispensable).[113]

In the face of these realities it is untenable that the Debtors cling to an unacceptable, unconfirmable plan.  For this reason alone, exclusivity should be terminated.

### C.    The Debtors Have Not Made Any Progress Negotiating with the Asbestos Constituents.

There can be no dispute that the Debtors have made any progress in their negotiations with the Asbestos Constituents.  At the conclusion of the mediation in June 2006, the Debtors admitted as much, stating that that there did not appear "to be any foothold for moving forward with any further [mediation] discussions."[114]  Moreover, the fact and the contours of the estimation proceedings are testimony to the fact that the Debtors have chosen to litigate rather than negotiate with the Asbestos Constituents.[115]

---

[112] Id.

[113] See also H.R. Rep. 103-835, 103d Cong., 2d Sess. (Oct. 4, 1994) ("[I]n order for present claimants to be bound by a trust/injunction . . . a separate creditor class [must] be established for those with present claims, which must vote by a 75% margin to approve the plan.").

[114] R-2232 at 4, lines 21-22.

[115] Congress has recognized that extensions of exclusivity should not be granted when the debtor is trying to use the extension as a tactical device to put pressure on parties in interest to yield to a plan they believe is unsatisfactory; some showing of probable success must attend any request for an exclusivity extension. See S. Rep. No. 989, 95th Cong., 2d Sess. 118 (1978).  See also In re Texas Extrusion Corp., 844 F.2d

**D.    The Debtors' Repeated Extensions of the Exclusive Periods Are Holding the Asbestos Constituents Hostage to the Bankruptcy Process.**

For five and a half years, the Asbestos Constituents have been unable to pursue their claims against the Debtors.  This has real-world consequences for individuals who are suffering from often fatal asbestos-related diseases.  This is in stark contrast to trade creditors who can sell their claims in a secondary trading market rather than awaiting the outcome of the bankruptcy.  Indeed, as the Federal Rules of Bankruptcy Procedure require notice of traded claims, the record more than amply reflects the huge volume of claims trading in the Debtors' bankruptcy cases.[116]  Similarly, equity holders are free to sell their securities in the stock market.  However, asbestos claimants, whose claims are both unliquidated and disputed by the Debtors, have no such luxury.[117]  Thus, the asbestos claimants alone are the quintessential financial hostages in this bankruptcy.  The Debtors have hoped to use this considerable leverage to force agreement on a plan that pays asbestos claimants less than they would have been paid absent the bankruptcy of this family of companies.  At some point, however, a point that undoubtedly has been reached in this case, the "leverage accorded to the debtor by the period of exclusivity must give way to the legitimate interests of other parties in interest so that progress toward an effective reorganization of the debtor" can be attained.  In re Sharon Steel Corp., 78 B.R. 762, 766 (Bankr. W.D. Pa. 1987).

---

1142 (5th Cir.) (debtor's delay tactics are grounds for reduction of exclusivity), cert. denied, 488 U.S. 926 (1988).

[116] See, e.g., R-2396 through R-3219.  An example of a Notice of Transfer of Claim Pursuant to FRBP Rule 3001(e)(2) is attached as Exhibit 6 to the Appellants' Record Excerpts and is also available in the Record at R-2865.

[117] A dramatic example of how asbestos creditors are relatively disadvantaged by the pendency of this bankruptcy is that asbestos personal injury claimants who are facing death are not permitted to preserve their own testimony.  R-309; R-317; R-318; R-3355; R-3368-3370.

**E.    After More Than Five and a Half Years, the Debtors Have Had More Than Sufficient Time to Negotiate a Consensual, Confirmable Plan.**

The Asbestos Constituents do not dispute that there have been delays in the bankruptcy for which the Debtors cannot be held responsible, such as the halt of all proceedings when the recusal of Judge Wolin was before the Third Circuit, but those delays pale when viewed in the context that these chapter 11 cases have been pending since April 2001. The reality is that many of the same delays were suffered by other asbestos debtors who have long since reorganized. The Debtors have had more than enough time to try to reach a consensual plan if they were so inclined. The Debtors' failings in this regard are assuredly not for lack of resources. To date, they have spent in excess of $125 million in professional fees and expenses, a huge sum that could have at least partially bridged the chasm between "the bid and the ask" in this case.[118] The time has come to terminate the Debtors' exclusive periods and permit the filing of competing plans, if for no other reason than to reduce the burn of cash and other resources that would be better spent on distributions to creditors.

**F.    The Size and Complexity of the Chapter 11 Case Alone Does Not Provide "Cause" for an Extension of the Debtors' Exclusive Periods.**

The Asbestos Constituents do not dispute that the Debtors' chapter 11 cases are large and complex, but in this era of mega-bankruptcy cases the Debtors' bankruptcy hardly approaches the size or complexity of many others that have come and gone since this case began, such as Enron and WorldCom. Indeed, size and complexity alone do not provide cause for an extension of the Debtors' exclusive periods. See In re Pub. Serv. Co. of New Hampshire, 88 B.R. 521, 537 (Bankr. D.N.H. 1988) (stating same); In re Curry Corp., 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (same). Rather, that factor "must be accompanied by factors such as the likelihood of

---

[118] R-2320; R-2350.

agreement on a consensual plan if [the] debtor remains in control, the absence of alternative creditor plans which cannot be filed because of the debtor's exclusive right to propose and confirm a plan, and a showing that the debtor is not using exclusivity to force on its creditors its view of an appropriate plan." In re Express One Int'l, 194 B.R. at 100-101. See also In re Washington-St. Tammany Elec. Coop., Inc., 97 B.R. at 854-55 (same).[119]   None of these additional factors are present here.

### G.    The Unresolved Contingencies That Exist in the Debtors' Chapter 11 Cases Do Not Support An Extension of Exclusivity.

The only significant unresolved contingencies in the Debtors' bankruptcy cases that bear on reorganization are the Debtors' unliquidated liabilities for claims such as the asbestos claims. Those contingencies, however, do not have to be resolved before competing plans of reorganization can be filed.   Indeed, the Bankruptcy Court undertook the estimation of the Asbestos Liabilities as a means of determining the feasibility of any filed plan of reorganization, not the allowance of any individual asbestos claim, the latter being left to the 524(g) trust that accepts the legal liability for those claims.   Any competing plan can simply take into consideration the possible outcomes of the Asbestos Liabilities estimation and any litigation involving other unliquidated and disputed claims.   In re Parker St. Florist & Garden Ctr., Inc., 31 B.R. at 208 (stating same and refusing to extend a debtor's exclusive period).   Thus, a

---

[119] If size and complexity alone were sufficient to find cause, then debtors in complex cases would have an unlimited right to exclusivity and section 1121(d) would be rendered meaningless in complex cases. Clearly this is not the case because requests for an extension of a debtor's exclusive periods have been denied in other large and complex asbestos bankruptcy cases.  See, e.g., In re Federal-Mogul Global Inc., Case No. 01-10578 (Bankr. D. Del.) (chapter 11 case filed in October 2001 and exclusive periods terminated in October 2003); In re Babcock & Wilcox Co., Case No. 00-10992 (Bankr. E.D. La.) (chapter 11 case filed in February 2000 and exclusive periods terminated in May 2002); In re U.S. Minerals Products Co., Case No. 01-2471 (Bankr. D. Del.) (chapter 11 case filed in July 2001 and exclusive periods terminated in December 2003); In re Congoleum Corporation, et al., Case No. 03-51524 (Bankr. D.N.J.) (chapter 11 case filed in December 2003 and exclusive periods terminated in November 2005).

competing plan could be filed now, the disclosures approved by the Bankruptcy Court and voted upon, all before the estimation hearings are commenced. This would allow for an exit from bankruptcy in 2007, not some far distant date that comports with the Debtors' campaign of delay.

### H. The Debtors Have Prospered in Bankruptcy and Have No Incentive to Reorganize and Their Businesses Will Not Suffer If Exclusivity is Terminated.

It cannot be disputed that the Debtors have prospered as a result of these bankruptcy proceedings. The Debtors have bought and sold business components, granted rich compensation and benefit packages to all levels of those in their employ, given lucrative consultancy packages to highly paid executives upon retirement who have failed to advance this case to reorganization, and accumulated so much cash that the Debtors have not even had to borrow from their debtor-in-possession credit facilities. And during this time, no creditor, including any of the asbestos claimants, can prosecute their claims against the Debtors because of the automatic stay. With such benefits of bankruptcy, it is plain why the Debtors are eager to delay their exit from bankruptcy.

The Debtors argued to the Bankruptcy Court that because the termination of exclusivity is rare in complex chapter 11 asbestos cases (it is not), the "very act of doing so will send alarm bells throughout the marketplace," but this Court should not be guided by what is best for equity over the interests of creditors. The Bankruptcy Code requires that the interests of equityholders take a back seat to creditors who have not been paid in full. See 11 U.S.C. § 1129(b)(2)(B)(ii). Moreover, in the last four years, bankruptcy courts have terminated a debtor's exclusive periods in at least four asbestos-related bankruptcy cases, all without alarm bells going off. See, e.g., Federal-Mogul Global Inc., Babcock & Wilcox Co., U.S. Minerals Products Co., and Congoleum Corp.

The Debtors' parade of horribles of what follows from the termination of exclusivity, such as the loss of customers and the negative impact on employees, is make-weight. This is demonstrated by the fact that the Debtors have prospered in the face of numerous adverse events, next to which termination of exclusivity pales into insignificance.[120] In truth, the Debtors' customers and employees ought to be looking forward to the Debtors' emergence from bankruptcy and encouraged by the fact that exclusivity has been terminated to facilitate an earlier exit strategy than what is currently on the horizon. Surely, if the Debtors have weathered the indictment of the companies, as well as past and present officers, without the loss of customer or employee confidence, the enhanced prospect of reorganization could hardly be negative. Moreover, in the final analysis, the risk of the foregoing is actually going to be borne by asbestos claimants who will undoubtedly own a portion of the reorganized companies as contemplated under section 524(g) of the Bankruptcy Code. See 11 U.S.C. § 524(g)(2)(B)(2)(B)(i)(III).

---

[120] For example, in November 2000, W.R. Grace announced it would be unable to file its next quarterly financial statements on time. In April 2001, the Debtors filed for bankruptcy and announced they would be unable to file their 2000 financial statements timely. In December 2002, partial summary judgment was granted in favor of the government against the Debtors for recovery of cleanup costs related to previously operated vermiculite mining and processing sites near Libby, Montana. In March 2003, the Debtors' former chief executive J.P. Bolduc agreed to settle Securities and Exchange Commission ("SEC") fraud charges. In August 2003, two former executives agreed to cease-and-desist orders from the SEC related to fraudulent earnings reporting in the 1990s. In August 2003, the Federal District Court in Missoula, Montana ordered repayment to the government of $54.5 million for the investigation and cleaning of Libby, Montana. In March 2004, the Bankruptcy Court stated that it was close to considering the appointment of a trustee to oversee the Debtors' chapter 11 cases. In August 2004, the Debtors restated their 2003 financial results. In November 2004, the Debtors announced that CEO Paul Norris was to retire effective May 31, 2005. In February 2005, the Debtors and seven executives were indicted by the United States for federal crimes arising out of the Debtors' Libby, Montana operations. And in June 2005, the New Jersey Attorney General filed suit against the Debtors and two former company executives for falsely certifying that any hazardous asbestos contamination at the company's Hamilton Township plan had been cleaned up in accordance with state requirements. See R-481.

## CONCLUSION

This chapter 11 case is old with no end in sight.  Court-ordered mediation has failed to advance a debtor-sponsored, consensual plan.  It is clear to all that the Debtors' Plan cannot be confirmed – it is there to force asbestos creditors to take less than they are owed so that existing shareholders reap a windfall.  To the objective observer, there can be little doubt that asbestos creditors are being held hostage.  While the Debtors continue to promote their own agenda in chapter 11:  holders of unsecured commercial claims can sell their claims into a liquid market - they do not have to wait to get paid; equity shares are traded daily on the New York Stock Exchange -  the shareholders do not have to wait to liquidate their interests; and senior management is handsomely rewarded for their efforts and has no financial incentive to exit chapter 11.

Yet, the real victims of the Debtors' past conduct, those claimants who have been exposed to the Debtors' asbestos-containing products must wait.  They have been paid nothing since the petition date in 2001 and, if the Debtors have it their way, will not see any payment anytime soon.  This cannot be what Congress intended when it limited a debtor's exclusive periods to six-months and required an affirmative showing of cause before any extension, let alone a ninth extension, would be granted.

The Asbestos Constituents endured those nine extensions of exclusivity, spanning a period of more than five and a half years before they concluded that the situation had become intolerable.  Despite the Debtors' persistent denials which bespeak thirty years of litigation experience, people are dying as a result of products manufactured by these Debtors and buildings remain where those products are still on the premises.  In contrast, the relief sought by the Asbestos Constituents here is benign.  All we seek is the opportunity to file a plan of reorganization that is not encumbered by false limitations and classifications designed solely to

attain an unjust result; a plan which provides that all creditors that are functionally and legally impaired are able to vote for or against it, and which adheres to the rule of absolute priorities.

In sum, for the reasons set forth above, the Bankruptcy Court erred in concluding that "cause" existed for a ninth extension of the Debtors' exclusive periods. Further, while this Court need not reach these issues, it is also apparent for the same reasons, that the Bankruptcy Court's findings of fact are clearly erroneous and that the Bankruptcy Court abused its discretion.

Accordingly, the Asbestos Constituents respectfully submit that this Court (i) grant the motion for expedited review of this appeal (filed contemporaneously with this brief), (ii) reverse the Bankruptcy Court's Order, and (iii) enter an order terminating the Debtors' exclusive periods, thereby allowing these Debtors to exit from bankruptcy in 2007.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Roger Frankel*
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
3050 K Street, NW
Washington, DC 20007
Telephone:  (202) 339-8400

John C. Phillips, Jr. (#110)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200

*Counsel for David T. Austern,*
*Future Claimants' Representative*

CAMPBELL & LEVINE, LLC

*/s/ Mark T. Hurford*
Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
800 King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900

Elihu Inselbuch
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone:  (212) 319-7125

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW
Washington, DC 20005
Telephone:  (202) 862-5000

*Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

BILZIN SUMBERG BAENA
PRICE & AXELROD LLP

*/s/ Scott L. Baena*
Scott L. Baena
Jay M. Sakalo
Matthew Kramer
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-2336
Telephone:  (305) 374-7580

Theodore J. Tacconelli (#2678)
Lisa L. Coggins (#4234)
FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone:  (302) 575-1555

*Counsel for the Official Committee of
Asbestos Property Damage Claimants*

Dated:  December 1, 2006

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**W.R. GRACE & CO., et al.**

---

| | | |
|---|---|---|
| **Official Committee of Asbestos Personal Injury Claimants, et al.,** | ) ) ) | **Civil Action No. 06-689** |
| **Appellants,** | ) ) | |
| **v.** | ) ) | |
| **W.R. Grace & Co., et al.,** | ) ) | **Bankruptcy Case No. 01-1139** |
| **Appellees.** | ) | **Appeal No. 06-63** |

## <u>RECORD EXCERPTS IN SUPPORT OF BRIEF OF APPELLANTS</u>

Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
3050 K Street, NW
Washington, DC 20007
Telephone: (202) 339-8400

John C. Phillips, Jr. (#110)
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200

*Counsel for David T. Austern,
Future Claimants' Representative*

Elihu Inselbuch
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, DC 20005
Telephone: (202) 862-5000

Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900

*Counsel for the Official Committee of
Asbestos Personal Injury Claimants*

Scott L. Baena
Jay M. Sakalo
Matthew Kramer
Bilzin Sumberg Baena Price &
Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-2336
Telephone: (305) 374-7580

Theodore J. Tacconelli (#2678)
Lisa L. Coggins (#4234)
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555

*Counsel for the Official Committee of
Asbestos Property Damage Claimants*

Dated: December 1, 2006

## RECORD EXCERPTS IN SUPPORT OF BRIEF OF APPELLANTS

| Exhibit | Document | Page Numbers | Exhibit Number in Full Record |
|---|---|---|---|
| 1 | Order Pursuant to Bankruptcy Code Section 1121(d) Extending Debtors' Exclusive Periods in Which to File A Chapter 11 Plan and to Solicit Votes Thereon | A-1 to A-2 | 2394 |
| 2 | Amended Joint Plan of Reorganization | A-3 to A-61 | 419 |
| 3 | Debtors' Ninth Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods in Which to File A Chapter 11 Plan and to Solicit Votes Thereto | A-62 to A-78 | 1852 |
| 4 | Grace's Status Report on the Progress of the Case | A-79 to A-96 | 2036 |
| 5 | Excerpts from Bankruptcy Court Hearing Transcript on Motion to Extend Exclusivity, Honorable Judith K. Fitzgerald, September 11, 2006 | A-97 to A-210 | 2390 |
| 6 | Notice of Transfer of Claim Pursuant to FRBP Rule 3001(e)(2) | A-211 to A-212 | 2865 |

# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) |  |
|  | ) | Case no. 01-01139 (JFK) |
| W.R. GRACE & CO., *et al.*, | ) | Jointly Administered |
|  | ) | Re: Docket No. 11067 |
| Debtors | ) | 9/11/06 Agenda |
|  | ) | ~~Item No. 11067~~ |

## ORDER PURSUANT TO BANKRUPTCY CODE SECTION 1121(d) EXTENDING DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND TO SOLICIT VOTES THEREON

This matter coming before the Court on the Debtors' Ninth Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods in Which to file a Chapter 11 Plan and to Solicit Votes Thereon (the "Motion"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1134, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (c) notice of the Motion was adequate under the circumstances; and the Court having reviewed the relevant responses and objections to the Motion, having heard the arguments of Counsel and having determined that just cause has been established for the relief granted herein;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is granted.

2.    The Debtors' exclusive filing and solicitation periods for a chapter 11 plan are extended through and including the date of the Court's Omnibus Hearing in July 2007, at which time the Debtors may be heard with respect to a request for a further extension of such periods.

3.    This Order is without prejudice to any party in interest moving the Court to terminate the Debtors' exclusive periods at any time prior to the July 2007 hearing.

4.     The Court shall retain jurisdiction to hear and determine all mattes arising from or related to this Order.

Dated:  __**October 3,**_____, 2006

_Judith K. Fitzgerald_

The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

2

A-2

# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.,**[1] | ) | **Case No. 01-1139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | |

## AMENDED JOINT PLAN OF REORGANIZATION

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER BANKRUPTCY CODE §§ 105 AND 524(g) THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF W. R. GRACE & CO. AND THE ASBESTOS PROTECTED PARTIES (AS DEFINED HEREIN) INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.**

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Jonathan P. Friedland
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100

and

Bennett L. Spiegel
Lori Sinanyan
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400

- Co-Counsel for the Debtors and Debtors in Possession -

Dated: January 13, 2005

---

[1]    Debtors are defined in the Glossary.

## TABLE OF CONTENTS

**Article 1.  DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS AND ANCILLARY DOCUMENTS**...................................................................1
  1.1  Defined Terms........................................................................................1
  1.2  Other Terms/Interpretation.....................................................................1
  1.3  The Plan Documents...............................................................................2
  1.4  Ancillary Documents...............................................................................3

**Article 2.  PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS**...............................................3
  2.1  Unclassified Claims.................................................................................3
  2.2  Payment of Allowed Administrative Expense Claims................................3
  2.3  Priority Tax Claims..................................................................................4

**Article 3.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**.......................................................................4
  3.1  Summary.................................................................................................4
    3.1.1  Class 1. Priority Claims..............................................................5
    3.1.2  Class 2. Secured Claims.............................................................5
    3.1.3  Class 3. Unsecured Pass-Through Employee Related Claims........6
    3.1.4  Class 4. Workers' Compensation Claims.....................................6
    3.1.5  Class 5. Intercompany Claims.....................................................6
    3.1.6  Class 6. Asbestos PI-SE Claims..................................................7
    3.1.7  Class 7. Asbestos PI-AO Claims.................................................8
    3.1.8  Class 8. Asbestos PD Claims......................................................9
    3.1.9  Class 9. General Unsecured Claims...........................................10
    3.1.10  Class 10. Equity Interests in the Parent......................................11
    3.1.11  Class 11. Equity Interests in the Debtors other than the Parent.....11
  3.2  Effect of Asbestos PI Claimant Electing Various Options.........................11
    3.2.1  Cash-Out Option........................................................................11
    3.2.2  Litigation Option and Canadian Litigation Option.......................12
    3.2.3  Registry Option.........................................................................12

**Article 4.  MODIFICATION OR WITHDRAWAL OF THIS PLAN**.....................12
  4.1  Modification of this Plan; Amendment of Plan Documents.......................12
    4.1.1  Modification of this Plan............................................................12
    4.1.2  Amendment of Plan Documents.................................................12
  4.2  Withdrawal of this Plan..........................................................................13
    4.2.1  Right to Withdraw this Plan.......................................................13
    4.2.2  Effect of Withdrawal.................................................................13

**Article 5.  PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND ASBESTOS CLAIMS GENERALLY**.......................................13
  5.1  Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims.....................................................................................13
  5.2  Distribution on Account of Disputed Claims...........................................13

| | | |
|---|---|---|
| 5.3 | Resolution of Asbestos Claims | 14 |
| | 5.3.1 Making of an Election by Asbestos PI Claimants | 14 |
| | 5.3.2 Claims Materials for Asbestos PI Claimants | 14 |
| | 5.3.3 Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims | 15 |
| | 5.3.4 Withdrawal of Claims | 15 |

**Article 6.     ACCEPTANCE OR REJECTION OF THIS PLAN** ........ **15**

| | | |
|---|---|---|
| 6.1 | Impaired Classes to Vote | 15 |
| 6.2 | Acceptance by Impaired Classes of Claims | 15 |
| 6.3 | Presumed Acceptance of this Plan | 16 |
| 6.4 | Nonconsensual Confirmation | 16 |
| | 6.4.1 Cramdown | 16 |
| | 6.4.2 General Reservation of Rights | 16 |

**Article 7.     IMPLEMENTATION OF THIS PLAN** ........ **16**

| | | |
|---|---|---|
| 7.1 | Corporate Governance of the Parent and the Other Debtors | 16 |
| | 7.1.1 Amendment of Certificates of Incorporation or Articles of Incorporation of the Debtors | 16 |
| | 7.1.2 Amendment of By-Laws of the Parent | 17 |
| | 7.1.3 D&O and Fiduciary Liability Tail Coverage Policies | 17 |
| 7.2 | The Asbestos Trust | 17 |
| | 7.2.1 Creation of the Asbestos Trust | 17 |
| | 7.2.2 Funding of the Asbestos Trust | 17 |
| | 7.2.3 Transfer of Assets into the Asbestos Trust | 18 |
| | 7.2.4 Transfer of Claims and Demands to the Asbestos Trust | 18 |
| | 7.2.5 Creation of Asbestos Trust Sub-Accounts | 18 |
| | 7.2.6 Appointment and Termination of Trustees | 18 |
| | 7.2.7 Creation and Termination of the TAC | 19 |
| | 7.2.8 Cooperation Agreement | 19 |
| | 7.2.9 Institution and Maintenance of Legal and other Proceedings | 19 |
| 7.3 | Payments and Distributions Under this Plan | 19 |
| | 7.3.1 Asbestos Trust Payments and Plan Distributions | 19 |
| | 7.3.2 Timing of Plan Distributions | 20 |
| 7.4 | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 20 |
| | 7.4.1 Delivery by the Reorganized Debtors of Distributions in General | 20 |
| | 7.4.2 Undeliverable Distributions by the Reorganized Debtors | 20 |
| 7.5 | Payments under this Plan | 20 |
| | 7.5.1 Manner of Payments under this Plan | 20 |
| | 7.5.2 Fractional Payments under this Plan | 21 |
| 7.6 | Occurrence of the Confirmation Date | 21 |
| | 7.6.1 Findings of Fact and/or Conclusions of Law | 21 |
| | 7.6.2 Orders of this Court | 25 |
| 7.7 | Conditions to Occurrence of the Effective Date | 26 |
| 7.8 | Management of the Reorganized Debtors | 28 |
| 7.9 | Corporate Action | 28 |
| 7.10 | Effectuating Documents and Further Transactions | 28 |

| | | |
|---|---|---|
| 7.11 | Allocation of Plan Distributions Between Principal and Interest | 29 |
| 7.12 | No Successor Liability | 29 |
| 7.13 | Deemed Consolidation of the Debtors for Plan Purposes Only | 29 |

**Article 8.** **INJUNCTIONS, RELEASES & DISCHARGE** ........................................ **30**

| | | | |
|---|---|---|---|
| 8.1 | Discharge | | 30 |
| | 8.1.1 | Discharge of the Debtors and Related Discharge Injunction | 30 |
| | 8.1.2 | Discharge of Liabilities to Holders of Asbestos Claims | 30 |
| | 8.1.3 | Disallowed Claims and Disallowed Equity Interests | 31 |
| | 8.1.4 | Non-Dischargeable ERISA Liability | 31 |
| 8.2 | The Asbestos Channeling Injunction | | 31 |
| 8.3 | Asbestos Insurance Entity Injunction | | 33 |
| | 8.3.1 | Injunction | 33 |
| | 8.3.2 | Reservations from the Asbestos Insurance Entity Injunction | 34 |
| 8.4 | Released Matters Injunction | | 34 |
| | 8.4.1 | Injunction | 34 |
| | 8.4.2 | Reservations from the Released Matters Injunction | 35 |
| 8.5 | Injunctions and Releases Related to the Sealed Air Indemnified Parties and Fresenius Indemnified Parties | | 35 |
| 8.6 | Term of Certain Injunctions and Automatic Stay | | 36 |
| | 8.6.1 | Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation | 36 |
| | 8.6.2 | Injunctions Provided for in this Plan | 36 |
| 8.7 | Additional Releases and Indemnification | | 36 |
| | 8.7.1 | Representatives of the Debtors | 36 |
| | 8.7.2 | Release of Sealed Air Indemnified Parties | 37 |
| | 8.7.3 | Release of Fresenius Indemnified Parties | 37 |
| | 8.7.4 | Specific Releases by Holders of Claims or Equity Interests | 38 |
| | 8.7.5 | Approval of Sealed Air Settlement Agreement | 38 |
| | 8.7.6 | Effect of the Fresenius Settlement Agreement, the Fresenius Settlement Order, and the Sealed Air Settlement Agreement. | 38 |

**Article 9.** **EXECUTORY CONTRACTS, UNEXPIRED LEASES, GUARANTIES, AND INDEMNITY AGREEMENTS** .......................... **39**

| | | |
|---|---|---|
| 9.1 | Assumption of Executory Contracts and Unexpired Leases | 39 |
| 9.2 | Letters of Credit, Surety Bonds, Guaranties, and Certain Indemnity Agreements | 40 |
| 9.3 | Compensation and Benefits Program | 41 |

**Article 10.** **RETENTION OF JURISDICTION** ........................................ **41**

| | | |
|---|---|---|
| 10.1 | Plan Documents | 41 |
| 10.2 | Executory Contracts and Unexpired Leases | 41 |
| 10.3 | Disputed Claims Allowance/Disallowance | 42 |
| 10.4 | Enforcement/Modification of this Plan | 42 |
| 10.5 | Compensation of Professionals | 43 |
| 10.6 | Settlements | 43 |
| 10.7 | Taxes | 43 |

|       |       |                                                                                 |    |
|-------|-------|---------------------------------------------------------------------------------|----|
| 10.8  |       | Specific Purposes                                                               | 43 |
| 10.9  |       | Insurance Matters.                                                              | 43 |

**Article 11.    MISCELLANEOUS PROVISIONS** ............................................................. **43**

| 11.1  | Authority of the Debtors | 43 |
| 11.2  | Payment of Statutory Fees | 44 |
| 11.3  | Retained Causes of Action | 44 |
| 11.3.1 | Maintenance of Causes of Action | 44 |
| 11.3.2 | Preservation of Causes of Action | 44 |
| 11.3.3 | Preservation of All Causes of Action not Expressly Settled or Released | 44 |
| 11.4  | Third-Party Agreements | 45 |
| 11.5  | Purpose of the Fresenius Payment and Consistency of Treatment | 45 |
| 11.6  | Purpose of the Sealed Air Payment and Consistency of Treatment | 46 |
| 11.7  | Dissolution of the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee and the Equity Committee; Continued Retention of the Future Claimants' Representative | 47 |
| 11.8  | Exculpation | 47 |
| 11.9  | Title to Assets; Discharge of Liabilities | 48 |
| 11.10 | Notices  48 |  |
| 11.11 | Headings | 51 |
| 11.12 | Governing Law | 51 |
| 11.13 | Filing of Additional Documents | 51 |
| 11.14 | Compliance with Tax Requirements | 51 |
| 11.15 | Exemption from Transfer Taxes | 51 |
| 11.16 | Further Assurances | 51 |
| 11.17 | Further Authorizations | 52 |

W. R. Grace & Co. and the above-captioned debtors and debtors in possession (collectively, "Grace" or the "Debtors"), the Official Committee of Unsecured Creditors, and the Official Committee of Equity Security Holders (collectively, the "Plan Proponents") hereby propose the following Plan of Reorganization pursuant to the provisions of chapter 11 of title 11 of the United States Code. Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for, among other things, a discussion of the history, businesses, properties, results of operations, projections for future operations of the Debtors, and risks associated with this Plan.

## Article 1.
## DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS AND ANCILLARY DOCUMENTS

### 1.1 DEFINED TERMS

All capitalized terms used herein shall have the respective meanings specified herein or in the Glossary for this Plan listed as Exhibit 2 in the Exhibit Book, unless the context otherwise requires.

### 1.2 OTHER TERMS/INTERPRETATION

(a) Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(b) When used in this Plan, the term "Claim" shall be broadly construed to include all manner and type of Claim, whenever and wherever such Claim may arise, and shall include Asbestos PI-SE Claims, Asbestos PI-AO Claims, and Asbestos PD Claims.

(c) Any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

(d) Any reference in this Plan to an existing document or exhibit in the Exhibit Book Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified or supplemented.

(e) Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

(f) The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

(g) The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

(h) Unless otherwise indicated herein, all references to dollars are to United States dollars.

(i) An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

(j) The descriptive headings contained in this Plan are included for convenience of reference only and are not intended to be a part of and shall not affect in any way the meaning or interpretation of this Plan.

(k) All references in this Plan to sections, articles, and exhibits are references to sections, articles and exhibits of or to this Plan unless otherwise specified.

(l) Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(m)The rules of construction set forth in Bankruptcy Code § 102 shall apply.

## 1.3 THE PLAN DOCUMENTS

The Plan Documents, once Filed, shall also be available for review:

(a) in the office of the clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court;

(b) on Business Days from 9:00 a.m. through 5:00 p.m. (Eastern Time) at the following address:

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Attn: David W. Carickhoff, Jr.

(c) by download from the following website:  www.bmccorp.net/wrgrace

Holders of Claims and Equity Interests may also obtain a copy of the Plan Documents following their Filing with the Clerk of the Court by contacting counsel for the Debtors by a written request sent to the above address.

## 1.4 ANCILLARY DOCUMENTS

Each of the Plan Documents is an integral part of this Plan and is hereby incorporated by reference and made a part of this Plan.

## Article 2.
## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### 2.1 UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Article 3 of this Plan.

### 2.2 PAYMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS

Subject to the provisions of Bankruptcy Code §§ 330(a), 331, and 503, each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Administrative Expense Claim either (i) in full, in cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Administrative Expense Claim and the Reorganized Debtors or otherwise established pursuant to an order of the Bankruptcy Court; provided that (A) Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession on or after the Petition Date or assumed by the Debtors in Possession pursuant to this Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court and (B) Allowed Administrative Expense Claims of Professionals shall be paid pursuant to order of the Bankruptcy Court.

All final applications for compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Confirmation Date, and any other request for compensation by any Entity for making a substantial contribution (as described in Bankruptcy Code § 503(b)(3)(D)) in the Chapter 11 Cases (except only for Claims under 28 U.S.C. § 1930 and for fees incurred by the Clerk's Office), shall be Filed no later than ninety (90) days after the Effective Date.  Any Professional or Entity with a Claim for payment of such an Administrative Expense Claim that does not File an application for payment of such Claim or expenses by the deadline set forth herein shall be forever barred from asserting such Claim and shall receive no Distribution under this Plan or otherwise on account of such Claim.

3

## 2.3 PRIORITY TAX CLAIMS

Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors, or (iii) in equal quarterly cash payments on the Initial Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at 3.5% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; provided, however, that each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.

## Article 3.
## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS

### 3.1 SUMMARY

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to this Plan and pursuant to Bankruptcy Code §§ 1122 and 1123(a)(1), as follows:

| CLASSIFICATION | | IMPAIRMENT AND VOTING |
|---|---|---|
| Class 1 | Priority Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 2 | Secured Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 3 | Unsecured Pass-Through Employee Related Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 4 | Workers' Compensation Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 5 | Intercompany Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 6 | Asbestos PI-SE Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 7 | Asbestos PI-AO Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 8 | Asbestos PD Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 9 | General Unsecured Claims | Impaired -- vote being solicited. |
| Class 10 | Equity Interests in the Parent | Impaired -- vote being solicited. |

4

| CLASSIFICATION | | IMPAIRMENT AND VOTING |
|---|---|---|
| Class 11 | Equity Interests in Debtors Other than the Parent | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |

### 3.1.1   Class 1.        Priority Claims

(a) Classification

Class 1 consists of all Priority Claims against the Debtors.

(b) Treatment

Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Claim and the Reorganized Debtors.

(c) Impairment and Voting

Class 1 is unimpaired.  The Holders of the Allowed Priority Claims in Class 1 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.2   Class 2.        Secured Claims

(a) Classification

Class 2 consists of all Secured Claims against the Debtors.

(b) Treatment

Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Secured Claim and the Reorganized Debtors; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D).

(c) Impairment and Voting

Class 2 is unimpaired.  The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.3   Class 3.         Unsecured Pass-Through Employee Related Claims

(a) Classification

Class 3 consists of all Unsecured Pass-Through Employee Related Claims.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.

(c) Impairment and Voting

Class 3 is unimpaired.  The Holders of the Unsecured Pass-Through Employee Related Claims in Class 3 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.4   Class 4.         Workers' Compensation Claims

(a) Classification

Class 4 consists of all Workers' Compensation Claims against the Debtors.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.

(c) Impairment and Voting

Class 4 is unimpaired.  The Holders of the Workers' Compensation Claims in Class 4 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.5   Class 5.         Intercompany Claims

(a) Classification

Class 5 consists of all Intercompany Claims.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim.

(c) Impairment and Voting

Class 5 is unimpaired.  The Holders of Intercompany Claims in Class 5 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

6

A-13

### 3.1.6  Class 6.        Asbestos PI-SE Claims

(a) Classification

Class 6 consists of all Asbestos PI-SE Claims against the Debtors and the Canadian Affiliates.

(b) Treatment

(i)     All Allowed Class 6 Claims shall be paid in full.

(ii)     All Allowed Class 6 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement, and the PI-SE TDP.

(iii)     All Allowed Class 6 Claims shall be paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary.

(iv)     In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim that is not a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect:  (A) the Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is not a Canadian Claim shall be conclusively presumed to have elected the Litigation Option.

(v)     In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim that is a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect:  (A) the Canadian Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is a Canadian Claim shall be conclusively presumed to have elected the Canadian Litigation Option.

(vi)     Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or the Canadian Litigation Option, as applicable.

(vii)     Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-SE Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.  Claimants may assert their Claims on the Asbestos PI Proof of Claim Form included with the Claims Materials.

(c) Asbestos Channeling Injunction

The sole recourse of the Holder of an Asbestos PI-SE Claim on account of such Claim shall be to the PI-SE Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-SE TDP.

(d) Impairment and Voting

Class 6 is unimpaired. The Holders of the Allowed Asbestos PI-SE Claims in Class 6 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.7    Class 7.        Asbestos PI-AO Claims

(a) Classification

Class 7 consists of all Asbestos PI-AO Claims against the Debtors and the Canadian Affiliates.

(b) Treatment

(i)    All Allowed Class 7 Claims shall be paid in full.

(ii)    All Allowed Class 7 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-AO TDP.

(iii)    All Allowed Class 7 Claims shall be paid initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund which shall be funded by the Sealed Air Payment (to the extent any funds remain after first funding the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund) and the Warrants. After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

(iv)    In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an Asbestos PI-AO Claim that is not a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option, (B) the Registry Option, or (C) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is not a Canadian Claim shall be conclusively presumed to have elected the Litigation Option.

(v)    In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an Asbestos PI-AO Claim that is a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Canadian Litigation Option, (B) the Registry Option, or (C) the Cash-Out Option; provided, however, that a Holder of a Third Party

Indemnification/Contribution Claim that is a Canadian Claim shall be conclusively presumed to have elected the Canadian Litigation Option.

(vi)    Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or the Canadian Litigation Option, as applicable.

(vii)    Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-AO Claim that has not yet been Allowed from agreeing with the Reorganized Debtors for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted. Claimants may assert their Claims on the Asbestos PI Proof of Claim Form included with the Claims Materials.

(c) Asbestos Channeling Injunction

The sole recourse of the Holder of an Asbestos PI-AO Claim on account of such Claim shall be to the PI-AO Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-AO TDP.

(d) Impairment and Voting

Class 7 is unimpaired. The Holders of the Allowed Asbestos PI-AO Claims in Class 7 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.8    Class 8.    Asbestos PD Claims

(a) Classification

Class 8 consists of all Asbestos PD Claims against the Debtors and the Canadian Affiliates.

(b) Treatment

(i)    All Allowed Class 8 Claims shall be paid in full.

(ii)    All Allowed Class 8 Claims shall be processed and paid out of the Asbestos PD Class Fund (funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary) in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PD TDP.

(iii)    Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PD Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

(c) Asbestos Channeling Injunction

The sole recourse of the Holder of an Asbestos PD Claim on account of such Claim shall be to the PD Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PD TDP.

(d) Impairment and Voting

Class 8 is unimpaired. The Holders of the Asbestos PD Claims in Class 8 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.9   Class 9.        General Unsecured Claims

(a) Classification

Class 9 consists of all General Unsecured Claims against the Debtors.

(b) Treatment

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date. Such payment shall be either (i) in full, plus post-petition interest, such payment to be 85% in cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of this Plan, and the Management Stock Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors. Notwithstanding the foregoing, each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.

Post-petition interest shall accrue from the filing date through the date of payment and shall be (i) for the Holders of the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims who, but for the Filing of the Chapter 11 Cases would be entitled under a contract or otherwise to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually.

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with this Section 3.1.9(b) shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date.

(c) Impairment and Voting

Class 9 is impaired. The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject this Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 3.1.10 Class 10.    Equity Interests in the Parent

(a) Classification

Class 10 consists of Equity Interests in the Parent.

(b) Treatment

On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of this Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of this Plan.

(c) Impairment and Voting

Class 10 is impaired. The Debtors are soliciting the votes of Holders of the Allowed Equity Interests in the Parent in Class 10 to accept or reject this Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 3.1.11 Class 11.    Equity Interests in the Debtors other than the Parent

(a) Classification

Class 11 consists of Equity Interests in the Debtors other than the Parent.

(b) Treatment

This Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest.

(c) Impairment and Voting

Class 11 is unimpaired. The Holders of the Equity Interests in the Debtors other than the Parent in Class 11 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.2 EFFECT OF ASBESTOS PI CLAIMANT ELECTING VARIOUS OPTIONS

#### 3.2.1 Cash-Out Option

If an Asbestos PI Claimant elects the Cash-Out Option, (i) his election is irrevocable, (ii) his Claim will be treated under the terms of the PI-SE TDP or PI-AO TDP, as applicable, and (iii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of this Plan on account of such Claim.

11

### 3.2.2   Litigation Option and Canadian Litigation Option

If an Asbestos PI Claimant elects, or is deemed to elect, the Litigation Option or the Canadian Litigation Option as applicable, (i) his Claim will be litigated against the Asbestos Trust and (ii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of this Plan on account of such Claim.

### 3.2.3   Registry Option

If an Asbestos PI-AO Claimant chooses the Registry Option, he shall (i) register his name on the Registry, (ii) be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of this Plan, (iii) have the statute of limitations be deemed to be tolled to the extent that such Claimant becomes an Asbestos PI-SE Claimant and (iv) be entitled to seek further recovery, in accordance with the provisions of this Plan, against the Asbestos Trust if such Holder becomes an Asbestos PI-SE Claimant.

## Article 4.
## MODIFICATION OR WITHDRAWAL OF THIS PLAN

### 4.1 MODIFICATION OF THIS PLAN; AMENDMENT OF PLAN DOCUMENTS

#### 4.1.1   Modification of this Plan.

The Debtors may alter, amend, or modify this Plan, or any other Plan Document, under Bankruptcy Code § 1127(a) at any time prior to the Confirmation Date so long as (i) prior to any modification of this Plan or any other Plan Documents that affects any interest of Class 9, the Debtors obtain the consent of the Unsecured Creditors' Committee, (ii) prior to any modification of this Plan or any other Plan Documents that affects any interest of Class 10, the Debtors obtain the consent of the Equity Committee, (iii) prior to any other modification of this Plan or any other Plan Documents, the Debtors consult with each of the Unsecured Creditors' Committee and the Equity Committee, and (iv) this Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123. Except as set forth in Section 4.1.2 below, after the Confirmation Date, and prior to the Effective Date, the Debtors may alter, amend, or modify this Plan in accordance with Bankruptcy Code § 1127(b) and the requirements set forth in Section 4.1.1(i) - (iii).

#### 4.1.2   Amendment of Plan Documents.

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Documents shall be as provided in this Plan or such documents.

A-19

### 4.2 WITHDRAWAL OF THIS PLAN

#### 4.2.1   Right to Withdraw this Plan

This Plan may be withdrawn by the Debtors prior to the Confirmation Date, but only after consultation with the Unsecured Creditors' Committee and the Equity Committee.

#### 4.2.2   Effect of Withdrawal

If this Plan is withdrawn prior to the Confirmation Date, this Plan shall be deemed null and void.  In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

### Article 5.
### PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS
### AND ASBESTOS CLAIMS GENERALLY

### 5.1 OBJECTIONS TO CLAIMS (OTHER THAN ASBESTOS CLAIMS); PROSECUTION OF DISPUTED CLAIMS

The Debtors or Reorganized Debtors, as applicable, the United States Trustee and any other party-in-interest may object to the allowance of any Administrative Expense Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, and Class 9 Claims Filed with the Bankruptcy Court or to be otherwise resolved by the Debtors or Reorganized Debtors pursuant to any provisions of this Plan with respect to which the they dispute liability, in whole or in part.  The Debtors' pending objections to any Claims not channeled to and assumed by the Asbestos Trust shall be transferred to the Reorganized Debtors for final resolution.

All objections that are Filed and prosecuted by the Reorganized Debtors as provided herein may be:  (i) compromised and settled in accordance with the business judgment of the Reorganized Debtors without approval of the Bankruptcy Court or (ii) litigated to Final Order by the Reorganized Debtors.  Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Reorganized Debtors to Claims shall be served and Filed no later than one (1) year after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court.  Such further order may be obtained by the Reorganized Debtors without a hearing or notice.  The Debtors reserve the right to designate, upon notice to the Holders of such Claim, any Claim as a Disputed Claim on or before the Confirmation Date.

To the extent that the Court enters an alternative dispute resolution order which contemplates that an order shall survive confirmation of this Plan, such order shall be controlling.

### 5.2 DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS

Notwithstanding Section 5.1 hereof, a Distribution shall be made to the Holder of a Disputed Claim only when, and to the extent that, such Disputed Claim becomes Allowed and pursuant to the appropriate provisions of this Plan covering the class of which such Disputed

13

Claim is a part. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 5.1 hereof.

### 5.3 RESOLUTION OF ASBESTOS CLAIMS

The Allowed Amount of Asbestos Claims (except for Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims) shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, the applicable TDP, and the CMO. If any Asbestos Claim becomes Allowed, it shall be satisfied from the Asbestos Trust in accordance with the Asbestos Trust Agreement and the applicable TDPs.

The Allowed Amount of Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims shall be determined in accordance with the Canadian Litigation Procedure and the applicable TDP.

The Asbestos Trust shall have the sole right and authority to resolve all Asbestos PI-SE Claims and Asbestos PD Claims. All Asbestos PI-SE Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

The Asbestos Trust shall also have the sole right and authority to resolve all Asbestos PI-AO Claims to the extent the Holder of an Asbestos PI-AO Claim elects the Registry Option or the Cash-Out Option.

If the Holder of an Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable, the Reorganized Debtors shall have the sole right and authority to resolve all such Asbestos PI-AO Claims. All Asbestos PI-AO Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by the Reorganized Debtors or the Canadian Affiliates, as applicable, in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund.

Any court proceeding related to the resolution of Canadian Claims shall be resolved by the Canadian Court in the context of the Canadian Proceedings.

### 5.3.1    Making of an Election by Asbestos PI Claimants

The Holders of Asbestos PI Claims shall make the election described in Section 3.2 of this Plan either in the Asbestos PI Questionnaire (if submitted to the Debtors prior to the Effective Date), or the Claims Materials (if submitted to the Asbestos Trust after the Effective Date).

### 5.3.2    Claims Materials for Asbestos PI Claimants

The Asbestos Trust shall provide the Claims Materials to any Asbestos PI Claimant upon a written request for such materials to the Asbestos Trust. The Claims Materials include: (i) the Asbestos PI Proof of Claim Form, (ii) the Asbestos PI Questionnaire, (iii) a certification to be completed by the Asbestos PI Claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure, (iv) a copy of the Disclosure Statement, and (v) instructions to the Asbestos PI Claimants in such form as the Trustees shall approve.

A-21

### 5.3.3   Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims

The Asbestos Trust or Reorganized Debtors may obtain information directly from an Asbestos PI Claimant who completes the Asbestos PI Questionnaire or the Claims Materials. The Asbestos Trust or Reorganized Debtors may also request that an Asbestos PI Claimant supply evidence of recovery from other asbestos claims resolution organizations. Asbestos PI Claimants may provide any or all information to the Asbestos Trust or Reorganized Debtors in an electronic format.

If an Asbestos PI Claimant fails to provide the requested information, the Asbestos Trust or Reorganized Debtors may obtain information (that would otherwise be provided by the Asbestos PI Questionnaire or the Claims Materials) from electronic databases maintained by any asbestos claims resolution organization instead of collecting some or all of the Claims information from a Claimant or the Claimant's attorney but only if:  (i) the Asbestos Trust or Reorganized Debtors inform the Asbestos PI Claimant that it plans to obtain information as may be available from such other organizations and (ii) the Asbestos PI Claimant does not provide such information directly to the Asbestos Trust or Reorganized Debtors.

### 5.3.4   Withdrawal of Claims

An Asbestos PI Claimant may withdraw its Asbestos PI Claim at any time, upon written notice to the Asbestos Trust, and subsequently file another Claim.  Any such Claim that is filed after withdrawal shall be given a place in the applicable FIFO Processing Queue based on the date of such subsequent filing.  The withdrawal of an Asbestos PI Claim shall not revoke the Claimant's election of the Cash-Out Option, which is irrevocable.  Except for Asbestos PI Claims held by representatives of deceased or incompetent Claimants for which court approval of the Asbestos Trust's offer is required, a Claim will be deemed to have been withdrawn if the Claimant neither accepts, rejects, nor initiates arbitration within six months of the Asbestos Trust's offer of payment or rejection of the Claim.  Upon written request and for good cause within such six month period, the Asbestos Trust may extend this period for up to an additional six months.

### Article 6.
## ACCEPTANCE OR REJECTION OF THIS PLAN

### 6.1 IMPAIRED CLASSES TO VOTE

Each Holder of a Claim or Equity Interest in an impaired Class is entitled to vote to accept or reject this Plan to the extent and in the manner provided herein or in the Confirmation Procedures Order.

### 6.2 ACCEPTANCE BY IMPAIRED CLASSES OF CLAIMS

Acceptance of this Plan by any impaired Class of Claims shall be determined in accordance with the Confirmation Procedures Order and the Bankruptcy Code.

### 6.3 PRESUMED ACCEPTANCE OF THIS PLAN

Classes 1, 2, 3, 4, 5, 6, 7, 8 and 11 of Claims and Equity Interests are unimpaired. Under Bankruptcy Code § 1126(f), the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have voted to accept this Plan.

### 6.4 NONCONSENSUAL CONFIRMATION

#### 6.4.1  Cramdown

With respect to impaired Equity Interests and any impaired Class of Claims, including Classes of Claims created pursuant to amendments to this Plan, that fail to accept this Plan in accordance with Bankruptcy Code §§ 1126 and 1129(a), the Debtors intend to request, to the extent consistent with applicable law, that the Court confirm this Plan in accordance with Bankruptcy Code § 1129(b) with respect to such non-accepting Classes, in which case this Plan shall constitute a motion for such relief.

#### 6.4.2  General Reservation of Rights

Should this Plan fail to be accepted by the requisite number and amount of the Holders of Claims and Equity Interests required to satisfy Bankruptcy Code §§ 524(g) and 1129, then, notwithstanding any other provision of this Plan to the contrary, the Debtors reserve the right to amend this Plan.

### Article 7.
### IMPLEMENTATION OF THIS PLAN

### 7.1 CORPORATE GOVERNANCE OF THE PARENT AND THE OTHER DEBTORS

#### 7.1.1  Amendment of Certificates of Incorporation or Articles of Incorporation of the Debtors

The Certificates of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation shall be amended as of the Effective Date. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, of the Debtors shall, among other things: (i) prohibit the issuance of nonvoting equity securities as required by Bankruptcy Code § 1123(a)(6), and subject to further amendment as permitted by applicable law, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of the Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of this Plan. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, shall be filed with the Secretary of State or equivalent official in their respective jurisdictions of incorporation on or prior to the Effective Date and be in full force and effect without any further amendment as of the Effective Date.

The restrictions on stock transfers in order to protect the Reorganized Debtors' tax position shall include a three (3) year prohibition, waivable by the Parent's Board of Directors,

on: (i) any Entity other than the Asbestos Trust acquiring after the Effective Date an amount of shares of the Parent Common Stock that would cause such Entity to become a Holder of 4.75% or more of the Parent Common Stock, and (ii) any Entity that as of the Effective Date holds 4.75% or more of the Parent Common Stock from increasing its ownership of the Parent Common Stock. In addition, any Parent Common Stock held by the Asbestos Trust will not be transferable for a period of at least three (3) years after the Effective Date. Other restrictions will apply with respect to the Warrants held by the Asbestos Trust, including a prohibition on the Asbestos Trust exercising an amount of Warrants greater than 50% of its total Warrants for a period of at least three (3) years after the Effective Date.

### 7.1.2    Amendment of By-Laws of the Parent

The By-Laws of the Parent shall be amended as of the Effective Date substantially in the form to be included in the Plan Supplement to, among other things, effectuate the provisions of this Plan.

### 7.1.3    D&O and Fiduciary Liability Tail Coverage Policies

The Reorganized Debtors shall obtain sufficient tail coverage for a maximum period of six years under both (i) a directors and officers' insurance policy and (ii) a fiduciary liability coverage insurance policy for the current and former directors, officers, and employees of the Debtors.

## 7.2 THE ASBESTOS TRUST

### 7.2.1    Creation of the Asbestos Trust

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos Trust shall be created in accordance with the Plan Documents. The Asbestos Trust shall be a "qualified settlement fund" for federal income tax purposes within the meaning of regulations issued pursuant to Section 468B of the IRC.

The purpose of the Asbestos Trust shall be to, among other things: (i) assume the liabilities of the Debtors and the Canadian Affiliates with respect to all Asbestos Claims (whether now existing or arising at any time hereafter); (ii) process, liquidate, pay and satisfy all Asbestos Claims in accordance with this Plan, the Asbestos Trust Agreement, the respective TDPs, the CMO, the Canadian Litigation Procedure and the Confirmation Order and in such a way that provides reasonable assurance that the Asbestos Trust will value, and be in a position to pay, present and future Asbestos Claims and to otherwise comply with Bankruptcy Code § 524(g)(2)(B)(i); (iii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims; and (iv) otherwise carry out the provisions of the Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with this Plan.

The Asbestos Trust shall file all tax returns required to be filed by the Asbestos Trust consistent with the terms of the Sealed Air Settlement Agreement.

### 7.2.2    Funding of the Asbestos Trust

Effective on the Effective Date and conditioned upon the fulfillment of events enumerated in the Sealed Air Settlement Agreement, Cryovac, Inc. shall fund the Sealed Air

17

Payment into the Asbestos Trust in accordance with this Plan and the provisions of the Sealed Air Settlement Agreement. Effective on the thirty-first (31st) day after the Effective Date, the Parent shall transfer or cause the transfer of the Debtors' Payment into the Asbestos Trust in accordance with this Plan.

The Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund. The remainder of the Sealed Air Payment, if any, and the Warrants included as part of the Debtors' Payment shall fund the Asbestos PI-AO Class Fund.

In addition, in the event that the proceeds of the sale of Parent Common Stock following exercise of all of the Warrants are insufficient to pay all Allowed Asbestos PI-AO Claims in full, the Reorganized Debtors shall pay the Asbestos Trust in full and in cash for the benefit of the Holders of such Claims, such payment to be made by the Reorganized Debtors on the first Business Day of the next calendar quarter after the date upon which the Asbestos PI-AO Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the payment date shall be the first Business Day of the next succeeding calendar quarter.

### 7.2.3    Transfer of Assets into the Asbestos Trust

Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity.

### 7.2.4    Transfer of Claims and Demands to the Asbestos Trust

On the Effective Date, without any further action of any Entity, all liabilities, obligations, and responsibilities of any Asbestos Protected Party relating to all Asbestos Claims shall be channeled to and assumed by the Asbestos Trust whether or not (A) a proof of Claim based on such Claim was Filed or deemed Filed under Bankruptcy Code § 501, (B) such Claim is or was Allowed under Bankruptcy Code § 502, (C) such Claim was listed on the Schedules of a Debtor, or (D) the Holder of such Claim voted on or accepted this Plan. This paragraph is intended to further effect the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, the Release Matters Injunction, and the Discharge described in Section 8.1 of this Plan. This paragraph is not intended to, and it shall not, serve as a waiver of any defense to any claim the Debtors, the Canadian Affiliates or the Asbestos Trust would otherwise have.

### 7.2.5    Creation of Asbestos Trust Sub-Accounts

On the Effective Date, the Asbestos Trust shall contain the PD Account, the PI-AO Account, the PI-SE Account, the Trust Expenses Account, and such other accounts as may be provided for in and in accordance with the Asbestos Trust Agreement.

### 7.2.6    Appointment and Termination of Trustees

On or before the Confirmation Date, the Debtors shall nominate the initial three (3) Trustees of the Asbestos Trust. The Bankruptcy Court, after notice and opportunity for hearing,

18

A-25

shall be asked to appoint the three individuals named by the Debtors to serve as Trustees of the Asbestos Trust effective as of the Effective Date. Upon termination of the Asbestos Trust, the Trustees' employment shall be deemed terminated and the Trustees shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 7.2.7 Creation and Termination of the TAC

Pursuant to the terms of the Asbestos Trust Agreement, the Debtors, the FCR, the Asbestos PI Committee and the Asbestos PD Committee, acting jointly, shall nominate the three (3) initial members of the TAC. On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall be asked to appoint the initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Asbestos Trust Agreement. Upon termination of the Asbestos Trust, the TAC shall be deemed dissolved and the TAC shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 7.2.8 Cooperation Agreement

On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors and the Asbestos Trust shall enter into a cooperation agreement pursuant to which:    (a) the Reorganized Debtors shall provide to the Asbestos Trust the non-privileged books and records of the Debtors and the Reorganized Debtors that pertain directly to Asbestos Claims and (b) the Asbestos Trust shall provide to the Reorganized Debtors books and records of the Asbestos Trust that pertain to Asbestos Claims so as to fully enable the Reorganized Debtors to recover any amounts available under any Asbestos Insurance Policy as if the Reorganized Debtors were processing, litigating and/or paying all Asbestos Claims directly. Execution of the cooperation agreement, in a form acceptable to the Debtors, is a condition precedent to the Sealed Air Payment and the Debtors' Payment being delivered to the Asbestos Trust.

The Debtors shall File the draft of the cooperation agreement prior to the Effective Date and shall seek an order from the Court that the providing of books and records under such cooperation agreement shall not result in the destruction, impairment or waiver of any applicable privileges pertaining to such books and records.

### 7.2.9 Institution and Maintenance of Legal and other Proceedings

As of the Effective Date, without any further action of any Entity, the Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Trust, provided that the Reorganized Debtors and the Canadian Affiliates, as applicable, shall have the sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable.

### 7.3 PAYMENTS AND DISTRIBUTIONS UNDER THIS PLAN

### 7.3.1 Asbestos Trust Payments and Plan Distributions

Payments to Holders of Allowed Asbestos Claims shall be made by the Asbestos Trust in accordance with the Asbestos Trust Agreement, the respective TDPs, the CMO and the Canadian

Litigation Procedure, as applicable. All Distributions or payments required or permitted to be made under this Plan (other than to Professionals) shall be made by the Reorganized Debtors in accordance with the treatment specified for each such Holder as specified herein (unless otherwise ordered by the Bankruptcy Court). Distributions to be made on the GUC Distribution Date, the Initial Distribution Date or the Quarterly Distribution Date shall be deemed actually made on such distribution date if made either (i) on the GUC Distribution Date, the Initial Distribution Date or the Quarterly Distribution Date or (ii) as soon as practicable thereafter. Professionals shall be paid pursuant to the order of the Bankruptcy Court.

### 7.3.2   Timing of Plan Distributions

Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without the accrual of any additional interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 7.4 DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS.

### 7.4.1   Delivery by the Reorganized Debtors of Distributions in General

Payments by the Asbestos Trust to Holders of Allowed Asbestos Claims shall be made in accordance with the Asbestos Trust Agreement and the respective TDPs. All other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as set forth on the Schedules, unless superseded by a new address, or as set forth (i) on a proof of Claim Filed by a Holder of an Allowed Claim, (ii) in another writing notifying the Reorganized Debtors of a change of address prior to the date of Distribution, or (iii) in a request for payment of an Administrative Expense Claim, as the case may be.

### 7.4.2   Undeliverable Distributions by the Reorganized Debtors

Any cash, assets, and other properties to be distributed by the Reorganized Debtors under this Plan to Holders of Claims, other than Asbestos Claims, that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (i) one year after Distribution or (ii) one-hundred twenty (120) calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, the Reorganized Debtors. In such event, such Entity's Claim shall no longer be deemed to be Allowed, and such Entity shall be deemed to have waived its rights to such payments or Distributions under this Plan pursuant to Bankruptcy Code § 1143, shall have no further Claim in respect of such Distribution, and shall not participate in any further Distributions under this Plan with respect to such Claim.

### 7.5 PAYMENTS UNDER THIS PLAN

### 7.5.1   Manner of Payments under this Plan

Unless the Entity receiving a Distribution or payment agrees otherwise, any such Distribution or payment in cash to be made by the Reorganized Debtors or the Asbestos Trust shall be made, at the election of the Reorganized Debtors or the Asbestos Trust, as applicable, by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 7.5.2   Fractional Payments under this Plan

Notwithstanding any other provision of this Plan, payments of fractions of dollars or of fractional shares shall not be made.  Whenever, under this Plan, any payment of a fraction of a dollar or a fractional share of Parent Common Stock would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar or nearest whole share of Parent Common Stock, as applicable, (up or down), with half dollars or half shares being rounded up.

### 7.6 OCCURRENCE OF THE CONFIRMATION DATE

The following shall constitute conditions precedent to confirmation of this Plan:

### 7.6.1   Findings of Fact and/or Conclusions of Law

The Court shall have made the following findings of fact and/or conclusions of law, among others, substantially to the effect as follows, in connection with the confirmation of this Plan, each of which shall be expressly set forth in the Confirmation Order:

(a)   The Plan complies with all applicable sections of the Bankruptcy Code, including Bankruptcy Code § 524(g);

(b)   Claimants in Classes 6 through 8 shall be deemed to have voted for acceptance under the Plan in the requisite numbers and amounts required by Bankruptcy Code §§ 524(g), 1126 and 1129;

(c)   As of the Petition Date, the Debtors have been named as defendants in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(d)   On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors and the Canadian Affiliates with respect to all Asbestos Claims;

(e)   The Asbestos Trust is to be funded in part by securities of the Parent and by the obligations of the Reorganized Parent to make future payments;

(f)   On the Effective Date, the Asbestos Trust would be entitled to own (if specific contingencies occur), the majority of the voting shares of the Reorganized Parent, by exercise of rights granted under the Plan;

(g)   The Asbestos Trust is to use the Asbestos Trust Assets to pay Asbestos Claims;

(h)   The Debtors and the Canadian Affiliates are likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Claims, which

21

Demands are addressed by the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction;

(i)    The actual amounts, numbers, and timing of Demands cannot be determined;

(j)    Pursuit of Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with the Asbestos Claims and Demands;

(k)    The terms of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction, including any provisions barring actions against third parties, are set out in the Plan in accordance with the requirements of Bankruptcy Rule 3016(c) and are adequately described in the Disclosure Statement;

(l)    Pursuant to Court orders or otherwise, the Asbestos Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims or Demands, or other comparable mechanisms that provide reasonable assurance that the Asbestos Trust shall value, and be in a position to pay, Asbestos Claims or Demands that involve similar claims in substantially the same manner;

(m)    The FCR shall have been appointed by the Court as part of the proceedings leading to the issuance of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction for the purpose of, among other things, protecting the rights of Entities that might subsequently assert Demands of the kind that are addressed in the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction and transferred to the Asbestos Trust;

(n)    In light of the benefits provided, or to be provided, to the Asbestos Trust by, or on behalf of, each Asbestos Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the Entities that might subsequently assert Demands against any Asbestos Protected Party;

(o)    The Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction are to be implemented in connection with the Plan and the Plan Documents;

(p)    The Asbestos Channeling Injunction is essential to the Plan and the Debtors' reorganization efforts;

22

(q)  An identity of interests exists among the Debtors and the Asbestos Protected Parties such that a Claim asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of the law of indemnity and/or contribution;

(r)  The Sealed Air Payment to the Asbestos Trust, together with the Debtors' Payment, and the Fresenius Payment constitute both (i) substantial assets of the Plan and the reorganization, and (ii) a fair, reasonable, and equitable settlement of all Asbestos Claims asserted against any Asbestos Protected Party;

(s)  As of the Effective Date, the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business all of their respective obligations and liabilities, including all Fresenius Indemnified Taxes and other liabilities under, the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement;

(t)  Upon the transfer of the Sealed Air Common Stock to the Asbestos Trust, the Trustees shall represent and warrant and agree (on behalf of the Asbestos Trust) with Sealed Air, that the Asbestos Trust is acquiring the Sealed Air Common Stock for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act and the Asbestos Trust and its transferees will comply with all filing and other reporting obligations under all applicable laws which shall be applicable to such Asbestos Trust with respect to the Sealed Air Common Stock.

(u)  Upon confirmation and consummation of the Plan, each of the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement and the Fresenius Settlement Order shall be in full force and effect.

(v)  The Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than one billion, four hundred eighty three million ($1,483,000,000).[2]

(w)  The Court shall have found the Asbestos PI-AO Class Fund is not greater than one hundred thirty million ($130,000,000).

---

[2] This figure does not include Asbestos PD Claims that are fully secured by an appeal bond in the case of <u>Solow, et al. v W. R. Grace & Co.-Conn</u> currently pending in the New York Supreme Court, Appellate Division.

(x)   The Court has entered an order finding that Class 6, Class 7, and Class 8 are unimpaired.

(y)   The Court has entered the Confirmation Order granting the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction to take effect as of the Effective Date.

(z)   The terms of the Plan and the Confirmation Order do not violate any obligation of the Debtors, the Canadian Affiliates or any Asbestos Insurance Entity under any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement.

(aa)  The terms of the Plan and the Confirmation Order do not violate any obligation of the Debtors, the Canadian Affiliates or any Asbestos Insurance Entity under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement.

(bb)  The confirmation and/or recognition of the Plan does not materially increase any Asbestos Insurance Entity's risk of providing coverage for the asbestos-related liabilities under the Asbestos Insurance Policies as compared to the risk that was otherwise being borne by the Asbestos Insurance Entity prior to the Effective Date.

(cc)  The duties and obligations of the Asbestos Insurance Entities under the Asbestos Insurance Policies and Asbestos Insurance Settlement Agreements are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of the obligations and liabilities of the Asbestos Protected Parties for and in respect of all Asbestos Claims or (2) the assumption by the Asbestos Trust of responsibility and liability for all Asbestos Claims.

(dd)  All Asbestos Claims shall be channeled to the Asbestos Trust.

(ee)  All Asbestos PI-SE Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

(ff)  All Allowed PI-SE Claims shall be paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary.

(gg)  All Allowed PI-AO Claims shall be paid initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund, which shall be funded solely by the Warrants.

(hh) All Asbestos PI-AO Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by the Reorganized Debtors or the Canadian Affiliates, as applicable, in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund.

(ii) After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

(jj) Although the litigation of Asbestos PI-AO Claims and Asbestos PI-SE Claims both are or will be in the name of the Asbestos Trust, the Asbestos Trust is the true party in interest in defending and/or objecting to Asbestos PI-SE Claims whereas, the Reorganized Debtors are the true parties in interest in defending and/or objecting to Asbestos PI-AO Claims.

(kk) There is no unity of economic interest between the Asbestos Trust in the context of the litigation of Asbestos PI-SE Claims and the Reorganized Debtors, acting nominally for the Asbestos Trust, in the context of the litigation of Asbestos PI-AO Claims.

(ll) Any findings of fact or conclusions of law arising out of the adjudication of any disputed Asbestos PI-SE Claims by the Asbestos Trust, and in which the Reorganized Debtors shall not appear as parties in interest and shall not participate directly, will not have collateral estoppel or any other preclusive effect on the Reorganized Debtors and/or the Asbestos Trust in the context of adjudication of any disputed Asbestos PI-AO Claim.

This Plan shall not be confirmed and the Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtors and by Sealed Air and Fresenius with respect to the conditions set forth in paragraphs 7.6.1(r) and 7.6.1(s) above, and by Sealed Air with respect to the condition set forth in paragraph 7.6.1(t) above.

### 7.6.2  Orders of this Court

(a) The Confirmation Order shall be in form and substance acceptable to the Plan Proponents.

(b) The Confirmation Order shall be consistent with the requirements of the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement and the Fresenius Settlement Order.

(c) The Court shall have entered the CMO in form and substance acceptable to the Debtors.

(d) The Court shall have entered the Estimation Order in form and substance acceptable to the Plan Proponents, including the following findings:

(i)    the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

(ii)    the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

(iii)    the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

(e) The Court shall have entered an order in form and substance acceptable to the Plan Proponents approving the Sealed Air Settlement Agreement.

This Plan shall not be confirmed and the Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtors, and by the Unsecured Creditors' Committee and the Equity Committee with respect to the conditions set forth in paragraphs 7.6.2(a), 7.6.2(d) and 7.6.2(e).

### 7.7 CONDITIONS TO OCCURRENCE OF THE EFFECTIVE DATE

The "effective date of the plan," as used in Bankruptcy Code § 1129, shall not occur, and this Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

(a) Each of the Confirmation Order and the Recognition Order shall have been issued or affirmed by the District Court or the Canadian Court, as the case may be, and each shall have become a Final Order; provided that, at the option of the Plan Proponents, the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case, at the option of the Plan Proponents, the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b) The District Court shall have entered or affirmed an order(s) entering the Asbestos Channeling Injunction which shall have been approved or recognized by the Canadian Court in the context of the Canadian Proceedings.

91100-001\DOCS_DE:104619.1

(c) The District Court shall have entered or affirmed an order(s) approving this Plan and all the Plan Documents and such order(s) shall have become Final Orders and which Final Orders shall have been approved or recognized by the Canadian Court in the context of the Canadian Proceedings.

(d) The Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction shall be in full force and effect.

(e) The Plan Documents, including the Sealed Air Settlement Agreement, necessary or appropriate to implement this Plan shall have been (i) executed, in a form acceptable to the Plan Proponents, (ii) delivered by Sealed Air and, where applicable, (iii) filed with the appropriate governmental or supervisory authorities.

(f) The Certificate of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors, as amended in accordance with this Plan, shall be in full force and effect.

(g) The Exit Financing, in an amount and on such terms satisfactory to the Debtors, shall be in full force and effect and available immediately upon the occurrence of the Effective Date and after all necessary parties have executed the documentation relating thereto.

(h) The Sealed Air Settlement Agreement shall have been duly approved by the board of directors of Sealed Air.

(i) The Court shall have entered a finding that the cooperation agreements entered into between the Reorganized Debtors and the Asbestos Trust do not result in the destruction, impairment, or waiver of any applicable privileges pertaining to the books and records subject thereto.

The Effective Date shall not occur unless and until each of the foregoing conditions is either satisfied or waived by the Debtors, by the Unsecured Creditors' Committee and the Equity Committee with respect to the conditions set forth in paragraphs 7.7(a), 7.7(b), 7.7(c), 7.7(d) and 7.7(e), and by Sealed Air with respect to the conditions set forth in paragraph 7.7(h). Notice of the occurrence of the Effective Date reflecting that the foregoing conditions have been satisfied or waived shall: (i) be signed by the Debtor and each Entity whose consent is required pursuant to this Plan, (ii) state the date of the Effective Date; and (iii) be Filed with the Bankruptcy Court by the Debtors' counsel. No waiver shall be effective unless it complies with the requirements of this provision.

If the Effective Date does not occur by December 31, 2005, the Debtors reserve the right to seek dismissal of the Chapter 11 Cases. The other Plan Proponents reserve their right to take any action they believe appropriate regarding the Debtors' seeking of dismissal of the Chapter 11 Cases. In the event that the Effective Date does not occur, all parties shall be returned to the

position they would have held had the Confirmation Order not been entered. In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

### 7.8 MANAGEMENT OF THE REORGANIZED DEBTORS

On and after the Effective Date, the business and affairs of the Reorganized Debtors will be managed by their respective Boards of Directors or equivalent thereof. Upon the Effective Date, the Board of Directors of the Reorganized Parent shall be composed of at least five (5) directors. The Debtors shall specify the directors of the Reorganized Parent in the Plan Supplement. The directors of the Reorganized Parent appointed upon the Effective Date shall serve for two (2) years without replacement other than as a consequence of resignation, death or action of the Board of Directors. Thereafter, the directors may be replaced by stockholder action. In addition, as will be specified in the Plan Supplement, certain key members of current management are expected to continue with the Reorganized Debtors.

### 7.9 CORPORATE ACTION

On or prior to the Effective Date, the Boards of Directors of the respective Debtors that are corporations shall adopt an amendment to their respective Certificates of Incorporation or Articles of Incorporation, as applicable (the Certificate of Incorporation of the Parent to be substantially in the form included in the Plan Supplement) and the Parent shall adopt the By-Laws substantially in the form included in the Plan Supplement, and such corporate actions shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including any action by the stockholders of the Parent, the Debtors in Possession, or the Reorganized Debtors. On the Effective Date or as soon thereafter as is practicable, the Parent shall file with the Secretary of State of the State of Delaware, in accordance with the applicable Delaware statutes, rules, and regulations, such amendment to its Certificate of Incorporation and each of the other Debtors shall file their respective Certificates of Incorporation or Articles of Incorporation, as applicable with the Secretary of State, or equivalent official in their respective jurisdictions. On the Effective Date, the approval and effectiveness of matters provided under this Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred and to have been authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order, or rule, including any action by the stockholders or directors of the Debtors, the Debtors in Possession, or the Reorganized Debtors.

### 7.10 EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS

Each of the officers of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate and further evidence the terms and conditions of this Plan, the transactions contemplated by this Plan, and any securities issued pursuant to this Plan.

91100-001\DOCS_DE:104619.1

### 7.11   ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST

To the extent that any Allowed Claim entitled to a Distribution under this Plan consists of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated first to the principal amount of the Claim and then, to the extent the Distribution exceeds the principal amount of the Claim, to the accrued but unpaid interest.

### 7.12   NO SUCCESSOR LIABILITY

Except as otherwise expressly provided in this Plan, the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the FCR, and the Asbestos Protected Parties will not, pursuant to this Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates, as such liabilities or obligations may relate to or arise out of the operations of or assets of the Debtors or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. Neither the Asbestos Protected Parties, the Reorganized Debtors, nor the Asbestos Trust is, or shall be, a successor to the Debtors or any of the Debtors' past or present Affiliates by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Asbestos Trust shall assume the obligations specified in this Plan and the Confirmation Order.

Except as otherwise expressly provided in this Plan, effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall be unconditionally, irrevocably and fully released from any and all Claims and causes of action, including Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or similar Claims or causes of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtors or the Canadian Affiliates (or any of their predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

### 7.13   DEEMED CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY

Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under this Plan for Plan purposes only. Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under this Plan and as set forth above in this Section 7.13) affect: (i) the legal and organizational structure of the Debtors; (ii) any Encumbrances that are required to be maintained under this Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (B) pursuant to this Plan, or (C) in connection with any Exit Financing; (iii) the Sealed Air Settlement Agreement; and (iv) the Fresenius Settlement Agreement.

Notwithstanding anything contained in this Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims (other than Asbestos

29

Claims) being reinstated and left unimpaired under this Plan, and the legal, equitable, and contractual rights to which the Holders of any such Claims (other than Asbestos Claims) are entitled shall be left unaltered by this Plan.

## Article 8.
## INJUNCTIONS, RELEASES & DISCHARGE

### 8.1 DISCHARGE

#### 8.1.1    Discharge of the Debtors and Related Discharge Injunction

The rights afforded in this Plan and the treatment of all Claims, Demands and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims, Demands against, and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to this Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in this Plan.

With respect to any debts discharged by operation of law under Bankruptcy Code §§ 524(a) and 1141, the discharge of the Debtors operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived; provided, however, that the obligations of the Reorganized Debtors under this Plan are not so discharged.

#### 8.1.2    Discharge of Liabilities to Holders of Asbestos Claims

The transfer to, vesting in, and assumption by the Asbestos Trust of the Asbestos Trust Assets as contemplated by this Plan, among other things, shall (i) discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos Claims and (ii) discharge, release, and extinguish all obligations and liabilities of the Asbestos Protected Parties and Asbestos Insurance Entities for and in respect of all Asbestos Claims, subject to the reservations listed in Section 8.3.2 herein. On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors with respect to all Asbestos Claims and shall pay the Allowed Asbestos Claims in accordance with the Asbestos Trust Agreement and the appropriate TDPs.

### 8.1.3  Disallowed Claims and Disallowed Equity Interests

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

### 8.1.4  Non-Dischargeable ERISA Liability

The Parent is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") applies (the "Pension Plans"). The Debtors intend, and this Plan contemplates, that the Reorganized Debtors will continue to be the contributing sponsor of all the Pension Plans that it currently sponsors. Each of the Pension Plans is a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation ("PBGC") under ERISA. The Pension Plans are subject to minimum funding requirements of ERISA and Section 412 of the IRC. The PBGC believes the Pension Plans to be underfunded on a termination basis. As of their April 2004 Form 4010 Filings with the PBGC, the Debtors Actuarial Information Certification indicates the total unfunded status of the Pension Plans was $394.2 million as of December 31, 2003. An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA. Should the Pension Plans terminate, the PBGC may assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC. The PBGC further asserts that portions of those claims would be entitled to priority status.

Nothing contained in this Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the PBGC with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of this Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

### 8.2  THE ASBESTOS CHANNELING INJUNCTION

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code §§ 1141 and 524(a) and as described in this Article 8, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code §§ 524(g) and 105(a), the Confirmation Order shall provide for issuance of the Asbestos Channeling Injunction to take effect as of the Effective Date. On and after the Effective Date, the sole recourse of the Holder of an Asbestos Claim on account of such Claim shall be to the Asbestos

Trust pursuant to the provisions of the Asbestos Channeling Injunction and the appropriate TDPs and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against the Debtors, the Canadian Affiliates, the Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any Distributions made pursuant to this Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future Holders of Asbestos Claims, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims other than from the Asbestos Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Asbestos Trust Agreement and the appropriate TDPs, including:

(a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(b) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(d) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e) proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the appropriate TDPs.

Notwithstanding anything to the contrary above, this Asbestos Channeling Injunction shall not enjoin the rights of Entities to the treatment accorded them under Article 3 of this Plan, as applicable, including the rights of Entities with Asbestos Claims to assert such Asbestos Claims in accordance with the appropriate TDPs.

Except as otherwise expressly provided in this Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in this Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the

Canadian Affiliates, the Reorganized Debtors, or the Asbestos Trust may have against any Entity in connection with or arising out of or related to any Asbestos Claim.

### 8.3 ASBESTOS INSURANCE ENTITY INJUNCTION

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Asbestos Insurance Entity Injunction to take effect as of the Effective Date.

#### 8.3.1 Injunction

(a) All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, Demand, Asbestos Insurance Rights, Asbestos Insurance Policies, or Asbestos Insurance Settlement Agreements, whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iv) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity; and

(v) proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement, the appropriate TDPs, and the appropriate Asbestos Insurance Settlement Agreements.

(b) The Reorganized Debtors shall have the sole and exclusive authority at any time to terminate, reduce or limit the scope of, the Asbestos Insurance Entity Injunction as it may apply to any Asbestos Insurance Entity upon express written notice to that Asbestos Insurance Entity; and

(c) The Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is or may become a third-party beneficiary of the Asbestos Insurance Entity Injunction.

### 8.3.2    Reservations from the Asbestos Insurance Entity Injunction

Notwithstanding anything to the contrary above, the Asbestos Insurance Entity Injunction shall not enjoin:

(a) the rights of any Entity to the treatment accorded it under this Plan;

(b) the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c) the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity, in satisfaction of any Asbestos Insurance Rights that any of the Debtors, the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

### 8.4 RELEASED MATTERS INJUNCTION

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Released Matters Injunction to take effect as of the Effective Date.

### 8.4.1    Injunction

(a) All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Entity released under any provision of this Plan, shall be enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on account of such released matters, including:

(i)    commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity;

(ii)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity;

(iii)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity; and

(iv)    setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity.

### 8.4.2   Reservations from the Released Matters Injunction

Notwithstanding anything to the contrary above, the injunction provided in Section 8.4.1 of this Plan shall not enjoin:

(a)  the rights of any Entity to the treatment accorded it under this Plan;

(b)  the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c)  the rights any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity in satisfaction of any Asbestos Insurance Rights that any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

### 8.5 INJUNCTIONS AND RELEASES RELATED TO THE SEALED AIR INDEMNIFIED PARTIES AND FRESENIUS INDEMNIFIED PARTIES

As required by the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement, and the Fresenius Settlement Order, the injunctions and releases outlined in this Plan, including the Asbestos Channeling Injunction and the Released Matters Injunction and

provided under Bankruptcy Code §§ 105(a) and 524(g), shall absolutely and unequivocally extend to and protect the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties.

## 8.6 TERM OF CERTAIN INJUNCTIONS AND AUTOMATIC STAY

### 8.6.1 Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to Bankruptcy Code §§ 105, 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in this Plan become effective, and thereafter if so provided by this Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Reorganized Debtors may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

### 8.6.2 Injunctions Provided for in this Plan

Each of the injunctions provided for in this Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by this Plan. Notwithstanding anything to the contrary contained in this Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

## 8.7 ADDITIONAL RELEASES AND INDEMNIFICATION

### 8.7.1 Representatives of the Debtors

#### (a) Release of Representatives of the Debtors

For good and valuable consideration, the receipt and sufficiency of which is acknowledged in this Plan, all Representatives of the Debtors and any of the Non-Debtor Affiliates will be released, as of the Effective Date, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date for Claims or liabilities resulting from their services as Representatives of the Debtors or any of the Non-Debtor Affiliates to the extent such Claims or liabilities relate to the business, operations, or management of any of the Debtors or Non-Debtor Affiliates prior to the Effective Date or any of the matters referred to in Section 11.8 so long as, in each case such action, or failure to act, did not constitute willful misconduct; provided, however, that such releases shall not preclude a governmental entity from enforcing its police and regulatory powers. These releases are conditioned on the released Representatives giving a mutual release, except that such Representatives are not releasing Claims with respect to commercial obligations of the Debtors and the Non-Debtor Affiliates, any Claims for indemnification in favor of the released Representatives, or Claims for wages, fees, benefits,

commissions and expenses. Further, these releases are not intended to, and shall not, alter in any way the rights of the present and/or former officers and/or directors of the Parent, or of any of the other Debtors or Non-Debtor Affiliates, under the Parent's By-Laws and/or Certificate of Incorporation, or any of the other Debtors' or Non-Debtor Affiliates' applicable by-laws and/or certificates of incorporation, whatever those rights, if any, may be.

### (b) Indemnification of Representatives of the Debtors and Non-Debtor Affiliates

The Reorganized Debtors will defend, indemnify, and hold harmless to the fullest extent permitted by applicable law, all Representatives of the Debtors, and all Representatives of the Non-Debtor Affiliates, on and after the Effective Date for all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 8.7.1(a) herein.

### 8.7.2    Release of Sealed Air Indemnified Parties

Upon receipt of the Sealed Air Payment (i) the Debtors, the Asbestos PD Committee and the Asbestos PI Committee shall execute and deliver the Release; (ii) the Government Plaintiff shall execute and deliver the Government Release; and (iii) the Asbestos PI Committee and the Asbestos PD Committee shall deliver the Fresenius Release, all as provided for and defined in the Sealed Air Settlement Agreement. In addition, each of the Non-Debtor Affiliates shall irrevocably release, acquit, and forever discharge the Sealed Air Indemnified Parties from any and all Asbestos Claims and any and all Claims, on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement, that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other person any and all Asbestos Claims, and any and all Claims on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall defend, indemnify, and hold harmless each of the Sealed Air Indemnified Parties as provided in, and to the extent set forth in the Sealed Air Settlement Agreement, and the indemnification provisions set forth in the Sealed Air Settlement Agreement shall be binding on the Asbestos Trust with the same force and effect as if the Asbestos Trust was a party to the Sealed Air Settlement Agreement.

### 8.7.3    Release of Fresenius Indemnified Parties

Upon receipt of the Fresenius Payment, the Debtors, the Reorganized Debtors, the Asbestos PI Committee and the Asbestos PD Committee will fully, finally and forever release, relinquish and discharge each and every Fresenius Indemnified Party from any and all Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, that the Debtors, the Reorganized Debtors, the Asbestos PI Committee or the Asbestos PD Committee have asserted or could have asserted in the Bankruptcy Court or any other forum against any of the Fresenius Indemnified Parties and the release that is attached as Appendix B to the Fresenius Settlement Agreement shall become effective. Upon receipt of the Fresenius Payment, in

addition to the more limited duties of indemnification by the Debtors to the Fresenius Indemnified Parties under Article III of the Fresenius Settlement Agreement, the Debtors and the Reorganized Debtors shall indemnify, defend and hold harmless the Fresenius Indemnified Parties as provided in and to the extent set forth in the Fresenius Settlement Agreement.

### 8.7.4    Specific Releases by Holders of Claims or Equity Interests

Without limiting any other provisions of this Plan, each Holder of a Claim or Equity Interest who votes in favor of this Plan or receives or retains any property under this Plan shall be deemed to unconditionally have released the Asbestos Protected Parties, the Asbestos Insurance Entities, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee and the FCR, and each party's Representatives, as of the Effective Date from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating or pertaining to, the Debtors or the Reorganized Debtors, the Chapter 11 Cases, or the negotiation, formulation, and preparation of this Plan or any related agreements, instruments, or other documents, so long as, in each case, such action or failure to act does not constitute willful misconduct. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers.

### 8.7.5    Approval of Sealed Air Settlement Agreement

The Confirmation Order shall constitute an order approving, as a compromise and settlement pursuant to Bankruptcy Code § 1123(b)(3)(A), the release of Sealed Air, the respective releases of each of the Reorganized Debtors and the Asbestos Trust contained in the Sealed Air Settlement Agreement, and the execution and delivery of the Sealed Air Settlement Agreement which contains the foregoing releases. The Confirmation Order shall also constitute an order assuming the 1998 Tax Sharing Agreement as defined in the Sealed Air Settlement Agreement.

### 8.7.6    Effect of the Fresenius Settlement Agreement, the Fresenius Settlement Order, and the Sealed Air Settlement Agreement.

Notwithstanding anything to the contrary in this Plan, any of the Plan Documents, or the Confirmation Order, nothing in this Plan, any of the Plan Documents or the Confirmation Order (including any other provisions that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing or limiting the legal, equitable or contractual rights or obligations of the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties or the Debtors, the Reorganized Debtors and the Non-Debtor Affiliates, respectively, pursuant to the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or the Fresenius Settlement Order, as applicable, each of which is expressly made a part of this Plan and incorporated in this Plan by reference.

38

A-45

The Sealed Air Settlement Agreement, the Fresenius Settlement Agreement, and the Fresenius Settlement Order set forth certain preconditions to the making of the Sealed Air Payment and/or the Fresenius Payment and the Debtors intend by this Plan to fulfill each and every such precondition whether expressly or impliedly outlined in the Plan Documents.

## Article 9.
## EXECUTORY CONTRACTS, UNEXPIRED LEASES, GUARANTIES, AND INDEMNITY AGREEMENTS

### 9.1 ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except for (i) executory contracts and unexpired leases that the Debtors reject prior to the Effective Date or designate (on a list to be included in the Plan Supplement) as being subject to rejection in connection with the Effective Date and (ii) agreements, to the extent executory, providing for indemnification of third parties for Asbestos Claims, all executory contracts and unexpired leases, including all Asbestos Insurance Policies and the 1998 Tax Sharing Agreement (as defined in the Sealed Air Settlement Agreement), not previously assumed by the Debtors pursuant to Bankruptcy Code § 365 shall be deemed to have been assumed by the Reorganized Debtors on the Effective Date, and this Plan shall constitute a motion to assume such executory contracts and unexpired leases as of the Effective Date.

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list of rejected contracts to be included in the Plan Supplement to add executory contracts or leases (but not the 1998 Tax Sharing Agreement) or remove executory contracts or leases, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice. Notwithstanding the foregoing, such affected parties shall not be entitled to any Administrative Expense Claim for any executory contracts or leases added to the list of rejected contracts and will only be entitled to a Claim for rejection damages.

Pursuant to the terms of the March 2003 Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of Claim for each Claim arising from the rejection of an executory contract or unexpired lease pursuant to this Plan or otherwise shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (i) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, (ii) the Confirmation Date, or (iii) service of notice of rejection if such party is an affected party as described in the paragraph immediately above. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from the rejection of an executory contract or unexpired lease shall be included in Class 9 and shall be treated in accordance with Article 3 herein.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to Bankruptcy Code § 365(a) and a finding by the Court that each such assumption is in the best interests of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

With respect to each such executory contract or unexpired lease assumed by the Reorganized Debtors, unless otherwise determined by the Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such

default becomes known to the Debtors and, if the cure amount is disputed, such cure amount shall be established pursuant to applicable law, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amount, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

To the extent executory, all agreements providing for indemnification of third parties for Asbestos Claims shall be deemed rejected by operation of entry of the Confirmation Order unless expressly identified and assumed pursuant to an order of the Bankruptcy Court.

Executory Contracts and unexpired leases previously assumed by the Debtors during the case pursuant to Bankruptcy Code § 365 shall be governed by and subject to the provisions of the order of the Court authorizing the assumption thereof.

### 9.2 LETTERS OF CREDIT, SURETY BONDS, GUARANTIES, AND CERTAIN INDEMNITY AGREEMENTS

Unless otherwise designated by the Debtors in the Plan Supplement, agreed to in writing by the affected parties, or modified by order of the Court, the Debtors' obligations under letters of credit, surety bonds, guaranties (which for purposes of this Section 9.2 include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan. The Debtors' obligations under such letters of credit, surety bonds, guaranties, and indemnity agreements shall be deemed assumed pursuant to Bankruptcy Code § 365(a), survive entry of the Confirmation Order and occurrence of the Effective Date, remain unaffected thereby (except as provided in this Section 9.2), and not be discharged in accordance with Bankruptcy Code § 1141.

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list to be included in the Plan Supplement to add or remove letters of credit, surety bonds, guaranties, or indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

Pursuant to the terms of the March 2003 Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of Claim for each Claim arising from the rejection of a: (i) letter of credit, (ii) surety bond, (iii) guaranty, or (iv) written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (A) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, (B) the Confirmation Date, or (C) service of notice of rejection if such party is an affected party as described in the paragraph immediately above. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from the rejection of a letter of credit, surety bond, guaranty, or written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be included in Class 9 and shall be treated in accordance with Article 3 herein.

The Reorganized Debtors shall have the right to cure any defaults existing as of the Effective Date under any such letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date promptly after any such default becomes known to the Debtors or Reorganized Debtors and, if disputed, established pursuant to applicable law. All letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date shall be deemed reinstated on the Effective Date notwithstanding any default therein by the Debtors, any delay in the cure thereof by the Debtors, or the Filing or existence of the Chapter 11 Cases, or any action taken in connection therewith, and shall be binding upon, and enforceable against, all parties thereto, subject to any rights and defenses existing thereunder. All undrawn or partially drawn letters of credit, including letters of credit outstanding under the Debtors' pre-petition credit facilities, will be replaced as soon as practicable with new or replacement letters of credit under a new facility.

Nothing in Article 9, however, shall (i) constitute a reinstatement, continuation or assumption of any warranty provision, guaranty or any other contractual or other obligation, Demand or Claim by the Reorganized Debtors to the extent that the Claim, Demand or obligation constitutes an Asbestos PD Claim, an Asbestos PI-SE Claim, or an Asbestos PI-AO Claim, or (ii) limit, restrict or otherwise impair the releases afforded to the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties that are granted elsewhere in this Plan or Plan Documents.

### 9.3 COMPENSATION AND BENEFITS PROGRAM

Unless otherwise agreed to by the affected parties, or modified by order of the Court, all of the Debtors' obligations under employment and severance contracts and policies, and all compensation and benefit plans, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under this Plan.

## Article 10.
## RETENTION OF JURISDICTION

Pursuant to Bankruptcy Code §§ 105(a) and 1142, and except as any matters outlined in this Section relate to the litigation of Canadian Claims or the hearing on the Recognition Order, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or this Plan, or (iii) that relates to the following, provided that the District Court shall retain jurisdiction for such matters to which the automatic reference to the Bankruptcy Court has been withdrawn:

### 10.1   PLAN DOCUMENTS

To interpret, enforce, and administer the terms of the Plan Documents and all annexes and exhibits thereto);

### 10.2   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

To hear and determine any and all motions or applications for the assumption and/or assignment or rejection of (i) executory contracts, (ii) unexpired leases, (iii) letters of credit, (iv) surety bonds, (v) guaranties (which for purposes of this Section 10.2 include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or (vi) written indemnity agreements with respect to letters of credit, surety bonds or guaranties

91100-001\DOCS_DE:104619.1

existing as of the Effective Date to which the Debtors are parties or with respect to which the Debtors may be liable that are: (A) pending on the Confirmation Date or (B) within the 30-day reservation period described in Sections 9.1 and 9.2 of this Plan, and to review and determine all Claims resulting from the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date;

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list of rejected contracts to be included in the Plan Supplement to add or remove executory contracts, leases, letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

### 10.3    DISPUTED CLAIMS ALLOWANCE/DISALLOWANCE

To hear and determine any objections to: (i) the allowance of Claims, including any objections to the classification of any Claim; (ii) to allow or disallow any Disputed Claim in whole or in part; and (iii) to allow or disallow any disputed Asbestos Claim;

### 10.4    ENFORCEMENT/MODIFICATION OF THIS PLAN

(a) To issue such orders in aid of execution of this Plan to the extent authorized or contemplated by Bankruptcy Code § 1142;

(b) To consider and approve any modifications of this Plan or Plan Documents, remedy any defect or omission, or reconcile any inconsistency in any order of the Court, including the Confirmation Order;

(c) To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan Documents or their interpretation, implementation, enforcement, or consummation;

(d) To hear and determine all objections to the termination of the Asbestos Trust;

(e) To determine such other matters that may be set forth in, or that may arise in connection with, this Plan, the Confirmation Order, the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, the Released Matters Injunction, or the Asbestos Trust Agreement;

(f) To hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, or the Released Matters Injunction;

(g) To enter an order or final decree closing the Chapter 11 Cases;

(h) To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Court in the Chapter 11 Cases;

(i) To enter such orders as are necessary to implement and enforce the injunctions described herein; and

(j) To enter orders authorizing immaterial modifications to this Plan which are necessary to comply with Section 468B of the IRC.

### 10.5    COMPENSATION OF PROFESSIONALS

To hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals under Bankruptcy Code §§ 327, 328, 329, 330, 331 and 363 and any other fees and expenses authorized to be paid or reimbursed under this Plan;

### 10.6    SETTLEMENTS

To the extent that Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Debtors' or Reorganized Debtors' estates or the Asbestos Trust;

### 10.7    TAXES

To hear and determine matters concerning state, local, and federal taxes (including the amount of net operating loss carryforwards), fines, penalties, or additions to taxes for which the Debtors or Debtors in Possession may be liable, directly or indirectly, in accordance with Bankruptcy Code §§ 346, 505, and 1146.

### 10.8    SPECIFIC PURPOSES

To hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order; and

### 10.9    INSURANCE MATTERS.

To hear and determine matters concerning the Asbestos Insurance Policies; provided that the Court shall have nonexclusive jurisdiction over such matters.

## Article 11.
## MISCELLANEOUS PROVISIONS

### 11.1    AUTHORITY OF THE DEBTORS

On the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively (i) the provisions of this Plan and (ii) the creation of the Asbestos Trust.

**11.2    PAYMENT OF STATUTORY FEES**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Court at the hearing on confirmation of this Plan, shall be paid by the Debtors on or before the Effective Date.

**11.3    RETAINED CAUSES OF ACTION**

### 11.3.1 Maintenance of Causes of Action

Nothing in this Section 11.3 of this Plan shall be deemed to be a transfer by the Debtors and the Reorganized Debtors of any Claims, causes of action, or defenses relating to assumed executory contracts or otherwise which are required by the Reorganized Debtors to conduct their businesses in the ordinary course subsequent to the Effective Date. Moreover, except as otherwise expressly contemplated by this Plan, the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or other Plan Documents, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights to commence and pursue any and all Claims, causes of action, including the Retained Causes of Action, or defenses against any parties, including Claimants and Holders of Equity Interests, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed on Exhibit 11 in the Exhibit Book.

The Reorganized Debtors shall retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with this Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

### 11.3.2 Preservation of Causes of Action

The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed to date, and, under this Plan, the Reorganized Debtors retain the right on behalf of the Debtors to commence and pursue any and all Retained Causes of Action. The potential causes of action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date or by the Reorganized Debtors, after the Effective Date are described more fully in the Disclosure Statement. In addition, there may be numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action herein, or on Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors.

### 11.3.3 Preservation of All Causes of Action not Expressly Settled or Released

Unless a Claim or cause of action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of

Action) for later adjudication by the Reorganized Debtors, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been released in this Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and the successor entities under this Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) such Claimant's proof of Claim has been objected to; (iii) such Claimant's Claim was included in the Debtors' Schedules; or (iv) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

## 11.4    THIRD-PARTY AGREEMENTS

The Distributions to the various classes of Claims hereunder will not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect.

## 11.5    PURPOSE OF THE FRESENIUS PAYMENT AND CONSISTENCY OF TREATMENT

The Debtors acknowledge and agree, that the Fresenius Indemnified Parties have entered into the Fresenius Settlement Agreement for the purpose of settling and terminating any and all controversies relating to the assertion of Asbestos Claims, as well as other Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, against the Fresenius Indemnified Parties. The Fresenius Payment is intended and shall be treated by the Settling Parties, as that term is defined in the Fresenius Settlement Agreement, as a payment by the Fresenius Indemnified Parties of an ordinary and necessary expense incurred by the Fresenius Indemnified Parties and as income of the Debtors and Reorganized Debtors in the same amount. Any indemnification payments made by Grace-Conn. to the Fresenius Indemnified Parties to the extent the indemnified obligation would have been an ordinary and necessary expense if incurred directly by Grace-Conn., shall be treated by the Settling Parties, as that term is defined in the Fresenius Settlement Agreement, as a payment by Grace-Conn. of an ordinary and necessary expense incurred by Grace-Conn. and, to the extent the indemnified obligation was itself deducted as an ordinary and necessary expense of the Fresenius Indemnified Parties as income of the Fresenius Indemnified Parties. None of the Settling Parties, as that term is defined in the

Fresenius Settlement Agreement, shall take a position inconsistent with the foregoing in any Tax Return, as that term is defined in the Fresenius Settlement Agreement, or with any tax authority.

## 11.6   PURPOSE OF THE SEALED AIR PAYMENT AND CONSISTENCY OF TREATMENT

The Debtors, the Reorganized Debtors and the Asbestos Trust shall treat for all tax purposes any and all payments by the Sealed Air Indemnified Parties directly to the Asbestos Trust as a direct payment by the Sealed Air Indemnified Parties to the Asbestos Trust for Asbestos Claims that constitutes an ordinary and necessary expense of the Sealed Air Indemnified Parties, and the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee and the Asbestos Trust (i) shall be prohibited from taking any Defined Action, as that term is defined in the Sealed Air Settlement Agreement, that is inconsistent with the provisions of the Sealed Air Settlement Agreement and (ii) shall take all Defined Actions, as that term is defined in the Sealed Air Settlement Agreement, that are reasonably requested by Sealed Air and consistent with the provisions of the Sealed Air Settlement Agreement unless otherwise permitted under the Sealed Air Settlement Agreement and the procedures outlined therein. The Debtors, the Reorganized Debtors and the Asbestos Trust shall file all Tax Returns, as that term is defined in the Sealed Air Settlement Agreement, required to be filed by such person, if any, consistent with the provisions of the Sealed Air Settlement Agreement. Each of the Debtors shall use its best efforts to:  (i) cause the Asbestos Trust to qualify, and to maintain its status, as a Qualified Settlement Fund, as that term is defined in the Sealed Air Settlement Agreement, and (ii) structure the transactions contemplated by the Sealed Air Settlement Agreement to achieve favorable tax treatment to the Sealed Air Indemnified Parties as set forth in the Sealed Air Settlement Agreement, provided that nothing in the Sealed Air Settlement Agreement shall in any way be construed as a representation, warranty, or covenant concerning the treatment for federal income tax purposes of any transfer by the Sealed Air Indemnified Parties pursuant to the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall promptly notify Sealed Air upon receipt by any such party of any notice of any pending or threatened audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar claim involving the Asbestos Trust, any Debtor, Reorganized Debtor or Non-Debtor Affiliate from any tax authority or any other person challenging the qualification of the Asbestos Trust as a Qualified Settlement Fund, as that term is defined in the Sealed Air Settlement Agreement, or the Sealed Air Payment as a direct payment to the Asbestos Trust that constitutes an ordinary and necessary expense of the Sealed Air Indemnified Parties and the Sealed Air Indemnified Parties shall be entitled to participate in such matters as outlined in the Sealed Air Settlement Agreement.

The Debtors and the Reorganized Debtors acknowledge and agree that the Debtors will account in their books and records for the liabilities satisfied by the Sealed Air Payment and the transfer of the Sealed Air Payment to the Asbestos Trust consistent with provisions of the Sealed Air Settlement Agreement.

### 11.7 DISSOLUTION OF THE UNSECURED CREDITORS' COMMITTEE, THE ASBESTOS PI COMMITTEE, THE ASBESTOS PD COMMITTEE AND THE EQUITY COMMITTEE; CONTINUED RETENTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE

On the Effective Date, the Asbestos PI Committee, the Asbestos PD Committee, and the Equity Committee shall thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and those committees shall be deemed dissolved.

The Unsecured Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and that committee shall be deemed dissolved on the first date on which the Reorganized Debtors shall have made distributions on account of Class 9 Claims in the aggregate amount of $881 million excluding post-petition interest (the "UCC Dissolution Date").

Notwithstanding the foregoing, if the Effective Date or the UCC Dissolution Date, as applicable, occurs prior to the entry of a Final Order with respect to final fee applications of Professionals retained by order of the Bankruptcy Court during the Chapter 11 Cases, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, and the Equity Committee may, at their option, continue to serve until a Final Order is entered with respect to such proceedings.

The FCR shall continue to serve through the termination of the Asbestos Trust in order to perform the functions required by the Asbestos Trust Agreement. Upon termination of the Asbestos Trust, the FCR's employment shall be deemed terminated and the FCR shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases.

All reasonable and necessary post-Effective Date fees and expenses of the Professionals retained by the Unsecured Creditors' Committee shall be paid by the Reorganized Debtors. If any dispute regarding the payment of such fees and expenses arises, the parties shall attempt to resolve such dispute in good faith. If they fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

### 11.8 EXCULPATION

None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Trustees of the Asbestos Trust, the Asbestos Trust Advisory Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors' Committee, the Equity Committee, the FCR, or any of their respective Representatives are to have or incur any liability to any Entity for any pre- or post-Petition Date act or omission in connection with, related to, or arising out of the negotiation of this Plan or the settlement provided in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of confirmation of this Plan, the consummation of this Plan or the settlement provided in the Sealed Air Settlement Agreement or Fresenius Settlement Agreement, or the administration of this Plan or the property to be distributed under this Plan so long as, in each case such action, or failure to act, did not constitute willful misconduct. In all respects, they will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. Any act or omission taken with the approval of the Bankruptcy Court will be

conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers.

### 11.9    TITLE TO ASSETS; DISCHARGE OF LIABILITIES

Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity. Except as otherwise provided in this Plan and in accordance with Bankruptcy Code § 1123(b)(3), on the Effective Date, title to all of the Debtors' assets and properties and interests in property, including the Retained Causes of Action, shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors.

### 11.10    NOTICES

Any notices, statements, requests, and demands required or permitted to be provided under this Plan, in order to be effective, must be:   (i) in writing (including by facsimile transmission), and unless otherwise expressly provided herein, shall be deemed to have been duly given or made (A) if personally delivered or if delivered by facsimile or courier service, when actually received by the Entity to whom notice is sent, (B) if deposited with the United States Postal Service (but only when actually received), at the close of business on the third business day following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, or (C) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) (but only when actually received) and (ii) addressed to the appropriate Entity or Entities to whom such notice, statement, request or demand is directed (and, if required, its counsel), at the address of such Entity or Entities set forth below (or at such other address as such Entity may designate from time to time by written notice to all other Entities listed below in accordance with this Section 11.10):

| If to the Debtors: | W. R. Grace & Co.<br>7500 Grace Drive<br>Columbia, MD 21044<br>Attn: Secretary<br>Telephone:          (410) 531-4000<br>Facsimile:          (410) 531-4545 |
|---|---|

A-55

| | |
|---|---|
| **With a copy to:** | Kirkland & Ellis LLP<br>777 South Figueroa Street, 37th Floor<br>Los Angeles, CA 90017<br>Attn:  Bennett L. Spiegel / Lori Sinanyan<br>Telephone:        (213) 680-8400<br>Facsimile:         (213) 680-8500<br><br>and<br><br>Kirkland & Ellis LLP<br>200 East Randolph Drive<br>Chicago, IL 60601<br>Attn:  Jonathan Friedland / Ryan Bennett<br>Telephone:        (312) 861-2000<br>Facsimile:         (312) 861-2200<br><br>and<br><br>Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.<br>919 North Market Street, 16th Floor<br>P.O. Box 8705<br>Attn:  Laura Davis Jones / David W. Carickhoff, Jr.<br>Wilmington, Delaware 19899-8705 (Courier 19801)<br>Telephone:        (302) 652-4100<br>Facsimile:         (302) 652-4400 |
| **If to Grace Canada Inc.:** | Grace Canada Inc.<br>627 Lyons Lane, Suite 308<br>Oakville, Ontario L6J 5Z7<br>Canada<br>Attn:  Pierre Le Bourdais<br>Telephone:        (905) 845-2728<br>Facsimile:         * |
| **With a copy to:** | Ogilvy Renault<br>Royal Bank Plaza, South Tower<br>200 Bay Street, Suite 3800<br>Toronto, Ontario  M5J 2Z4<br>Canada<br>Attn:  Derrick Tay<br>Telephone:        (416) 216-4832<br>Facsimile:         (416) 216-3930 |
| **If to the Asbestos PI Committee:** | Caplin & Drysdale, Chartered<br>One Thomas Circle NW, Suite 1100<br>Washington D.C. 20005<br>Attn: Peter Van N. Lockwood<br>Telephone:        (202) 862-5000<br>Facsimile:         (202) 429-3301 |
| **If to the Asbestos PD Committee:** | Bilzin Sumberg Baena Price & Axelrod LLP<br>200 South Biscayne Blvd., Suite 2500<br>Miami, FL  33131-2336<br>Attn:  Scott L. Baena / Jay Sackalo / Minda A. Mora<br>Telephone:        (305) 374-7580<br>Facsimile:         (305) 374-7593 |

49

A-56

| If to the Future Claimants' Representative: | David T. Austern<br>8260 Willow Oaks Corp. Drive<br>P.O. Box 10415<br>Fairfax, VA 22031<br>Telephone:        (703) 204-9300<br>Facsimile:        (703) 205-6249 |
|---|---|
| With a copy to: | Swidler, Berlin, Shereff, Friedman LLP<br>The Washington Harbour<br>3000 K Street, NW, Suite 300<br>Washington, DC 20007<br>Attn:  Roger Frankel<br>Telephone:        (202) 424-7500<br>Facsimile:        (202) 424-7643 |
| If to the Unsecured Creditors' Committee: | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY  10038-4982<br>Attn:  Lewis Kruger / Arlene Krieger / Kenneth Pasquale<br>Telephone:        (212) 806-5400<br>Facsimile:        (212) 806-6006 |
| If to Sealed Air: | Sealed Air Corporation<br>Park 80 East<br>Saddlebrook, NJ  07663<br>Attn:  Mary A. Coventry<br>Telephone:        (201) 791-7600<br>Facsimile:        (201) 703-4205 |
| With a copy to: | Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY  10036<br>Attn:  Jan Baker / Shmuel Vasser<br>Telephone:        (212) 735-3000<br>Facsimile:        (212) 735-2000 |
| If to Fresenius: | Fresenius Medical Care North America<br>Corporate Headquarters<br>Corporate Law Department<br>95 Hayden Avenue<br>Lexington, MA 02420-9192<br>Attn:  General Counsel<br>Telephone:        (781) 402-9000<br>Facsimile:        (781) 402-9700 |
| With a copy to: | McDermott, Will & Emery<br>227 W. Monroe, Suite 4400<br>Chicago, IL 60606<br>Attn:  David S. Rosenbloom<br>Telephone:        (312) 372-2000<br>Facsimile:        (312) 984-7700 |
| If to the Equity Committee: | Kramer Levin Naftalis & Frankel LLP<br>919 Third Avenue<br>New York, NY 10022<br>Attn:  Phillip Bentley / Gary M. Becker<br>Telephone:        (212) 715-9100<br>Facsimile:        (212) 715-8000 |

### 11.11  HEADINGS

The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

### 11.12  GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware, without giving effect to any conflicts of law principles thereof that would result in the application of the laws of any other jurisdiction, shall govern the construction of this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise expressly provided in such instruments, agreements, or documents.

### 11.13  FILING OF ADDITIONAL DOCUMENTS

On or before the Effective Date, the Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee, the Unsecured Creditors' Committee, and the FCR shall File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### 11.14  COMPLIANCE WITH TAX REQUIREMENTS

In connection with this Plan, the Debtors, the Reorganized Debtors, and the Asbestos Trust will comply with all applicable withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all Distributions hereunder or under any Plan Document shall be subject to such withholding and reporting requirements, if any. Notwithstanding any other provision of this Plan, each Entity receiving a Distribution pursuant to this Plan, or any other Plan Document, will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income tax and other obligations, on account of that Distribution.

### 11.15  EXEMPTION FROM TRANSFER TAXES

Pursuant to Bankruptcy Code § 1146(c), the issuance, transfer, or exchange of notes or equity securities under this Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan shall be exempt from all taxes as provided in Bankruptcy Code § 1146(c).

### 11.16  FURTHER ASSURANCES

The Plan Proponents, the Reorganized Debtors, the Non-Debtor Affiliates, the Asbestos Indemnified Parties, the Asbestos Insurance Entities, the Asbestos Trust, and all Holders of Claims receiving Distributions under this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of this Plan as may be necessary to effectuate the provisions and intent of this Plan, with each such Entity to bear its own costs incurred in connection therewith.

A-58

**11.17  FURTHER AUTHORIZATIONS**

The Debtors, and, after the Effective Date, the Reorganized Debtors or the Asbestos Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan, with each such Entity to bear its own costs in connection therewith.

Respectfully submitted,

**W. R. GRACE & CO.,** et al.
(on behalf of the Debtors and Debtors In Possession)

By: _____
Name: David B. Siegel
Title:  Senior Vice President, General Counsel &
        Chief Restructuring Officer

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
Name: Thomas F. Maher
Title:  Chairman

**OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

By: _____
Name: R. Ted Weschler
Title:  Chairman

52

K&B 9713202.15

A-59

**11.17  FURTHER AUTHORIZATIONS**

The Debtors, and, after the Effective Date, the Reorganized Debtors or the Asbestos Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan, with each such Entity to bear its own costs in connection therewith.

Respectfully submitted,

**W. R. GRACE & CO., et al,**
(on behalf of the Debtors and Debtors In Possession)

By: _____
Name: David B. Siegel
Title:  Senior Vice President, General Counsel &
        Chief Restructuring Officer

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
Name: Thomas F. Maher
Title:  Chairman

**OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

By: _____
Name: R. Ted Weschler
Title:  Chairman

52

A-60

**11.17  FURTHER AUTHORIZATIONS**

The Debtors, and, after the Effective Date, the Reorganized Debtors or the Asbestos Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan, with each such Entity to bear its own costs in connection therewith.

Respectfully submitted,

**W. R. GRACE & CO., et al.**
(on behalf of the Debtors and Debtors In Possession)

By: _____
Name: David B. Siegel
Title:   Senior Vice President, General Counsel &
          Chief Restructuring Officer

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
Name: Thomas F. Maher
Title:   Chairman

**OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

By: _____
Name: R. Ted Weschler
Title:   Chairman

52

K&E 9713202.25

# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: December 2, 2005 at 4:00 p.m.
Hearing Date: December 19, 2005 at 12:00 p.m.

### DEBTORS' NINTH MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1121(d) EXTENDING DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND TO SOLICIT VOTES THEREON

The Debtors' chapter 11 cases present a complex challenge for all parties. From the very beginning, the Debtors aggressively attempted to map out a strategy for claims adjudication, common issue litigation and confirmation. While the various constituencies have been at odds for years on such strategy, the Court has now placed the parties on a clear path toward estimation and ultimately confirmation. Extending the Debtors' exclusivity is completely consistent with that process and should be ordered.

The Court has approved case management orders for the estimation of both PI and PD claims, and a PI questionnaire; the parties have complied with the requirements of the PD CMO and are nearly at the stage of the Phase I hearing for PD claims; the Debtors have eliminated nearly 75% of the PD claims through claims objections; and all constituents have a renewed commitment to settlement discussions to reach a consensual plan of reorganization. Essentially, the parties are well down the estimation road that the Court established. Only along

(or at the end of) this road is confirmation likely. Accordingly, the Debtors' request at this time for an extension of the Exclusive Periods is reasonable and should be granted.

### Relief Requested

By this Motion, the Debtors request that this Court (a) extend the exclusive right to file a chapter 11 plan of reorganization under Bankruptcy Code § 1121(b) (the "Exclusive Filing Period") through and including the 90th day after a final order is issued in the Estimation Hearings, and (b) extend the exclusive right to solicit acceptances of a plan of reorganization under Bankruptcy Code § 1121(c)(3) through and including an additional 60 days thereafter (the "Exclusive Solicitation Period" and together with the Exclusive Filing Period, the "Exclusive Periods.")

### Argument

1.    The facts and the law squarely support extending the Exclusive Periods. The length of these chapter 11 cases is consistent with other complex asbestos cases. In fact, as elaborated below, the Debtors have made substantial progress toward confirmation of a plan of reorganization. Thus, the Debtors satisfy the factors courts have examined in granting similar extensions. Failure to extend the Exclusive Periods would cause potential chaos at a key time in these cases and could damage the Debtors' businesses.

I.      **The Length of these Cases is Consistent with Other Large, Complex Asbestos Cases**

        2.      The Debtors filed a motion for approval of an original case management order (the "Original CMO Motion") less than 3 months after the Petition Date.[1]  The Original CMO Motion requested protocols for pre-confirmation common issues litigation and claims liquidation, and thus presented a path for confirming a plan with reasonable speed.  Judge Wolin never ruled upon the Original CMO Motion.

        3.      The various parties in these chapter 11 cases have tried to negotiate a consensual plan and continue to have discussions in this regard.  However, there remains fundamental and dramatic disagreements among all parties over the value of the various claims in these cases that makes negotiations extremely difficult.  For example:

- The ZAI claimants believe their claims significantly dwarf those of the other PD claimants and PI claimants;

- the PD claimants believe their claims are comparable to the PI claims;

- the PI claimants believe their claims eclipse those of the PD claimants; and

- the Unsecured Creditors' Committee and the Equity Committee believe all the tort claims are overvalued and the Debtors' businesses have substantial equity.

        4.      Because the various parties were unable to reach any agreement on a plan, the Debtors offered an alternative path to confirmation.  Specifically, they filed a plan of

---

[1]   See Docket No. 586.

reorganization and disclosure statement along with related motions for estimation, solicitation and a new case management order.[2]

     5.    The Court did not approve the Disclosure Statement.  Instead, the Court instructed the Debtors to work with each of the Asbestos Parties to negotiate a case management order to govern the estimation of asbestos property damage ("PD") and asbestos personal injury ("PI") liabilities.  In doing so, the Court recognized that, in order to confirm any plan in these chapter 11 cases, it would be necessary to conduct an estimation and determine the aggregate amount of asbestos claims.[3]

## II.    Progress made in Chapter 11 Cases with Respect to Asbestos Claims

     6.    As detailed below, the Debtors subsequently negotiated the terms of two case management orders to govern the estimation of asbestos claims.  Estimation is key absent settlement.  The Debtors can only proceed to plan confirmation after the Estimation Hearings are concluded and the aggregate amount of asbestos claims is determined.  The Court, and all the parties, recognize this and are now well down the road of estimation.

---

[2]    Each was filed on November 13, 2004.  See *Plan* (Docket No. 6895); *Disclosure Statement* (Docket No. 6896); *Estimation Motion* (Docket No. 6899); *Solicitation Motion* (Docket No. 6900) and *New CMO Motion* (Docket No. 6898).  On January 13, 2005, the Debtors filed an amended plan and disclosure statement to include the Official Committee of Unsecured Creditors and the Equity Committee as joint proponents (the "Plan" and the "Disclosure Statement," respectively).

[3]    This occurred at the January 21, 2005 hearing.

A-65

## A.  Asbestos Property Damage Claims

7.     Since the January 2005 disclosure statement hearing, the Debtors

negotiated the terms of a case management order to govern the estimation of the PD claims.  On

August 31, 2005, the Court entered a case management order for estimating the liability for

pending PD claims (the "PD CMO"), excluding ZAI claims.  The PD CMO targets a Phase I

hearing in March 2006 and a Phase II hearing in September 2006 (the "PD Estimation

Hearing").[4]

8.     The PD CMO required that the parties (a) designate their witnesses and

experts and (b) submit briefs, and responses thereto, to the Court addressing constructive notice

and methodology issues.  The PD CMO further mandated that the Debtors submit expert reports

addressing the Phase I issues.  These designations and submissions have been completed and the

Court is set to hear, at the November omnibus hearing, the issues briefed so as to rule on the

scope of the Phase I trial.

9.     In addition to the above, the Debtors have begun to overcome one of the

biggest impediments to reaching a resolution with the PD claimants -- the claims filed by

Speights & Runyan.  The Debtors' objections thus far have resulted in the withdrawal or

disallowance of approximately 1,700 Speights & Runyan claims as of October 31, 2005.  The

Debtors anticipate disallowance of another approximately 600 claims as a result of the Court's

October 31, 2005 ruling regarding the Anderson Memorial related claims.

---

[4]    Phase I is to deal with two issues:  Daubert methodology and constructive notice.  Phase II will consist of merits-based estimation of the PD claims.

A-66

10.     In addition, the Debtors have obtained the disallowance of or successfully negotiated the resolution of approximately another 200 non-Speights & Runyan PD claims and have executed or are in the process of executing stipulations regarding many of these claims. Furthermore, the Debtors anticipate that an additional approximately 250 claims will be disallowed as the claimants failed to respond to the Debtors' objections.

11.     The substantial progress that the Debtors have made in reducing approximately 3,950 PD claims down to approximately 1,200 PD claims will make it easier to either negotiate a consensual resolution of the PD claims or litigate the PD claims through the continuing objection process or at the PD Estimation Hearing.

### B.    Asbestos Personal Injury Claims

12.     Since the January 2005 disclosure statement hearing, the Debtors have also (a) negotiated the terms of a case management order to govern the estimation of the asbestos personal injury claims and (b) obtained an order approving the form of Debtors' proposed questionnaire for asbestos personal injury pre-petition litigation claims (the "PI Questionnaire").

13.     On August 31, 2005, the Court issued a case management order for estimating the liability for pending PI claims (the "PI CMO") and approved the PI Questionnaire. The PI CMO targets an estimation hearing in September 2006 (the "PI Estimation Hearing" and together with the PD Estimation Hearing, the "Estimation Hearings"). The Debtors believe that one of the keys to this estimation process is the PI Questionnaire as all PI claimants are obliged to provide the Debtors with detailed information regarding their PI claims. The Debtors require this data in order to accurately estimate the PI claims for purposes of the PI Estimation Hearing. PI Questionnaires have now been sent to all known holders of prepetition PI claims.

K&E 10807134.7

A-67

### III.    Cause Exists to Extend the Exclusive Periods

14.    Bankruptcy Code § 1121(d) grants this Court authority to extend the

Exclusive Periods "for cause" after notice and a hearing.[5]

15.    Courts have relied on a variety of factors to determine whether cause

exists to extend the exclusive periods in which to file a plan of reorganization, each of which

may provide sufficient grounds for such an extension.  These factors include:

- the size and complexity of the case,

- the existence of good faith progress toward reorganization,

- whether the debtor is paying its debts as they come due,

- whether the debtor has demonstrated reasonable prospects for filing a viable plan,

- whether the debtor has made progress in negotiating with creditors,

- whether the debtor is seeking the extension to pressure creditors, and

- whether unresolved contingencies exist.[6]

---

[5]    Although the term "cause" is not defined by the Bankruptcy Code, the legislative history indicates that it is to be viewed flexibly "in order to allow the debtor to reach an agreement." H.R. Rep. No. 95, 95th Cong., 1st Sess. 232 (1997); see also, In re McLean Indus., Inc., 87 B.R. 830, 833 (Bankr. S.D.N.Y. 1987) (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 231 (1978), reprinted in 1978, U.S.C.C.A.N. 5963, 6190); and In re Public Serv. Co. of New Hampshire, 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("legislative intent . . . [is] to promote maximum flexibility").

To facilitate this legislative intent, a debtor should be given a reasonable opportunity to negotiate an acceptable plan with creditors and to prepare adequate financial and nonfinancial information concerning the ramifications of any proposed plan for disclosure to creditors. See, e.g., McLean Indus., 87 B.R. at 833-34; In re Texaco Inc., 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987). The decision to extend a debtor's exclusive periods is committed to the sound discretion of the bankruptcy court based upon the facts and circumstances of each particular case. See, e.g., First Am. Bank of New York v. Southwest Gloves and Safety Equip., Inc., 64 B.R. 963, 965 (D. Del. 1986).

[6]    See In re Express One Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (finding cause to extend the exclusive periods where the debtor has been diligent in its attempts to reorganize and the extension was not sought for an indefinite period); see also, In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409-10

(Continued...)

16.     These factors clearly support extending the Exclusive Periods in the

Debtors' cases:

- These chapter 11 cases were filed as a result of mounting asbestos-related litigation liabilities. Defining these liabilities and then providing for the payment of valid claims on a basis that preserves the Debtors' core business operations is a complex process that is central to resolving these chapter 11 cases. This process is now firmly under way, as discovery in connection with estimation is progressing.

- Regardless of the means chosen by the Court to estimate the Debtors' asbestos-related liabilities, the process will almost certainly be a time-consuming and complex one toward which the Debtors and the Asbestos Parties must devote a tremendous amount of time and a large number of resources. As the Court has focused all the parties on an estimation process, the relief requested herein would afford the Debtors an opportunity to continue to work toward estimation without the ancillary distraction of addressing potential competing plans.

- Further, the Debtors and all constituencies continue to engage in discussions concerning a consensual plan. In fact, of late, as the estimation discovery progresses, these settlement discussions have increased and all parties have a renewed commitment to attempting to make progress. The requested relief would allow the Debtors to continue to utilize their resources in a manner that will most effectively and expediently further the estimation process while also providing the opportunity for the Debtors to continue discussions with other constituents that could result in a consensual plan.

- Additionally, at all times during the course of these chapter 11 cases, the Debtors have acted in good faith and have continued to pay their post-petition obligations.

- Finally, in light of the size and complexity of these chapter 11 cases and in light of the current time frame for resolving the

---

(E.D.N.Y. 1989) (listing some of the above-referenced factors); In re Grand Traverse Dev. Co. Ltd. P'ship, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992) (same); In re General Bearing Corp., 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) (same); and In re Southwest Oil Co. of Jourdanton, 84 B.R. 448, 451-54 (Bankr. W.D. Tex. 1987) (same).

K&E 10807134.7

Asbestos Claim issues, which will be a critical component of the Debtors' (or any) ultimate plan of reorganization, the Debtors' request at this time for an extension of the Exclusive Periods is reasonable.

17.     Given the complex circumstances of this case and the unusual length of time required to properly estimate the asbestos claims and determine how such claims should be valued in the Debtors' plan of reorganization, the Debtors' request is not beyond the range of extensions granted by this and other courts in large reorganization cases, which did not involve such complexities in their administration.  See, e.g., In re Loewen Group Int'l, Inc., Case No. 99-1244 (PJW) (Bankr. D. Del. June 1, 1999) (exclusive periods extended for 25 months because ongoing litigation complicated the resolution of the chapter 11 case).

18.     Indeed, courts have routinely granted exclusive period extensions covering several years even when resolution of the chapter 11 cases did not revolve around complex litigation issues.  See, e.g., In re Phar-Mor, Inc., Case No. 92-41599 (Bankr. N.D. Ohio) (exclusive periods extended approximately three years).  Here, the Debtors cannot (nor can any party) proceed to plan confirmation on a practical or reasonable basis until after the Estimation Hearings are concluded and the aggregate amount of asbestos claims is determined.

19.     Accordingly, extending the Exclusive Periods as requested by the Debtors is reasonable and appropriate under the circumstances.

9                                    A-70

## IV.   Terminating Exclusivity Would Hurt All Parties

20.    As discussed at length in the *Debtors' Report on Business Effects of Terminating Exclusivity*[7] and the accompanying affidavit of the Debtors' President and CEO, Fred Festa, terminating exclusivity in these chapter 11 cases may have a negative impact on the Debtors' businesses.  Externally, terminating exclusivity would almost certainly result in, among other things, a tightening of the Debtors' ability to obtain credit and other accommodations, loss of customer confidence, and lack of competitive edge.  Internally, terminating exclusivity may damage, among other things, employee relations and the Debtors' ability to recruit and keep young talent.  This would hurt <u>all</u> parties.

21.    Furthermore, terminating exclusivity in a case of this size and complexity is rare.  In fact, in the approximately 70 significant asbestos related chapter 11 cases that have been filed over the last 20 years, the Debtors have found that on only three occasions has exclusivity been terminated and, those three cases are distinguishable from the present situation.  The very fact that exclusivity is essentially never terminated in cases of this sort will set off alarm bells that are likely to affect the Debtors' businesses in the event it is terminated here.  Thus, the Debtors' Motion should be granted.

### <u>Notice</u>

22.    Notice of this Motion has been given to (a) the Office of the United States Trustee, (b) counsel to the debtor-in-possession lenders, (c) counsel to the committees appointed

---

[7]    <u>See</u> Docket No. 8486.

by the United States Trustee, and (d) those parties that requested papers under Fed. R. Bankr. P.

2002.

WHEREFORE, the Debtors respectfully request that the Court enter an order:

(a) extending the Debtors' Exclusive Filing Period through and including the 90th day after a

final order is issued in the Estimation Hearings; (b) extending the Debtors' Exclusive Solicitation

Period through and including an additional 60 days thereafter; and (c) granting such other relief

as may be fair and equitable.

Dated:  November 14, 2005      KIRKLAND & ELLIS
David M. Bernick, P.C.
Janet S. Baer
Jonathan Friedland
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile:  (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

_James E O'Neill_

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-counsel for Debtors and Debtors in Possession

A-72

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Objection Deadline: December 2, 2005 at 4:00 p.m.** |
| | | **Hearing Date: December 19, 2005 at 12:00 p.m.** |

**NOTICE OF DEBTORS' NINTH MOTION FOR AN ORDER PURSUANT TO
11 U.S.C. § 1121(d) EXTENDING DEBTORS' EXCLUSIVE PERIODS
IN WHICH TO FILE A CHAPTER 11 PLAN AND TO SOLICIT VOTES THEREON**

TO:    Parties required to receive notice pursuant to Del. Bankr. LR 2002-1.

On November 14, 2005, the above-captioned debtors and debtors in possession

(collectively, the "Debtors") filed the *"Debtors' Ninth Motion for an Order Pursuant to 11*

*U.S.C. § 1121(d) Extending Debtors' Exclusive Periods In Which to File a Chapter 11 Plan and*

*to Solicit Votes Thereon"* (the "Motion") with the United States Bankruptcy Court for the District

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

of Delaware, 824 Market Street, Wilmington, Delaware 19801 (the "Bankruptcy Court"). The

Motion seeks to extend (a) the Debtors' exclusive period for filing a chapter 11 plan of

reorganization through and including the 90th day after a final order is issued in the Estimation

Hearings and (b) the Debtors' exclusive right to solcit votes thereon through and including an

additional 60 days thereafter. A true and correct copy of the Motion is attached hereto.

   Objections and other responses to the relief requested in the Motion, if any, must

be in writing and be filed with the Bankruptcy Court no later than **4:00 p.m. prevailing Eastern

Time on December 2, 2005.**

   At the same time, you must also serve a copy of the objections or responses, if

any, upon the following: (i) co-counsel for the Debtors, Janet S. Baer, Esquire, Kirkland & Ellis

LLP, 200 East Randolph Drive, Chicago, Illinois 60601 (fax number 312-861-2200), and Laura

Davis Jones, Esquire, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., 919 North

Market Street, 16th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801) (fax

number 302-652-4400); (ii) counsel to the Official Committee of Unsecured Creditors, Lewis

Kruger, Esquire, Stroock & Stroock & Lavan, 180 Maiden Lane, New York, New York 10038-

4982 (fax number 212-806-6006), and Michael R. Lastowski, Esquire, Duane, Morris &

Heckscher, LLP, 1100 N. Market Street, Suite 1200, Wilmington, Delaware 19801-1246 (fax

number 302-657-4901); (iii) counsel to the Official Committee of Property Damage Claimants,

Scott L. Baena, Esquire, Bilzin, Sumberg, Dunn, Baena, Price & Axelrod, First Union Financial

Center, 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131 (fax number 305-

374-7593), and Michael B. Joseph, Esquire, Ferry & Joseph, P.A., 824 Market Street, Suite 904,

P.O. Box 1351, Wilmington, Delaware 19899 (fax number 302-575-1714); (iv) counsel to the

Official Committee of Personal Injury Claimants, Elihu Inselbuch, Esquire, Caplin & Drysdale,

399 Park Avenue, 36th Floor, New York, New York 10022 (fax number 212-644-6755), and

Mark Hurford, Esquire, Campbell & Levine, LLC, Chase Manhattan Centre, 15th Floor, 1201

Market Street, Suite 1500, Wilmington, Delaware 19801 (fax number 302-426-9947);

(v) counsel to the DIP Lenders, J. Douglas Bacon, Esquire, Latham & Watkins, Sears Tower,

Suite 5800, Chicago, Illinois 60606 (fax number 312-993-9767), and Steven M. Yoder, Esquire,

The Bayard Firm, 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, Delaware

19899 (fax number 302-658-6395); (vi) the Office of the United States Trustee, Attn: David

Klauder, Esquire, 844 N. King Street, Wilmington, Delaware 19801 (fax number 302-573-

6497); and (vii) counsel to the Official Committee of Equity Holders, Gary Becker, Esquire,

Kramer Levin Naftalis & Frankel LLP, 919 Third Avenue, New York, New York 10022 (fax

number 212-715-8000).

IF NO OBJECTIONS ARE TIMELY FILED AND SERVED IN

ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE

RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

IN THE EVENT THAT ANY OBJECTION OR RESPONSE IS FILED AND

SERVED IN ACCORDANCE WITH THIS NOTICE, A HEARING ON THE MOTION WILL

BE HELD BEFORE THE HONORABLE JUDITH K. FITZGERALD AT THE

3

A-75

BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, MARINE MIDLAND

PLAZA, 824 MARKET STREET, WILMINGTON, DELAWARE, 19801 ON DECEMBER 19,

2005 AT 12:00 P.M. NOON PREVAILING EASTERN TIME.

Dated:  November 14, 2005          KIRKLAND & ELLIS
                                    David M. Bernick, P.C.
                                    Janet S. Baer
                                    Jonathan Friedland
                                    200 East Randolph Drive
                                    Chicago, Illinois 60601
                                    Telephone:  (312) 861-2000
                                    Facsimile:  (312) 861-2200

                                    and

                                    PACHULSKI, STANG, ZIEHL, YOUNG, JONES
                                    & WEINTRAUB P.C.

                                    _____
                                    Laura Davis Jones (Bar No. 2436)
                                    James E. O'Neill (Bar No. 4042)
                                    919 North Market Street, 16th Floor
                                    P.O. Box 8705
                                    Wilmington, DE 19899-8705 (Courier 19801)
                                    Telephone:  (302) 652-4100
                                    Facsimile:  (302) 652-4400

                                    Co-counsel for Debtors and Debtors in Possession

A-76

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | Re: Docket No. ____ |
| | | Agenda Item No. _____ |

### ORDER PURSUANT TO 11 U.S.C. §1121(d)
### EXTENDING DEBTORS' EXCLUSIVE PERIODS IN WHICH
### TO FILE A CHAPTER 11 PLAN AND TO SOLICIT VOTES THEREON

This matter coming before the Court on the "Debtors' Ninth Motion for an Order

Pursuant to 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods In Which to File a

Chapter 11 Plan and to Solicit Votes Thereon" (the "Motion") filed by the Debtors for entry of

an order pursuant to section 1121(d) of the Bankruptcy Code[2] extending the exclusive periods in

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

**A-77**

which to file a chapter 11 plan of reorganization and to solicit acceptances thereof; the Court

having reviewed the Motion; the Court finding that (a) the Court has jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2), and (c) notice of the Motion was adequate under the circumstances; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The Debtors' Exclusive Filing Period is extended through and including

the 90th day after a final order is issued in the Estimation Hearings.

3.    The Debtors' Exclusive Solicitation Period is extended through and

including an additional 60 days thereafter.

4.    This Order shall be without prejudice to the Debtors' rights to seek

additional extensions of the Exclusive Filing Period and the Exclusive Solicitation Period.

5.    The Court shall retain jurisdiction to hear and determine all matters arising

from or relating to this Order.

Dated: _____ , 2005

_____
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

A-78

# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## GRACE'S STATUS REPORT ON THE PROGRESS OF THE CASE

Grace appreciates both the substantial efforts undertaken by the Court to date and the fact that progress toward resolution of this case sometimes has been less than clear. Overwhelmingly, such progress turns upon addressing the difficult substantive issues that are central to determining the true scope of Grace's legal liability. Sometimes, however, describing case developments fully to the Court has been a problem for all parties. Grace files this status report in an effort to set forth in the plainest possible fashion (1) a negotiation history that has not previously been fully reported to the Court, and (2) the concrete steps that have been taken by Grace in recent weeks both to respond to certain concerns previously expressed by the Court and to advance the case.

We want to reiterate at the outset, however, that the most persistent obstacle is neither a lack of communication, nor any unwillingness of the Debtors to bring the case to conclusion. Rather, resolving substantive issues remains key. Excepting one, these issues are well known to the Court. They are:

- The difficulty of distinguishing valid personal injury claims from the mass of "screening claims." The latter have been decried by all objective observers, ranging from the scientific community, to the Supreme Court, to legislators and, more recently, to certain federal courts.

**A-79**

- The wholesale creation of a new round of property damage litigation comprising reams of "new" claims,* a formidable undertaking made in this case and elsewhere by the ever-imaginative and patient Dan Speights.

- The less mature effort to hypothesize the existence of ZAI claims that are speculative in dimension and lacking in scientific and legal merit.

Probably less well known to the Court are the additional issues posed by the Government's decision to prosecute criminal environmental claims against Grace. These claims do not comprise a whole new area of civil liability (indeed, any civil injuries flowing from the underlying conduct at issue have been asserted against Grace in this case and in historical litigation that is to be resolved in this case). But the dimensions of the criminal case remain uncertain and its outcome unknown, adding to the uncertainty surrounding Grace's overall liability.

Uncertainty concerning Grace's liabilities nonetheless does not spell insolvency, albeit the claimants here would have the Court prejudge this to be so. The recent announcement of a consensual plan for USG is instructive. USG too claimed that it was solvent and prompted the same denials by the same constituencies that have urged the Court here to simply blink away the critical task of defining Grace's real legal liability. Now it turns out that USG has billions in equity value.

Beyond the substantive issues posed in this case, there are external factors as well – factors that Grace does not control – that have produced delay. Again, the Court is very familiar with some of these factors and less so with others:

- The Court itself has experienced the impact of (a) Judge Becker's decision to reassign the case to Judge Wolin (even as Judge Farnan was set to rule on Grace's request for case management orders), (b) Judge Wolin's decision to postpone even addressing the scope of Grace's personal injury liability, (c) the subsequent recusal of Judge Wolin,

---

* After approximately 20 years of property damage litigation, fewer than ten property damage suits remained pending as of the date Grace filed for Chapter 11 protection.

- 2 -

and (d) the resulting reassignment of the case for a second time. These events literally stopped in its tracks for nearly four years the task of defining Grace's personal injury liability, a task that only began for the first time six months ago when the Court approved the issuance of questionnaires.

- The Court probably is less knowledgeable about the unintended effects of the proposed asbestos legislation. The fact is that while passage of the legislation would have a dramatically positive impact upon this case, the legislation as proposed but not passed has had a dramatically negative effect, particularly on negotiations. It was not until an agreement was reached in the Babcock and Wilcox case last August that the personal injury claimants and an asbestos debtor were able to negotiate a contingency provision that permitted case resolution even though the legislation remained pending. The USG plan contains a similar feature.

So, what does this status report offer up that is new? Four things. *First*, it recounts in detail what was not disclosed fully to the Court last December – a chronology of the recent efforts (undertaken with Grace's full cooperation and indeed its initiative) to reach agreement on a plan. *Second*, it updates that account with a description of what has happened since December. *Third*, it describes the steps that Grace has taken to specifically address concerns expressed by the Court regarding the progress of negotiations and Grace's currently proposed plan. *Finally*, it reviews what can be done by the Court to assure further progress.

## I.    NEGOTIATIONS PRIOR TO THE DECEMBER HEARING

In connection with the extension of exclusivity last December, the Court received briefs from the personal injury claimants, the property damage claimants and David Austern, all asserting (some stridently) that Grace had done nothing to advance settlement negotiations. These representations were inaccurate, in part out of ignorance. Grace pointed this out in its own brief, but relied upon the expected oral report of Mr. Dies to set the record straight. For a variety of reasons, this never occurred and the Court was faced with the task of sorting out the truth from counsel's competing accounts. Not a good situation.

The affidavit of Robert Beber attached as <u>Exhibit A</u> sets out the history that Grace expected would emerge when Mr. Dies rose to speak. In submitting this affidavit, Grace intends

neither to criticize Mr. Dies nor to impugn his integrity. Mr. Dies' presentation was constrained by many factors, none of them (in Grace's view) borne of an intent to mislead the Court. But the fact remains that the full story was never told.

The essence of Mr. Beber's affidavit can be captured in a few sentences. At the direction of the Court, Grace developed a proposed plan of reorganization in the Fall of 2004. While the ensuing briefing concerning this plan focused on legal issues, an equally important function of the plan was to propose basic economic terms for a deal. Grace devoted much thought and analysis to these terms when it put the plan together, and it specifically intended to use the plan as a vehicle for a real, dollar-oriented negotiation. In doing so, Grace built upon principal-to-principal discussions that had occurred earlier in the case. The whole idea was to re-start real negotiations.

And this is exactly what occurred. Before filing the plan, Grace circulated a description of the plan and met with the parties. The discussions involved principals. And they came close to success. The Court may recall that Grace asked for a 30-day extension of the deadline to file the plan. This request was driven directly by the parties' optimism that an agreement was imminent.

This optimism ultimately proved to be only that. A deal was not reached for reasons that are still unclear to Grace but that now are irrelevant. And so the plan was filed without the support of the tort claimants. The consequent developments in court were totally predictable: extensive briefing on legal issues raised by the plan, briefing on estimation, briefing on case management orders, etc. etc.

When all the dust settled, the Court deferred ruling on the legal issues raised concerning the plan and set the course for estimation.

But the fire of the nearly-reached agreement did still burn. Mr. Beber, former General Counsel for Grace, had developed a 25 year relationship with Mr. Dies. Both thought that an agreement to resolve the entire case was achievable, notwithstanding the recent stalemate. Mr. Dies, in turn, enjoyed a parallel relationship with Russell Budd, one of the key personal injury attorneys in the case. Dies and Beber agreed that Dies should discuss global resolution with Budd and see if progress could be made. Grace, in turn, met with other representatives of the personal injury committee and heard their suggestion that the personal injury claims should be settled. Judging that resolution of the whole case should be given priority over partial resolution, Grace decided to hold off on negotiating directly with the personal injury claimants (or with any claimants for that matter), leaving the field clear for discussions between Dies and Budd.

As of the December 2005 hearing, Grace had heard promising reports on the dialogue between Dies and Budd. Grace did not, however, know the terms of the deal currently under discussion. Relying upon its relationship with Mr. Dies, Grace was content to await his report to the Court.

As events unfolded, that report was very brief and did nothing to dispel the dark cloud cast over Grace's diligence by the previously submitted briefs.

## II.    WHAT HAS OCCURRED ON THE NEGOTIATION FRONT SINCE THE DECEMBER HEARING

Following the December hearing, Grace has sought to move negotiations forward on two fronts.

*First*, through Mr. Beber, Grace has encouraged the continuation of discussions between Messrs. Dies and Budd. Grace also has asked to learn the terms being negotiated, so as to avoid misunderstandings in the event that an agreement is reached. Grace has learned that the dialogue between Dies and Budd has not progressed, apparently because counsel for the personal injury

A-83

claimants have been fully occupied with the USG negotiations. Grace takes these representations at face value and does not suggest that the resulting delay is unreasonable. Grace still has received no response to its request for information concerning the Dies and Budd negotiation.

*Second*, in line with the Courts' prior reminder to Grace that it was responsible for taking the initiative on plan negotiations, Grace has sought to reactivate direct discussions with personal injury representatives. Specifically:

- Grace has had direct discussions with counsel for David Austern and with counsel for personal injury claimants.

- Grace developed and distributed a proposed structure for a consensual plan that would (a) reflect agreement with the general unsecured creditors, (b) resolve all issues with personal injury claimants, and (c) could grow to include an agreement with property damage claimants.

- At the invitation of the personal injury claimants, Grace has recently made a financial proposal for resolution of current and future personal injury claims.

Grace is prepared to proceed with either of the settlement tracks. Each has advantages and disadvantages, but either could produce resolution.

## III.    GRACE'S WORK ON PLAN AMENDMENT

Grace also has been at work both to address the Court's concerns with the plan on file and also to draft a plan to be used if agreement is reached with the personal injury claimants.

As to the plan now on file, the Court will recall that:

- That plan was filed on November 13, 2004 and amended on January 13, 2005 to include the support of equity and the general unsecured creditors.

- The plan called for a capped fund dedicated to the resolution of meritorious personal injury claims, the amount of the cap to be determined through estimation. Estimation would not be done for allowance or disallowance purposes but solely to set the cap.

- The plan further provided that other contested personal injury claims would be liquidated post-confirmation pursuant to a case management order. There would be no cap, and equity would be at risk.

- 6 -

- Property damage claims would be estimated for distribution purposes and paid.

- After the plan was filed, it was challenged on legal grounds, with a major focus being the issue of impairment.

- The Court heard extensive argument on the impairment issue on January 21, 2005 and decided to defer resolution of this and other plan issues and proceed with estimation.

- This the parties did, ultimately leading to the approval of questionnaires and case management orders.

At the December 2005 hearing, the Court re-raised the issue of impairment, focusing both on the proposed use of estimation to fix the value of personal injury claims and also on the hard cap. Grace clarified that the estimation was not for the purpose of liquidating individual claims but, instead, was designed solely to set the hard cap. This is fundamentally different than the approach to property damage claims. Property claims can be estimated for distribution purposes and should be so estimated where, as here, individual claim litigation with full discovery and a full trial would be too time consuming. Grace is prepared to discuss this matter in greater detail in connection with a proposed further amended plan, to which we now will turn.

Given the Court's concern with the hard cap, Grace is ready to file (if necessary) an amended plan that removes the cap on personal injury claims and puts equity at risk. Grace does not believe that the law requires this change but wants to get past the issue. A brief outline of the proposed amended plan is attached as Exhibit B. The actual plan revisions are in process and will be completed by the March omnibus hearing.

Filing such a plan, however, should await the outcome of the current negotiations. So as to minimize delay, Grace also is preparing amendments that could be used in the event that agreement is reached with the personal injury claimants. A short summary of that revised plan structure is attached as Exhibit C.

Again, Grace is doing the work necessary to pursue all options without delay.

- 7 -

**A-85**

## IV.    WHERE TO GO FROM HERE

The path for keeping this case on track and the parties on a tight leash is clear.

*First*, given the distraction of the USG settlement, exclusivity should be extended for another sixty days so that the current negotiations can be given a fair chance. The deadline for personal injury claimants to submit questionnaires also should be extended accordingly.

*Second*, the estimation process for traditional property damage claims must continue. The large portion of the claims lodged by Mr. Speights solely for strategic and obstructive purposes remains a major impediment to meaningful negotiations.

*Third*, Grace submits that the time has come for the Court to issue its opinion regarding the ZAI claims. The Court previously alerted the parties that an opinion would be forthcoming at the end of January and properly suggested that the parties should use the window of opportunity to resolve the matter consensually. This has not occurred, and ZAI remains a significant uncertainty that limits the prospects of negotiating a consensual plan. The speculative nature of even the number of claims affects the other parties' confidence in dedicating funds to resolve other types of claims.

*Finally*, the Court should take proposals for a mediator to be appointed in the event that the negotiations prove unsuccessful. Grace believes that such an appointment is critical both to moving the parties toward resolution and to providing progress reports (non-substantive, of course) that are not biased by efforts to obtain leverage. The appointment of a mediator proved instrumental to resolving the Babcock and Wilcox case.

If the Court adopts the suggestions set forth above, all bases are covered. The active litigation will be focused, the questionnaire process will be available without delay if the negotiations fail, and the additional resources offered by a separate mediator likewise will be available without delay in that same eventuality.

Wilmington, Delaware
Dated: February 13, 2006

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Salvatore F. Bianca
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*And*

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB, PC

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4240)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

- 9 -                                              **A-87**

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## AFFIDAVIT OF ROBERT H. BEBER

Robert H. Beber, on oath, hereby testifies as follows:

1.     I am the former General Counsel of W. R. Grace. I was hired by Grace in April, 1988 to form an in-house team to manage asbestos litigation. I served in that capacity for some time and then as General Counsel from April 1991 to August 31, 1998. I am currently a consultant to Grace, having become a consultant on September 1, 1998, upon my retirement.

2.     My experience with asbestos litigation pre-dates my employment with Grace. I joined GAF Corporation in January 1981 as General Counsel and served in that role until May 1984. During my tenure with GAF, GAF was involved in both asbestos PI and asbestos PD litigation as a result of certain GAF floor tile products that contained asbestos.

3.     Both at GAF and then at Grace, I became acquainted with many of the asbestos plaintiffs' lawyers, including Martin Dies, Dan Speights and Ed Westbrook, who litigated and settled numerous significant PD cases with Grace.

4.     In the fall of 2004, I participated in a meeting with other representatives of Grace, representatives of PI and PD claimants and the FCR in Washington DC, to discuss a consensual chapter 11 plan. That meeting took place after Grace had circulated a proposed plan concept, in advance of the October 14, 2004 deadline for filing a plan. At that meeting, I believe that the parties came very close to agreement on the important economic terms of a consensual plan. In

fact, the parties were so close that PI and PD representatives and the FCR requested that the Debtors obtain a 30-day delay of the October 14, 2004 deadline, so that the parties could continue their efforts to reach consensus.

5.     Those efforts continued but ultimately broke down. I was not sure why they broke down. However, based on the productive and positive professional relationship Mr. Dies and I had developed over the past 25 years, we believed that together we could be helpful in moving the Grace chapter 11 cases further along toward a consensual plan.

6.     Commencing in or about February 2005, Mr. Dies and I began a regular and frequent dialogue with respect to a consensual plan. Mr. Dies indicated to me that the parties had gotten so close to agreement, that he believed an effort to restart the negotiations would be successful. Mr. Dies also indicated that he had a positive professional relationship with certain attorneys for PI plaintiffs, especially Russell Budd, and that he believed he could work with me, on behalf of Grace and Mr. Budd, on behalf of PI claimants to put together a consensual plan that would work for all constituencies.

7.     As a consequence, I have participated in various meetings with key constituencies to discuss a consensual plan. The details of certain meetings, however, remain confidential at the request of the participants.

8.     In the spring and summer of 2005, I participated with other Grace representatives in at least two meetings with Dan Speights. It was Grace's impression that the 3000 PD Claims filed by Mr. Speights posed a significant stumbling block to consensus on a plan. The meetings were set up for the purpose of seeing if we could get Mr. Speights to voluntarily withdraw certain claims and settle the balance of his remaining claims.

2

9.     During the spring and summer of 2005, Mr. Dies and I met several times in person and spoke at least weekly via telephone to discuss progress that had been made in several areas.

10.     I understand that in late July or early August 2005, counsel for Grace, David Bernick, spoke with counsel for certain PI constituents. I understand that the parties discussed whether the Debtors and the PI claimants should try to negotiate a resolution of the PI claims separately.

11.     At that time, I spoke with Mr. Bernick and others at Grace about the status of the various discussions. We all agreed that it made sense to continue to encourage and support Mr. Dies' efforts to structure a fully consensual plan by concluding his discussions with Mr. Budd and others representing the PI claimants. Failing that, Grace could pursue resolution of the PI claims separately.

12.     From approximately September through December 2005 Grace, primarily through me, had almost daily discussions with Mr Dies with respect to plan progress. During that time, Mr. Dies indicated to me that the plan structure being discussed with personal injury claimants would include PI, PD and ZAI.

13.     On December 2, 2005, the PI Committee filed an opposition to the Debtors request for an extension of exclusivity. In that opposition, the PI Committee took credit for having discussions with the PD Committee on a consensual plan but did not give either Mr. Dies or Grace any credit for, in fact, being the parties to instigate and push along those discussions. Nor, as I understood it, did Grace's role get accurately reported in the PD claimants report to the Court regarding plan discussions. The PI Committee did acknowledge that "substantial progress is being made" among the PI and PD Committees with respect to a consensual agreement. In

3

fact, Mr. Dies had told me that he had made a formal proposal on behalf of PD which included traditional PD and ZAI, and that the PI Committee was discussing the proposal.

14.    Since that time, I have been in frequent contact with Mr. Dies on the status of the negotiations. He has advised me that he is still waiting for a response from the PI claimants to the proposal made to them in December, 2005.

15.    Still today, neither I nor Grace have been told of the content of the discussions between Messrs. Dies and Budd.

16.    Grace has recently sought to activate discussions on a parallel track directly with the PI claimants.

Dated: February 13, 2006

                                          Robert H. Beber

4

# EXHIBIT B

**Key Elements of Modified W.R. Grace & Co. Chapter 11 Plan that is Non-Consensual with Asbestos Claimants**

I.      Classification of Asbestos Claims:

      A.      Asbestos Personal Injury Claims ("PI Claims") and Asbestos Property Damages Claims ("PD Claims") would be classified in a single class.

II.     Treatment of PI Claims:

      A.      PI Claims will be channeled to a post confirmation trust (the "Trust") and paid the full amount of their allowed claim.

      B.      There will be no limitation or "cap" on the funds available to the post confirmation trust to pay PI Claims.  On the Effective Date the Trust will be funded in an amount estimated by the Court to be adequate to pay PI Claims in full.  The Reorganized Debtor will be ultimately responsible for any shortfall if the initial funding of the Trust proves inadequate to pay PI Claims in full.

      C.      PI Claims will have the option under the plan (i) to accept a "cash out" option administered by the Trust pursuant to a TDP; or (ii) to litigate the allowance of their claims pursuant to a CMO entered by the Court in connection with confirmation, which will be managed by the Reorganized Debtor on behalf of the Trust.

      D.      PI Claims shall be unimpaired and deemed to have accepted the plan for all purposes.

III.    Treatment of PD Claims:

      A.      PD Claims will be channeled to the Trust and paid the full amount of their allowed claims.

      B.      PD Claims will be paid by the Trust out of a segregated fund which will be in an amount estimated by the Court, under its authority to estimate claims for purposes of allowance set forth in 11 U.S.C. § 502(c)(1), as adequate to pay all PD Claims in full.  The sole source of payment for PD Claims will be this segregated fund.

      C.      Subsequent to the Effective Date the Reorganized Debtor and PD Claimants shall litigate the allowed amount of each PD Claim pursuant to a CMO entered by the Court in connection with confirmation.

      D.      PD Claims shall be unimpaired and deemed to have accepted the plan for all purposes.

**EXHIBIT C**

**Key Elements of Modified W.R. Grace & Co. Chapter 11 Plan that is Consensual with Asbestos Personal Injury Claimants ("PI Claimants")**

I.  Grace and the PI Claimants agree on the funding and terms of a post-confirmation trust (the "Trust"), to be used to pay current and future PI claims and to qualify for a channeling injunction.

II. Classification of Asbestos Claims:

    A.  Asbestos PI Claims and Asbestos Property Damages Claims ("PD Claims") would be classified in a single class for purposes of (i) voting, and (ii) the channeling injunction to the Trust.

III. Treatment of Asbestos PI Claims:

    A.  Funding:

        1.  Grace would pay the Trust the present value of cash equal to Grace's financial obligation to the national trust in the event that the FAIR Act passes substantially in its present form.

        2.  On the Effective Date Grace would deliver the Trust a Contingent Note for an additional amount in the event that the FAIR Act does not pass:

            (a)  The amount and other terms of the Contingent Note would be negotiated with the PI Claimants.

            (b)  The amount of the Contingent Note would be increased depending upon the amounts ultimately paid to PD Claims (including ZAI) and the outcome of the pending criminal case in Montana.

    B.  TDP

        1.  To be in line with recent consensual plans.

        2.  Provisions regarding Libby claimants to be negotiated.

IV. Treatment of Asbestos PD Claims:

    A.  Payment of PD Claims will be channeled to the Trust under §524(g) and funded separately in an amount estimated by the Court to result in parity with PI Claims.

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 01-1139(JKF)
                                . Adv. No. 02-1657(JKF)
                                .
W.R. GRACE & CO.,               . 5414 USX Tower Building
                                . Pittsburgh, PA  15222
                                .
                    Debtor.     .
                                . September 11, 2006
. . . . . . . . . . . . . . . . . 9:57 a.m.


TRANSCRIPT OF HEARING
ARGUMENT ON MOTION TO EXTEND EXCLUSIVITY AND
ARGUMENT ON QUESTIONNAIRE ISSUES
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Kirkland & Ellis, LLP
                                By:  DAVID M. BERNICK, P.C., ESQ.
                                     BARBARA HARDING, ESQ.
                                     AMANDA BASTA, ESQ.
                                     SALVATORE BIANCA, ESQ.
                                Aon Center
                                200 East Randolph Drive
                                Chicago, IL  60601


Unsecured Creditors'            Stroock & Stroock & Lavan, LLP
Committee:                      By:  LEWIS KRUGER, ESQ.
                                     KENNETH PASQUALE, ESQ.
                                180 Maiden Lane
                                New York, NY  10048-4982


Audio Operator:                 Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Equity Committee: | Cramer, Levin<br>PHIL BENTLEY, ESQ.<br>(No Address Provided) |
| For David T. Austern,<br>Future Claimants Rep: | Phillips, Goldman & Spence, P.A.<br>By: DEBRA FELDER, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Asbestos Creditors' | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>399 Park Avenue, 27th Floor<br>New York, NY  10022 |
| | Caplin & Drysdale, Chartered<br>By:  NATHAN D. FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, DC  20005 |
| For Official Committee of<br>Property Damage Claimants: | Bilzin Sumberg Baena Price<br>  & Axelrod LLP<br>By:  SCOTT L. BAENA, ESQ.<br>    JAY M. SAKALO, ESQ.<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For Reaud, Morgan & Quinn<br>and ELG: | Stutzman, Bromberg, Esserman,<br>  & Plifka, PC<br>By:  SANDER L. ESSERMAN, ESQ.<br>    VAN J. HOOKER, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, TX  75201 |
| For Ad Hoc Committee<br>of Equity Security-Holders: | Weil, Gotshal & Manges, LLP<br>By:  JUDY G. Z. LIU, ESQ.<br>    M. JARRAD WRIGHT, ESQ.<br>1300 Eye Street, NW, Suite 900<br>Washington, DC 20005 |

TELEPHONICALLY:

| | |
|---|---|
| For the FAI Claimants: | The Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>2712 Middleburg Dr.<br>P. O. Box 2665<br>Columbia, SC 29206 |

**A-98**

3

APPEARANCES: (Cont'd)

For National Union Fire          Zeichner Ellman & Krause LLP
Company:                         By:  MICHAEL S. DAVIS, ESQ.
                                      ROBERT GUTTMAN, ESQ.
                                 575 Lexington Avenue
                                 New York, NY  10022

For Official Committee of        Ferry, Joseph & Pearce, P.A.
Asbestos Property Damage         By:  THEODORE J. TACCONELLI, ESQ.
Claimants:                       824 Market Street
                                 Suite 904
                                 P.O. Box 1351
                                 Wilmington, DE  19899

For Ad Hoc Committee of          The Bayard Firm
Equity Security Holders:         By:  NEIL B. GLASSMAN, ESQ.
                                      STEVEN M. YODER, ESQ.
                                 222 Delaware Avenue, Suite 900
                                 P.O. Box 25130
                                 Wilmington, DE  19899

For David T. Austern,            Phillips, Goldman & Spence, P.A.
Future Claimants Rep:            By:  RICHARD Y. WYRON, JR., ESQ.
                                      ALEX VENEGAS, ESQ.
                                 1200 North Broom Street
                                 Wilmington, DE  19806

For Libby Claimants:             Landis, Rath & Cobb, LLP
                                 By:  KERRI K. MUMFORD, ESQ.

For Fireman's Fund               Stevens & Lee, P.C.
Insurance Company:               By:  THOMAS WHALEN, ESQ.
                                 1107 North Market St., 7th Floor
                                 Wilmington, DE  19801

For the Debtor:                  Kirkland & Ellis, LLP
                                 By:  DAVID MENDELSON, ESQ.
                                 Aon Center
                                 200 East Randolph Drive
                                 Chicago, IL  60601

For William Assire, et al.:      Cooney & Conway
                                 By:  KATHY BYRNE, ESQ.

For Thornton, et al.:            Hogan Firm Attorneys at Law
                                 By:  DANIEL HOGAN

4

<u>APPEARANCES</u> (Cont'd)

For Asbestos Personal Injury     Shannon Law Firm, LLC
Claimants:                       By:  KELLEY M. BERRY, ESQ.


For Hartley & O'Brien,           Heiman, Gouge & Kaufman, LLP
Luckey & Millins:                By:  SUSAN E. KAUFMAN, ESQ.


For Latigo Partners:             Latigo Partners
                                 By:  STEPHEN BLAUNER, ESQ.


For Royal Insurance:             Wilson, Elser, Moskowitz
                                 Edelman & Dicker, LLP
                                 By:  SARAH J. EDWARDS, ESQ.
                                 150 E. 42nd Street
                                 New York, NY  10017-5639


For Property Damage              Speights & Runyan
Claimants:                       By:  DANIEL A. SPEIGHTS, ESQ.
                                 200 Jackson Avenue East
                                 Hampton, SC  29924


Roman Catholic Church            Dies, Henderson & Carona
Archdiocese of New Orleans:      By:  MARTIN DIES, ESQ.
                                 1009 Green Avenue
                                 Orange, TX  77630


For Tennenbaum Capital:          Tennenbaum Capital Partners, LLC
                                 By:  STEPHEN MOYER, ESQ.


For Federal Insurance Co.:       Cozen O'Connor
                                 By:  DAVID J. LIEBMAN, ESQ.
                                      JACOB C. COHN, ESQ.
                                 1900 Market Street
                                 Philadelphia, PA  19103


For Linden Advisors, LP:         Linden Advisors, LP
                                 By:  CRAIG GILBERG


For Future Claimants:            Phillips, Goldman & Spence, P.A.
                                 By:  JOHN C. PHILLIPS, JR., ESQ.
                                 1200 North Broom Street
                                 Wilmington, DE  19806


For Everest Reinsurance          Crowell & Moring, LLP
Co. & McKinley Ins. Co.:         By:  MARK D. PLVEIN, ESQ.
                                      LESLIE A. EPLEY, ESQ.
                                 1001 Pennsylvania Avenue, NW
                                 Washington, DC  20004


**A-100**

5

<u>APPEARANCES</u>: (Cont'd):

For Everest Reinsurance          Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:            Courtney, P.C.
                                 By:  BRIAN KASPRZAK, ESQ.
                                 913 North Market St., Suite 800
                                 Wilmington, DE  19801


For Halcyon Asset                Halcyon Asset Management, LLC
Management, LLC:                 By:  OSCAR MOCKRIDGE, ESQ.


Co-Counsel to Libby              Cohn, Whitesell & Goldberg, LLP
Claimants:                       By:  DANIEL C. COHN, ESQ.
                                 101 Arch Street
                                 Boston, MA  02110


For the State of Montana:        Monzack and Monaco, P.A.
                                 By:  FRANCIS MONACO, ESQ.
                                 1201 North Orange St., Suite 400
                                 P.O. Box 2031
                                 Wilmington, DE  19899


For Grace Certain Cancer         Montgomery, McCracken, Walker
Claimants:                          & Rhoads, LLP
                                 By:  NOEL C. BURNHAM, ESQ.
                                      LEONARD BUSBY, ESQ.
                                 300 Delaware Avenue, Suite 750
                                 Wilmington, DE  19801-1607


For Asbestos Plaintiffs:         Wallace & Graham, PA
                                 By:  WILLIAM MARC GRAHAM, ESQ.
                                 North Carolina


For ACE Insurance Co.:           White & Williams, LLP
                                 By:  MARC S. CASARINO, ESQ.
                                 824 N. Market Street, Suite 902
                                 P.O. Box 709
                                 Wilmington, DE  19899-0709


For Continental Casualty:        Ford, Marrin, Esposito,
                                    Witmeyer & Gleser, LLP
                                 By:  ELIZABETH DeCRISTOFARO, ESQ.
                                 Wall Street Plaza, 23rd Floor
                                 New York, NY  10005-1875


U.S. Trustee:                    U.S. Trustee Department
                                 By:  DAVID KLAUDER


For Claimants:                   Goldberg, Perksy & White
                                 By:  MARK MEYER, ESQ.

**A-101**

6

APPEARANCES: (Cont'd)

| | |
|---|---|
| For PD Claimants: | Richardson Patrick Westbrook<br>  & Brickman, LLC<br>By:  EDWARD WESTBROOK, ESQ.<br>1037 Chuck Dawley Blvd., Bldg. A<br>Mount Pleasant, SC  29464 |
| For George & Sipes: | George & Sipes<br>By:  KATHLEEN FARINAS, ESQ.<br>156 East Market Street, Suite 600<br>Indianapolis, IN  46204 |
| Official Committee of<br>Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL R. LASTOWSKI, ESQ.<br>1100 North Market St., Suite 1200<br>Wilmington, DE  19801-1246 |
| For London Market Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829 |
| For Reaud, Morgan & Quinn<br>and ELG: | Stutzman, Bromberg, Esserman,<br> & Plifka, PC<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, TX  75201 |
| For Asbestos Claimants<br>& Wellborn Houston, LLP: | Wellborn*Houston, LLP<br>By:  PAUL L. SADLER, ESQ.<br>300 West Main<br>P.O. Box 1109<br>Henderson, TX  75653-1109 |
| For Campbell, Cherry,<br>Harrison, Davis, Dove: | Frank/Gecker, LLP<br>JOSEPH D. FRANK, ESQ.<br>325 N. LaSalle, Suite 625<br>Chicago, IL  60610 |
| For Christopher Grell: | Law Office of Christopher Grell<br>By:  RICHARD F. RESCHO, ESQ.<br>360 22nd Street, Suite 320<br>Oakland, CA  94612 |
| For Asbestos Property Damage | The Brandi Law Firm<br>By:  TERENCE D. EDWARDS, ESQ.<br>44 Montgomery Street, Ste. 1050<br>San Francisco, CA  94104 |

7

<u>APPEARANCES</u>:   (Cont'd)

For Asbestos Property Damage     Bilzin Sumberg Baena Price
Claimants:                             & Axelrod LLP
                                  By:  MATTHEW I. KRAMER, ESQ.
                                  Wachovia Financial Center
                                  200 South Biscayne Boulevard
                                  Suite 2500
                                  Miami, FL  33131

Also Appearing by Telephone:  JANET WORDBLACK, ESQ.

8

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  This is the matter of

3    W.R. Grace, bankruptcy number 01-1139.  Participants I have

4    listed by phone are Robert Guttman, Kerri Mumford, Michael

5    Davis, David Mendelson, Kathy Byrne, Daniel Hogan, Kelley

6    Berry, Susan Kaufman, Janet Wordblack, Thomas Whalen, Martin

7    Dies, Darrell Scott, Stephen Moyer, Theodore Tacconelli, David

8    Liebman, Jacob Cohn, Craig Gilbert, Van Hooker, John Phillips,

9    Mark Plevin, Leslie Epley, Brian Kasprzak, Oscar Mockridge,

10   Stephanie Kwong, Paul Norris, Mark Shelnitz, David Siegel,

11   Daniel Cohn, Neil Glassman, Steven Yoder, Daniel Speights,

12   Richard Wyron, Alex Venegas, Jonathan Brownstein, William

13   Graham, Marti Murray, William Sparks, Marc Casarino, Elizabeth

14   DeCristofaro, David Klauder, Edward Westbrook, Kathleen

15   Farinas, Michael Lastowski, Arlene Krieger, Peg Brickley, Alex

16   Mueller, David Parsons, Stephen Vogel, Paul Sadler, Stephen

17   Blauner, Sarah Edwards, Noel Burnham, Simon Porter, Joseph

18   Frank, Peter Shawn, Richard Rescho, Alan Madian, Terence

19   Edwards, Matthew Kramer, Guy Baron, Sara Gooch, John O'Connell

20   and Francis Monaco.

21          Good morning.  I'll take entries in court, please.

22          MR. BERNICK:  Thank you, Your Honor.  David Bernick,

23   for Grace.

24          MS. HARDING:  Barbara Harding, for Grace, Your Honor.

25          MS. BASTA:  Amanda Basta, for Grace, Your Honor.

9

1          THE COURT:  Spell your last name.

2          MS. BASTA:  B-a-s-t-a.

3          MR. BIANCA:  Salvatore Bianca, for Grace.

4          MR. KRUGER:  Lewis Kruger and Ken Pasquale, for the

5   unsecured creditors' committee.

6          MR. PASQUALE:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. BENTLEY:  Phil Bentley, for the equity committee.

9          MR. FRANKEL:  Good morning, Your Honor.

10         THE COURT:  Wait.  Excuse me one second.  I need to

11  make this bigger or I'm not going to be able to read what I'm

12  doing, so.  Okay.  I'm sorry.

13         MR. FRANKEL:  Good morning, Your Honor.  Roger

14  Frankel, for David Austern and the future claims

15  representative.  And also with me is Debra Felder, from my

16  firm.

17         THE COURT:  Thank you.

18         MR. INSELBUCH:  Elihu Inselbuch and Nathan Finch, for

19  the asbestos creditors' committee.

20         MR. BAENA:  Good morning, Your Honor.  Scott Baena,

21  for the property damage committee.

22         MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo,

23  for the property damage committee.

24         MR. ESSERMAN:  Good morning, Your Honor.  Sander

25  Esserman, on behalf of the various law firms.

**J&J COURT TRANSCRIBERS, INC.**

10

1              MS. LIU:  Good morning, Your Honor.  Judy Liu, from

2    Weil, Gotshal and Manges, for the ad hoc committee of equity

3    security holders, and with me is Jarrad Wright.

4              THE COURT:  Anyone else?  Okay.  Mr. Bernick.

5              MR. BERNICK:  Your Honor, today we have two matters

6    that are on the agenda, one, the request for an additional

7    extension of exclusivity, and the second is our motion practice

8    with regard to the questionnaires, that is, the motion to

9    compel.

10             Again, unless there is some preference that the Court

11   has, I'll just start out with the motion for extension of

12   exclusivity.

13             THE COURT:  That's fine.

14             MR. BERNICK:  And we can proceed from there.  I want

15   to take us back to the beginning of the case and provide a

16   brief overview.  I know Your Honor's very familiar with all

17   these matters, and in fact, I'm sure Your Honor probably

18   already has strong leanings about what you want to do in this

19   area, because the issue has been on the agenda a couple

20   different times, and the substantive matters that are at stake

21   are ones that have been discussed I think fairly carefully

22   before.

23             But it probably is appropriate at this point in time

24   as we're now at a very critical stage in the case to at least

25   do a short review.  I've got a very simple chart here.  We were

11

1 reviewing some of the other pages here and I would say that, on

2 a hopeful note, most of these pages relate to the CD case,

3 which was, after all, a consensual plan.

4       So maybe eventually we can get there in this case,

5 although thus far it has been obviously controversial.  The --

6 I put down scope of liability here as a key term, because we

7 now know that at the outset of this case, the very first brief

8 that was filed in this case, Grace in it's informational brief

9 set out the principal challenge that had to be met in this

10 case, which was, as they defined as the central path, to

11 determine the true scope of Grace's liability in this mess is

12 plaintiff's.

13       We said, as Your Honor knows very well, definitively,

14 that absent further definition of that scope of liability,

15 resolution of this case on a consensual basis and beyond any

16 kind of basis will prove to be elusive.  Five years later the

17 asbestos claimants in their supplemental objection have used a

18 somewhat different term, but it obviously converges on the same

19 facts, which is solvency.

20       The recent mediation efforts make it abundantly

21 clear, now sayeth the asbestos claimants themselves.  But the

22 real stumbling block for a consensual resolution of these cases

23 is the markedly different views of the debtor's solvency.

24 There has been a discussion and then a final concluding

25 sentence here that, again, we would agree with:  "Accordingly,

12

 1  absent consent, the plan cannot be confirmed without a

 2  determination of the debtor's solvency."

 3      Put differently really one has the same concept,

 4  whether we're talking about a consensual resolution or a

 5  nonconsensual resolution there must be some determination in a

 6  binding fashion with regard to what is the debtor's actual

 7  liability.  There are then two paths that have been set out for

 8  trying to bring this case to resolution in light of that

 9  central issue and central path.

10      One path is the path that the debtor has pursued, and

11  we've pursued it at all points, and I believe consistently and

12  transparently, and that is a path that seeks to define

13  liability in the only way that our jurisprudence knows, which

14  is through a litigation and estimation process with the

15  ultimate hope and expectation that once the scope of Grace's

16  liability is determined, at least in part in that fashion, it

17  will then be possible to draft a plan for resolution, hopefully

18  a consensual plan.

19      And I'm going to talk a little bit about the progress

20  that's been made, because although it's been an arduous path

21  and an arduous process, progress now has been very substantial.

22  The second path is also very clear, although some of the

23  details of it have been not made apparent to the Court, and

24  indeed, not been made apparent to the parties in a binding

25  fashion.

13

1           And that is the path that's now been outlined to the

2    Court, and I'll call it the asbestos claimants' deal, which is

3    the agreement in principle that's been announced between the

4    different asbestos creditor or claimant constituencies in the

5    case.  And after I talk about the path that Grace has pursued

6    I'm going to spend some time talking about the alternative path

7    the asbestos creditors laid out to the Court and what it

8    promises to bring to this case.

9           So beginning with the liability, the litigation and

10   estimation path.  And again, I'm not going to pursue this in

11   all of its detail, but to bring us back to the beginning, at

12   the beginning of this case we were set -- set out or we were

13   facing three basic questions, three basic puzzles that, if I

14   could use the term, wish I could use the focus better, three

15   basic puzzles relating to three basic areas of liability of the

16   Grace case as of the time of the petition.

17          The first was the personal injury liability, and this

18   really was the driver for the filing.  And Your Honor will well

19   recall that throughout this case we have featured the almost

20   irrational exuberance of the plaintiff's personal injury bar in

21   prosecuting claims against Grace in 2001, which seemed to defy

22   all notions of a scientific trend and really were the reason

23   why Grace filed for Chapter 11.

24          There was then a different picture for the property

25   damage litigation.  Traditional property damage litigation had

14

1  been the principal litigation that Grace faced over the years.

2  And as we know, because it was during mature litigation, by the

3  time that Grace filed for Chapter 11 the number of new case

4  filings had been -- had vanished essentially to nothing, and

5  the number of pending cases had been reduced to a total of

6  seven.

7       The question then was -- the very different question

8  from personal injury, which is, what could there possibly be

9  else out there.  This was really a question of resolving a

10  handful of cases.  And then the brave new world that was being

11  -- was thought to be used to replaced traditional property

12  damage cases were ZAI property damage claims.

13       And here, there had been no verdicts, no settlements,

14  indeed, a preliminary injunction request that had been made

15  with regard to ZAI had been denied, but prior to the Chapter

16  11.  So essentially, after the Chapter 11 -- shortly before and

17  certainly after -- this whole question arose, as well as their

18  whole new area of liability where there has been no liability

19  determined in any way, shape or form before, is there now this

20  huge thing Mr. Lockwood, who is not here today, Mr. Lockwood

21  talked about the potential elephant or gorilla in the room,

22  even though there was no track record to say that it was, that

23  it created the question.

24       And these were the fundamental questions that we

25  faced at the very outset of the case.  Indeed, I'll tell the

15

1  Court, as almost a curiosity, these charts actually were the

2  charts that I had prepared to present --

3            MR. SPEAKER (TELEPHONE):  Prior to Friday.

4            MR. BERNICK:  -- to present to Judge Farnham the day

5  the case was transferred from Judge Farnham to Judge Woollen,

6  and we never ultimately had the hearing on the case management

7  orders that was originally scheduled to take place in the fall

8  of 2001.

9            So what progress has now been made.  Well, it has

10 been slow and it's been slow principally because different

11 judges in charge of the case have determined to proceed in the

12 different fashion with regard to pressing forward in these

13 different areas.

14           We began with Judge Farnham in the very beginning of

15 the case.  He wanted case management orders on all of the

16 different liability tracks, and ultimately in trying to end a

17 -- focus this a little bit better.

18           THE COURT:  Is it something with the -- is it our

19 screen or is it the --

20           COURT RECORDER:  No.  That's the other one.

21           MR. SPEAKER:  Clarity would be hard to --

22           MR. BERNICK:  Thank you.

23           THE COURT:  There you go.

24           MR. BERNICK:  He's just jealous, is all he is.  I

25 won't talk about your handwriting; I'll let you.  In any event,

**J&J COURT TRANSCRIBERS, INC.**

16

1  let's -- yeah, that's about as good as it's going to get.

2  Judge Farnham wanted to have all of the different case

3  management tracks laid out all at once, to proceed all at once.

4  That's where we were headed literally on the morning of the

5  hearing that was scheduled for that day.

6          The case was reassigned.  Judge Woollen decided

7  otherwise.  He wanted to proceed with the Sealed Air fraudulent

8  conveyance litigation.  He then said the property damage can

9  take place before Your Honor as well as ZAI, but he very

10 carefully and very deliberately deferred any consideration of

11 the personal injury track.

12          So there literally was no progress with regard to the

13 personal injury under the administration of Judge Woollen.  the

14 Sealed Air case was eventually resolved.  The property damage

15 claims proceeded to -- under Your Honor's supervision through

16 the claims form process and ZAI went through the science

17 summary judgment adjudicative process following a very

18 interesting and unresolved question of whether to proceed by

19 way of class action.

20          So the case was active but the huge issue of personal

21 injury was deferred.  When Judge Woollen was recused Your Honor

22 then, I'm sure with very mixed feelings about it, or maybe

23 unmixed feelings, also inherited the personal injury side of

24 the case.

25          And at that point actually if we take a look at the

17

1  progress that's been made on the personal injury side of the

2  case, since Your Honor took over there has been steady progress

3  to deal with those issues in the case.  So as we sit here today

4  we actually have had very substantial progress in answering the

5  central question of the case in all respects.

6          And in fact, we would submit for Grace that the end

7  is not only in sight, it is literally only months away.  P.D.

8  is furthest along.  Your Honor has seen these versions of these

9  charts, but I think it would be important to provide a little

10  bit of an update.

11          We started out with upwards of 4,000 property damage

12  -- official property damage claims.  Your Honor is well

13  familiar with the fact that as a result of Grace's threshold

14  questions about whether there was even the authority to file

15  the claims and whether a good faith basis even existed to a

16  product ID, that the total came down very, very quickly from

17  4,000, and today we have 656 traditional property damage claims

18  that remain in the case.

19          Your Honor also is familiar that we now have a case

20  management order which contemplates both the summary judgment

21  process, an then also a gateway objection process before we

22  then go through estimation.  And to give Your Honor a flavor

23  for what -- how -- what the impact of this could be I've got a

24  couple more charts.

25          If you isolated the 55 non-traditional claims at the

18

1    top of the bar, that is essentially 52 claims that arise out of

2    people saying they have property damage as a result of their

3    homes being contaminated and Libby.  We will be filing a

4    summary judgment motion that says the EPA either, a, has

5    cleaned them up, or b, has plans to clean them up, is committed

6    to clean them up, and Grace is funding that cleanup effort.

7         So whatever issue there is concerning that property,

8    we're already paying to have it resolved.  That will be a

9    motion that's filed before Your Honor.  We have 97 property

10   damage claims in Canada, and Your Honor already knows that we

11   have a major issue concerning whether tort law in Canada even

12   permits the prosecution of those claims, given the decision in

13   the Privest (phonetic) case.

14        There are also statute of limitations issues, as

15   well.  We'll be raising that by motion practice.  That then

16   leaves a total of 504 traditional property damage claims in the

17   United States.  Of those, we have motions -- we are -- the

18   motion that we are going to file for statute of limitations in

19   Louisiana, very, very strong, clear law in Louisiana, that will

20   affect the claim -- 99 claims other than those of Mr. Speights

21   and Mr. Dies in Louisiana; that is, the 99 other Louisiana

22   claims.

23        We then have Mr. Dies' claims, including the

24   Louisiana, he has filed largely in Louisiana on behalf of

25   clients that can make the annulum tentés argument.  So we're --

19

1  there's a different situation with respect to those claims.

2  With Mr. Speights we have 180 remaining claims, including

3  Louisiana.

4       Mr. Speights' claims are on the next page.  We have

5  California University, 92.  There is fairly clear law in

6  California, but an overwhelmingly clear fact, which is -- and

7  it's been admitted now in the claim forms in this case,

8  California University's actually filed a lawsuit in 1990

9  seeking the original jurisdiction of the Supreme Court of the

10 United States.

11      It involves the same claim that's being made here.

12 So we have a clear sketch with regard to that claim.  We then

13 have with respect to the others the issues that have been

14 raised before Your Honor of whether there was authority at the

15 time that the claim was filed.

16      Those are already under submission to Your Honor.

17 Those account, by my eye, for 59 out of the remaining 88

18 claims.  So we think that the balance of Mr. Speights' claims

19 are also going to be subject to a successful motion practice,

20 which then leads us back, as a birds' eye view, given the print

21 here it's hard, but there will be motions affecting these

22 claims, these claims.

23      With respect to the Speights' claims motions already

24 have been made or will be made with respect to California

25 covering virtually all of the claims.  And then of the

20

1  remaining claims, even before we get to other motions, which I

2  haven't yet described, we're talking about out of the

3  remaining, let's see, 160, 270, approximately 330 claims, 100

4  of those would be subject -- these are all claims that are

5  subject to summary judgment motions, even before we get to the

6  gateway objections that are scheduled to be heard in the next

7  year.

8          So we expect that Your Honor will have before you on

9  paper motion practice that goes to the bulk of the remaining

10 traditional property damage claims.  With respect to ZAI, that

11 matter has been fully briefed and it's under submission to Your

12 Honor.  I know Your Honor --

13         THE COURT:  And I'm hoping by next week you might

14 actually get an opinion.

15         MR. BERNICK:  Okay.  Well, that would be very, very

16 useful.  That causes me to reflect a little bit on where the

17 criminal case stands, and I know that that's been a matter

18 that's been brought to Your Honor's attention before.  And I'm

19 not going to go through the details of all the different

20 rulings that have taken place.

21         Enough said that Judge Malloy has issued a series of

22 rulings on in limine motions, as well as on motions that have

23 gone to the indictment.  And the result of that, for example,

24 of interest in the case of Libby is of the ATSDR study, which

25 is a study that purported to survey effects within the

21

1    population, has now been excluded as not being relevant to the

2    issue of causation because it wasn't designed for that purpose.

3           There are new studies that have now come out and been

4    produced under a motion by the government.  The government has

5    now taken an appeal from the Court's recent rulings with

6    respect to one of the accounts.  The trial that was scheduled

7    to go forward literally today or this week has now been stayed,

8    and the prosecution by the government in their appeal to the

9    Ninth Circuit.

10          So that case currently is on hold, but there's a lot

11   of -- there's a lot that's emerged in connection with that case

12   that is of consequence.  So progress, a lot of progress has

13   been made on ED, on ZAI.  We then come to personal injury,

14   which is after all, the major event we have.

15          We already know that the claim's history that

16   prompted the filing of the case has little, if any,

17   relationship to actual legal liability -- and I'm talking again

18   about our basic Speights here -- that has now been established

19   really by the admission of the asbestos claimants' own expert

20   in this case, Dr. Peterson.

21          Dr. Peterson was clear, we had the opportunity to

22   examine him in the Babcock and Wilcox case, that this trend

23   that you see is not a trend that represents the actual disease

24   caused by any company's asbestos.  It doesn't even purport to

25   measure that.  No epidemiological model determines the number

22

 1  of claims or the number of cases of disease associated with

 2  Babcock and Wilcox's product or Grace's product.

 3          It's just not what the story is about.  So if the

 4  question is, what is the actual liability, even in the sense of

 5  who actually was injured by Grace's product, there is no

 6  analysis that we're going to see from Dr. Peterson or from the

 7  asbestos claimants' committee that's going to answer that

 8  question.

 9          Instead, what we will see is what we've already seen

10  in these cases.  We will see an effort by the claimants to take

11  an overall, nationwide trend of malignancies not specific to

12  Grace, and then seek to relate that to Grace's settlement

13  history -- this is a settlement history -- in order to

14  establish a relationship, and on the basis of Grace's

15  settlement history to say, well, here's what Grace settled in

16  the past, so we're now going to tell you what Grace would

17  settle in the future.

18          Our approach is very different.  Our approach says,

19  well, tell us of the claims that actually were pending against

20  the company as of the time it went 11; doesn't even focus on

21  who was hurt by our product in fact.  We know that the number

22  is going to be very, very different, and we know that already.

23          We know that it's going to be way, way down on that

24  graph.  How do we know that?  We know that, really, as a result

25  of two things.  One is the questionnaires that have been

23

1  returned already to date, and we'll talk a little bit about --

2  more about those in detail.

3      But I wanted to acquaint the Court with the basic

4  historical fact that now has come to dominate this case, and it

5  actually goes back, indeed, to Mr. Austern, who's the futures

6  claimant representative in this case; goes back to the Manville

7  case.

8      In the Manville case the deal that was originally

9  done essentially returned the Manville Trust -- in place of

10 Manville, the Manville Trust back into the Tort system.  It

11 says that claimants had to file their claims against the

12 Manville Trust; can't do it against Manville, but they can do

13 so after an effort to settle the claims.  They can do so in the

14 tort system.

15     Very quickly the money began to run out because

16 Weinstein and his -- as only Judge Weinstein has a tendency to

17 do, took over the situation, stopped the bleeding, stopped the

18 flow of money out and acquired control over the assets so that

19 they wouldn't be depleted.

20     And the reason this is of consequence to this case is

21 that it was the bell weather of what turned into the problem

22 that we now see with all these claims being filed, because in

23 order to essentially redo that plan there had to be a

24 settlement, and a class settlement was superimposed on the

25 plan.

24

1          And to produce that settlement the company or the

2     other -- the company, essentially, or all those who were

3     interested in keeping the plan together, had to reach a deal.

4     And the deal had to take the trust out of the tort system.  So

5     the claimants had to agree that the trust was no longer going

6     to be in the tort system.  All was the give-up.

7          The give-up was that the TDP was changed.  There was

8     a TDP actually that was put in place and the TDP called out who

9     could get paid what amounts of money without any litigation,

10    and critically, that TDP created an enormous opening for people

11    to prosecute as "asbestosis" claims, claims that would never

12    have passed muster for asbestosis before.

13         The trust recognized this at the time and indeed

14    shortly after doors opened for business again the asbestosis

15    claims against the Manville Trust skyrocketed.  Why?  Because

16    it was easier to get a claim from asbestosis proved up under

17    the new criteria, and the money available to pay lung cancer

18    claims was discounted to the extent that there was a history of

19    smoking.

20         So in the Manville Trust a very interesting dynamic

21    arose, which is of amazing and direct relevance here.  And that

22    is that the Manville Trust itself decided to audit the doctors

23    who were putting in the claims.  So there was an audit done by

24    the University of Pennsylvania, and I call it the Penn State

25    Manville audit.

25

1          And under this audit they basically took a look at

2   doctors who had the highest volume of screenings or readings

3   that were being processed and said, can we replicate this

4   independently.  And they found out that the answer was no, that

5   10 doctors responsible for 46 percent of all claims had a 63

6   percent failure rate, and over a third of the claims showed no

7   disease whatsoever, just those 10 doctors.

8          The most active doctor, you can see what happened to

9   the percentage of claims that he handled.  It jumped from 1983

10  less than one percent, to 1996, 31.8 percent.  And 49 percent

11  of the most active doctor claims came from him at all.  Forty-

12  nine percent showed no disease, evidence of disease whatsoever.

13  We now know who that doctor is.

14         Well, in the face of this audit experience the trust

15  basically stopped paying his claims, and there was litigation

16  that unfolded before Judge Weinstein about whether the trust

17  still had to pay them because a deal's a deal.  Judge Weinstein

18  ultimately decided, a deal's a deal; you can't come back and

19  refuse to pay these claims just because you've done an audit.

20  And so the claims continued to be paid.

21         Well, we now know what happened.  What happened was

22  that most of these claims came the swamp the Manville Trust and

23  prorated payouts of the Manville Trust dropped, and ultimately,

24  Judge Weinstein himself issued an order saying that something

25  has got to be done here.  That took place I think in 2002-2003,

26

1  and from thereafter we've now seen a snowball effect where

2  attention has been focused on these doctors, focused on these

3  doctors by Judge Jack on the silica cases.  There are now

4  investigations that are going on of these doctors; were taking

5  discovery of these doctors.

6         What impact does that have in this case?  In the <u>BMW</u>

7  case, Babcock and Wilcox, we analyzed returned claim forms and

8  'lo and behold, those same 10 doctors, the same 10 doctors

9  accounted for 46 percent of the asbestosis claims that were

10  being made.  What about in this case?

11         Well, we now have analyzed where we can determine

12  where the claimants named are diagnosing via reading or

13  interpreting documents, we just focus on the ones who are part

14  of that same audit.  We now know from the questionnaires that

15  their names appear in 41.2 percent of the occasions in which

16  the claimants name who their doctors are, amazingly close to

17  the 46 percent that we saw with Babcock and Wilcox.

18         So the problem of these doctors, these doctors whose

19  results cannot be replicated, the results have now been called

20  into wide question.  Clearly, we have a <u>Daubert</u> situation here,

21  and I can go on and on but I won't.  We even -- there's

22  actually one case that's now just emerged called the <u>CSX</u> case

23  it turns out, at least it's alleged, that the law firm had or

24  made a -- a runner for a law firm made a request that somebody

25  else stand in for the x-rays, somebody who had asbestosis stand

27

1  in for the x-rays.

2          So we have got a clear problem situation.  And the

3  reason this is important is that this Court is not -- in the

4  sense we're not finding out new facts.  We're finding out facts

5  that are basically part of this sequence, the history.  It's

6  just the reality of what occurred, and all we're doing is

7  saying, gee, it happens that -- it happened in the Grace case,

8  too; big surprise.

9          Now, we've seen some reaction to this.  I said last

10 time that I was here that a number of questionnaires had been

11 returned, but actually, many have not been returned.  Of the

12 116,000 mail questionnaires, and this does not include

13 questionnaires that relate to people with potentially settled

14 claims, with respect to the -- what we believe to be non-

15 settled claims there are 116,000 mailed questionnaires.

16          Fifty-one percent of them have been returned.  So

17 half of them have not even been returned.  And it may be that

18 some of these terms are not pressing the claims that have been

19 supported by these factors.  We think that there are some firms

20 where that is clearly the case.  It was dramatically scaled

21 back on the number of claims that they're pressing.

22          However, we don't know that to be the case because of

23 the issue that I raised before about the settled claims.  And

24 we know that there are other firms that haven't done any such

25 thing.  And in fact, those are the firms where they still -- 41

28

1  percent of the cases still use medical data that was generated

2  by these 10 doctors that go back out -- in the years to the

3  Manville days.

4           The problem is not just a problem, and

5  notwithstanding, you know, what the heck we keep on talking

6  about, diagnostic data and diagnostic standards and

7  methodologies.  The problem is also a problem of exposure, as

8  who really was significantly exposed to our product.

9           And in the case of Grace, before 1995 a lot of claims

10  were dismissed because we had the ability, as this chart

11  indicates, to quite carefully scrutinize the exposure evidence.

12  After the claims started to skyrocket this process no longer

13  was feasible, not because we believe that there was exposure.

14           It's that we did not have the realistic opportunity,

15  given the way the claims were being administered, not state

16  substantive law, state administrative procedure.  We didn't

17  have the opportunity to exact the same requirement for

18  scrutinizing exposure.

19           And even then, even before 1995, we were necessarily

20  hampered in that effect.  So we can see that very few, much --

21  many fewer claims were dismissed post-1995.  And we now know

22  this is a chart that's been shown to the Court previously, but

23  a huge number of claims that had been pressed against Grace as

24  of the time of the filing come from people who worked in

25  industries that were not serviced, that were not sold to with

**J&J COURT TRANSCRIBERS, INC.**

29

1   the principal Grace products, which were principally used in

2   the construction business.

3        This chart indicates that only 12 percent of the

4   sample that was taken involved claims of people who worked in

5   the construction field.  When you combine these two things,

6   that is, looking for real disease, real exposure, without

7   getting into any other issues, we believe that we are

8   substantially along the path already of being able to

9   demonstrate to the Court that when it comes just to figuring

10  out who really got hurt by a Grace product, nothing else, who

11  really got hurt by a Grace product based upon reliable data,

12  data that would satisfy a <u>Daubert</u> standard, then we're talking

13  about a huge, huge number of claims pending against Grace as of

14  the time of the filing that don't -- that are not based on that

15  kind of data, and only a fraction of cases that are.

16       This is what has been reported widely in the press

17  and it's true here that the money that had been paid out went

18  mostly to people who just didn't have claims, even by the basic

19  standards and requirements that apply in this Court under the

20  Federal Rules, before you get to a jury issue.

21       These figure very, very prominently, obviously, in

22  our belief that the claims largely are not going to pass

23  muster.  The implications of this are clear.  The law says, the

24  law says that no matter what the plan is, only -- the claims

25  can neither be overpaid nor underpaid.

**J&J COURT TRANSCRIBERS, INC.**

30

1          That is to say, the claimants can't get -- they may

2   have to get less than they deserve in the sense that there's

3   not enough money to pay them, but they can't get more money

4   than they deserve, absolutely a fundamental predicate; that we

5   can't -- we don't have a situation where the law permits --

6   where the constituencies, where it is to their interest to band

7   together and decide, here's how we're going to divide up the

8   pot, even though the division of the pot doesn't match the

9   merit of the claims.

10          Obviously, if nobody objects whatsoever, I guess it

11  will escape the scrutiny of the Court.  But where there is an

12  objection or where there is scrutiny by the Court, the claims

13  can neither be overpaid nor be underpaid.  They have to be paid

14  according to their merit.

15          So we have now a huge disconnect based upon the

16  litigation, just as we sit here today, between what it is that

17  people said was the liability at the time the case was filed to

18  what now has emerged as being the liability.  It's a disconnect

19  even from the plan that Grace currently has on file with the

20  Court.

21          The plan that Grace currently has on file, because as

22  we explained before was designed to continue on a mediated or

23  consensual resolution process is out of sync.  There's way too

24  much money in that plan for property damages.  There's way too

25  much money in that plan from any personal injury plan.

**J&J COURT TRANSCRIBERS, INC.**

1      So time has already moved us beyond even the

2  provisions of that plan.  So what is our path?  Our path is

3  straightforward.  It says we litigate and estimate, and based

4  upon that we, as the law requires us to do, develop a plan that

5  is tailored to the liabilities as who really got hurt from our

6  product.

7      It's a tailored plan.  You can't put the cart before

8  the horse.  We've already see what the consequences of that

9  are.  What, then, is the alternative?  What's the alternative

10  that the asbestos claimants have proposed?  And here, there's

11  been still the absence of complete communication.

12      There was an announcement by Mr. Lockwood to the

13  Court.  Mr. Lockwood said -- and this is April 17, 2006 --

14  Following a mediation period that was supposed to produce a

15  consensual plan, it produced a plan that was consensual only

16  among those who agreed with one another that they would like to

17  leave nothing there for the company and for its sole

18  shareholders.

19      Mr. Lockwood says:  "I'm please to report that Judge

20  Pointer's report to you is accurate.  We do believe that we

21  have an agreement in principle between the PI and PD committee

22  with respect to our respective claims, how we envisage those

23  going forward.

24      So this was the big fanfare; this was the big

25  announcement.  And Your Honor properly recognized, although it

32

1  was not the whole ball of wax to the extent that it was a

2  partial resolution among significant constituencies, it could

3  be very important.

4        But what was the agreement?  What was the agreement?

5  Now, certain parts of that have been very clear.  One, it's an

6  agreement that gives equity nothing, zero.  We were not even

7  invited to the table that we set, and that's fine.  That's

8  their prerogative to make that proposal, but that means it's

9  going to be a cram-down plan.

10        That's one thing that's very clear.  It is a -- it

11  purports to be the outline of a cram-down plan.  But it has

12  significance that goes beyond that.  It is not only a plan that

13  in order to be confirmed it would require the Court to go

14  through an estimation process designed to determine whether

15  that plan was fair and equitable.

16        It has a more pervasive effect on the process that

17  we're now going through, and this has not been fully shared

18  with the Court and it's still not even been fully shared with

19  the other constituencies.  Under this plan an allocation has

20  been agreed to between the property damage claimants and the

21  personal injury claimants, and it involves filters of who gets

22  what insurance and then what's ahead of insurance, et cetera,

23  et cetera.

24        But essentially, what's left over at the end of the

25  day after administrative expenses and considering the pot of

33

1  insurance that's dedicated to one set of claims or another is

2  that the personal injury and property damage constituencies

3  agreed to divide the pot 85/15; 85 percent to the personal

4  injury claimants, 15 percent to the property damage.

5        Well, I guess, you know, anybody can make that kind

6  of deal.  That's appropriate.  But the key thing is that that

7  allocation applies, regardless of whether as a result of the

8  process that we have underway here that is the actual

9  proportion of value that is allocable to those constituencies.

10        They have essentially reached an agreement amongst

11  themselves that simply says, here's how we're going to allocate

12  it, regardless of whether that represents the value the Court

13  has now determined to apply to those claims.  Okay.  Well,

14  that's an interesting kind of concept.

15        Can they really do that?  Can they not do that if

16  there's an objection to plan?  We'll have to take that up.  But

17  this goes way beyond the question of being a cram-down.  This

18  is an effort to say, we're deciding on the allocation, such

19  like -- it's a Mary Carter agreement, because they -- you know

20  -- geez, whatever happens, here's how we're going to divide it

21  up; that's respectively what it is.

22        But it has a third component that's also equally

23  important, and that is that as we understand it, no party to

24  that agreement can enter into any deal with the debtor or any

25  deal with the unsecured creditors, absent the approval of the

34

1   other parties to the agreement.

2           Now, we've gone through -- I've -- and outside of

3   bankruptcy I faced these questions because we had a joint

4   defense agreement in San Juan, Puerto Rico, in the San Juan

5   DuPont Plaza, a hotel fire case.  And the Court found that it

6   was unlawful, that it violated public policy and judicial

7   policy, because our joint defense agreement has the effect of

8   stymying or getting in the way of settlement.

9           Here we are in the bankruptcy process where the whole

10  purpose of the process essentially at the end of the day is to

11  produce a consensus.  Yet we have an agreement that, at least

12  as it's been recited to me, says nobody can do a deal unless

13  the other parties to this deal that's already been made agree

14  to that effect.

15          It's a lock-up.  It's not a Mary Carter.  It's a

16  lock-up.  It says, what's being locked up -- what's being

17  locked up is support.  Support has been locked up.  Now, maybe

18  that'll change.  That is at least what we believe.  We've asked

19  now for them to basically acknowledge this in writing.

20          Your Honor will hear that out on September the 25th

21  because they've declined to do that.  Under any set of

22  circumstances this path here is a path that doesn't get to and

23  presumes in fact, indeed, discounts and seeks to set aside the

24  only process that is available in our jurisprudence to actually

25  answer the question that everybody agrees is the central

35

1  question.

2         You can't -- unless there's agreement you cannot

3  bypass those rules, and yet, the only alternative that they

4  have set out to the Court here is to do precisely that because

5  they have reached what they characterize to be a deal that's

6  favorable to them.

7         In our view, Your Honor, there's only one path, only

8  one path that was there to begin with, only one path that's

9  there today, which is to continue this litigation estimation

10 process and get the thing done.  If there's one answer to the

11 question of how to resolve the case in our judicial system,

12 it's to set the thing for trial.  And effectively, it's now

13 been set for trial.

14        If at the end of the day they're correct and the

15 liabilities exceed the assets, well, then, we'll all know where

16 to go.  But prior to that time to terminate exclusivity so that

17 we can have them pursue yet another track of litigation now

18 dedicated to something that has all of the earmarks as being

19 contrary to the interests of case resolution, rather than

20 facilitative of that resolution, that is the wrong way to go.

21        There's only one thing that I'll add and then I'll

22 sit down, and that is a further proposal has been made, and

23 that proposal by the other side -- I suppose they'll touch on

24 it today -- say, well, in determining scope of liability or

25 solvency, let's take it a step at a time, and let's just go

**J&J COURT TRANSCRIBERS, INC.**

36

1  with the malignant claims first.

2          Let's estimate the malignant claims first, because if

3  it turns out that Grace is insolvent giving the malignant

4  claims, then we don't have to proceed and do anything else.

5  Your Honor, that path has not been taken in the other

6  estimations, and would be counterproductive here.

7          While we believe that the nonmalignant claims have

8  very few of them any merit, nonetheless that should be

9  determined.  Why?  Well, talk about the elephant in the room.

10 Of the 55,000 questionnaires processed to date approximately 88

11 percent have been submitted on behalf of claimants who

12 purportedly have a non-malignant asbestos-related disease.

13         We're going to have to get there, and we're going to

14 have to get there not only because it's a central issue given

15 the number of claims that have been made, but for two

16 additional reasons.  Reason one, if they are successful in

17 showing, as we believe they will not be, that Grace is

18 insolvent for malignant claims, that may tell equity that

19 they've got nothing left in this case.

20         But it leaves open the question of what value should

21 be available to the other unsecured creditors, and that value

22 requires not only a determination of solvency, but it requires

23 the determination of what the scope of the asbestos claimants'

24 claims is, what the liability is, so a -- all the claimants can

25 be treated pari passu.

**J&J COURT TRANSCRIBERS, INC.**

37

```
 1          That issue does not go away if you have a
 2   determination of insolvency by reason of malignant claims.  But
 3   secondly, and this is now problematic even with respect to
 4   litigation against the Court to the position of the equity-
 5   holders.  They have created what is really an illusory
 6   distinction.
 7          They make out as if you can determine the malignancy
 8   liability and the non-malignancy liability.  Well, they don't
 9   have anything to do with one another.  They're different kinds
10   of diseases.  And what they have failed to appreciate and have
11   failed to tell the Court is that there are always two prongs to
12   causation.
13          One prong is the diagnosis of the disease and the
14   other prong is exposure to a product in causation from that
15   exposure.  And where you have malignant claims, it may be that
16   the diagnosis of the malignant claim is easy, mesothelioma is
17   mesothelioma; lung cancer is lung cancer.
18          But when it gets to the question particularly with
19   respect to lung cancer, which arises in the general population
20   pervasively as a result of smoking, to determine whether a lung
21   cancer's attributable to asbestos exposure, guess what you get
22   back to?  You get back to the x-rays, which are used to
23   demonstrate there is in fact evidence of asbestos exposure and
24   asbestos-related pathology and provides a tie of lung cancer
25   claims to asbestos.
```

38

1        We're going to go back into the whole world of

2   reading the x-rays and all the rest of that, no matter which

3   way this gets cut.  And for all those reasons we're already

4   well down the path of an overall estimate.  They can be handled

5   at the same time.  They are currently scheduled to take place

6   at the same time.

7        To take a step backwards now and say, oh, we've now

8   decided that liability is important, but we only want to talk

9   about part of the liability would be a step backwards in this

10  case.  So -- and for all those reasons, Your Honor, the debtor

11  seeks an extension of exclusivity up through a decision on the

12  estimation motions that are now pending before the Court.

13        THE COURT:  Anyone wish to speak in support of the

14  debtor's motion?

15        MR. BENTLEY:  Your Honor, would you prefer that I --

16        THE COURT:  Your name again, please?

17        MR. BENTLEY:  Yes.  Phillip Bentley, of Cramer,

18  Levin, for the equity committee.

19        THE COURT:  Whichever place you're comfortable, just

20  so the court reporter can hear you, is fine.

21        MR. BENTLEY:  I'll stay here, then, if that's all

22  right with the Court.

23        THE COURT:  That's fine.

24        MR. BENTLEY:  Your Honor, I -- we certainly support

25  everything that Mr. Bernick has said, and I'd like to add a few

**J&J COURT TRANSCRIBERS, INC.**

39

1  points on one issue that he touched on, specifically the last

2  issue he touched on, namely, the proposal by the plaintiffs

3  that Your Honor bifurcate the estimation process to a cancer-

4  only estimation first and turn to malignant later.

5       Mr. Bernick has explained several reasons why that

6  makes no sense.  I'd like to add two reasons to the litany, and

7  they both relate to the fact that the proposal that the

8  plaintiffs had made on this issue is predicated on the

9  assumption that there's no serious dispute about the value of

10  the debtor's assets here.

11       Your Honor will recall in their papers they say that

12  in order to push the debtor into -- to establish insolvency,

13  they would simply need to establish an aggregate asbestos

14  liability of $2.9 billion.  There are several fallacies in this

15  argument, Your Honor.

16       The first fallacy is simply in the number they've

17  picked.  We think it's very clear that the $2.9 billion figure

18  they've picked is very, very, very much lower than the real

19  number.  I'll just mention one or two obvious errors that

20  they've --

21       THE COURT:  Wait.  Say that again, please?

22       MR. BENTLEY:  The plaintiffs have said in support of

23  their proposal that the Court bifurcate the estimation

24  proceeding that we should proceed first with a cancer-only

25  estimation because we'll show that cancer-only claims by

**J&J COURT TRANSCRIBERS, INC.**

40

1  themselves exceed $2.9 billion of liability.

2          And they then attach a computation which purports to

3  show that so long as asbestos claims exceed 2.9 billion the

4  debtor will be insolvent, because the debtor's assets less its

5  non-asbestos liabilities are $2.9 billion.

6          We think that number is flat-out wrong, Your Honor,

7  and just to make the (indiscernible) the Court clear of error

8  in the analysis that's been presented to you in their papers,

9  they -- the 2.9 figure is based on a -- they rattle off a list

10  of their assets, including the forseeneous (phonetic) on Sealed

11  Air contributions, the debtor's enterprise value, they simply

12  omit, they provide a zero, for the debtor's insurance.

13          And as the Court may recall, the debtor's have

14  estimated that if the asbestos claims were high enough to

15  approach an insolvency situation, the insurance would be

16  somewhere in the vicinity of $800 million.  That figure is

17  simply omitted from the computation of the 2.9.

18          So if you added that in we're already up to 3.7.  And

19  then there's additional reasons why then the true number, the

20  insolvency number, the aggregate asbestos liability needed to

21  push the debtor into insolvency, would be much higher than $3.7

22  billion.  For one thing, this computation includes an

23  enterprise value that's based necessarily on EBITDA numbers to

24  date; in fact, sometime prior to today, clearly.

25          Obviously, any valuation of the debtor that's done

41

1  would be done using values as of confirmation.  The debtor is

2  projecting of EBITDA growth of something on the order of $40

3  million over the next year.  If you use multiples of the sort

4  that the plaintiffs themselves are using, that would add

5  another three of $400 million to the insolvency number,

6  bringing us up now to $4 billion.

7         And finally, the plaintiffs are using multiples, and

8  they're -- they ignore the fact that the multiples at which

9  companies that are comparable to Grace have been selling have

10 been growing substantially.  They ignore the more recent

11 multiples, which are substantially higher than prior multiples.

12        And in our view, Your Honor, if you use the

13 appropriate multiples it could push the insolvency number up to

14 as high as $5 billion.  So we have this enormous swing between

15 the 2.9 billion that they say is the true number and the up to

16 $5 billion that we think Your Honor will ultimately determine

17 is the true number.  You would need to have vastly more

18 asbestos liability in that number, obviously, to hit a $2.9

19 billion number.

20        Final point, Your Honor, conceptually there --

21 there's a final reason why you can't possibly put the cart

22 before the horse the way they're proposing to do.  They say,

23 Your Honor, determine the value of cancer-only first, and it

24 will establish insolvency.  But that assumes that everybody

25 agrees that we know what the insolvency number is.

42

1    And as I've just discussed, clearly, there's a big

2    range.  Your Honor will need to hold a contested valuation

3    hearing.  There will be experts opining.  As always happens in

4    valuation hearings, there will be a significant range in values

5    that are presented to Your Honor.

6    And until Your Honor has had that hearing you can't

7    possibly say, Aha, the asbestos claims have been proved to

8    exceed the solvency number.  So it's a recipe for Your Honor

9    simply having to do everything twice.  It's a recipe for delay,

10   not for expediting the case.  And for that reason, as well,

11   Your Honor, we think it makes no sense to seriously consider

12   this bifurcation proposal --

13   THE COURT:  Well, I like the idea of getting to a

14   valuation hearing.  Those I understand.

15   (Laughter)

16   THE COURT:  We do those a lot in bankruptcy.  Okay.

17   Thank you.

18   MR. BENTLEY:  Thank you, Your Honor.

19   MR. KRUGER:  Your Honor, Lewis Kruger, of Stroock and

20   Stroock and Lavan, the unsecured creditors' committee.  I'd

21   just like to say that we would agree with Mr. Bernick's

22   presentation and also point out to Your Honor that just the

23   finding of insolvency does not by any means stop the process.

24   The estimation would still need to go forward in

25   order to determine the ultimate distribution, both to asbestos

**J&J COURT TRANSCRIBERS, INC.**

43

1  claimants, as well as unsecured creditors in these proceedings.

2  Beyond that I'd like to reserve whatever comments we may have

3  until after we hear from our colleagues across the room.

4         THE COURT:  All right.  Mr. Frankel.

5         MR. FRANKEL:  Good morning, Your Honor.

6         THE COURT:  Good morning.

7         MR. FRANKEL:  Roger Frankel, on behalf of the future

8  claimants' representative.  First of all, Your Honor, I might

9  say that if Mr. Bentley's numbers are right, some 300 billion

10  -- 3 billion have been put on the table we might not be here at

11  this moment.  But I'll walk through the solvency numbers as we

12  see them.

13        MR. BERNICK:  I would object to that statement.  That

14  implicates the negotiations actually have taken place, and that

15  is misleading.

16        THE COURT:  Okay.  It's stricken.  Go ahead, Mr.

17  Frankel.

18        MR. FRANKEL:  Thank you, Your Honor.  Your Honor, I

19  think that what we heard very little of from Mr. Bernick is

20  about cause and about why exclusivity should be extended.  And

21  what I want to focus on and what I want the Court to focus on

22  is the time line that we have had in this case, and the time

23  line that we are likely to have in this case if exclusivity is

24  not lifted.

25            I'm going to go through a series of slides, and

**J&J COURT TRANSCRIBERS, INC.**

44

1  because they are not particularly readable on the screen, we're

2  also going to hand them out to those that are involved or that

3  enter their appearance in the exclusivity hearing.  And if --

4          THE COURT:  Me, too.

5          MR. FRANKEL:  -- and I have a set for Your Honor.

6          THE COURT:  Thank you.  They're just a little

7  difficult to see on the screen.  I'm not sure whether it's the

8  -- that machine or the screen that's causing the problems

9  today, but they're hard to read.  Thank you.

10          MR. FRANKEL:  First of all, the first slide is a

11  slide that the Court is certainly familiar with, and it takes

12  us from the beginning of the case, essentially, to where we are

13  now.  And there's a few points that I just want to point out;

14  the petition date, obviously, April of '01.

15          In November of '02, there was a significant event,

16  which was the Sealed Air settlement.  And the Sealed Air

17  settlement was significant in the sense that one of the

18  elements of that litigation was the solvency of Grace.  Sealed

19  Air paid $1 billion to settle that case, as we now know,

20  contingent on 524(g) protection ultimately being obtained.

21          We move on in 2004.  The FCR was appointed, Mr.

22  Austern.  2005 in February Grace was indicted.  And then we get

23  each one of these deals with different exclusivity extensions,

24  and the third page of slide one, the Court was concerned back

25  in June of '05 about whether there would be some business

45

1  reason why perhaps exclusivity should not be terminated.

2           There were briefs.  There were affidavits.  The

3  bottom line is, there's never been any real concern.  Grace has

4  never expressed any real concern that its business would be

5  affected if exclusivity would be terminated.  Perhaps the stock

6  price would go down, but that's a different issue than the

7  business being affected.

8           Some of the critical factors and those that are

9  relevant in this case, Your Honor, that the Court must take

10 into account in determining whether the debtor has met its

11 burden for another extension is the time in Chapter 11.  It's

12 been over five years; whether a confirmable plan is on file and

13 its status, and I'll get to that; and then the balancing of the

14 benefits of a further extension against the harm of

15 termination.

16          So how does estimation, which is essentially all the

17 debtors talk about in their brief, and in fact, all they talked

18 about today, play into all of this?  I think everyone agrees

19 that estimation of asbestos liability is necessary without a

20 fully consensual plan.

21          The question is, would an estimation in the context

22 of competing asbestos constituent plans meet the goal of

23 exiting Chapter 11 on a quicker time line.  We're now going to

24 go to slide two.  Your Honor, on slide two if we start with

25 estimation hearing, which is in June of '07, essentially what

46

1 we have here is that two things can happen.

2          Under the current plan, the only plan that's on file,

3 if the Court estimates that the asbestos liabilities -- and

4 don't forget, we're including because it's the way their plan

5 is set up -- ZAI claims, as well as property damage claims, as

6 well as present and future personal injury claims, if those are

7 all estimated below $1.6 billion then the debtor goes forward

8 to a disclosure statement hearing.

9          As Your Honor well knows, we have significant

10 confirmation issues that would be raised at the disclosure

11 statement, in particular, whether or not those that are

12 personal injury claimants, for instance, are entitled to vote

13 under Section 524(g).

14          Assuming that they get past the disclosure statement

15 hearing, then we go to a confirmation hearing.  We are in --

16 under the most favorable circumstances to the debtor, we are in

17 early '08 for confirmation.  Now, if we look at the other side

18 of the chart and we assume, as we do, that the asbestos

19 liabilities will be estimated above $1.6 billion, then what

20 happens?

21          Under the debtor's plan there is no possible

22 confirmation.  They don't go to a disclosure statement.  They

23 go to an amended plan.  Presumably, they amend their plan to

24 conform with the rulings of the Court in the estimation

25 hearing.  We then go forward to a disclosure statement hearing.

47

1          Well, if the debtors continue to believe that the
2  asbestos claimants don't have the right to vote, we have
3  objection confirmation hearings in connection with the
4  disclosure, whether the disclosure should even go forward or
5  not.  If the Court rules that the disclosure should go forward,
6  we are basically into a confirmation hearing in the second
7  quarter of 2008.

8          If the Court rules that the disclosure statement
9  should not go out for solicitation because asbestos claimants
10 are entitled to vote, we're at the earliest in the middle of
11 '08.  The company may be solvent, may be insolvent.  I agree we
12 need to have a separate hearing during this process on that
13 issue.

14         But the fact is, is that under the debtor's approach
15 and under the debtor's plan that's on file we're going to be
16 here a long, long time before we get to a confirmation hearing
17 of a confirmable plan.  The asbestos constituents now seek a
18 process to get this case confirmed more quickly.

19         And while the debtors don't want to hear that, we
20 think the Court would want to hear that and we think that
21 that's essentially the cause that has not been shown by the
22 debtors.  This slide three shows essentially what the asbestos
23 constituents have in mind.

24         Well, I'm not working this too well, but what we
25 would say, Your Honor, is that the estimation takes place, but

48

1 in the meantime we would have a plan that would be on file.

2 And I'll get to that time line in a moment.  But our plan would

3 say that the administrative creditors would be paid in full.

4 We think that number's 560 million.

5       And by the way, almost all of these numbers are

6 numbers that our financial advisor have discussed with the

7 debtor's financial advisor.  So I don't believe there are any

8 surprises here; that the potential for nonasbestos pre-petition

9 creditors to be paid in full is there.

10      It would depend on what the asbestos constituents'

11 plan says, but the point that I'm making here is that if the

12 estimation comes out to be higher than 2.9 million -- 2.9

13 billion, assuming that that's the insolvency number, or

14 whatever the insolvency number is, then our plan would say the

15 commercial creditors get paid whether it's at par, whether it's

16 at 90 percent, but it would have a number.

17      And just like in Armstrong World Industries the

18 Court, once it got to an estimation that exceeded a certain

19 number, it's done.  The case goes forward with our plan because

20 we've fixed a number for the commercial creditors and we've

21 basically said the remaining assets go into a trust for the

22 benefit of the asbestos creditors, and the asbestos creditors,

23 as Mr. Bernick had said, have already agreed on how they're

24 going to split up the remaining assets.  There's a second page

25 to this plan --

49

1          THE COURT:  Well, I'm a little confused about the

2   agreement to split up the assets because, frankly, of something

3   that Mr. Bernick raised in his argument, and that is this.  I

4   do expect that within a week or so the ZAI opinion is coming

5   out, and I do expect that at some point we're going to be

6   looking at other property damage claims.

7          Now, just hypothetically, what happens if those

8   decisions aren't in conformity with the value of the trust that

9   has been devoted to property damage claims?  Either higher or

10  lower, it doesn't matter, just what if it doesn't reflect those

11  claims?  I don't think you can agree your way around a court

12  decision.

13         MR. FRANKEL:  Your Honor, I think the way the

14  agreement works is this:  if we just take an extreme

15  hypothetical that property damage is valued at zero, but the

16  personal injury claims are valued at $4 billion, okay, and what

17  ends up coming in is $3 billion of assets, we would have a vote

18  by the asbestos claimants, both property damage and personal

19  injury claimants, that of that $3 billion 85 percent is going

20  to go to the personal injury claimants, even though their

21  claims have been estimated at $4 billion.

22         THE COURT:  Okay.  But that's not the problem.  The

23  problem is that if the Court has actually made a determination

24  that there are no allowable property damage claims, that's the

25  end.  I don't think I can confirm a plan that says you're going

**J&J COURT TRANSCRIBERS, INC.**

50

1    to pay value when I've determined that there's no value that's

2    owed.  I don't think that plan's confirmable.

3         MR. FRANKEL:  Well, Your Honor, if the plan is not

4    confirmable on that basis then, obviously, the agreement would

5    fall apart.

6         THE COURT:  Well, there's the problem, because right

7    now what I -- now, assuming that Mr. Bernick has correctly

8    articulated that there is a form of lockup agreement to divide

9    up those assets, regardless of what the Court's valuations are,

10   then you can't propose a confirmable plan at this point,

11   either.

12        MR. FRANKEL:  But Your Honor, I think that our plan

13   would be subject to what the Court orders.  If the Court says

14   that you cannot split the assets the way you've agreed, then we

15   can't do it and we won't do it.  I mean, the agreement right

16   now is an agreement among us.  It is a way to try to move this

17   forward.

18        We frankly don't think property damage is valued at

19   zero.  We may not be exactly right at 15 percent, but if we

20   wait for every last claim to be litigated, this case will go on

21   way too long.  And our goal was to try to reach some agreement

22   that we felt reasonably represented the allocation of resources

23   of the parties.

24        And by the way, it is not dependent on there being no

25   equity.  It is the split as between the asbestos constituents.

**J&J COURT TRANSCRIBERS, INC.**

51

1  If the Court determines that there is equity, our split is

2  still 85 to 15.  And our plan -- I don't want to get into the

3  details of what our plan would say because, frankly, we haven't

4  drafted our plan.

5       What we're seeking here is the right to file the

6  plan, but we would file a plan that would certainly take into

7  account the fact that if the Court determines that this

8  arrangement is not confirmable, then that plan can still go

9  forward without that arrangement.

10      Your Honor, I think the point about our plan is it

11  would require a vote.  It would require all of the traditional

12  1129 requirements and 524(g) requirements.  We would expect it

13  to have a vote of all the asbestos constituents in each of

14  their respective classes, and we would expect it to be accepted

15  by the requisite majorities.

16      We don't believe that, notwithstanding that the Court

17  might estimate an amount, that that means you can channel them,

18  pay them in full based on the estimated amount and that's the

19  end of it and they don't have a right to vote.

20      THE COURT:  But conversely, just to satisfy that

21  objection, the debtor and the plan proponents could also modify

22  the existing plan to cure that issue to say that in the event

23  that there's a determination that the claims have to vote, that

24  they can then vote.

25      So I mean, if the only issue is to fix a plan so that

**J&J COURT TRANSCRIBERS, INC.**

**A-147**

52

1  one way or other, whatever the Court's rulings are, the plan

2  can go forward, that's a pretty easy amendment to make.

3        MR. FRANKEL:  Your Honor, I will get to what the

4  debtor's plan could say and what in fact they said it would say

5  if we couldn't reach agreement.  And if the right plan were on

6  file I don't think we'd be here arguing over exclusivity.  I

7  think the problem is we have a plan that's absolutely not

8  confirmable that's on file.

9        Your Honor, this is what we see as the time line in

10  connection with the asbestos constituents' plan if exclusivity

11  was lifted.  And the point of this graph is simply that when we

12  got to the estimation hearing we would already have gone

13  through a disclosure statement hearing and a solicitation.

14        And if we were right that the liabilities are over

15  1.6 billion or over 2.9 billion or over 4 billion, then in that

16  event we would be prepared to go right forward to confirmation.

17  And we think in that situation we could have a confirmation in

18  the third quarter of 2007, and we think it's the only way that

19  there's going to be a confirmation in that kind of time period.

20        THE COURT:  You're keeping it in this -- this is

21  assuming that the estimation hearing is still in June of '07?

22        MR. FRANKEL:  Yes, Your Honor.

23        THE COURT:  And that you're going to get to

24  confirmation even if everything else is done in the third

25  quarter, when June's the end of the second quarter,

**J&J COURT TRANSCRIBERS, INC.**

**A-148**

53

1  Mr. Frankel?  I think that's a bit ambitious.

2          MR. FRANKEL:  Well, Your Honor, it -- maybe it is,

3  but the -- but again, our plan would already have been

4  solicited.  The disclosure statement would have been approved,

5  obviously, and the only thing that would be left would be the

6  estimation hearing.  So the way the pot is split up would be

7  dependent on the estimation hearing and evaluation of the

8  company.  Those --

9          THE COURT:  Right.  But you're telling me it's also

10  going to be a contested valuation.  And frankly, you're taking

11  up virtually all of the days that -- in that time frame, not

12  until June, but starting in that June time frame to get these

13  other things done.  So somewhere in there we need a valuation

14  hearing process, too.

15          MR. FRANKEL:  I think -- I absolutely agree, and I

16  think we're going to probably need a valuation hearing no

17  matter what.  I will say this, and I'm going to get to the

18  solvency numbers in a moment, but -- so actually, I'll save the

19  discussion on valuation for a moment, if I can.

20          The one idea that we had floated in our papers

21  earlier, which we actually thought the debtors had indicated at

22  one point had merit, was the idea of doing a staged estimation

23  where we would do the cancers only first.  It appears today

24  that the debtors don't think that's a good idea.

25          We're still not sure why, because certainly, if it

54

1 turned out that the cancers only, including those with meso,

2 with lung cancer, exceeded the solvency number then we would be

3 done and it would be a shorter process and the whole issue of

4 the so-called bad doctors and all of those kinds of things we

5 could avoid.  We --

6           THE COURT:  Well, how would it be done, because you'd

7 still have to figure out what the value would be, or you're

8 suggesting that you're somehow going to come up with a consent

9 by the creditors' committee, the commercial committees, to

10 figure out what their distribution should be if the debtor is

11 determined to be insolvent based on the cancer assessment,

12 because at that point even though the debtor may be insolvent

13 from that kind of a sense, you're not going to pay all the

14 money over to the cancers --

15           MR. FRANKEL:  Right.

16           THE COURT:  -- when there are other creditors in an

17 equal class.

18           MR. FRANKEL:  Your Honor, what we're suggesting is

19 that under our plan we would fix a number.  As we're sitting

20 here today I don't know whether it would be par for the

21 commercial creditors, 90 percent, but it would be a fixed

22 number.

23           And then if the estimation of the cancer claimants

24 was above the solvency number, or if we went to 90 percent it

25 would be higher than the solvency number, then the Court

**J&J COURT TRANSCRIBERS, INC.**

**A-150**

55

1  wouldn't have to go any further.  In other words, the asbestos

2  claimants would be agreeing, again, as was done in <u>Armstrong</u>,

3  that if you're above a certain number then you don't have to go

4  any further than that.

5        THE COURT:  Okay.  I appreciate the -- I appreciate

6  that at a certain stage in the case that may make sense.

7  Frankly, five years into this case I think we're probably

8  looking at an extra day, possibly two days of trial to get the

9  entire estimation done, and I don't really see at this point a

10 reason to bifurcate that process.

11       If you want to put all the testimony in, in a case if

12 it makes sense in the case itself to structure it so that the

13 evidence with respect to the cancers and the mesos goes in

14 first, that may be one thing, but I really just don't see at

15 this point any reason to take the entire estimation process and

16 put it into two parts, because if for example I determine that

17 the cancers and the mesos are less than that 2.9 billion, then

18 I'm stuck with doing it anyway.

19       And frankly, in analyzing this sort of technical

20 evidence I would really just prefer to do it once and get it

21 done.

22       MR. FRANKEL:  Your Honor, it is -- no more said on

23 it, then.  We were floating it as an idea that we thought might

24 -- maybe the debtors and the Court would want.  We're obviously

25 prepared to go forward with the CMO as it is, and we do

**J&J COURT TRANSCRIBERS, INC.**

56

1  recognize, I think as everybody now does, that without a

2  consensual plan we do have to do that.

3       I want to get back to the debtor's plan for a moment,

4  and I want to get back to the fact that the only way that the

5  debtors can achieve confirmation is if three things happen: the

6  estimation of all the present asbestos claims, present, future,

7  ZAI, et cetera, is 1.6 billion or less, two, the Court

8  determines that the asbestos claims are not impaired, and

9  therefore have no right to vote, and third, that the 524(g)

10  does not require the vote of PI claims that are channeled.  All

11  three of those would have to go in the debtor's favor for their

12  plan to go forward with confirmation.

13       Your Honor, I don't want to spend a lot of time on

14  the solvency analysis, but I do want to just show and

15  illustrate how we got to the number that we got to, because

16  most of these numbers are not really in dispute.  The $2.7

17  billion number, which is the enterprise value, is actually a

18  number that's been discussed among the financial advisors.

19       Could it be wrong?  Could Grace become more valuable?

20  Of course.  Could Grace become less valuable?  Of course.  Mr.

21  Bentley is right, the insurance is footnoted in this slide.  It

22  is not given a value because of several reasons.  Number one,

23  it is generally very disputed.

24       Number two, it is very much dependent on the total

25  amount of claims.  So if in fact there are $3 billion of

**J&J COURT TRANSCRIBERS, INC.**

57

1  asbestos claims or $4 billion of asbestos claims, then there's

2  more insurance, but in that event the company is even more

3  insolvent, because the insurance is greater, based on the

4  greater number of asbestos claims.

5          The other point, though, is that there are three line

6  items on here for which we have attributed zero liability, but

7  which could have significant liability.  There's the federal

8  criminal case, where there are fines at stake.  There's the

9  Libby Montana Mine cleanup and there's the New Jersey

10 environmental case.

11         We just don't know what kind of valuation or

12 liability to put on that, and frankly, I don't think the

13 company does at this point either.  So the $2.9 billion

14 insolvency number is our good faith attempt to show where we

15 are today.  We'll need a valuation hearing on some of these

16 issues, but we don't think that number is very far off.

17         And if it's off because the insurance is more

18 valuable, that only means there's been a lot more asbestos

19 claims than the debtor at least believes is the case.

20         THE COURT:  Well, okay.  I'm not sure I understand

21 that.  If -- let's just assume for a moment that the asbestos

22 liability turns out to be 1.6 billion just hypothetically, but

23 the insurance assets are not valued at any more than 800

24 million no matter what.  Then the 800 million isn't going to go

25 up because the claims go up.

58

1           MR. FRANKEL:  No, Your Honor.  I think everybody

2  would agree if the asbestos liability is 1.6 or less there's

3  not 800 million of insurance.  It's much less than that.

4           THE COURT:  Okay.  All right.

5           MR. FRANKEL:  The 800 million example was based on, I

6  believe, 3 billion.  I think that 800 is not 800 at 3 billion,

7  but the way it works it's a sliding scale.  The higher the

8  asbestos number, the higher the insurance.  But in terms of

9  round numbers the 800 million was pegged at about $3 billion of

10 asbestos liability.

11          THE COURT:  Okay.

12          MR. FRANKEL:  At 1.8 it's a much, much lower number.

13          THE COURT:  All right.

14          MR. FRANKEL:  Your Honor, I want to get to the --

15 this is my final item on my argument here.  The -- I want to

16 talk about the debtor's status report.  It was filed February

17 13 of 2006, Docket No. 11756.  Clearly, the debtors were

18 concerned then about losing exclusivity.

19          They were just as concerned with this Court's remarks

20 that the debtor's plan has problems.  So let's look at what the

21 debtor said back in February in section 3 of the status report

22 titled, "Grace's work on plan amendment," at page 6.  The

23 report state, one, "Grace also has been at work, both to

24 address the Court's concerns with the plan on file and also to

25 draft a plan to be used if agreement is reached."

**J&J COURT TRANSCRIBERS, INC.**

**A-154**

59

1          Two at page 7, "Given the Court's concern with the
2   hard cap, Grace is ready to file if necessary an amended plan
3   that removes the cap on personal injury claims and puts equity
4   at risk.  The actual plan revisions are in process and will be
5   completed by the March omnibus hearing.  Filing such a plan,
6   however, should await the outcome of the current negotiations."
7          Obviously, the current negotiations ended a long time
8   ago.  They attached a Exhibit B to the status report showing
9   what the nonconsensual plan would look like.  And this gets to
10  Your Honor's comments of a few moments ago that Grace could
11  file a plan that would have a much better chance of
12  confirmation.
13         The PI claims will be channeled -- I'm actually going
14  to pick this up because I can't read it otherwise, but
15  everybody has it.  "The PI claims will be channeled to a post-
16  confirmation trust and paid in full the amount of their allowed
17  claim."  Again, this is from their exhibit to their status
18  report.
19         "The plan would say that there would be no limitation
20  or cap on the funds available to the post-confirmation trust to
21  pay PI claims.  The reorganized debtor will be ultimately
22  responsible for any shortfall if the initial funding of the
23  trust proves inadequate to pay PI claims in full"; nothing like
24  the current plan that's on file.
25         And then finally in this section, "Treatment of PI

60

1   claims," it says that, "PI claims shall be unimpaired and

2   deemed to have accepted the plan for all purposes."  Again, we

3   don't think you can do that under 524(g), but under a plan like

4   this maybe they would even get the acceptance.  Who knows?

5           But there is nothing like this that's on file.  Your

6   Honor, we believe the time has come to try a different

7   approach, because the debtor has simply not shown cause.  This

8   goes back to -- this is a bankruptcy case.  Asbestos cases

9   aren't non-bankruptcy cases.  They're bankruptcy cases.

10          Cause has to be shown.  The only thing that the

11  debtor has shown is that there has to be estimation, and after

12  estimation they'll get around to filing a confirmable plan.

13  They chose to file a plan arm in arm with the commercial

14  creditors, and more importantly, with old equity.

15          That's their choice.  It's their right, but there are

16  consequences that come with that.  The debtor's plan refuses to

17  even recognize the possibility that the aggregate asbestos

18  liability makes this debtor insolvent and therefore, the equity

19  worthless.  Now, Your Honor, is the time to level the playing

20  field.  Thank you.

21          THE COURT:  Let me just whether anyone else is going

22  to speak in opposition to the debtor's motion for extension of

23  exclusivity.  Yes.  Why don't we take a five-minute recess,

24  then, and then we'll return.

25          (Recess at 11:25 a.m., until 11:45 a.m.)

**J&J COURT TRANSCRIBERS, INC.**

61

1          THE CLERK:  All rise.

2          THE COURT:  Mr. Baena.

3          MR. BAENA:  May it please the Court.  Scott Baena, on

4   behalf of the property damage committee.  Judge, I, too, speak

5   in opposition to the debtor's motion to extend exclusivity for

6   yet another time in this case.  And I would reiterate that the

7   burden is on the debtor.

8          And we've heard much ado about where we've been,

9   which we all know hasn't brought us to anyplace in particular,

10  except where we are now, which isn't any closer to the end of

11  this case than we were before.  But there are a couple aspects

12  of Mr. Frankel's presentation and the underlying dispute that I

13  would like to focus on and I'll be very brief.

14         To his credit, Mr. Frankel analyzed for the Court in

15  the schematic that shows the decision tree, which I have up on

16  the screen, just what happens in the current state of play

17  where we just pursue the estimations or valuations, whatever

18  you might characterize them as, while we leave on the table

19  only the debtor's plan, which we all thing for some reason or

20  another is not confirmable.

21         And giving everybody the absolute best case scenario,

22  Mr. Frankel described how, whatever the result is if we could

23  reach it in the second quarter of '07, by the third quarter of

24  '07 somebody would be able to genuflect in response to that.

25  Either the debtor, if it's wrong about the extent of asbestos

**J&J COURT TRANSCRIBERS, INC.**

62

1  liabilities, it'll just amend its plan.

2          Or the asbestos claimants, if they're wrong about it

3  they'll do something else, too.  But we all know, Judge, that

4  the prospect of all that happening in that short period of time

5  is but a wish, and may be just wishful thinking.  In fact, the

6  delays could be inordinate and all the appeals that are also

7  alluded to in Mr. Frankel's exposition on the subject may well

8  indeed be accelerated, and we may be sitting there like the

9  atheist at his own funeral, with just no place to go at the

10  determination of the Court as to the extent of asbestos

11  liabilities.

12          And on the extent of the asbestos liabilities, not to

13  suggest too strongly which of those branches we're likely to be

14  on, you know, we ought to reflect a little in this context, as

15  well, about the fact that we know what's happened in other

16  cases, asbestos cases that have preceded us with regard to the

17  estimation of liabilities, and we know that in certain of those

18  cases those debtors were likewise selling the same kind of

19  product as Grace.

20          And we know the difference between the extent of the

21  market shares between those debtors and Grace in respect of

22  their principal products and we can only wonder how it is that

23  the debtor would ever expect to get in under the wire of $1.6

24  billion.  But that of course is a matter for another day.

25          The reality is, though, Judge, someone's going to be

63

1   very sorely disappointed by the result, and that disappointment

2   is going to engender a much longer process, and that's the

3   delay that we've all been trying to avert on this side of the

4   table.

5        Now, even Mr. Bernick along the way when we've

6   described this litigation strategy that Grace has had, when

7   we've talked about defining the types of estimation processes

8   that we were going to undertake, even Mr. Bernick admitted

9   along the way that one of the principal purposes and benefits

10  to be derived from all of that litigation would be to create

11  the delta for a settlement between the parties.

12       And indeed, I'm sure the Court's harbored that hope

13  all along.  You sent us out to conduct a mediation, and 'lo and

14  behold, what happened?  Actually, a sociological extreme

15  occurred where asbestos creditors of both the property damage

16  and the personal injury variety, came to a conclusion, a

17  consensual conclusion amongst themselves without any litigation

18  amongst themselves about one means by which they could resolve

19  their respect interest.

20       But we did not come to an agreement with any other

21  constituency and in the context of this exclusivity argument

22  it's a little bit important to understand how that falls into

23  the equation.  When the Court hoped for a consensual

24  arrangement I don't imagine that your hopes were as high of

25  everybody coming to an agreement with the debtor as it might

64

1  have been in respect of all the creditor constituencies perhaps

2  being able to unify.

3        And the reason is simple, because the issue in

4  respect of reaching a consensual arrangement with the debtor is

5  part and parcel tied inextricably with the issue of whether

6  there's any equity in this case for equity-holders.  And the

7  debtor will continue, as we would expect most debtors to

8  continue, to promote the interest of equity-holders, even when

9  all creditors have unified.

10        And in fact, that's why the asbestos constituencies

11 became more focused on trying to reach an agreement with the

12 non-asbestos creditor constituencies.  And I wish to remind the

13 Court that the reason that an agreement couldn't be reached

14 with the noncreditor asbestos constituency was, although

15 Mr. Kruger characterizes it as just part of the process, it was

16 the most important part of the process at that juncture, and

17 that is a supreme, absolute, abject difference of opinion as to

18 whether or not this debtor was insolvent.

19        And indeed, it was based upon that difference of

20 opinion that unsecureds say, we can't give up an entitlement to

21 being paid in full; we can't give up an entitlement to post-

22 petition interest because if the debtor is solvent that's

23 exactly what we're entitled to.

24        And there's no legal question about that.  And so the

25 issue that was forged by virtue of that mediation, by virtue of

**J&J COURT TRANSCRIBERS, INC.**

65

1  the several attempts to reach a consensus was solvent or

2  insolvent.  Whatever the number is that we measure solvency by,

3  we've got to broach that issue and we've got to broach it as

4  quickly as we can in a most efficiently way possible if we ever

5  want to emerge, despite how jaded we're becoming, if we ever

6  want to emerge in a reasonable period of time.

7          And so that's why we didn't author or propose a

8  unique solution.  We borrowed.  We borrowed somebody else's

9  solution to this puzzle of how we can move this along, how we

10 can create a new settlement dynamic, one that might well work

11 against us, we understand; we don't think so, but it might, but

12 one which creates that playing field on which creditor

13 constituencies at least can unify.

14         And we reflected on the fact that in U.S. Gypsum, as

15 you're well aware, Judge Rolland was confronted with the very

16 same issue and he was confronted with the very same concerns

17 about attenuated and extensive litigation, much like that which

18 is being proposed by Grace, some of which wasn't even as

19 ambitious as what's been proposed by Grace.

20         And he said, no, why don't we just take a look at

21 cancers.  Let's determine the extent of cancers, and then we'll

22 know who's in the money and who's out of the money, and we'll

23 create the dynamic that everybody needs in order to go forward

24 with settlement discussions, and that's the simple elegance, if

25 you will, of the proposal that was put forward, Judge.

66

1          We understand that in some contexts the decisions
2   that you come to in respect of the extent of malignancies
3   precipitates issues in other aspects of the case.  We
4   understand that.  That's the problem with fitting these tort
5   cases into the context of a bankruptcy.

6          They don't exactly dovetail -- the prosecution of a
7   tort case doesn't exactly dovetail with the processes that we
8   employ in bankruptcy, and that's why the Code in many, many
9   respects say, you know, determinations in one respect aren't
10  necessarily binding in others.

11         But at the bottom, the Code insists upon one thing
12  and that is that that fresh start that everybody's entitled to
13  occurs within somebody's lifetime that's associated with the
14  case.  And we're not near that.  And so with its frailty, the
15  biggest being that maybe that calculus doesn't work in some
16  other context, if I'm going to bet against the process at the
17  outside -- outset, maybe that's a real concern, but I don't bet
18  against that process at the outset.

19         We think that the calculus for settlement is
20  immediately put into place when you adhere to this malignancy
21  only concept.  And we certainly think that it is absolutely
22  irrefutable just by virtue of the scope of the litigation to
23  conclude anything other than the fact that if we go forward on
24  that basis we will be in the thick of it quicker, and we will
25  be out of that thicket faster than the process that we've been

**J&J COURT TRANSCRIBERS, INC.**

**A-162**

67

1  employing to date.

2          And we think that that's what this case demands,

3  Judge, in all due respect, or we'll just be feeding at this

4  trough forever.  And there is no peaceful conclusion ahead of

5  it; it's just the litigated type.  And the litigated type never

6  ends, because in that environment everybody has an incentive to

7  continue to appeal until the cows come home.

8          We don't think that's the advisable way of

9  proceeding, Judge, and respectfully, we do think that we've

10  offered an attractive, workable, efficient alternative to what

11  we've been engaged in, or not engaged in as the case may be,

12  for the last five years.

13          We urge you to deny exclusivity.  We urge you to grab

14  this case by its neck, Judge, and we urge you to install a

15  process that we think brings it closer to end than we are

16  presently scheduled for.  Thank you.

17          THE COURT:  Mr. Inselbuch.

18          MR. INSELBUCH:  I don't have any charts.

19          THE COURT:  Thank you.

20          MR. INSELBUCH:  I would ask the Court's --

21          MR. BENTLEY:  I'll lend you some.

22          MR. INSELBUCH:  -- I would ask the Court to kind of

23  work backwards with me.  What's clear is the Court has to

24  estimate the asbestos liability.  I disagree with the Court in

25  -- only insofar as I believe we could get there a lot quicker

**J&J COURT TRANSCRIBERS, INC.**

68

1 if we just did the cancers first, because we wouldn't have this

2 sideshow war over the broken tort system and all of this other

3 kind of stuff.

4         But the Court -- if that's how the Court wants to

5 proceed, fine.  We need to estimate the asbestos liabilities,

6 and we need to value the assets here.  Now, I've been through a

7 couple of these asbestos bankruptcies recently where we did

8 just that.  These are not great mysteries.

9         But what we need to do is start at the point where we

10 -- the Court has done that.  The Court has estimated the

11 asbestos liabilities and has valued the company.  What do we

12 need then?  If we had a plan on file right then that said,

13 pari passu now, done, it's just arithmetic after that, we would

14 have a confirmation hearing the next day.

15         And in effect, what we're suggesting is that's the

16 road we should follow.  Now, we might -- if you give us the

17 authority to file a plan we might file a plan that's a little

18 different from that, because as you're well aware, creditors

19 will often file plans that offer incentives to other creditor

20 constituencies to prevent the next stage of the war, which

21 would be an appeal from this Court's ruling on confirmation, on

22 this Court's rulings on the estimation of the asbestos

23 liabilities.

24         We had those kinds of circuses in the other

25 bankruptcies where the courts, in very short order, estimated

**J&J COURT TRANSCRIBERS, INC.**

**A-164**

69

1   the asbestos liabilities; a few days of hearings, that's all it

2   took.  But appeals can take us through a District Court in this

3   case and then to the Court of Appeals.  That's two years.  Even

4   if everything is affirmed, it's two years.

5        What I would like to see happen is when this Court is

6   finished estimating the asbestos liabilities and valuing the

7   company that there's a plan that can be confirmed, that the

8   plan is on file, that it's been voted approval already, and

9   that it's a plan and a confirmation order that will -- that is

10  less likely to be appealed and is not to be appealed by someone

11  whose appeal will stay the effective date of the plan's coming

12  forward.

13       And that's what we're trying to design for the Court,

14  because if you follow the debtor's logic and we go to the

15  estimation and we go to the valuation, they will then appeal.

16  Someone will appeal that and there will still be no plan in

17  place.  There will still be no deal in place.  There'll be no

18  framework, no matrix around which the constituencies can

19  coalesce.

20       THE COURT:  Well, I have a little bit of trouble with

21  the concept that I'm not doing estimation and valuation in the

22  construct of a plan, and I don't intend to be entering final

23  orders with respect to estimation and valuation except in the

24  context of a plan, so that if there is an appeal --

25       MR. INSELBUCH:  Then there better be a plan.

**J&J COURT TRANSCRIBERS, INC.**

70

1          THE COURT:  -- then there better be a plan.

2          MR. INSELBUCH:  They why shouldn't there be a plan on

3 file now that can get voted on, that will be in front of the

4 Court when the estimation is being done and when the valuation

5 is being done?

6          THE COURT:  Well, that's all a good question and I'm

7 not sure I know the answer to why shouldn't there be, because

8 at the moment I do have a plan.  I understand there are some

9 significant concerns by the -- some of the creditor

10 constituents with it, but nonetheless, there is a plan on file.

11          My intention is not to create appealable orders until

12 we get to plan confirmation, because it seems to me that this

13 is all done in the context of a plan, and I don't see any

14 benefit to piecemealing these issues one at a time.

15          MR. INSELBUCH:  I couldn't agree with the Court more.

16 But then there should be some plan or plans on file that,

17 depending on what Your Honor finally decides, will -- you will

18 confirm.

19          THE COURT:  Well, on file is one thing.  Out for

20 votes is quite another, because there are so many issues at the

21 moment with respect to the liability and the valuation and the

22 possibility of cram-down under a number of scenarios, I don't

23 know how it can -- I don't know how any plan can necessarily

24 get out to vote until those determinations are made.

25          MR. INSELBUCH:  Just if there were a plan that said

**J&J COURT TRANSCRIBERS, INC.**

71

1  nothing that all than pari passu determinations after this

2  Court's done the calculation, a plan that is just simply

3  arithmetic.

4        THE COURT:  Well, that plan probably doesn't even

5  need to go out to vote, I mean.

6        MR. INSELBUCH:  Well, I think it does need to go out

7  to vote.  Particularly, you need to know -- you will need to

8  rule -- if the debtor is correct in its views of estimation you

9  will need to know whether or not the asbestos claimants need to

10  vote.  The simplest thing to do, of course, is let them vote.

11  Then you can decide -- if they voted against his plan, you

12  could decide it doesn't matter.

13        THE COURT:  I think that's a very wise discussion to

14  have with the debtor.

15        MR. INSELBUCH:  Now, I don't understand how going

16  forward with simply the debtor's plan, which can only be

17  confirmed if your rulings are of a certain kind, is a useful

18  exercise.  And to leave us at the end of the day -- suppose you

19  came in with an estimation at 1.7.

20        That still wouldn't make our constituency very happy,

21  but his plan wouldn't be confirmed, because his plan doesn't

22  provide for that.  Now, what we are suggesting, and we haven't

23  formulated the plan yet because Your Honor hasn't authorized us

24  to do so, is that we would have before the Court and out for

25  vote, hopefully, a plan that irrespective of how Your Honor

72

1    rules can be confirmed with the numbers plugged in and we can

2    be, at least at that point, past the level of the Bankruptcy

3    Court, recognizing that everything after this Court is still

4    subject to appeals.

5        But we are hopeful that that process is much more

6    likely to lead to fewer appeals, because we might provide in

7    such a plan an alternative course for other creditors, where if

8    they supported the plan it would be to their advantage,

9    depending upon what the estimation showed.

10        Now, I -- what we can't understand is how that

11   approach is not going to expedite the process.  We believe it

12   has to expedite the process because whether or not we get this

13   estimation done in June or July, I suspect if Your Honor keeps

14   it on the calendar it will get done as scheduled.

15        That's been the experience in every one -- every

16   other one of these cases.  If the Court just stays with the

17   schedule the lawyers will have to adjust to that.

18        THE COURT:  I think I've said pretty clearly, I don't

19   see any reason right now why that schedule's going to change.

20        MR. INSELBUCH:  Nor do I.

21        THE COURT:  Again.

22        MR. INSELBUCH:  Nor do I; nor would I ask that it

23   change.  It's time to get done.  It's time to have a plan that

24   can be confirmed.  It's time to find out what people are

25   willing to do by their votes on a plan and on a proposal on an

73

1  arrangement that is subject to what the unknowns are here, what

2  your rulings will be.

3         And I urge the Court to let us go forward to put that

4  on the table so that we can get moving forward.  And if the

5  debtor wants to take its plan forward, as well, we would

6  support that also.  And we can have a big package that goes out

7  and people can vote A or B or both A or not A and not B,

8  however they choose.

9         But we would really advance the ball during this

10 period while we're working on estimation and we're working on

11 valuation.  We could really advance the ball so that when Your

12 Honor rules, we're ready to go.  Thank you.

13        THE COURT:  Mr. Esserman.

14        MR. ESSERMAN:  Your Honor, Sandy Esserman.  We've

15 filed papers on behalf of Barron and Budd, Environmental

16 Litigation Group, Law Offices of Peter Angelos, Real, Morgan,

17 Silver Perlman, and Simmons Cooper on this matter.  I obviously

18 will not repeat anything you've already heard, but a couple

19 things we haven't heard.

20        April 2, 2001, that's when this debtor filed

21 bankruptcy.  So what Your Honor has to ask yourself is how much

22 time is enough.  How long should exclusivity go on?  Under the

23 debtor's proposal they're really talking about exclusivity,

24 really, through 2008, or at least until 2008.  Even today,

25 April 2, 2001, is a significant period of time.

**J&J COURT TRANSCRIBERS, INC.**

74

1          The next question I suspect Your Honor is going to

2    ask herself is, what is the more likely path for resolution of

3    this case?  No one's really talked about that either.  Well,

4    we've tried mediation and it partially worked.  There were some

5    deals that came out.

6          Is this the path that's going to most likely resolve

7    this case?  It seems to me that if you've got an evening of the

8    playing field, if you've got two plans, that's going to force a

9    lot of things to happen.  It's going to force a lot of the

10   creditors to take a sharp look and see an alternative to

11   confirmation.

12         If Your Honor lifts exclusivity the sky is not

13   falling.  Your Honor controls the process.  You control when

14   disclosure statement hearings occur.  You control when plans

15   get voted on, when they get submitted to the creditors, when

16   confirmation hearings are set.

17         It is not the end of the world for the debtor by any

18   means.  But what it does do, it puts an alternative proposal on

19   the table that people can at least discuss.  It seems to me now

20   is the time to do that.  If we don't do it now I think we're

21   really looking at 2008 before anything really happens to even

22   the playing field.  Thank you.

23         THE COURT:  Anyone else?  Mr. Bernick.

24         MR. BERNICK:  Is it all right if I sit here, Your

25   Honor?  The labels that are used are somewhat different.  We

**J&J COURT TRANSCRIBERS, INC.**

75

1  say scope of liability.  They talk about solvency.  Solvency

2  obviously involves an asset valuation, one that can't be done

3  without looking at the liability.

4        Everybody agrees with fervor that we've got to get to

5  the core of what the liabilities are.  I think that -- I know

6  that we appreciate Mr. Frankel's candor and for that matter,

7  Mr. Inselbuch's candor in saying that the way to determine that

8  liability is not to do it piecemeal in the Court's mind; fine,

9  we'll do it all together.  I think that that is both candid and

10 sound.

11       So there is I think a common core of central

12 agreement.  Number two, beyond the fact that we have to go and

13 turn to that matter, there's the question of, well, is there

14 any plan really that at the end of the day is immune from that

15 determination; that is, can go forward without regard to the

16 outcome of that process?

17       It's been demonstrated here graphically -- it's not

18 really a demonstration; it's an illustration.  This is the

19 chart that Mr. Frankel used -- but certainly, when it comes to

20 the debtor's plan the outcome of the estimation will have an

21 impact on the plan.

22       Now, the plan was designed to have that occur.  So we

23 know that the debtor's plan is not immune to the outcome of the

24 litigation, of the estimation.  That was transparent from the

25 very beginning, but at the same, as Your Honor has recognized,

**J&J COURT TRANSCRIBERS, INC.**

76

1  how much modification really would be necessary, depending upon

2  the outcome?

3          What's very revealing is that -- a small modification

4  to Mr. Frankel's chart illustrates this point -- is that the

5  estimation hearing would have an impact not only on the

6  debtor's plan on file, but also upon any asbestos plans,

7  certainly any asbestos plan that purports to follow through on

8  the deal that's now been reached.

9          And what Mr. -- both Mr. Frankel and Mr. Inselbuch

10 have now acknowledged is that any plan that they develop has

11 got to be subject to court order.  That is to say, once the

12 estimation takes place it may well have an impact on the plan,

13 and as Your Honor has recognized, certainly with respect to a

14 plan that purports already to allocate value.

15         And interestingly, when I described what the plan

16 did, their plan or the outline of their plan did I said, it's a

17 cram-down plan, number one.  Number two, it purports to

18 allocate value without regard to whether the value matches up

19 to Your Honor's values, and number three, it's a lockup on

20 negotiations.

21         Not one person stood up here this morning to say that

22 that was wrong, not one.  I'm sure that now that I've said it

23 I'll probably get a chorus.

24         MR. INSELBUCH:  It's wrong.

25         MR. BERNICK:  A chorus, it's wrong.  But that's

**J&J COURT TRANSCRIBERS, INC.**

77

1   exactly what we've asked them to confirm in writing.  That's

2   what we believe -- that's what I was told -- that's what we

3   believe the deal is.  And as they now recognize, that if that's

4   the deal the plan will fall apart if Your Honor's

5   determinations don't support that allocation.

6          So they made -- they have to make their plan subject

7   to court order, so that effectively, all plans, all plans that

8   are under consideration have to deal with the scope of Grace's

9   liabilities.  That's why we're here.  And depending upon what

10  the scope of Grace's liabilities are, call it a solvency

11  proceeding, call it an estimation proceeding, that is going to

12  inform any plan in this process.

13         In a way, they say -- well, I'll -- let me stay to

14  the other point.  What does that mean?  That means that we have

15  to have an estimation hearing before any plan can be finally

16  structured to be in accordance with the Court's resolution of

17  the central issue in the case.

18         Now, what have we done?  We have said, give us an

19  extension of exclusivity up through the determination on

20  estimation.  That doesn't give us an advantage.  That simply

21  recites the fact that nobody really can develop a plan here

22  without knowing more about what the Court's going to determine

23  here.

24         So our proposal regarding exclusivity does not give

25  us the upper hand.  It preserves the status quo so that we can

**J&J COURT TRANSCRIBERS, INC.**

78

1  get business done that is necessary to be done for any plan to

2  be finally formulated.  That is what we're proposing.  We're

3  proposing nothing more than that.

4          So now, the question becomes well, if that's what the

5  story is, that is, if at the end of the day any plan is going

6  to be subject in some fashion to the Court's order, the Court's

7  order is going to come out of the estimation hearing, is there

8  anything that can or should take place during the interim by

9  way of proposing an alternative plan, and should it take place?

10          And I think that the answer to that is that -- as

11  follows.  First, does it make sense to have -- I've now marked

12  this up here -- an alternative plan go out which is subject to

13  court order for solicitation during this period of time?  It

14  makes absolutely no sense.

15          It makes no sense first of all because there'd be a

16  competing solicitation.  So what happens?  All these

17  proceedings, I don't know when they're going to occur because

18  Your Honor doesn't have time on the schedule to deal with this

19  whole plan, disclosure statement process, solicitations process

20  and contest all before the estimation takes place?  Come on;

21  not going to happen.

22          Number two is, what are you soliciting?  If you got a

23  plan that all it says is, well, here's how we're going to lock

24  everything up, but it's all subject to court order, what are

25  you really asking for people to sign off on?  So the idea of

**J&J COURT TRANSCRIBERS, INC.**

79

1  having a solicitation is, a, going to be incredibly time-

2  consuming, and b, legally, how is it the solicitation that you

3  can really say at the end of the day provides adequate

4  information to people whose votes you're soliciting?

5       You don't know what the final picture is going to be.

6  So then the question becomes, well, what if we just have a

7  plan?  We don't solicit it.  We'll just send the plan out there

8  so it'll be there at the time that Your Honor rules; there at

9  the time Your Honor rules.

10      Well, first, I don't think that they're actually

11  contented yet.  They want something more.  They want to

12  solicit.  They want to send it out so it's ready.  If they

13  can't solicit and send it out then what's the point of having

14  the thing on file to begin with?

15      It just kind of sits there, unless their real purpose

16  is that they really want to have some kind of impact on how the

17  stock market and the securities market looks at this case, and

18  that's not a legitimate consideration for proposing --

19      THE COURT:  Maybe they just wanted to get a plan on

20  file that they think is confirmable, because they don't think

21  the debtor's plan's confirmable and the debtor has offered --

22      MR. BERNICK:  But that --

23      THE COURT:  -- to amend the plan, but hasn't done it.

24      MR. BERNICK:  Well, I'm going to get to the offer to

25  amend and what's happened with respect to that in just a

80

1    moment.  But let's assume that they say, well, we don't like

2    the debtor's plan.  So let's -- we want our plan on there.

3    What's the -- what purpose is accomplished by that?

4             It can't have content to it until the Court provides

5    the estimation.  Let's kind of take a huge step back from these

6    plans.  There's a certain part of the plans that has to deal

7    with 524(g) and solicitation of votes, and that becomes very

8    complicated.

9             It becomes complicated for the debtor to deal with

10   leaving the claimants unimpaired in the event that there's not

11   a consensual plan.  We recognize that that's an issue and we

12   recognize it -- we had a whole hearing on that subject about a

13   year ago.

14            Their problem is, as Your Honor has suggested -- as I

15   suggested and Your Honor has at least said that's important to

16   think about, they can't overpay claims.  They have no license

17   to overpay claims, and they can't prove -- they have not proved

18   so far what the claims are worth.

19            So they've got a problem.  Everybody's got the same

20   problem.  With all this elaborate thing here or there, 524(g),

21   the central problem is the plan is going to have one principal

22   purpose, which is to allocate value to claimants.  Whether it's

23   our plan or it's their plan, the common skeleton, the common

24   structure will be the allocation of value to certain claimants.

25            That's the core.  When claimants vote they're going

81

1  to want to know what they are voting for, how much value they

2  are going to get out of the plan.  So Mr. Baena's folks and

3  property, they're going to want to know, well, are we going to

4  get paid at all or is the Court's -- is the disallowance that4

5  the Court just issued in connection with our claim, is that

6  going to prevent us from getting paid, or our claim is going to

7  be disallowed?  Are they going to be paid at all?

8        How can they possibly exercise their voting rights in

9  an informed fashion if they don't know what their value is

10 going to be?  To simply say, oh, well, the creditors get

11 treated equally and equity gets money if there's money left

12 over to them, that's not much to vote on.

13       We all know that, basically, the constituencies will

14 vote depending upon how they think that's going to sort out,

15 but they won't have information that tells them how it's going

16 to sort out.  We'd have to go ahead and resolicit all these

17 things once you actually knew what the dollars are.

18       All plans have to deal with this problem.  All plans

19 have to have an allocation of funds to pay claims.  That is

20 what the claimants are going to vote on.  Their plan that says,

21 equity gets nothing unless the Court orders otherwise.  Our

22 plan says, equity gets something unless the Court orders

23 otherwise.

24       We're all wrestling with the same problem, which is

25 that we don't know what the Court is going to determine, and no

82

1  plan that's put on trial, our plan, their plan is going to

2  definitively answer that question until Your Honor rules.

3  That's just the basic fact.

4         And you say, well, but under those circumstances,

5  that is, where no plan can really make that specification

6  today, do you terminate exclusivity so that we can have their

7  plan come on trial?  And that raises an interesting question.

8  It's the question that Mr. Frankel raised.  It's the question

9  Mr. Baena raised.

10        It is, what is the standard for the extension of

11  exclusivity?  What is it that cause means?  And they indicate

12  that, well, for the -- for Grace to be able to demonstrate, and

13  as Mr. Baena states, the burden is ours, that exclusivity

14  should be extended.  We have to say our plan on file today is

15  confirmable.

16        I don't believe that that's what the standard is.

17  It's certainly not how the standards read out.  That's to say

18  that given the progress of the case there is a prospect, a

19  reasonable prospect that ultimately a viable plan will be

20  proposed by the debtor.

21        That's how it reads, and that is exactly -- so that

22  then takes you back to the question not of whether the plan on

23  file today is confirmable, but whether the debtor has engaged

24  in the process, a process that points to ultimate success in

25  filing a confirmable plan.

83

1    And we've already talked about how we and we alone

2    throughout this case, all the years that Mr. Esserman refers

3    to, we and we alone have sought to supply the key element

4    that's going to be part of any plan, which is the element of

5    ascertaining value, who gets what.

6         That's what we have done. That's what nobody else

7    has done in the case. But there's also another story, a story

8    that relates directly to plan formulation, and that is historic

9    and has been described previously, but not today. And it's

10   extremely germane, and that is, what has happened with the --

11   with respect to proposing plans that ultimately are designed to

12   be consensual plans?

13        And Your Honor, remember, we -- at your direction we

14   filed our plan. We were given a deadline for filing a plan.

15   And recall that prior to that plan deadline being reached we

16   asked that it be put off for 30 days. And the reason was that

17   there were active negotiations on a plan at that time.

18        And why were there active negotiations? Because

19   there already had been settlement negotiations before within a

20   certain range. I'll just indicate it roughly like that, and we

21   were proposing filing a plan that we thought would pick up on

22   those settlement discussions and put us in a range where we

23   thought we could reach a settlement.

24        And so close was everybody that everybody agreed that

25   the deadline should be extended. We filed the plan and we then

84

1 had a big problem, which was the walkaway problem. All of a

2 sudden things started to deteriorate. I'm not going to go into

3 who, why, what. It just didn't work out.

4       It didn't stop, however. There were then efforts to

5 revive the settlement discussions, again, within a range that

6 was a workable range, and Your Honor has heard by that -- about

7 that. And that continued on for some period of time, and

8 ultimately, when it came time to then say, well, what should

9 happen, there's a proposal for mediation.

10       And the quote that was made from our statement that

11 we were working on a nonconsensual plan, that quote was taken

12 for what we told the Court just as that mediation started,

13 because we were optimistic that if the mediation went, as all

14 of the other discussions had taken place, that there would be a

15 way to reach out and create a common ground for resolving this

16 case.

17       That plan, our statement expressly considered the

18 prospect that there would be a meaningful mediation following

19 in with the settlement discussion history and including the

20 debtor. It never happened; it never happened. The mediation

21 process never included us.

22       There was a walkaway, a walkaway from this entire

23 history. So you say, has the debtor demonstrated a process and

24 a willingness and activity not only to resolve the core issue

25 in the case, that is, who gets what, but to pursue and produce

**J&J COURT TRANSCRIBERS, INC.**

85

1 a plan that is a consensual plan.

2      The answers on both scores, we've done absolutely

3 everything that we possibly could.  And what's now being said

4 is that we can have a mediation process that excludes the

5 debtor, a plan that they want to file that they can't even yet

6 formulate, that excludes equity, that doesn't treat the

7 unsecureds as they believe they're entitled to be treated.

8      And somehow because they've now set that table,

9 unless we can come and say to Your Honor, oh, we'll persuade

10 even them to terminate exclusivity.  It can't be right.

11 Exclusivity is out there to foster a two-way street, not a one-

12 way street, not a street of lockups, not a street of, we don't

13 want to estimate, which is what they've said for five years,

14 not a street of, you're not invited to the mediation table that

15 you're responsible for setting.

16      That's not what termination of exclusivity is about.

17 We're on a good path.  We should continue back on that path.  I

18 just want to cover a couple miscellaneous points and then I'll

19 sit down.  It's been suggested here that we all know where the

20 estimation is going to go.

21      Take a look at Owens Corning Fiberboard, take a look

22 at Armstrong, and I guess I've got one answer to that.  If

23 they're so confident that the estimation is going to turn out

24 their way then what's the big deal.  Let's just get it done,

25 because if they're right, they're right.

**J&J COURT TRANSCRIBERS, INC.**

86

1          That's what -- that's the bet that we're making.
2   It's a bet the company bet, which says, all the cards are on
3   the table.  Let the liabilities be whatever they are.  When
4   Grace filed for Chapter 11 that is the bet that it made, that
5   it did not believe that the liabilities were what the -- what
6   was being told to it.  And the only way to get that rationally
7   decided was before this Court.

8          We made that bet long ago and it's time for them to
9   be also parties to that bet.  I would point out just
10  parenthetically, a lot of discussion took place regarding the
11  <u>Armstrong</u> case and the fact that it was somehow not necessary
12  for the Court to focus on a particular number.

13          <u>Armstrong</u> has been misconstrued.  The <u>Armstrong</u> case
14  was a consensual plan.  It was an agreed-to plan.  There was
15  only one dissent that came from the unsecured creditors'
16  committee who didn't believe -- who believed that it was a
17  discriminatory plan.

18          And the only issue, therefore, that remained to be
19  resolved of all the other issues was, was the total value
20  placed on the asbestos liabilities reasonable.  That's all that
21  it was.  It was a very carefully constrained case, and even
22  then the Court had to engage in an estimation of all of the
23  asbestos liabilities.

24          Another point.  They say, well -- Mr. Baena says, we
25  know how this is going to come out; we know what the market

87

1  shares are and it's been done this before, that before.  Your

2  Honor, when you take a look at the cases that have come up for

3  estimation, they are -- it's no accident that the cases have

4  come out that way.

5        You have <u>OCF</u>.  You have <u>Federal Mobile</u> and you have

6  <u>Armstrong</u>.  If you went back, the big picture at the time that

7  the cases were consolidated under Judge Woollen, there were

8  some companies that wanted to test liability because they

9  believed that there was equity there.  There were some

10 companies that did not.

11       <u>Owens Corning Fiberboard</u> never believed that there

12 was money there for equity.  It was always a question of which

13 of the creditors was going to get what.  And that case was

14 litigated.  It was not litigated by the debtor.  It was

15 litigated by other creditor constituencies, and <u>Owens Corning</u>

16 <u>Fiberglass</u> was an amazingly -- Fiberboard -- was an amazingly

17 important player in the asbestos liability picture.

18       Its personal injury history was very, very different

19 from that of Grace and that of <u>USG</u>.  <u>Armstrong</u> was another

20 situation where the company decided day one that for whatever

21 reason, they did not want to pursue an issue of what the scope

22 of their liability was.

23       They, day one, sought to develop a plan that provided

24 nothing for equity.  The only exception was warrants for

25 management and we see that that evolved also in a different

88

1  kind of way.  What case is most similar to our case?  It is

2  USG.  USG's history was largely a history of property damage

3  like Grace's.

4           USG was a late-comer to the personal injury table,

5  and yet, with respect to USG, the same people made exactly the

6  same arguments.  They said, oh, hopelessly insolvent, how often

7  I've heard, hopelessly insolvent, billions and billions and

8  billions, but then what happened?  A deal got done?

9           And a deal left billions of dollars of equity on the

10 table.  Now, why did that deal get done?  I'm not quite sure.

11 But when this is all made to be inevitable that everybody knows

12 what the liability is, it's a foregone conclusion, that is not

13 what history says.

14           Mr. Baena says -- characterizes the agreement that

15 was reached with the personal injury constituency as being a

16 sociological extreme.  I guess that means you guys get along so

17 well ordinarily.  It was not a sociological extreme.  That deal

18 stands -- the lockup deal stands for a sociological mainstream

19 event which is that when it comes to allocating who gets what

20 of other people's money, often it's easier to reach agreement

21 among yourselves rather than with the people who actually have

22 the money.

23           Should there be a malignant only estimation first,

24 Mr. Frankel acknowledges, Your Honor, if you want to have it

25 all at once, that's fine.  Mr. Inselbuch, the same thing.  Only

89

1 Mr. Baena seems to have a stake and say, no, we really should

2 have malignant only.  Why?  Because a subtext here is that the

3 property damage constituency would like to get out from the

4 litigation of property damage claims, and this is a way that

5 that strategic objective can be achieved.

6 　　　　　Mr. Esserman says, how long must this take.  And the

7 answer is relatively simple.  It's been simple from the outset

8 of the case.  Only so long as the parties believe that there is

9 room to wiggle on the ultimate answer to the ultimate question,

10 which is, what are the claims worth.

11 　　　　　We have to live with that answer.  They have to live

12 with that answer.  The faster we get to the answer, that's how

13 fast the case will be resolved.  What is the best path to

14 consent?  Well, if the answer is that the only path to consent

15 is one where all the equity is gone because their theory of the

16 case is bought, there will not be a consensual plan unless Your

17 Honor agrees with that position.

18 　　　　　That's our way of saying, you must be like Owens

19 Corning Fiberboard.  You must be like Armstrong.  You must

20 capitulate.  Ironically, actually in the Manville case, the

21 first case, 20 percent of the equity of the reorganized

22 Manville did not go to the asbestos claimants.  It went to

23 management and other key players going forward with respect to

24 the case.

25 　　　　　So I don't know what ultimately is the best path.

**J&J COURT TRANSCRIBERS, INC.**

A-185

90

1  The only path is one that resolves the central issue of the

2  case.  And then what really is the purpose of terminating

3  exclusivity?  An argument has been made in the past, and this

4  is Mr. Baena that says, gee, you got to terminate exclusivity

5  because the marketplace is reacting to what's happening in

6  court.

7          And we filed this plan and as a result we've kind of

8  misled or framed how the marketplace reacts, and in some

9  fashion exclusivity has to be terminated for marketplace

10  reasons.  We've actually taken a look at that and we will

11  provide the Court -- this is the trend of what happened to

12  stock prices.

13          And what we see is that the stock price for Grace

14  actually rose fairly significantly long before our plan of

15  reorganization was filed.  It was beginning in June of '04 and

16  we all know why it rose.  It rose as a result of the

17  legislation.

18          If you take a look at what happened to Grace's stock

19  price immediately after the plan of reorganization was filed,

20  it didn't jump up.  It declined.  It declined.  Whether you

21  take a look at one week, whether you take a look at two or

22  three weeks, it declined.

23          If you take a look at what happened after the amended

24  plan of reorganization was filed in January of 2005, it

25  declined again.  So the whole idea that somehow the marketplace

91

1 is reacting to the undue optimism associated with the Grace

2 plan, it is just not right.

3          The fact of the matter is -- and we can supply this

4 chart -- take a look at literally all the major developments

5 that have taken place in the stock market over time.  They're

6 overwhelmingly driven, first of all, by the Sealed Air

7 negotiation and then by developments concerning legislation.

8          One last footnote on Sealed Air, they've somehow

9 suggested that the Sealed Air settlement was a concession that

10 at least Sealed Air believed that Grace was insolvent in 1998

11 at the time of that transaction.  And what's interesting about

12 that is that it shows the danger of inferring anything from

13 settlements.

14          Your Honor may or may not recall, one of the first

15 players that came into the Grace case was Sealed Air.  They

16 came in, in connection with the preliminary injunction process

17 at the beginning.  What was their big problem?  Their big

18 problem was that once sealed -- once Grace went into Chapter 11

19 all the folks who were suing Grace turned around and they

20 started to sue Sealed Air.

21          We had 6,000 claims in 60 days.  Sealed Air,

22 supported by the debtor, was able to get an expansion or an

23 extension of the stay and preliminary injunction to include it,

24 but then it faced a big problem.  If they didn't make a deal at

25 the end of this case they would be back exactly where they

**J&J COURT TRANSCRIBERS, INC.**

A-187

92

1  began.

2          So you say, the money that they paid, which is

3  contingent upon getting a 524(g) injunction, did that represent

4  an admission that Grace was insolvent in 1998?  I don't think

5  so.  I think what that represented was Sealed Air's

6  determination to get what a lot of other companies that are

7  solvent companies would love to get and have not been able to

8  get, which is a 524(g) channeling injunction without having to

9  go into bankruptcy themselves.  And did they pay money for it?

10  Yes, they did.

11          MR. INSELBUCH:  Can I just have a minute or two to

12  respond to some of this?  Mr. Bernick has the ability to read

13  men's minds and tell you what was going on in cases where he

14  wasn't even present.  He also has the ability to tell you

15  what's going on in the court system and I think what you're

16  going to start to hear today in the next motion that's before

17  you is a story that's very different from what you heard from

18  the debtor.  But I would like to just point to his chart over

19  here and write one word on it.  We've had five years --

20          THE COURT:  Sir, you're going to have to use a mike.

21          MR. INSELBUCH:  I'll just write the word and then

22  I'll talk.  The word is "failure."  We've been doing it their

23  way for five years and we've had a failure.  We've gotten

24  nowhere.  He had negotiations, he says now, where he thought he

25  was close to a deal.  That was based upon the possibility that

93

1  there'd be a Fair Act.

2         The reason why people bought equity in this company

3  was because they thought there was the possibility of the Fair

4  Act.  Now, there's not such a good possibility for the Fair

5  Act.  Maybe next congress there'll be another Fair Act.  Who

6  knows?  We've got to get this done.

7         We can propose a plan.  In every one of these other

8  cases estimation was done after the plans were voted on.

9  That's just silly.  We can propose a plan that the Court will

10  -- that will have a disclosure statement that this Court will

11  approve that will give sufficient information for people to

12  vote.

13         We've done it in every other case.  We can propose --

14  and we could propose a plan that provides for the commercial

15  creditors, something that they might like and they might even

16  vote for.  But we're going to get nowhere on his track for

17  another five years if what he gets to do is do estimation,

18  which we all agree we're going to get done in June.

19         But then we're going to have no plan on file, nothing

20  to confirm, no deal in place and we're going to wind up

21  appealing all the rest of these pieces.  That's what he wants.

22  That's how he keeps control of this case.  This Court must take

23  control of this case and this Court must see to it that when

24  this Court rules there'll be something to rule on.

25         MR. KRUGER:  Yes.  Good afternoon, Your Honor.  Lewis

94

1  Kruger, for the unsecured creditors' committee.  First, let me

2  say, to the best of my knowledge I think Your Honor does have

3  control of this case.  I've never thought otherwise, and I

4  still think that that's true.

5        But what I've heard from my friends at the asbestos

6  side today is -- in a sense I would almost laugh, but I really

7  -- it's too serious to laugh at.  First, what they say to us

8  is, for the unsecured creditors and looking solely from their

9  perspective, they will file a plan that has the potential if

10 there is insolvency, potential for claims to be paid in full;

11 not a certainty, but a potential.

12       Then they go on to say that we're going to have a

13 plan filed and we're going to have a disclosure statement

14 filed, and a disclosure statement hearing.  And at that hearing

15 this is what will not be known, right.  We will not know the

16 estimation of the asbestos liability, the property damage

17 claim.

18       We may know something more about Zone-A-Life

19 (phonetic) by then, perhaps.  We won't know the total

20 enterprise value or the total distributable value.  In addition

21 to that, what else won't we know?  We will also not know the

22 results of the federal criminal case, the would-be Montana

23 cleanup, the New Jersey environmental suit.

24       We won't know any of those things, but we're supposed

25 to vote on that reorganization plan in which all of the key

**J&J COURT TRANSCRIBERS, INC.**

**A-190**

95

1   elements of a plan are missing.  What they're really in a sense
2   suggesting, Your Honor, is that somehow or other the Chapter 7
3   ought to be brought into this process, because what we're
4   really saying is, it doesn't matter how you vote.

5           There's going to be a determination about the
6   enterprise value, the amount of the liabilities and it will
7   come out however it comes out.  That's not what Chapter 11 is
8   supposed to be about.  If we're going to have a disclosure
9   statement it needs to disclose relevant information so that
10  ordinary human beings can indeed cast a vote based upon some
11  reasonable level of knowledge about the outcome to them
12  economically of what which they are voting upon.

13          May not be perfect, but there ought to be at least
14  some measure that gives them some comfort that there is
15  something that they can look forward to receiving.  This
16  proposed plan would do none of those things.  You would not
17  know whether or not you were voting for something that gets you
18  any recovery, some recovery, a handsome recovery, all of that
19  would be unknown and it wouldn't be a known until after there
20  has been indeed the estimation hearing that they seek really to
21  avoid.

22          What they really seek to do is to have a microscopic
23  estimation hearing in the context of the confirmation of the
24  plan on the assumption that that will be quicker and better and
25  easier.  But the reality of it is that the Court does indeed

96

1  put forth an estimation program and a time frame and a process.

2          We've also been at this case for the same years that

3  everybody else has been at this case, but at this point in this

4  case I think it's far more important to get it right than to

5  try to get it fast and wrong.  And it's wrong to think that

6  creditors should be put in the position of having to vote,

7  really, on a best guess by what I assume that their plan would

8  provide, is their best guess as to how outcomes might come.

9          Well, we're very close to having the actual answer to

10 many of these questions.  I think we ought to see the answer to

11 those questions.  In addition to that, I think in terms of

12 exclusivity I think the debtor has done everything it possibly

13 can do to try to move this case along.

14         It has certainly not dragged its feet.  It has

15 certainly not been unresponsive, either to its -- all of its

16 constituencies.  In light of that I think the debtor's

17 suggestion that exclusivity should be continued until the

18 conclusion of at least the estimation hearing is a proper one

19 and should be granted by the Court.

20         MR. BENTLEY:  Phillip Bentley for the equity

21 committee; very briefly, Your Honor.  I entirely agree with

22 everything Mr. Bernick and Mr. Kruger have said about how any

23 plan that the plaintiffs were to file now would be premature.

24 It would need to be based on a prejudging of rulings that the

25 Court has not yet made.

**J&J COURT TRANSCRIBERS, INC.**

97

1    And any plan that they would file we've seen, they've

2 announced would be based on a pre-judging of whether the debtor

3 would be solvent or insolvent, which as Your Honor has

4 recognized, will hinge not only on Your Honor's estimation

5 rulings, but also on valuation rulings, which may be -- are

6 disputed.

7    Let me just add two brief points to what's been said

8 in this regard about how it would be inappropriate to pre-judge

9 solvency or insolvency.  First, I entirely agree with

10 Mr. Bernick that USG is the analogous case to look at, and as

11 Your Honor knows very well, that was a case where, as

12 Mr. Bernick pointed out, we heard choruses from the other side

13 about USG was deeply insolvent.

14    It turned out that at confirmation pre-petition

15 equity was given consideration that at confirmation had a value

16 of more than $3 billion.  So that's a number that's worth

17 keeping in mind.

18    THE COURT:  Well, I got into USG late, but frankly, I

19 never heard that USG, who had this chorus of people or entities

20 claiming that it was insolvent.  In fact, I kept hearing that

21 pretty much from the outset of my taking over the case that

22 there was relative agreement as to the value and that it would

23 not be insolvent.  So that may have occurred before me, but I

24 have to say on the record, that was not my exposure in USG.

25    MR. BENTLEY:  Okay.  Your Honor may recall that the -

**J&J COURT TRANSCRIBERS, INC.**

**A-193**

98

1  -

2          MR. BERNICK:  I think that actually --

3          MR. BENTLEY:  Okay.

4          MR. BERNICK:  -- that statement was made even in this

5  case about USG in August of last year, but we'll provide the

6  citation for it.

7          THE COURT:  Well, it doesn't matter.  USG is done,

8  gone.  It's not this case.  I'm concerned about this case.

9          MR. BENTLEY:  Fair enough, Your Honor.  It simply

10  underscores the point that I think we all agree on, which is we

11  cannot pre-judge issues like this.  One final point, Your

12  Honor, and that is, how is it that the plaintiffs have gotten

13  to this pre-judgment of theirs that there is no solvency here?

14          And I think what we've seen today is that in

15  significant part they've gotten there based on an analysis

16  which they have now essentially conceded was flawed, and that's

17  the analysis that goes into the $2.9 billion solvency number

18  that you've heard them speak about today.

19          And as everybody has conceded that $2.9 billion

20  figure contains zero for insurance.  We heard Mr. Frankel

21  acknowledge today that in fact if the asbestos liabilities are

22  in the range of 2.9 or 3 billion, which is the number that

23  would be necessary to achieve insolvency, then in that instance

24  insurance is in the vicinity of $800 million.

25          THE COURT:  Yes.  I understand.  But frankly, I want

**J&J COURT TRANSCRIBERS, INC.**

**A-194**

99

1  to hear from the financial advisors what the company's worth

2  and how to value whether or not there's going to be a criminal

3  find in the New Jersey environmental problem and all the other

4  matters, because I -- you know -- I appreciate the fact that

5  there are a lot of unknowns and as a result, some of these

6  things are very difficult to value.

7          But if we're going to get into a solvency hearing

8  we're going to get into the whole nine yards and figure out

9  what all of the liability, potential liabilities and assets are

10 worth from a financial advisor perspective.  So that's for

11 another day.

12         MR. BENTLEY:  And we completely agree with Your Honor

13 on that there.  My point is simply to underscore that there are

14 very serious issues here that one would need to get past before

15 you could even contemplate the conclusion that the debtor is

16 insolvent.  It's premature to do that today.  Thank you, Your

17 Honor.

18         MR. BAENA:  I'll be brief, Your Honor.  May it please

19 the Court, Scott Baena.  Since Mr. Bernick thinks that it's

20 appropriate to talk about agendas I do wish to suggest that we

21 need to take what Mr. Kruger says with a grain of salt, and

22 it's for a very fundamental reason.

23         If Mr. Kruger is absolutely right about everything he

24 maintains in this case, Mr. Kruger is indifferent to how long

25 this takes, because his clients will get post-petition

**J&J COURT TRANSCRIBERS, INC.**

100

1  interest.  And so this estate will continue to pay the price

2  for its allegiance from Mr. Kruger's clients.

3          THE COURT:  But if his clients get post-petition

4  interest, your clients will get post-petition interest.

5          MR. BAENA:  It -- well --

6          THE COURT:  Because it's -- you know -- it's --

7          MR. BAENA:  -- it will not happen that way, Judge.

8          THE COURT:  Well, I don't think it'll happen that way

9  either, Mr. Baena, but you know, to the extent that one

10  unsecured creditor class is going to get post-petition

11  interest, I don't know how the rest of them aren't.  And you

12  can agree not to, but --

13          MR. BAENA:  And well, Judge, as you well know, that

14  calculus, despite all the efforts of all the brain trusts that

15  have, you know, come into being as a result of these asbestos

16  cases, nobody can figure out really how to implement that level

17  of equity and fairness because of the extreme that's present in

18  these cases that claims, you know, emerge later.

19          THE COURT:  Right.  So let's get onto something

20  realistic.

21          MR. BAENA:  I just want to make the point, though.

22  And I do think, as well, Judge, it's a bit ironic that we've

23  spent more time today critiquing a plan which hasn't even been

24  put forward by the asbestos contingency -- constituencies than

25  we've had an opportunity to critique their plan, which happens

J&J COURT TRANSCRIBERS, INC.

A-196

101

1  to be on the table.

2         And the test for whether or not they should have

3  continued exclusivity is not how good a plan is that has not

4  yet been filed as a counterweight to their plan, but whether

5  there is a dynamic here that warrants the continued exclusivity

6  in favor of the debtor.

7         And that's an important point, that we can take some

8  direction from a higher power from -- in respect of.  While the

9  new Bankruptcy Code amendments are not applicable to this case,

10 the disparity --

11        THE COURT:  Yes, and I'm --

12        MR. BAENA:  -- the disparity, Judge, between --

13        THE COURT:  -- it's irrelevant, Mr. Baena.

14        MR. BAENA:  It's not irrelevant from the perspective,

15 Judge, that they have divined that 18 months is all that you

16 can give.  And --

17        THE COURT:  Yes.  And how many asbestos cases that

18 aren't pre-packs are going to be filed as a result?

19        MR. BAENA:  But the point, Judge, of the --

20        THE COURT:  None, Mr. Baena.  Let's put the cards on

21 the table, none, because you can't do this kind of a case in 18

22 months and we all know it.  Now, five years, that may be a

23 little long, but 18 months, as a not pre-pack, Mr. Baena, you

24 have to agree --

25        MR. BAENA:  Here's --

**J&J COURT TRANSCRIBERS, INC.**

102

1        THE COURT:  -- it won't happen.

2        MR. BAENA:  Oh.  Oh, I'm sure; I'm sure.  I'm sure it

3   won't happen because by setting an 18-month immutable

4   limitation congress told you something about how it views

5   exclusivity.  It told you that it is not some elastic concept

6   that has all this flexibility to accommodate every single,

7   well-intentioned program that a debtor wants to accomplish in

8   the course of its bankruptcy.

9        THE COURT:  Whatever congress wants me to do for

10  cases filed on and after October 17th of 2005, my sworn duty is

11  to do it and I will do it.  This case wasn't then.  Don't

12  bother me with that right now.  I have enough other --

13       MR. BAENA:  I'm not trying --

14       THE COURT:  -- issues to deal with in this case.

15       MR. BAENA:  -- I'm not trying to bother you.  I'm not

16  trying to give you another test that should be applied.  I'm

17  just trying to suggest, Judge, that we've really got to step

18  back and think about these rules of engagement.  Now,

19  Mr. Bernick brings up what's happening in the marketplace in

20  response to something I said earlier.

21       What Mr. Bernick said in his soliloquy about what's

22  happening in the marketplace is so far from the truth that I

23  feel constrained to have to respond.  Mr. Bernick suggests that

24  the ramping up of the value of the stock of Grace was

25  principally -- in fact, the way he described it, it sounded

103

1    like solely -- due to the fact of impending legislation.

2           Judge, that's not the case at all.  If we look at the

3    facts of what was occurring in the period June '04 through as

4    late as January of '05, what was happening was that Grace was

5    announcing to this Court, publicly, at any opportunity it had,

6    that there were ongoing conversations with creditor

7    constituencies.

8           An article appeared in business publications in

9    September talking about the meetings that were going on between

10   the asbestos constituencies and Grace.  In October Grace comes

11   to the Court and said, don't make us file this plan of

12   reorganization that you want us to put on the table, because

13   we're still talking to those asbestos constituencies.

14          That is all driving up the price of that stock.

15   That's exactly what was happening.  And the market was reacting

16   more favorably to the prospect of a settlement with asbestos

17   than it was getting bogged down in adjusting the value too much

18   of the stock when indictments were being issued in respect of

19   employees and what -- and former employees.

20          THE COURT:  Mr. Baena, I want to stop you only for

21   this reason.  Whatever the debtor announced may or may not have

22   had an effect on the market.  What more likely had an affect on

23   the market is what debtor's products were being sold and for

24   what purpose out in the marketplace at the time.

25          The economic statistics at the time indicated that --

**J&J COURT TRANSCRIBERS, INC.**

**A-199**

104

1 that, for example, housing starts were much higher in that

2 certain period than they were in other places.  And to the

3 extent the debtor's products, both here and internationally,

4 may have been sold, there are lots of reasons that affect the

5 stock price.

6          MR. BAENA:  Oh, absolutely.

7          THE COURT:  So --

8          MR. BAENA:  Absolutely.  But Judge, you know, the

9 reason that he points to, what I told the Court at a prior

10 hearing, and the reason -- what he left out was why I was

11 bringing this to the Court's attention.  And it goes back to

12 the same exact point I argued in my response to Mr. Bernick's

13 argument, which was that the unsecureds were unable to embrace

14 the notion of an agreement with asbestos unless and until they

15 got 100 percent of their claims, plus post-petition interest.

16          And because they were telling you at that hearing,

17 the marketplace was playing par plus, or valuing their claims

18 at par plus.  And our position was, don't listen to the

19 marketplace; it could be manipulated; there are lots of

20 external forces and dynamics that move that price, and that's

21 the only point.

22          THE COURT:  Well, and I agree with that point.

23          MR. BAENA:  Thank you, Judge.

24          THE COURT:  Anyone else?  Mr. Bernick, I'll give you

25 two minutes if you have anything you want to say.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  Nope, I'm ready to go onto the next

2   one.

3        THE COURT:  All right.  Do you -- shall we take a

4   recess?  I need to give you a chance to get lunch, get a change

5   in court staff reports.  I also need to be finished and out of

6   here, literally out of here by quarter till 6:00.  So --

7        MR. BERNICK:  Well, I guess maybe it would be good to

8   find out -- and it's my suggestion -- I know that I'll take

9   probably a half an hour.  I don't know if anybody else from our

10  side intends to speak to this issue.

11       THE COURT:  Does anyone?  No?

12       MR. BENTLEY:  Not at the moment, Your Honor.

13       MR. KRUGER:  Not at the moment.

14       THE COURT:  All right.

15       MR. BERNICK:  So then it might be worthwhile to find

16  out if specifically -- I would actually -- I think a lot of us

17  would like to get out here even before 10:00.  Who else really

18  intends to speak to this issue besides the creditor --

19       MR. SANDERS:  I'll probably take 15 minutes or so.

20       THE COURT:  All right.

21       MR. KRAUSE:  Your Honor, Peter Krause for the Waters

22  and Krause plaintiffs in the case of Pacific --

23       THE COURT:  I'm sorry.  I can't pick you up, sir.

24       COURT RECORDER:  You have to use the mike.

25       THE COURT:  You need to use --

106

1          MR. KRAUSE:  Probably 20 to 30 minutes, Your Honor.

2          THE COURT:  All right.  Mr. Krause is indicating

3   probably 20 to 30 minutes.

4          MR. KRAUSE:  PD has no role in this argument, Judge.

5   In fact, we'll ask for permission to leave table so that

6   counsel can use it.

7          THE COURT:  All right.

8          MR. MEYER:  Your Honor, Mark Meyer, maybe 10 minutes.

9          THE COURT:  All right.  So we're up to an hour.

10          MR. MEYER:  Meyer.

11          MR. HERRICK:  Your Honor, John Herrick, probably 10

12   minutes.

13          MR. BUSEY:  Your Honor, Byron Busey (phonetic), for

14   the Grace certain cancer claimants, 10 to 15 minutes.

15          MR. BRADLEY:  Your Honor, Ron Garrett Bradley

16   (phonetic), probably 10 minutes.

17          MR. BERNICK:  If we find out -- I know brother Krause

18   from the Babcock and Wilcox case.  I don't even know who the

19   rest of these folks are from.

20          THE COURT:  Well, you can do that later, Mr. Bernick.

21   Most of them have filed responses.  So I appreciate that you're

22   representing creditors in the case.

23          MR. SPEAKER:  We're the people litigating you.

24          MR. BERNICK:  Oh.

25          (Laughter)

**J&J COURT TRANSCRIBERS, INC.**

107

1          MR. SPEAKER2:  Your Honor, I may have five or 10

2   minutes at the end.  It depends on what issues come up.

3          MR. BERNICK:  If I total all that up it sounds like a

4   couple hours.

5          THE COURT:  Right.  We're up to at lest two hours,

6   plus some rebuttal plus whatever questions.

7          MR. BERNICK:  Well, that --

8          THE COURT:  So let's say three hours.

9          MR. BERNICK:  So if we were back -- I think that

10  makes it tight.

11          THE COURT:  So do you want a half an hour so you can

12  get a sandwich downstairs --

13          MR. BENTLEY:  Yes.

14          THE COURT:  -- or do you want to keep going?

15          MR. BENTLEY:  Half-hour for a sandwich.

16          THE COURT:  Half an hour?  Okay.  We'll take a recess

17  until 20 after 1:00.

18          MR. BERNICK:  Can I make a proposal?

19          THE COURT:  Yes.

20          MR. BERNICK:  IN order to expedite it.  Why don't we

21  just let them all go first?  I -- you know -- it'd just save a

22  lot of time.

23          THE COURT:  Well, some people may have --

24          MR. FINCH:  No, Your Honor.  It's their motion.

25          MR. SPEAKER2:  It's his motion.

108

1           MR. BERNICK:  Well, I --

2           THE COURT:  Well, it's not for that.  Some people

3  have health concerns, Mr. Bernick.  So I think I need to allow

4  some people to get food.

5           MR. BERNICK:  Oh, I'm not -- I'm not -- I'm just

6  saying after we come back.

7           THE COURT:  Oh.  Oh.  Yeah, I think we'll be fine.

8  If you limit your opening remarks to half an hour we should be

9  fine.  You should -- what times are your flights?

10          MR. BERNICK:  My flight is at 5:00.  I'm frankly

11 coming back from -- I got here at 3:00 a.m. this morning, so.

12          THE COURT:  I'll --

13          MR. SPEAKER:  Yes, please.

14          THE COURT:  -- try to get you out by 3:30.  That's

15 two hours.  So folks, all of you from the plaintiff's far side,

16 go consolidate your remarks over this next half-hour so that

17 you're not repeating anything.  Many of your papers duplicate.

18 I have read every single word and all six of these volumes.

19          So I am familiar with your arguments.  You don't need

20 to restate that.  You can just illuminate the highlights or

21 give me some new points.

22          MR. FINCH:  Your Honor, before we start the motion to

23 compel there is one two-minute housekeeping matter relating to

24 the bar date order that Grace and the asbestos claimants have

25 reached an agreement on.  I'd just like to put that on the

109

1   record, or we can do it right when we come back from lunch or

2   we can do it now, at the Court's convenience.

3           THE COURT:  Everybody's ready to go.  Why don't we do

4   it as soon as you come back.

5           MR. FINCH:  Okay.  Thank you, Your Honor.

6           THE COURT:  All right.

7           MR. BAENA:  Judge, just for those who have no

8   interest in this or have an interest but not to stay, are you

9   going to rule on exclusivity today or --

10          THE COURT:  I'm hoping to after lunch, but it depends

11  on how much of the little bit of research I want to do, I get

12  done over this half-hour.  So I'm -- I intend to, but I'm not

13  totally sure.

14          MR. BAENA:  Thank you, Judge.

15          THE COURT:  All right.  We'll be in recess until

16  1:20.

17          MR. BERNICK:  Your Honor, here's research on the

18  exclusivity standards.

19          THE COURT:  Well, you can give me those.  I know the

20  standards.

21          MR. BAENA:  Yeah.  Yeah.  Yeah.  Yeah.

22          MR. BERNICK:  Well, I guess I said that we ought

23  to --

24          THE COURT:  Okay.  I'll take whatever you want to

25  give me, but that wasn't it.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

**A-205**

110

1          (Recess at 12:54 p.m. until 1:44 p.m.)

2          MR. FINCH:  Your Honor, before we proceed with the --

3          THE COURT:  Your name, please.

4          MR. FINCH:  Nathan Finch, for the asbestos claimants'

5    committee.  Unless Your Honor has a ruling --

6          THE COURT:  I do.

7          MR. FINCH:  Okay.

8          THE COURT:  All right.  Why don't we deal with your

9    issue and then I'll wait till -- make sure everyone is here

10   first.  Go ahead.

11         MR. FINCH:  Oh, well, okay.  Is Barbara Harding in

12   the courtroom?

13         MR. BERNICK:  No, she's --

14         THE COURT:  Oh, you want to wait for Ms. Harding.

15         MR. FINCH:  Ms. Harding, yes.

16         THE COURT:  Oh.  I'm sorry.  I'll give you the ruling

17   on the exclusivity, then.

18         MR. FINCH:  Okay.

19         THE COURT:  Okay.  This is really not an easy

20   decision for this Court because this case has been on slow burn

21   from time to time, and I agree that the debtor has the burden

22   of substantiating cause to extend exclusivity.  This case was

23   filed in April of 2001, and some of the delay between then and

24   now is really not related to the debtor, the debtor's actions

25   or the debtor's inactions, but was caused by some things, such

111

1  as the assignment and reassignment of judges.

2         That all led to some delays in hearings, by the stay

3  that this Court imposed to allow the mediation to take place

4  with the hope that some or all issues between the various

5  parties could be settled.  In addition, the debtor has

6  requested the ability to try certain issues since the outset of

7  the filing of the case, but has not been permitted to start

8  that process until recently.

9         Now, the debtor is moving ahead with the issues that

10  it raised.  The parties argue that the case is old, and I

11  suppose a five-year-old case is old, but it is not the oldest

12  or the longest running case ever seen or in this Court.  And

13  the age, in and of itself, is not the only factor that this

14  Court has to consider, especially given the complexities of the

15  case, the very different ideas of how to resolve the case that

16  have been articulated on the record of various hearings by

17  different parties, the uncertainties that have arisen post-

18  petition, such as the criminal indictment, the New Jersey

19  environmental claim that is a decade old or longer, and the

20  other matters that have added layers of complexity beyond those

21  that have existed in some of the other asbestos bankruptcies,

22  even.

23         In addition, several major rulings by this Court and

24  others have affected and will continue to affect the claims

25  that the estate will have to deal with.  For example, some

112

1  stigma damage claims, the Speights issues, some of the

2  insurance issues concerning the preliminary injunction and so

3  forth.

4          Nevertheless, the question before this Court now is

5  what's the current lay of the land.  Does it appear from the

6  debtor's showing that the debtor can propose a plan that is

7  feasible and within a reasonable time?  And at this time the

8  Court must answer that question with a yes.

9          As all parties have articulated and agreed, the major

10  issues of estimation and valuation must be considered by all

11  parties prior to any plan being confirmed by the Court.  At

12  this point in this case it is more important for all parties to

13  focus their efforts on resolving the outstanding issues, than

14  in creating additional fees and expenses for the estate by

15  requiring the filing or redoing or doing of competing plans.

16          The parties have articulated outlines for their views

17  of confirmation, and this Court expects that having heard those

18  articulated views all parties will now meet and continue to

19  meet and confer on a regular basis in an effort to try to

20  resolve those differences of opinion and put together a

21  confirmable and consensual plan.

22          And Mr. Bernick, I said this to you once before.  I

23  say it again.  I'm holding you responsible for taking the

24  laboring oar to make sure it gets done this time.  The Court

25  will consider anew the issue of exclusivity at the July 2007

113

1   omnibus hearing if the debtor renews its motion, or earlier if,

2   for cause shown, another party moves to terminate exclusivity

3   prior to that time.

4            However, the Court cautions that this order is

5   entered to permit all parties to continue to negotiate so that

6   the estimation and valuation decisions can be incorporated into

7   a plan that is to be filed within 30 days after the issues of

8   estimation and solvency are resolved, either consensually or by

9   court order.

10           So whether or not exclusivity is terminated by some

11  subsequent order, plans will be due within 30 days.  I expect

12  all parties to get together and attempt to resolve the various

13  issues.  I will take an order from the debtor on a

14  certification of counsel that extends exclusivity through the

15  conclusion of the July 2007 omnibus hearing, however, require

16  the debtor to set any new motion for a hearing at that July

17  2007 hearing, and this order is without prejudice to any other

18  party moving to terminate exclusivity for cause.  Okay.

19           MR. BERNICK:  Thank you, Your Honor.  Maybe so that

20  Mr. Finch -- why don't you to try out the stipulation and if I

21  remember it correctly, I might be able to confirm it, as well.

22           MR. FINCH:  Okay.  Your Honor, there is a small

23  amount of good news in that Grace and the asbestos

24  constituencies I believe agree on who does not have to file a

25  proof of claim form in response to the Court's asbestos

276

1

2

3                                CERTIFICATE

4          I, ELIZABETH REID-GRIGSBY, a certified electronic

5  transcriber, certify that the foregoing is a correct

6  transcript, to the best of the transcriber's ability, from the

7  official electronic sound recording of the proceedings in the

8  above-entitled matter.

9

10  /s/ Elizabeth Reid-Grigsby              September 20, 2006

11  Elizabeth Reid-Grigsby

12  AAERT CET**00145

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
-----------------------------------------------------------------X
In re:                                                          |
                                                                | Chapter 11
W.R. GRACE & CO.-CONN.                                          |
                                                                | Case No. 01-01140
                                                                |
                   Debtors.                                     |
-----------------------------------------------------------------X    **Claim No. 13352**

### NOTICE OF TRANSFER OF CLAIM PURSUANT TO FRBP RULE 3001(e)(2)

To: (Transferor)            Envirocare of Utah, Inc.
                            605 North 5600 West
                            Salt Lake City, UT 84116
                            Attn: Mark Green

The transfer of your claim as shown above, in the amount of $6,850,000.00 has been transferred
(unless previously expunged by court order) to:
                            LONGACRE MASTER FUND, LTD.
                            Transferor: Envirocare of Utah, Inc.
                            810 Seventh Avenue, 22nd Floor
                            New York, NY 10019
                            Att: Vladimir Jelisavcic

No action is required if you do not object to the transfer of your claim. However, IF YOU
OBJECT TO THE TRANSFER OF YOUR CLAIM, WITHIN 20 DAYS OF THE DATE OF
THIS NOTICE, YOU MUST:

        - FILE A WRITTEN OBJECTION TO THE TRANSFER with:

            United States Bankruptcy Court
            District of Delaware
            824 Market Street, Room 525
            Wilmington, DE 19801

        - SEND A COPY OF YOUR OBJECTION TO THE TRANSFEREE.
Refer to INTERNAL CONTROL No. _____ in your objection. If you file an objection, a hearing
will be scheduled. IF YOUR OBJECTION IS NOT TIMELY FILED, THE TRANSFEREE
WILL BE SUBSTITUTED ON OUR RECORDS AS THE CLAIMANT.
                                                        Intake Clerk
-----------------------------------------------------------------------------------------------------------
FOR CLERK'S OFFICE USE ONLY:
This notice was mailed to the first named party, by first class mail, post prepaid on _____, 2004.
INTERNAL CONTROL NO._____
Claims Agent Noticed: (Name of Outside Agent)
Copy to Transferee:_____


                            _____
                            Deputy Clerk

**A-211**

## EVIDENCE OF TRANSFER OF CLAIM

### Exhibit B

TO:        United States Bankruptcy Court ("<u>Bankruptcy Court</u>")
                District of Delaware
                824 Market St., Room 525
                Wilmington, DE 19801
                Attn:   Clerk

AND TO:     W.R. GRACE & CO.-CONN., ("<u>Debtor</u>")
                Case No. 01-01140

<u>Claim # 13352</u>

**ENVIROCARE OF UTAH, INC.,** its successors and assigns ("<u>Seller</u>"), for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer and assign unto:

                **LONGACRE MASTER FUND, LTD.**
                810 Seventh Avenue, 22nd Floor
                New York, NY 10019
                Attn: Vladimir Jelisavcic

its successors and assigns ("<u>Buyer</u>"), all rights, title and interest in and to the claim of Seller, including all rights of stoppage in transit, replevin and reclamation, in the principal amount of <u>$6,850,000.00</u> ("<u>Claim</u>") against the Debtor in the Bankruptcy Court, or any other court with jurisdiction over the bankruptcy proceedings of the Debtor.

Seller hereby waives any objection to the transfer of the Claim to Buyer on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Seller acknowledges and understands, and hereby stipulates that an order of the Bankruptcy Court may be entered without further notice to Seller transferring to Buyer the Claim and recognizing the Buyer as the sole owner and holder of the Claim.

You are hereby directed to make all future payments and distributions, and to give all notices and other communications, in respect of the Claim to Buyer.

IN WITNESS WHEREOF, the undersigned has duly executed this Assignment of Claim by its duly authorized representative dated 27 August, 2004.

**ENVIROCARE OF UTAH, INC.**

By:     /s/ Khoscow B. Semnani_____
Name:  Khoscow B. Semnani
Title:    President

**A-212**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**In re:**

**W.R. GRACE & CO., et al.**

---

| | | |
|---|---|---|
| **Official Committee of Asbestos** | ) | |
| **Personal Injury Claimants, et al.,** | ) | |
| | ) | **Civil Action No. 06-689** |
| **Appellants,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **W.R. Grace & Co., et al.,** | ) | |
| | ) | **Bankruptcy Case No. 01-1139** |
| **Appellees.** | ) | **Appeal No. 06-63** |

## CERTIFICATE OF SERVICE

I, ROSE M. MEADE, do hereby certify that I am over the age of 18, and that on this 1st day of December, 2006, I caused copies of the Brief of Appellants, with Record Excerpts in Support thereof, to be served by email and first class mail, postage prepaid, on those individuals shown in the attached service list.

Rose M. Meade
Orrick, Herrington & Sutcliffe LLP

# SERVICE LIST

| | |
|---|---|
| Kirkland & Ellis LLP<br>David M. Bernick, P.C.<br>Janet S. Baer<br>Salvatore F. Bianca<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br><br>david_bernick@chicago.kirkland.com<br>jbaer@kirkland.com<br>sbianca@kirkland.com | Pachulski Stang Ziehl Young Jones &<br>Weintraub LLP<br>Laura Davis Jones<br>James E. O'Neill<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705<br><br>ljones@pszyjw.com<br>joneill@pszyjw.com |
| Stroock & Stroock & Lavan LLP<br>Lewis Kruger<br>Kenneth Pasquale<br>180 Maiden Lane<br>New York, New York 10038<br><br>lkruger@stroock.com<br>kpasquale@stroock.com | Duane Morris LLP<br>Michael R. Lastowski<br>Richard W. Riley<br>1100 North Market Street, Suite 1200<br>Wilmington, Delaware 19801<br><br>mlastowski@duanemorris.com<br>rwriley@duanemorris.dom |
| Duane Morris LLP<br>William S. Katchen<br>744 Broad Street, Suite 1200<br>Newark, New Jersey 07102<br><br>wskatchen@duanemorris.com | Kramer Levin Naftalis & Frankel LLP<br>Philip Bentley<br>Gregory Horowitz<br>Gary M. Becker<br>919 Third Avenue<br>New York, New York 10022<br><br>pbentley@kramerlevin.com<br>ghorowitz@kramerlevin.com<br>gbecker@kramerlevin.com |
| Buchanan Ingersoll & Rooney, PC<br>Teresa K.D. Currier<br>The Brandywine Building<br>1000 West Street, Suite 1410<br>Wilmington, Delaware 19801<br><br>Teresa.currier@bipc.com | David M. Klauder<br>Trial Attorney<br>Office of the United States Trustee<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, Delaware 19801<br><br>david.klauder@usdoj.com |