# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**W.R. GRACE & CO.,** *et al.,*

---

| | |
|---|---|
| **Official Committee of Asbestos Personal Injury Claimants, et al.,** )<br><br>**Appellants,** )<br><br>**v.** )<br><br>**W.R. GRACE & CO., et al.,** )<br><br>**Appellees.** ) | **Civil Action No. 06-689**<br><br><br>**Bankruptcy Case No. 01-1139**<br>**Appeal No. 06-63** |

## BRIEF OF APPELLEES

| | |
|---|---|
| David M. Bernick, P.C.<br>Theodore L. Freedman<br>Janet S. Baer<br>Deanna D. Boll<br>Anna Isman<br>Kirkland & Ellis LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, NY 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br><br>Counsel for the Debtors | Laura Davis Jones (Bar No. 2436)<br>James E. O'Neill, III (Bar. No.4042)<br>Pachulski, Stang, Ziehl, Young,<br>Jones & Weintraub LLP<br>919 North Market Street, 17th Floor<br>Wilmington, Delaware 19801<br>Telephone:    (302) 652-4100<br>Facsimile:    (302) 652-4400<br><br><br><br>Counsel for the Debtors |
| Lewis Kruger<br>Kenneth Pasquale<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038-4982<br>Telephone: (212) 806-5400<br>Facsimile (212) 806-6006<br><br>Counsel for the Official Committee of Unsecured Creditors | Philip Bentley<br>Gary Becker<br>Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 715-9100<br>Facsimile: (212) 715-8000<br><br>Counsel for the Official Committee of Equity Holders |

Dated:  December 28, 2006

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT OF ISSUE PRESENTED ............................................................. 1

INTRODUCTION ................................................................................................ 2

STATEMENT OF APPLICABLE STANDARD OF REVIEW ........................... 4

STATEMENT OF THE NATURE AND STAGE OF PROCEEDING .................. 9

SUMMARY OF ARGUMENT ........................................................................... 10

STATEMENT OF FACTS .................................................................................. 14

    I.     The Bankruptcy Filing ...................................................................... 14

    II.    The Debtors' Original Approach To Resolving Asbestos Personal
          Injury Claims In Chapter 11 ............................................................. 16

    III.   The Debtors Continue To Press For A Merits-Based Adjudication Of
          The Asbestos Personal Injury Claims ............................................... 17

    IV.   A Future Claimants' Representative is Appointed ............................ 19

    V.    The Bankruptcy Court Takes Over Issues Related To Asbestos
          Personal Injury Claims, And The Debtors File a Proposed Plan ..... 19

    VI.   The CMOs are Entered and the Estimation Proceedings Are
          Scheduled ......................................................................................... 21

    VII.  The Parties Again Attempt to Resolve the Case but Fail Because the
          Scope of Liability Has Not Been Defined .......................................... 23

    VIII. The Questionnaire Litigation Finally Concludes ............................. 24

    IX.   The Debtors Have Made Great Progress with Asbestos Property
          Damage And Non-Asbestos Litigation .............................................. 26

    X.    The Debtors Address The ZAI Claims .............................................. 27

    XI.   Estimation Discovery Progresses And A Trial Date Is Set .............. 29

ARGUMENT ...................................................................................................... 30

    I.     The Central Issue Remaining In The Case is the Scope of the Debtors'
          Asbestos Liability, and Lifting Exclusivity Before This Issue Is
          Addressed Will Impede, Rather Than Facilitate, Case Resolution ..... 30

## TABLE OF CONTENTS

Page

A.  The Impact Of Estimation On Resolution Of This Case Is
    Unquestionable.................................................................................30

B.  The Appellants' Putative Competing Plan Will Only Prompt
    More Litigation .................................................................................31

C.  Terminating Exclusivity and Proposing Competing Plans Has
    Not Proven to Result in a Quick Exit From Chapter 11 in
    Asbestos-Related Cases .......................................................................35

II. The Bankruptcy Court Did Not Abuse Its Discretion In Finding,
    Based on The Facts of The Chapter 11 Case, That Cause Exists to
    Extend Exclusivity to July 2007.............................................................36

    A.  Bankruptcy Courts Have Broad Discretion and Can Examine
        Numerous Factors When Deciding Whether to Extend
        Exclusivity...................................................................................36

    B.  The Bankruptcy Court Did Not Abuse Its Discretion In The
        Chapter 11 Case By Finding That Cause Exists to Extend
        Exclusivity...................................................................................38

III. Appellants' Remaining Arguments In Favor of Lifting Exclusivity Are
     Irrelevant .......................................................................................41

    A.  Appellants' Arguments Favoring Treatment Under the 2005
        Amendments to the Bankruptcy Code Should Be Disregarded ..........41

    B.  Appellants' Arguments in Favor of Bifurcating Estimation
        Phases Have Already Been Rejected by the Bankruptcy Court
        and Are Not the Subject of This or Any Appeal .............................43

CONCLUSION ...........................................................................................45

K&E 11548856.4

## TABLE OF AUTHORITIES

Page

### CASES

*Baldino v. Wilson*, 116 F.3d 87, 89 (3d Cir. 1997).........................................................5

*Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir. 1988) .........4

*Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir 1994) ........................................................6

*Continental Casualty Co. v. Burns & Roe Enters. (In re Burns & Roe Enters., Inc.)*,
No. 0 5-2529, 2005 U.S. Dist. LEXIS 26247 (D.N.J. Nov. 2, 2005).................................4

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).......................................17

*Evans v. Buchanan*, 555 F.2d 373, 378-79 (3d Cir. 1977) ..........................................38

*Geriatrics Nursing Home, Inc. v. First Fid. Bank, N.A.*
*(In re Geriatrics Nursing Home, Inc.)*, 187 B.R. 128, 131 (D.N.J. 1995)...........................4, 8

*In re 203 North LaSalle Street Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd*,
195 B.R. 692 (N.D. Ill. 1996), *aff'd*, 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds*,
434 U.S. 526 (1999)..................................................................................32

*In re Adelphia Commc'ns Corp.*, No. 02-41729, 2006 Bankr. LEXIS 2348
(Bankr. S.D.N.Y. Sept. 19, 2006)..................................................................37

*In re Adelphia Commc'ns Corp.*, 342 B.R. 122, 126 (S.D.N.Y. 2006) ..............................5, 7

*In re Ames Dep't. Stores, Inc.*, No. 90 B 11233, 1991 U.S. Dist. LEXIS 17074
(S.D.N.Y. Nov. 25, 1991)............................................................................5

*In re Burns and Roe Enterprises, Inc.*, No. 05-2529, 2005 U.S. Dist. LEXIS 26247
(D.N.J. Nov. 2, 2005) ........................................................................7, 36, 42

*In re Cent. Jersey Airport Servs.*, 282 B.R. 176 (Bankr. D.N.J. 2002)............................37

*In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997)...........................37

*In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003).......................................33

*In re Express One, Int'l*, 194 B.R. 98 (Bankr. E.D. Tex. 1996)...................................37

*In re Friedman's Inc.*, 336 B.R. 884 (Bankr. S.D. Ga. 2005).....................................36

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612-18 (Bankr. D. Del. 2001) ................33

*In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405 (E.D.N.Y. 1989)............................5

## TABLE OF AUTHORITIES

Page

*In re Hoffinger Indus., Inc.,* 292 B.R. 639 (B.A.P. 8th Cir. 2003)....................................5, 7, 38

*In re Morrissey,* 717 F.2d 100, 104 (3d Cir. 1983)..........................................................................4

*In re San Juan Dupont Plaza Hotel Fire Litig,* 1989 WL 996278, at *1 (D. P.R. 1989).........34

*In re Sharon Steel Corp.,* 78 B.R. 762 (Bankr. W.D. Pa. 1987) ...................................................5

*In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir. 1989) ....................................................6

*In re The Elder-Beerman Stores, Corp.,* No. C-3-97-175, 1997 U.S. Dist. LEXIS 23785
(S.D. Ohio June 23, 1997) ...................................................................................................5, 38, 42

*In re Trans World Airlines, Inc.,* 1993 WL 559245 (D. Del. 1993)..............................................6

*In re Vertientes, Ltd.,* 845 F.2d 57, 58-59 (3d Cir. 1988).........................................................4, 6

*New England Coal & Coke Co. v. Rutland R. Co.,* 143 F.2d 179, 186 (2d Cir. 1944) ...........33

*Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l. Hosp.*
*(In re Henry Mayo Newhall Mem'l. Hosp.),* 282 B.R. 444 (B.A.P. 9th Cir. 2002) ...............7, 8

*Rode v. Dellarciprete,* 892 F.2d 1177, 1182 (3d Cir. 1990).......................................................38

*Rosin v. RCN II (In re RCN II),* 118 B.R. 460, 463 (W.D. Mich. 1990) ...................................5

*Siberman v. Bogle,* 683 F.2d 62, 65 (3d Cir. 1982).....................................................................38

## DOCKETED CASES

*In re Armstrong World Indust., Inc.,* Case No. 00-4471 (Bankr. D. Del.).........................13, 17

*In re The Babcock & Wilcox Co.,* Case No. 00-10992 (Bankr. E.D. La.) ...................12, 13, 35

*In re Combustion Engineering, Inc.,* Case No. -3-10495 (Bankr. D. Del.) .............................13

*In re Federal-Mogul Global, Inc.,* Case No. 01-10578 (Bankr. D. Del.)......................13, 17, 36

*In re Owens Corning,* Case No. 00-03837 (Bankr. D. Del.)...............................................13, 17

*In re USG Corp.,* Case No. 01-2094 (Bankr. D. Del.) ........................................................13, 17

*In re W.R. Grace & Co.,* Case No. 01-01139 (Bankr. D. Del.).................................................17

# TABLE OF AUTHORITIES

Page

## STATUTES AND RULES

11 U.S.C. § 362(d)(1) ................................................................................6

11 U.S.C. § 502(b) ...................................................................................31

11 U.S.C. § 502(c) ...................................................................................30

11 U.S.C. § 1121(d) ..............................................................4, 6, 8, 36, 37, 41

11 U.S.C. § 1123(a)(4) .............................................................................31

11 U.S.C. § 1129(b)(1) .........................................................................32, 33

11 U.S.C. § 1129(b)(2) .............................................................................33

11 U.S.C. § 1129(b)(2)(C)(i) ......................................................................33

Fed. R. Bankr. P. 8013 ..............................................................................4

Fed. R. Bankr. P. 9006(c)(1) .......................................................................6

## OTHER AUTHORITIES

H.R. Rep. No. 103-835, at 36 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3340, 3343) ...........42

H.R. Rep. No. 95-598, at 232 (1978), *reprinted in* U.S.C.C.A.N. 6191 .......................7

Hearing Transcript -- *In re Stations Holding,* No. 02-10882 (Bankr.. D. Del.),
Dkt. Nos. 190 & 196, Sept. 25, 2002 Hrg. Tr., at 27 ..............................................34

Hearing Transcript --*In re NII Holdings,* No. 02-11505 (Bankr. D. Del.), Dkt. No. 394,
October 22, 2002 Hrg. Tr. at 59 ...................................................................34

K&E 11548856.4

## STATEMENT OF ISSUE PRESENTED

W.R. Grace & Co., and its related debtors ("Grace" or the "Debtors"),[1] the Official Committee of Equity Holders, and the Official Committee of Unsecured Creditors (collectively, the "Appellees") submit that the issue presented is whether the October 3, 2006 extension of exclusivity should be overturned as an abuse of discretion where (1) a very sophisticated and informed Bankruptcy Court gave careful consideration to the history of the Chapter 11 case; (2) the complex bankruptcy litigation underway has now reached the central issue -- estimation of Grace's asbestos personal injury liability -- which is critical to *any* resolution of the case and that litigation requires the undivided attention of the parties and the Bankruptcy Court; (3) attempts at encourage plan negotiation have been extensive, but they have failed precisely because the asbestos liabilities have not been estimated; and (4) the proposed resolution that Appellants will seek through a competing plan already has been disclosed, and its obvious legal problems will only engender an additional layer of litigation.

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# INTRODUCTION

This appeal boils down to a simple issue: whether this Court should find an abuse of discretion in the strategic judgment, made by a highly experienced and deeply involved Bankruptcy Court, that the best way to advance this case at this point is to complete an estimation process regarded by all parties as critical to case resolution, rather than open a new and distracting round of premature plan-related litigation.[2]

This basic judgment did not turn upon any fundamental issue of law. Nor are the *key* facts disputed:

- Estimation is required for the confirmation of any contested plan;

- While a completely consensual plan is always the most desirable alternative, extensive negotiations thus far have foundered on disagreements over the extent of the estimated asbestos liability;

- The work necessary to conduct the estimation is far advanced and the hearing itself has been scheduled for June 2007; and

- Questions already have been raised by the Bankruptcy Court about the legality of the asbestos claimants' agreement *inter se,* which agreement apparently is to serve as the core of their alternative plan. These questions clearly foretell extensive plan-related litigation if exclusivity were to be lifted.

---

[2] All citations to the Appellants' designated record items will be referred to as "R-__" with the corresponding exhibit number. All citations to the Appellees' counter-designated record items will be referred to as "Supp R-___" with the corresponding exhibit number.

K&E 11548856.4

So, it fell to the Bankruptcy Court to make a judgment about how to proceed in light of these facts. And, this it did after careful review of the facts, the law, and the positions of the parties. The Bankruptcy Court stated:

> As all parties have articulated and agreed, the major issues of estimation and valuation must be considered by all parties prior to any plan being confirmed by the Court. At this point in the case, it is more important for all parties to focus their efforts on resolving the outstanding issues, than in creating additional fees and expenses of the estate by requiring the finding or redoing or doing of competing plans.[3]

This is precisely the type of judgment committed by the law to the Bankruptcy Court's sound discretion. That judgment should not be upset on appeal to this Court.

---

[3]    R-2390 at 112.

## STATEMENT OF APPLICABLE STANDARD OF REVIEW

The standard of review applicable to the rulings of a bankruptcy court turns on the nature of the issue presented on appeal. Factual determinations are entitled to deference and cannot be reversed unless clearly erroneous. Fed. R. Bankr. P. 8013 ("[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses"); *In re Morrissey*, 717 F.2d 100, 104 (3d Cir. 1983). Legal conclusions are subject to plenary review and are considered *de novo* on appeal. *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir. 1988). Bankruptcy court orders involving the exercise of discretion are reviewed for abuse of discretion. *In re Vertientes, Ltd.*, 845 F.2d 57, 58-59 (3d Cir. 1988).

The Bankruptcy Court extended exclusivity pursuant to 11 U.S.C. § 1121(d), which states:

> On request of a party in interest made within the respective periods specified . . . .
> and after notice and a hearing, the court may for cause . . . . increase the 120 day
> period [in which the debtor has the exclusive right to file a plan].

11 U.S.C. § 1121(d). Appellate courts, including courts within the Third Circuit, consistently have held that the applicable standard of review of an exclusivity extension for cause pursuant to Section 1121(d) of the Bankruptcy Code is abuse of discretion. *See, e.g., Continental Cas. Co. v. Burns & Roe Enters. (In re Burns & Roe Enters., Inc.)*, No. 05-2529, 2005 U.S. Dist. LEXIS 26247 (D.N.J. Nov. 2, 2005) ("This Court reviews a bankruptcy court's decision to extend debtor's periods of exclusivity for abuse of discretion."); *Geriatrics Nursing Home, Inc. v. First Fid. Bank, N.A. (In re Geriatrics Nursing Home, Inc.)*, 187 B.R. 128, 131 (D.N.J. 1995) ("an order altering the exclusivity period will not be set aside absent an abuse of discretion"); *In re*

4

*Sharon Steel Corp.*, 78 B.R. 762 (Bankr. W.D. Pa. 1987) (same). *See also In re Adelphia Commc'ns Corp.*, 342 B.R. 122, 126 (S.D.N.Y. 2006 (reviewing bankruptcy court's determination to extend exclusivity under abuse of discretion standard); *In re The Elder-Beerman Stores, Corp.*, No. C-3-97-175, 1997 U.S. Dist. LEXIS 23785 (S.D. Ohio June 23, 1997) ("the issue of whether to grant or deny a request to extend the exclusivity period is a matter committed to the sound discretion of the bankruptcy court"); *In re Hoffinger Indus., Inc.*, 292 B.R. 639 (B.A.P. 8th Cir. 2003) (same); *In re Ames Dep't Stores, Inc.*, No. 90 B 11233, 1991 U.S. Dist. LEXIS 17074 (S.D.N.Y. Nov. 25, 1991) ("The bankruptcy court has the discretion, under 11 U.S.C. § 1121(d), to extend the debtor's exclusivity period. A district court will not lightly interfere with the bankruptcy judge's decision on this issue."); *Rosin v. RCN II (In re RCN II)*, 118 B.R. 460, 463 (W.D. Mich. 1990) ("the Court will not overturn such an order [extending exclusivity] absent an abuse of discretion by the lower court judge in order to provide for maximum flexibility in reorganization proceedings"); *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405 (E.D.N.Y. 1989) (same).

While the Third Circuit Court of Appeals itself and the District Court of Delaware do not appear to have addressed the standard of review in the specific context of extending exclusivity, both those courts and numerous other courts in this Circuit have held that other discretionary rulings which decide "cause" under the Bankruptcy Code are reviewable only for abuse of discretion. For example, the Third Circuit has held that decisions denying, for cause, relief from the automatic stay pursuant to Section 362(d) of the Bankruptcy Code are reviewed for abuse of discretion. *Baldino v. Wilson*, 116 F.3d 87, 89 (3d Cir. 1997). The *Baldino* Court expressly

5

found that, because Section 362(d) of the Bankruptcy Code applies a "cause" standard,[4] the standard of review is abuse of discretion. 116 F.3d at 89 (relying on *Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir 1994) in which the Court held that "[b]ecause the Bankruptcy Code provides no definition of what constitutes 'cause,' the courts must determine when discretionary relief is appropriate on a case-by-case basis. We will reverse a decision to lift the automatic stay for 'cause' only when an abuse of discretion has occurred.")); *see also In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) (bankruptcy court's decision regarding appointment of a trustee for "cause" is reviewed for abuse of discretion); *Vertientes*, 845 F.2d at 59 (orders granting or denying a creditor's motion to file a late proof of claim "for cause" reviewed for an abuse of discretion); *In re Trans World Airlines, Inc.*, 1993 WL 559245 (D. Del. June 22, 1993) (whether to allow a hearing to go forward on shortened notice pursuant to Fed. R. Bankr. P. 9006(c)(1) depends upon a showing of cause and, therefore, the standard of review is abuse of discretion).

Section 1121(d) of the Bankruptcy Code, relating to exclusivity extensions, plainly adopts a "cause" standard, allowing the court "for cause [to] reduce or increase [the exclusive period for the debtor to file a plan of reorganization]." 11 U.S.C. § 1121(d). The Bankruptcy Code thus requires discretionary rulings, which should, in turn, be reviewed for abuse of discretion.

In addition, the statutory language of Section 1121(d) indicates further that bankruptcy courts enjoy wide latitude in extending exclusivity periods. Section 1121(d) states that the court "may" increase the exclusive period for cause. 11 U.S.C. § 1121(d). The use of the term "may"

---

[4]    Section 362(d) of the Bankruptcy Code states in relevant part: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay -- (1) for cause. . ." 11 U.S.C. § 362(d)(1).

clearly confers and underscores the bankruptcy court's discretion in determining whether or not to extend exclusivity. This interpretation of Section 1121(d) is supported by legislative history. Regarding exclusivity, the House Report to the 1978 Bankruptcy Act states that the bankruptcy court is "given the power . . . to increase or reduce the 120-day period depending on the circumstances of the case." H.R. Rep. No. 95-598, at 232 (1978), *reprinted in* U.S.C.C.A.N. 6191.

The Appellants here seek to wipe all of this away through blunt advocacy, asserting (with scant discussion of the overwhelming majority of case law that supports an abuse of discretion standard of review) that the applicable standard of review is *de novo*. Appellants rely solely upon a single ruling by a single bankruptcy appellate panel in the 9th Circuit,[5] *Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l. Hosp. (In re Henry Mayo Newhall Mem'l. Hosp.)*, 282 B.R. 444 (B.A.P. 9th Cir. 2002) (reviewing a bankruptcy court's decision to extend exclusivity under a *de novo* standard).

That single case has not been followed by courts within the Third Circuit, such as *Burns & Roe Enters.*, or by courts outside of the Third Circuit, such as the Southern District of New York in *Adelphia* and the Bankruptcy Appellate Panel in the Eighth Circuit in *Hoffinger Indus.* All of these courts have determined, *subsequent* to the *Henry Mayo* decision, that the correct standard of review for extensions of exclusivity is abuse of discretion.

Furthermore, the decision in *Henry Mayo* itself was controversial. Judge Marlar concurred that the extension of exclusivity in that case was proper, but he wrote separately to

---

[5] Of course, the Bankruptcy Appellate Panel for the Ninth Circuit is <u>not</u> the Unites States Court of Appeals for the Ninth Circuit. Rather, bankruptcy appellate panels ("BAPs") are the first level of appeal from bankruptcy court decisions in the jurisdictions in which they have been established (*e.g.*, 1st, 6th, 8th, 9th and 10th Circuits). They are on par with appellate rulings of district courts reviewing bankruptcy court decisions.

disagree with the court's decision to review the bankruptcy court's decision *de novo*: "I do not envision that as requiring a divergence from well-established law and changing to a *de novo* standard of review. District courts and bankruptcy courts have consistently held that the applicable standard for review for § 1121(d) cases is abuse of discretion." 282 B.R. at 454.

Appellants' only attempt to deal with the applicable authority in this Circuit is relegated to a footnote.[6] There they concede that the District Court for the District of New Jersey in *Geriatrics Nursing Home* held that appellate courts review Section 1121(d) decisions for abuse of discretion. Appellants then wrongly imply that the case no longer is the law because it is seven years old and pre-dates *Henry Mayo*. But the District of New Jersey has spoken since and has adhered to the standard applied in *Geriatrics Nursing Home*. *See Burns & Roe Enters.* (where, in 2005, in a decision rendered in the sixth year of an asbestos-related bankruptcy case, the district court sustained a bankruptcy court order granting the <u>fourteenth</u> and <u>fifteenth</u> extensions of exclusivity).

Appellees respectfully submit that the Bankruptcy Court did not abuse its discretion in finding that cause exists to extend exclusivity to July 2007. In the event that this Court nonetheless decides to apply a different standard of review, the Appellees respectfully submit that the Bankruptcy Court's factual findings were not clearly erroneous, that it applied the correct legal standard, and that its decision to extend exclusivity should be affirmed.

---

[6]    Appellants' Opening Brief at 2-3, n. 3.

8

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDING

The Bankruptcy Court's October 3, 2006 Order extended exclusivity until July 2007. The extension is designed specifically to allow for a scheduled estimation hearing that will define the scope of the Debtors' liability on account of asbestos-related personal injury claims. Notwithstanding this crucial goal and the ongoing hard work necessary to achieve it, the Appellants ask this Court to reverse the Bankruptcy Court's October 3, 2006 Order, terminate exclusivity, and allow them to file a competing plan that immediately will raise new problems for the Bankruptcy Court to resolve.

## SUMMARY OF ARGUMENT

Absent a consensual deal among all constituents, the Bankruptcy Court must decide what has always been a fundamental issue in this case -- the extent of the Debtors' actual legal liability on account of asbestos claims. The Debtors have urged from the very beginning of the case that a merits-based assessment of the asbestos-related personal injury claims, must take place. Those claims can neither be overpaid nor underpaid; they must be paid according to their merit. Through the arduous process described below, the Bankruptcy Court has sheparded this case through its many phases -- including mediation -- and now has structured litigation to get at the merits and values of the personal injury claims in the aggregate. The time is finally at hand, and no distractions should be allowed.

The Appellants' tactic is to avoid the merits -- both in litigating their claims below and in coming to grips here with the Bankruptcy Court's exercise of its discretion -- and to indulge in a revisionist account of the time this case has consumed. They allege that the Chapter 11 case is stalled at the hands of the Debtors.[7] This could not be further from the truth. The Debtors have been working from the inception of the Chapter 11 case to put in place a process for defining their actual asbestos liabilities. The Appellants have opposed these efforts at every turn. While there is no question that this is a long, complex case, its duration is *not* a function of *any* stalling strategy by the Debtors. To the contrary, as the Bankruptcy Court found:

This case was filed in April of 2001, and some of the delay between then and now is really not related to the debtor, the debtor's actions or the debtor's inactions, but was caused by some things, such as the assignment and reassignment of judges. That all led to some delays in hearings, by the stay that this Court

---

[7]    Appellants' Opening Brief at 7-8.

10

> imposed to allow the mediation to take place . . . In addition, the debtor has
> requested the ability to try certain issues since the outset of the filing of the case,
> but has not been permitted to start that process until recently. Now, the debtor is
> moving ahead with the issues that it raised. The parties argue that the case is old,
> and I suppose a five-year old case is old, but it is not the oldest or the longest
> running case ever seen or in this Court. And the age, in and of itself, is not the
> only factor that this Court has to consider, especially given the complexities of the
> case . . .[8]

In this, the Bankruptcy Court could easily and properly have gone further and looked to the

Appellants themselves as an important factor in prolonging the proceedings. As set forth below,

just the formulation of the questionnaire that will provide the foundation for the estimation took

two rounds of litigation extending for approximately 2 years. Litigating objections lodged by the

asbestos claimants' committee was not, apparently, enough. The same objections were then

repeated and litigated by the claimants' individual lawyers.

Nor is it candid for Appellants to argue, as they do, that expediting the case is their true

purpose here. Lifting exclusivity will not advance formulation of a confirmable plan of

reorganization and a quicker exit from Chapter 11. Appellants' suggestion that they could

possibly confirm a plan without incorporating the results of the estimation proceeding makes no

legal sense. The Appellants cannot dispute that an estimation proceeding is, in all events,

necessary.[9] Indeed, Appellants have finally conceded that "absent consent, a plan cannot be

confirmed without a determination of the Debtors' solvency."[10] There has been no insolvency

determination, and a plan that purported to eliminate the interests of the equity holders could not

be confirmed unless or until such insolvency determination is made. The proceeding before the

---

[8]    R-2390 at 110-111.

[9]    R-2390 at 67, 112.

[10]   R-2241 at 3.

11

Bankruptcy Court to estimate and value the Debtors' asbestos personal injury liability is at the core of any solvency determination.

Competing plans will only distract the parties and the Bankruptcy Court and, additionally, create yet more litigation. The Appellants already have been at pains to preview the approach to be taken in their plan, and its central defect already has been revealed -- it attempts to trump the Bankruptcy Court's determinations of which types of claims are meritorious and should be accorded value.[11] The Bankruptcy Court reacted with appropriate skepticism to the very first discussion of this feature, and counsel promptly backed away from the whole idea:

> COURT: Okay. But that's not the problem. The problem is that if the Court has actually made a determination that there are no allowable property damage claims, that's the end. I don't think I can confirm a plan that says you're going to pay value when I've determined that there's no value that's owed. I don't think that plan's confirmable.
>
> MR. FRANKEL: Well, Your Honor, if the plan is not confirmable on that basis then, obviously, the agreement would fall apart.[12]

The Appellants also claim that "no alarm bells went off" in other asbestos-related cases where competing plans were filed and infer thereby that such cases moved along smoothly and quickly as a result of such events.[13] They refer to the *Babcock & Wilcox* case,[14] another recent asbestos-related chapter 11 case in which competing plans were filed. However, the *Babcock* case is a classic example of how the competing plan process solved nothing. Competing plans

---

[11]  The Appellants' agreement is discussed more fully *infra* at 31.

[12]  R-2930 at 49-50.

[13]  Appellants' Opening Brief at 37.

[14]  Appellants' Opening Brief at 37.

were filed in that case in May through July 2002.[15]  The case did not confirm until January 17, 2006, nearly three and a half years after competing plans were filed.  The confirmed plan did not resemble any of the plans filed in 2002.[16]

Appellants' suggestion that the imminent estimation should be in phases (cancer claims, followed by non-cancer claims) is merely a case management criticism and is not germane to the issue on appeal.  And it is a criticism all but abandoned, because the Bankruptcy Court rejected this approach and the Appellants did not appeal that ruling.[17]

In the end, a very dedicated and extremely expert Bankruptcy Court[18] objectively examined the relevant factors in order to determine whether cause exists to extend exclusivity.  It decided that cause does exist based on the facts and circumstances of this case.  Its ruling should be affirmed.

---

[15]  *In re The Babcock & Wilcox Co.*, Case No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000), Dkt. Nos. 3148 and 3316 (Debtors' 2002 Plans) and Dkt. No. 3320 (asbestos constituents' plan).

[16]  *In re The Babcock & Wilcox Co.*, Case No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000), Dkt. No. 7059 (Confirmed Plan dated September 28, 2005 as modified)

[17]  R-2930 at 55.

[18]  *See, e.g., In re Combustion Engineering, Inc.*, Case No. 03-10495 (Bankr. D. Del.); *In re Federal-Mogul Global, Inc.*, Case No. 01-10578 (Bankr. D. Del.); *In re Armstrong World Indust., Inc.*, Case No. 00-4471 (Bankr. D. Del.); *In re USG Corp.* Case No. 01-2094 (Bankr. D. Del.); *In re Owens Corning*, Case No. 00-03837 (Bankr. D. Del.); and *In re Pittsburgh Corning Corp.*, Case No. 00-22876 (Bankr. W.D. Pa.).

## STATEMENT OF FACTS

The Appellants have sought to put the duration of this case at issue, and, as an inevitable

consequence, the history of the case. That history, however, only demonstrates the difficulty of

the Bankruptcy Court's work to both resolve and focus the bankruptcy, and the care with which

it has decided to extend exclusivity.

### I.    The Bankruptcy Filing

On April 2, 2001, the Debtors filed for bankruptcy protection in order to resolve the

hundreds of thousands of asbestos claims lodged against them in the only forum that could fully

and effectively address all claims comprehensively and finally. The traditional tort system had

ceased to provide any realistic opportunity to define the actual responsibility of any manufacturer

of asbestos products, including the Debtors, for asbestos-related claims. Even the Supreme

Court observed that the tort system is besieged by an "elephantine mass of asbestos cases" that

"defies customary judicial administration.[19] The situation is "a disaster of major proportions to

both the victims and the producers of asbestos products" alike.[20] Indeed, "[n]o mass tort

litigation ... has received more intense criticism than the litigation concerning exposure to

asbestos."[21]

The problem had and still has many causes, but Grace was focused on those factors that

have had particular impact on the scope of the Debtors' potential personal injury liability. For

example, there were (and are still) the mass screening programs that facilitated prosecution of

---

[19]   R-2 at 5 (page numbering for Informational Brief as stamped by Court on 11/13/2006).

[20]   R. 2 at 5.

[21]   R-2 at 17.

huge numbers of claims by those who are unimpaired (*i.e.,* show no signs of an asbestos-related disease).[22]   As Judge Weinstein observed when presiding over the *Johns-Manville* bankruptcy, some plaintiffs' attorneys "have filed all of their cases without regard to the extent of injury."[23] Working in conjunction with unions, they have "arranged through the use of medical trailers and the like to have x-rays taken of thousands of workers without manifestations of disease and then filed complaints for those that had any hint of pleural plaque."[24]   Steven Kazan, a prominent counsel for cancer claimants and counsel for claimants against Grace, testified before Congress that the increase in claims "is conjured up through systematic, for-profit screening programs designed to find potential plaintiffs with some X-ray evidence consistent with asbestosis" and concluded that "[i]f this were medicine, it would be malpractice.  But it is not medicine: It is the medical side of legal entrepreneurship."[25]

Litigation-driven screenings and the practice of suing everyone without real evidence of significant asbestos exposure to their products drove dramatic increases or "spikes" in the number of claims filed against Grace and in the number of settlement demands in 2000.[26]   These increases bore no apparent relation to changes in liability or trends in disease, but they threatened the Debtors' financial health and core businesses.   Under these circumstances, the Debtors concluded that there was no way to define and resolve their asbestos liability, while preserving

---

[22]   R-2 at 23.

[23]   R-2 at 24.

[24]   R-2 at 24.

[25]   R-2249 at 17-18

[26]   R-2 at 41.

15

the value and viability of their core business operations, other than through a reorganization under chapter 11 of the Bankruptcy Code.

## II.    The Debtors' Original Approach To Resolving Asbestos Personal Injury Claims In Chapter 11

From the *first day* of this case, the Debtors identified these problems and sought to present a transparent framework for defining their actual asbestos liability. Thus, on the date of the filing, the Debtors filed an Informational Brief, which included a detailed summary of the Debtors' involvement in the asbestos business and the crisis facing the Debtors as a result of the skyrocketing personal injury claims. Critically, the Informational Brief set forth proposals for how the Bankruptcy Court could deal with the various liability issues facing the Debtors, especially with respect to the allowance and valuation of personal injury claims.[27]

Within 75 days of the bankruptcy filing, at the request of District Judge Farnan (the original District Court Judge assigned to the Debtors' case), the Debtors filed a proposed case management order, outlining the Debtors' proposal for resolving *all* of the key tort liability issues in the case.[28] That proposal sought to deploy the procedural devices adopted in the Bankruptcy Code in order to streamline the process of adjudicating claims on a common issue basis, while preserving legitimate personal injury claimants' right to a jury trial. The Debtors proposed filing exemplar objections and summary judgment motions to each category of disputed personal injury claims. These objections and summary judgment motions would frame common issues of proper diagnostic method vs. litigation screening, and biologically effective exposure to Grace products vs. mere presence at a job site, among others. Incorporated in the

---

[27]    R-2.

[28]    R-23, R-24, and Supp. R-5.

16

litigation of these summary judgment issues would be the submission of expert reports on disease diagnosis, dosage, and causation, allowing the parties to engage in *Daubert*[29] proceedings regarding the reliability of scientific evidence used to support personal injury claims. Similar procedures were proposed for property damage claims.

Because the scope of the Debtors' true personal injury liability was undefined and without such definition no plan of reorganization could be confirmed, the Debtors intended that the common-issue litigation would occur before any reorganization plan would be proposed.[30] The asbestos claimants objected to the Debtors' proposed CMO,[31] asserting that the merits of the asbestos claims need never be decided.

The CMO was fully briefed and set to be heard before Judge Farnan on November 21, 2001. On the morning of November 21, the Debtors were told that the Court of Appeals for the Third Circuit had reassigned Grace's chapter 11 case to the Honorable Judge Alfred M. Wolin.

**III.    The Debtors Continue To Press For A Merits-Based Adjudication Of The Asbestos Personal Injury Claims**

Altogether, the Third Circuit assigned Judge Wolin five, high profile, asbestos-related chapter 11 cases.[32] Judge Wolin, in turn, sought to prioritize the major issues in each of the five cases. When Judge Wolin received Grace's Chapter 11 case, he (i) asked the parties to identify the major issues facing the Debtors, then (ii) retained on his docket the asbestos personal injury

---

[29]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[30]    R-23, R-24.

[31]    R-52, R-54.

[32]    *In re W.R. Grace & Co.*, Case No. 01-01139 (Bankr. D. Del.); *In re Federal-Mogul Global, Inc.*, Case No. 01-10578 (Bankr. D. Del.); *In re Armstrong World Indust., Inc.*, Case No. 00-4471 (Bankr. D. Del.) *In re USG Corp.*, Case No. 01-2094 (Bankr. D. Del.); *In re Owens Corning*, Case No. 00-03837 (Bankr. D. Del.).

17

issues and proposed fraudulent transfer litigation, and (iii) referred all other matters to Bankruptcy Judge Judith Fitzgerald.

The Debtors spent the better part of 2002 participating in the fraudulent transfer litigation,[33] initiating the property damage litigation before the Bankruptcy Court, and explaining and refining their case management proposals for personal injury claims. In an effort to reduce the burden of litigating the personal injury claims, the Debtors narrowed the scope of their requests. In their revised CMO submissions, the Debtors' proposals evolved from requesting an immediate bar date and detailed proof of claim form for all claimants, to a modified proposal under which only asbestos personal injury claimants with currently pending litigation claims would file proofs of claim, and the core issues from those claims would be the subject of common issue litigation.

As explained in detail in the revised CMO and personal injury procedures briefs filed by the Debtors,[34] this process would afford the Bankruptcy Court the opportunity to efficiently identify and resolve all of the critical common issues raised by the pending personal injury claims.

---

[33] At the time Grace filed chapter 11, an uncertified class action alleging fraudulent transfer claims was pending against Grace, Sealed Air Corporation and Fresenius Medical Care A.G. This litigation related to certain corporate divestiture transactions that took place between (i) Grace and Fresenius Medical Care A.G. in 1996 and (ii) Grace and Sealed Air Corporation in 1998. These fraudulent transfer claims were litigated before Judge Wolin in 2002. After extensive discovery and litigation of certain key issues, the litigation was resolved through settlement in November of 2002. The settlement with Fresenius was approved in July 2003, and the settlement with Sealed Air and Cryovac was approved in June 2005 by the Bankruptcy Court. The settlements together contemplate payments in the aggregate of approximately $1.2 billion to the Debtors' estates upon confirmation of the Debtors' plan and subject to certain other conditions.

[34] R-92, R-94.

Notwithstanding these efforts, the asbestos personal injury claimants opposed all of the Debtors' proposals.[35] At the same time, Judge Wolin focused his attention on the other asbestos cases pending before him and did not address the Debtors' proposals.

In May 2004, Judge Wolin was recused prior to having rendered any substantive decisions on the Debtors' proposals. The Grace case was, again, reassigned.

## IV.    A Future Claimants' Representative is Appointed

In as early as 2003, the Debtors moved for the appointment of a legal representative on account of holders of future asbestos-related claims.[36] Shortly before Judge Wolin's recusal, on April 19, 2004, the Debtors filed a renewed application for the appointment of an FCR. The Debtors had conferred with each of the official committees appointed in the Chapter 11 case and, based upon such dialogue, determined that there was no consensus support for any single applicant. Accordingly, the Debtors asked the Bankruptcy Court to appoint one of three individuals. Numerous responses and objections were filed, and, on May 25, 2004, the Bankruptcy Court entered an order appointing David T. Austern as the FCR.[37]

## V.    The Bankruptcy Court Takes Over Issues Related To Asbestos Personal Injury Claims, And The Debtors File a Proposed Plan

After Judge Wolin's recusal, the Bankruptcy Court assumed responsibility for issues related to the asbestos personal injury claims. The Bankruptcy Court also made it clear that it wanted to move to a chapter 11 plan process as soon as possible.

---

[35]  R-177.

[36]  Supp.R.-16.

[37]  R-322.

On June 16, 2004, the Bankruptcy Court entered an order directing the Debtors to file a chapter 11 plan no later than October 14, 2004. In the summer and fall of 2004, the Debtors circulated to the various creditor constituencies a financial analysis which could form the basis for a chapter 11 plan. That analysis was based upon a financial assessment of the Debtors' operations and the funding available for all creditor constituencies.

Thereafter, the parties engaged in sincere and productive settlement discussions aimed at a consensual plan. Those discussions were progressing so well that, on October 14, 2004, the date the Court had ordered the plan to be filed,[38] the asbestos committees asked that the Debtors not file their chapter 11 plan so that discussions could continue. The Debtors sought and were granted an extension of time.[39]

On November 12, 2004, after settlement negotiations stalled, the Debtors filed a plan of reorganization, along with a disclosure statement and renewed motions for entry of a CMO for asbestos-related claims and the estimation of asbestos personal injury claims.[40] The Debtors also filed extensive exhibits which included detailed trust distribution procedures outlining how asbestos claims would be reviewed and resolved post-confirmation. Thereafter, the Debtors filed a further brief regarding certain plan confirmation issues.[41] Appellants opposed all of the Debtors' motions and objected to the Debtors' disclosure statement and plan.[42] On January 13,

---

[38]    R-326.

[39]    R-347.

[40]    R-361 and R-362.

[41]    7502

[42]    7305, 7314, 7335, 7340, 7340.

2005, the Debtors filed an amended plan of reorganization (the "Amended Plan").[43]    The Amended Plan is supported by the Unsecured Creditors' Committee and the Official Committee of Equity Holders as co-proponents with the Debtors. It is not supported by the Appellants.

Under the terms of the Amended Plan, a trust would be established to which all pending and future asbestos-related claims would be channeled for resolution. An estimation proceeding was proposed to aid the Debtors in determining the amount that had to be paid to the trust in order to satisfy the estimated liability for all classes of asbestos personal injury claimants. The Amended Plan provides that the Debtors' asbestos-related liabilities would be satisfied in full (using cash and securities from the Debtors and the proceeds of the Sealed Air and Fresenius litigation)[44] and that the current equity holders would retain equity in the reorganized Debtors. The Debtors believe that if the asbestos claims are estimated using the merits-based approach outlined by the Debtors' CMO, the Debtors can pay in full all unsecured claims, including all valid asbestos claims. Equity will remain for the shareholders.

## VI.    The CMOs are Entered and the Estimation Proceedings Are Scheduled

Having reviewed the Amended Plan and heard the legal challenges to it, the Bankruptcy Court decided that the best course was to proceed with estimation. In January 2005, the Bankruptcy Court ordered the parties to negotiate case management orders for the estimation of asbestos personal injury and property damage claims.[45] The Bankruptcy Court also agreed that a questionnaire was an appropriate vehicle for claimants to provide certain fact-based information

---

[43]    R-419.

[44]    *See n. 33, supra.*

[45]    R-431 at 167-68; 209-210.

21

regarding their asbestos claims. It ordered the parties to negotiate the format and questions in the questionnaire and the CMOs.

Several months of negotiation ensued thereafter. The asbestos claimants continued to fight the Debtors' approach. In May 2005, the Debtors filed yet another motion to approve a personal injury CMO and questionnaire. They asked that each holder of an asbestos personal injury claim who filed a pre-petition lawsuit against the Debtors complete and return a proposed questionnaire in order to provide uniform and relevant information for with the estimation.[46] Again, the asbestos claimants objected to the Debtors' CMOs and questionnaire, and argued for estimation based on settlement history rather than actual liability.[47] Detailed objections also were directed at virtually every line of the questionnaire. The final content of the questionnaire was determined in an extended hearing, complete with give-and-take by both sides. In August 2005, over the claimants' objections, the Bankruptcy Court approved the Asbestos Personal Injury CMO and questionnaire and also approved an Asbestos Property Damage CMO.[48]

Pursuant to the Asbestos Personal Injury CMO, all holders of asbestos personal injury claims who had commenced suit against the Debtors prior to the filing of the Chapter 11 were ordered to fill out and return a detailed questionnaire with respect to their claims. The original due date for return of those questionnaires was January 12, 2006.[49] That deadline was thereafter

---

[46]  R-449, R-450.

[47]  R-472, R-473, R-475, and R-476.

[48]  R-537, R-538.

[49]  R-537.

extended several times at the request of the Asbestos PI Committee and the claimants. The deadline ultimately was pushed to July 12, 2006.

## VII.    The Parties Again Attempt to Resolve the Case but Fail Because the Scope of Liability Has Not Been Defined

In the fall and winter of 2005, renewed settlement discussions took place. The discussions were primarily led by certain asbestos attorneys. These discussions prompted the Debtors to delay the due date for the person injury questionnaires several times.

When the settlement discussions appeared once again to stall, the parties agreed to the appointment of a mediator. On March 10, 2006, by agreement of all of the official committees, Judge Sam Pointer (retired) was appointed as the plan mediator.[50]  On March 27, 2006, while discovery was progressing under the Asbestos Personal Injury CMO and the Asbestos Property Damage CMO, the Bankruptcy Court entered a stay of proceedings so that the parties could concentrate on settlement.[51]  Judge Pointer thereafter conducted both telephonic and face-to-face discussions with all of the parties. Beyond an initial introductory meeting, however, the asbestos parties declined to engage the Debtors or the Equity Committee in settlement discussions.[52] Instead, the asbestos committees used the rest of the time the stay of litigation was in place to negotiate an agreement among themselves on how they would divide up the available assets.

Specifically, the Debtors understand that the agreement consists of a formula that would govern how any funds paid to asbestos claimants under *any plan* proposed by *any party* will be divided. No matter what the plan or Court decisions provide, the agreement dictates the

---

[50]    R-2125.

[51]    R-2155, R-2156.

[52]    The asbestos committees' meetings with the Unsecured Creditors' Committee were unproductive.

percentages of funds that will go to pay PI and PD claims. The PD distribution, in turn, is to be divided, based upon a in a fixed percentage, between "traditional" PD claims and ZAI claims. It is the Debtors' understanding that the agreement controls regardless of the Bankruptcy Court's rulings on ZAI,[53] its disallowance of other PD claims, or its ultimate decision in the PI estimation. Such an agreement is fundamentally flawed in that it (i) is in direct conflict with the Bankruptcy Code's explicit claims allowance and distribution rules; (ii) contemplates an unconfirmable plan; and (iii) obstructs plan negotiations and thus is against public policy.

In July, 2006, the mediation was terminated. The failure of the mediation prompted all parties to recognize that the size of the Debtors' legitimate asbestos liability must be judicially determined. Appellants' observed: "The recent mediation efforts make it abundantly clear that the real stumbling block for a consensual resolution of these cases is the markedly different views of the Debtors' solvency."[54] As a result, the stay was lifted so that the parties could complete the work necessary in order for the Bankruptcy Court to conduct an estimation hearing with respect to such liabilities.[55]

## VIII.   The Questionnaire Litigation Finally Concludes

As noted above, in November of 2004, the Debtors first moved the Bankruptcy Court for an Order authorizing it to serve a questionnaire on asbestos personal injury claimants. By this

---

[53]   As discussed below, on December 14, 2006, the Court entered an order granting in part the Debtors' Motion for Summary Judgment finding that ZAI does not pose an unreasonable risk of harm. A copy of the Bankruptcy Court's December 14, 2006 Order Resolving Motion for Partial Summary Judgment, Cross Motions for Summary Judgment, and Scheduling a Status Conference, and Memorandum Opinion in Support ("ZAI Opinion"), Dkt. Nos. 14015 and 14014 respectively, which post-date the record on appeal, are provided for this Court's ease of reference in the Appendix submitted herewith.

[54]   R-2241 at 2.

[55]   R-2292 at 8-11, 31.

time, as described further below, a parallel process (involving detailed claim forms) was already well-underway for property damage claims. After extensive litigation, on August 29, 2005, the Bankruptcy Court ordered that all holders of *pre-petition* asbestos personal injury litigation claims complete the questionnaire.[56]  By the adjusted July 12, 2006 deadline, approximately 60,500 of 179,000 questionnaires had been returned.

Regretfully, the great majority of the questionnaires returned merely recited broad objections rather than providing information requested; this, despite the fact that the Bankruptcy Court had already examined each and every one of the questions and ruled that they were all appropriate and relevant.[57]  Thus began yet another round of litigation over the questionnaires, this time with additional claimants' counsel joining in.

On August 24, 2006, the Bankruptcy Court entered an Order setting a bar date for the filing of proofs of claims (the "PI Bar Date")[58] by all holders of asbestos personal injury claims who (1) had commenced suit against the Debtors prior to the filing of the Chapter 11 case or (2) held asbestos personal injury claims against the Debtors that had been settled prior the petition date but remained unpaid.

The Bankruptcy Court also conducted two hearings on September 11, 2006 and September 25, 2006 to again resolve the issues raised by the objections to the questionnaires. Thereafter, guided by the Bankruptcy Court's suggestions, the Debtors filed motions to compel with respect to over 50,000 claimants represented by approximately a dozen law firms, in order

---

[56]   R-537.

[57]   R-2172 at 26-28.

[58]   R-2347.

to frame for decision problems found universally in almost all of the responses to the questionnaires. The Bankruptcy Court held a hearing on all such motions on December 5, 2006, and on December 22, 2006, it ordered that all questionnaires be appropriately supplemented by January 12, 2007, one year exactly after the original due date for the return of the questionnaires as set forth in the original PI CMO.[59]   Thus, the prospect of receiving properly completed questionnaires finally is in immediate sight.

## IX.    The Debtors Have Made Great Progress with Asbestos Property Damage And Non-Asbestos Litigation

On a parallel track, from the beginning of this case, the Debtors also sought to define the scope of any liability for asbestos property damage claims. The approach similarly called for detailed claim forms (like the PI Questionnaires) and common issue litigation. By order dated April 22, 2002 (the "Non-PI Bar Date Order"),[60] the Bankruptcy Court set March 31, 2003 as the last date for filing proofs of claim for all pre-petition claims relating to (i) asbestos property damage; (ii) non-asbestos claims and (iii) medical monitoring claims. Once the specialized proof of claim forms were approved and the Non-PI Bar Date Order was entered, the Debtors spent over $4 million to publish the bar date notice, and mailed out over 200,000 bar date notice packages. Pursuant to the Non-PI Bar Date Order, 4,042 asbestos property damage claims were filed, 2975 of them by one firm, Speights & Runyan.[61]

---

[59]   Order Regarding Motions to Compel Claimants to Respond to the W.R. Grace & Co. Asbestos Personal Injury Questionnaire, Dec. 22, 2006 (Dkt. No. 14149); Supplemental Order Regarding Motions to Compel Claimants to Respond to the W.R. Grace & Co. Asbestos Personal Injury Questionnaire, Dec. 22, 2006 (Dkt. No. 14150). Copies of these orders are provided for the Court's ease of reference in the Appendix submitted herewith.

[60]   R-134.

[61]   To date, the Debtors filed a total of 20 Omnibus Objections to large groups of claims – 18 aimed at non-employee, non-asbestos claims, and 2 aimed at the asbestos property damage claims. *See, e.g.,* R-467, R-540, R-541, R-2127, R-2388. In addition, on June 12, 2004, the Debtors moved to establish an alternative dispute

26

On September 1, 2005, the Debtors filed objections to 4002 property damage claims on various grounds. The Bankruptcy Court conducted a series of hearings over the course of the next year, focused on adjudicating the property damage claims objections sequentially. As of December 20, 2006, of the 4,042 filed property damage claims, only 629 remain pending. Of the 2975 filed by Speights and Runyan, only 255 remain.

Important objections, now going to the merits of certain property damage claims, remain to be resolved and are governed by a series of PD CMOs. In particular, a hearing on the admissibility of surface dust sample collection and analysis is set for January 29, 30 and 31, 2007. A hearing on objections regarding product identification, limitations periods, and certain properties in Libby, Montana is set for April 23, 24 and 25, 2007. A hearing on the risks posed by Grace's products is set for May 30 and 31, 2007. Motions for Summary Judgment with respect to objections to PD claims are also set to be heard in April and May, 2007.[62]

As noted above, this entire process parallels that which has been adopted for personal injury claims. Its efficacy to date bodes well for the PI estimation process now underway.

## X.    The Debtors Address The ZAI Claims

As part of the original June, 2001 CMO request, the Debtors also sought approval of a detailed proof of claim form and bar date notice program for property damage claims involving one of the Debtors' specific products: Zonolite Attic Insulation ("ZAI"). The Debtors' approach

---

resolution program to liquidate certain contested, non-asbestos claims. The ADR order was entered on November 8, 2004. R-541, R-542. As of December 1, 2006, 2,112 non-asbestos claims have been resolved, leaving 1,136 open and unresolved non-asbestos claims. However, after eliminating duplicate claims filed against more than one Debtor, the actual number of non-asbestos claims remaining to be resolved is approximately 417.

[62]    R-2342.

27

was opposed by the ZAI claimants, who favored class-certification.  The matter was litigated in the Bankruptcy Court.  Since no ZAI claims had ever been tried to judgment and the whole theory of ZAI liability was relatively new at the time the Debtors filed their Chapter 11 case, Judge Fitzgerald decided that the first order of business should be to receive scientific evidence on whether ZAI creates any unreasonable risk of harm.[63]

On April 12, 2002, the Debtors, pursuant to Section 501(c) of the Bankruptcy Code, filed ten proofs of claim on behalf of claimants who were holders of ZAI Claims.  The Debtors then filed objections to these ZAI Claims.[64]  On October 21, 2002, the Bankruptcy Court entered an Order scheduling discovery and briefing with respect "to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm."[65]  Discovery was completed on this subject, and summary judgment was fully briefed.[66]  The Bankruptcy Court held a hearing regarding this issue in October 2004.

On December 14, 2006, the Bankruptcy Court issued its Memorandum Opinion and Order granting in part the Debtors' Motion for Summary Judgment, finding that ZAI poses no unreasonable risk of harm.[67]  Specifically, the Bankruptcy Court found that there is no dispute regarding the fact that ZAI is contaminated with asbestos and can release asbestos fibers when

---

[63]    R-127 at 84-88, 116-118, R-141 at 11-17.

[64]    R-153.

[65]    R-215.

[66]    R-239-247; R-251, R-256-257; R-260-263; R-272; and R-274-277.

[67]    On December 22, 2006, the ZAI Claimants filed a notice of appeal and a motion for leave to file an interlocutory appeal of the Order and ZAI Opinion.

28

disturbed during foreseeable homeowner activities. However, the Bankruptcy Court went on to find that any such contamination was not sufficient to constitute an unreasonable risk of harm.[68]

## XI.    Estimation Discovery Progresses And A Trial Date Is Set

On July 24, 2006 the Bankruptcy Court entered a modified PI CMO wherein it set June 13, 2007 as the date by which the hearing on the estimation of asbestos personal injury claims will commence.[69]  Discovery is progressing with respect to this estimation, and, separately, with respect to the issues raised by the PD matters set forth above.  Extending exclusivity to July 2007 allows these significant events to move forward without disruption.

---

[68]    ZAI Opinion at 51.

[69]    Supp. R.-50.

## **ARGUMENT**

**I.    The Central Issue Remaining In The Case is the Scope of the Debtors' Asbestos Liability, and Lifting Exclusivity Before This Issue Is Addressed Will Impede, Rather Than Facilitate, Case Resolution**

Any review of exclusivity in this case must recognize the fundamental fact that the scope of the Debtors' legal liability must first be determined in order for any plan to be confirmed. Allowing the prosecution of competing plans puts the proverbial "cart before the horse," and will needlessly burden an already burdened docket. Whatever standard governs this Court's review, these basic facts are dispositive.

### **A.    The Impact Of Estimation On Resolution Of This Case Is Unquestionable.**

There is no record of the Debtors' insolvency. Absent such a determination, a plan that seeks to eliminate the rights of the Debtors' equity holders and dilute the rights of non-asbestos unsecured creditors cannot be confirmed. How the Debtors' liability should be estimated is determined by the procedural and evidentiary rules of the Bankruptcy Code.

The Bankruptcy Court has ordered that the proper mechanism for valuing the Debtors' asbestos personal injury liabilities is through the estimation procedures established under the Bankruptcy Code. Section 502(c) of the Bankruptcy Code provides: "[t]here shall be estimated for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c).

Significantly, the Appellants have agreed that an estimation proceeding must occur before a plan is confirmed.[70]  They even agree that pursuant to the Bankruptcy Court's order, such estimation shall take place in June 2007.[71]

### B.    The Appellants' Putative Competing Plan Will Only Prompt More Litigation

The Appellants have argued that "the Asbestos Constituents all reached agreement among themselves . . .as to their relative treatment under any plan and are ready to move forward with a competing plan."[72]  What they fail to tell this Court is that any plan based on such agreement will simply generate more litigation.

The agreement that the Appellants have struck purports to pay 85% of any funds distributed with respect to asbestos claims to the asbestos personal injury claimants and 15% of any funds distributed to the property damage claims, including ZAI Claims.[73]  If the agreement were used to fashion a competing plan, it would render that plan unconfirmable.

First, the Appellants' agreement is in direct conflict with the Bankruptcy Court's explicit claims allowance and distribution rules.  Pursuant to Section 502(b) of the Bankruptcy Code, the court must not allow any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law. . ." 11 U.S.C. § 502(b)(1).  The Bankruptcy Code also calls for equal treatment for equally situated claimants.  11 U.S.C. § 1123(a)(4) (requiring that a plan of reorganization "provide the same treatment for each claim or interest in a particular

---

[70]    R-2930 at 67-68.

[71]    R.-2930 at 72.

[72]    Appellants' Opening Brief at 7.  Notably, to the best of Appellees knowledge, this statement is not entirely accurate in so far as it does not purport to include the participation and consent of holders of certain kinds of Canadian asbestos-related claims.

[73]    R-2390 at 31-35, 48-50; R-2232 at 13-25; R-2292 at 9-11; and R.-2249.

class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest."). Unless the Bankruptcy Court's determinations of the Debtors' liability to personal injury and property damage claimants are identical to the allocation in the agreement, a competing plan proposed at this time would pay too much to some claimants to the detriment of others.

Second, unless or until it is determined that the Debtors are insolvent, any plan that purports to distribute funds in a way that assumes insolvency, as the Appellants' putative plan does, cannot be confirmed over the objection of the equity holders. In particular, under Section 1129(b) of the Bankruptcy Code, unless a debtor is shown to be insolvent, a plan which makes no provisions for equity commensurate with the value of its rights cannot be confirmed.

Section 1129(b)(1) provides that in order to confirm a nonconsensual plan of reorganization, a plan proponent must show that the "plan does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[74]    There are a variety of different tests employed to determine whether a plan discriminates unfairly against a particular class of claims or equity interests. At the very least, however, it must be shown that the dissenting class will receive at least its liquidation value. *In re 203 North LaSalle St. Ltd. P'ship,* 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd,* 195 B.R. 692 (N.D. Ill. 1996), *aff'd,* 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds,* 526 U.S. 434 (1999).

After demonstrating that the plan's treatment of the dissenting, impaired class is not unfairly discriminatory, the plan proponent must then demonstrate that the plan's treatment of

---

[74]    11 U.S.C. § 1129(b)(1).

32

that class is "fair and equitable."[75]  Two components of this rule are (1) the absolute priority rule

and (2) the rule that no creditor be paid more than it is owed.  The absolute priority rule means

that senior creditors must receive property equal to the full allowed amount of their claims or

interests before  a holder of any junior claim or interest will receive or retain under the plan on

account of such junior claim or interest any property.[76]  Thus, if all of a debtor's value is

allocated to senior classes of claims with no value remaining for equity interests, then pursuant to

the absolute priority rule, the equity holders will retain nothing since their interests are junior to

senior creditors.  However, with no valuation having been determined in the Chapter 11 case, a

plan that presumes such result cannot be confirmed.

  The second major component of the "fair and equitable" requirement -- and one that is

highly germane here -- is that no creditor or interest holder be paid a "premium" over the

allowed amount of its claim.  Once the claim holder receives or retains property equal to its

claim, it may receive no more.  *New England Coal & Coke Co. v. Rutland R. Co.*, 143 F.2d 179,

186 (2d Cir. 1944); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003); *In re Genesis

Health Ventures, Inc.*, 266 B.R. 591, 612-18 (Bankr. D. Del. 2001).  Again, a plan which

presumes there will be no residual value available for equity holders would indeed overpay

unsecured creditors if the Debtors were determined to be solvent and otherwise capable of

paying such creditors in full.[77]

---

[75]  11 U.S.C. § 1129(b)(1).

[76]  11 U.S.C. § 1129(b)(2).

[77]  *See also* 11 U.S.C. § 1129(b)(2)(C)(i), which states that a plan is fair and equitable as to a class of equity
interests if that class of equity interests receives its liquidation preference, its fixed redemption price or its
value.

33

The Debtors suspect that the Appellants want to file a competing plan that presumes the Debtors' insolvency in order to send a message to the marketplace that the Debtors appear substantially insolvent, thereby eroding the Debtors' stock price and, in turn, possibly weakening the equity holders' ability to negotiate effectively. Appellants' repeated argument, that the Debtors are insolvent, without more, does not suffice. Rather, it is through the estimation proceeding and other asbestos claims litigation that this issue will be resolved.

Third, the agreement obstructs settlement; thus, is against public policy -- even outside of bankruptcy. Specifically, it eliminates the possibility that the Debtors could separately settle with asbestos personal injury claimants, traditional property damage claimants, or holders of ZAI Claims, because agreeing to a settlement with one of them would lock in corresponding distributions under the Appellants' agreement with the other two that may not reflect the Debtors' actual liability on account of such claims. Such a "lockup" agreement that hinders settlement violates public policy and should be voided. *See In re San Juan Dupont Plaza Hotel Fire Litigation*, 1989 WL 996278, at *1 (D. P.R. Sept. 14, 1989) (Judgment/Settlement Sharing Agreement rejected: "in practical terms, the Agreement discourages settlements with the plaintiffs, and enhances an unnecessarily recalcitrant position by defendants toward the plaintiffs"). This prohibition applies *a fortiori* in bankruptcy, where jurisprudential policy overwhelmingly favors negotiated resolution. *See, e.g., In re Stations Holding,* No. 02-10882 (Bankr.. D. Del.), Dkt. Nos. 190 & 196, Sept. 25, 2002 Hrg. Tr., at 27 (characterizing lockup agreement as an impermissible solicitation of a vote, rather than mere negotiations, and constituting a violation of Section 1125(b) of the Bankruptcy Code); *In re NII Holdings,* No. 02-11505 (Bankr. D. Del.), Dkt. No. 394, Oct. 22, 2002 Hrg. Tr. at 59 (disqualifying creditors who

34

assented to a pre-petition lockup agreement structured within a pre-negotiated plan of reorganization if the parties sought to have such agreements designated as a vote).[78]

## C.    Terminating Exclusivity and Proposing Competing Plans Has Not Proven to Result in a Quick Exit From Chapter 11 in Asbestos-Related Cases

Termination of exclusivity and the proposal of competing plans, particularly in the asbestos context, do not necessarily result in a quick exit from bankruptcy. The Appellants argue that "bankruptcy courts have terminated a debtor's exclusive periods in at least four asbestos-related bankruptcy cases, all without alarm bells going off."[79] What is meant by "alarm bells" is unclear, but what is clear is that terminating exclusivity does not guarantee a quick exit from chapter 11.

As noted above, the Appellants cite the *Babcock & Wilcox* case, among others, to support their proposition.[80]    The Babcock & Wilcox Company ("B&W"), along with three of its subsidiaries, filed for chapter 11 protection on February 22, 2000 in the Bankruptcy Court for the Eastern District of Louisiana.[81] Like Grace, B&W filed for chapter 11 protection on account of the overwhelming number of asbestos-related claims filed against it and its inability to reasonably deal with such claims in the tort system. By order of the court dated May 15, 2002, the bankruptcy court terminated the debtors' exclusivity.[82] Shortly thereafter, in May through July 2002, competing plans were filed by the debtors and the asbestos committees (along with

---

[78]    Relevant portions of the hearing transcripts are contained in the Appendix.

[79]    Appellants' Opening Brief at 37.

[80]    Appellants' Opening Brief at 37.

[81]    *In re The Babcock & Wilcox Co.*, Case No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000.

[82]    *In re The Babcock & Wilcox Co.*, Case No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000), Dkt. No. 3173.

the support of the representative for future asbestos claimants).[83]    However, despite the

competing plans, the plan of reorganization that was ultimately confirmed was not confirmed

until January 2006, and did not represent either of the competing plans filed in 2002.[84]  Indeed,

after competing plans were filed, other modified plans were filed, appeals were filed, and finally

nearly three and a half years later, the debtors exited from chapter 11.[85]    It is simply

unreasonable to presume that terminating exclusivity here will produce any better result.

## II.    The Bankruptcy Court Did Not Abuse Its Discretion In Finding, Based on The Facts of The Chapter 11 Case, That Cause Exists to Extend Exclusivity to July 2007.

### A.    Bankruptcy Courts Have Broad Discretion and Can Examine Numerous Factors When Deciding Whether to Extend Exclusivity

As noted above, pursuant to Section 1121(d) of the Bankruptcy Code, a bankruptcy court

may increase the debtor's exclusivity period beyond the initial 120 days on request of a party in

interest "for cause," after notice and a hearing.  See 11 U.S.C. § 1121(d).  A bankruptcy court

has broad discretion to determine what is sufficient cause in each individual case.  *In re Burns*

*and Roe Enterprises, Inc*, No. 05-2529, 2005 U.S. Dist. LEXIS 26247 (D.N.J. Nov. 2, 2005).

---

[83]  *See, supra,* n. 15.

[84]  *See, supra,* n.16.

[85]  *In re The Babcock & Wilcox Co.*, Case No. 00-10992 (Bankr. E.D. La. Feb. 22, 2000), Dkt. No. 4695 (Notice of Effective Date of Plan of Reorganization).  Appellants also cite to the *Federal-Mogul Global Inc., U.S. Minerals Products Co.*, and *Congoleum Corp.* bankruptcies.  Appellants' Opening Brief at 37.  The *Federal Mogul* chapter 11 proceeding commenced on October 1, 2001.  *In re Federal-Mogul Global, Inc.*, Case No. 01-10578 (D. Del. Oct. 1, 2001), Dkt. No. 1.  The bankruptcy court terminated exclusivity on October 1, 2003.  *Id.*, Dkt. No. 3523.  A plan has not yet been confirmed.  The *U.S. Minerals Products Co.* bankruptcy commenced on July 23, 2001.  *In re United States Mineral Products Co*, No. 01-02471 (Bankr. D. Del. July 23, 2002), Dkt. No. 1.  The bankruptcy court terminated exclusivity on December 19, 2003.  *Id.*, Dkt. No. 1635.  The confirmation order was entered on November 30, 2005.  *Id.*, Dkt. No. 3282.  The *Congoleum* bankruptcy commenced on December 31, 2003.  *In re Congoleum Corp.*, No. 03-51524 (Bankr. D. N.J. Dec. 31, 2003), Dkt. No. 1.  The bankruptcy court recently terminated exclusivity on November 21, 2005 (Dkt. No. 3266), and it remains too soon to tell what effects termination will have on confirmation.

36

Although Section 1121(d) does not define "cause", the following factors, among others, have been identified by courts as being relevant in determining whether "cause" exists:

- the size and complexity of the case;

- the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

- the existence of good faith progress toward reorganization;

- the fact that the debtor is paying its bills as they become due;

- whether the debtor has demonstrated reasonable prospects for filing a viable plan;

- whether the debtor has made progress in negotiations with its creditors;

- the amount of time which has elapsed in the case;

- whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

- whether an unresolved contingency exists.

*See In re Adelphia Commc'ns.*, No. 02-41729, 2006 Bankr. LEXIS 2348 (Bankr. S.D.N.Y. Sept. 19, 2006); *In re Friedman's Inc.*, 336 B.R. 884 (Bankr. S.D. Ga. 2005); *In re Cent. Jersey Airport Servs.*, 282 B.R. 176 (Bankr. D.N.J. 2002); *In re Express One, Int'l.*, 194 B.R. 98 (Bankr. E.D. Tex. 1996). Courts may also disregard these nine factors altogether and simply determine whether terminating exclusivity will move the case forward. In *Adelphia*, 2006 Bankr. LEXIS 2348, at *30-32, the court, after applying the nine factors, also stated, "It has been held that the primary consideration for the court in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward, and that this 'is a practical call that can override a mere toting up of the factors.'" *Id.* (citing *In re Dow Corning, Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997)).

The choice of pertinent factors depends largely upon the factual nature of the case before the court. It is within the discretion of a bankruptcy court to decide which factors are relevant

37

and give the appropriate weight to each. As long as a bankruptcy court does not abuse its discretion, its decision will be affirmed. *In re Hoffinger Indus., Inc.*, 292 B.R. 639 (B.A.P. 8th Cir. 2003). Thus, a bankruptcy court faced with the issue of whether the necessary "cause" exists to extend the exclusivity period has a high degree of flexibility in fashioning the appropriate test to be applied, and is not required to apply any particular set of factors, or number of factors in every case. *See In re The Elder-Beerman Stores, Corp.*, No. C-3-97-175, 1997 U.S. Dist. LEXIS 23785 (S.D. Ohio June 23, 1997).

**B.    The Bankruptcy Court Did Not Abuse Its Discretion In The Chapter 11 Case By Finding That Cause Exists to Extend Exclusivity**

An abuse of discretion exists when a judicial action is "arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used." *Evans v. Buchanan*, 555 F.2d 373, 378-79 (3d Cir. 1977); *see also Rode v. Dellarciprete*, 892 F.2d 1177, 1182 (3d Cir. 1990) (a decision constitutes an abuse of discretion only when "no reasonable person would adopt the district court's view" ) (citing *Siberman v. Bogle*, 683 F.2d 62, 65 (3d Cir. 1982)).

The Bankruptcy Court gave the parties full and fair opportunity to brief the issue of whether exclusivity should be extended.[86] It also held a lengthy hearing on the matter and let all parties present their cases.[87] After considering all of the arguments, the Bankruptcy Court concluded that based on the facts and circumstances of the case, exclusivity should be extended.[88] The Bankruptcy Court focused on the key factors relevant to the case in its determination, namely (1) the size and complexity of the case; (2) the time that has elapsed in the

---

[86]   R-1852; R-1876-1877; R-1879-1880; R-2241; R-2249; R-2261; and R-2268.

[87]   R-2930.

[88]   R.-2930 at 112.

38

case; and (3) where the Debtors are at now and whether they have demonstrated reasonable prospects of filing a viable plan of reorganization.[89]   The Bankruptcy Court also considered whether a competing plan process would move the case along or otherwise add value.[90]

The Bankruptcy Court recognized that, while the case is old, "age, in and of itself, is not the only factor that this Court has to consider, especially given the complexities of the case . . ."[91] The Bankruptcy Court then explained some of the complexities of the case that demonstrate cause for an extension of exclusivity:

> the very different ideas of how to resolve the case that have been articulated on the record of various hearings by different parties, the uncertainties that have arisen post-petition, such as the criminal indictment, the New Jersey environmental claim[92] that is a decade old or longer, and the other matters that have added layers of complexity beyond those that have existed in some of the other asbestos bankruptcies even.[93]

---

[89]   R.-2930 at 110-112.

[90]   R.-2930 at 112.

[91]   R.-2930 at 111.

[92]   On June 1, 2005 the New Jersey Department of Environmental Protection brought a civil action in New Jersey state court against the Debtors, one of the Debtors' officers and a former employee seeking to recover more than $800 million. The DEP claims that in a June 1995 report, defendants should have provided additional information about the expansion of vermiculite concentrate and because defendants failed to do so, the State of New Jersey may recover $75,000 in civil penalties for every day over the last ten years that the defendants failed to correct the allegedly false report. The complaint does not seek environmental remediation or recovery of any environmental clean-up costs; in fact, the property has been in the process of remediation by Grace and the EPA for some time. Over a year ago, Grace also received information with respect to a potential criminal investigation by the Department of Justice with respect to New Jersey but to date nothing further has occurred in that regard.

[93]   R-2930 at 111.

39

The Bankruptcy Court also focused on "what's the current lay of the land" and whether it appears that "the debtor can propose a plan that is feasible and within a reasonable time."[94]  The Bankruptcy Court answered "yes."[95]

The Bankruptcy Court reasoned that "[a]s all parties have articulated and agreed, the major issues of estimation and valuation must be considered by all parties prior to any plan being confirmed by the Court."[96]  Indeed, not only have all the parties agreed to an estimation, but the asbestos committees even acknowledged that "we all agree we're going to get done [the estimation] in June."[97]  The Bankruptcy Court then considered whether competing plans would add value and concluded that "[a]t this point in this case it is more important for all parties to focus their efforts on resolving the outstanding issues, than in creating additional fees and expenses for the estate by requiring the filing or redoing or doing of competing plans."[98]  The Bankruptcy Court also made clear, however, that the extension of exclusivity was keyed to the estimation process, and that the order extending exclusivity was being entered "to permit all parties to continue to negotiate so that the estimation and valuation decisions can be incorporated into a plan that is to be filed within 30 days after the issues of estimation and solvency are resolved" and "whether or not exclusivity is terminated by some subsequent order, plans will be due within 30 days [of the estimation and valuation decisions]."[99]

---

[94]    R-2930 at 112.

[95]    R.-2930 at 112.

[96]    R.-2930 at 112.

[97]    R-2930 at 93.

[98]    R.-2930 at 112.

[99]    R-2930 at 113.

In short, the Bankruptcy Court carefully reasoned that exclusivity should be extended to allow the parties to negotiate, and to allow solvency and estimation issues to be resolved. The Bankruptcy Court understood, and all of the parties agreed, that no plan filed without such issues resolved could be confirmed at this time, absent consensual resolution between all constituents. The parties even agreed that this process would take them through June 2007. Given that reality, the fact that the estimation process was on track, the Bankruptcy Court's consideration of the complexities of the case and the age of the case, and the Bankruptcy Court's opinion that allowing the filing of competing plans at this time would solve nothing and instead would create unnecessary fees and expenses in the case, the Bankruptcy Court, in its discretion, extended exclusivity to July 2007. It cannot be said that "no reasonable person could agree" with the Bankruptcy Court. Accordingly, this Court should not find that the Bankruptcy Court abused its discretion.

## III. Appellants' Remaining Arguments In Favor of Lifting Exclusivity Are Irrelevant

### A. Appellants' Arguments Favoring Treatment Under the 2005 Amendments to the Bankruptcy Code Should Be Disregarded

While admitting that the amendment to Section 1121(d) of the Bankruptcy Code is not applicable to this case,[100] the Appellants nonetheless ask this Court to consider that amendment. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended Section 1121(d) of the Bankruptcy Code to provide that a debtor's exclusive period of time to file a plan shall not extend beyond 18 months from the date of the filing of the bankruptcy

---

[100] Appellants' Opening Brief at 9, 28.

41

petition.[101]  Prior to such amendment, the Debtors' exclusivity could be extended under Section 1121(d) indefinitely by a bankruptcy court "for cause."

First, as admitted by Appellants, the amendment is not retroactive.  This case was filed in 2001, and a 2005 amendment to the Bankruptcy Code cannot be said to apply here.

Second, in examining the Congressional intent behind the version of Section 1121(d) of the Bankruptcy Code that does apply here, other courts have rejected arguments that Congress disfavors extensions of exclusivity.  *See In re Burns and Roe Enters., Inc.,* No. 05-2529, 2005 U.S. Dist. LEXIS 26247 (D.N.J. Nov. 2, 2005).  In reviewing a request to extend exclusivity in a case that pre-dated the BAPCPA amendments, the *Burns* court held that the BAPCPA amendments did not apply, and that "[c]ontrary to appellants' assertion, the legislative history of §1121(d) does not show that Congress disfavors repeated extensions of exclusivity, nor does it mention repeated extensions of exclusivity at all.  Rather, the legislative history is clear that the point of exclusivity is 'to promote an environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated.'"  *Burns,* 2005 U.S. Dist. LEXIS 26247, at \*14-15 (citing H.R. Rep. No. 103-835, at 36 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3340, 3343).  Although the legislative history shows that Congress disfavored *undue* extensions, "a bankruptcy court's finding of cause precludes such undue extensions, thereby preventing any excessive delays."  *Burns,* 2005 U.S. Dist. LEXIS 26247, at \*15.  *See also Elder-Beekman Stores,* 1997 U.S. Dist. LEXIS 23785, at \*22-23 (legislative history of Section 1121(d) does not indicate a distaste for repeated extensions, but rather, demonstrates that Congress intended to

---

[101]  11 U.S.C. § 1121(d), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

give bankruptcy courts the flexibility to determine whether, in a particular case, the factual circumstances support an extension of exclusivity).

Finally, certain of the Appellants have repeatedly made these arguments in favor of a BAPCPA approach to the Bankruptcy Court, and the Bankruptcy Court has flatly rejected such arguments, noting that BAPCPA amendments respecting exclusivity extensions are "irrelevant"[102] here, and that "[n]o one in their right mind will file a[n] [asbestos] bankruptcy case like this under the Reform Act."[103]  Simply put, the parties have to live under the statute and the Congressional intent of the statute that was in place when this Chapter 11 Case was filed.

**B.      Appellants' Arguments in Favor of Bifurcating Estimation Phases Have Already Been Rejected by the Bankruptcy Court and Are Not the Subject of This or Any Appeal**

The Appellants have argued, and continue to argue, that instead of estimating all asbestos claims, the Bankruptcy Court should bifurcate estimation, and in the first instance, limit the estimation to a determination of the estimated value of "cancer only" claims.[104]  They believe that such approach is "more expedient and less expensive" than the Debtors' approach and, without demonstrating how, suggest that if exclusivity is terminated, they will be in a position to pursue that estimation agenda.[105]  The Bankruptcy Court, however, rejected the Appellants' view that estimation involving the Debtors' asbestos personal injury liability should be limited to claims for severe diseases.[106]  So, to the extent that Appellants suggest to this Court that lifting

---

[102]  R-2930 at 101.

[103]  R-477 at 58.

[104]  R-2930 at 53-54; Appellants' Opening Brief at 17.

[105]  Appellants' Opening Brief at 17.

[106]  R-2930 at 55.

43

exclusivity now will allow them to embark on this "more expedient and less expensive process," they are disingenuous.  They have already agreed whatever estimation is to occur shall occur in June 2007.  Lifting exclusivity will in no way affect that timing or the scope of the claims being estimated.

44

## CONCLUSION

Bankruptcy courts have broad discretion in determining whether cause exists to extend exclusivity. The Bankruptcy Court here did not abuse its discretion in finding that cause exists to extend exclusivity to July 2007. Furthermore, even if this Court were to apply a heightened standard of review, the facts and circumstances of this case warrants an extension of exclusivity to allow the estimation and solvency determinations to be made before any competing plans can or should be filed. Accordingly, the Bankruptcy Court's October 3, 2006 Order extending exclusivity to July 2007 should be affirmed.

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Janet Baer
Deanna D. Boll
Anna Isman
Citigroup Center
153 East 53rd Street
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Counsel for the Debtors

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill, III (Bar. No.4042)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Counsel for the Debtors

STROOCK & STROOCK & LAVAN LLP
Lewis Kruger
Kenneth Pasquale
180 Maiden Lane
New York, NY 10038-4982
Telephone: (212) 806-5400
Facsimile (212) 806-6006

Counsel for the Official Committee of
Unsecured Creditors

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gary Becker
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

Counsel for the Official Committee of Equity
Holders

Dated:  December 28, 2006

45