## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**W.R. GRACE & CO., et al.,**

---

| | | |
|---|---|---|
| **Official Committee of Asbestos Personal Injury Claimants, et al.,** | ) ) ) | |
| **Appellants,** | ) ) | **Civil Action No. 06-689 (RLB)** |
| **v.** | ) ) | |
| **W.R. Grace & Co., et al.,** | ) ) | **Bankruptcy Case No. 01-1139 (JKF)** |
| **Appellees.** | ) ) ) | **Appeal No. 06-63** |

### APPENDIX TO BRIEF OF APPELLEES

| | |
|---|---|
| David M. Bernick, P.C.<br>Theodore L. Freedman<br>Janet S. Baer<br>Deanna D. Boll<br>Anna Isman<br>Kirkland & Ellis LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, NY  10022<br>Telephone: (212) 446-4800<br>Facsimile:  (212) 446-4900<br><br>Counsel for the Debtors | Laura Davis Jones (Bar No. 2436)<br>James E. O'Neill, III (Bar. No. 4042)<br>Pachulski Stang Ziehl Young<br>Jones & Weintraub LLP<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE  19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Facsimile:  (302) 652-4400<br><br><br>Counsel for the Debtors |
| Lewis Kruger<br>Kenneth Pasquale<br>Strook & Strook & Lavan LLP<br>180 Maiden Lane<br>New York, NY  10038-4982<br>Telephone: (212) 806-5400<br>Facsimile:  (212) 806-6006<br><br>Counsel for the Official Committee of Unsecured Creditors | Philip Bentley<br>Gary Becker<br>Kramer Levin Naftalis & Frankel LLP<br>919 Third Avenue<br>New York, NY  10022<br>Telephone: (212) 715-9100<br>Facsimile:  (212) 715-8000<br><br>Counsel for the Official Committee of Equity Holders |

Dated:  December 28, 2006

# TABLE OF CONTENTS

**UNPUBLISHED OPINIONS**

Exhibit                                                                 Page No.

1       In re Adelphia Communications Corp.,
        No. 02-41729, 2006 Bankr. LEXIS 2348 (Bankr. S.D.N.Y. Sept. 19,
        2006).................................................................................. A001

2       In re Ames Dep't. Stores, Inc.,
        No. 90 B 11233, 1991 U.S. Dist. LEXIS 17074 (S.D.N.Y. Nov. 25,
        1991)................................................................................... A012

3       In re Burns and Roe Enterprises, Inc.
        No. 05-2529, 2005 U.S. Dist. LEXIS 26247 (D.N.J. Nov. 2, 2005).......... A016

4       In re San Juan Dupont Plaza Hotel Fire Litigation,
        1989 WL 996278 (D.P.R. Sept. 14, 1989) ................................. A027

5       In re The Elder-Beerman Stores, Corp.,
        No. C-3-97-175, 1997 U.S. Dist. LEXIS 23785 (S.D. Ohio June 23,
        1997)................................................................................... A031

6       In re Trans World Airlines, Inc.,
        1993 WL 559245 (D. Del. 1993)................................................ A044

**HOUSE BILLS**

7       2005 U.S. Dist. LEXIS 26247, at *14-15 (citing H.R. Rep. No. 103-835, at 36
        (1994), as reprinted in 1994 U.S.C.C.A.N. 3340, 3343)................... A052

8       H.R. Rep. No. 95-598, at 232 (1978), reprinted in U.S.C.C.A.N. 6191 ......... A197

**BANKRUPTCY COURT ORDERS POST-DATING SUBMISSION OF RECORD ON APPEAL**

9       Order Granting in Part and Denying in Part W. R. Grace & Co.'s
        Motion for Reconsideration [Filed: 12/07/2006] (Docket No. 13947)............. A198

10      Memorandum Opinion [Filed: 12/14/2006] (Docket No. 14014) ................ A199

11      Order Resolving Motion for Partial Summary Judgment,
        Cross Motions for Summary Judgment, and Scheduling a
        Status Conference [Filed: 12/14/2006] (Docket No. 14015)............... A253

2

## TRANSCRIPTS

12   In re NII Holdings,
          No. 02-11505 (Bankr. D. Del.), Dkt. No. 394, Oct. 22, 2002 Hrg. Tr. at 59 ... A256

13   In re Stations Holding,
          No. 02-10882 (Bankr. D. Del.), Dkt. Nos. 190 & 196, Sept. 25, 2002 Hrg.
          Tr. at 27 ............................................................................................................. A258

91100-001\DOCS_DE:123879.1

# EXHIBIT 1

LEXSEE



Analysis
As of: Dec 28, 2006

In re: Adelphia Communications Corp., et al., Debtors.

Chapter 11, Case No. 02-41729 (REG), Jointly Administered

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT
OF NEW YORK

352 B.R. 578; 2006 Bankr. LEXIS 2348; 47 Bankr. Ct. Dec. 39

September 19, 2006, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A group of bondholders of one debtor moved to terminate debtors' plan exclusivity. The bondholders also moved for a determination to resume now-suspended litigation of interdebtor and intercreditor disputes in the instant cases, and to unseal matter that had been subject to confidentiality orders, or had been filed under seal, in connection with the litigation of those issues.

**OVERVIEW:** Debtors proposed, jointly with the creditors' committee, a reorganization plan that proposed a compromise of intercreditor disputes (and of the interdebtor disputes). The bondholders argued that an extension of debtors' exclusivity was unwarranted. The court decided to keep exclusivity in place, at least for the relatively brief period of six to eight weeks during which it would ascertain whether the joint plan had the requisite support and was confirmable. There was nothing in the record here from which the court could find that a waiver of any type. Further, most of the Dow Corning factors did not favor terminating exclusivity. The case was of unprecedented complexity and overwhelming size. Debtors, together with the creditors' committee, had already filed a plan that could be quickly solicited. Debtors showed good faith efforts to achieve emergence. The support of the plan by creditor groups holding billions of dollars in par amount strongly suggested that it was viable. Further, in light of the contentious nature of this case, debtors had made tremendous progress in their negotiations with creditors.

**OUTCOME:** The court denied the motion to terminate exclusivity and denied the motion to resume the now-suspended litigation of the interdebtor issues. The court granted in part the motion to unseal protected matter, subject to debtors' ability to protect commercially sensitive matter (and for other parties in interest to be heard to protect matter that should be protected for other reasons).

**CORE TERMS:** exclusivity, negotiation, intercreditor, settlement, terminate, interdebtor, terminating, termination, contingency, holders, solicitation, reorganization, constituency, confirmation, unresolved, progress, case-law, viable, plan of reorganization, settlement process, unseal, stakeholders, unhappiness, bondholder, enumerated, disclosure, solicited, confirmed, retention, negotiate

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN1] 11 U.S.C.S. § 1121(b) grants a debtor exclusive periods for the filing, and solicitation, of a reorganization plan. These periods are subject to extension, or contraction, for cause. But § 1121 does not mention a waiver of exclusivity, much less articulate standards under which a waiver of a debtor's § 1121 rights may be found.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN2] See 11 U.S.C.S. § 1121(d).

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

*Contracts Law > Contract Conditions & Provisions > Waivers > General Overview*

[HN3] A waiver is the intentional relinquishment of a known legal right. Because waiver of a right must be proved to be intentional, a court does not find accidental waivers lightly.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*

[HN4] In addition to providing for a debtor's exclusive periods, 11 U.S.C.S. § 1121 authorizes a bankruptcy court to reduce or increase the exclusivity period for cause. A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*

[HN5] The elements that constitute "cause" aren't outlined in the Bankruptcy Code, but the caselaw has identified factors that normally are considered when determining whether "cause" exists to reduce or increase the debtor's exclusivity period. Courts typically rely on nine enumerated factors: (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. Displeasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*

[HN6] While the Dow Corning factors (considered when determining whether "cause" exists to reduce or increase a debtor's exclusivity period) do not prohibit the consideration of other relevant factors, they nevertheless cannot be ignored.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*

[HN7] The fifth factor to consider when determining whether "cause" exists to reduce or increase the debtor's exclusivity period is whether the debtor has demonstrated reasonable prospects for filing a viable plan. This factor requires only that a debtor be able to attain confirmation of at least some viable plan, not necessarily the plan currently proposed.

**COUNSEL:** [*1] For Debtors and Debtors in Possession: Marc Abrams, Esq., Paul V. Shalhoub, Esq., Morris J. Massel, Esq., Jamie M. Ketten, Esq., WILLKIE FARR & GALLAGHER LLP, New York, NY.

For the Official Committee of Unsecured Creditors: David M. Friedman, Esq., Adam L. Shiff, Esq., KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, New York, NY; Edward T. Attanasio, Esq., David M. Stern, Esq., KLEE, TUCHIN, BOGDANOFF & STERN LLP, Los Angeles, CA.

For the Ad Hoc Committee of ACC Senior Noteholders: Martin J. Bienenstock, Esq. (argued), WEIL, GOTSHAL & MANGES LLP, ("ACC Bondholder Group"), New York, NY; Sylvia Ann Mayer, Esq., WEIL, GOTSHAL & MANGES LLP, ("ACC Bondholder Group"), Houston, Texas; Bruce Bennett, Esq., HENNIGAN, BENNETT & DORMAN LLP, Los Angeles, CA.

For Official Committee of Equity Security Holders: Gregory A. Blue, Esq., Eric B. Fisher, Esq., MORGENSTERN JACOBS & BLUE LLC, New York, NY.

For U.S. Bank National Association, as Indenture Trustee in Respect of the Arahova Notes and the FrontierVision Notes: David McCarty, Esq., SHEPPARD MULLIN RICHTER & HAMPTON LLP, Los Angeles, CA.

For Law Debenture Trust Company of New York, as ACC Senior Notes Trustee: Arlene R. Alves Esq., [*2] , SEWARD & KISSEL LLP, New York, NY.

For the Ad Hoc Adelphia Trade Claims Committee:Edward S. Weisfelner, Esq., BROWN RUDNICK BERLACK ISRAELS LLP, New York, NY.

For the Ad Hoc Committee of Arahova Noteholders: J. Christopher Shore, Esq., WHITE & CASE LLP, New York, NY; Richard S. Kebrdle, Esq., WHITE & CASE LLP, Miami, FL.

For W.R. Huff Asset Management Co., L.L.C.: Gary Kaplan, Esq., Craig M. Price, Esq., FRIED FRANK

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

HARRIS SHRIVER & JACOBSON LLP, New York, NY.

For Bank of America, N.A., as Administrative Agent for the Century Cable Lenders: Robin E. Phelan, Esq., HAYNES AND BOONE, LLP, Dallas, TX; Judith Elkin, Esq., HAYNES AND BOONE, LLP, New York, NY.

For Bank of Montreal, as Administrative Agent for the Olympus Lenders: Kenneth E. Noble, Esq., MAYER, BROWN ROWE & MAW LLP, New York, NY; J. Robert Stoll, Esq., MAYER, BROWN, ROWE & MAW LLP, Chicago, Illinois.

For the Ad Hoc Committee of Non-Agent TCI and Parnassos Lenders: Mark E. Palmer, Esq., David C. Albalah, Esq., ACEWELL & GIULIANI, LLP, New York, NY.

For Wachovia Bank, N.A., as Administrative Agent for the UCA Lenders: Peter Pantaleo, Esq., Elisha D. Graff, Esq., SIMPSON THACHER & BARTLETT [*3] LLP, New York, NY.

For Tudor Investment Corporation: Gina Lynn Martin, Esq., GOODWIN PROCTER LLP, Boston, MA; Allan S. Brilliant, Brian W. Harvey, Esq., GOODWIN PROCTER LLP, New York, NY.

For Murray Capital Management: Richard Pachulski, Esq., PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB P.C. LLP, New York, NY.

For Elliot Associates (via telephone): Isaac Pachulski, Esq., STUTMAN TREISTER & GLATT P.C., Los Angeles, CA.

For Calyon Securities: Andrew Brozman, Esq., CLIFFORD CHANCE US LLP, New York, NY.

For the Olympus Bondholders: Robert J. Rosenberg, Esq., LATHAM & WATKINS LLP, New York, NY.

For the Fort Myers Noteholders: Lee S. Attanasio, Esq., SIDLEY AUSTIN LLP, New York, NY.

For the Class Action Plaintiffs: John H. Drucker, Esq., COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A., New York, NY.

For the FrontierVision Ad Hoc Committee: Kenneth H. Eckstein, Esq., KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY

For JPMorgan Chase Bank: James C. Tecce, Esq., MILBANK, TWEED, HADLEY & MC CLOY LLP, New York, NY.

For ACC: Richard L. Wynne, Esq., Michael I. Gottfried, Esq. (via telephone), KIRKLAND & ELLIS LLP, Los Angeles, CA.

For [*4] Credit Suisse First Boston: Philip D. Anker, Esq., WILMER CUTLER PICKERING HALE & DORR LLP, New York, NY.

For Moctesuma Esparza: Giovanni Orantes, Esq., LAW OFFICES OF FEDERICO SAYRE.

For ABN AMRO Bank N.V.: Sarah Nye Campbell, Esq., WHITE & CASE LLP, New York, NY.

Tracy Hope Davis, Esq., OFFICE OF THE UNITED STATES TRUSTEE, New York, NY.

**JUDGES:** Robert E. Gerber, United States Bankruptcy Judge.

**OPINION BY:** Robert E. Gerber

**OPINION:**

BENCH DECISION n1 ON MOTION TO TERMINATE EXCLUSIVITY; TO RESUME LITIGATION OF INTERDEBTOR ISSUES; AND TO UNSEAL PROTECTED MATTER

> n1 I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where time does not permit more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have fewer citations and other footnotes, and have a more conversational tone.

BEFORE: ROBERT E. GERBER

UNITED STATES BANKRUPTCY JUDGE

A group of bondholders ("ACC Bondholder [*5] Group") of Adelphia Communications Corporation ("ACC Parent"), the highest entity in Adelphia's capital structure, moves to terminate the Debtors' plan exclusivity. The ACC Bondholder Group also moves for a determination on my part to resume the now-suspended litigation of the interdebtor and intercreditor disputes in these cases, and to unseal matter that had been subject to

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

confidentiality orders, and/or had been filed under seal, in connection with the litigation of those issues.

The motion to terminate exclusivity is denied. The motion to resume the now-suspended litigation of the interdebtor issues is likewise denied. The motion to unseal protected matter is granted in part, subject to the Debtors' ability to protect commercially sensitive matter (and for other parties in interest to be heard to protect matter that should be protected for other reasons), as set forth more fully below.

I don't agree with the ACC Bondholder Group's suggestion n2 that the factors set forth in the caselaw for exclusivity termination determinations are "platitudes." I do agree with it, however, to the extent that I consider this exclusivity termination motion not just by a checking off, or any mechanical [*6] counting or even weighing, of the enumerated factors, but also by taking a broader, more global view--focused on what is best for these chapter 11 cases; most in keeping with the letter and spirit of chapter 11; and what is most appropriate under the unique facts of a case that has been aptly described as one of the most challenging in bankruptcy history.

n2 Arg. Tr. 125.

Here the Debtors have proposed, jointly with the Creditors' Committee, a reorganization plan that, among other things, proposes a compromise of intercreditor disputes (and of the interdebtor disputes, which in huge respects drive the intercreditor disputes) that have plagued this case for years. The plan follows weeks of court-ordered settlement efforts, amongst the parties and then with the assistance of Judge Morris of this Court. The Joint Plan has secured very substantial, but not universal, indications of potential approval. While I will say now and again that I don't regard decisions of this character as a mechanical exercise in counting [*7] noses (or tallying up dollars, in par amount, of claims held), I believe that the proposed plan plainly deserves to be put up for a vote. While the settlement process did not include for a time (that, in retrospect, was too long) bank lenders and unsecured creditors (like Olympus) that were not players in the interdebtor disputes, the Debtors have now brought those parties in, or at least tried to do so. I disagree with the contentions that the process that led up to the term sheet that underlies it was in any way unlawful or illegitimate.

The proposed plan will go out for a vote. Many creditors, particularly bondholders at the ACC Parent level, have not been heard from, one way or the other. And at least for the relatively brief period of 6 to 8 weeks

during which we'll ascertain whether the Joint Plan has the requisite support and is confirmable, I will keep exclusivity in place.

The following factors inform my exercise of discretion in this regard.

Relevant Factual Considerations

I can and do decide these motions on undisputed facts.

As the Creditors' Committee fairly observes, n3 this case "may very well be the largest and most complicated and difficult case of all time. [*8] " Matters that made it so have been listed or addressed in prior decisions in these cases--more than 25 of my published decisions have been in this case alone--and needn't be discussed at length in this decision. It's sufficient, for purposes of this discussion, to note that the amalgam of pre-distribution matters to be addressed in these cases--the things to be fixed from the Rigas era; the claims to be defended against, or prosecuted, in connection with the Rigases' conduct; the efforts to stabilize and maximize the value of a business that had no management at the highest levels with cable expertise, and which lacked accounting records upon which managers or the public could rely; and the effort to market a company that ultimately fetched $ 17 billion--by themselves presented extraordinary challenges. And just as it appeared that the Debtors had met all of these challenges, it appeared that intercreditor disputes could still destroy this case. As it turned out, they nearly did, and still may.

n3 Creditors' Comm. Opp. at 5.

[*9]

When uncertainties as to interdebtor liabilities; allocation of the burdens of the DoJ/SEC settlement; allocation of the consideration of the sale of the Company to Time Warner and Comcast, and a host of other issues proved to be incapable of consensual ruling amongst creditors, the Debtors moved for a mechanism in aid of the process to resolve the interdebtor and related intercreditor disputes, to tee up the issues for judicial determination. Their initial motion, referred to in shorthand by parties in this case as the "Motion in Aid," was granted and led to a process referred to in these cases as the "MIA." But the time budgeted for the MIA process, which had been envisioned to encompass seven phases, to be determined in a series of hearings (for the most part, evidentiary trials) of one week each, proved to be wholly unrealistic, in light of the factual and legal complexity of the underlying issues--exacerbated by the desire of the litigants to litigate every arguable legal and factual issue, and to leave no stone unturned. After about

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

6 weeks, we were (and still are) in Phase II, with supplemental briefs to be submitted on 14 issues that I identified for the parties that I thought [*10] would have a material effect on the Phase II outcome.

Realizing that the MIA litigation could drag on for a very long period; recognizing the strain that the MIA litigation was putting on the Debtor's personnel, operations and finances, and fearing that the inability to resolve the intercreditor disputes would at least paralyze, and perhaps destroy, the case, I first ordered the parties to the MIA into mandatory settlement negotiations, requiring the MIA litigants to attend twice weekly negotiation sessions, one day per week with lawyers and principals, and one additional day per week with principals only. (The lawyer representatives were excused from the second day of attendance, as they were otherwise on trial before me, or working on their next rounds of briefs and trial preparation.) When that was insufficiently productive, and I was concerned about the pace and seriousness of the negotiations, I then enlisted my colleague, Hon. Cecilia Morris, U.S.B.J., to act as a non-adjudicative monitor and facilitator of the discussions. She brought the parties together for intensified efforts to settle the intercreditor disputes. At a chambers conference in May, at which all restricted parties [*11] were represented, including all of the parties to the interdebtor disputes, I asked the parties if any objected to my receiving a report from Judge Morris concerning the settlement negotiations. Nobody objected. Thereafter, she submitted a report to me, which included a term sheet for a now superseded plan, which had some support, but none at the ACC Parent level, and much less support than the plan that later secured the agreement of the Debtors and Creditors' Committee. Judge Morris stated that in her view, settlement was a better alternative to continued litigation of the MIA, and continuing proceedings under the MIA process.

The negotiations assisted by Judge Morris led to a series of term sheets for plan proposals that would embody a settlement of an increasing percentage of the various intercreditor disputes. Early on, much less than all of the affected parties signed on, but with time, various unsecured (and later, secured) creditors agreed to it. The earliest negotiations involved only the parties to the MIA. With the benefit of hindsight, I think this was not the best way to do it, and when holders of bank claims complained of this (at a chambers conference whose transcript [*12] I will unseal), I agreed with many of their points, and I urged that they be brought in to the process. Later discussions included the agents for holders of bank claims that had not previously reached agreements as to plan treatment (3 of the 6 principal bank agents having already done so), and unsecured creditors who had not been litigants in the MIA. With time, more

and more creditors reached agreement, including two major holders of bonds at the ACC Parent level, Tudor and Highfields (who are also members of the Creditors' Committee), and Wachovia and the Bank of Montreal, the agents on 2 of the 3 bank syndicates that had not previously reached agreement. Two major holders of unsecured claims at the ACC Parent level, who are members of the ACC Bondholder Group, were parties to the negotiations, but did not agree to the proposed plan treatment.

The Debtors and Creditors' Committee proposed a Joint Plan of Reorganization that would embody the compromises reached up to that point in time. (The Debtors disclaimed being a plan proponent with respect to adverse treatment of holders of bank claims with whom the Debtors had not reached a settlement, consistent with an earlier agreement [*13] with holders of bank claims to which the Debtors had agreed.) The Joint Plan now appears to have very considerable, but not total, support. Its supporters include Tudor and Highfields, which had been participants in the settlement process from the very outset--and were at various times the representatives, or among the representatives, of the ACC Parent bondholders. But the members of the ACC Bondholder Group (some of whom were also participants in the settlement process, at least toward the end) don't like the Joint Plan. I regard it as now unnecessary to discuss why parties like it or don't like it. Accusations have flown between feuding creditors as to these matters, but they raise disputed issues of fact, and perhaps law, and ultimately need not be resolved on this motion. Parties' rights as to these issues will be reserved.

The ACC Bondholder Group has contended that that the negotiation process that led to the present Joint Plan was procedurally defective--to the point that the Joint Plan should not even be allowed to be solicited. As I indicated on the record at the first day of the disclosure statement hearing on the Joint Plan, I disagree. The Joint Plan was the result of [*14] weeks of effort to bring seemingly intractable disagreements to a consensual conclusion. The negotiations that led to it were done in full view of the members of the ACC Bondholder Group, and at least some of them were participants in it. The negotiation process was at least partly successful; whether it's more than that will be determined by the votes of creditors, and a confirmation process that guarantees participants in the chapter 11 process the protections to which they're entitled under law. The ACC Bondholder Group's objections are insufficient to warrant depriving the Debtors of their right to put the plan up for a vote.

These chapter 11 cases, which were filed in July 2002, have now gone on for more than 4 years, by reason of the complexities described (in part) above, and by reason of the intercreditor disputes, described above and

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

below. At this point, by reason of a combination of early Debtor motions to extend exclusivity; a bridge order extending exclusivity that was never followed up or objected to; failures to move to terminate exclusivity; and a denial of a motion to terminate exclusivity for a subset of the Debtors, the Debtors retain exclusivity. The Debtors' plan [*15] proposals, until this one, have not generated creditor enthusiasm, but that hasn't been because the Debtors were trying to feather their own nest, or to advance their own parochial desires. To the contrary, it has been by reason of the difficulty of the intercreditor issues, and the aggressiveness with which creditors (not just the members of the ACC Bondholder Group) have sought to maximize their individual recoveries. If creditors come to the view that bringing this case to an end may require them to stop doing battle to squeeze out incremental recoveries, they may support the Joint Plan.

I.

Exclusivity

The ACC Bondholder Group argues that the Debtors involuntarily waived exclusivity by co-proposing their plan of reorganization with the Creditors' Committee. The ACC Bondholder Group also argues that an extension of the Debtors' exclusivity is unwarranted at this time, and that the plan process should now be opened up to competing plans.

*A. Involuntary Waiver.*

[HN1] Section 1121 (b) grants a debtor exclusive periods for the filing, and solicitation, of a reorganization plan. These periods are subject to extension, or contraction, for cause. n4 But section 1121 doesn't [*16] mention a waiver of exclusivity, much less articulate standards under which a waiver of a debtor's section 1121 rights may be found. Nor has any case been brought to my attention holding that a debtor has waived exclusivity by sharing it in an assertedly improper way. Both common sense and waiver doctrine generally, and highly relevant case law, cause me to reject the ACC Bondholder Committee's contentions that the Debtors have waived exclusivity here.

> n4 As applicable to these cases, section 1121(d) provides:
>
> > [HN2] On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase

the 120-day period or the 180-day period referred to in this section.

First, as a matter of common sense and waiver doctrine generally, I am loath to find inadvertent waiver here. At least as relevant here, [HN3] a waiver is the intentional relinquishment of a known legal right. n5 Because waiver of a right [*17] must be proved to be intentional, n6 I don't find accidental waivers lightly. There is nothing in the record from which I can find that a waiver of any type--much less the type said to have occurred here--was ever intended by the Debtors.

> n5 *See, e.g., United States v. Johnson*, 391 F.3d 67, 75 (2d Cir. 2004), citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938) (defining waiver as an "intentional relinquishment or abandonment of a known right or privilege"); *City of New York v. State*, 40 N.Y.2d 659, 669, 357 N.E.2d 988, 389 N.Y.S.2d 332 (1976) (under New York law, a waiver is "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it").

> n6 *See, e.g., Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 585 (2d Cir. 2006), and cases it cites.

As importantly, the waiver argument cannot be squared with the relevant caselaw. In the *Texaco* case [*18] in this district, n7 Judge Schwartzberg of this Court rejected the notion of an exclusivity waiver by implication. There the Icahn group argued that Texaco had lost exclusivity by permitting Pennzoil to co-propose a joint plan. Judge Schwartzberg agreed with Texaco that no waiver had occurred, observing that "there are no cases which support this novel idea." n8 To the contrary, he noted that "Texaco and Pennzoil have done precisely what 11 U.S.C. § 1121 contemplated; namely the negotiation of a plan of reorganization that may be acceptable to creditors and other interested parties." n9

> n7 *In re Texaco Inc.*, 81 B.R. 806, 810 (Bankr. S.D.N.Y. 1988) (Schwartzberg, J.).

> N8 *Id.*

> n9 *Id.*

Debtors and other parties in interest--most commonly, unsecured creditors' committees--often propose joint chapter 11 plans, and do so while the debtor has exclusivity. Chapter 11 plans confirmed on my watch in *Adelphia Business Solutions* n10 and *Casual Male*, n11 both [*19] while the debtors still had exclusivity, are just a couple of the examples of this. Joint plans are proposed for good reason; they are reflective of the consensus building that's the goal in chapter 11, and give the creditors who are asked to vote on the plan comfort that those who've been following the case and share their interests believe that the plan should be solicited. I am not going to penalize these Debtors for having done likewise.

n10 S.D.N.Y. Case No. 02-11389 (REG).

n11 317 B.R. 472, S.D.N.Y.

### B. Termination for Cause.

[HN4] In addition to providing for a debtor's exclusive periods, section 1121 of the Code authorizes a bankruptcy court to reduce or increase the exclusivity period for cause. A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, n12 and is fact-specific. [HN5] The elements that constitute "cause" aren't outlined in the Code, but the caselaw has identified factors that normally are considered when determining whether "cause" [*20] exists to reduce or increase the Debtor's exclusivity period.

n12 *In re Adelphia Communications Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y.) (Gerber, J.) ("*Adelphia Arahova Motions Decision*"), *aff'd* 342 B.R. 122 (S.D.N.Y. 2006) (Scheindlin, J.); *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989).

Courts typically rely on nine enumerated factors:

(a) the size and complexity of the case;

(b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

(c) the existence of good faith progress toward reorganization;

(d) the fact that the debtor is paying its bills as they become due;

(e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f) whether the debtor has made progress in negotiations with its creditors;

(g) the amount of time which has elapsed in the case;

(h) whether the debtor is seeking an extension of exclusivity in order [*21] to pressure creditors to submit to the debtor's reorganization demands; and

(i) whether an unresolved contingency exists. n13

I note that displeasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file. n14

n13 *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997); *Adelphia Arahova Motions Decision*, 336 B.R. at 674 (citing *Dow Corning*).

n14 *See Adelphia Arahova Motions Decision*, 336 B.R. at 676 & n. 183 ("the notion that creditor constituency unhappiness, without more, constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been judicially rejected"), *citing In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 134 (D.N.J. 1995).

No one disputes that the factors listed [*22] in *Dow Corning* and in the *Adelphia Arahova Motions Decision* are the factors that have been identified in the caselaw as factors that are to be considered. While the ACC Bondholder Group characterizes the enumerated factors as "platitudes" n15 (implying that these are less than worthy of being considered), I can't agree. They're objective factors which courts historically have considered in making determinations of this character, as a means of ensuring that at least these factors are considered. [HN6] While

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

they don't prohibit the consideration of other relevant factors, they nevertheless can't be ignored.

n15 *See Arg.* Tr. 125.

The first factor--the size and complexity of the case--favors preservation of the Debtors' exclusivity. This case is of unprecedented complexity and overwhelming size. As I indicated in the *Adelphia Arahova Motions Decision*:

The Debtors' cases involve 231 debtors, 6 different prepetition credit facilities, approximately 30 issuances of outstanding public indebtedness at [*23] different levels of a complex capital structure, numerous and exceedingly complex Intercreditor Dispute issues, SEC and DoJ investigations and settlements, massive ongoing litigation among stakeholders, the wholesale departure of Rigas Family management, the effects of the massive prepetition fraud of Rigas Family management, an approximately $ 17.6 billion sale transaction of unprecedented size and scope in a chapter 11 proceeding, and numerous other complicated matters and issues. n16

n16 *Adelphia Arahova Motions Decision,* 336 B.R. at 675.

The second factor--the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information--also favors the Debtors' retention of exclusivity. Here the Debtors, together with the Creditors' Committee, have already filed a plan, that can be quickly solicited. We aren't talking about the time to negotiate and file a plan; we're talking about the time to solicit acceptances to it, and we'll quickly learn if [*24] this plan gets the acceptances. In the context of a 4 year-old case, the 6 to 8 weeks of extra time now requested by the Debtors to solicit the acceptances and possibly secure confirmation is *de minimus.*

The third factor is the existence of good faith progress toward reorganization. Back in January, at the time of the Arahova Noteholders' effort to terminate exclusivity, I'd noted the Debtors' progress on the operational side, their cooperation with their stakeholders, and their good faith efforts to achieve emergence. n17 Since that time, the Debtors have shown me more of the same, bringing the Time Warner/Comcast sale to a successful conclusion, despite creditor feuding that subjected that sale to substantial risk. The failure to have confirmed a plan up to this point has hardly been the Debtors' fault; it's been the consequence of the continuing feuding between the Debtors' creditors. Now the creditors have

made substantial progress in coming to an agreement, and there has been huge progress toward reorganization. The Debtors, in cooperation with the Creditors' Committee, have now proposed a plan that has the apparent support of nearly all the unsecured creditor constituencies [*25] in this case, and several of the bank lender agents as well. This factor, which I regard as one of the more important factors under the facts of these cases, strongly favors retention of exclusivity by the Debtors.

n17 *See id.*

The fourth factor--the debtor's payment of bills as they become due--would be more of a factor if it were *not* satisfied here. I give it modest weight, since the Debtors have consistently met their financial obligations, and note only that it plainly doesn't warrant terminating exclusivity.

[HN7] The fifth factor is whether the debtor has demonstrated reasonable prospects for filing a viable plan. Here, of course, we aren't talking about the *filing* of a plan (since a plan has been filed, and its solicitation is imminent), but rather are focusing principally on whether this plan (or a modification of it) will secure favorable reaction from the Debtors' creditors. This factor requires only that a debtor be able to attain confirmation of at least *some* viable plan, n18 not necessarily [*26] the plan currently proposed. The ACC Bondholders Group hasn't persuaded me that the Debtors lack any realistic prospect of proposing a viable plan. The Debtors have already confirmed plans for the Joint Venture Debtors. And as I've noted, we have a plan that's about to be solicited, and the support of it by creditor groups holding billions of dollars in par amount strongly suggests that it's hardly dead on arrival, and is, at the least, viable. This factor, which I consider to be the most important under the facts of these cases, also strongly favors retention of exclusivity by the Debtors.

n18 See *Dow Corning,* 208 B.R. at 665. The ACC Noteholders assert potential non-confirmability of the Debtors' plan as a cause to terminate exclusivity. But the merits of the plan are to be examined at confirmation and don't play a meaningful role in the court's decision as to whether or not to terminate exclusivity.

The sixth factor is whether the debtor has made progress in negotiations with its creditors. [*27] Under the facts here, it overlaps materially with factors already discussed, and like those factors, also strongly favors the retention of exclusivity by the Debtors. In light of the

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

contentious nature of this case, the Debtors have made tremendous progress in their negotiations with their creditors. Securing the support of Tudor, Highfields, and, later, the Olympus and Ft. Myers Bondholders was a major step forward. So was securing agreements with secured lender agents Wachovia and the Bank of Montreal, and "nominal agents," such as Credit Suisse and the Royal Bank of Scotland.

The seventh factor--the time elapsed in the case-- seemingly would favor terminating the Debtors' exclusivity, which they have enjoyed for 4 years, but giving that factor material weight under the facts of this case would in my mind be inappropriate. This case has been anything but ordinary. For a large part of these 4 years, and to this day, the Debtors have been held hostage to bitter intercreditor disputes and have been peppered with motions and objections of unhappy creditors, who've shown little interest in maximizing the value of the estate for all creditors and who've attempted to tilt--and if necessary [*28] derail--the negotiation process to maximize their individual recoveries. At least in the absence of an agreement amongst creditors, it would hardly have been realistic to expect confirmation of a plan at an earlier time. And now that many creditors are in agreement, it would be premature to say that it's time for the Debtors to abandon their efforts to bring creditors together, and to subject the estate to the discord that would result from competing plans. That's particularly so since within just a few more weeks, we'll be able to ascertain, with much more precision, the level of creditor support for the Joint Plan. Spending a few more weeks with exclusivity would hardly be inappropriate in light of the complexity of this case.

The eighth factor is whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands. This, like one of the predecessor factors, would be significant if I were to find it to be present, but has no material weight here. While the ACC Bondholder Group contends that the Debtors are using exclusivity to "attempt to strongarm" them "into accepting the harsh economic impact" of the Joint [*29] Plan, and that such is "coercive, improper, and warrants a termination of exclusivity," n19 I see no basis for such a charge. Creditors at every level in the corporate capital structure, including at ACC Parent, have expressed support for the Joint Plan. While reasonable parties can disagree as to the benefits of the settlement the Joint Plan embodies, widespread approval doesn't make the plan coercive. I've already taken steps, in connection with the disclosure statement approval process, to ensure that the solicitation for the Joint Plan is *not* coercive. The ACC Bondholder Group's real issue is that other creditors (including some, like Tudor and Highfields, that are creditors of ACC Parent) may not

agree with the ACC Bondholder Group's views of the merits of the settlement, or as to the desirability or undesirability of settling at all. If the ACC Bondholder Group's unhappiness is shared by other creditors (and the ACC Bondholder Group will be free to express its unhappiness with the merits of the plan, and the reasons for it, to other creditors, of ACC Parent and other Debtors), the Joint Plan will presumably not secure the requisite votes.

n19 ACC Bondholder Group Exclusivity Motion P 57.

[*30]

The ninth factor--the existence of an unresolved contingency--is not, at this stage of the game, particularly relevant in either direction. The existence of a huge contingency--the outcome of the MIA--is in my mind not the kind of unresolved contingency that this factor addresses. In other cases, the "unresolved contingency" factor might support continuing exclusivity to see how the unresolved contingency pans out, but I don't see it as applicable here. It plainly doesn't cut in favor of terminating exclusivity in this case, at this time.

As I noted above, I agree with the ACC Bondholder Committee to a certain extent; I agree that the caselaw factors might not, in every case, by themselves be determinative. It has been held that the primary consideration for the court in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward, n20 and that this "is a practical call that can override a mere toting up of the factors." n21 I agree with that in substantial part--though I'd say that the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise [*31] be the case. Certainly practical considerations, or other considerations in the interests of justice, could override, in certain cases, the result after analysis of the nine factors. n22 But here, looking to a broader view, including examination of practical considerations and what is best in this case, leads me to the same result that the nine factors do. In this case, termination of exclusivity, just a few weeks before the Debtors might be in the position to confirm a plan, would be at odds with moving the case forward, and could be disastrous. Terminating exclusivity might well result in the solicitation of three or even more plans (not just one or two), with some addressing only parochial concerns. Or, given predictions creditors have made to me, several creditor constituencies might file their own "wish list" plans, with each being no more palatable to other constituencies than all of the proposals that I've seen to date. A competing plans battle now might well

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push this process back to square one. A competing plans battle would also likely drag out the solicitation process, [*32] subjecting the estate to substantial extra costs that might otherwise be avoided, including huge IPO costs associated with making Time Warner stock freely tradable.

n20 See *Dow Corning*, 208 B.R. at 670.

n21 *Id.*

n22 See *id.*

As we'll know whether the Joint Plan has secured the necessary votes and is confirmable in just a few weeks, this time is, in my view, exactly the wrong time to be terminating exclusivity. The ACC Bondholder Group's Motion to terminate exclusivity is denied.

II.

Continuing MIA process

The ACC Bondholder Group has also asked me to revive the MIA process. Such a request is premature. A plan has been proposed that will settle the MIA issues, and make the MIA process unnecessary, relieving creditors of the extraordinary costs that continued litigation would entail, and relieving the Debtors and their continuing employees of the enormous strain the MIA process created. This is not the time to announce the MIA process's revival. If the Joint Plan is not [*33] confirmed, there will be time enough to revive the MIA process then.

III.

Unsealing

The ACC Bondholder Group has also asked me to "declassify" a variety of documents that were submitted to me, and/or filed, under seal, including evidence and transcripts of proceedings in the MIA process, and documents (sometimes vaguely described) relating to the negotiations that led to the Joint Plan. This motion is granted, in part, subject to safeguards for the estate and its creditors.

Insofar as the "unsealing" motion involves "declassifying" evidence in the MIA process, and transcripts of the proceedings in the MIA process, I am granting the motion, subject to the rights of the Debtors to redact or withhold material that would otherwise be declassified, to excise material whose disclosure would be damaging to the interests of the estate. Frankly, I have doubts as to

whether review of the MIA evidence, or transcripts, would assist creditors in any significant way in evaluating the MIA dispute (which is extraordinarily complex), or in making predictions as to its outcome. But I'm willing to let creditors try, and (more realistically) to let plan supporters and opponents make arguments [*34] based on MIA evidence.

Based on my knowledge of the proceedings before me, I assume that some, but much less than all, of the evidence will still be redacted or withheld. I think that preserving the Debtors' right to protect sensitive evidence is essential to protecting the Debtors, and their stakeholders, from prejudice. And I don't believe that by authorizing the withholding or redaction of evidence whose disclosure would be commercially prejudicial, I would be materially impairing the value of the evidence made public. For all practical purposes, the evidence will then all be "out there," and I assume (without deciding) that with so much information having been provided, bondholders who had been restricted because of access to that information will now be free to trade. If any party in interest believes that the Debtors erred in making a decision to protect or disclose any particular matter, it should first try to resolve any dispute with the Debtors consensually, and in the event of an inability to agree, I will address any disputes by conference call.

I'll also declassify and unseal briefs and hearing or conference transcripts that were filed under seal in proceedings before [*35] me that related to the settlement process, except to the extent (which I believe is modest) that the submissions included commercially sensitive matter that is subject to protection by reason of my first ruling. That will result principally in the disclosure of certain briefs by bank lenders, and a conference transcript. I am otherwise denying authorization for disclosure of nonpublic matter relating to the settlement negotiation process. Such would be inconsistent with Rule 408 and the basic ground rules under which we encourage parties to negotiate settlements, and under which we request and authorize facilitative mediation. The wisdom of the interdebtor settlement that was ultimately proposed will of course be subject to full debate, assisted by very nearly wholly unfettered access to evidence and briefs introduced in the MIA process, in accordance with my earlier ruling.

Conclusion

The Debtors are to settle an order in accordance with the foregoing, as promptly as possible, but on no less than two business days' notice by hand or fax. The time to appeal or move for leave to appeal these determinations will run from the date of entry of the resulting order, and not from the [*36] time of this Bench Decision.

352 B.R. 578; 2006 Bankr. LEXIS 2348, *;
47 Bankr. Ct. Dec. 39

Dated: New York, New York                      *s/ Robert E. Gerber*

    September 19, 2006                          United States Bankruptcy Judge

A011

# EXHIBIT 2

LEXSEE



Cited
As of: Dec 28, 2006

**In re AMES DEPARTMENT STORES, INC., EASTERN RETAILERS SERVICE CORPORATION, et al., Debtors.**

**M-47 (PKL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1991 U.S. Dist. LEXIS 17074**

**November 25, 1991, Decided
November 25, 1991, Filed**

**PRIOR HISTORY:** [*1] Chapter 11 Reorganization Cases Nos. 90 B 11233 through 90 B 11285 (JAG)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner secured creditor filed a motion for an order withdrawing in part the reference of respondent debtor's bankruptcy cases to a bankruptcy court and terminating the exclusivity period under 11 U.S.C.S. § 1121.

**OVERVIEW:** The debtor, a retail store and its subsidiaries, filed a voluntary bankruptcy petition pursuant to Chapter 11. All of the cases were referred from the court to the bankruptcy court, and the bankruptcy court extended the debtor's period of exclusivity nine times. The creditor, who represented the secured creditors, filed a motion to withdraw the reference of the cases with respect to issues concerning the exclusivity period and to terminate the exclusivity period so that the creditor and others could file plans of reorganization. The creditor argued that the debtor continued to lose money during the extended periods of time and that the creditor's position was therefore being jeopardized by such extensions. However, in denying the creditor's motion, the court held that the bankruptcy court did not abuse its discretion in granting the extensions of time. The court noted that the cases were complex and the debtor had a large number of creditors to meet with in order to negotiate a suitable plan. The court also noted that it was unlikely that the bankruptcy court would grant any additional extensions of time.

**OUTCOME:** The court denied the creditor's motion.

**CORE TERMS:** exclusivity, reorganization plan, withdraw, extending, reorganization, consolidation, withdrawing, terminating, interfere, season, reasons stated, cause shown, emergency, discovery, latest, plan of reorganization, financial position, extension of time, written consent, termination, disruptive, intimately, selling, joined

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
*Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations*
[HN1] Under 28 U.S.C.S. § 157(d), the district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
[HN2] A district court has discretion in deciding whether to withdraw a reference to a bankruptcy court "for cause shown" under 28 U.S.C.S. § 157(d). Factors for the court to consider include the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN3] Under 28 U.S.C.S. § 157(b)(2)(A), "core proceedings" in the bankruptcy area include matters concerning the administration of the estate. The issue of a debtor's exclusivity period and the propriety of any extensions of the period is certainly a "core proceeding," and is particularly well suited for determination by the bankruptcy court. The bankruptcy court has the discretion, under 11 U.S.C.S. § 1121(d), to extend the debtor's exclusivity period. A district court will not lightly interfere with the bankruptcy judge's decision on this issue.

JUDGES: LEISURE

OPINION BY: PETER K. LEISURE

OPINION:

MEMORANDUM ORDER

LEISURE, District Judge:

Citibank, N.A. ("Citibank") has moved this Court on an emergency basis for an order withdrawing in part the reference of these cases to the United States Bankruptcy Court for the Southern District of New York and terminating the exclusivity periods under 11 U.S.C. § 1121. For the reasons stated below, Citibank's motion is denied.

Background

On April 25, 1990, Ames Department Stores, Inc. ("Ames Department Stores") and its 52 subsidiaries (collectively, the "Ames Group") filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the Southern District of New York. The Ames Group continues to operate its businesses and manage its properties as debtors-in-possession under 11 U.S.C. §§ 1107 and 1108. The Ames Group's bankruptcy cases were referred to the United States Bankruptcy Court for the Southern District of New York, pursuant to 28 U.S.C. §

157(a) and a standing Order of this Court dated July 10, 1984 (Ward, Acting C.J.). The cases were initially assigned to the Honorable Howard Buschman; after he resigned [*2] from the bench in early 1991, the cases were reassigned to the Honorable James Goodman, a visiting bankruptcy judge from the District of Maine.

Under 11 U.S.C. § 1121(b), the Ames Group had the exclusive right to file a plan or plans of reorganization for 120 days after the filing of the petitions. These exclusivity periods were to expire on August 23, 1990; the Bankruptcy Court has subsequently granted nine extensions of the exclusivity periods. The latest extension was granted on November 13, 1991, and extends the exclusivity periods until January 10, 1992.

Citibank, as agent for the secured lenders ("the banks") under a $ 900 million Credit Agreement dated October 28, 1988, and as amended, has moved this Court on an emergency basis for an order withdrawing the reference of these cases to the Bankruptcy Court with respect to issues concerning the exclusivity periods, and terminating those exclusivity periods so that Citibank and the banks can file their own plan of reorganization. Citibank argues that the Ames Group is moving too slowly in filing its reorganization plan, and that the banks are suffering because they cannot file their own reorganization plan during the exclusivity [*3] period. Citibank maintains that with each successive extension in the exclusivity period, the Ames Group is losing large sums of money and incurring excessive legal, investment banking, and other fees, and that by the time the Ames Group does finally file a plan of reorganization, the Ames Group's financial situation will have deteriorated so badly that the banks will not have any meaningful recovery.

The Ames Group opposes Citibank's motion, and has been joined in its opposition by the Official Committee of Unsecured Creditors of Ames Department Stores (the "Unsecured Creditors' Committee") and the Official Committee of Employees ("Employees' Committee") of Ames Department Stores. The Ames Group advances a number of arguments in opposition to Citibank's motion: the determination of a debtor's exclusivity period is a fundamental "core proceeding" and should be decided by the Bankruptcy Court; Judge Goodman has been intimately involved with these complicated cases and this Court should not interfere with his decision regarding the propriety of extending the exclusivity periods until January 10, 1992; Judge Goodman's most recent order extending the exclusivity periods states that the [*4] extension until January 10, 1992 "shall be the final extension of time" in these cases and that "no further extension shall be granted without either a showing of extraordinary cause" or upon written consent of all the parties, thus demonstrating the likelihood that the exclusivity

periods will not be further extended beyond January 10, 1992; and withdrawal of the reference and termination of the exclusivity plan so that the banks can file their own reorganization plan will have a disruptive effect on Ames Department Stores' all-important Christmas selling season.

Discussion

These bankruptcy cases involving the Ames Group were referred to the Bankruptcy Court under 28 U.S.C. § 157(a) and a standing order of this Court dated July 10, 1984 (Ward, C.J.). [HN1] Under 28 U.S.C. § 157(d), "the district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The burden is thus on Citibank to demonstrate why the Court should withdraw the reference with respect to issues concerning the exclusivity periods under 11 U.S.C. § 1121(b) and issue an order terminating the exclusivity periods. [*5]

[HN2] The Court has discretion in deciding whether to withdraw a reference to the Bankruptcy Court "for cause shown" under 28 U.S.C. § 157(d). Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.), 94 Bankr. 293, 295 (S.D.N.Y. 1988); Lesser v. A-Z Associates (In re Lion Capital Corp.), 48 Bankr. 329, 333 (S.D.N.Y. 1985). Factors for the Court to consider include "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." Holland America Insurance Co. v. Succession of Roy, 777 F.2d 992, 999 (5th Cir. 1985).

Citibank's motion is to withdraw the reference of these bankruptcy cases to the Bankruptcy Court with respect to issues concerning the Ames Group's exclusivity periods under 11 U.S.C. § 1121(b). [HN3] Under 28 U.S.C. § 157(b)(2)(A), "core proceedings" in the bankruptcy area include "matters concerning the administration of the estate." The issue of a debtor's exclusivity period and the propriety of any extensions of the period is certainly a "core proceeding," see, e.g., [*6] In re Texaco Inc., 76 Bankr. 322, 328 (Bankr. S.D.N.Y. 1987), and is particularly well suited for determination by the Bankruptcy Court. The Bankruptcy Court has the discretion, under 11 U.S.C. § 1121(d), to extend the debtor's exclusivity period. See In re McLean Industries, Inc., 87 Bankr. 830, 833 (Bankr. S.D.N.Y. 1987). This Court will not lightly interfere with the Bankruptcy Judge's decision on this issue; in order to prevail on its motion, Citibank must persuade the Court that the Bankruptcy Judge's latest extension of the exclusivity periods to January 10, 1992 was an abuse of his discretion.

Judge Goodman of the Bankruptcy Court has been intimately involved with these bankruptcy cases since the beginning of this year. The decision of whether to extend the exclusivity periods under 11 U.S.C. § 1121(d) involves a careful balancing of competing factors and a consideration of the interests of the many parties involved -- including the Ames Group, Citibank and the banks, the Unsecured Creditors' Committee, the Employees' Committee, the Statutory Bondholders' Committee of Ames Department Stores, and the Official Committee of Unsecured Creditors [*7] of the Subsidiaries of Ames Department Stores.

With each extension of the exclusivity periods that Judge Goodman has granted, he has monitored the Ames Group's progress in putting together a reorganization plan. Although the speed with which the Ames Group is progressing is not satisfactory to Citibank, and the Court certainly understands Citibank's desire to have the proceedings advance more quickly, the Ames Group is nonetheless working toward filing its own reorganization plan. Indeed, during the period from October 11, 1991 to November 14, 1991, a total of 16 meetings took place between the financial advisors working on these cases as well as between the Ames Group and the various creditor groups. See Affidavit of John M. Friedman, Jr., Esq. of Dewey Ballantine, counsel for the Unsecured Creditors' Committee, sworn to on November 18, 1991, para. 16.

Citibank and the Ames Group have presented sharply differing views of the Ames Group's financial position. Judge Goodman is in a far better position than is this Court to evaluate the Ames Group's financial position as it relates to the appropriate length of the exclusivity periods. Judge Goodman has factored such financial considerations [*8] into his decisions to extend the exclusivity periods, and Citibank has not demonstrated that Judge Goodman has acted improperly with respect to these considerations.

The Court cannot conclude that Judge Goodman's determination to extend the exclusivity periods until January 10, 1992 was inappropriate or an abuse of his discretion. The purpose of the Bankruptcy Code's exclusivity period is to allow the debtor flexibility to negotiate with its creditors. Given the complexity of these cases and the large number of creditors and other interested parties involved, it is not surprising that negotiations have been protracted and that the circumstances have warranted extensions of the exclusivity periods. Judge Goodman has carefully considered all of these factors in deciding to grant the Ames Group's requests for extensions.

An additional factor -- and perhaps the most important factor of all -- that justifies Judge Goodman's most recent extension to January 10, 1992, and militates

against this Court's intrusion into the proceedings to terminate the exclusivity periods, is the upcoming Christmas selling season. A termination of the exclusivity periods now would likely have a disruptive effect [*9] on the Ames Group's business operations during one of the retail industry's most crucial sales periods. Giving the Ames Group another seven weeks in which to file its own reorganization plan will not only avoid such a disruption in the Ames Group's operations but will also allow the Ames Group to factor its Christmas season sales results into a proposed reorganization plan.

The Court also notes that Judge Goodman's most recent order extending the exclusivity periods states that "this Order shall be the final extension of time under Section 1121(d) of the Code granted and no further extension shall be granted without either a showing of extraordinary cause or upon the written consent of all of the official committees appointed in these cases and Citibank, N.A., as Agent for the Ames Group's pre-petition secured creditors." See Order Under 11 U.S.C. § 1121(d), Granting Extension of Ames Group's Exclusive Periods in Which to File Plan(s) of Reorganization and Solicit Acceptances Thereof, para. 3 (Bankr. S.D.N.Y. Nov. 13, 1991) (Goodman, J.). Although there is certainly no guarantee that, on or before January 10, 1992, the Ames Group will not seek yet another extension in the exclusivity [*10] periods or that Judge Goodman will not grant such a request, Judge Goodman's order makes it clear that the Ames Group will have a very heavy burden to meet should it decide to seek another extension beyond January 10, 1992. Furthermore, during oral arguments on the instant motion held on November 19, 1991, George A. Zimmerman, Esq., counsel for the Ames Group, indicated to the Court that it was most unlikely that the Ames Group would seek another extension in the exclusivity periods. There is, therefore, no compelling reason for this Court to interfere with Judge Goodman's carefully considered determination that the exclusivity periods should be extended for a comparatively brief period, until January 10, 1992.

Matters that have been brought to the Court's attention after oral arguments do not change this result. Counsel for Citibank has informed the Court that on November 19, 1991, the Unsecured Creditors' Committee filed a motion (in which the Ames Group has joined) in the Bankruptcy Court for substantive consolidation of the Ames Group pursuant to 11 U.S.C. § 302. Citibank contends that the filing of the motion "effectively eliminates the possibility of a consensual plan being [*11] filed" by January 10, 1992, and that the motion "will require significant discovery and its resolution will take many months." Letter of Ronald DeKoven, Esq., counsel for Citibank, dated November 21, 1991. Counsel for the Ames Group responds that significant discovery relevant to the motion for substantive consolidation has already been completed in connection with a previous adversary proceeding commenced by the Ames Group, and notes that the Ames Group's joinder in the motion proposes that the Bankruptcy Court set a schedule in order to resolve the motion within the time frame established in Judge Goodman's most recent order extending the exclusivity period. Letter of George A. Zimmerman, Esq., counsel for the Ames Group, dated November 22, 1991. Citibank has not persuaded the Court that the motion for consolidation substantially increases the likelihood that the Ames Group will seek another extension in the exclusivity periods or that Judge Goodman would grant such a request. The Bankruptcy Court is in the best position to evaluate what impact, if any, the motion will have on the Ames Group's ability to file its reorganization plan by January 10, 1992, and Judge Goodman will undoubtedly [*12] consider that in deciding the motion.

Conclusion

For the reasons stated above, Citibank's motion for an order withdrawing in part the reference of these cases to the Bankruptcy Court and terminating the Ames Group's exclusivity periods is denied. The cases are remanded to the Bankruptcy Court in their entirety.

*SO ORDERED*

New York, New York
November 25, 1991

Peter K. Leisure

U.S.D.J.

# EXHIBIT 3

LEXSEE



Analysis
As of: Dec 28, 2006

In re: BURNS AND ROE ENTERPRISES, INC. Debtor. CONTINENTAL CASU-
ALTY COMPANY AMERICAN CASUALTY COMPANY, Appellants, vs. BURNS
AND ROE ENTERPRISES, INC., Appellee.

Civil Action No. 05-2529 (KSH) and Civil Action No. 05-4125 (KSH)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2005 U.S. Dist. LEXIS 26247

November 2, 2005, Decided
November 3, 2005, Filed

**NOTICE:** [*1] NOT FOR PUBLICATION

**PRIOR HISTORY:** Chapter 11 Case No. 00-41610 RG

**DISPOSITION:** Decisions of the bankruptcy court af-
firmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee debtor, which
had filed a Chapter 11 bankruptcy petition in the United
States Bankruptcy Court for the District of New Jersey,
had been granted 15 extensions under 11 U.S.C.S. §
1121(d) of the period of exclusivity in which to file and
solicit acceptances of a reorganization plan. Appellant
insurers sought review of the bankruptcy court's grant of
the fourteenth and fifteenth motions for extension.

**OVERVIEW:** The debtor stated that its Chapter 11 fil-
ing resulted from asbestos-related personal injury com-
plaints, coupled with the refusal by one of the insurers to
defend or indemnify the debtor in asbestos lawsuits. The
fourteenth extension of exclusivity was granted because
of a delay in approving a settlement with another insur-
ance carrier and in order to allow the debtor to conform
its plan to a decision of the United States Court of Ap-
peals for the Third Circuit concerning use of channeling
injunctions. The bankruptcy court found good cause for
the fifteenth extension based on the size and complexity
of the case, the debtor's good faith progress toward reor-
ganization, and the absence of any showing that the

debtor was seeking to pressure creditors. The district
court found no abuse of discretion in the granting of the
extensions based on those factors. The bankruptcy court
could determine the size and complexity of the case
without additional affirmative evidence, nor was addi-
tional evidence required as to the settlement. The bank-
ruptcy court appropriately found that the requests for
extensions did not breach the debtor's fiduciary duty as a
debtor-in-possession.

**OUTCOME:** The bankruptcy court's orders were af-
firmed.

**CORE TERMS:** exclusivity, settlement, reorganization,
legislative history, bankruptcy case, plan of reorganiza-
tion, abuse of discretion, accede, sufficient cause, pro-
gress, affirmative evidence, reorganization plan, non-
creditor, channeling, injunction, claimants, contingen-
cies, unresolved, insurers, judicial notice, debtor-in-
possession, asbestos-related, adversarial, termination,
contested, extending, evidenced, asbestos, hostage, ex-
tension of time

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals >*
*Standards of Review > Abuse of Discretion*
*Bankruptcy Law > Reorganizations > Plans > Eligible*
*Proponents*

[HN1] A district court reviews a bankruptcy court's decision to extend a debtor's periods of exclusivity to file a reorganization plan for abuse of discretion. Abuse of discretion can lie in either the failure to apply the proper legal standard or to follow proper procedures in making the determination. Abuse of discretion can also be found if the bankruptcy court's decision was based on clearly erroneous findings of fact.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*
[HN2] Any legal interpretations of a bankruptcy court receive plenary review.

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN3] A district court has jurisdiction to hear an appeal from an order of a bankruptcy court pursuant to 28 U.S.C.S. § 158(a)(2), which states that the district courts of the United States shall have jurisdiction to hear appeals from interlocutory orders and decrees issued under 11 U.S.C.S. § 1121(d) increasing or reducing the time periods referred to in 11 U.S.C.S. § 1121. 28 U.S.C.S. § 158(a)(2).

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN4] The Bankruptcy Code allows a Chapter 11 debtor the exclusive right to file a reorganization plan for the first 120 days that the debtor is in bankruptcy. 11 U.S.C.S. § 1121(b). Under § 1121(d), a bankruptcy court may increase the debtor's exclusivity period beyond the initial 120 days on request of a party in interest "for cause," after notice and a hearing. Whether or not to grant an extension of exclusivity is a matter of discretion based on all facts and circumstances, but the discretion is limited by the requirement that cause be shown. However, a bankruptcy court has broad discretion to determine what is sufficient cause in each individual case.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN5] Neither the Bankruptcy Code nor its legislative history defines "cause" for purposes of an extension of exclusivity under 11 U.S.C.S. § 1121(d). However, the examples given in the legislative history are instructive. Cause may be established by a showing of some promise of probable success. Cause might include an unusually large or an unusually small case, delay by the debtor or

recalcitrance among creditors. Many courts have attempted to define "cause" in the context of an extension of the exclusivity period. A huge debtor with a complex financial structure generally constitutes cause for extending the exclusivity periods. A debtor's showing of progress in formulating a plan in the face of unusual procedural or substantive difficulties or developments in the case may establish the requisite "good cause" for extension of the exclusivity periods. Cause for an extension of exclusivity may be found where sheer mass, weight, volume and complication of the filings justify a shakedown period. Another factor that has been considered is whether progress is being made regarding acceptance of the plan.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN6] Both the legislative history and the courts have discussed when it is not appropriate to grant an extension of exclusivity under 11 U.S.C.S. § 1121(d). For example, an extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory. Extensions are impermissible if they are for the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN7] See 11 U.S.C.S. § 1121(d).

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN8] The decision of whether or not to grant an extension of exclusivity is squarely within the discretion of a bankruptcy court, subject to a finding of cause. The legislative history of 11 U.S.C.S. § 1121(d) does not show that Congress disfavors repeated extensions of exclusivity, nor does it mention repeated extensions of exclusivity at all. Rather, the legislative history is clear that the point of exclusivity is to promote an environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated. Presumably, therefore, so long as exclusivity is extended upon the bankruptcy court's finding of cause and where the ultimate goals are to rehabilitate the debtor's business and negotiate a consensual plan of reorganization, congressional intent is satisfied. The legislative history shows that Congress disfavors "undue extensions" that result in excessively prolonged and costly delay, to the detriment of creditors. However, a bankruptcy court's finding of cause

precludes such undue extensions, thereby preventing any excessive delays.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN9] The period of debtor exclusivity to file a reorganization plan is designed to limit the delay that makes creditors the hostages of Chapter 11 debtors.

*Bankruptcy Law > General Overview*
[HN10] The Bankruptcy Code is intended to create a relative balance of negotiating strength among debtor and creditor, not "among interested parties."

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN11] Extensions of exclusivity under 11 U.S.C.S. § 1121(d) should not be granted "routinely" or "cavalierly." However, where the exclusive period is insufficient because of extraneous factors, exclusivity should be continued.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN12] The legislative history surrounding 11 U.S.C.S. § 1121 indicates that Congress has enacted the limited exclusivity period to avoid imbalance in the bargaining leverage between a bankrupt debtor and its creditors.

*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview*
*Bankruptcy Law > Practice & Proceedings > Contested Matters*
[HN13] Disputes within a bankruptcy case are divided into two types: adversarial proceedings and contested matters.

*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview*
*Evidence > Procedural Considerations*
[HN14] An adversarial proceeding within a bankruptcy case should be treated as "an independent litigation" and the bankruptcy court may not consider documents filed only in the underlying bankruptcy case unless they were also offered at the hearing.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*

*Evidence > Procedural Considerations*
[HN15] It is a fundamental concept of procedural due process that a party to litigation is entitled to have the evidence relied on by his opponent presented at the hearing of his case.

*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview*
*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Evidence > Judicial Notice > Adjudicative Facts > General Overview*
[HN16] In a dispute within a bankruptcy case, a bankruptcy court cannot properly use documents filed only in the underlying bankruptcy case unless that use can be justified under the judicial notice doctrine. However the procedures governing contested matters are less formal than those governing adversarial proceedings. Therefore, a bankruptcy court's decision to consider the entire case file is justified under the judicial notice doctrine where the contested matter is sufficiently associated with the general administration of the debtor's estate.

*Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview*
*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN17] An extension of a bankruptcy debtor's period of exclusivity to file a reorganization plan is a contested matter, not an adversarial proceeding.

*Bankruptcy Law > Practice & Proceedings > General Overview*
*Evidence > Judicial Notice > Adjudicative Facts > General Overview*
[HN18] The existence of a settlement, as evidenced, inter alia, by an order approving the settlement, is the type of information about which a bankruptcy court is entitled to take judicial notice.

*Bankruptcy Law > Practice & Proceedings > Appeals > General Overview*
[HN19] An issue in an bankruptcy appeal that is raised for the first time in an appellate brief will not be considered by a district court on appeal.

*Bankruptcy Law > Practice & Proceedings > Appeals > General Overview*

[HN20] A district court acts as an appellate court when considering an appeal of an order of a bankruptcy court and may review both claims that were argued before the court below as well as issues that were ruled on by the court below.

COUNSEL: For CONTINENTAL CASUALTY COMPANY, AMERICAN CASUALTY COMPANY, Appellants: CUSHING O. CONDON, II, FORD, MARRIN, ESPOSITO, WITMEYER & GLESER, LLP, UPPER MONTCLAIR, NJ.

For BURNS AND ROE ENTERPRISES, INC., Appellee: JACK MICHAEL ZACKIN, SILLS CUMMIS EPSTEIN & GROSS PC, NEWARK, NJ.

JUDGES: Katharine S. Hayden, U.S.D.J.

OPINION BY: Katharine S. Hayden

OPINION: KATHARINE S. HAYDEN, U.S.D.J.

I. INTRODUCTION

Appellee-debtor Burns and Roe Enterprises, Inc. ("appellee" or "debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 4, 2000 and continues to operate the business as the debtor-in-possession. On April 11, 2005, U. S. Bankruptcy Judge Rosemary Gambardella granted debtor its fourteenth extension of exclusivity in which to file and solicit acceptances of a plan of reorganization pursuant to 11 U.S.C. § 1121(d) to May 16, 2005 and July 15, 2005, respectively. On June 29, 2005, Judge Gambardella granted debtor's fifteenth motion to extend the exclusivity periods to August 15, 2005 and October 15, 2005. Appellants [*2] Continental Casualty Company and American Casualty Company (collectively "CNA" or "appellants") appeal both orders. Appellants request that the Court reverse these two extension orders; enter an order providing that the debtor's exclusivity period for filing a plan of reorganization is terminated effective April 11, 2005 (alternatively June 29, 2005); prohibit debtor from requesting or receiving any other extensions of exclusivity; and provide other further relief as the Court deems just. For the reasons that follow, the decisions of the bankruptcy court are **affirmed.**

II. BACKGROUND

In its brief on the first appeal, the debtor states that "the Chapter 11 filing was precipitated by massive increases in asbestos-related personal injury complaints filed against [it], coupled with the refusal of [CNA] to defend or indemnify the Debtor in asbestos lawsuits, despite a 16-year history of contributing to defense and

settlement costs." Appellee's Brief at 2, No. 05-2529 (July 7, 2005). Upon the filing of the bankruptcy, the United States Trustee appointed a Committee of Unsecured Creditors ("Creditors' Committee") and, as well, a Future Claims Representative ("FCR") to [*3] represent the present and future asbestos-related personal injury claimants. Pursuant to § 524(g) of the Bankruptcy Code, the debtor has set up a trust that will assume all present and future liabilities incurred by personal injury, wrongful death, or property-damage actions caused by asbestos. Upon confirmation of a reorganization plan that includes a § 524(g) trust, a bankruptcy court issues a "channeling injunction" that prevents anyone from taking legal action against the debtor for claims that should be channeled to the trust. Both the trust and the channeling injunction must be included in the reorganization plan, and 75% of the class claimants who will be channeled to the trust (here, represented by the FCR) must vote in favor of the reorganization plan in order for the § 524(g) trust mechanism to be utilized. If approved, the combination of the trust and the channeling injunction allows a company to emerge intact from Chapter 11 bankruptcy essentially free from both present and future asbestos-related tort liability.

Because the only two extensions at issue in these appeals are the fourteenth and fifteenth, the details of the early background of the [*4] Chapter 11 case will not be addressed. On December 15, 2003, debtor filed its first amended Plan of Reorganization as well as a Disclosure Statement, and was under a deadline of February 13, 2004 to solicit acceptances to its Plan. Due in part to the numerous objections filed to both the Plan and the Disclosure Statement, including objections by appellants, the bankruptcy court extended debtor's solicitation deadline numerous times. The bankruptcy court approved the Disclosure Statement on June 4, 2004 after two amendments, but did not approve the Plan of Reorganization pending discovery and hearings on the objections. At a status conference on November 18, 2004 debtor informed the bankruptcy court that it had reached a settlement with one of its insurance carriers, Hartford Accident and Indemnity Company ("Hartford"), under which Hartford would pay the bankruptcy estate $ 62.5 million to fund the § 524(g) trust for asbestos claimants. If approved, the Hartford settlement would necessitate changes to the then-filed Plan of Reorganization. On December 6, 2004, debtor filed a motion for approval of the settlement to which appellants objected. The court overruled the appellants' objections [*5] to the settlement and directed the parties to agree on the form of the orders. The court also granted debtor the thirteenth extension of its period of exclusivity to file and solicit acceptances of its Plan to March 15, 2005 and May 15, 2005, respectively. Because the parties were unable to agree on their own to the form of orders approving the

Hartford settlement, the bankruptcy court drafted and entered the approval order on February 17, 2005.

At this point, however, debtor was compelled to draft substantial changes to its Plan in order to comply with the decision in In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004), which was issued on December 2, 2004. There the Third Circuit held that a channeling injunction could not be used to shield non-debtor affiliates against independent asbestos-related claims, and it invalidated a reorganization plan with a channeling injunction that had the effect of "extending bankruptcy relief to two non-debtor companies outside of bankruptcy." Id. at 237. Believing this ruling would preclude approval of its then-existing Plan, debtor began making changes. Because of the need to change the Plan as well [*6] as the delay in the approval of the Hartford settlement, debtor requested another extension. The bankruptcy court held a hearing on April 11, 2005, at which both the Creditors' Committee and the FCR supported the extension motion. The bankruptcy court granted debtor the extensions to May 16, 2005 and July 15, 2005 for the filing and solicitation of acceptances of its Plan. This was the fourteenth extension granted to debtor, and is the subject of appellants' first appeal to this Court, # 05-2529.

In granting that extension, the bankruptcy court held that debtor had presented sufficient cause to justify extending its period of exclusivity because, first, the Hartford settlement was a significant step in the reorganization in that it would allow the debtor to file a plan in which the trust for future asbestos claimants would be funded by $ 62.5 million. Transcript of Hearing 62:6-14, In Re Burns & Roe Enter., Inc., No. 00-41610 (Bankr. D. N.J., April 11, 2005). Second, negotiations were taking place with both the Creditors' Committee and the FCR regarding distribution of the trust proceeds, which the bankruptcy court deemed to be evidence of debtor's good faith progress toward reorganization. [*7] Id. 62:15-19. The bankruptcy court also found that the size and the complexity of the case as well as the need to comply with the Third Circuit decision in Combustion Engineering contributed to sufficient cause to grant debtor's request for extension. Id. 63:10-20. The bankruptcy court found that the debtor was making significant progress in its reorganization and would continue to make progress going forward. Id. 63:16-20. It also found that there were unresolved contingencies that would have a substantial effect on the debtor's Plan if they were resolved. Id. 64:1-5. Finally, the bankruptcy court did not find any evidence that the debtor was seeking the extension of time in order to pressure creditors to accede to reorganization demands. Id. 63:1-4.

Before the appeal of the fourteenth extension was decided, debtor moved for another extension of its exclu-

sivity period. The bankruptcy court heard this motion on June 29, 2005, and granted debtor's request for extension of exclusivity and solicitation of acceptances to August 15 and October 15, 2005, respectively. This was the fifteenth extension granted to debtor, and is the subject of appellants' second appeal [*8] to this Court, # 05-4125. In granting this extension, the bankruptcy court found that the record supported cause for the extension because of the size and complexity of the case, the good faith progress towards reorganization, and the bankruptcy court's belief that the debtor was not seeking extension of exclusivity to pressure creditors to accede to reorganization demands. Transcript of Motion Hearing 48:5-25, In Re Burns & Roe Enter., Inc., No. 00-41610 (Bankr. D. N.J., June 29, 2005). In addition, the bankruptcy court found that the resolution of the unresolved contingencies was "under way." Id. 49:5-11. The bankruptcy court also noted that both the Creditors' Committee and the FCR again supported the extension. Id. 48:25-49:4. Finally, the bankruptcy court stated that it was "satisfied that there has not been the type of prejudice to [the appellants] to tip the balance in favor of ending exclusivity today." Id. 49:15-21. The bankruptcy court declined to declare that this was debtor's final extension, but cautioned the debtor that it would "take that request into consideration" if necessary at a later date. Id. 50:1-11.

## III. STANDARD OF REVIEW [*9]

[HN1] This Court reviews a bankruptcy court's decision to extend debtor's periods of exclusivity for abuse of discretion. In re Hoffinger Indus., Inc., 292 B.R. 639, 642 (B.A.P. 8th Cir. 2003). See also In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 131 (D. N.J. 1995). Abuse of discretion can lie in either the failure to "apply the proper legal standard or to follow proper procedures in making the determination." Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc., 50 F.3d 253, 257 (3d Cir. 1995). Abuse of discretion can also be found if the bankruptcy court's decision was based on clearly erroneous findings of fact. Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir.1988). [HN2] Any legal interpretations of the bankruptcy court receive plenary review. In re Engel, 124 F.3d 567, 571 (3d Cir. 1997).

## IV. JURISDICTION

[HN3] This Court has jurisdiction to hear an appeal from an order of the bankruptcy court pursuant to 28 U.S.C.A. § 158(a)(2), which states that "the district courts of the United States shall have jurisdiction to hear appeals . . . from interlocutory orders and decrees [*10] issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title . . . ." 28 U.S.C.A. § 158(a)(2). See also In re

White Beauty View, Inc., 841 F.2d 524, 527 (3d Cir.1988).

## V. DISCUSSION

### A. Extensions of Exclusivity Under the Bankruptcy Code - What is "Cause"?

[HN4] The Bankruptcy Code allows a Chapter 11 debtor the exclusive right to file a reorganization plan for the first 120 days that the debtor is in bankruptcy. 11 U.S.C. § 1121(b). Under § 1121(d), a bankruptcy court may increase the debtor's exclusivity period beyond the initial 120 days on request of a party in interest "for cause," after notice and a hearing. Whether or not to grant an extension of exclusivity "is a matter of discretion based on all facts and circumstances," In re Mid-State Raceway, Inc., 323 B.R. 63, 68 (Bankr. N.D.N.Y. 2005), but the discretion "is limited by the requirement that cause be shown . . . ." In re Perkins, 71 B.R. 294, 298 (W.D. Tenn. 1987). However, a bankruptcy court has "broad discretion to determine what is sufficient cause [*11] in each individual case." In re Sharon Steel Corp., 78 B.R. 762, 765 (Bankr. W.D. Pa. 1987).

[HN5] Neither the Bankruptcy Code nor its legislative history defines "cause." However, the examples given in the legislative history are instructive. According to the Senate Report, cause may be established by "a showing of some promise of probable success." S. Rep. No. 95-989, at 118 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5904. The House stated that "cause might include an unusually large or an unusually small case, delay by the debtor or recalcitrance among creditors." H.R. Rep. No. 95-595, at 406 (1977), as reprinted in 1978 U.S.C.C.A.N. 5787, 6362. Many courts have attempted to define "cause" in the context of an extension of the exclusivity period. A "huge debtor with a complex financial structure generally constitute[s] cause for extending the exclusivity periods." In re Texaco, Inc., 76 B.R. 322, 326 (Bankr. S.D. N.Y. 1987). "[A] debtor's showing of progress in formulating a plan in the face of . . . unusual procedural or substantive difficulties or developments in the case may . . . establish the requisite "good cause" for extension [*12] of the exclusivity periods." In re Nicolet, Inc., 80 B.R. 733, 742 (Bankr. E.D. Pa. 1987). Cause for an extension of exclusivity may be found where "sheer mass, weight, volume and complication of the [] filings . . . justify a shakedown period." In re Manville Forest Prod.Corp., 31 B.R. 991, 994-995 (S.D.N.Y. 1983). Another factor that has been considered is whether progress is being made regarding acceptance of the plan. In re Crescent Mfg. Co., 122 B.R. 979, 982 (Bankr. N.D. Ohio 1990).

[HN6] Both the legislative history and the courts have also discussed when it is not appropriate to grant an extension. For example, "an extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 95-989, at 118 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5904. "Extensions are impermissible if they are for the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute." Matter of Lake in the Woods, 10 B.R. 338, 345-346 (D.C. Mich. 1981).

### B. APPELLANTS' [*13] FIRST ARGUMENT: § 1121(d) disfavors repeated extensions of debtor's period of exclusivity.

Appellants first argue that the legislative history of § 1121(d) shows that Congress disfavors repeated extensions of debtor's exclusivity. They contend that setting limits on a debtor's exclusivity period is meant to balance the negotiating strength between parties and expedite the reorganization process. Appellants' Brief at 5-6, No. 05-2529 (June 10, 2005). They argue that the allowable bases for cause decrease over time, and that extensions should not be routinely or cavalierly granted. Id. at 6-7. Appellants also state that since the 2005 amendments to the Bankruptcy Code provide additional limitations on the debtor's exclusivity periods, Congress has shown its disapproval of "cavalier extensions by the courts." Id. at 8, citing to The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, PL 109-8, April 20, 2005, 119 Stat 23.

In opposition, appellee argues that the decision of whether or not to extend the debtor's period of exclusivity is entrusted to the discretion of the bankruptcy court. Appellee Brief at 9, No. 05-2529 (July 7, 2005). Congressional intent, [*14] appellee asserts, is best discerned by the statutory language of § 1121(d), which reads, in pertinent part, [HN7] "the court may for cause reduce or increase" the exclusivity period of the debtor. Id. As further evidence of the discretionary standard, appellee notes that an order of the bankruptcy court that extends the period of exclusivity will only be set aside if this Court finds an abuse of discretion. Id.

[HN8] The decision of whether or not to grant an extension of exclusivity is squarely within the discretion of the bankruptcy court, subject to a finding of cause. See discussion supra Part V.A. See also In re Mid-State Raceway, Inc., 323 B.R. 63 (Bankr. N.D. N.Y. 2005); In re Sharon Steel Corp., 78 B.R. 762 (Bankr. W.D. Pa. 1987); In re Perkins, 71 B.R. 294 (W.D. Tenn. 1987). Contrary to appellants' assertion, the legislative history of § 1121(d) does not show that Congress disfavors repeated extensions of exclusivity, nor does it mention repeated extensions of exclusivity at all. Rather, the legislative history is clear that the point of exclusivity is "to

promote an environment in which the debtor's business may [*15] be rehabilitated and a consensual plan may be negotiated." H.R. Rep. No. 103-835, at 36 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3340, 3344. Presumably, therefore, so long as exclusivity is extended upon the bankruptcy court's finding of cause and where the ultimate goals are to rehabilitate the debtor's business and negotiate a consensual plan of reorganization, congressional intent is satisfied. The Court notes that the legislative history shows that Congress disfavors *"undue* extension[s]" that result in "excessively prolonged and costly delay, to the detriment of creditors." Id. (emphasis added). However, a bankruptcy court's finding of cause precludes such undue extensions, thereby preventing any excessive delays. Therefore, this Court finds that the bankruptcy court did not abuse its discretion when weighing appellants' objections in light of the legislative history and purpose of § 1121(d).

Appellants point to In re Timbers of Inwood Forest Association, Ltd., 808 F.2d 363 (5th Cir. 1987) (en banc), aff'd United Sav. Asso. v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988), for the proposition [*16] that the period of debtor exclusivity was "meant to free parties from their role as debtor's hostages and, thereby, to expedite the reorganization process." Appellants' Brief at 5-6, No. 05-2529 (June 10, 2005). The Court finds that appellants' reliance on Timbers of Inwood Forest is misplaced. That court did not state that the period of debtor exclusivity was "meant to free *parties* from their role as debtor's hostages," as appellants state. Instead, the Fifth Circuit stated in Timbers that [HN9] the period of debtor exclusivity "was designed . . . to limit the delay that makes *creditors* the hostages of Chapter 11 debtors." Timbers, 808 F.2d at 372 (emphasis added).

Appellants state that "courts have recognized that the Bankruptcy Code was intended to create 'a relative balance of negotiating strength' among interested parties." Appellants' Br. at 6, No. 05-2529 (June 10, 2005), relying on In re Lake in the Woods, 10 B.R. 338 (E.D. Mich. 1981). But this mischaracterizes the holding in Lake in the Woods. In that case, the court stated that [HN10] the Code was intended to create "a relative balance of negotiating strength among *debtor and creditor,* [*17] " not, as appellants state, "among interested parties." Lake in the Woods, 10 B.R. at 343. Appellants are not creditors of this debtor, but non-creditor insurance carriers who issued policies to the debtor. The Creditors' Committee supports the debtor's request for an extension in the exclusivity period, as does the FCR. Presumably, therefore, neither the creditors nor the future claimants are being held hostage by these extensions in the debtor's exclusivity period. Furthermore, as the bankruptcy court pointed out, there remains some dispute as to whether

appellants are even "parties in interest" such that they are entitled to make the present objections or submit competing reorganization plans. Tr. of Hr'g 61:7-13 (Bankr. D. N.J. April 11, 2005).

Appellants cite In re McLean Industries, Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) for its observation that [HN11] extensions of exclusivity should not be granted "routinely" or "cavalierly." Appellants' Br. at 6, No. 05-2529 (June 10, 2005). In context, however, while the court made that warning, it also stated that "where the exclusive period is insufficient because of extraneous factors, exclusivity [*18] *should be continued."* McLean Industries, Inc., 87 B.R. at 834 (emphasis added). In the case before this Court, the bankruptcy court found numerous extraneous factors provided sufficient cause to extend the debtor's periods of exclusivity and made findings to that effect. In granting the extension that is the subject of the first appeal, the bankruptcy court found the following reasons contributed to a finding of cause. First, the debtor was making good faith progress toward reorganization, as evidenced by the Hartford settlement and the ongoing negotiations between the debtor, the Creditor's Committee, and the FCR. Tr. of Hr'g 62:6-19 (Bankr. D. N.J., April 11, 2005). Second, the debtor had to change its Plan to comply with the Third Circuit decision in Combustion Engineering. Id. 63:10-20. Third, the size and complexity of the case, in combination with other factors, warranted the extension. Id. 63:10-20. Fourth, the bankruptcy court deemed that the debtor would continue to make progress toward reorganization. Id. 63:16-20. Fifth, the existence of unresolved contingencies that would have a substantial effect on the debtor's Plan if they were resolved. [*19] Id. 64:1-5. Finally, the bankruptcy court did not find any evidence that the debtor was seeking the extension of time in order to pressure creditors to accede to reorganization demands. Id. 63:1-4. In granting the extension that is the subject of the second appeal, the bankruptcy court found the following reasons contributed to a finding of cause. First, the size and complexity of the case, in combination with other factors, warranted the extension. Tr. of Mot. Hr'g 47:22-48:2 (Bankr. D. N.J., June 29, 2005). Second, the debtor's good faith progress towards reorganization justified an extension. Id. 48:5-21. Third, the bankruptcy court deemed that the debtor was not seeking extension of exclusivity to pressure creditors to accede to reorganization demands. Id. 48:5-25. Fourth, the resolution of the unresolved contingencies was "under way." Id. 49:5-11. Fifth, both the Creditors' Committee and the FCR again supported the extension. Id. 48:25-49:4. Finally, the bankruptcy court stated that it was "satisfied that there has not been the type of prejudice to [the appellants] to tip the balance in favor of ending exclusivity today." Id. 49:15-21. This Court [*20] easily finds that

ganization and proposal of a plan," <u>Parker Street Florist, 31 B.R. at 207,</u> *not* as appellants suggest [*30] in their brief, the lack of evidence proffered to support the debtor's alleged cause, Appellants' Brief at 10, No. 05-2529 (June 10, 2005). The decision rejected the *cause* itself, not the insufficiency of evidentiary support for the cause. <u>Nicolet, 80 B.R. 733,</u> can also be distinguished. There, the debtor offered the entire bankruptcy file "without any selectivity" into evidence on the day of the hearing. That court found that this offering was "out of step with the underlying . . . due process" rationale of Aughenbaugh because it deprived the opponents of a meaningful chance to examine the evidence and respond. <u>Nicolet., 80 B.R. at 743.</u> In contrast, appellants were aware of and meaningfully responded to the evidence in question.

As a final note, appellants' reliance on an isolated sentence from the Third Circuit's decision in <u>Mulvaney v. Rush, 487 F.2d 684,</u> that "statement[s] by counsel unless stipulated to, are not evidence and cannot be considered as such," is inapposite. Mulvaney was an appeal from a grant of habeas corpus on the grounds of double jeopardy. The Third Circuit reversed because the district court made [*31] a decision concerning the substance of the underlying trials without reviewing the record of the underlying trials, relying instead on statements by counsel. The context of particular phrase quoted by the appellants was the Mulvaney appellant's attempt to use briefs as evidence by sending them to the court as exhibits. "Perhaps the appellant is of the view that statements in briefs are evidence and the record may be supplemented in this way. As stated above, statement (sic) by counsel, unless stipulated to, are not evidence and cannot be considered as such." <u>Mulvaney v. Rush, 487 F.2d at 687.</u> The court went on to hold that "it was inappropriate to find error in a presumptively valid state court proceeding by this procedure." Id. Both its context and its analysis make the Mulvaney quotation of no consequence to the issues at bar, and raise questions about the methods appellants use in doing their research.

Under the rubric of both <u>Aughenbaugh</u> and <u>Indian Palms,</u> this Court finds no abuse of discretion in the bankruptcy court's decisions to consider these limited matters from the underlying bankruptcy case and rejects appellants' position that they [*32] were evidentially out of bounds.

Appellants also argue that the bankruptcy court abused its discretion by finding cause to extend the debtor's period of exclusivity because, they claim, in fact the case is *not* large, the case is *not* complex, the case involves limited issues, and litigation regarding the insurance policies does not constitute cause. Alternatively, appellants argue that size and complexity alone do not constitute cause. In opposition, appellee argues that

debtor has demonstrated sufficient cause to extend exclusivity because of the large size and complexity of the case, because the debtor is not using the extension to pressure creditors into accepting less beneficial terms (as evidenced by the fact that both the Creditors' Committee and the FCR support the extension motion), because the debtor is making progress toward reorganization, and because the debtor is paying its bills as they become due. The bankruptcy court found that the following reasons supported its decisions to grant debtors the extensions of their periods of exclusivity: (1) the good faith progress that the debtor has made toward reorganization based in part on the Hartford settlement; (2) the [*33] existence of negotiations with other insurers; (3) the agreement of the Creditors' Committee and the FCR; (4) the lack of evidence that the extensions were for the purpose of pressuring creditors to accede; (5) the size and complexity of the case; (6) the Third Circuit opinion in Combustion Engineering that required debtor to rework its Plan; (7) the multiple settlements that the bankruptcy court approved; (8) the existence of unresolved contingencies; and (9) the need to resolve claims that would have a substantial effect on the Plan and the trust fund. Tr. of Hr'g 62-64 (Bankr. D. N.J. April 11, 2005). The bankruptcy court did not consider size and complexity alone to be sufficient cause, nor the existence of negotiations with insurers, but found that the above factors, *taken as a whole,* were sufficient cause to grant the extensions. The bankruptcy court supported its decisions with reasoned and appropriate facts and findings, and did not abuse its discretion.

### D. APPELLANTS' THIRD ARGUMENT: Equity requires termination of exclusivity

Appellants argue that this Court should decide, as a matter of equity, to terminate debtor's period of exclusivity because the debtor's [*34] actions are for an improper purpose, namely to gain leverage over other parties, and that such purpose is a breach of the debtor's duties as debtor-in possession. Appellants' Br. at 19-22, No. 05-2529 (June 10, 2005). Appellants also argue that termination of the debtor's exclusivity will not prejudice the debtor nor any other party. Id. at 23-24. Appellee did not directly address this argument in its brief.

While appellants cite law review articles that flesh out the duties of a debtor-in-possession as well as cases that indicate that the debtor has a duty to file a plan of reorganization, they do not provide any support for their argument that requests for extensions of exclusivity constitute breach of those duties. Even assuming, *arguendo,* that the requests for extensions constitute such breach, appellants do not support their argument that the bankruptcy court should have denied the requests on that basis. The bankruptcy court addressed this argument and appropriately did not find that the requests for extensions

constituted breaches of the fiduciary duty of a debtor-in-possession. Tr. of Hr'g 64:11-18 (Bankr. D. N.J. April 11, 2005). This Court does not find any abuse [*35] of discretion in the bankruptcy court's determinations.

Within their argument that the debtor breached its duty as debtor-in-possession, appellants argue that the debtor should forfeit its right to seek an extension of exclusivity because debtor has proposed a "new-value" Plan based on the analysis in In re Situation Management Systems, 252 B.R. 859 (Bankr. Mass. 2000). This Court finds nothing in the record to show that appellants raised this argument below. Appellants also argue here for the first time that termination of the debtor's exclusivity will not prejudice the debtor nor any other party. Neither of these arguments will be addressed. [HN19] An issue in an bankruptcy appeal that is raised for the first time in an appellate brief will not be considered by the district court on appeal. Butler Consumer Discount Co. v. Cain, 50 B.R. 388, 390 (D.C. Pa. 1985). See also In re Bona, 124 B.R. 11, 16 (S.D.N.Y. 1991).

**E.  APPELLANTS'  FOURTH  ARGUMENT: Debtor's second amended Plan favors debtor's parent at the expense of debtor's insurers.**

In this argument, which is only raised in the second appeal, appellants argue that the debtor should [*36] not have been granted extensions of its periods of exclusivity because debtor's second amended Plan favors debtor's owner at the expense of debtor's insurers, including appellants. Specifically, appellants argue that Trust Distribution Procedures ("TDP's") in the second amended Plan were negotiated without input from appellants and do not adhere to the legal requirements under the Bankruptcy Code. Appellants ask this Court to terminate debtor's exclusivity so that appellants' competing plan of reorganization can be considered contemporaneously with that of the debtor in order to make the most efficient use of the debtor's and the bankruptcy court's resources. Appellants argue that continued exclusivity allows the debtor to pressure its insurers, including appellants, to accede to TDP's that are inconsistent with the Code and applicable law. In opposition, appellee argues that since it did not file a second amended Plan until August 15, 2005, almost two months after the motion hearing, the bankruptcy court could not have rejected the motion for extension on the grounds that the second amended Plan was not confirmable.

At the hearing, the bankruptcy court stated that the debtor had [*37] not filed an amended Plan as of that date. Tr. of Mot. Hr'g 42:5-6 (Bankr. D. N.J. June 29, 2005). Since the bankruptcy court could not address the matter of legality of a plan's TDP's nor confirmability of a plan that had not been filed, the bankruptcy court did not address appellants' arguments concerning the second amended Plan. [HN20] This Court acts as an appellate court when considering an appeal of an order of the bankruptcy court, In re Grand Union Co., 200 B.R. 101, 106 (D. Del. 1996), and may review both claims that were argued before the court below as well as issues that were ruled on by the court below, Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 90 (2d Cir. 2004). Since the issue of the confirmability of the second amended Plan was neither argued before nor ruled on by the bankruptcy court, this Court will not review this issue. Assuming, *arguendo,* that appellants have standing to argue against confirmation of debtor's Plan, appellants will have the opportunity make their arguments against the second amended Plan at a subsequent plan confirmation hearing

**VI. CONCLUSION**

It hardly needs noting that the bankruptcy court [*38] is in a much better position than this Court to decide whether the debtor has requested these last two extensions for impermissible purposes, and the legal standard of abuse of discretion reflects this. Moreover, Judge Gambardella backed up her decisions on these extensions with reasoned conclusions based on facts well known to the appellants. This Court does not find an abuse of discretion and the decisions of the bankruptcy court are **affirmed.** An appropriate order will be entered.

Dated: November 2, 2005

    Katharine S. Hayden, U.S.D.J.

    **ORDER**

**KATHARINE S. HAYDEN, U.S.D.J.**

**THIS MATTER** having come before the Court; the Court having considered the written submissions by the parties, and for good cause shown and for the reasons more fully set forth in the **opinion** filed herewith,

It is on this 2nd of November, 2005;

**ORDERED** that the decision of the bankruptcy court is **affirmed.**

    Katharine S. Hayden, U.S.D.J.

the bankruptcy court's assessments were neither routine nor cavalier. There was no abuse of discretion.

Although appellants argued that the 2005 amendments to the Bankruptcy Code show that Congress disapproves of "cavalier extensions by the courts," the bankruptcy court noted that appellants conceded that those amendments do not impact this case. Tr. of Mot. Hr'g 45:10-18 (Bankr. D. N.J. June 29, 2005).

The Court also notes that appellants argued at the motion hearings that the extension of the debtor's exclusivity was inconsistent with the legislative intent of the Bankruptcy Code. As discussed above, [HN12] the legislative history surrounding § 1121 indicates that Congress enacted the limited exclusivity period to avoid imbalance in the bargaining leverage between a bankrupt debtor and its creditors. The bankruptcy court considered this issue in its decision by pointing out that both the Creditors' Committee and the FCR support the extension of exclusivity, Tr. of Hr'g 64:19-23 (Bankr. D. N.J., April 11, 2005), and by pointing out that there was no substantiation to appellants' allegation that the debtor sought this extension of time to pressure creditors to accede [*21] to reorganization demands. Id. 62:6-19.

In one of their reply briefs, appellants offer new support for their argument that because under § 1121(d) non-creditor parties in interest are entitled to request a reduction in or termination of the debtor's period of exclusivity, Congress also intended the bankruptcy courts to balance the interests of such non-creditors when passing on that request. Appellants' Reply Br. at 5-6, No. 05-2529 (July 21, 2005). However, neither case that appellants cite supports this proposition. Appellants take a portion of Jones v. Liberty Mutual Ins. Co. (In re Wallace & Gale Co.), 385 F.3d 820, 829 (4th Cir. 2004), completely out of context in arguing that non-creditor parties have rights nearly equal to those of creditors on the issue of extending exclusivity. In that case, the court was addressing the interpretation of insurance contracts in a bankruptcy estate. In discussing whether to apply state or federal law, the court stated: "the property interests involved here are the rights of the insurance companies to have their obligations for payment ascertained," and it went on to find that state law applied. This observation has nothing to do with the issue at hand. [*22] Similarly, the decision in In re Lehigh Valley Professional Sports Club, Inc., 2000 Bankr. LEXIS 237, 11-12 (Bankr. D. Pa. 2000), which discussed the differences between old Chapter XI and new Chapter 11, talks about the "competing interests which Congress sought to balance" in the new legislation, but not in a manner that supports appellants' argument. The opinion defines "competing interests" as those of debtor and creditors, and nothing in the opinion suggests that Congress intended that bankruptcy courts balance the interests of

non-creditors when passing on a debtor's request for extension of exclusivity.

Based on the foregoing, this Court does not find an abuse of discretion in the bankruptcy court's determinations. Having so concluded, the Court is constrained to point out the unhelpful way in which appellants presented their arguments to the contrary. In their brief, they state that "the bases for 'cause' to extend exclusivity decrease over time," and cite six cases in a long footnote, none of which stands for the stated proposition. Appellants' Br. at 7, No. 05-2529 (June 10, 2005). Appellants then state that "the justifications for other parties to be allowed [*23] to file competing plans increase and must be balanced with other factors," id., and cite two cases in a footnote, neither of which supports appellants' position. Id. 2000 Bankr. LEXIS 237 at 7 n.5. In fact, the first case cited, In re Service Merchandise Co., 256 B.R. 744, 751 (Bankr. M.D. Tenn. 2000), does not give, as appellants claim, a list of nine factors used in determining cause to extend exclusivity. Rather, that case presents a discussion of factors used to determine whether the court should grant an extension of time to assume or reject a lease under § 364(d)(4) of the Bankruptcy Code, which is irrelevant to the present inquiry. Further, this list of factors does not include "existence of good faith and time case pending," contrary to appellants' express assertion. Appellants' Br. at 7, n.5, No. 05-2529 (June 10, 2005).

**C. APPELLANTS' SECOND ARGUMENT: The bankruptcy court failed to determine debtor's motion was both procedurally and substantively deficient.**

Appellants argue that debtor's motions were procedurally deficient because the debtor did not provide proper affirmative record evidence to support its requests, and because the bankruptcy [*24] court mistakenly relied upon evidence outside the record to find cause. Appellants' Brief at 10-13, No. 05-2529 (June 10, 2005). Appellants also argue that the debtor's motions were substantively deficient because debtor did not provide sufficient cause for the extensions granted. Id. 2000 Bankr. LEXIS 237 at 13-19. The gravamen of appellants' procedural argument is that the bankruptcy court erroneously relied on mere "allegations" by the debtor to decide whether or not cause existed, "most notably" the size and complexity of the case and debtor's efforts to obtain the Hartford settlement. Appellants contend that the bankruptcy court's review of the motion for extension of exclusivity should have been limited to the materials submitted in the motion, and that due process requires that other parties have notice and opportunity to respond to any other materials considered by the bankruptcy court. Appellants particularly take exception to what they assert is a lack of affirmative evidence that the size and complexity of the bankruptcy case support the requested ex-

tensions and to a lack of affirmative evidence showing that the debtor has been making efforts to obtain the settlement with Hartford insurance. [*25] In support of their argument, appellants rely on In re Parker Street Florist & Garden Center, Inc., 31 B.R. 206 (Bankr. D. Ma. 1983), In re Nicolet, Inc., 80 B.R. 733 (Bankr. E.D. Pa. 1987), and Mulvaney v. Rush, 487 F.2d 684 (3d Cir. 1973). In opposition, appellee argues that the bankruptcy court may take judicial notice of certain adjudicative facts, including the size and complexity of the bankruptcy case before it and the existence of the settlement with Hartford insurance.

[HN13] Disputes within a bankruptcy case are divided into two types: adversarial proceedings and contested matters. In In re Aughenbaugh, 125 F.2d 887 (3d Cir. 1942), the Third Circuit held that [HN14] an adversarial proceeding within a bankruptcy case should be treated as "an independent litigation" and the bankruptcy court may not consider documents filed only in the underlying bankruptcy case unless they were also offered at the hearing. Id. at 889. The court reasoned that [HN15] it was a "fundamental concept of procedural due process that a party to litigation is entitled to have the evidence relied on by his opponent presented at the hearing [*26] of his case." Id. More recently, in In re Indian Palms Associates Ltd. v. California Federal Bank, 61 F.3d 197 (3d Cir. 1995), the Third Circuit applied the Aughenbaugh rule and stated that [HN16] the bankruptcy court "cannot properly use documents filed only in the underlying bankruptcy case unless that use can be justified under the judicial notice doctrine." Id. at 204. However the court noted the procedures governing contested matters are less formal than those governing adversarial proceedings. Id. at 204 n.11. Therefore, the court found that the lower court's decision to consider the entire case file was justified under the judicial notice doctrine because "the contested matter [was] sufficiently associated with the general administration of the debtor's estate." Id. at 204.

[HN17] An extension of a debtor's period of exclusivity is a contested matter, not an adversarial proceeding. See, e.g., In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997). As such, the Aughenbaugh rule as modified by Indian Palms is the proper framework to apply to the case at bar. The two specific [*27] exceptions that appellants make to the lack of affirmative evidence are the allegations of the size and complexity of the bankruptcy case and that the debtor has been making efforts to obtain a settlement with Hartford insurance. The proper inquiry is whether these matters were sufficiently associated with the general administration of the bankruptcy to justify the bankruptcy court's notice of them without the express introduction of affirmative evidence at the motion hearings.

This Court easily finds that inasmuch as the bankruptcy court has been handling the administration of this case since December 4, 2000, it is able to make a reliable determination about the size and complexity without additional affirmative evidence. In addition, appellants were aware of debtor's reliance on the size and complexity of the bankruptcy case as part of its showings of cause. Counsel for appellants stated that debtor offered both the complexity of the case and the Hartford settlement as part of its "cause" offering in the previous motion for extension of exclusivity. The Court also notes the following statements in appellants' brief: "Debtor's oft-repeated claim that the size and complexity of this [*28] case justifies a further extension of exclusivity no longer has merit . . ." and "this case has been pending for over four years, and any *issues regarding its size or complexity have long been known by all parties.*" Appellants' Br. at 14, No. 05-2529 (June 10, 2005) (emphasis added). The records of both motion hearings demonstrate that counsel for appellants strenuously argued against the bankruptcy court finding that the case was sufficiently large and complex to justify an extension, belying any suggestion that appellants were denied an opportunity to respond. That the bankruptcy was large and complex was not a stray piece of random evidence buried in a copious case file about which appellants were taken by surprise. The bankruptcy court did not abuse its discretion by relying upon the size and complexity of the case in making its decisions to grant the motions.

Appellants were also well aware of the existence of the Hartford settlement as well as its details, as evidenced by their objection to debtor's December 6, 2004 motion for approval of the settlement, which took place prior to the orders on appeal. In the motion hearings, counsel for appellants urged the bankruptcy court [*29] to reject the proposition that the Hartford settlement provided additional cause to extend debtor's exclusivity. Again, there was no evidentiary surprise sprung upon the appellants. Furthermore, [HN18] the existence of the Hartford settlement, as evidenced, *inter alia,* by an order approving the settlement, is the type of information about which the bankruptcy court was entitled to take judicial notice. See, e.g., In re Indian Palms Associates, 61 F.3d at 205. Once the bankruptcy court approved the Hartford settlement (prior to the orders appealed herein), the existence of the Hartford settlement was not seriously in dispute and the bankruptcy court did not abuse its discretion by relying upon it.

Turning to the specific cases appellants rely on, as the bankruptcy court noted, Parker Street Florist, 31 B.R. 206, is distinguishable. Tr. of Hr'g 61:23-63:9 (Bankr. D. N.J. April 11, 2005). That ruling turned on the fact that the only cause alleged by the debtor was its desire to "prevent a small creditor from interfering with its reor-

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1989 WL 996278 (D.Puerto Rico)
**(Cite as: Not Reported in F.Supp.)**

**H**
In re San Juan Dupont Plaza Hotel Fire Litiga-
tionD.Puerto Rico,1989.Only the Westlaw citation is
currently available.
United States District Court, D. Puerto Rico.
In re: SAN JUAN DUPONT PLAZA HOTEL FIRE
LITIGATION
**No. MDL-721.**

Sept. 14, 1989.

ORDER NO. 221
ACOSTA, District J.

VOIDANCE OF DEFENDANTS' JUDGMENT/
SETTLEMENT SHARING AGREEMENT

**\*1** The Plaintiffs' Steering Committee ("PSC") has
moved the Court to void the *Judgment/Settlement
Sharing Agreement* [FN1] ("Agreement") subscribed to
by certain defendants during May and June of this
year [FN2] and to publish it to the jury. [FN3] The sig-
natories to the Agreement have opposed both peti-
tions [FN4] whereas non-signatories have objected to
the request that it be disclosed to the jury. [FN5] The
Plaintiffs' Steering Committee ("PSC") contends that
the Agreement violates both public policy and ethical
principles. Participants to the Agreement
("signatories") oppose the PSC's motion by arguing
that it is essentially a joint defense document warran-
ted by the complex nature of these proceedings, that
it does not contravene any public policy and that it
disposes of the claims among participants.

> FN1. *See* PSC's Motion to Void Judgment/
> Settlement Agreement, filed under seal on
> August 9, 1989 (docket No. 12164). The
> Agreement was originally disclosed to the
> parties by Court Margin Order No. 499
> (Docket No 12180, filed August 10, 1989)
> and subsequently to the public by Order No.
> 217 (Docket No. 12196, filed August 11,
> 1989) after the Court found that the priv-
> ileges belatedly asserted by the signatories
> had been waived.
>
> FN2. There are 40 signatories to the Agree-

ment. These are listed in Otis' Notice of Fil-
ing Materials Under Seal (Docket No.
12151, filed August 8, 1989).

> FN3. *See* Motion to Admit into Evidence
> and Publish to the Jury the Joint Defense
> and Judgment/Settlement Sharing Agree-
> ment, filed under seal on August 9, 1989,
> docket No. 12164.
>
> FN4. *See* Defendants' Opposition to PSC's
> Motion (re: Motion to Void Judgment...),
> filed August 17, 1989, docket No. 12309
> and Defendants' Opposition to PSC's Motion
> (re: Motion to Admit into Evidence and
> Publish to the Jury the Joint Defense...),
> filed August 17, 1989, docket No. 12311.
>
> FN5. *See* SCM Corp. & Industrias Glidden
> de P.R.'s Opposition to PSC's Motion (re:
> admission into evidence) ... (Docket No.
> 12226, filed August 14, 1989); ADT's
> Memorandum in Opposition... (Docket No.
> 12252, filed August 15, 1989); Laminating
> Services, Inc. and Maharam Fabrics Corp.'s
> Memo in Opposition... (Docket No. 12368,
> filed August 21, 1989); Frankel Associates,
> Inc.'s Motion to Join in ADT and SCM &
> Industrias Glidden's Motions... (Docket No.
> 12372, filed August 21, 1989); Fernández &
> Gutiérrez's Motion to Another Entitled
> "Opposition to the Admission into Evid-
> ence..." (Docket No. 12382, filed August 21,
> 1989); and La Cor Wicker Notice of Joinder
> in Memorandum of ADT Diversified Ser-
> vices, Inc. in Opposition to PSC's Motion to
> Admit Judgment Sharing Agreement into
> Evidence (Docket No. 12568, filed Septem-
> ber 8, 1989).

The Court has reviewed all the motions filed pertain-
ing to the validity of the document in question as well
as the Agreement itself, together with the August 1,
1989 amendment, and hereby rules as follows.

According to the Agreement's preamble, the signator-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1989 WL 996278 (D.Puerto Rico)
(Cite as: Not Reported in F.Supp.)

ies were prompted into joining forces based on their perception that plaintiffs have already been sufficiently compensated by those defendants who have settled.[FN6] As originally drafted, the Agreement provides for the sharing of defense work and costs, establishes a formula by which the signatories will proportionately pay for any eventual judgments, dispenses with any contribution claims the signatories may have among themselves and provides a rigid and exclusive settlement mechanism for the participants.

> [FN6]. See Agreement at p. 2. ("[S]ettlements or judgments... which exceed, in total, the fair and reasonable compensation for all damages incurred by the Plaintiffs and, as a result, the Plaintiffs have been fully compensated without reference to any settlement or payment by the Participants...").

The signatories' main argument in response to the PSC's motion is that the Agreement essentially allows them to forge a united front against the plaintiffs while saving the time and money as well as the Court's resources-which would otherwise be expended should each case have to be defended individually. They also mention that the document promotes settlements with plaintiffs and the extrajudicial resolution of the contribution claims between defendants. We are not convinced, however, that this document is truly a "defense cooperation" agreement emphasizing cost-effective joint litigation strategies; rather, we view it as a conscious effort by the signatories to impede the ongoing settlement process in this case. Similarly, the argument that the Agreement aids in the management of this case by helping defendants to dispose of the controversies among them and streamlining the defense work, falls flat because, in practical terms, the Agreement discourages settlements with the plaintiffs, and enhances an unnecessarily recalcitrant position by defendants towards the plaintiffs. Indeed, the result could very well be the unfair and wasteful protraction of this case.

Generally, settlement is unquestionably lauded by well-settled public policy and should always be encouraged. See, Committee Notes on admissibility of settlement agreements under Rule 408 Fed.R.Evid. (promotion of public policy favors compromising and

settlement of disputes); McCormick on Evidence, 3rd Ed. § 247 (policy of promoting settlement of disputes); and Louisell and Mueller Federal Evidence, L.Ed. (1985) § 170 (policy of encouraging the out-of-court settlement of disputes). However, just because the word "settlement" appears in a document does not mean that it is automatically imbued with systemic appeal or that it embodies the principles supporting the extrajudicial resolution of disputes. On many occasions, false promises of settlement prospects are improperly used to lull a Court and/or the opposing party into a tactical delay. Consequently, settlement procedures must always be carefully scrutinized in light of the circumstances of a particular case and the realities of the litigation process. Courts must be particularly watchful of contracts among parties that serve to hide relevant facts or that otherwise hamper the truth-finding process under the guise of cost/task-sharing or settlement. Although damages sharing agreements may serve a legitimate purpose, "they may have the effect-and often the purpose-of preventing any partial settlement, and may discourage the introduction of evidence indicating the liability on the part of co-defendants." *Manual for Complex Litigation Second,* § 23.23, p. 172.

\*2 Defendants argue that the Agreement does not hide the adversarial position among them because that adversity only arises during a contribution suit and the contribution claims are not being tried in this phase; therefore, the Agreement could not permit a "skewed" presentation of the evidence. We do not agree. Regardless of the fact that contribution claims may be tried at a different time, there are claims of another nature between the defendants that are properly the subject of this trial phase. For instance, intervening causes for which one present defendant is responsible may exonerate other defendants from liability. This is not the first time the Court has pointed this out. *See also* PTO No. 208, note 2. In fact, defendants rely primarily on the intervening cause defense in this case. Yet, defendants have conveniently ignored the full scope of the defense and have limited it only to the San Juan Dupont Plaza Hotel, the Sheraton, and the Teamsters Union, as clearly indicated in their portions of the Pretrial Memorandum and their opening statements. Part of the danger in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A029

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 996278 (D.Puerto Rico)
(Cite as: Not Reported in F.Supp.)

this position is that the defendants might be tempted, or otherwise feel obligated to withhold relevant evidence that would otherwise give the jury a full presentation of the facts, out of fear that that they would be violating the non-adversarial covenant among them.

Section III, paragraph 11(c) of the Agreement, sans its rider, reads as follows:

This Agreement provides the *only* method by which the Participants shall settle the claims asserted against them in this Litigation. In no event shall any participant negotiate a separate settlement with the Plaintiffs, or any other party to the Litigation. (Emphasis ours.)

A plain reading of this portion, which flatly prohibits individual settlements with the PSC or other non-signatories, denotes the real purpose behind the allegiance, that is, to prevent resolution of plaintiffs' claims using the armor of a defense cooperation.

Approximately a year and a half before signing the Agreement, these defendants already had a fully-effective joint defense agreement. The *Dupont Plaza Cooperation Agreement*, [FN7] a document designed by and for the defendants precisely with a joint defense in mind, was prepared as early as December 9, 1987 and certain signatories joined even before they were made parties to this litigation. It provided for a common defense operation funded by participants to assist in reducing costs through document management, notification, investigation as to damages, coordination of discovery, legal research, and the pooling of damages experts. A comparison between these two documents vividly portrays their different natures. In one, the emphasis is on cooperation, in the other, it is on blocking communications with plaintiffs and strong-arming defendants into obdurate positions which affect the proper conduct of this trial. The Dupont Plaza Cooperation Agreement is still in effect today. And since it embodies most, if all, of the raison d'etre defendants have described to support the Agreement before us one is left wondering why the second agreement (Agreement) was necessary.

FN7. Pursuant to Court Margin Order No. 499 this document was disclosed to the parties and pursuant to Order No. 217 it was

made part of the public record.

*3 Participants conveniently modified paragraph 11(c) (described above) of the Agreement on or about August 1, 1986 to purportedly allow for individual settlements, with limitations which are far from clear. We find the timing of the amendment quite revealing having been filed shortly after the Court initially expressed its concern over the legality of this particular provision. [FN8] This specific change constitutes a deliberate attempt to circumvent the discovery process already initiated by the Court, and as such, should be disregarded. If this appears to be an artless attempt to jettison one of the most troublesome provisions of the Agreement in the hope of saving the others. But the provisions of the Agreement are not severable because of what we feel is the improper underlying motive and potential ill effects of the entire document.

FN8. This issue was prompted by the PSC's Request for Production of Defense Counsels' Covenant Not to Settle (Docket No. 10415, filed on May 30, 1989) in response to which Hon. Louis C. Bechtle, on June 13, 1989, docket No. 10666 in Memorandum and Settlement Order No. 20 instructed defendants to provide copy of any pertinent documents to the Court and thereafter Settlement Order # 39 issued on July 31, 1989, docket No. 12075 which required copies be produced to the PSC.

The significant problem with the united front approach formulated by these particular defendants can be readily ascertained from the following provision.

[A] Participant shall not admit liability or aid the Plaintiffs or the Hotel by attempting to assert liability against any other Participant, nor will any Participant provide witnesses, technical support or assistance, documents or any other evidentiary materials to the Plaintiffs and/or the Hotel. (Emphasis ours.)

Defendants argue that this part only contemplates disclosure of their common work product. However, no distinction is made in the Agreement between individual and common documents. The provision is so all-inclusive that it constitutes a total prohibition of

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1989 WL 996278 (D.Puerto Rico)
**(Cite as: Not Reported in F.Supp.)**


the exchange of materials with no apparent value except to prevent an open flow of information among the parties and eventually to the Court and the jury.

### CONCLUSION

Based on the foregoing, the PSC's Motion to Void Judgment/Settlement Sharing Agreement (Docket No. 12200, filed August 11, 1989) is hereby GRANTED. The Court finds that the Agreement is null and void in that its main purpose and overall result has been to keep defendants from individually resolving their disputes with the plaintiffs under the guise of "defense cooperation", while discouraging the presentation of relevant and admissible evidence at trial.

Since we find that the Agreement, as currently drafted, is void, it now becomes irrelevant for purposes of this trial. Therefore, the PSC's Motion to Admit into Evidence and Publish to the Jury the Joint Defense and Judgment/Settlement Sharing Agreement (Docket No. 12203, filed August 11, 1989) is hereby DENIED.

IT IS SO ORDERED.

D.Puerto Rico,1989.
In re San Juan Dupont Plaza Hotel Fire Litigation
Not Reported in F.Supp., 1989 WL 996278 (D.Puerto Rico)

END OF DOCUMENT

A030

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

LEXSEE



Cited
As of: Dec 28, 2006

**IN RE: THE ELDER-BEERMAN STORES CORPORATION, et al., Debtors. THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Appellant, vs. THE
ELDER BEERMAN STORES CORPORATION, et al., Appellees.**

**Case No. C-3-97-175**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
OHIO, WESTERN DIVISION**

**1997 U.S. Dist. LEXIS 23785**

**June 23, 1997, Decided
June 23, 1997, Filed**

**DISPOSITION:** [*1] Appellant's six assignments of
error OVERRULED. Order of the Bankruptcy Court
granting on extension of the exclusivity period until Au-
gust 18, 1997, AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a bankruptcy proceed-
ing, appellant creditors' committee sought review of an
interlocutory order of the United States Bankruptcy
Court for the Southern District of Ohio that granted ap-
pellee debtor's application for a third extension of the
period in which, pursuant to 11 U.S.C.S. § 1121(d), the
debtor had an exclusive right to file a reorganization
plan.

**OVERVIEW:** The debtor filed a bankruptcy petition
under Chapter 11. Since filing its petition, the debtor was
successful in stabilizing and turning around its business
operations and achieved a successful turnaround in its
management and business operations. The debtor
reached the first three milestones necessary for its emer-
gence from Chapter 11--accomplishing all of its goals
except for the development and confirmation of a plan of
reorganization. After having received two extensions of
the period in which only the debtor could file a reorgani-
zation plan, the debtor, pursuant to 11 U.S.C.S. §
1121(d), filed a third application for an extension. The
bankruptcy court granted the third extension. Affirming,
the court held that the bankruptcy court had flexibility to

fashion an appropriate test for determining whether the
debtor showed the requisite cause for granting an exten-
sion. The bankruptcy court did not err in finding that the
debtor was not seeking an extension of exclusivity in
order to pressure the parties or gain leverage in the nego-
tiation process. The court declined to punish the debtor
for the actions of several former members of its board of
directors by refusing the extension.

**OUTCOME:** The court affirmed the order of the bank-
ruptcy court.

**CORE TERMS:** exclusivity, negotiation, misconduct,
plan of reorganization, assignment of error, reorganiza-
tion, negotiation process, legislative history, abuse of
discretion, impasse, board of directors, shareholder,
flexibility, consensual, probable, lockout, then-current,
motivation, turnaround, requisite, assignments of error,
presently, leverage, retail, clearly erroneous, exclude
evidence, exclusive right, designated, progress, conflict-
ing testimony

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals >
Jurisdiction*
*Bankruptcy Law > Reorganizations > Plans > Eligible
Proponents*

*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*
[HN1] Although courts are generally not permitted to entertain appeals from interlocutory orders, the United States District Court for the Southern District of Ohio has jurisdiction to hear appeals from interlocutory orders and decrees issued under 11 U.S.C.S. § 1121(d) increasing or reducing the time periods referred to in 11 U.S.C.S. § 1121. 28 U.S.C.S. § 158(a)(2).

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN2] A debtor has only 120 days from the date of filing its Chapter 11 petition in which it has the exclusive right to file a plan of reorganization; after that date, any interested party can propose such a plan. Upon a showing of cause, however, this time period may be extended by the Bankruptcy Court.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
*Civil Procedure > Judgments > Relief From Judgment > General Overview*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > General Overview*
[HN3] Only the debtor may file a plan of reorganization during the first 120 days after the date of the order of relief under this chapter. 11 U.S.C.S. § 1121(b). If such a plan is not filed during this period of time, then any other party in interest, including a creditors' committee, may file a competing plan. 11 U.S.C.S. § 1121(c). This so-called "exclusivity period" may, however, be increased by a court for cause, upon the request of any party in interest. 11 U.S.C.S. § 1121(d).

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN4] An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN5] Although there are a large number of potential factors that have been identified by various courts as being pertinent to a determination of whether cause has been shown, many courts have chosen to rely upon relatively few factors--albeit different ones--to determine whether the necessary cause exists to alter the statutory time period set forth in 11 U.S.C.S. § 1121. The choice of pertinent factors depends largely upon the factual na-

ture of the case before the court. Thus, a bankruptcy court faced with the issue of whether the necessary "cause" exists to extend the exclusivity period has a high degree of flexibility in fashioning the appropriate test to be applied, and is not required to apply any particular set of factors, or number of factors, in every case.

*Bankruptcy Law > Reorganizations > Plans > Eligible Proponents*
[HN6] It is not necessary to be a Texaco, Johns-Manville Forest Products, or Ames Department Stores to be considered "large and complex" within the meaning of 11 U.S.C.S. § 1121.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*
*Civil Procedure > Judicial Officers > General Overview*
[HN7] In a bankruptcy proceeding, the bankruptcy court is the finder of fact. These findings of fact should not be set aside by a reviewing court unless they are clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Fed. R. Bank. P. 8013. Indeed, the Sixth Circuit has consistently held that a bankruptcy court's findings of fact should not be disturbed by the district court judge unless there is most cogent evidence of mistake or miscarriage of justice. In other words, a district court should not substitute its own judgment for that of the bankruptcy court. In regard to a bankruptcy court's conclusions of law, however, a district court should conduct a de novo review.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review*
*Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > General Overview*
[HN8] The issue of whether to grant or deny a request to extend the exclusivity period is a matter committed to the sound discretion of the bankruptcy court. Therefore, an order extending the exclusivity period will not be set aside absent an abuse of discretion. An abuse of discretion will be found to exist where the lower court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact, or where the reviewing court is left with a definite and firm conviction that the lower court committed a clear error of judgment.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN9] A lower court's decision to exclude evidence is reviewed under an abuse of discretion standard. Such a ruling should not be reversed on appeal unless the reviewing court finds that the ruling excluding the evidence is not only erroneous but results in substantial injustice to the aggrieved party.

**COUNSEL:** For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, appellant: Louis Frank Solimine, Thompson, Hine & Flory, Cincinnati, OH.

For ELDER BEERMAN STORES CORPORATION, appellee: Richard M Cieri, Jones, Day, Reavis & Pogue, Cleveland, OH.

**JUDGES:** WALTER HERBERT RICE, CHIEF JUDGE, UNITED STATES DISTRICT COURT.

**OPINION BY:** WALTER HERBERT RICE

**OPINION:**

OPINION AND ORDER AFFIRMING THE BANKRUPTCY COURT'S DECISION GRANTING A THIRD EXTENSION OF THE EXCLUSIVITY PERIOD

This case arises from circumstances surrounding the present involvement of the Elder-Beerman Stores Corporation, and a number of its affiliates and subsidiaries ("Appellees" or "Debtors"), in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of Ohio. n1 A group of the Appellees' creditors, the Official Committee of Unsecured Creditors of the Elder-Beerman Stores Corp. ("Appellant" or "Creditors' Committee"), have taken this appeal from an interlocutory order by Bankruptcy Judge William A. Clark. n2 The contested order extends until August 18, 1997, the [*2] "exclusivity period," during which only the Debtors are permitted to file a reorganization plan. This was the third extension successfully sought by the Debtors. This Court heard oral argument on the appeal on June 11, 1997, and is now prepared to render its decision on the merits.

n1 The case number in the Bankruptcy Court is No. 95-33643.

n2 The other official creditors' committee, the Official Committee of Unsecured Trade Creditors, is not a party to this appeal.

Appellant has designated the following issues to be presented on appeal: n3

1. Whether the Bankruptcy Court erred in concluding that the Debtors have shown cause for a further extension of exclusivity under Section 1121(d) of the Bankruptcy Code;

2. Whether the Bankruptcy Court erred in finding that the Debtors are not seeking an extension of exclusivity in order to pressure parties or gain leverage in the negotiation process;

3. Whether the Bankruptcy Court erred in finding that the Debtors and the committees have not reached [*3] a negotiating impasse on the terms of a consensual plan;

4. Whether the Bankruptcy Court erred in finding that creditors will not be prejudiced by a further extension of exclusivity;

5. Whether the Bankruptcy Court erred in granting the Debtors an extension of exclusivity until August 18, 1997[,] when the evidence established the Debtors' belief that they would be able to file a plan no later than June 16, 1997; and

6. Whether the Bankruptcy Court erred in excluding evidence that was relevant to the issue of whether the Debtors were entitled to a further extension of exclusivity under Section 1121(d) of the Bankruptcy Code.

After reviewing the basis for this Court's jurisdiction over this appeal, setting forth a brief statement of facts, describing the applicable law, summarizing the Bankruptcy Court's order, and setting forth the applicable standard of review, the Court will address each of the Appellant's six assignments of error, as well as the additional arguments raised in its brief. n4

n3 Unfortunately, the Appellant's brief (Doc. # 4) does not appear to track these assignments of error; instead, it addresses some of them, ignores some of them, raises additional arguments not related to these assignments of error. Although, as a technical matter, this Court could refuse to review the merits of arguments that were not designated as issues to be presented on appeal, it will, in the interest of rendering as thorough a decision as possible, proceed to consider the merits of all arguments raised by the Appellant, whether they were raised in its assignments of error and/or in its brief.

[*4]

n4 See supra note 3.

I. Jurisdiction

The Bankruptcy Court's order, which was entered pursuant to 11 U.S.C. § 1121(d), is an interlocutory, or non-final, order. [HN1] Although courts are generally not permitted to entertain appeals from interlocutory orders, this Court does have jurisdiction to hear appeals "from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title." 28 U.S.C. § 158(a)(2). Accordingly, this Court has jurisdiction over this appeal.

II. Statement of Facts

The Appellees own and operate a variety of retail stores throughout the Midwest. The size of this complex business enterprise is evidenced by the fact that Elder-Beerman employs over 8,500 full-time and part-time employees. By autumn of 1995, however, the company's financial situation had deteriorated as a result of its failure to reach an agreement with its institutional lenders on the restructuring of its outstanding debt. As a result, vendors refused to ship merchandise [*5] to Elder-Beerman's retail stores, due to their doubts regarding the company's continued liquidity. Faced with the prospect of lacking the inventory necessary for a financially successful Christmas shopping season, a critical business period for any retail store, Elder-Beerman filed a petition for relief under Chapter 11 of the Bankruptcy Code on October 17, 1995.

Since filing its petition, Elder-Beerman has been successful in stabilizing and turning around its business operations. It has accomplished this task, in large part, by following a four-point plan designed to lead to its suc-cessful emergence from Chapter 11: (1) the implementation of a short-term operational turnaround plan to stabilize the debtor's businesses; (2) development and validation of a long-term business plan; (3) assessment of the debtor's likely reorganization value or range of values; and (4) the formulation and confirmation of a plan of reorganization. As a result of its efforts to reach these milestones, the amount of the Debtors' assets has increased since the petition date. Specifically, in every measurable category (earnings, gross margin and operating profit), the Debtors' efforts have produced a remarkable [*6] financial turnaround. n5

n5 For example, since the petition date, there has been a turnaround of over $ 40 million in EBITDAR, Earnings Before Interest, Taxes, Depreciation, Amortization and Reorganization (Bank. Ct. Order at 4).

In addition to its financial success, Elder-Beerman has also been able to achieve a successful turnaround in its management and business operations. Since the petition date, the Debtors' management has instituted various performance-enhancing systems, such as a price look-up system that scans tickets at the point of sale, electronic data transmission of purchase orders to vendors, and an inventory replenishment system. More importantly, Elder-Beerman has signed employment contracts for senior management positions with three noted retail industry executives--John A. Muskovich, Steven D. Lipton and Frederick Mershad--each of whom has had extensive managerial experience with retail stores of the size and caliber of Elder-Beerman.

In sum, the progress that Elder-Beerman has made in regard [*7] to its financial situation and business operations, since the filing of its Chapter 11 petition in October, 1995, has been nothing short of remarkable. In fact, as of March, 1997, Elder-Beerman had reached the first three milestones necessary for its emergence from Chapter 11--accomplishing all of its goals except for the development and confirmation of a plan of reorganization. n6

n6 With respect to this last milestone, the Debtors and their creditors began negotiations in February, 1997, regarding the formulation of a consensual plan of reorganization.

As is explained below, [HN2] a debtor has only 120 days from the date of filing its Chapter 11 petition in which it has the exclusive right to file a plan of reorganization; after that date, any interested party can propose

such a plan. Upon a showing of cause, however, this time period may be extended by the Bankruptcy Court. Prior to the extension which is currently being appealed, the Debtors had received two such extensions, the second of which was granted in August, [*8] 1996. On March 13, 1997, the Bankruptcy Court held a hearing regarding the Debtors' third request for an extension. n7 Based upon the evidence presented at the hearing and the arguments of the parties, the Bankruptcy Court issued a decision allowing said request, thereby granting the Debtors the exclusive right to file a plan of reorganization until August 18, 1997. It is this order which is currently being appealed.

> n7 Although the Debtors' second extension was set to expire on February 17, 1997, the Bankruptcy Court and the parties agreed that it would remain in effect until March 17, 1997, in order to give the parties the time necessary to complete preparation for a hearing on the Debtors' third request for an extension.

III. Applicable Law: 11 U.S.C. § 1121

The central issue in this appeal concerns the present ability, or inability, of various interested parties to file plans of reorganization in regard to the Debtors. n8 The pertinent provision of the United States Code provides [*9] that [HN3] "only the debtor may file a plan [of reorganization during the first] 120 days after the date of the order of relief under this chapter." 11 U.S.C. § 1121(b). If such a plan is not filed during this period of time, then any other party in interest, including a creditors' committee, may file a competing plan. 11 U.S.C. § 1121(c). This so-called "exclusivity period" may, however, be increased by a court for cause, upon the request of any party in interest. 11 U.S.C. § 1121(d).

> n8 The importance of this event was explained by one court as follows:

>> The purpose of a reorganization is to restructure the debtor's finances, if possible, so that the debtor may both continue to operate the enterprise and repay its creditors. To accomplish this goal a plan of reorganization must be formulated, then filed and confirmed through the bankruptcy court.... The terms of the plan itself are necessarily a product of negotiation between the debtor and those with outstanding claims or interests, and Chapter 11 is drafted to afford maximum flexibility to the parties in the structuring of a plan of reorganization.

>> In the Matter of Lake in the Woods, 10 B.R. 338, 340 (E.D. Mich. 1981).

[*10]

Section 1121, which was enacted as part of the Bankruptcy Reform Act of 1978, has been referred to in the legislative history as follows:

> Subsection (d) [of section 1121] permits the court, for cause, to increase or reduce the 120-day... period[] specified. Since the debtor has an exclusive privilege for [4] months during which others may not file a plan, the granted extension should be based on a showing of some promise of probable success. [HN4] An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.

S. Rep. No. 95-989, at 118 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5904.

> Proposed Chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days. In most cases, 120 [*11] days will give the debtor adequate time to negotiate a settlement, without unduly delaying creditors. The court is given the power, though, to increase or reduce the 120-day period depending on the circumstances of the case. For exam-

ple, if an unusually large company were to seek reorganization under Chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement... Again, the bill allows the flexibility for individual cases that is unavailable today.

H.R. Rep. No. 95-595, at 232 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6191. By requiring an affirmative showing of cause to grant such an extension, "Congress intended to create a balance so as to protect the right of a debtor in possession to propose and obtain the requisite consents to its plan of reorganization while at the same time protecting creditors from abuse of Chapter 11 by a debtor unwilling to negotiate in good faith with creditors." 5 Collier on Bankruptcy (15th ed.) § 1121.04, quoted in In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S. D. Ohio 1996).

Since the enactment of § 1121(d), courts have struggled to identify the factors [*12] that should be considered in determining whether the requisite "cause" exists to extend or reduce the 120-day exclusivity period. See In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 132 (D.N.J. 1995) ("How a movant can meet that burden [of showing cause] is an area left unchartered by Congress and only sporadically explored by the courts"); In re Perkins, 71 B.R. 294, 297 (W.D. Tenn. 1987) (observing that section 1121(d) "does not define 'cause,' and courts have struggled to extract guidelines from the legislative history").

A review of the case law indicates that, [HN5] although there are a large number of potential factors that have been identified by various courts as being pertinent to a determination of whether cause has been shown, many courts have chosen to rely upon relatively few factors--albeit different ones--to determine whether the necessary cause exists to alter the statutory time period set forth in 11 U.S.C. § 1121. See, e.g., In re Amko Plastics, Inc., 197 B.R. at 77 (relying solely upon the debtor's rapid turn-around effort, the lack of prejudice to the creditors, and the absence of an impermissible [*13] motivation for the debtor's request for an extension, to conclude that the requisite cause had been shown); In the Matter of Lake in the Woods, 10 B.R. 338, 345 (E.D. Mich. 1981) (relying solely upon the legislative history of § 1121(d) to conclude that the requisite cause had not been shown).

Furthermore, it appears that the choice of pertinent factors depends largely upon the factual nature of the case before the court. See In re Amko Plastics, Inc., 197 B.R. at 76 ("We are of the opinion... that the debate by the parties regarding size and complexity is beside the point and does not fairly deal with the thrust of the evidence. Different considerations should be applied in this case.").

Thus, a bankruptcy court faced with the issue of whether the necessary "cause" exists to extend the exclusivity period has a high degree of flexibility in fashioning the appropriate test to be applied, and is not required to apply any particular set of factors, or number of factors, in every case. See In re Public Serv. Co. of New Hampshire, 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("the legislative intent [behind § 1121(d)] has been construed [*14] to leave the question [of cause] to the reorganization court in the exercise of its discretion and to promote maximum flexibility to suit various types of reorganization proceedings").

IV. Bankruptcy Court's Order

After conducting a hearing on the Appellees' motion for an order granting a third extension of the exclusivity period, Chief Judge Clark issued a well-reasoned opinion in which he concluded that six separate factors weighed in favor of finding the necessary cause to grant the requested extension. Specifically, Judge Clark considered the evidence in light of the following factors: (1) the legislative history behind § 1121(d); (2) the size and complexity of the bankruptcy case; (3) the debtor's progress in the bankruptcy proceedings; (4) the debtor's motivation in seeking an extension of exclusivity, and promise of probable success in presenting a plan within the time frame requested; (5) the possibility of harm to the creditors; and (6) whether the parties have reached a stalemate or impasse in plan negotiations. His rationale in regard to each of these factors will be summarized below.

First, in regard to the legislative history behind [*15] § 1121(d), the Bankruptcy Court rejected the Creditors' Committee's argument that a further extension of exclusivity would contradict Congress' intent to impose a specific time limit on the debtor's previously unlimited right of exclusivity to file a plan of reorganization. The court reasoned that although the legislative history of § 1121 reflects that its provisions are not to be used by the debtor as leverage, it was not intended to create a completely level playing field between the debtor and creditor, but, rather, retained the debtor's exclusive right to propose a plan of reorganization for a certain period of time, subject to an extension granted upon a showing of cause.

Second, in regard to the size and complexity of the bankruptcy case, the Bankruptcy Court approvingly quoted another court's observation that [HN6] it is "not... necessary to be a Texaco, Johns-Manville Forest Products, or Ames Department Stores to be considered 'large and complex' within the meaning of section 1121." In re

Express One Intern., Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996). The Court further found that this case is sizable and complex, as it concerns "issues regarding a retail [*16] bankruptcy with thousands of claims and assets/liabilities of over $ 300 million" dollars.

Third, in regard to the Debtors' progress in the bankruptcy proceedings, the Bankruptcy Court found that "the evidence is virtually uncontested... [that] the Debtor here has instituted an extensive turnaround plan and continues to meet or exceed its criteria... the court finds it significant that not a single witness presented by the parties opposing this extension could fault the Debtors and their current management for the business judgment and success achieved thus far in this case."

Fourth, in regard to the Debtors' motivation in seeking an extension of exclusivity, and the promise of probable success in presenting a plan within the time frame requested, the Bankruptcy Court noted that a debtor may not seek an extension in order to pressure parties or gain leverage in the negotiation process, and concluded that, "based upon the evidence presented in the March 13, 1997 hearing, the court is convinced that this is not the Debtors' motivation." Specifically, the Court pointed to evidence showing that plan negotiations had begun in earnest two months prior to the hearing, and [*17] noted that it was too early to declare that the parties were at an impasse. The Court further found, based upon the evidence, that the Debtors would be able to present a plan within the requested extension period.

Fifth, in regard to the possibility of harm to the creditors, the Bankruptcy Court concluded that it was "clear from the evidence and argument presented in the March 13, 1997 hearing that [the] creditors will not be prejudiced by a further extension of exclusivity." The Court supported this conclusion by pointing to undisputed evidence that the Debtors' management had effectuated a substantial turnaround in its operating profit, including testimony that estimates of the Debtors' value were more than double the estimates made in April, 1996.

Sixth, in regard to whether the parties have reached a stalemate or impasse in plan negotiations, the Bankruptcy Court examined conflicting testimony in the record and found that "it is clear... that while the parties appear firmly entrenched in their respective positions, they have not yet negotiated enough to have reached an impasse."

Based upon all of these factors, and, in particular, upon the size and complexity of the [*18] case and "the success of the Debtors thus far in the reorganization process," the Bankruptcy Court concluded that the Debtors had shown sufficient cause to support granting the

requested extension, until August 18, 1997. Accordingly, the Court ordered that the extension be granted.

V. Standard of Review

[HN7] In a bankruptcy proceeding, the bankruptcy court is the finder of fact. In re Isaacman, 26 F.3d 629, 631 (6th Cir. 1994). These findings of fact should not be set aside by a reviewing court unless they are "clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bank. P. 8013. Indeed, the Sixth Circuit has consistently held that a bankruptcy court's findings of fact "should not be disturbed by the district court judge unless there is most cogent evidence of mistake or miscarriage of justice." In re Caldwell, 851 F.2d 852, 857 (6th Cir. 1988) (citations omitted). In other words, this Court should not substitute its own judgment for that of the Bankruptcy Court. In regard to a bankruptcy court's conclusions of law, however, a district court should conduct [*19] a de novo review. In re Isaacman, 26 F.3d at 631.

Importantly, [HN8] the issue of whether to grant or deny a request to extend the exclusivity period is a matter committed to the sound discretion of the bankruptcy court. In re Murray, 116 B.R. 6, 7 (D. Mass. 1990) ("after notice and a hearing, the bankruptcy court has the discretion to allow extensions or reductions of the exclusivity period upon a finding of cause"); accord In re Sharon Steel Corp., 78 B.R. 762, 763 (Bankr. W.D. Penn. 1987). Therefore, an order extending the exclusivity period will not be set aside absent an abuse of discretion. In re RCN Anlagenivestitionen Frodsgesellschaft II-Kommanditgesellschaft, 118 B.R. 460, 462 n.1 (W.D. Mich. 1990) ("In reviewing the bankruptcy court's decision to grant a request to extend the exclusivity period, the Court will not overturn such an order absent an abuse of discretion"); accord In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 131 (D.N.J. 1995); In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409 (E.D.N.Y. 1989); cf. Fishell v. United States Trustee, 1994 U.S. App. LEXIS 3875, No. 93-1182, 1994 WL 64718, [*20] at *2 (6th Cir. 1994) ("Discretionary rulings made pursuant to the Bankruptcy Code are reviewable only for abuse of discretion"). An abuse of discretion will be found to exist where the lower court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact," Schachner v. Blue Cross and Blue Shield of Ohio, 77 F.3d 889, 895 (6th Cir. 1996) (citation omitted), or where the reviewing court is left with a "definite and firm conviction that the [lower] court committed a clear error of judgment." Bowling v. Pfizer, Inc., 102 F.3d 777, 780 (6th Cir. 1996).

VI. Appellant's Assignments of Error

As noted above, the Appellant has designated six issues to be presented to this Court on appeal. The Court will address each, in the order that they were identified by the Appellant. n9 In its discussion of the first assignment of error, the Court will also address those arguments that were raised by the Appellant in its brief but were not specifically designated as issues to be presented on appeal.

n9 See supra at 2-3.

[*21]

1. Whether the Bankruptcy Court erred in concluding that the Debtors have shown cause for a further extension of exclusivity under Section 1121(d) of the Bankruptcy Code

This general, all-encompassing assignment of error subsumes the next three issues raised by the Appellant, namely, whether the Bankruptcy Court erred in its factual determinations in regard to the fourth, fifth, and sixth factors identified in its opinion. Since those issues will be discussed at length, infra, the Court will merely note here its conclusion that these contested factual determinations were not clearly erroneous. In addition, it will note that, having reviewed the evidence, it finds that none of the Bankruptcy Court's other factual findings supporting the extension was clearly erroneous. n10 Accordingly, since the Bankruptcy Court's findings of fact are not clearly erroneous, they do not present a basis for holding that it abused its discretion in concluding that sufficient cause exists to support a third extension of the exclusivity period.

n10 Indeed, this Court agrees with the Bankruptcy Court's conclusions that the evidence clearly shows that the bankruptcy case is sizable and complex, that the Debtors' management has made significant progress in regard to improving their financial outlook, and that there is a promise of probable success in presenting a plan within the time frame requested.

[*22]

Since this is such a broad assignment of error, the Court will include in this discussion those arguments raised by the Appellant in its brief which were not specifically assigned as error, namely: (1) that the Bankruptcy Court was not properly mindful of the legislative goals underlying § 1121 of the Bankruptcy Code; (2)

that the Debtors failed to show that the filing of a consensual plan is likely to occur; (3) that the evidence established that an alternative plan is being delayed because of the Debtors' exclusivity; and (4) that the extension of exclusivity will result in holding the creditors hostage to the Chapter 11 process. For the reasons given below, the Court need only address the merits of the first argument advanced by the Appellants.

In regard to this argument, the Court is convinced, from its review of the case law and the legislative history surrounding § 1121, that the Bankruptcy Court was, indeed, "properly mindful" of the legislative intent behind this section. As discussed, supra, Congress intended to give bankruptcy courts the flexibility to determine whether, in a particular case, the factual circumstances supported an extension of [*23] the 120-day period given the debtor to file a reorganization plan. This flexibility was properly exercised by Chief Judge Clark, who relied upon six factors that have not only been relied upon by other courts, n11 but reflect Congress' overriding intent to create an environment in which both debtor and creditor are motivated and able to negotiate a consensual reorganization plan.

n11 See, e.g., In the Matter of Lake in the Woods, 10 B.R. at 343-45 (considering the legislative history of § 1121(d)); In re Express One Intern., Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (considering the size and complexity of the case); In re Gibson & Cushman Dredging Corp., 101 B.R. at 409 (noting that "a finding of cause should be premised upon some promise of probable success and an extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory"); In re Amko Plastics, Inc., 197 B.R. at 77 (considering the lack of prejudice to creditors if the requested extension is granted); In re Perkins, 71 B.R. at 298 ("Courts have considered the likelihood of success of a debtor's reorganizational activities as a factor in determination of cause to extend the exclusivity period"); In re Eagle-Picher Indus., Inc., 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994) (finding lack of cause to terminate the exclusivity period where there was no evidence of undue delay in the negotiations).

[*24]

In regard to Appellant's insistence that the evidence was not sufficient to meet three additional factors identified and discussed in the Appellant's brief, which form the basis of their additional arguments that the Bankruptcy Court erred in granting the extension, the Court

concludes that, although some courts have required what may be described as a "heightened showing" of cause when, as in the case sub judice, a debtor requests a second or third extension of the exclusivity period, see, e.g., In re Washington-St. Tammany Elec. Co-op, Inc., 97 B.R. 852, 854-55 (E.D. La. 1989) (stating that a debtor requesting an additional extension must demonstrate "the likelihood of an agreement on a consensual plan... the absence of alternative creditor plans which cannot be filed because of [the exclusivity period]... and a showing that the debtor is not using exclusivity to force on its creditors its view of an appropriate plan"), and although the Appellant has asserted that the evidence was not sufficient to meet these factors, n12 the Bankruptcy Court's failure to consider these factors does not constitute error, much less an abuse of discretion. As discussed at [*25] length earlier in this opinion, the legislative history discussing § 1121(d), far from mandating that any specific test (much less these three factors) be applied, indicates that bankruptcy courts have been given the flexibility to consider the factual circumstances surrounding the request for an extension, in determining whether a showing of cause has been made. Even if the Appellant had argued to the Bankruptcy Court that it was required to consider these three factors--which is an argument that apparently was not raised below n13--this Court would nevertheless conclude that, given the flexibility granted to that Court to fashion an appropriate test for determining whether the requisite cause for granting the extension has been shown, a refusal to consider these three factors was not an abuse of discretion.

> n12 Specifically, Appellant has argued: (1) that the Debtors failed to demonstrate that the filing of a consensual plan was likely; (2) that the evidence established that an alternative plan is being delayed because of the exclusivity period; and (3) that an extension of the exclusivity period will hold the creditors hostage to the Chapter 11 proceedings. Since the Court concludes that the Bankruptcy Court did not abuse its discretion in failing to consider these factors, the Court will not, because it need not, review the evidence in the record in regard to these assertions.

[*26]

> n13 The parties have vigorously disputed this point. This Court's examination of the Appellant's citations to the record (Doc. # 9 at 9, citing to Bankruptcy Record, Doc. # 2, "Objection of the Official Committee of Unsecured Creditors to Motion of Debtors and Debtors in Possession for Third Extension of Exclusive Right to File and

Seek Acceptance of Plan of Reorganization" at 16-23, and Transcript from Hearing of March 13, 1997, at 13-20) leads it to conclude that, although the Creditors' Committee relied upon these three factors (among many others) in arguing against an extension, it did not assert that these three factors must be considered by the Bankruptcy Court in engaging in its review, due to the prior extensions granted to the Debtors. Thus, the record does not reflect that the Appellant made this argument to the Bankruptcy Court.

In sum, the Court finds no error, much less an abuse of discretion, in the Bankruptcy Court's recognition of the legislative intent behind § 1121(d) through its application of the six factors described in its opinion. Accordingly, this argument is [*27] unpersuasive.

Finally, having reviewed the evidence and the arguments of the parties, this Court concurs with Chief Judge Clark's conclusion that all six factors weigh in favor of finding sufficient cause to support a third extension of the exclusivity period, and finds absolutely no error, much less an abuse of discretion, in his holding to this effect. Accordingly, the Appellant's first assignment of error is OVERRULED.

2. Whether the Bankruptcy Court erred in finding that the Debtors are not seeking an extension of exclusivity in order to pressure the parties or gain leverage in the negotiation process

This assignment of error, concerning the Debtors' motivation in seeking the extension, was not addressed by the Appellant in its brief. n14 Having reviewed the evidence in the record, the Court concludes that the Bankruptcy Court's factual finding, namely, that the Debtors are not seeking an extension in order to pressure the parties or gain leverage in the negotiation process, is not clearly erroneous. Accordingly, the Appellant's second assignment of error is OVERRULED.

> n14 Indeed, the Appellant argued that "the focus should be on the consequences of the debtor's actions rather than the debtor's intent." Doc. # 4 at 32.

[*28]

3. Whether the Bankruptcy Court erred in finding that the Debtors and the committees have not reached a negotiating impasse on the terms of a consensual plan

As it did below, the Appellant has argued that the parties have reached an impasse on two critical issues,

regarding the allocation of the Debtors' equity value and control over the makeup of the Debtors' Board of Directors (Doc. # 4 at 27-28). After considering the conflicting testimony presented by the parties in regard to the status of the negotiations, including their positions on these two specific issues, Chief Judge Clark concluded that negotiations had just begun, that there had been only one meeting between the parties, and that it was too early to conclude that negotiations were at an impasse.

Having reviewed the evidence in the record, this Court concludes that the Bankruptcy Court's factual finding that negotiations were not at an impasse is not clearly erroneous, particularly in view of the Bankruptcy Court's unique ability to gauge the credibility of witnesses when presented with conflicting testimony. Accordingly, the Appellant's third assignment of error is OVERRULED.

4. Whether the Bankruptcy [*29] Court erred in finding that creditors will not be prejudiced by a further extension of exclusivity

The Appellant did not directly address this issue in its brief. Having reviewed the evidence in the record-- and, in particular, the undisputed evidence that the Debtors' management has done a remarkable job of increasing its assets within a relatively short period of time, as demonstrated by increases in earnings, gross margin and operating profits--this Court is unconvinced that the Bankruptcy Court's factual finding, namely, that the creditors will not be harmed by a further extension, is clearly erroneous. Accordingly, the Appellant's fourth assignment of error is OVERRULED.

5. Whether the Bankruptcy Court erred in granting the Debtors an extension of exclusivity until August 18, 1997, when the evidence established the Debtors' belief that they would be able to file a plan no later than June 16, 1997

Appellant has argued that the Bankruptcy Court erred in extending the exclusivity period until August 18, 1997, since the Debtors' executive vice-president, John Muskovich, testified that June 16, 1997, is a reasonable date for the Debtors to be able to file a plan in this [*30] case (Hearing Transcript at 75-76).

Although this issue was not addressed by Chief Judge Clark in his opinion, it was raised as a question to the Debtors' Counsel at the end of the hearing:

> THE COURT: The five months [requested as an extension] is for the filing of the plan?
>
> MR. CIERI: The plan Your Honor, yes.

> THE COURT: I guess there's a time line in your document that raised a little question about what you really meant. I say the time line, there's a chart there.
>
> MR. CIERI: Right Your Honor, the idea is to protect exclusivity through the period. Again, June is a projected date, it depends on the negotiation and all that.
>
> THE COURT: I'm happy to have that clarification.

Hearing Transcript at 352 (emphasis added). Based upon this clarification, offered by Counsel, and in view of the fact that Muskovich testified that the June 16, 1997, date is only a reasonable (rather than certain) date for filing the plan, the Court concludes that the Bankruptcy Court did not abuse its discretion in granting the Debtors' request to extend the exclusivity period until August 18, 1997. Accordingly, this assignment of error is OVERRULED.

6. Whether [*31] the Bankruptcy Court erred in excluding evidence that was relevant to the issue of whether the Debtors were entitled to a further extension of exclusivity under Section 1121(d) of the Bankruptcy Code

Appellant mentioned, but did not argue, this issue in its brief. Before ruling upon this assignment of error, the Court must first describe a bit of the pertinent history which preceded the ruling. Briefly stated, three of the Debtors' major shareholders, n15 who formerly were members of the Board of Directors, engaged in behavior both prior to and after the Debtors' bankruptcy filing on October 17, 1995, that called into question their ability to conduct good-faith negotiations with the creditors in regard to formulating a consensual plan of reorganization. Significantly, by the time of the hearing on March 13, 1997, these three shareholders had been removed from the Board of Directors and had "lost their voice" in regard to the Chapter 11 proceedings, including the negotiation process (Hearing Transcript at 105).

n15 These individuals are William Weprin, Barbara Weprin and Leonard Peal.

[*32]

Prior to the hearing, the Appellees moved to exclude evidence regarding the prior misconduct engaged in by these individuals, including evidence of two lockout

agreements and subsequent negotiations with other potential buyers, as well as alleged misconduct by the Debtors' current chief executive officer and chairman, Max Gutmann. The Bankruptcy Court ruled, both in writing and orally, that some, but not all, of this evidence should be excluded. Specifically, the Bankruptcy Court issued a written ruling which stated as follows:

> The evidence presented in the objections to the motion to extend may be divided into two, that evidence which demonstrates the questionable actions and conduct by William Weprin, Barbara Weprin and Leonard Peal, the shareholders, and the alleged misconduct of Max Gutmann. The questionable conduct of the now resigned shareholder members of the board is acknowledged by the committee and is not disputed by the debtor.

> The shareholder directors have resigned, and thus the nature of their past actions may no longer be a controlling factor in the reorganization process.

> The nature and extent of the lockout agreements are well known to the court, having [*33] heard the information at prior hearings, so that reassertion of that evidence at the hearing next Thursday, March 13, 1997, would be repetitious under Fed. R. Evidence 403.

> The court considers relevant new evidence pertaining to the presently constituted board members and their role in the reorganization. Therefore, the motion in limine [to exclude the proffered evidence] is granted in part and denied in part.

> It is granted to exclude the presentation of evidence that is already before the court from prior hearings and for evidence solely pertaining to motivations and conduct of past board members, including evidence of lockout agreements.

> The motion in limine is denied as to evidence, which pertains to past shareholder actions, which could be shown to influence the conduct or affect the judgment or the actions of the presently constituted board of directors.

Decision and Order on Motion in Limine, filed March 7, 1997, Doc. # 10 of Bankruptcy Record (emphasis

added). The Bankruptcy Court later orally amended its ruling in regard to the emphasized portions, by indicating that Fed. R. Evid. 403 did not form a basis for its ruling, and that any evidence not relevant [*34] under Fed. R. Evid. 401 would be excluded:

> I did state that the excluded evidence would [include] evidence of the lockout agreement, and [did] it under [Fed. R. Evid.] 403, because while it may be relevant in a way, it is not of the type that the court could consider in this hearing, which I think is what we must get back to, and understand [the hearing] is for the specific issue of whether or not there is cause to grant Elder Beerman an extension of the exclusivity period. I do want to exclude evidence of the lockout agreement. I don't know how else better to say it than that.

> The only way I answered... yes to [admitting the evidence] is, that in argument, if you can demonstrate that that [evidence] in some way influenced the presently constituted Board of Directors, then that may, if it influenced that conduct in some way, and you can establish that, then to that extent it has some probative value.

> But just for what happened with the lockout agreement and its use by [the] shareholder Board of Director individuals is not material and not relevant to the case that we're dealing with at this time. The case, meaning this matter on the exclusivity extension. [*35]

Transcript of March 12, 1997, Conference Call on Debtors' Motion to Exclude as Witnesses Messrs. Kenneth A. Simon and Michael Kramer, at 16-17, Doc. # 14 of Bankruptcy Record (emphasis added). Thus, the Bankruptcy Court clarified that it would exclude any evidence of lockout agreements or other misconduct, unless that evidence tended to show an undue influence on the judgment or actions of the presently constituted Board of Directors. At the hearing, the Bankruptcy Court adhered to this ruling. n16

> n16 Specifically, the Bankruptcy Court allowed into evidence extensive evidence concerning Mr. Gutmann's close social and business ties with the three deposed members of the Board, as

well as regarding some of his own actions which were argued by the creditors to constitute misconduct. The Bankruptcy Court did not admit other evidence (concerning actions taken by the former Board members) that was not argued to show an undue influence on the presently constituted Board of Directors, although it did allow the creditors to make a proffer regarding same.

[*36]

The Court is not even persuaded that this evidentiary ruling was in error, much less that it was an abuse of discretion. n17 Indeed, the Court agrees with Chief Judge Clark's conclusions that the contested evidence was only relevant if it pertained to the Debtors' then-current ability (as of the time of the March 13, 1997, hearing) to engage in good-faith negotiations with the creditors, and that any evidence which solely demonstrated past misconduct--by persons who no longer had a role in the negotiation process--was not relevant to any of the six factors under consideration by the Bankruptcy Court. That is, given that the excluded evidence was not shown by its proponents to have an effect on the then-current negotiations, it did not have "any tendency to make the existence of any fact that is of consequence to the determination of the action," i.e., any of the six factors under consideration by the Bankruptcy Court, either "more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (defining the term "relevant evidence"). In other words, although it was proper for the Bankruptcy Court to examine the state of the negotiation process at the time [*37] that the request for an extension was considered--and, as part of this examination, to admit any evidence tending to show that the negotiation process was, at that time, being unduly influenced by alleged misconduct--it was likewise proper for that Court to exclude evidence of wholly past misconduct, which could not be shown to have had any influence on the then-current state of negotiations.

n17 [HN9] A lower court's decision to exclude evidence is reviewed under an abuse of discretion standard. Sutkiewicz v. Monroe County Sheriff, 110 F.3d 352, 357 (6th Cir. 1997). Such a ruling should not be reversed on appeal "unless the reviewing court finds that the ruling excluding the evidence is not only erroneous but results in substantial injustice to the aggrieved party." Id.

The Court has no doubt that, if the alleged misconduct had been ongoing at the time that the Debtors' request for an extension was considered in March, 1997, then it arguably would have been relevant to the Bank-

ruptcy Court's [*38] ruling. n18 Since, however, the alleged miscreants were removed from the Board of Directors (and, thereby, from the negotiation process) on February 27, 1997, prior to the hearing conducted by the Bankruptcy Court, then any evidence of their misconduct--which was wholly in the past at the time of the hearing--would only have been relevant to the issues considered at the hearing if, as Chief Judge Clark ruled, such evidence could have been shown to have an effect on the then-presently-constituted Board of Directors, i.e., on the then-current state of negotiations.

n18 Similarly, if the misconduct had been known at the time that the Bankruptcy Court granted the Debtors' second request for an extension, then it arguably would have been relevant to that determination, since it would have raised an inference that the extension was sought by the Debtors in order to obtain a tactical device to put pressure on the creditors, which would have been relevant to the determination of whether the creditors would be harmed by the extension.

[*39]

Put differently, the Bankruptcy Court acted correctly in declining to punish the Debtors for the past misconduct of three of their former directors, which is precisely what would have occurred if it had refused to grant the extension solely because of evidence of this wholly past misconduct--evidence that could not be shown to have an effect upon the then-current negotiating process. According to this Court's extensive research, neither the legislative history of § 1121(d) nor the case law would support such a punitive approach. Instead, the Bankruptcy Court properly confined itself to examining the then-current state of the negotiation process--including extensive evidence concerning Max Gutmann's social and business ties with the former directors, which was admitted into the record in accordance with Chief Judge Clark's evidentiary ruling--in making its determination that the Debtors had shown cause for granting the extension. This Court is persuaded that the Bankruptcy Court acted correctly in following this approach. Accordingly, this sixth assignment of error is OVERRULED.

WHEREFORE, based upon the aforesaid, the Appellant's six assignments of error are OVERRULED. The order [*40] of the Bankruptcy Court granting an extension of the exclusivity period until August 18, 1997, is AFFIRMED. n19

n19 The Court notes here that although the three deposed directors are still shareholders of

1997 U.S. Dist. LEXIS 23785, *

Elder-Beerman, there is nothing in the record to suggest that this status entitles them to any input in the drafting or negotiation of a plan of reorganization.

June 23, 1997

WALTER HERBERT RICE, CHIEF JUDGE

UNITED STATES DISTRICT COURT

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945
**(Cite as: Not Reported in F.Supp.)**

▷

Briefs and Other Related Documents
In re Trans World Airlines, Inc.D.Del.,1993.
United States District Court, D. Delaware.
In re TRANS WORLD AIRLINES, INC., Debtor.
UNITED STATES of America, Appellant,
v.
AIR LINE PILOTS ASSOCIATION, INTERNA-
TIONAL, Appellee.
**Bankruptcy No. 92-115, C.A. No. 92-678-SLR.**

June 22, 1993.

S. David Peress of Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, for debtor.
Thomas E. Ross, Philadelphia, PA, U.S. Trustee.
William C. Carpenter, Jr., U.S. Atty. and Ellen W.
Slights, Asst. U.S. Atty., Wilmington, DE, and Stuart D.
Gibson, Tax Div., U.S. Dept. of Justice, Washington,
DC, for appellant.
Stephen W. Spence, and Judith Reese of Phillips,
Goldman & Spence, PA, Wilmington, DE, and Ralph
R. Mabey, Stephen M. Tumblin, and M. Margaret
Huntz, of LeBoeuf, Lamb, Leiby & MacRae, Salt
Lake City, UT, for appellee.
Laura Davis Jones of Young, Conaway, Stargatt &
Taylor, James E. Spiotto, Barbara C. Klabacha, and
Sanjay T. Tailor of Chapman and Cutler, Chicago,
IL, for the Official Unsecured Creditors' Committee
of Trans World Airlines, Inc.

MEMORANDUM OPINION
SUE L. ROBINSON, District Judge.

I. INTRODUCTION

**\*1** This appeal arises from orders of the United States
Bankruptcy Court for the District of Delaware ap-
proving payment by Trans World Airlines, Inc.
("TWA"), to the Airline Pilots Association, Interna-
tional ("ALPA"), a TWA creditor and labor union
that represents TWA's approximately 2,700 pilots, for
professional fees and expenses incurred by ALPA in
connection with this matter both prior and subsequent
to the filing of TWA's bankruptcy petition. The
United States, another TWA creditor, appeals from

these orders on three separate, but related grounds.
The ALPA and the Official Committee of Unsecured
Creditors (the "Creditors Committee") both have
filed briefs in opposition to the United States'
appeal.FN1 Additionally, the ALPA moves to dis-
miss this appeal on the ground that the bankruptcy
court order appealed from is interlocutory and thus
non-appealable. The United States opposed ALPA's
motion. On March 25, 1993, following the comple-
tion of briefing, the Court heard oral argument both
on the United States' appeal and ALPA's motion to
dismiss.

II. FACTUAL BACKGROUND

TWA, a Delaware corporation, filed a petition seek-
ing relief under Chapter 11 of the Bankruptcy Code
on January 11, 1992. In August 1992, as part of its
"Turnaround Plan," TWA, the ALPA and the Credit-
ors Committee entered into an agreement, referred to
as the "Agreement in Principle," whereby the ALPA
agreed to amendments to the pilots' collective bar-
gaining agreement which resulted in substantial wage
concessions, and to waiver of certain legal claims
against TWA. In exchange, TWA made various com-
promises and agreements, including an agreement
that "TWA, if and to the extent approved by the
Bankruptcy Court and consistent with applicable
bankruptcy law, shall reimburse as an actual and ne-
cessary cost to the estate, the reasonable fees and ex-
penses incurred by ALPA in connection with this
Agreement...." (D.I. 4, Vol. II, Exhibit D at ¶ 9) The
Agreement in Principle provides, in relevant part, that
it is "effective subject only to (i) ratification ... by
ALPA membership no later than 45 days after the ex-
ecution of this Agreement, unless ratification is
waived by ALPA, ... and (iv)(a) Bankruptcy Court
approval of ... this Agreement by October 12, 1992
and (b) Bankruptcy Court determination relating to
the fees and expenses pursuant to paragraph 5 ... by
October 12, 1992, in either case unless ALPA agrees
to extend such date...." (*Id.* at ¶ 10)

TWA and the Creditors Committee filed a joint mo-
tion with the bankruptcy court on or about August 27,
1992 seeking authorization for the debtor to enter in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945
(Cite as: Not Reported in F.Supp.)

to and perform the Agreement in Principle with the ALPA as well as other corresponding agreements with TWA's other unions. The motion informed the bankruptcy court, apparently without dispute, that substantial wage and benefit concessions from TWA's employees were required for TWA to become a viable, competitive airline and to successfully emerge from bankruptcy under a feasible plan of reorganization. (D.I. 4, Vol. I, Designation 2 at ¶¶ 8-10) The motion further indicated that TWA's timely entry into the Agreement in Principle was a crucial factor in obtaining immediate implementation of those much-needed wage and benefit concessions. (Id.)

**2** After the bankruptcy court received objections to the joint motion and conducted a hearing on the motion, the court approved the motion and the debtor's entry into the Agreement in Principle. In so ruling, the court stated as follows:

I have ... agreements which have been referred to as package deals. This Court does not rewrite agreements. It has authority to approve or disapprove.

The consensus is that these agreements are essential to the turnaround business plan which has been worked upon by TWA, most diligently and at arm's length, with representatives of the unions and others for a period exceeding six weeks ... on a day by day basis and very lengthy days.

These agreements represent concessions made by the employees of TWA which will generate [$]177 million in savings on an annual basis for a period of three years.

These agreements also settle various claims which ... have the potential for litigation in this court and other courts on claims that arose over many ... years and could be very costly.

The agreements ... provide that the employees will have an equity position. This ... was agreed to ... by the Creditors Committee with some question because obviously this has some impact on the creditors and others.

The Creditors Committee vigorously supports this agreement in principle. The bone of contention as far as the objections which are no longer viable was that there was some fear that the rights of all would be affected by the Debtor's and the Creditors Committee's agreements as to what they will or will not do in con-

nection with the request for fees and expenses at some future date.

The Creditors Committee counsel and Debtor's counsel have allayed those fears and I will emphasize that all parties' rights remain unaffected as to ... any application for fees and expenses to be ruled upon at a subsequent date by the Court upon further application.

(D.I. 4, Vol. I, Designation 5 at 100-101)

On September 10, 1992, the bankruptcy court ruled that "TWA and the Creditors' Committee shall be, and hereby are, authorized pursuant to sections 363 and 105 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure to enter into and perform the Union Agreements [i.e., the ALPA Agreement in Principle and other corresponding union agreements], including, *inter alia*, the payment of fees as provided in the Union Agreements and the settlement or limitation of certain claims, as provided in the Union Agreements." (D.I. 4, Vol. I, Designation 6 at 3-4) The United States did not file an appeal from the bankruptcy court's order authorizing the Debtor, ALPA and Creditors Committee to enter into and perform the Agreement in Principle.

On October 2, 1992, the ALPA and Creditors Committee filed a Joint Fee Motion seeking bankruptcy court approval of payment by TWA to ALPA of approximately $1,000,000 in reimbursement for fees and expenses incurred by ALPA's attorneys and financial advisors. (D.I. 2, Designation 1) The motion was filed and the reimbursement was sought pursuant to the terms of the Agreement in Principle and pursuant to Bankruptcy Code sections 503(b)(3)(D) and (b)(4). On that same day, the motion was served by Federal Express on the United States. (D.I. 10 at 13) On October 5, 1992, exhibits to the Joint Fee Motion were filed with the bankruptcy court and served by Federal Express on the United States. (Id.) On October 7, 1992, the United States filed a timely objection to the Joint Fee Motion. (D.I. 2, Designation 3) On October 8, the bankruptcy court held a hearing on the Joint Fee Motion. (D.I. 2, Designation 4)

**3** The United States objected to approval of the Joint Fee Motion on various substantive and procedural

A045

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 3
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945
(Cite as: Not Reported in F.Supp.)

grounds, two of which are raised again in this appeal. The United States' procedural objection was grounded on its contention that the motion was untimely filed. In particular, the United States argued then, as it does now, that the ALPA had the ability to extend the October 12, 1992 deadline for bankruptcy court approval of the fee application and to file the Joint Fee Motion at an earlier time, either of which would have obviated the problem of having only several days for interested parties to review, formulate objections to and, if appropriate, oppose, in whole or in part, the Joint Fee Motion. The bankruptcy court held the hearing despite the shortened notice and thereby rejected the United States' procedural objection. The other objection raised below, which the United States reasserts on appeal, is grounded on its contention that the fee application should have been denied insofar as it sought reimbursement for fees and expenses incurred during the period prior to TWA's filing of its Chapter 11 petition ("pre-petition fees and expenses").

After hearing argument and testimony regarding the Joint Fee Motion, the bankruptcy court issued an Order authorizing reimbursement to the ALPA for its pre-petition and post-petition fees and expenses incurred up to and including August 31, 1992, although the court reserved decision on the exact amount of fees and expenses to be approved until October 14, 1992 pending its review of the reasonableness thereof. (D.I. 2, Designation 5) In its Order, the court found that "ALPA has made a substantial contribution to this bankruptcy case which has benefitted TWA's estate." (*Id.* at 2) The court further stated that payment of these fees and expenses "is in the best interest of TWA's estate and is authorized by Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code." (*Id.*) The court also ruled that fees and expenses incurred by the ALPA subsequent to August 31, 1992 would be payable to the ALPA on a monthly basis "under Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code subject to review by [the bankruptcy court] as to the reasonableness thereof." (*Id.*) On October 14, 1992, consistent with its prior Order, the court issued an Amended Order reiterating the sum and substance of its prior Order and authorizing payment to ALPA in the specific amount of $1,077,841.

(D.I. 3, Designation 7) The United States filed the instant appeal from that Order approximately two weeks later.

### III. JURISDICTION

ALPA moves to dismiss the United States' appeal on the ground that the bankruptcy court's "Amended Fee Order [from which this appeal arises] is an order allowing the payment of compensation and expenses on an interim basis and, therefore, it is not a final order." (D.I. 9 at 6) ALPA contends that bankruptcy court orders "which award fees and expenses on an interim basis are interlocutory orders because they are always subject to the bankruptcy court's re-examination and adjustment during the course of a Chapter 11 case." (D.I. 9 at 6 (citing, *inter alia*, *In re Boddy*, 950 F.2d 334, 336 (6th Cir.1991); *In re Valley Forge Plaza Assoc.*, 119 B.R. 471, 472 (E.D.Pa.1990); 2 *Collier on Bankruptcy* ¶ 331.03 (15th ed. 1992); 11 U.S.C. § 331)) The authorities cited here by ALPA address whether orders awarding compensation pursuant to section 331 of the Bankruptcy Code, which by definition are interim awards, are interlocutory. The fee awards at issue here, however, were not authorized pursuant to section 331. Accordingly, the authorities relied upon by ALPA in this regard are inapposite to the issue at bar.

*4 Even if a section 331 analysis were applicable to the facts at bar, it has been held "that an order of interim fees becomes final when it is no longer subject to modification by the bankruptcy court." *Boddy*, 950 F.2d at 336. In the instant case, it appears that at least one of the fee and expense award decisions on appeal here, i.e., the court's decision to allow payment for pre-petition costs, is "no longer subject to modification by the bankruptcy court."

Section 158(a), title 11 of the United States Code grants district courts "jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges...." The term "final" is viewed quite differently in the bankruptcy context than in the usual context of appeals from non-bankruptcy litigation. The Third Circuit recently explained this notion as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 4
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945
(Cite as: Not Reported in F.Supp.)

This court has "consistently recognized that finality must be viewed pragmatically in bankruptcy appeals." *Wheeling-Pittsburgh Steel Corp. v. McCune, 836 F.2d 153, 157 (3d Cir.1987).* This is so because "bankruptcy cases 'frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from viewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.' " *Id.* at 158, quoting *In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir.1985).* In *In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir.1987),* we set out several factors to be weighed in evaluating the propriety of jurisdiction in a bankruptcy case:

Our jurisdiction is properly invoked by balancing a general reluctance to expand traditional interpretations regarding finality and a desire to effectuate a practical termination of the matter before us. Factors to evaluate in this weighing process are the impact upon the assets of the bankrupt estate, the necessity for further fact-finding on remand, the preclusive effects of our decision on the merits on further litigation, and whether the interest of judicial economy would be furthered.

The "most important" of these factors is the impact upon the assets of the bankrupt estate.

*In re Market Square Inn, Inc., 978 F.2d 116, 120 (3d Cir.1992).*[FN2]

In the matter at bar, there are three bankruptcy court decisions from which the United States appeals. First, the court rejected the United States' objection to holding the hearing on ALPA's request for payment of fees and expenses on an expedited basis, with shortened notice. Second, the court awarded pre-petition fees and expenses incurred over the United States' objection that such fees and expenses are *per se* not recoverable as an administrative expense. Third, according to the United States, the court determined that ALPA made a "substantial contribution" to the TWA bankruptcy case within the meaning of section 503(b)(3)(D) and ruled that future ALPA fee and expense applications would not be tested under this standard and would be reviewed for reasonableness only.

*5 Initially, the Court finds that it is appropriate to analyze each of these separate, albeit related, decisions independently in order to determine if this Court has jurisdiction to review any or all of those decisions. *See In re Delaware & H.R. Co., 129 Bankr. 388, 393 (D.Del.1991).* With respect to the court's decision to allow an administrative claim for pre-petition fees and expenses, relevant authorities suggest that the decision is "final" within the meaning of section 158(a) as that term has been interpreted by courts in this circuit. As this Court recently explained:

In *Walsh Trucking,* the Court of Appeals concluded that the standard for determining finality under the 1984 Amendments to the Bankruptcy Act was the same as that in effect since the Bankruptcy Act of 1898, i.e., " 'any dispute between a bankrupt and his creditors over a claim or priority was a separate "proceeding" and an order settling such a dispute was appealable.' " *Walsh Trucking* at 700, quoting *In re Saco Local Development Corp., 711 F.2d 441, 445 (1st Cir.1983).* The Court of Appeals also noted its approval of dictum of two other courts, stating that under the 1984 Act each adversary proceeding should be analyzed independently when determining finality. *See In re The Charter Co., 778 F.2d 617, 621 (11th Cir.1985)* ("In bankruptcy proceedings, it is generally the particular adversary proceeding or controversy that must be finally resolved, rather than the entire bankruptcy litigation."); *In re Fox, 762 F.2d 54, 55 (7th Cir.1985)* ("A proceeding to establish a claim against a bankrupt estate is final for purposes of appeal when it is over and done with, even though the bankruptcy goes on.").

*In re Collated Products Corp., 121 Bankr. 195, 200 (D.Del.1990).*

The dispute over whether ALPA is entitled to receive as an administrative expense reimbursement from the estate for its pre-petition expenses and fees essentially was a separate proceeding over a claim or priority. The bankruptcy court's decision to allow ALPA to collect said reimbursement as an administrative expense pursuant to sections 503(b)(3)(D) and 503(b)(4) constituted a final decision with respect to that matter.

A047

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 5
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945
(Cite as: Not Reported in F.Supp.)

Analysis of the factors considered when determining whether jurisdiction properly is exercised under section 158(a) further supports this conclusion. The sum of money which the bankruptcy court allowed ALPA to receive as an administrative expense, $1,077,841, clearly is a substantial amount. ALPA asserts that "the Amended Fee Order will not have a significant impact on the assets of TWA's estate or adversely effect TWA's reorganization efforts." (D.I. 15 at 4-5) However, ALPA submits no evidence whatsoever in support of this assertion, and the Court can not presume that payment of $1,077,841 will not impact on the TWA's estate. As the moving party, with the burden of proof on this factual issue, ALPA has failed to present evidence supporting its position. The Court finds that this "most important" factor weighs in favor of exercising jurisdiction.

\*6 Furthermore, resolution of this issue at the present time will promote prompt and efficient resolution of this bankruptcy case by removing any uncertainty as to the validity of this administrative claim. Indeed, the ALPA itself conceded at oral argument that "the legal issue of pre-petition fees under Section 503(b)(3)(D) and (4) of the Bankruptcy Code ... is an issue which has been fully briefed and is before the Court, and it may make sense for the Court to determine it at this time as a matter of judicial economy." (D.I. 23 at 27)

As to the other decisions by the bankruptcy court from which the United States appeals, the analysis is different. The United States objected to the bankruptcy court's decision to hold a hearing on ALPA's administrative expense claim on an expedited basis. The court overruled the United States' objection and held the hearing on the expedited schedule originally designated. The record indicates that the bankruptcy court will not be holding another hearing on the matters addressed at the October 8 hearing. It cannot be disputed that the court's decision to overrule the United States' objection and to hold the expedited hearing constituted a "final" decision on that singular issue.

With respect to the bankruptcy court's Order providing that "ALPA shall be entitled to submit monthly requests for compensation of its legal and financial advisors which requests shall be entitled to payment under Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code subject to review by [the bankruptcy court] as to the reasonableness thereof," the Court finds that this portion of the court's order is interlocutory and, accordingly, is non-appealable. Although the United States characterizes this language as indicating that the bankruptcy court had finally resolved the "substantial contribution" issue and that future fee and expense applications would not be subject to the "substantial contribution" standard, this Court will not assume that the bankruptcy court will decline to consider the substantial contribution issue in ruling on future fee applications. Since the bankruptcy court has not finally decided anything in connection with this portion of its order, there is nothing from which to appeal.

For the reasons stated, the Court will grant ALPA's motion to dismiss as to the future payments issue, but will otherwise deny the motion, there being jurisdiction to hear the remainder of the issues on appeal.

## IV. STANDARD OF REVIEW

The proper standard of review to be applied by a district court reviewing the rulings of a bankruptcy court turns on the nature of the issues presented on appeal. Factual determinations of the bankruptcy court are entitled to deference and are not reversed unless found to be clearly erroneous. Bankruptcy Rule 8013; *In re Morrissey*, 717 F.2d 100, 104 (3rd Cir.1983). Legal conclusions of the bankruptcy court are subject to plenary review by the district court and are considered *de novo* on appeal. *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988). Bankruptcy court decisions involving the exercise of discretion are reviewed for abuse of discretion. *In re Vertientes, Ltd.*, 845 F.2d 57, 58-59 (3d Cir.1988).

\*7 The bankruptcy court exercised its discretion in allowing the Joint Fee Motion hearing to go forward on shortened notice. *See* Bankruptcy Rule 9006(c)(1) ("when an act is required or allowed to be done at or within a specified time by these rules, the court for cause shown may in its discretion with or without motion or notice order the period reduced"). Thus,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether or not that decision was erroneous turns on whether the court abused its discretion in so doing. The legal issue presented here, which is subject to *de novo* review, is whether the bankruptcy court had authority to authorize payment of pre-petition fees and expenses as an administrative claim pursuant to section 503(b) of the Code. Certain factual determinations made by the bankruptcy court in allowing payment of this administrative claim must be accepted on appeal unless found to be clearly erroneous. *See infra* at n. 9.

## V. DISCUSSION

### A. The Shortened Notice Issue

The United States contends on appeal that the bankruptcy court violated the terms of Bankruptcy Rule 2002(a)(7) by failing to give 20 days' notice of the hearing on the Joint Fee Motion and that the court abused its discretion by holding the hearing on only six days' notice.

The United States presented this objection to the bankruptcy court. Although the court did not issue a specific order allowing for hearing of the motion on shortened notice, the court received evidence regarding the good cause exception to the notice requirements of Rule 2002(a)(7).[FN3] By actually conducting the hearing over the United States' objection, the court *de facto* ruled that the requirements of Bankruptcy Rule 9006(c) were satisfied and that the hearing properly could be held on shortened notice. The Court finds that the bankruptcy court did not abuse its discretion in this regard.

### B. Pre-petition Fees and Expenses

The bankruptcy court approved TWA's reimbursement of ALPA's professionals' fees and expenses as an administrative expense pursuant to section 503(b)(3)(D) of the Bankruptcy Code. This provision allows for such payments only when the fees and expenses were "incurred by a creditor ... in making a substantial contribution in a case under [C]hapter ... 11." 11 U.S.C. § 503(b)(3)(D).

The United States objects to the bankruptcy court's approval of these payments on the ground that pay-

ment of fees and expenses is proper under section 503(b)(3)(D) only when the expenses at issue were "incurred after the filing of the petition, or in connection with the filing of the petition." (D.I. 7 at 12)

Relevant authorities indicate that a debtor's payment of a professional's pre-petition fees and expenses as an administrative expense pursuant to section 503(b) is not *per se* disallowed, and that such payment is permissible under certain appropriate circumstances. *See In re Lister,* 846 F.2d 55, 57 (10th Cir.1988); *In re Financial News Network, Inc.,* 134 B.R. 732, 736-37 (Bankr.S.D.N.Y.1991); *In re Texaco, Inc.,* 90 B.R. 622, 630-31 (Bankr.S.D.N.Y.1988); *In re Russell Transfer, Inc.,* 59 B.R. 871, 873 (Bankr.W.D.Va.1986); *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557, 565-59 (Bankr.D.Utah 1985); *In re Med General, Inc.,* 17 B.R. 13 (Bankr.D.Minn.1981); *see also Randolph v. Scruggs,* 190 U.S. 533 (1902); 124 Cong.Rec. H 11,094-95 (Sept. 28, 1978); 124 Cong.Rec. S 17,411 (Oct. 6, 1978).

**\*8** One court ruling on a similar application, after carefully considering relevant precedent and legislative history, opined as follows: "The appropriate test under Section 503(b) is whether the services substantially contributed to a successful result, that is, an actual and demonstrable benefit to the debtor's estate, the creditors, and, to the extent relevant, the stockholders."[FN4] In a similar case, the court allowed for payment of professionals' pre-petition fees and expenses on the basis of the following facts:
[T]he informal creditors' committee was engaged in the beginning of a continuous process which eventuated in the acceptance of a plan of reorganization beneficial to the general creditors. I see no reason to distinguish on the facts known to the Court between the beneficial results of the pre-petition activity as opposed to the post-petition activity of the committee which is admittedly compensable. Given such benefit conferred, Section 503(b)(4) forms the statutory predicate for reimbursement of reasonable compensation for its employed attorney based on the nature, extent, and value of the services as well as the cost of comparable services as well as reimbursement for necessary expenses incurred.

*Med General, Inc.,* 17 B.R. at 14.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 7
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945
(Cite as: Not Reported in F.Supp.)

In the instant case, the record amply supports the bankruptcy court's finding that the efforts of the ALPA and its professionals "substantially contributed to a successful result, that is, an actual and demonstrable benefit" to TWA's estate and creditors. The Court finds that, under the facts and unique circumstances before it [FN5], the bankruptcy court did not err as a legal matter in allowing reimbursement of ALPA's professionals' pre-petition fees and expenses as an administrative expense pursuant to section 503(b) and the Agreement in Principle.

The United States essentially concedes that ALPA, with the assistance of its financial advisors and attorneys, made a "substantial contribution" in TWA's Chapter 11 case, but asserts that there is no evidence in the record showing that "the particular expenses for which [ALPA] asserts an administrative priority claim were 'incurred in' making the substantial contribution...." (D.I. 13 at 10) [FN6] In other words, the United States argues that the bankruptcy court erred in allowing payment here because there is no evidence of a nexus between ALPA's incurrence of particular pre-petition fees and expenses and the admittedly substantial contribution made by ALPA. [FN7]

The Court disagrees. Evidence of record supports the conclusion that there was a nexus between the pre-petition professional fees and expenses incurred by ALPA, and the services underlying those costs, and the substantial contribution which the United States concedes was made (and continues to be made) by ALPA in entering into and complying with the terms of the Agreement in Principle. (D.I 2, Designation 4 at 196, 1. 9 to 199, 1. 8 and at 209, 1. 1 to 211, 1. 3) [FN8] The bankruptcy court's implicit factual finding of nexus based on this evidence, therefore, was not clearly erroneous. [FN9]

## VI. CONCLUSION

*9 For reasons stated, ALPA's motion to dismiss will be denied except as to the United States' third ground for appeal, i.e., the future payments issue, as to which the motion will be granted. Finding the United States' arguments as to which this Court has appellate jurisdiction to be without merit, the Court will affirm.

FN1. TWA did not participate in these appellate proceedings.

FN2. Although these authorities dealt with the issue of whether the court of appeals had jurisdiction over a district court decision arising from a bankruptcy appeal, the Third Circuit has held that the same standard governs appeals under section 158(a) from bankruptcy courts to district courts. See *Walsh Trucking Co., Inc. v. Insurance Co. of North America,* 838 F.2d 698, 699-700 (3d Cir.1988).

FN3. In particular, undisputed facts before the bankruptcy court indicated that (1) the Joint Fee Motion was filed and served as soon as possible under the circumstances, and (2) the effectiveness of the Agreement in Principle would have lapsed and, more significantly, the much-needed immediate release of wage concession monies held in escrow would not have occurred absent bankruptcy court approval of the ALPA's fee and expense reimbursement request by October 12, 1992. (D.I. 2, Designation 4 at 163-65, 171-72 and 178-79)

FN4. *Jensen-Farley, Pictures, Inc.,* 47 B.R. at 569 (citing *In re United Puerto Rican Food Corp.,* 41 B.R. 565, 574 (Bankr.E.D.N.Y.1984); *In re Calumet Realty Co.,* 34 B.R. 922 (Bankr.E.D.Pa.1983); *In re J.V. Knitling Services, Inc.,* 22 B.R. 543, 545 (Bankr.S.D.Fla.1982); *In re Richton Int'l Corp.,* 15 B.R. 854 (Bankr.S.D.N.Y.1981); W. Norton, 1 NORTON BANKRUPTCY LAW AND PRACTICE § 12.32, at pt. 12, p. 49 (1981); 3 COLLIER ON BANKRUPTCY ¶ 503.04, at 503-38 (15th ed. 1984)).

FN5. The Agreement in Principle, which the record clearly indicates has brought TWA to the point where it likely will be able to emerge successfully from bankruptcy under a plan of reorganization, apparently in only a few weeks, has been characterized as repres-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 8
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945
(Cite as: Not Reported in F.Supp.)

enting TWA's, the Creditors Committee's and ALPA's "joint commitment to the long term health of the airline [and as] truly unprecedented and historic." (D.I. 4, Vol. I, Designation 1 at ¶ 10) The record shows that the ALPA wage and benefit concessions are to result in more than $120 million in savings to TWA over a three year period. The record further indicates that TWA already has enjoyed over $15 million in savings as a result of the pilots' wage and benefit concessions under the terms of Agreement in Principle. Therefore, although the Agreement in Principle required TWA to reimburse the ALPA over $1 million for its professionals' fees and expenses, the overall transaction resulted in a significant net benefit to TWA and its creditors, including the United States. The Creditors Committee vigorously supports the Agreement in Principle and enforcement of its terms, including reimbursement of ALPA's fees and expenses at issue here, precisely because of this net benefit to TWA and its creditors, and because of the positive effect the Agreement had and is having on TWA's ability to successfully reorganize.

FN6. The United States failed to raise its "nexus" argument until the filing of its reply brief. (D.I. 12 at 6-10) The United States raised this argument only with respect to pre-petition fees and expenses, and did not specifically challenge reimbursement of ALPA's already-approved, post-petition fees and expenses on nexus grounds.

FN7. Although the United States set forth a factual basis for its nexus argument (D.I. 13 at 6-7), albeit in its reply brief, the record indicates, as explained below, that other evidence supports a finding of nexus between ALPA's pre-petition fees/expenses and its substantial contribution to the TWA bankruptcy case.

FN8. At oral argument, the United States made a cursory effort, in response to pre-

argument prompting by the Court (D.I. 16 at 2-3), to supply specific references to record evidence supporting its factually-based argument that there was no nexus between ALPA's pre-petition fees and expenses and ALPA's conceded substantial contribution to TWA's bankruptcy case and estate. (D.I. 23 at 8-9, 11, and 50-51) Of course, the United States had the burden of supporting its various arguments raised on appeal both as a legal and as a factual matter. The Court finds that the United States failed to carry its burden as to its factually-grounded nexus argument.

FN9. Although it has been held that "[t]he allowance of administrative expenses under ... section [503(b)(3)(D) ] should be left to the trial court's discretion" and that "abuse of discretion" is the proper standard of review when reviewing a bankruptcy court's ruling on an application for such administrative expenses, *Lister, 846 F.2d at 56-7* (emphasis in original), the Court finds that the "nexus" findings at issue here are factual determinations subject to the "clearly erroneous" standard of review. *See* Bankruptcy Rule 8013; *In re Morrissey, 717 F.2d 100, 104 (3rd Cir.1983).*

D.Del.,1993.
In re Trans World Airlines, Inc.
Not Reported in F.Supp., 1993 WL 559245 (D.Del.), 145 L.R.R.M. (BNA) 2375, 72 A.F.T.R.2d 93-5945

Briefs and Other Related Documents (Back to top)

• 1:92CV00678 (Docket) (Nov. 24, 1992)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

H.R. REP. 103-835                                                    Page 1
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

*1 P.L. 103-394, **3340 BANKRUPTCY REFORM ACT OF 1994

BANKRUPTCY AMENDMENTS OF 1994

DATES OF CONSIDERATION AND PASSAGE

House: October 4, 5, 1994
Senate: April 19, 20, 21, October 6, 1994
Cong. Record Vol. 140 (1994)
House Report (Judiciary Committee) No. 103-835,
Oct. 4, 1994 (To accompany H.R. 5116)
Senate Report (Judiciary Committee) No. 103-168,
Oct. 28, 1993 (To accompany S. 540)

HOUSE REPORT NO. 103-835
October 4, 1994
[To accompany H.R. 5116]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5116) to
amend title 11 of the United States Code, having considered the same, report favor-
ably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:
Strike out all after the enacting clause and insert in lieu thereof the follow-
ing:

SECTION 1. SHORT TITLE.

(a) Short Title.-This Act may be cited as the "Bankruptcy Amendments of 1994".
(b) Table of Contents.-The table of contents is as follows:

Sec. 1. Short title.

TITLE I-IMPROVED BANKRUPTCY ADMINISTRATION

Sec. 101. Expedited hearing on automatic stay.
Sec. 102. Jurisdiction to review interlocutory orders
           increasing or reducing certain time periods for filing
           plan.
Sec. 103. Expedited procedure for reaffirmation of debts.
Sec. 104. Powers of bankruptcy courts.
Sec. 105. Participation by bankruptcy administrator at meetings
           of creditors and equity security holders.
Sec. 106. Definition relating to eligibility to serve on chapter
           11 committees.
Sec. 107. Increased incentive compensation for trustees.

A052

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 2
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

Sec. 108. Dollar adjustments.
Sec. 109. Premerger notification.
Sec. 110. Allowance of creditor committee expenses.
Sec. 111. Supplemental injunctions; settlement of claims
          and demands for payment.
Sec. 112. Authority of bankruptcy judges to conduct jury
          trials in civil proceedings.
Sec. 113. Sovereign immunity.
Sec. 114. Service of process in bankruptcy proceedings on an
          insured depository institution.
Sec. 115. Meetings of creditors and equity security holders.
Sec. 116. Tax assessment.
Sec. 117. Additional trustee compensation.


              TITLE II-COMMERCIAL BANKRUPTCY ISSUES

Sec. 201. Aircraft equipment and vessels; rolling stock equipment.
Sec. 202. Limitation on liability of non-insider transferee
          for avoided transfer.
Sec. 203. Perfection of purchase-money security interest.
Sec. 204. Continued perfection.
Sec. 205. Rejection of unexpired leases of real property or
          timeshare interests.
Sec. 206. Contents of plan.
Sec. 207. Priority of independent sales representatives.
Sec. 208. Exclusion from the estate of interests in liquid and
          gaseous hydrocarbons transferred by the debtor pursuant
          to production payment agreements.
Sec. 209. Seller's right to reclaim goods.
Sec. 210. Investment of money of the estate.
Sec. 211. Election of trustee under chapter 11.
Sec. 212. Rights of partnership trustee against general partners.
Sec. 213. Exclusion from the estate of certain accounts and
          chattel paper.
Sec. 214. Impairment of claims and interests.
Sec. 215. Protection of security interest in post-petition rents.
Sec. 216. Amendment to definition of swap agreement.
Sec. 217. Limitation on avoiding powers.
Sec. 218. Small businesses.
Sec. 219. Single asset real estate.
Sec. 220. Leases of personal property.
Sec. 221. Exemption for small business investment companies.
Sec. 222. Payment of taxes with borrowed funds.
Sec. 223. Return of goods.
Sec. 224. Proceeds of money order agreements.
Sec. 225. Airport leases.
Sec. 226. Trustee duties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)


Sec. 227. Notices to creditors.

## TITLE III-CONSUMER BANKRUPTCY ISSUES

Sec. 301. Period for curing default relating to principal
          residence.
Sec. 302. Nondischargeability of fine under chapter 13.
Sec. 303. Impairment of exemptions.
Sec. 304. Protection of child support and alimony.
Sec. 305. Interest on interest.
Sec. 306. Exception to discharge.
Sec. 307. Payments under chapter 13.
Sec. 308. Bankruptcy petition preparers.
Sec. 309. Fairness to condominium and cooperative owners.
Sec. 310. Nonavoidability of fixing of lien on tools and
          implements of trade, animals, and crops.
Sec. 311. Conversion of case under chapter 13.
Sec. 312. Bankruptcy fraud.
Sec. 313. Protection against discriminatory treatment of
          applications for student loans.

## TITLE IV-GOVERNMENTAL BANKRUPTCY ISSUES

Sec. 401. Exception from automatic stay for post-petition
          property taxes.
Sec. 402. Municipal bankruptcy.

## TITLE V-TECHNICAL CORRECTIONS

Sec. 501. Amendments to bankruptcy definitions, necessitated
          by enactment of Public Law 101-647.
Sec. 502. Title 28 of the United States Code.

## TITLE VI-BANKRUPTCY REVIEW COMMISSION

Sec. 601. Short title.
Sec. 602. Establishment.
Sec. 603. Duties of the commission.
Sec. 604. Membership.
Sec. 605. Compensation of the commission.
Sec. 606. Staff of commission; experts and consultants.
Sec. 607. Powers of the commission.
Sec. 608. Report.
Sec. 609. Termination.
Sec. 610. Authorization of appropriations.

## TITLE VII-SEVERABILITY: EFFECTIVE DATE: APPLICATION OF

A054

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 4
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

                        AMENDMENTS.

Sec. 701. Severability.
Sec. 702. Effective date; application of amendments.


             TITLE I-IMPROVED BANKRUPTCY ADMINISTRATION

SEC. 101. EXPEDITED HEARING ON AUTOMATIC STAY.

    The last sentence of section 362(e) of title 11, United States Code, is amended-
    (1) by striking "commenced" and inserting "concluded", and
    (2) by inserting before the period at the end the following:
    ", unless the 30-day period is extended with the consent of the parties in in-
terest or for a specific time which the court finds is required by compelling cir-
cumstances".


*3 SEC. 102. JURISDICTION TO REVIEW INTERLOCUTORY ORDERS INCREASING OR REDUCING CER-
TAIN TIME PERIODS FOR FILING PLAN.

    Section 158(a) of title 28, United States Code, is amended by striking  "from"
the first place it appears and all that follows through "decrees,", and inserting
the following:
    "(1) from final judgments, orders, and decrees;
    "(2) from interlocutory orders and decrees issued under section 1121(d) of title
11 increasing reducing the time periods referred to in section 1121 of such title;
and
    "(3) with leave of the court, from other interlocutory orders and decrees;".

SEC. 103. EXPEDITED PROCEDURE FOR REAFFIRMATION OF DEBTS.

    (a) Reaffirmation.-Section 524(c) of title 11, United States Code, is amended-
    (1) in paragraph (2)-
    (A) by inserting "(A)" after "(2)",
    (B) by adding "and" at the end, and
    (C) by inserting after subparagraph (A), as so designated, the following:
    "(B) such agreement contains a clear and conspicuous statement which advises the
debtor that such agreement is not required under this title, under nonbankruptcy
law, or under any agreement not in accordance with the provisions of this subsec-
tion;", and
    (2) in paragraph (3)-
    (A) in the matter preceding subparagraph (A) by striking "such agreement" the
last place it appears,
    (B) in subparagraph (A)-
    (i) by inserting "such agreement" after "(A)", and
    (ii) by striking "and" at the end,
    (C) in subparagraph (B)-
    (i) by inserting "such agreement" after "(B)", and
    (ii) by adding "and" at the end, and

                              A055

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                      Page 5
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

    (3) by adding at the end the following:
    "(C) the attorney fully advised the debtor of the legal effect and consequences
of-
    "(i) an agreement of the kind specified in this subsection; and
    "(ii) any default under such an agreement;".
    (b) Effect of Discharge.-The third sentence of <u>section 524(d) of title 11,</u>
<u>United States Code,</u> is amended in the matter preceding paragraph (1) by inserting
"and was not represented by an attorney during the course of negotiating such agree-
ment" after "this section".

SEC. 104. POWERS OF BANKRUPTCY COURTS.

    (a) Status Conferences.-<u>Section 105 of title 11, United States Code,</u> is amended
by adding at the end the following:
    "(d) The court, on its own motion or on the request of a party in interest, may-
    "(1) hold a status conference regarding any case or proceeding under this title
after notice to the parties in interest; and
    "(2) unless inconsistent with another provision of this title or with applicable
Federal Rules of Bankruptcy Procedure, issue an order at any such conference pre-
scribing such limitations and conditions as the court deems appropriate to ensure
that the case is handled expeditiously and economically, including an order that-
    "(A) sets the date by which the trustee must assume or reject an executory con-
tract or unexpired lease; or
    "(B) in a case under chapter 11 of this title-
    "(i) sets a date by which the debtor, or trustee if one has been appointed,
shall file a disclosure statement and plan;
    "(ii) sets a date by which the debtor, or trustee if one has been appointed,
shall solicit acceptances of a plan;
    "(iii) sets the date by which a party in interest other than a debtor may file
a plan;
    "(iv) sets a date by which a proponent of a plan, other than the debtor, shall
solicit acceptances of such plan;
    "(v) fixes the scope and format of the notice to be provided regarding the
hearing on approval of the disclosure statement; or
    "(vi) provides that the hearing on approval of the disclosure statement may be
combined with the hearing on confirmation of the plan.".
    (b) Abstention.-<u>Section 1334 of title 28, United States Code,</u> is amended-
    (1) by redesignating subsection (d) as subsection (e), and
    (2) in the second sentence of subsection (c)(2)-
    *4 (A) by inserting "(other than a decision not to abstain in a proceeding de-
scribed in subsection (c)(2))" after "subsection", and
    (B) by striking "Any" and inserting the following:
    "(d) Any".
    (c) Establishment, Operation, and Termination of Bankruptcy Appellate Panel Ser-
vice.-<u>Section 158(b) of title 28, United States Code,</u> is amended-
    (1) by striking paragraphs (3) and (4),
    (2) by redesignating paragraph (2) as paragraph (4),
    (3) by striking paragraph (1) and inserting the following:

                               A056

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(1) The judicial council of a circuit shall establish a bankruptcy appellate panel service composed of bankruptcy judges of the districts in the circuit who are appointed by the judicial council in accordance with paragraph (3), to hear and determine, with the consent of all the parties, appeals under subsection (a) unless the judicial council finds that-

"(A) there are insufficient judicial resources available in the circuit; or

"(B) establishment of such service would result in undue delay or increased cost to parties in cases under title 11.

Not later than 90 days after making the finding, the judicial council shall submit to the Judicial Conference of the United States a report containing the factual basis of such finding.

"(2)(A) A judicial council may reconsider, at any time, the finding described in paragraph (1).

"(B) On the request of a majority of the district judges in a circuit for which a bankruptcy appellate panel service is established under paragraph (1), made after the expiration of the 1-year period beginning on the date such service is established, the judicial council of the circuit shall determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

"(C) On its own motion, after the expiration of the 3-year period beginning on the date a bankruptcy appellate panel service is established under paragraph (1), the judicial council of the circuit may determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

"(D) If the judicial council finds that either of such circumstances exists, the judicial council may provide for the completion of the appeals then pending before such service and the orderly termination of such service.

"(3) Bankruptcy judges appointed under paragraph (1) shall be appointed and may be reappointed under such paragraph.", and

(4) by inserting after paragraph (4), as so redesignated, the following:

"(5) An appeal to be heard under this subsection shall be heard by a panel of 3 members of the bankruptcy appellate panel service, except that a member of such service may not hear an appeal originating in the district for which such member is appointed or designated under section 152 of this title.

"(6) Appeals may not be heard under this subsection by a panel of the bankruptcy appellate panel service unless the district judges for the district in which the appeals occur, by majority vote, have authorized such service to hear and determine appeals originating in such district.".

(d) Appeals To Be Heard by Bankruptcy Appellate Panel Service.-Section 158 of title 28, United States Code, is amended-

(1) in subsection (c) by striking "(c)" and inserting "(2)", and

(2) by inserting after subsection (b) the following:

"(c)(1) Subject to subsection (b), each appeal under subsection (a) shall be heard by a 3-judge panel of the bankruptcy appellate panel service established under subsection (b)(1) unless-

"(A) the appellant elects at the time of filing the appeal; or

"(B) any other party elects, not later than 30 days after service of notice of the appeal;

to have such appeal heard by the district court.".

A057

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                      Page 7
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

(e) Rules of Procedure and Evidence; Method of Prescribing.-Section 2073 of
title 28, United States Code, is amended-
    (1) in subsection (a)(2) by striking "section 2072" and inserting  "sections
2072 and 2075", and
    (2) in subsections (d) and (e) by inserting "or 2075" after "2072" each place it
appears.
    (f) Effective Date of Bankruptcy Rules.-Section 2075 of title 28, United States
Code, is amended by striking "ninety days" and inserting "180 days".

*5 SEC. 105. PARTICIPATION BY BANKRUPTCY ADMINISTRATOR AT MEETINGS OF CREDITORS AND
EQUITY SECURITY HOLDERS.

    (a) Presiding Officer.-A bankruptcy administrator appointed under section
302(d)(3)(I) of the Bankruptcy Judges, United States Trustees, and Family Farmer
Bankruptcy Act of 1986 (28 U.S.C. 581 note; Public Law 99-554; 100 Stat. 3123), as
amended by section 317(a) of the Federal Courts Study Committee Implementation Act
of 1990 (Public Law 101-650; 104 Stat. 5115), or the bankruptcy administrator's de-
signee may preside at the meeting of creditors convened under section 341(a) of
title 11, United States Code. The bankruptcy administrator or the bankruptcy admin-
istrator's designee may preside at any meeting of equity security holders convened
under section 341(b) of title 11, United States Code.
    (b) Examination of the Debtor.-The bankruptcy administrator or the bankruptcy
administrator's designee may examine the debtor at the meeting of creditors and may
administer the oath required under section 343 of title 11, United States Code.

SEC. 106. DEFINITION RELATING TO ELIGIBILITY TO SERVE ON CHAPTER 11 COMMITTEES.

    Section 101(41) of title 11, United States Code, is amended to read as follows:
    "(41) 'person' includes individual, partnership, and corporation, but does not
include governmental unit, except that a governmental unit that-
    "(A) acquires an asset from a person-
    "(i) as a result of the operation of a loan guarantee agreement; or
    "(ii) as receiver or liquidating agent of a person;
    "(B) is a guarantor of a pension benefit payable by or on behalf of the debtor
or an affiliate of the debtor; or
    "(C) is the legal or beneficial owner of an asset of-
    "(i) an employee pension benefit plan that is a governmental plan, as defined
in section 414(d) of the Internal Revenue Code of 1986; or
    "(ii) an eligible deferred compensation plan, as defined in section 457(b) of
the Internal Revenue Code of 1986;
    shall be considered, for purposes of section 1102 of this title, to be a person
with respect to such asset or such benefit;".

SEC. 107. INCREASED INCENTIVE COMPENSATION FOR TRUSTEES.

    Section 326(a) of title 11, United States Code, is amended by striking  "fif-
teen" and all that follows through "$3,000" the last place it appears, and inserting
the following:
    "25 percent on the first $5,000 or less, 10 percent on any amount in excess of

A058

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                        Page 8
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

$5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000
but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent
of such moneys in excess of $1,000,000".

SEC. 108. DOLLAR ADJUSTMENTS.

    (a) Who May Be a Debtor Under Chapter 13.-Section 109(e) of title 11, United
States Code, is amended-
    (1) by striking "$100,000" each place it appears and inserting "$250,000", and
    (2) by striking "$350,000" each place it appears and inserting "$750,000".
    (b) Involuntary Cases.-Section 303(b) of title 11, United States Code, is
amended-
    (1) in paragraph (1) by striking "$5,000" and inserting "$10,000", and
    (2) in paragraph (2) by striking "$5,000" and inserting "$10,000".
    (c) Priorities.-Section 507(a) of title 11, United States Code, is amended-
    (1) in paragraph (4)(B)(i) by striking "$2,000" and inserting "$4,000",
    (2) in paragraph (5) by striking "$2,000" and inserting "$4,000", and
    (3) in paragraph (6) by striking "$900" and inserting "$1,800".
    (d) Exemptions.-Section 522(d) of title 11, United States Code, is amended-
    (1) in paragraph (1) by striking "$7,500"  and inserting "$15,000",
    (2) in paragraph (2) by striking "$1,200"  and inserting "$2,400",
    (3) in paragraph (3)-
    (A) by striking "$200" and inserting "$400", and
    (B) by striking "$4,000" and inserting "$8,000",
    (4) in paragraph (4) by striking "$500"  and inserting "$1,000",
    (5) in paragraph (5)-
    (A) by striking "$400" and inserting "$800", and
    (B) by striking "$3,750" and inserting "$7,500",
    (6) in paragraph (6) by striking "$750"  and inserting "$1,500",
    (7) in paragraph (8) by striking "$4,000"  and inserting "$8,000", and
    (8) in paragraph (11)(D) by striking "$7,500"  and inserting "$15,000".
    *6 (e) Future Adjustments.-Section 104 of title 11, United States Code, is
amended-
    (1) by inserting "(a)" before "The", and
    (2) by adding at the end the following:
    "(b)(1) On April 1, 1998, and at each 3-year interval ending on April 1 there-
after, each dollar amount in effect under sections 109(e), 303(b), 507(a), 522(d),
and 523(a)(2)(C) immediately before such April 1 shall be adjusted-
    "(A) to reflect the change in the Consumer Price Index for All Urban Consumers,
published by the Department of Labor, for the most recent 3-year period ending imme-
diately before January 1 preceding such April 1, and
    "(B) to round to the nearest $25 the dollar amount that represents such change.
    "(2) Not later than March 1, 1998, and at each 3-year interval ending on March 1
thereafter, the Judicial Conference of the United States shall publish in the Feder-
al Register the dollar amounts that will become effective on such April 1 under sec-
tions 109(e), 303(b), 507(a), 522(d), and 523(a)(2)(C) of this title.
    "(3) Adjustments made in accordance with paragraph (1) shall not apply with re-
spect to cases commenced before the date of such adjustments.".

                                A059

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 9
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

SEC. 109. PREMERGER NOTIFICATION.

    Subparagraphs (A) and (B) of section 363(b)(2) of title 11, United States Code,
are amended to read as follows:
    "(A) notwithstanding subsection (a) of such section, the notification required
by such subsection to be given by the debtor shall be given by the trustee; and
    "(B) notwithstanding subsection (b) of such section, the required waiting period
shall end on the 15th day after the date of the receipt, by the Federal Trade Com-
mission and the Assistant Attorney General in charge of the Antitrust Division of
the Department of Justice, of the notification required under such subsection (a),
unless such waiting period is extended-
    "(i) pursuant to subsection (e)(2) of such section, in the same manner as such
subsection (e)(2) applies to a cash tender offer;
    "(ii) pursuant to subsection (g)(2) of such section; or
    "(iii) by the court after notice and a hearing.".

SEC. 110. ALLOWANCE OF CREDITOR COMMITTEE EXPENSES.

    Section 503(b)(3) of title 11, United States Code, is amended-
    (1) in  subparagraph (D) by striking "or" at the end,
    (2) in subparagraph (E) by inserting "or" at the end, and
    (3) by adding at the end the following:
    "(F) a member of a committee appointed under section 1102 of this title, if such
expenses are incurred in the performance of the duties of such committee;".

SEC. 111. SUPPLEMENTAL INJUNCTIONS; SETTLEMENT OF CLAIMS AND DEMANDS FOR PAYMENT.

    (a) Supplemental Injunctions.-Section 524 of title 11, United States Code, is
amended by adding at the end the following:
    "(g)(1)(A) After notice and hearing, a court that enters an order confirming a
plan of reorganization under chapter 11 may issue an injunction to supplement the
injunctive effect of a discharge under this section.
    "(B) An injunction may be issued under subparagraph (A) to enjoin persons and
governmental units from taking legal action for the purpose of directly or indir-
ectly collecting, recovering, or receiving payment or recovery of, on, or with re-
spect to any claim or demand that, under a plan of reorganization, is to be paid in
whole or in part by a trust described in paragraph (2)(B)(i), except such legal ac-
tions as are expressly allowed by the injunction, the confirmation order, or the
plan of reorganization.
    "(2)(A) If the requirements of subparagraph (B) are met at any time, then, after
entry of an injunction under paragraph (1), any proceeding that involves the valid-
ity, application, construction, or modification of the injunction or of this subsec-
tion with respect to the injunction may be commenced only in the district court in
which the injunction was entered, and such court shall have exclusive jurisdiction
over any such proceeding without regard to the amount in controversy.
    "(B) The requirements of this subparagraph are that-
    "(i) the injunction is to be implemented in connection with a trust that, pursu-
ant to the plan of reorganization-

                                    A060

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 10
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

"(I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, *7 wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

"(II) is to be funded in whole or in part by the securities of 1 or more debtors involved in the plan of reorganization and by the obligation of such debtor or debtors to make future payments, including dividends;

"(III) is to own, or by the exercise of rights granted under the plan could own, a majority of the voting shares of-

"(aa) each such debtor;

"(bb) the parent corporation of each such debtor; or

"(cc) a subsidiary of each such debtor that is also a debtor; and

"(IV) is to use its assets or income to pay claims and demands; and

"(ii) the court, at any time pursuant to its authority under the plan, over the trust, or otherwise, determines that-

"(I) the debtor may be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

"(II) the actual amounts, numbers, and timing of such future demands cannot be determined;

"(III) pursuit of such demands outside the procedures prescribed by the plan may threaten the plan's purpose to deal equitably with claims and future demands;

"(IV) as part of the process of seeking approval of the plan of reorganization-

"(aa) the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), shall be set out in the plan of reorganization and in any disclosure statement supporting the plan; and

"(bb) a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

"(V) pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands or other comparable alternates, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner, except that with respect to a trust in existence on the date of the enactment of the Bankruptcy Amendments of 1994 that is subject to a court order staying it from settling or paying further claims-

"(aa) the requirements of this subclause shall apply as of the date such stay is lifted or otherwise dissolved; and

"(bb) such a trust that meets the requirements of the subclause as of the date such stay is lifted or dissolved, shall be treated for all legal purposes as being in compliance with this subsection from the date of the enactment of such Act.

"(3)(A) If the requirements of paragraph (2)(B) are met and the order approving the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the or-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                          Page 11
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

der that issues or affirms the plan of reorganization-

"(i) the injunction shall be valid and enforceable and may not be revoked or
modified by any court except through appeal in accordance with paragraph (6);

"(ii) no entity that pursuant to the plan of reorganization or thereafter be-
comes a direct or indirect transferee of, or successor to any assets of, a debtor or
trust that is the subject of the injunction shall be liable with respect to any
claim or demand made against it by reason of its becoming such a transferee or suc-
cessor; and

"(iii) no entity that pursuant to the plan of reorganization or thereafter makes
a loan to such a debtor or trust or to such a successor or transferee shall, by
reason of making the loan, be liable with respect to any claim or demand made
against it, nor shall any pledge of assets made in connection with such a loan be
upset or impaired for that reason;

"(B) Subparagraph (A) shall not be construed to-

"(i) imply that an entity described in subparagraph (A) (ii) or (iii) would, if
this paragraph were not applicable, have liability by reason of any of the acts de-
scribed in subparagraph (A);

*8 "(ii) relieve any such entity of the duty to comply with, or of liability un-
der, any Federal or State law regarding the making of a fraudulent conveyance in a
transaction described in subparagraph (A) (ii) or (iii); or

"(iii) relieve a debtor of the debtor's obligation to comply with the terms of
the plan of reorganization or affect the power of the court to exercise its author-
ity under sections 1141 and 1142 to compel the debtor to do so.

"(4)(A)(i) Subject to subparagraph (B), an injunction under paragraph (1) shall
be valid and enforceable against all persons and governmental units that it ad-
dresses.

"(ii) Notwithstanding the provisions of section 524(e), such an injunction may
bar any action directed against a third party who is identifiable from the terms of
the injunction (by name or as part of an identifiable group) and is alleged to be
directly or indirectly liable for the conduct of, claims against, or demands on the
debtor by reason of-

"(I) the party's ownership of a financial interest in the debtor, a past or
present affiliate of the debtor, or a predecessor in interest of the debtor;

"(II) the party's involvement in the management of the debtor or a predecessor
in interest of the debtor, or service as an officer, director or employee of the
debtor or a related party;

"(III) the party's provision of insurance to the debtor or a related party; or

"(IV) the party's involvement in a transaction affecting the corporate structure
or financial condition of the debtor or a related party, including, but not limited
to-

"(aa) involvement in providing financing (debt or equity), or advice to a person
or entity involved in such a transaction; or

"(bb) acquiring or selling a financial interest in an entity as part of such a
transaction.

"(iii) As used in this subparagraph, the term 'related party' means-

"(I) a past or present affiliate of the debtor;

"(II) a predecessor in interest of the debtor; or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 12
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

"(III) any person or entity that owned a financial interest in-

"(aa) the debtor;

"(bb) a past or present affiliate of the debtor; or

"(cc) a predecessor interest in the debtor.

"(B) With respect to a demand (including a demand directed against a third party described in subparagraph (A)(ii)) that is made subsequent to the confirmation of a plan against any person or entity that is the subject of an injunction issued under paragraph (1), the injunction shall be valid and enforceable if, as part of the proceedings leading to its issuance, the court appointed a legal representative for the purpose of protecting the rights of persons that might subsequently assert such a demand.

"(5) In this subsection, the term 'demand' means a demand for payment, present or future, that-

"(A) was not a claim during the proceedings leading to the confirmation of a plan of reorganization;

"(B) arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1); and

"(C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i).

"(6) Paragraph (3)(A)(i) does not bar an action taken by or at the direction of an appellate court on appeal of an injunction issued under paragraph (1) or of the order of confirmation that relates to the injunction.

"(7) This subsection applies to any injunction of the nature described in paragraph (1)(B) in effect, and any trust of the nature described in paragraph (2)(B) in existence, on or after the date of enactment of this subsection.

"(8) This subsection does not affect the operation of section 1144 or the power of the district court to refer a proceeding under section 157 of title 28 or any reference of a proceeding made prior to the date of enactment of this subsection.

"(h) Nothing in subsection (g) shall affect the court's authority to issue an injunction (including an injunction that requires claims and demands to be presented for payment solely to a trust or any other type of court approved settlement vehicle) which is entered pursuant to an order approving a plan of reorganization.".

(b) Settlement of Claims and Demands for Payment.-Section 105 of title 11, United States Code, as amended by section 104, is amended by adding at the end the following:

"(e)(1) A court may issue an injunction that requires claims and demands to be presented for payment solely to a trust or other vehicle that is established for the purpose of settling such claims and demands and is approved by the court and entered into pursuant to an order approving a plan of reorganization.

*9 "(2) This subsection applies to any injunction of the nature described in paragraph (1) in effect, and any trust of the nature described in such paragraph in existence, on or after the date of the enactment of the Bankruptcy Amendments of 1994.".

SEC. 112. AUTHORITY OF BANKRUPTCY JUDGES TO CONDUCT JURY TRIALS IN CIVIL PROCEEDINGS.

Section 157(c) of title 28, United States Code, is amended by adding at the end

A063

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 13
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

the following:
    "(3) If the right to a jury trial applies in a proceeding that may be heard un-
der paragraph (1) or (2) of this subsection by a bankruptcy judge, the bankruptcy
judge may conduct the jury trial if specially designated to exercise such jurisdic-
tion by the district and with the consent of all the parties.".

SEC. 113. SOVEREIGN IMMUNITY.

    Section 106 of title 11, United States Code, is amended to read as follows:

"S 106. Waiver of sovereign immunity

    "(a) Notwithstanding an assertion of sovereign immunity, except as provided in
subsection (d)-
    "(1) all provisions of this title shall apply to governmental units;
    "(2) the court may hear and determine any issue arising with respect to the ap-
plication of such provisions to governmental units; and
    "(3) the court may issue and enforce any order, process, or judgment against a
governmental unit, including an order or judgment awarding a money recovery, to the
same extent as against any other entity.
    "(b) A governmental unit is deemed to have waived sovereign immunity with re-
spect to a claim against such governmental unit that is property of the estate and
that arose out of the same transaction or occurrence out of which the claim of such
governmental unit arose.
    "(c) Notwithstanding any assertion of sovereign immunity by a governmental unit,
there shall be offset against a claim or interest of a governmental unit any claim
against such governmental unit that is property of the estate.
    "(d) Except as provided in subsections (b) and (c) or in applicable nonbank-
ruptcy law, a governmental unit may assert sovereign immunity with respect to a
claim of the estate against such governmental unit only if such claim-
    "(1) is not a tax claim or related to a tax claim subject to determination under
section 505; and
    "(2)(A) is a claim of the debtor against such governmental unit that arose be-
fore the commencement of the case and became property of the estate only under para-
graph (1) or (2) of section 541(a); or
    "(B) arises under nonbankruptcy law after the commencement of the case from the
operation of the business of the debtor.".

SEC. 114. SERVICE OF PROCESS IN BANKRUPTCY PROCEEDINGS ON AN INSURED DEPOSITORY IN-
STITUTION.

    Rule 7004 of the Federal Rules of Bankruptcy Procedure is amended-
    (1) in subsection (b) by striking "In addition" and inserting "Except as
provided in subdivision (h), in addition"; and
    (2) by adding at the end the following:
    "(h) Service of Process on an Insured Depository Institution.-Service on an in-
sured depository institution (as defined in section 3 of the Federal Deposit Insur-
ance Act (12 U.S.C. 1813)) in a contested matter or adversary proceeding shall be
made by certified mail addressed to an officer of the institution unless-

                                    A064

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 14
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,   1994 U.S.C.C.A.N. 3340)

"(1) the institution has appeared by its attorney, in which case the attorney
shall be served by first class mail;

"(2) the court orders otherwise after service upon the institution by certified
mail of notice of an application to permit service on the institution by first class
mail sent to an officer of the institution designated by the institution; or

"(3) the institution has waived in writing its entitlement to service by certi-
fied mail by designating an officer to receive service.".

SEC. 115. MEETINGS OF CREDITORS AND EQUITY SECURITY HOLDERS.

    Section 341 of title 11, United States Code, is amended by adding at the end the
following:

"(d) Prior to the conclusion of the meeting of creditors or equity security
holders, the United States trustee shall orally examine the debtor to ensure that
the debtor is aware of-

"(1) the potential consequences of seeking a discharge in bankruptcy, including
the effects on credit history;

*10 "(2) the debtor's ability to file a petition under a different chapter of
this title;

"(3) the effect of receiving a discharge of debts under this title; and

"(4) the effect of reaffirming a debt, including the debtor's knowledge of the
provisions of section 524(d).".

SEC. 116. TAX ASSESSMENT.

    Section 362(b)(9) of title 11, United States Code, is amended to read as fol-
lows:

"(9) under subsection (a), of-

"(A) an audit by a governmental unit to determine tax liability;

"(B) the issuance to the debtor by a governmental unit of a notice of tax defi-
ciency;

"(C) a demand for tax returns; or

"(D) the making of an assessment for any tax and issuance of a notice and demand
for payment of such an assessment (but any tax lien that would otherwise attach to
property of the estate by reason of such an assessment shall not take effect unless
such tax is a debt of the debtor that will not be discharged in the case and such
property or its proceeds are transferred out of the estate to, or otherwise revested
in, the debtor).".

SEC. 117. ADDITIONAL TRUSTEE COMPENSATION.

    Section 330(b) of title 11, United States Code, is amended-

(1) by inserting "(1)" after "(b)"; and

(2) by adding at the end thereof the following:

"(2) The Judicial Conference of the United States shall prescribe additional
fees of the same kind as prescribed under section 1914(b) of title 28, to pay $15 to
the trustee serving in such case after such trustee's services are rendered. Such
$15 shall be paid in addition to the amount paid under paragraph (1).".

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

TITLE II-COMMERCIAL BANKRUPTCY ISSUES

SEC. 201. AIRCRAFT EQUIPMENT AND VESSELS; ROLLING STOCK EQUIPMENT.

   (a) Amendment of Section 1110.-Section 1110 of title 11, United States Code, is
amended to read as follows:

"S 1110. Aircraft equipment and vessels

   "(a)(1) The right of a secured party with a security interest in equipment de-
scribed in paragraph (2) or of a lessor or conditional vendor of such equipment  to
take possession of such equipment in compliance with a security agreement, lease, or
conditional sale contract  is not affected by section 362, 363, or 1129 or by any
power of the court to enjoin the taking of possession unless-
   "(A) before the date that is 60 days after the date of the order for relief un-
der this chapter, the trustee, subject to the court's approval, agrees to perform
all obligations of the debtor that become due on or after the date of the order un-
der such security agreement, lease, or conditional sale contract; and
   "(B) any default, other than a default of a kind specified in section 365(b)(2),
under such security agreement, lease, or conditional sale contract-
   "(i) that occurs before the date of the order is cured before the expiration of
such 60-day period; and
   "(ii) that occurs after the date of the order is cured before the later of-
   "(I) the date that is 30 days after the date of the default; or
   "(II) the expiration of such 60-day period.
   "(2) Equipment is described in this paragraph if it is-
   "(A) an aircraft, aircraft engine, propeller, appliance, or spare part (as
defined in section 40102 of title 49) that is subject to a  security interest gran-
ted by, leased to, or conditionally sold to a debtor that is a citizen of the United
States (as defined in 40102 of title 49) holding an air carrier operating certific-
ate issued by the Secretary of Transportation pursuant to chapter 447 of title 49
for aircraft capable of carrying 10 or more individuals or 6,000 pounds or more of
cargo; or
   "(B) a documented vessel (as defined in section 30101(1) of title 46) that is
subject to a  security interest granted by, leased to, or conditionally sold to a
debtor that is a water carrier that holds a certificate of public convenience and
necessity or permit issued by the Interstate Commerce Commission.
   "(3) Paragraph (1) applies to a secured party, lessor, or conditional vendor
acting in its own behalf or acting as trustee or otherwise in behalf of another
party.
   *11 "(b) The trustee and the secured party, lessor, or conditional vendor whose
right to take possession is protected under subsection (a) may agree, subject to the
court's approval, to extend the 60-day period specified in subsection (a)(1).
   "(c) With respect to equipment first placed in service on or prior to the date
of enactment of this subsection, for purposes of this section-
   "(1) the term 'lease' includes any written agreement with respect to which the
lessor and the debtor, as lessee, have expressed in the agreement or in a substan-
tially contemporaneous writing that the agreement is to be treated as a lease for

A066

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                      Page 16
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


Federal income tax purposes; and
     "(2) the term 'security interest' means a purchase-money equipment security in-
terest.".
     (b) Amendment of Section 1168.-Section 1168 of title 11, United States Code, is
amended to read as follows:

"S 1168. Rolling stock equipment

     "(a)(1) The right of a secured party with a security interest in or of a lessor
or conditional vendor of equipment described in paragraph (2) to take possession of
such equipment in compliance with an equipment security agreement, lease, or condi-
tional sale contract is not affected by section 362, 363, or 1129 or by any power of
the court to enjoin the taking of possession, unless-
     "(A) before the date that is 60 days after the date of commencement of a case
under this chapter, the trustee, subject to the court's approval, agrees to perform
all obligations of the debtor that become due on or after the date of commencement
of the case under such security agreement, lease, or conditional sale contract; and
     "(B) any default, other than a default of a kind described in section 365(b)(2),
under such security agreement, lease, or conditional sale contract-
     "(i) that occurs before the date of commencement of the case and is an event of
default therewith is cured before the expiration of such 60-day period; and
     "(ii) that occurs or becomes an event of default after the date of commencement
of the case is cured before the later of-
      "(I) the date that is 30 days after the date of the default or event of de-
fault; or
     "(II) the expiration of such 60-day period.
     "(2) Equipment is described in this paragraph if it is rolling stock equipment
or accessories used on such equipment, including superstructures and racks, that is
subject to a security interest granted by, leased to, or conditionally sold to the
debtor.
     "(3) Paragraph (1) applies to a secured party, lessor, or conditional vendor
acting in its own behalf or acting as trustee or otherwise in behalf of another
party.
     "(b) The trustee and the secured party, lessor, or conditional vendor whose
right to take possession is protected under subsection (a) may agree, subject to the
court's approval, to extend the 60-day period specified in subsection (a)(1).
     "(c) With respect to equipment first placed in service on or prior to the date
of enactment of this subsection, for purposes of this section-
     "(1) the term 'lease' includes any written agreement with respect to which the
lessor and the debtor, as lessee, have expressed in the agreement or in a substan-
tially contemporaneous writing that the agreement is to be treated as a lease for
Federal income tax purposes; and
     "(2) the term 'security interest' means a purchase-money equipment security in-
terest.".
     (b) Amendment of Section 1168.-Section 1168 of title 11, United States Code, is
amended to read as follows:

"S 1168. Rolling stock equipment

                                  A067

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(a)(1) The right of a secured party with a security interest in or of a lessor
or conditional vendor of equipment described in paragraph (2) to take possession of
such equipment in compliance with an equipment security agreement, lease, or condi-
tional sale contract is not affected by section 362, 363, or 1129 or by any power of
the court to enjoin the taking of possession, unless—

"(A) before the date that is 60 days after the date of commencement of a case
under this chapter, the trustee, subject to the court's approval, agrees to perform
all obligations of the debtor that become due on or after the date of commencement
of the case under such security agreement, lease, or conditional sale contract; and

"(B) any default, other than a default of a kind described in section 365(b)(2),
under such security agreement, lease, or conditional sale contract—

*12 "(i) that occurs before the date of commencement of the case and is an event
of default therewith is cured before the expiration of such 60-day period; and

"(ii) that occurs or becomes an event of default after the date of commencement
of the case is cured before the later of—

"(I) the date that is 30 days after the date of the default or event of de-
fault; or

"(II) the expiration of such 60-day period.

"(2) Equipment is described in this paragraph if it is rolling stock equipment
or accessories used on such equipment, including superstructures and racks, that is
subject to a security interest granted by, leased to, or conditionally sold to the
debtor.

"(3) Paragraph (1) applies to a secured party, lessor, or conditional vendor
acting in its own behalf or acting as trustee or otherwise in behalf of another
party.

"(b) The trustee and the secured party, lessor, or conditional vendor whose
right to take possession is protected under subsection (a) may agree, subject to the
court's approval, to extend the 60-day period specified in subsection (a)(1).

"(c) With respect to equipment first placed in service on or prior to the date
of enactment of this subsection, for purposes of this section—

"(1) the term 'lease' includes any written agreement with respect to which the
lessor and the debtor, as lessee, have expressed in the agreement or in a substan-
tially contemporaneous writing that the agreement is to be treated as a lease for
Federal income tax purposes; and

"(2) the term 'security interest' means a purchase-money equipment security in-
terest.

"(d) With respect to equipment first placed in service after the date of enact-
ment of this subsection, for purposes of this section, the term 'rolling stock
equipment' includes rolling stock equipment that is substantially rebuilt and ac-
cessories used on such equipment.".

SEC. 202. LIMITATION ON LIABILITY OF NON-INSIDER TRANSFEREE FOR AVOIDED TRANSFER.

Section 550 of title 11, United States Code, is amended—

(1) by redesignating subsections (c), (d), and (e) as subsections (d), (e), and
(f), respectively, and

(2) by inserting after subsection (b) the following:

"(c) If a transfer made between 90 days and one year before the filing of the

A068

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 18
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

petition-
    "(1) is avoided under section 547(b) of this title; and
    "(2) was made for the benefit of a creditor that at the time of such transfer
was an insider;
    the trustee may not recover under subsection (a) from a transferee that is not
an insider.".

SEC. 203. PERFECTION OF PURCHASE-MONEY SECURITY INTEREST.

    Section 547 of title 11, United States Code, is amended-
    (1) in subsection (c)(3)(B) by striking "10" and inserting "20", and
    (2) in subsection (e)(2)(A) by inserting ", except as provided in subsection
(c)(3)(B)" before the semicolon at the end.

SEC. 204. CONTINUED PERFECTION.

    (a) Automatic Stay.-Section 362(b)(3) of title 11, United States Code, is
amended by inserting ", or to maintain or continue the perfection of," after "to
perfect".
    (b) Limitations On Avoiding Powers.-Section 546(b) of title 11, United States
Code, is amended to read as follows:
    "(b)(1) The rights and powers of a trustee under sections 544, 545, and 549 of
this title are subject to any generally applicable law that-
    "(A) permits perfection of an interest in property to be effective against an
entity that acquires rights in such property before the date of perfection; or
    "(B) provides for the maintenance or continuation of perfection of an interest
in property to be effective against an entity that acquires rights in such property
before the date on which action is taken to effect such maintenance or continuation.
    "(2) If-
    "(A) a law described in paragraph (1) requires seizure of such property or com-
mencement of an action to accomplish such perfection, or maintenance or continuation
of perfection of an interest in property; and
    "(B) such property has not been seized or such an action has not been commenced
before the date of the filing of the petition;
    *13 such interest in such property shall be perfected, or perfection of such in-
terest shall be maintained or continued, by giving notice within the time fixed by
such law for such seizure or such commencement.".

SEC. 205. REJECTION OF UNEXPIRED LEASES OF REAL PROPERTY OR TIMESHARE INTERESTS.

    (a) Amendment to Section 365.-Section 365(h) of title 11, United States Code, is
amended to read as follows:
    "(h)(1)(A) If the trustee rejects an unexpired lease of real property under
which the debtor is the lessor and-
    "(i) if the rejection by the trustee amounts to such a breach as would entitle
the lessee to treat such lease as terminated by virtue of its terms, applicable non-
bankruptcy law, or any agreement made by the lessee, then the lessee under such
lease may treat such lease as terminated by the rejection; or
    "(ii) if the term of such lease has commenced, the lessee may retain its rights

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

under such lease (including rights such as those relating to the amount and timing
of payment of rent and other amounts payable by the lessee and any right of use,
possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in
or appurtenant to the real property for the balance of the term of such lease and
for any renewal or extension of such rights to the extent that such rights are en-
forceable under applicable nonbankruptcy law.

"(B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may
offset against the rent reserved under such lease for the balance of the term after
the date of the rejection of such lease and for the term of any renewal or extension
of such lease, the value of any damage caused by the nonperformance after the date
of such rejection, of any obligation of the debtor under such lease, but the lessee
shall not have any other right against the estate or the debtor on account of any
damage occurring after such date caused by such nonperformance.

"(C) The rejection of a lease of real property in a shopping center with respect
to which the lessee elects to retain its rights under subparagraph (A)(ii) does not
affect the enforceability under applicable nonbankruptcy law of any provision in the
lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

"(D) In this paragraph, 'lessee' includes any successor, assign, or mortgagee
permitted under the terms of such lease.

"(2)(A) If the trustee rejects a timeshare interest under a timeshare plan under
which the debtor is the timeshare interest seller and-

"(i) if the rejection amounts to such a breach as would entitle the timeshare
interest purchaser to treat the timeshare plan as terminated under its terms, ap-
plicable nonbankruptcy law, or any agreement made by timeshare interest purchaser,
the timeshare interest purchaser under the timeshare plan may treat the timeshare
plan as terminated by such rejection; or

"(ii) if the term of such timeshare interest has commenced, then the timeshare
interest purchaser may retain its rights in such timeshare interest for the balance
of such term and for any term of renewal or extension of such timeshare interest to
the extent that such rights are enforceable under applicable nonbankruptcy law.

"(B) If the timeshare interest purchaser retains its rights under subparagraph
(A), such timeshare interest purchaser may offset against the moneys due for such
timeshare interest for the balance of the term after the date of the rejection of
such timeshare interest, and the term of any renewal or extension of such timeshare
interest, the value of any damage caused by the nonperformance after the date of
such rejection, of any obligation of the debtor under such timeshare plan, but the
timeshare interest purchaser shall not have any right against the estate or the
debtor on account of any damage occurring after such date caused by such nonperform-
ance.".

(b) Technical Amendment.-Section 553(b)(1) of title 11, United States Code, is
amended by striking "365(h)(2)" and inserting "365(h)".

SEC. 206. CONTENTS OF PLAN.

Section 1123(b) of title 11, United States Code, is amended-
(1) in paragraph (4) by striking "and" at the end,
(2) by redesignating paragraph (5) as paragraph (6), and
(3) by inserting after paragraph (4) the following:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 20
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

"(5) modify the rights of holders of secured claims, other than a claim secured
only by a security interest in real property that is the debtor's principal resid-
ence, or of holders of unsecured claims, or leave unaffected the rights of holder of
any class of claims; and".

*14 SEC. 207. PRIORITY FOR INDEPENDENT SALES REPRESENTATIVES.

    Section 507(a)(3) of title 11, United States Code, is amended to read as fol-
lows:
    "(3) Third, allowed unsecured claims, but only to the extent of $4,000 for each
individual or corporation, as the case may be, earned within 90 days before the date
of the filing of the petition or the date of the cessation of the debtor's business,
whichever occurs first, for-
    "(A) wages, salaries, or commissions, including vacation, severance, and sick
leave pay earned by an individual; or
    "(B) sales commissions earned by an individual or by a corporation with only 1
employee, acting as an independent contractor in the sale of goods or services for
the debtor in the ordinary course of the debtor's business if, and only if, during
the 12 months preceding that date, at least 75 percent of the amount that the indi-
vidual or corporation earned by acting as an independent contractor in the sale of
goods or services was earned from the debtor;".

SEC. 208. EXCLUSION FROM THE ESTATE OF INTERESTS IN LIQUID AND GASEOUS HYDROCARBONS
TRANSFERRED BY THE DEBTOR PURSUANT TO PRODUCTION PAYMENT AGREEMENTS.

    (a) Definition.-Section 101 of title 11, United States Code, is amended by in-
serting after paragraph (42) the following:
    "(42A) 'production payment' means a payment (in cash or in kind) that is-
    "(A) contingent on the production of a liquid or gaseous hydrocarbon from par-
ticular real property; and
    "(B) attributable to part of a specified volume, or part of a specified value,
of the liquid or gaseous hydrocarbon produced from such property, and determined
without regard to production costs;".
    (b) Property of the Estate.-Section 541(b)(4) of title 11, United States Code,
is amended-
    (1) in subparagraph (A) by striking "(A)" and inserting "(A)(i)",
    (2) in subparagraph (B)-
    (A) by striking "(B)" and inserting "(ii),
    (B) by striking "such interest" and inserting "the interest referred to in
clause (i)", and
    (C) by striking the period at the end and inserting "; or", and
    (3) by adding at the end the following:
    "(B)(i) the debtor has transferred or has agreed to transfer such interest pur-
suant to a written agreement to make production payments to a person that does not
participate in the production of the liquid or gaseous hydrocarbon with respect to
which such payments are made; and
    "(ii) but for the operation of this paragraph, the estate could include the in-
terest referred to in clause (i) only by virtue of section 365 of this title;".

                                   A071

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 21
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


SEC. 209. SELLER'S RIGHT TO RECLAIM GOODS.

   Section 546(c)(1) of title 11, United States Code, is amended by striking "ten"
and inserting "20".

SEC. 210. INVESTMENT OF MONEY OF THE ESTATE.

   Section 345(b) of title 11, United States Code, is amended-
   (1) in paragraph (2) by striking the period at the end and inserting a semi-
colon, and
   (2) by adding "unless the court for cause orders otherwise." at the end of such
subsection.

SEC. 211. ELECTION OF TRUSTEE UNDER CHAPTER 11.

   (a) Election Authorized.-Section 1104 of title 11 of the United States Code is
amended-
   (1) by redesignating subsections (b) and (c) as subsections (c) and (d), re-
spectively, and
   (2) by inserting after subsection (a) the following:
   "(b) Except as provided in section 1163 of this title, on the request of a party
in interest made not later than 30 days after the court orders the appointment of a
trustee under subsection (a), the United States trustee shall convene a meeting of
creditors for the purpose of electing one disinterested person to serve as trustee
in the case. The election of a trustee shall be conducted in the manner provided in
subsections (a), (b), and (c) of section 702 of this title.".
   (b) Conforming Amendment.-Section 1106(b) of title 11, United States Code, is
amended by striking "1104(c)" and inserting "1104(d)".

*15 SEC. 212. RIGHTS OF PARTNERSHIP TRUSTEE AGAINST GENERAL PARTNERS.

   Section 723(a) of title 11, United States Code, is amended by striking  "for the
full amount of the deficiency" and inserting "to the extent that under applicable
nonbankruptcy law such general partner is personally liable for the debts of the
partnership".

SEC. 213. EXCLUSION FROM THE ESTATE OF CERTAIN ACCOUNTS AND CHATTEL PAPER.

   Section 541 of title 11, United States Code, as amended by section 208, is
amended-
   (1) in subsection (b) by inserting after paragraph (4) the following:
   "(5) any interest of the debtor in any account or chattel paper to the extent
that-
   "(A) such interest was actually sold under applicable nonbankruptcy law by the
debtor before the date of commencement of the case, but without taking into consid-
eration whether the purchaser filed a financing statement before such date; and
   "(B) but for the operation of this paragraph, the estate could include such in-
terest only by virtue of section 542 of this title; or", and
   (2) by adding at the end the following:


                              A072


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 22
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

    "(e) In this section-
    "(1) 'account' means any right to payment for goods sold or leased or for ser-
vices rendered that is not evidence by an instrument or chattel paper, whether or
not it has been earned by performance, and includes all rights to payment earned or
unearned under a charter or other contract involving the use or hire of a vessel and
all rights incident to such charter or such contract; and
    "(2) 'chattel paper' means-
    "(A) a writing or writings that evidence both a monetary obligation and a secur-
ity interest in or lease of specific goods (excluding a charter or other contract
involving the use or hire of a vessel); or
    "(B) if a transaction described in subparagraph (A) is evidenced both by such a
security agreement or a lease and by an instrument or a series of instruments, the
group of these writings taken together.".

SEC. 214. IMPAIRMENT OF CLAIMS AND INTERESTS.

    (a) Objection to Claims Filed Untimely.-Section 502(b) of title 11, United
States Code, is amended-
    (1) in paragraph (7) by striking "or" at the end,
    (2) in paragraph (8) by striking the period at the end and inserting  "; or",
and
    (3) by adding at the end the following:
    "(9) proof of such claim is not timely filed, except to the extent tardily filed
as permitted under paragraph (2) or (3) of section 726(a).".
    (b) Filing of Request for Administrative Expenses.-Section 503(a) of title 11,
United States Code, is amended-
    (1) by inserting "timely" after "may", and
    (2) by inserting ", or may tardily file such request if permitted by the court
for cause" before the period at the end.
    (c) Impairment of Claims or Interests.-Section 1124 of title 11, United States
Code, is amended-
    (1) in paragraph (1) by inserting "or" at the end,
    (2) in paragraph (2) by striking  "; or" at the end and inserting a period, and
    (3) by striking paragraph (3).

SEC. 215. PROTECTION OF SECURITY INTEREST IN POST-PETITION RENTS.

    (a) Postpetition Effect of Security Interest.-Section 552(b) of title 11, United
States Code, is amended-
    (1) by inserting "(1)" after "(b)",
    (2) by striking "rents," each place it appears, and
    (2) by adding at the end the following:
    "(2) Except as provided in sections 363, 506(c), 522, 544,  545, 547, and 548 of
this title, and notwithstanding section 546(b) of this title, if the debtor and an
entity entered into a security agreement before the commencement of the case and if
the security interest created by such security agreement extends to property of the
debtor acquired before the commencement of the case and to rents of such property,
then such security interest extends to such rents acquired by the estate after the

A073

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                Page 23
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

commencement of the case to the extent provided in such security agreement, except
to any extent that the court, after notice and a hearing and based on the equities
of the case, orders otherwise.".

(b) Use Sale, or Lease of Property.-Section 363(a) of title 11, United States
Code, is amended by inserting: "and the net fees, charges, accounts or other pay-
ments *16 for the use or occupancy of rooms and other public facilities in hotels,
motels, or other lodging properties" after " property".

SEC. 216. AMENDMENT TO DEFINITION OF SWAP AGREEMENT.

Subparagraph (A) of the first paragraph (55) of section 101 of title 11, United
States Code, is amended by inserting "spot foreign exchange agreement," after "for-
ward foreign exchange  agreement,".

SEC. 217. LIMITATION ON AVOIDING POWERS.

Section 546(a) of title 11, United States Code, is amended-
(1) by striking "earlier" and inserting "later", and
(2) by amending paragraphs (1) and (2) to read as follows:
"(1) 2 years after the entry of the order for relief; or
"(2) 1 year after the appointment or election of the first trustee under  sec-
tion 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such elec-
tion occurs before the expiration of the period specified in subparagraph (1).".

SEC. 218. SMALL BUSINESSES.

(a) Definition.-Section 101 of title 11, United States Code, is amended by in-
serting after paragraph (51) the following:
"(51C) 'small business' means a person engaged in commercial or business activ-
ities (but does not include a person whose primary activity is the business of own-
ing or operating real property and activities incidental thereto) whose aggregate
noncontingent liquidated secured and unsecured debts as of the date of the petition
do not exceed $2,000,000;".
(b) Creditors' Committees.-Section 1102(a) of title 11, United States Code, is
amended-
(1) in paragraph (1) by striking "As" and inserting "Except as provided in para-
graph (3), as"; and
(2) by adding at the end the following:
"(3) On request of a party in interest in a case in which the debtor is a small
business and for cause, the court may order that a committee of creditors not be ap-
pointed.".
(c) Conversion or Dismissal.-Section 1112(b) of title 11, United States Code, is
amended by inserting "or bankruptcy administrator" after "United States trustee".
(d) Who May File a Plan.-Section 1121 of title 11, United States Code, is
amended by adding at the end the following:
"(e) In a case in which the debtor elects to be considered a small business-
"(1) only the debtor may file a plan until after 100 days after the date of the
order for relief under this chapter;
"(2) all plans shall be filed within 160 days after the date of the order for

A074

© 2006 Thomson/West. No Claim to urig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 24
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

relief; and
     "(3) on request of a party in interest made within the respective periods spe-
cified in paragraphs (1) and (2) and after notice and a hearing, the court may-
     "(A) reduce the 100-day period or the 160-day period specified in paragraph (1)
or (2) for cause; and
     "(B) increase the 100-day period specified in paragraph (1) if the debtor shows
that the need for an increase is caused by circumstances for which the debtor should
not be held accountable.".
     (e) Postpetition Disclosure.-Section 1125 of title 11, United States Code, is
amended by adding at the end the following:
     "(f) Notwithstanding subsection (b), in a case in which the debtor is a small
business-
     "(1) the court may conditionally approve a disclosure statement subject
to  final approval after notice and a hearing;
     "(2) acceptances and rejections of a plan may be solicited based on a condition-
ally approved disclosure statement so long as the debtor provides adequate informa-
tion to each holder of a claim or interest that is solicited, but a conditionally
approved disclosure statement shall be mailed at least 10 days prior to the date of
the hearing on confirmation of the plan; and
     "(3) a hearing on the disclosure statement may be combined with a hearing on
confirmation of a plan.".

SEC. 219. SINGLE ASSET REAL ESTATE.

     (a) Definition.-Section 101 of title 11, United States Code, is amended by in-
serting after paragraph (51) the following:
     "(51B) 'single asset real estate' means real property constituting a single
property or project, other than residential real property with fewer than 4 residen-
tial *17 units, which generates substantially all of the gross income of a debtor
and on which no substantial business is being conducted by a debtor other than the
business of operating the real property and activities incidental thereto having ag-
gregate secured debts in an amount no more than $2,000,000;".
     (b) Automatic Stay.-Section 362 of title 11, United States Code, is amended-
     (1) in subsection (d)-
     (A) in paragraph (1) by striking "or" at the end,
     (B) in paragraph (2) by striking the period at the end and inserting  "; or",
and
     (C) by adding at the end the following:
     "(3) with respect to a stay of an act against single asset real estate under
subsection (a), by a creditor whose claim is secured by an interest in such real es-
tate, unless, not later than the date that is 90 days after the entry of the order
for relief (or such later date as the court may determine for cause by order entered
within that 90-day period)-
     "(A) the debtor has filed a plan of reorganization that has a reasonable possib-
ility of being confirmed within a reasonable time; or
     "(B) the debtor has commenced monthly payments to each creditor whose claim is
secured by such real estate (other than a claim secured by a judgment lien), which
payments are in an amount equal to interest at a current fair market rate on the

                              A075

H.R. REP. 103-835                                                    Page 25
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
**(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)**

value of the creditor's interest in the real estate.", and
    (2) by adding at the end the following:
    "(i)(1) An order under this section with respect to singlez asset real estate
shall not issue before the date that is 30 days after the date of entry of the order
for relief, but thereafter shall issue promptly after such a request.
    "(2) A hearing shall not be required for the granting of relief under this sec-
tion with respect to singlez asset real estate unless the debtor files an objection
to the request and shows the court extraordinary circumstances requiring such a
hearing.".

SEC. 220. LEASES OF PERSONAL PROPERTY.

    (a) Assumption.-Section 365(b)(1) of title 11, United States Code is amended-
    (1) in subparagraph (B) by striking "and" at the end,
    (2) in subparagraph (C) by striking the period and inserting "; and",
    (3) by adding at the end the following:
    "(D) satisfy any penalty rate or provision relating to a default arising from
any failure by the debtor to perform the obligations under the contract or executory
lease after the order for relief.".
    (b) Performance.-Section 365(d) of title 11, United States Code is amended by
adding at the end the following:
    "(10) The trustee shall timely perform all of the obligations of the debtor, ex-
cept those specified in section 365(b)(2), arising more than 60 days after the order
for relief in a case under chapter 11 of this title under an unexpired lease of per-
sonal property (other than personal property leased to an individual primarily for
personal, family, or household purposes), unless the court, after notice and a hear-
ing and based on cause or the equities of the case, orders otherwise.".
    (c) Limitation.-Section 365(e) of title 11, United States Code is amended by
adding at the end the following:
    "This subsection shall apply to property that is subject to any unexpired lease
of personal property (to the exclusion of such property being subject to an order to
lift the stay under section 362).".

SEC. 221. EXEMPTION FOR SMALL BUSINESS INVESTMENT COMPANIES.

    Section 109 of title 11, United States Code, is amended by adding at the end the
following:
    "(h) A small business investment company licensed by the Small Business Adminis-
tration under subsection (c) or (d) of section the Small Business Investment Act of
1958 may not be a debtor under chapter 11 of this title.".

SEC. 222. PAYMENT OF TAXES WITH BORROWED FUNDS.

    Section 523(a) of title 11, United States Code is amended-
    (1) in paragraph (13) by striking the period at the end and inserting a semi-
colon, and
    (2) by adding at the end the following:
    "(14) incurred to pay a tax to the United States that would be nondischargeable
pursuant to paragraph (1);".

                                    A076

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 54
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

The procedure is modeled on the trust-injunction in the Johns-Manville case, which
pioneered the approach a decade ago in response to the flood of asbestos lawsuits it
was facing. Asbestos-related disease has a long latency period-up to 30 years or
more-and many of the exposures from the 1940's, when asbestos was in widespread use
as an insulating material, had become the personal injury lawsuits of the 1970's and
1980's. In 1982, when Johns-Manville filed for bankruptcy, it had been named in
12,500 lawsuits; and epidemiologists estimated that 50,000 to 100,000 more could be
expected, with a potential liability totaling $2 billion. [FN7]

From the beginning, a central element of the case was how to deal with future
claimants-those who were not yet before the court, because their disease had not yet
manifested itself. The parties in the Manville case devised a creative solution to
help protect the future asbestos claimants, in the form of a trust into which **3349
would be placed stock of the emerging debtor company and a portion of future
profits, along with contributions from Johns-Manville's insurers. Present, as well
as future, asbestos personal injury claimants would bring their actions against the
trust. In connection with the trust, an injunction would be issued barring new as-
bestos claims against the emerging debtor company. Asbestos claimants would have a
stake in Johns-Manville's successful reorganization, because the company's success
would increase both the value of the stock held by the trust and the company profits
set aside for it.

The bankruptcy court appointed a special representative for the future claimants;
this special representative was centrally involved in formulating the plan and nego-
tiating support for it among the other creditors. The Johns-Manville plan was con-
firmed and upheld on appeal. [FN8]  Nevertheless, lingering uncertainty in the fin-
ancial community as to whether the injunction can withstand all challenges has ap-
parently made it more difficult for the company to meet its needs for capital and
has depressed the value of its stock. This has undermined the "fresh start" object-
ives of bankruptcy and the goals of the trust arrangement.

Meanwhile, following Johns-Manville's lead, another asbestos manufacturer, UNR,
has resolved its chapter 11 reorganization with a similar trust/injunction arrange-
ment. And other asbestos manufacturers are reportedly considering the same approach.

The Committee remains concerned that full consideration be accorded to the in-
terests of future claimants, who, by definition, do not have their own voice. Never-
theless, the Committee also recognizes *41 that the interests of future claimants
are ill-served if Johns-Manville and other asbestos companies are forced into li-
quidation and lose their ability to generate stock value and profits that can be
used to satisfy claims. Thus, the tension present in the trust/injunction mechanism
is not unlike the tension present in bankruptcy generally.

The Committee has approved section 111 of the bill in order to strengthen the Man-
ville and UNR trust/injunction mechanisms and to offer similar certitude to other
asbestos trust/injunction mechanisms that meet the same kind of high standards with
respect to regard for the rights of claimants, present and future, as displayed in
the two pioneering cases. The Committee believes Johns-Manville and UNR were aided
in meeting these high standards, in part at least, by the perceived legal uncer-
tainty surrounding this mechanism, which created strong incentives to take excep-
tional precautions at every stage of the proceeding. The Committee has concluded,
therefore, that creating greater certitude regarding the validity of the trust/

A105

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                          Page 26
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

*18 SEC. 223. RETURN OF GOODS.

    (a) Limitation on Avoiding Powers.-Section 546 of title 11, United States Code,
is amended by adding at the end the following:
    "(g) Notwithstanding the rights and powers of a trustee under sections 544(a),
545, 547, 549, and 553, if the court determines on a motion by the trustee made not
later than 120 days after the date of the order for relief in a case under chapter
11 of this title and after notice and a hearing, that a return is in the best in-
terests of the estate, the debtor, with the consent of a creditor, may return goods
shipped to the debtor by the creditor before the commencement of the case, and the
creditor may offset the purchase price of such goods against any claim of the cred-
itor against the debtor that arose before the commencement of the case.".
    (b) Setoff.-Section 553(b)(1) is amended by inserting "546(h)," after
"365(h)(2),".

SEC. 224. PROCEEDS OF MONEY ORDER AGREEMENTS.

    Section 541(b)(1) of title 11, United States Code, as amended by section 213, is
amended by inserting after paragraph (5) the following:
    "(6) any interest in cash or cash equivalents that constitute proceeds of a sale
by the debtor of a money order that is made-
    "(A) on or after the date that is 14 days prior to the date on which the peti-
tion is filed; and
    "(B) under an agreement with a money order issuer that prohibits the commingling
of such proceeds with property of the debtor (notwithstanding that, contrary to the
agreement, the proceeds may have been commingled with property of the debtor),
    unless the money order issuer had not taken action, prior to the filing of the
petition, to require compliance with the prohibition;".

SEC. 225. AIRPORT LEASES.

    (a) Executory Contracts and Unexpired Leases.-Section 365(d) of title 11, United
States Code, as amended by section 220, is amended by adding at the end the follow-
ing:
    "(11) Notwithstanding paragraphs (1), (2), and (4), if the trustee in a case un-
der any chapter of this title does not assume or reject an unexpired lease or ex-
ecutory contract with an airport operator under which the debtor has a right to the
use or possession of an airport terminal, aircraft gate, or related facility within
270 days after the date of the order for relief, or within such additional time as
the court sets during such 270-day period, such lease or executory contract is
deemed rejected unless the court finds in such period (including such additional
time) that the debtor's failure to assume or reject such lease or such contract in
such period is attributable to circumstances for which the debtor should not be held
accountable.".

SEC. 226. TRUSTEE DUTIES.

    Section 586(a)(3)(A) of title 28, United States Code, is amended to read as fol-
lows:

                                    A077

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 27
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

    "(A)(i) reviewing, in accordance with procedural guidelines adopted by the Exec-
utive Office of the United States Trustee (which guidelines shall be applied uni-
formly by the United States trustee except when circumstances warrant different
treatment), applications filed for compensation and reimbursement under section 330
of title 11; and
    "(ii) filing with the court comments with respect to such application and, if
the United States Trustee considers it to be appropriate, objections to such applic-
ation.".

SEC. 227. NOTICES TO CREDITORS.

    Section 342 of title 11, United States Code, is amended by adding at the end the
following:
    "(c) If notice is required to be given by the debtor to a creditor under this
title, any rule, any applicable law, or any order of the court, such notice shall
contain the name, address, and taxpayer identification number of the debtor, but the
failure of such notice to contain such information shall not invalidate the legal
effect of such notice.".

                          TITLE III-CONSUMER BANKRUPTCY ISSUES

SEC. 301. PERIOD FOR CURING DEFAULT RELATING TO PRINCIPAL RESIDENCE.

    Section 1322 of title 11, United States Code, is amended-
    (1) by redesignating subsection (c) as subsection (d), and
    (2) by inserting after subsection (b) the following:
    "(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law-
    *19 "(1) a default with respect to, or that gave rise to, a lien on the debtor's
principal residence may be cured under paragraph (3) or (5) of subsection (b) until
such residence is sold at a foreclosure sale that is conducted in accordance with
applicable nonbankruptcy law; and
    "(2) in a case in which the last payment on the original payment schedule for a
claim secured only by a security interest in real property that is the debtor's
principal residence is due before the date on which the final payment under the plan
is due, the plan may provide for the payment of the claim as modified pursuant to
1325(a)(5).".

SEC. 302. NONDISCHARGEABILITY OF FINE UNDER CHAPTER 13.

    Section 1328(a)(3) of title 11, United States Code, is amended by inserting ",
or a fine (other than a fine imposed under subchapter C of chapter 227 of title 18
of the United States Code) to the extent such fine exceeds $500, " after "restitu-
tion".

SEC. 303. IMPAIRMENT OF EXEMPTIONS.

    Section 522(f) of title 11, United States Code, is amended-
    (1) in paragraph (2)-
    (A) by redesignating subparagraphs (A), (B), and (C) as clauses (i), (ii), and

                                    A078

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(iii), respectively, and

    (B) by striking "(2)" and inserting "(B),

    (2) by redesignating paragraph (1) as subparagraph (A),

    (3) by inserting "(1)" before "Notwithstanding", and

    (4) by adding at the end the following:

    "(2)(A) For the purposes of this subsection, a lien shall be considered to im-
pair an exemption to the extent that the sum of-

    "(i) the lien,

    "(ii) all other liens on the property that are equal or greater in seniority to
the lien; and

    "(iii) the amount of the exemption that the debtor could claim if there were no
liens on the property,

    exceeds the value that the debtor's interest in the property would have in the
absence of any liens.

    "(B) In the case of a property subject to more than 1 lien, a lien that has been
avoided shall not be considered in making the calculation under subparagraph (A)
with respect to other liens.".

SEC. 304. PROTECTION OF CHILD SUPPORT AND ALIMONY.

    (a) Definition.-Section 101 of title 11, United States Code, is amended by in-
serting after paragraph (12) the following:

    "(12A) 'debt for child support' means a debt of a kind specified in section
523(a)(5) of this title for maintenance or support of a child of the debtor;".

    (b) Relief From Automatic Stay.-Section 362(b)(2) of title 11, United States
Code, is amended to read as follows:

    "(2) under subsection (a) of this section-

    "(A) of the commencement or continuation of an action or proceeding for-

    "(i) the establishment of paternity; or

    "(ii) the establishment or modification of an order for alimony, maintenance,
or support; or

    "(B) of the collection of alimony, maintenance, or support from property that is
not property of the estate;".

    (c) Priority of Claims.-Section 507(a) of title 11, United States Code, is
amended-

    (1) in paragraph (8) by striking "(8) Eighth" and inserting "(9) Ninth",

    (2) in paragraph (7) by striking "(7) Seventh" and inserting "(8) Eighth", and

    (3) by inserting after paragraph (6) the following:

    "(7) Seventh, allowed claims for debts to a spouse, former spouse, or child of
the debtor, for alimony to, maintenance for, or support of such spouse or child, in
connection with a separation agreement, divorce decree or other order of a court of
record, determination made in accordance with State or territorial law by a govern-
mental unit, or property settlement agreement, but not to the extent that such debt-

    "(A) is assigned to another entity, voluntarily, by operation of law, or other-
wise; or

    "(B) includes a liability designated as alimony, maintenance, or support, unless
such liability is actually in the nature of alimony, maintenance or support; or

    (d) Protection of Liens.-Section 522(f)(1)(A) of title 11, United States Code,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as amended by section 303, is amended by inserting after "lien" the following:
  *20 ", other than a judicial a lien that secures a debt-
  "(i) to a spouse, former spouse, or child of the debtor, for alimony to, main-
tenance for, or support of such spouse or child, in connection with a separation
agreement, divorce decree or other order of a court of record, determination made in
accordance with State or territorial law by a governmental unit, or property settle-
ment agreement; and
  "(ii) to the extent that such debt-
  "(I) is not assigned to another entity, voluntarily, by operation of law, or
otherwise; and
  "(II) includes a liability designated as alimony, maintenance, or support, un-
less such liability is actually in the nature of alimony, maintenance or support.".
  (e) Exception to Discharge.-Section 523 of title 11, United States Code, as
amended by section 222, is amended-
  (1) in subsection (a) by adding at the end the following:
  "(15) incurred by the debtor in the course of a divorce or separation or in con-
nection with a separation agreement, divorce decree or other order of a court of re-
cord, a determination made in accordance with State or territorial law by a govern-
mental unit unless-
  "(A) the debtor does not have the ability to pay such debt from income or prop-
erty of the debtor not reasonably necessary to be expended for the maintenance or
support of the debtor or a dependent of the debtor and, if the debtor is engaged in
a business, for the payment of expenditures necessary for the continuation, preser-
vation, and operation of such business; or
  "(B) discharging such debt would result in a benefit to the debtor that out-
weighs the detrimental consequences to a spouse, former spouse, or child of the
debtor; or", and
  (2) in subsection (c)(1) by striking "or (6)" each place it appears and insert-
ing "(6), or (15)".
  (f) Protection Against Trustee Avoidance.-Section 547(c) of title 11, United
States Code, is amended-
  (1) in paragraph (6) by striking "or" at the end,
  (2) by redesignating paragraph (7) as paragraph (8), and
  (3) by inserting after paragraph (6) the following:
  "(7) to the extent such transfer was a bona fide payment of a debt to a spouse,
former spouse, or child of the debtor, for alimony to, maintenance for, or support
of such spouse or child, in connection with a separation agreement, divorce decree
or other order of a court of record, determination made in accordance with State or
territorial law by a governmental unit, or property settlement agreement, but not to
the extent that such debt-
  "(A) is assigned to another entity, voluntarily, by operation of law, or other-
wise; or
  "(B) includes a liability designated as alimony, maintenance, or support, unless
such liability is actually in the nature of alimony, maintenance or support.".
  (g) Appearance Before Court.-Child support creditors or their representatives
shall be permitted to appear and intervene without charge, and without meeting any
special local court rule requirement for attorney appearances, in any bankruptcy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                    Page 30
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

case or proceeding in any bankruptcy court or district court of the United States if
such creditors or representatives file a form in such court that contains informa-
tion detailing the child support debt, its status, and other characteristics.
    (h) Conforming Amendments-Title 11 of the United States Code is amended-
    (1) in section 502(i) by striking "507(a)(7)" and inserting "507(a)(8)",
    (2) in section 503(b)(1)(B)(i) by striking "507(a)(7)" and inserting
"507(a)(8)",
    (3) in section 523(a)(1)(A) by striking "507(a)(7)" and inserting  "507(a)(8)",
    (4) in section 724(b)(2) by striking "or 507(a)(6)" and inserting  "507(a)(6),
or 507(a)(7)",
    (5) in section 726(b) by striking "or (7)" and inserting ", (7), or (8)",
    (6) in section 1123(a)(1) by striking "507(a)(7)" and inserting  "507(a)(8)",
    (7) in section 1129(a)(9)-
    (i) in subparagraph (B) by striking "or 507(a)(6)" and inserting  ", 507(a)(6),
or 507(a)(7)", and
    (ii) in subparagraph (C) by striking "507(a)(7)" and inserting "507(a)(8)".

SEC. 305. INTEREST ON INTEREST.

    (a) Chapter 11.-Section 1123 of title 11, United States Code, is amended by
adding at the end the following:
    *21 "(d) Notwithstanding subsection (a) of this section and sections 506(b),
1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a de-
fault, the amount necessary to cure the default, shall be determined in accordance
with the underlying agreement and applicable nonbankruptcy law.".
    (b) Chapter 12.-Section 1222 of title 11, United States Code, is amended by
adding at the end the following:
    "(d) Notwithstanding subsection (b)(2) of this section and sections 506(b) and
1225(a)(5) of this title, if it is proposed in a plan to cure a default, the amount
necessary to cure the default, shall be determined in accordance with the underlying
agreement and applicable nonbankruptcy law.".
    (c) Chapter 13.-Section 1322 of title 11, United States Code, as amended by sec-
tion 301, is amended by adding at the end the following:
    "(e) Notwithstanding subsection (b)(2) of this section and sections 506(b) and
1325(a)(5) of this title, if it is proposed in a plan to cure a default, the amount
necessary to cure the default, shall be determined in accordance with the underlying
agreement and applicable nonbankruptcy law.".

SEC. 306. EXCEPTION TO DISCHARGE.

    Section 523(a)(2)(C) of title 11, United States Code, is amended is amended-
    (1) by striking "$500" and inserting  "$1,500",
    (2) by striking "forty" and inserting "60",
    (3) by striking "$1,000" and inserting "$1,500", and
    (4) by striking "twenty" and inserting "60".

SEC. 307. PAYMENTS UNDER CHAPTER 13.

    Section 1326(a)(2) of title 11, United States Code, is amended in the second

                                    A081

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 31
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

sentence by striking the period and inserting "as soon as practicable.".

SEC. 308. BANKRUPTCY PETITION PREPARERS.

    (a) Amendment of Chapter 1.-Chapter 1 of title 11, United States Code, is
amended by adding at the end the following:

"S 110. Penalty for persons who negligently or fraudulently prepare bankruptcy petitions.

    "(a) In this section-
    "(1) 'bankruptcy petition preparer' means a person, other than an attorney or an
employee of an attorney, who prepares for compensation a document for filing; and
    "(2) 'document for filing' means a petition or any other document prepared for
filing by a debtor in a United States bankruptcy court or a United States district
court in connection with a case under this title.
    "(b)(1) A bankruptcy petition preparer who prepares a document for filing shall
sign the document and print on the document the preparer's name and address.
    "(2) A bankruptcy petition preparer who fails to comply with paragraph (1) may
be fined not more than $500 for each such failure unless the failure is due to reasonable cause.
    "(c)(1) A bankruptcy petition preparer who prepares a document for filing shall
place on the document, after the preparer's signature, an identifying number that
identifies the individuals who prepared the document.
    "(2) For purposes of this section, the identifying number of a bankruptcy petition preparer shall be the Social Security account number of each individual who
prepared the document or assisted in its preparation.
    "(3) A bankruptcy petition preparer who fails to comply with paragraph (1) may
be fined not more than $500 for each such failure unless the failure is due to reasonable cause.
    "(d)(1) A bankruptcy petition preparer shall, not later than the time at which a
document for filing is presented for the debtor's signature, furnish to the debtor a
copy of the document.
    "(2) A bankruptcy petition preparer who fails to comply with paragraph (1) may
be fined not more than $500 for each such failure unless the failure is due to reasonable cause.
    "(e)(1) A bankruptcy petition preparer shall not execute any document on behalf
of a debtor.
    "(2) A bankruptcy petition preparer may be fined not more than $500 for each
document executed in violation of paragraph (1).
    "(f)(1) A bankruptcy petition preparer shall not use the word 'legal' or any
similar term in any advertisements, or advertise under any category that includes
the word 'legal' or any similar term.
    *22 "(2) A bankruptcy petition preparer shall be fined not more than $500 for
each violation of paragraph (1).
    "(g)(1) A bankruptcy petition preparer shall not collect or receive any payment
from the debtor or on behalf of the debtor for the court fees in connection with
filing the petition.
                            A082

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                           Page 32
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

"(2) A bankruptcy petition preparer shall be fined not more than $500 for each
violation of paragraph (1).
"(h)(1) Within 10 days after the date of the filing of a petition, a bankruptcy
petition preparer shall file a declaration under penalty of perjury disclosing any
fee received from or on behalf of the debtor within 12 months immediately prior to
the filing of the case, and any unpaid fee charged to the debtor.
"(2) The court shall disallow and order the immediate turnover to the bankruptcy
trustee of any fee referred to in paragraph (1) found to be in excess of the value
of typing services for the documents prepared. The debtor may exempt any funds so
recovered under section 522(b).
"(3) The debtor, the trustee, a creditor, or the United States trustee may file
a motion for an order under paragraph (2).
"(4) A bankruptcy petition preparer shall be fined not more than $500 for each
failure to comply with a court order to turn over funds within 30 days of service of
such order.
"(i)(1) If a bankruptcy case or related proceeding is dismissed because of the
failure to file bankruptcy forms, the negligence or intentional disregard of this
title or the Federal Rules of Bankruptcy Procedure by a bankruptcy petition pre-
parer, or if a bankruptcy petition preparer violates this section or commits any
fraudulent, unfair, or deceptive act, the bankruptcy court shall certify that fact
to the district court, and the district court, on motion of the debtor, the trustee,
or a creditor and after a hearing, shall order the bankruptcy petition preparer to
pay to the debtor-
"(A) the debtor's actual damages;
"(B) the greater of-
"(i) $2,000; or
"(ii) twice the amount paid by the debtor to the bankruptcy petition preparer
for the preparer's services; and
"(C) reasonable attorneys' fees and costs in moving for damages under this sub-
section.
"(2) If the trustee or creditor moves for damages on behalf of the debtor under
this subsection, the bankruptcy petition preparer shall be ordered to pay the movant
the additional amount of $1,000 plus reasonable attorneys' fees and costs incurred.
"(j)(1) A debtor for whom a bankruptcy petition preparer has prepared a document
for filing, the trustee, a creditor, or the United States trustee in the district in
which the bankruptcy petition preparer resides, has conducted business, or the
United States trustee in any other district in which the debtor resides may bring a
civil action to enjoin a bankruptcy petition preparer from engaging in any conduct
in violation of this section or from further acting as a bankruptcy petition pre-
parer.
"(2)(A) In an action under paragraph (1), if the court finds that-
"(i) a bankruptcy petition preparer has-
"(I) engaged in conduct in violation of this section or of any provision of this
title a violation of which subjects a person to criminal penalty;
"(II) misrepresented the preparer's experience or education as a bankruptcy pe-
tition preparer; or
"(III) engaged in any other fraudulent, unfair, or deceptive conduct; and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(ii) injunctive relief is appropriate to prevent the recurrence of such con-
duct,

the court may enjoin the bankruptcy petition preparer from engaging in such con-
duct.

"(B) If the court finds that a bankruptcy petition preparer has continually en-
gaged in conduct described in subclause (I), (II), or (III) of clause (i) and that
an injunction prohibiting such conduct would not be sufficient to prevent such per-
son's interference with the proper administration of this title, or has not paid a
penalty imposed under this section, the court may enjoin the person from acting as a
bankruptcy petition preparer.

"(3) The court shall award to a debtor, trustee, or creditor that brings a suc-
cessful action under this subsection reasonable attorney's fees and costs of the ac-
tion, to be paid by the bankruptcy petition preparer.

"(k) Nothing in this section shall be construed to permit activities that are
otherwise prohibited by law, including rules and laws that prohibit the unauthorized
practice of law.".

(b) The chapter analysis for chapter 1 of title 11, United States Code, is
amended by adding at the end the following new item:

"110. Penalty for persons who negligently or fraudulently prepare bankruptcy peti-
tions.".

*23 SEC. 309. FAIRNESS TO CONDOMINIUM AND COOPERATIVE OWNERS.

Section 523(a) of title 11, United States Code, as amended by sections 222 and
304, is amended by adding at the end the following:

"(16) for a fee that becomes due and payable after the order for relief to a
membership association with respect to the debtor's interest in a dwelling unit that
has condominium ownership or in a share of a cooperative housing corporation, if
such fee is payable for a period during which—

"(A) the debtor physically occupied a dwelling unit in the condominium or co-
operative project; or

"(B) the debtor rented the dwelling unit to a tenant and received payments from
the tenant for such period,

but nothing in this paragraph shall except from discharge the debt of a debtor
for a membership association fee for a period arising before entry of the order for
relief in a pending or subsequent bankruptcy proceeding.".

SEC. 310. NONAVOIDABILITY OF FIXING OF LIEN ON TOOLS AND IMPLEMENTS OF TRADE, ANIM-
ALS, AND CROPS.

Section 522(f) of title 11, United States Code, as amended by sections 303 and
304, is amended—

(1) in paragraph (1) by inserting "but subject to paragraph (3)" after  "waiver
of exemptions", and

(2) by adding at the end the following:

"(3) In a case in which State law that is applicable to the debtor—

"(A) permits a person to voluntarily waive a right to claim exemptions under

A084

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                     Page 34
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

subsection (d) or prohibits a debtor from claiming exemptions under subsection (d);
and

    "(B) either permits the debtor to claim exemptions under State law without lim-
itation in amount, except to the extent that the debtor has permitted the fixing of
a consensual lien on any property or prohibits avoidance of a consensual lient on
property otherwise eligible to be claimed as exempt property;

    the debtor may not avoid the fixing of a lien on an interest of the debtor or a
dependent of the debtor in property if the lien is a nonpossessory, nonpurchase-
money security interest in implements, professional books, or tools of the trade of
the debtor or a dependent of the debtor or farm animals or crops of the debtor or a
dependent of the debtor to the extent such lien exceeds $5,000.".

SEC. 311. CONVERSION OF CASE UNDER CHAPTER 13.

    Section 348 of title 11, United States Code, is amended by adding at the end the
following:

    "(f)(1) Notwithstanding any other provision of this title, the debtor may not
convert a case to a case under chapter 13 in bad faith.

    "(2) When a case under chapter 13 of this title is converted to another chapter
under this title-

    "(A) property of the estate in the converted case shall consist of property of
the estate, as of the date of filing of the petition, that remains in the possession
of or is under the control of the debtor on the date of conversion; and

    "(B) valuations of property and of allowed secured claims in the chapter 13 case
shall apply in the converted case, with allowed secured claims reduced to the extent
that they have been paid in accordance with the chapter 13 plan.".

SEC. 312. BANKRUPTCY FRAUD.

    (a) In General.-
    (1) Offenses.-Chapter 9 of title 18, United States Code, is amended-
    (A) by amending sections 152, 153, and 154 to read as follows:

"S 152. Concealment of assets; false oaths and claims; bribery

    "A person who-
    "(1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or
other officer of the court charged with the control or custody of property, or, in
connection with a case under title 11, from creditors or the United States Trustee,
any property belonging to the estate of a debtor;

    "(2) knowingly and fraudulently makes a false oath or account in or in relation
to any case under title 11;

    "(3) knowingly and fraudulently makes a false declaration, certificate, verific-
ation, or statement under penalty of perjury as permitted under section 1746 of
title 28, in or in relation to any case under title 11;

    "(4) knowingly and fraudulently presents any false claim for proof against the
estate of a debtor, or uses any such claim in any case under title 11, in a personal
capacity or as or through an agent, proxy, or attorney;

    *24 "(5) knowingly and fraudulently receives any material amount of property

                                    A085

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                           Page 35
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

from a debtor after the filing of a case under title 11, with intent to defeat the
provisions of title 11;

"(6) knowingly and fraudulently gives, offers, receives, or attempts to obtain
any money or property, remuneration, compensation, reward, advantage, or promise
thereof for acting or forbearing to act in any case under title 11;

"(7) in a personal capacity or as an agent or officer of any person or corpora-
tion, in contemplation of a case under title 11 by or against the person or any oth-
er person or corporation, or with intent to defeat the provisions of title 11, know-
ingly and fraudulently transfers or conceals any of his property or the property of
such other person or corporation;

"(8) after the filing of a case under title 11 or in contemplation thereof,
knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a
false entry in any recorded information (including books, documents, records, and
papers) relating to the property or financial affairs of a debtor; or

"(9) after the filing of a case under title 11, knowingly and fraudulently with-
holds from a custodian, trustee, marshal, or other officer of the court or a United
States Trustee entitled to its possession, any recorded information (including
books, documents, records, and papers) relating to the property or financial affairs
of a debtor,

shall be fined not more than $5,000, imprisoned not more than 5 years, or both.

"S 153. Embezzlement against estate

"(a) Offense.-A person described in subsection (b) who knowingly and fraudu-
lently appropriates to the person's own use, embezzles, spends, or transfers any
property or secretes or destroys any document belonging to the estate of a debtor
shall be fined not more than $5,000, imprisoned not more than 5 years, or both.

"(b) Person to Whom Section Applies.-A person described in this subsection is
one who has access to property or documents belonging to an estate by virtue of the
person's participation in the administration of the estate as a trustee, custodian,
marshal, attorney, or other officer of the court or as an agent, employee, or other
person engaged by such an officer to perform a service with respect to the estate.

"S 154. Adverse interest and conduct of officers

"A person who, being a custodian, trustee, marshal, or other officer of the
court-

"(1) knowingly purchases, directly or indirectly, any property of the estate of
which the person is such an officer in a case under title 11;

"(2) knowingly refuses to permit a reasonable opportunity for the inspection by
parties in interest of the documents and accounts relating to the affairs of estates
in the person's charge by parties when directed by the court to do so; or

"(3) knowingly refuses to permit a reasonable opportunity for the inspection by
the United States Trustee of the documents and accounts relating to the affairs of
an estate in the person's charge,

shall be fined not more than $5,000 and shall forfeit the person's office, which
shall thereupon become vacant."; and

(B) by adding at the end the following:

A086

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

"S 156. Knowing disregard of bankruptcy law or rule

  "(a) Definitions.-In this section-
  "'bankruptcy petition preparer' means a person, other than the debtor's attorney
or an employee of such an attorney, who prepares for compensation a document for
filing.
  "'document for filing' means a  petition or any other document prepared for fil-
ing by a debtor in a United States bankruptcy court or a United States district
court in connection with a case under this title.
  "(b) Offense.-If a bankruptcy case or related proceeding is dismissed because of
a knowing attempt by a bankruptcy petition preparer in any manner to disregard the
requirements of title 11, United States Code, or the Federal Rules of Bankruptcy
Procedure, the bankruptcy petition preparer shall be fined under this title, im-
prisoned not more than 1 year, or both.

"S 157. Bankruptcy fraud

  "(a) Offense.-A person who, having devised or intending to devise a scheme or
artifice to defraud and for the purpose of executing or concealing such a scheme or
artifice or attempting to do so-
  "(1) files a petition under title 11;
  "(2) files a document in a proceeding under title 11; or
  *25 "(3) makes a false or fraudulent representation, claim, or promise concern-
ing or in relation to a proceeding under title 11, at any time before or after the
filing of the petition, or in relation to a proceeding falsely asserted to be
pending under such title,
  shall be fined under this title, imprisoned not more than 5 years, or both.
  "(b) Requirement of Intent.-
  "(1) In general.-The degree of intent required to be shown in the case of an of-
fense described in subsection (a) is that which is generally required to be shown in
cases of fraud.
  "(2) Violation not established.-A violation of subsection (a) is not established
if the defendant committed the act that is alleged to constitute fraud for a lawful
purpose.
  "(3) Violation established.-A violation of subsection (a) may be established if
the defendant committed the act that is alleged to constitute fraud with a purpose
of-
  "(A) preventing the proper application of title 11 in a particular case; or
  "(B) using a proceeding under title 11 in a manner that, while on its face may
appear to be legitimate, is in fact part of a scheme to defraud.".
  (2) Technical amendments.-The chapter analysis for chapter 9 of title 18, United
States Code, is amended-
  (A) by amending the item relating to section 153 to read as follows:

"Sec. 153. Embezzlement against estate.";

  and
  (B) by adding at the end the following new item:

A087

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 37
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

"Sec. 156. Knowing disregard of bankruptcy law or rule.

"Sec. 157. Bankruptcy fraud.".

    (b) RICO.-Section 1961(1)(D) of title 18, United States Code, is amended by in-
serting "(except a case under section 157 of that title)" after "title 11".

SEC. 313. PROTECTION AGAINST DISCRIMINATORY TREATMENT OF APPLICATIONS FOR STUDENT
LOANS.

    Section 525 of title 11, United States Code, is amended by adding at the end the
following:
    "(c)(1) A governmental unit that operates a student grant or loan program and a
person engaged in a business that includes the making of loans guaranteed or insured
under a student loan program may not deny a grant, loan, loan guarantee, or loan in-
surance to a person that is or has been a debtor under this title or a bankrupt or
debtor under the Bankruptcy Act, or another person with whom the debtor or bankrupt
has been associated, because the debtor or bankrupt is or has been a debtor under
this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent be-
fore the commencement of a case under this title or during the pendency of the case
but before the debtor is granted or denied a discharge, or has not paid a debt that
is dischargeable in the case under this title or that was discharged under the Bank-
ruptcy Act.
    "(2) In this section, 'student loan program' means the program operated under
part B, D, or E of title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et
seq.) or a similar program operated under State or local law.".

                    TITLE IV-GOVERNMENTAL BANKRUPTCY ISSUES

SEC. 401. EXCEPTION FROM AUTOMATIC STAY FOR POST-PETITION PROPERTY TAXES.

    Section 362(b) of title 11, United States Code, is amended by inserting after
paragraph (16) the following:
    "(18) under subsection (a) of the creation or perfection of a statutory lien for
an ad valorem property tax imposed by the District of Columbia, or a political sub-
division of a State, if such tax comes due after the filing of the petition.".

SEC. 402. MUNICIPAL BANKRUPTCY.

    Section 109(c)(2) of title 11, United States Code, is amended by striking "gener-
ally authorized" and inserting "specifically authorized, in its capacity as a muni-
cipality or by name,".

                    *26 TITLE V-TECHNICAL CORRECTIONS

SEC. 501. AMENDMENTS TO BANKRUPTCY DEFINITIONS, NECESSITATED BY ENACTMENT OF PUBLIC
LAW 101-647.

    (a) Alphabetizing and Redesignating Definitions.-Section 101 of title 11 of the
United States Code, as amended by sections 208, 218, 219, and 304 is amended-
                            A088

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 38
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)


    (1) by redesignating paragraph (3) as paragraph (21B) and transferring such
paragraph so as to insert it after paragraph (21A),
    (2) by redesignating paragraph (39) as paragraph (51A) and transferring such
paragraph so as to insert it after paragraph (51),
    (3) by redesignating paragraphs (54) through (57), as so redesignated by section
2522(e) of Public Law 101-647, as paragraphs (53A) through (53D), respectively,
    (4) by redesignating paragraph (56) as in effect immediately before the enact-
ment of Public Law 101-647, as paragraph (35A) and transferring such paragraph so as
to insert it after paragraph (35),
    (5) by redesignating paragraph (57), as in effect immediately before the enact-
ment of Public Law 101-647, as paragraph (39) and transferring such paragraph so as
to insert it after paragraph (38),
    (6) by redesignating paragraphs (54) and (55), as in effect immediately before
the enactment of Public Law 101-647, as paragraphs (65) and (66), respectively,
    (7) by redesigating paragraphs (21A) through (53D) as paragraphs  (22) through
(64), respectively, and
    (8) by redesignating paragraphs (4) through (12A) as paragraphs (3) through
(12), respectively.
    (b) Conforming and Related Amendments to title 11 of the United States Code,
Based on Redesignated Definitions.-(1) Section 101 of title 11 of the United States
Code, as amended by subsection (a), is amended-
    (A) in paragraph (5), as so redesignated, by striking "section 761(9)" and in-
serting "section 761",
    (B) in paragraph (24), as so redesignated, by striking "section 741(7)" and in-
serting "section 741",
    (C) in paragraph (37)(B), as so redesignated, by striking "paragraphs (3) and
(33)(A)" and inserting "paragraphs (23) and (35)(A)",
    (D) in paragraph (53)(B)(ii), as so redesignated, by striking "section 761(13)"
and inserting "section 761", and
    (E) in paragraph (61)(A), as so redesignated, by striking "section 741(2)" and
inserting "section 741".
    (2) Section 362(b) of title 11, United States Code, is amended-
    (A) in paragraph (6)-
    (i) by striking "section 761(4)" and inserting "section 761",
    (ii) by striking "section 741(7)" and inserting "section 741",
    (iii) by striking "section 101(34), 741(5), or 761(15)" and inserting "section
101, 741, or 761", and
    (iv) by striking "section 101(35) or 741(8)" and inserting  "section 101 or
741", and
    (B) in paragraph (7)-
    (i) by striking "section 741(5) or 761(15)" and inserting "section 741 or 761",
and
    (ii) by striking "section 741(8)" and inserting "section 741".
    (3) Section 507(a)(5) of title 11, United States Code, is amended-
    (A) by striking "section 557(b)(1)" and inserting "section 557(b)", and
    (B) by striking "section 557(b)(2)" and inserting "section 557(b)".
    (4) Section 546 of title 11, United States Code, is amended-

                                    A089

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(A) in subsection (e)-
(i) by striking "section 101(34), 741(5), or 761(15)" and inserting "section 101, 741, or 761", and
(ii) by striking "section 101(35) or 741(8)" and inserting "section 101 or 741", and
(B) in subsection (f)-
(i) by striking "section 741(5) or 761(15)" and inserting "section 741 or 761", and
(ii) by striking "section 741(8)" and inserting "section 741".
(5) Section 548(d)(2) of title 11, United States Code, is amended-
(A) in subparagraph (B)-
*27 (i) by striking "section 101(34), 741(5) or 761(15)" and inserting " section 101, 741, or 761", and
(ii) by striking "section 101(35) or 741(8)" and inserting "section 101 or 741", and
(B) in subparagraph (C)-
(i) by striking "section 741(5) or 761(15)" and inserting "section 741 or 761", and
(ii) by striking "section 741(8)" and inserting "section 741".
(6) Section 555 of title 11, United States Code, is amended by striking "section 741(7)" and inserting "section 741 of this title".
(7) Section 556 of title 11, United States Code, is amended by striking "section 761(4)" and inserting "section 761 of this title".
(c) Conforming Amendments to Other Laws Based on Redesignated Definitions.- (1) Section 207(c)(8)(D) of the Federal Credit Union Act (12 U.S.C. 1787(c)(8)(D)) is amended-
(A) in clause (ii)(I) by striking "section 741(7)" and inserting "section 741",
(B) in clause (iii) by striking "section 101(24)" and inserting "section 101",
(C) in clause (iv)(I) by striking "section 101(41)" and inserting "section 101", and
(D) in clause (v) by striking "section 101(50)" and inserting "section 101".
(2) Section 11(e)(8)(D) of the Federal Deposit Insurance Act (12 U.S.C. 1821(e)(8)(D)) is amended-
(A) in clause (ii)(I) by striking "section 741(7)" and inserting "section 741",
(B) in clause (iii) by striking "section 761(4)" and inserting "section 761",
(C) in clause (iv) by striking "section 101(24)" and inserting "section 101",
(D) in clause (v)(I) by striking "section 101(41)" and inserting "section 101", and
(E) in clause (viii) by striking "section 101(50)" and inserting "section 101".
(d) Other Technical Amendments.-Title 11 of the United States Code is amended-
(1) in section 101, as amended by subsection (a)-
(A) in paragraph (35), as so redesignated-
(i) in subparagraph (A) by striking "(12 U.S.C. 1813(u))", and
(ii) in subparagraph (B) by striking "(12 U.S.C. 1786(r))",
(B) in paragraph (36), as so redesignated, by striking "(12 U.S.C. 1752(7))",
(C) in paragraph (37)(A), as so redesignated, by striking "(12 U.S.C. 1813(c)(2))",

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                        Page 40
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

(D) in paragraph (52), as so redesignated-
(i) by striking "(15 U.S.C. 78q-1)", and
(ii) by striking "(15 U.S.C. 78c(12))",
(E) in paragraph (53), as so redesignated-
(i) in subparagraph (A)(xii)-
(I) by striking "(15 U.S.C. 77a et seq.)", and
(II) by striking "(15 U.S.C. 77c(b))", and
(ii) in subparagraph (B)(vi) by striking "(15 U.S.C. 77c(b))", and
(F) in paragraph (64), as so redesignated, by striking the period at the end and
inserting a semicolon,
(2) in section 109(b)(2) by striking "(12 U.S.C. 1813(h))",
(3) in section 322(a) by striking "1302, or 1202" and inserting "1202, or 1302",
(4) in section 346-
(A) in subsection (a) by striking "Internal Revenue Code of 1954 (26 U.S.C. 1 et
seq.)" and inserting "Internal Revenue Code of 1986", and
(B) in subsection (g)(1)(C) by striking "Internal Revenue Code of 1954  (26
U.S.C. 371)" and inserting "Internal Revenue Code of 1986",
(5) in section 348-
(A) in subsection (b) by striking "1301(a), 1305(a), 1201(a), 1221, and 1228(a)"
and inserting "1201(a), 1221, 1228(a), 1301(a), and 1305(a)", and
(B) in subsections (b), (c), (d), and (e) by striking "1307, or 1208" each place
it appears and inserting "1208, or 1307",
(6) in section 349(a) by striking "109(f)" and inserting "109(g)",
(7) in section 362-
(A) in subsection (a) by striking "(15 U.S.C. 78eee(a)(3))", and
(B) in subsection (b)-
(i) by striking "(15 U.S.C. 78eee(a)(3))",
(ii) in paragraph (10) by striking "or" at the end,
(iii) in paragraph (12)-
*28 (I) by striking "the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)"
and inserting "section 31325 of title 46", and
(II) by striking "(46 App. U.S.C. 1117 and 1271 et seq., respectively)",
(iv) in paragraph (13)-
(I) by striking "the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)" each
place it appears and inserting "section 31325 of title 46",
(II) by striking "(46 App. U.S.C. 1117 and 1271 et seq., respectively)", and
(III) by striking "or" at the end,
(v) in paragraph (15), as added by Public Law 101-508, by striking "or" at the
end,
(vi) in paragraph (16), as added by Public Law 101-508-
(I) by striking "(20 U.S.C.  1001 et seq.)", and
(II) by striking the period at the end and inserting a semicolon, and
(vii) in paragraph (14), as added by Public Law 101-311-
(I) by striking the period at the end and inserting "; or",
(II) by redesignating such paragraph as paragraph (17), and
(III) by transferring such paragraph so as to insert such paragraph after para-
graph (16),
                               A091

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 41
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


     (8) in section 363-
     (A) in subsection (b)(2) by striking "(15 U.S.C. 18a)", and
     (B) in subsection (c)(1) by striking "1304, 1203, or 1204" and inserting  "1203,
1204, or 1304",
     (9) in section 364-
     (A) in subsection (a) by striking "1304, 1203, or 1204" and inserting  "1203,
1204, or 1304", and
     (B) in subsection (f)-
      (i) by striking "(15 U.S.C. 77e)", and
      (ii) by striking "(15 U.S.C. 77aaa et seq.)",
     (10) in section 365-
     (A) in subsection (d)(6)(C) by striking "the Federal Aviation Act of 1958  (49
U.S.C. 1301)" and inserting "section 40102 of title 49",
     (B) in subparagraphs (A) and (B) of subsection (g)(2) by striking "1307, or
1208" each place it appears and inserting "1208, or 1307",
     (C) in subsection (n)(1)(B) by striking "to to" and inserting "to",
     (D) in subsection (o) by striking "the Federal" the first place it appears and
all that follows through "successors,", and inserting "a Federal depository institu-
tions regulatory agency (or predecessor to such agency)", and
     (E) by striking subsection (p),
     (11) in section 507-
     (A) in subsection (a)(9), as so redesignated by section 304, by striking "the
Federal" the first place it appears and all that follows through "successors,", and
inserting "a Federal depository institutions regulatory agency (or predecessor to
such agency)", and
     (B) in subsection (d) by striking "or (a)(6)" and inserting "(a)(6),  (a)(7),
(a)(8), or (a)(9)",
     (12) in section 522(d)(10)(E)(iii)-
     (A) by striking "408, or 409" the first place it appears and inserting "or 408",
and
     (B) by striking "Internal Revenue Code of 1954 (26 U.S.C. 401(a), 403(a),
403(b), 408, or 409)" and inserting "Internal Revenue Code of 1986",
     (13) in section 523-
     (A) in subsection (a)-
      (i) by striking "1141," and inserting "1141,", and
      (ii) in paragraph (2)(C) by striking "(15 U.S.C. 1601 et seq.)",
     (B) in subsection (b)-
      (i) by striking "(20 U.S.C. 1087-3)", and
      (ii) by striking "(42 U.S.C. 294f)", and
     (C) in subsection (e) by striking "depository institution or insured credit uni-
on" and inserting "insured depository institution",
     (14) in section 524-
     (A) in subsection (a)(3) by striking "or 1328(c)(1)" and inserting  ",
1228(a)(1), or 1328(a)(1)",
     (B) in subsection (c)(4) by striking "recission" and inserting  "rescission",
and
     *29 (C) in subsection (d)(1)(B)(ii) by adding "and" at the end,

                                    A092

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

(15) in section 525(a)-
(A) by striking "(7 U.S.C. 499a-499s)",
(B) by striking "(7 U.S.C. 181-229)", and
(C) by striking "(57 Stat. 422; 7 U.S.C. 204)",
(16) in section 542(e) by striking "to to" and inserting "to",
(17) in section 543(d)(1) by striking "section," and inserting "section",
(18) in section 549(b) inserting "the trustee may not avoid under subsection (a)
of this section" after "involuntary case,",
(19) in section 553-
(A) in subsection (a)(1) by striking "other than under section 502(b)(3) of this
title", and
(B) in subsection (b)(1) by striking "362(b)(14),," and insert-
ing  "362(b)(14),",
(20) in section 555 by striking "(15 U.S.C. 78aaa et seq.)",
(21) in section 559 by striking "(15 U.S.C. 78aaa et seq.)",
(22) in section 706(a) by striking "1307, or 1208" and inserting "1208, or
1307",
(23) in section 724(d) by striking "Internal Revenue Code of 1954 (26 U.S.C.
6323)" and inserting "Internal Revenue Code of 1986",
(24) in section 726(b)-
(A) inserting a comma after "section 1112", and
(B) by inserting "1009," after "chapter under section",
(25) in section 741(4)(A)(iii) by striking "(15 U.S.C. 78a et seq.)",
(26) in section 742 by striking "(15 U.S.C. 78aaa et seq.)",
(27) in section 743 by striking "342(a)" and inserting "342",
(28) in section 745(c) by striking "Internal Revenue Code of 1954 (26 U.S.C. 1
et seq.)" and inserting "Internal Revenue Code of 1986",
(29) in section 761-
(A) in paragraph (1) by striking "(7 U.S.C. 1 et seq.)",
(B) in paragraph (5) by striking "(7 U.S.C. 6c(b))", and
(C) in paragraph (13) by striking "(7 U.S.C. 23)",
(30) in section 1104(d), as so redesignated by section 211, inserting a comma
after "interest",
(31) in section 1123(a)(1) inserting a comma after "title" the last place it ap-
pears,
(32) in section 1129-
(A) in subsection (a)-
(i) in paragraph (4) by striking the semicolon at the end and inserting a peri-
od, and
(ii) in paragraph (12) inserting "of title 28" after "section 1930", and
(B) in subsection (d) by striking "(15 U.S.C. 77e)",
(33) in section 1145-
(A) in subsection (a)-
(i) by striking "does" and inserting "do",
(ii) by striking "(15 U.S.C. 77e)", and
(iii) in paragraph (3)(B)(i) by striking "(15 U.S.C. 78m or 78o(d))",
(B) in subsection (b)(1) by striking "(15 U.S.C. 77b(11))", and

A093

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

    (C) in subsection (d) by striking "(15 U.S.C. 77aaa et seq.)",
    (34) in section 1166(2) by striking "(45 U.S.C. 791(b))",
    (35) in section 1167-
    (A) by striking "(45 U.S.C. 151 et seq.)", and
    (B) by striking "(45 U.S.C. 156)",
    (36) in section 1226(b)(2)-
    (A) by striking "1202(d)" and inserting "1202(c)", and
    (B) by striking "1202(e)" and inserting "1202(d)",
    (37) in section 1302(b)(3) by striking "and" at the end, and
    (38) in section 1328(a)-
    (A) in paragraph (2) by striking "(5) or (8)" and inserting "(5), (8), or (9)",
and
    (B) by striking the last paragraph (3), and
    (39) in the table of chapters by striking the item relating to chapter 15.

SEC. 502. TITLE 28 OF THE UNITED STATES CODE.

    Section 586(a)(3) of title 28, United States Code, is amended in the matter pre-
ceding subparagraph (A) by inserting "12," after "11,".

                    *30 TITLE VI-BANKRUPTCY REVIEW COMMISSION

SEC. 601. SHORT TITLE.

    This title may be cited as the "National Bankruptcy Review Commission Act".

SEC. 602. ESTABLISHMENT.

    There is established the National Bankruptcy Review Commission (referred to as
the "Commission").

SEC. 603. DUTIES OF THE COMMISSION.

    The duties of the Commission are-
    (1) to investigate and study issues and problems relating to title 11, United
States Code (commonly known as the "Bankruptcy Code");
    (2) to evaluate the advisability of proposals and current arrangements with re-
spect to such issues and problems;
    (3) to prepare and submit to the Congress, the Chief Justice, and the President
a report in accordance with section 608; and
    (4) to solicit divergent views of all parties concerned with the operation of
the bankruptcy system.

SEC. 604. MEMBERSHIP.

    (a) Number and Appointment.-The Commission shall be composed of 9 members as
follows:
    (1) Three members appointed by the President, 1 of whom shall be designated as
chairman by the President.
    (2) One member shall be appointed by the President pro tempore of the Senate.

                                    A094

            © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 44
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

    (3) One member shall be appointed by the Minority Leader of the Senate.
    (4) One member shall be appointed by the Speaker of the House of Representat-
ives.
    (5) One member shall be appointed by the Minority Leader of the House of Repres-
entatives.
    (6) Two members appointed by the Chief Justice.
    Members of Congress shall be ineligible for appointment to the Commission.
    (b) Term.-Members of the Commission shall be appointed for the life of the Com-
mission.
    (c) Quorum.-Five members of the Commission shall constitute a quorum, but a
lesser number may conduct meetings.
    (d) Appointment Deadline.-The first appointments made under subsection (a) shall
be made within 60 days after the date of enactment of this Act.
    (e) First Meeting.-The first meeting of the Commission shall be called by the
chairman and shall be held within 210 days after the date of enactment of this Act.
    (f) Vacancy.-A vacancy on the Commission resulting from the death or resignation
of a member shall not affect its powers and shall be filled in the same manner in
which the original appointment was made.
    (g) Continuation of Membership.-If any member of the Commission who was appoin-
ted to the Commission as a member of Congress or as an officer or employee of a gov-
ernment leaves that office, or if any member of the Commission who was not appointed
in such a capacity becomes an officer or employee of a government, the member may
continue as a member of the Commission for not longer than the 90-day period begin-
ning on the date the member leaves that office or becomes such an officer or employ-
ee, as the case may be.
    (h) Consultation Prior to Appointment.-Prior to the appointment of members of
the Commission, the President, the President pro tempore of the Senate, the Speaker
of the House of Representatives, and the Chief Justice shall consult with each other
to ensure fair and equitable representation of various points of view in the Commis-
sion and its staff.

SEC. 605. COMPENSATION OF THE COMMISSION.

    (a) Pay.-
    (1) Nongovernment employees.-Each member of the Commission who is not otherwise
employed by the United States Government shall be entitled to receive the daily
equivalent of the annual rate of basic pay payable for level IV of the Executive
Schedule under section 5315 of title 5, United States Code, for each day (including
travel time) during which he or she is engaged in the actual performance of duties
as a member of the Commission.
    *31 (2) Government employees.-A member of the Commission who is an officer or
employee of the United States Government shall serve without additional compensa-
tion.
    (b) Travel.-Members of the Commission shall be reimbursed for travel, subsist-
ence, and other necessary expenses incurred by them in the performance of their du-
ties.

SEC. 606. STAFF OF COMMISSION; EXPERTS AND CONSULTANTS.

                                    A095

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                        Page 45
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

(a) Staff.-
(1) Appointment.-The chairman of the Commission may, without regard to the civil
service laws and regulations, appoint, and terminate an executive director and such
other personnel as are necessary to enable the Commission to perform its du-
ties.  The employment of an executive director shall be subject to confirmation by
the Commission.
(2) Compensation.-The chairman of the Commission may fix the compensation of the
executive director and other personnel without regard to the provisions of chapter
51 and subchapter II of chapter 53 of title 5, United States Code, relating to clas-
sification of positions and General Schedule pay rates, except that the rate of pay
for the executive director and other personnel may not exceed the rate payable for
level V of the Executive Schedule under section 5316 of that title.
(b) Experts and Consultants.-The Commission may procure temporary and intermit-
tent services of experts and consultants under section 3109(b) of title 5, United
States Code.

SEC. 607. POWERS OF THE COMMISSION.

(a) Hearings and Meetings.-The Commission or, on authorization of the Commis-
sion, a member of the Commission, may hold such hearings, sit and act at such time
and places, take such testimony, and receive such evidence, as the Commission con-
siders appropriate. The Commission or a member of the Commission may administer
oaths or affirmations to witnesses appearing before it.
(b) Official Data.-The Commission may secure directly from any Federal depart-
ment, agency, or court information necessary to enable it to carry out this title.
Upon request of the chairman of the Commission, the head of a Federal department or
agency or chief judge of a Federal court shall furnish such information, consistent
with law, to the Commission.
(c) Facilities and Support Services.-The Administrator of General Services shall
provide to the Commission on a reimbursable basis such facilities and support ser-
vices as the Commission may request.  Upon request of the Commission, the head of a
Federal department or agency may make any of the facilities or services of the
agency available to the Commission to assist the Commission in carrying out its du-
ties under this title.
(d) Expenditures and Contracts.-The Commission or, on authorization of the Com-
mission, a member of the Commission may make expenditures and enter into contracts
for the procurement of such supplies, services, and property as the Commission or
member considers appropriate for the purposes of carrying out the duties of the Com-
mission.  Such expenditures and contracts may be made only to such extent or in such
amounts as are provided in appropriation Acts.
(e) Mails.-The Commission may use the United States mails in the same manner and
under the same conditions as other Federal departments and agencies of the United
States.
(f) Gifts.-The Commission may accept, use, and dispose of gifts or donations of
services or property.

SEC. 608. REPORT.

A096

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

    The Commission shall submit to the Congress, the Chief Justice, and the Presid-
ent a report not later than 2 years after the date of its first meeting. The report
shall contain a detailed statement of the findings and conclusions of the Commis-
sion, together with its recommendations for such legislative or administrative ac-
tion as it considers appropriate.

SEC. 609. TERMINATION.

    The Commission shall cease to exist on the date that is 30 days after the date
on which it submits its report under section 608.

SEC. 610. AUTHORIZATION OF APPROPRIATIONS.

    There is authorized to be appropriated $1,500,000 to carry out this title.

        *32 TITLE VII-SEVERABILITY; EFFECTIVE DATE; APPLICATION OF AMENDMENTS

SEC. 701. SEVERABILITY.

    If any provision of this Act or amendment made by this Act or the application of
such provision or amendment to any person or circumstance is held to be unconstitu-
tional, the remaining provisions of and amendments made by this Act and the applica-
tion of such other provisions and amendments to any person or circumstance shall not
be affected thereby.

SEC. 702. EFFECTIVE DATE; APPLICATION OF AMENDMENTS.

    (a) Effective Date.-Except as provided in subsection (b), this Act shall take
effect on the date of the enactment of this Act.
    (b) Application of Amendments.-(1) Except as provided in paragraph (2), the
amendments made by this Act shall not apply with respect to cases commenced under
title 11 of the United States Code before the date of the enactment of this Act, and
shall not make appealable any decisions rendered in such cases.
    (2)(A) Paragraph (1) shall not apply with respect to the amendment made by sec-
tion 111.
    (B) The amendment made by section 113 shall apply with respect to cases com-
menced under title 11 of the United States Code before, on, and after the date of
the enactment of this Act.
    (C) Section 1110 of title 11, United States Code, as amended by section 201 of
this Act, shall apply with respect to any lease, as defined in such section 1110(c)
as so amended, entered into in connection with a settlement of any proceeding in any
case pending under title 11 of the United States Code on the date of the enactment
of this Act.
    (D) The amendments made by section 306 shall apply only to agreements entered
into after the date of enactment of this Act.

                        **3340 EXPLANATION OF AMENDMENT

                            A097

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 47
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

    Inasmuch as H.R. 5116 was ordered reported with a single amendment in the nature
of a substitute, the contents of this report constitute an explanation of that
amendment.

                              SUMMARY AND PURPOSE

    H.R. 5116 would improve the administration of bankruptcy cases, as well as provide
greater fairness and certainty for individuals, corporations, and governmental en-
tities. The bankruptcy system, as substantially overhauled by Congress in 1978, has
held up reasonably well despite the unprecedented shocks of persistent recessionary
forces. The legacy of runaway debt and rampant financial speculation in the 1980's
is a massive increase in bankruptcy filings in the 1990's. The resulting strain on
the bankruptcy system **3341 has exacerbated problems with slow and inefficient case
administration. In addition, there have been a number of problematic court opinions
construing the Bankruptcy Code. H.R. 5116 addresses the most pressing of these prob-
lems in a moderate and carefully balanced fashion.
    The uniform national bankruptcy system, as provided in the United States Constitu-
tion, is designed to achieve two equally important objectives. The first is to
provide honest debtors who have fallen on hard times the opportunity for a fresh
start in life, after they have made a good-faith attempt to pay what they can. This
not only helps honest debtors from being relegated to a lifetime of destitution or
the functional equivalent of financial indentured servitude from which they can nev-
er hope to recover, but also helps *33 reinforce the incentives for healthy business
entrepreneurship, which are the lifeblood of economic growth in a free market sys-
tem.
    The second objective of the bankruptcy system is to protect creditors in general
by preventing an insolvent debtor from selectively paying off the claims of certain
favored creditors at the expense of others. Because the essence of insolvency is
that there is not enough money to pay all claims in full, there is an inevitable
temptation among creditors to compete fiercely over the debtor's limited funds. The
bankruptcy system is thus designed to enforce a distribution of the debtor's assets
in an orderly manner in which the claims of all creditors are considered fairly, in
accordance with established principles rather than on the basis of the inside influ-
ence or economic leverage of a particular creditor.
    The bankruptcy system accomplishes these goals through several mechanisms. The
filing of a bankruptcy petition-by the debtor or, in some situations, by a group of
creditors-triggers an "automatic stay" of pending actions against the debtor by
creditors to recover claims. (Under certain specified circumstances, the bankruptcy
court, upon request of a creditor, can remove the automatic stay for a particular
claim.) The independent trustee appointed to manage the bankrupt debtor's "estate"
is empowered to "avoid" transfers that were made by the debtor shortly before the
bankruptcy is filed-referred to as "preferences"-and recover the funds from the
transferee, for the benefit of the creditors in general.
    In a chapter 7 liquidation case, except for certain personal and family property
that the debtor is permitted to retain, the property of the debtor is transferred to
the estate and sold for the benefit of the creditors. In chapter 13, which applies
only to individuals with regular income, a payment plan is proposed by the debtor,

                                      A098

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reviewed by the creditors, and approved by the court. For a period of 3 to 5 years
the debtor is required to pay all income-other than what is needed for support of
the debtor and his dependents-to a trustee, who distributes the money to creditors
according to the plan. In a chapter 11 business reorganization case, a payment plan
is negotiated between the debtor and all creditors under a more complex set of re-
quirements.

A narrow set of specified types of claims are "nondischargeable" in bankruptcy,
which means that they remain owed to the creditor to the full extent unpaid. Those
claims (such as claims relating to **3342 fraud, or claims for restitution to vic-
tims of crime) fail to meet the bankruptcy objective of giving a fresh start only to
honest debtors or are considered to be of paramount societal importance (such as tax
obligations, and alimony and child support). Congress is perennially beseeched to
expand the list of nondischargeable claims. These requests must also be scrutinized
with a critical eye, in order to preserve the twin objectives of the bankruptcy sys-
tem.

An even narrower set of specified types of claims, including certain tax obliga-
tions and limited past due wages to a debtor's employees, are given the further pro-
tection of "priority" status, which means those claims must be paid in full in order
for there to be any distribution to other creditors. Obviously, the types of claims
entitled to priority must be kept to a minimum, because each priority comes at the
expense of all other creditors. Perhaps just as obviously, various types of credit-
ors are perennially seeking amendments *34 to the Bankruptcy Code in order to obtain
priority status for their own claims. These efforts to amend the Bankruptcy Code
replicate the " every creditor for himself" tendency that the Bankruptcy Code itself
is designed to hold in check.

H.R. 5116 makes a limited number of changes to the Bankruptcy Code that, while re-
maining faithful to the bankruptcy system's twin objectives, increase the efficiency
of the bankruptcy process and resolve some uncertainties regarding application of
the Code. The bill requires expedited hearing on the automatic stay, clarifies the
powers of bankruptcy courts, and makes a number of other changes designed to improve
the bankruptcy process. The bill makes several changes pertaining to consumer bank-
ruptcies, including strengthening a debtor's right to cure a home mortgage default
in a chapter 13 plan and ensuring that the bankruptcy process cannot be utilized to
avoid alimony and child support obligations.

The bill also resolves a number of more complex commercial bankruptcy issues, such
as the liability of a non-insider transferee for payment by the debtor prior to
bankruptcy, and bankruptcy treatment of a secured real estate lender's interest in
postpetition rental revenues. In addition, the bill clarifies an ambiguity regarding
the right of municipalities to file for bankruptcy, and permits local governments to
secure payment of postbankruptcy property taxes through statutory liens.

                                 HEARINGS

H.R. 5116 is the product of numerous bankruptcy-related hearings conducted by the
Subcommittee on Economic and Commercial Law during the 102d and 103d Congresses.

On November 6, 1991, the Subcommittee held a hearing on the U.S. Trustee Program.
Witnesses included Mr. John E. Logan, Director, Executive Office for United States

                                   A099

H.R. REP. 103-835                                                      Page 49
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

Trustees; Mr. Anthony G. Sousa, U.S. Trustee, Region 17; former Judge George F.
Bason, Jr., U.S. Bankruptcy Court, Washington, D.C.; Mr. Lawrence A. Beck, Attorney
at Law, San Antonio, Texas; Mr. James A. Craig, on behalf of the National Associ-
ation of Bankruptcy Trustees; Mr. Philip J. Hendel, on behalf of the Commercial Law
League of America; **3343 and Chief Judge Larry E. Kelly, U.S. Bankruptcy Court,
Western District of Texas.

   On April 1, 1992, the Subcommittee held a bankruptcy hearing entitled  "Injunc-
tions in Mass Tort Cases in Bankruptcy." The Subcommittee heard testimony from Mr.
Kenneth N. Klee, Stutman, Treister & Glatt, Los Angeles, California, on behalf of
the National Bankruptcy Conference; Mr. Roger E. Podesta, Partner, Debevoise &
Plimpton, New York, New York, on behalf of Owens-Corning Fiberglas Corporation, the
Center for Claims Resolution, and the Committee for Equitable Compensation; and Mr.
W.T. Stephens, Chairman of the Board, President, and Chief Executive Officer, Man-
ville Corporation.

   On July 8, 1992, the Subcommittee held a hearing on consumer issues in bankruptcy.
Witnesses at the hearing were Ms. Barbara L. Clore, President, Associated Industries
Credit Union, Deer Park, Texas, on behalf of the National Consumer Bankruptcy Coali-
tion, accompanied by Martin J. Kelly, Chairman and C.E.O., ITT *35 Consumer Finan-
cial Corporation, Minneapolis, Minnesota; Mr. Willard Gourley, Jr., Barclays Americ-
an Mortgage Corporation, Charlotte, North Carolina, on behalf of the Mortgage
Bankers Association of America; Mr. Gary Klein, Managing Attorney, New Hampshire
Legal Assistance, Manchester, New Hampshire, on behalf of the National Consumer Law
Center; and Mr. Henry J. Sommer, Supervising Attorney, Consumer Law Project, Com-
munity Legal Services, Inc., Philadelphia, Pennsylvania, on behalf of the National
Bankruptcy Conference.

   On August 5, 1992, the Subcommittee conducted a hearing entitled "Commercial and
Public Sector Issues in Bankruptcy." Witnesses were Ronald DeKoven, Shearman & Ster-
ling, New York, New York, on behalf of the American Bankers Association; Mr. Philip
J. Hendel, Hendel, Collins & Newton, Springfield, Massachusetts, on behalf of the
commercial Law League of America; Professor Lawrence P. King, New York University
School of Law and Wachtell, Lipton, Rosen & Katz, New York, New York, on behalf of
the National Bankruptcy Conference, accompanied by Mr. Harvey Miller, Weil, Gotshal
& Manges, New York, New York; Mr. Jerry D. Klepner, Director of Legislation, Americ-
an Federal, State, County and Municipal Employees, AFL-CIO, accompanied by Mr.
Robert D. Lenhard, Associate General Counsel for American Federation of State,
County and Municipal Employees; Mr. Scott Scherer, Assistant Treasurer, The Boeing
Commercial Airplane Group; and Mr. James Spiotto, Chapman & Cutler, Chicago,
Illinois, on behalf of the National League of Cities.

   During the 103d Congress, the Subcommittee on Economic and Commercial Law held an
oversight hearing on "Bankruptcy Reform" on August 17, 1994. Testifying before the
Subcommittee were Kenneth N. Klee, Chairman, Legislative Committee, National Bank-
ruptcy Conference; Philip J. Hendel, Legislative Chairman, Bankruptcy and Insolvency
Section, Commercial Law League of America; Robin E. Phelan, President, American
Bankruptcy Institute; Philip S. Corwin, Director and Counsel, Operations and Retail
Banking, American Bankers Association.

                        **3344 COMMITTEE ACTION AND VOTE

                                    A100

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                     Page 50
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


    On September 28, 1994, a reporting quorum being present, the Subcommittee on Eco-
nomic and Commercial Law ordered H.R. 5116, amended in the nature of a substitute,
reported to the Committee on the Judiciary by voice vote. On September 29, 1994, a
reporting quorum being present, the Committee on the Judiciary ordered H.R. 5116, as
amended, reported to the full House by voice vote.

                          SECTION-BY-SECTION ANALYSIS

                   TITLE I. IMPROVED BANKRUPTCY ADMINISTRATION

Section 101. Expedited hearing on automatic stay.

    Section 362(e) of the Bankruptcy Code provides that a preliminary hearing on a mo-
tion to lift the automatic stay must conclude within 30 days, with the final hearing
to commence within 30 days thereafter. Under many court interpretations, there is no
specific *36 limitation on when the final hearing on the motion to lift the stay must
conclude. [FN1]
    This section provides that the final hearing must conclude within 30 days of the
preliminary hearing, unless extended by consent of the parties or for a specific
time which the court finds is required by compelling circumstances. Under this
standard, for example, an extension should not be available where the debtor was
merely seeking to delay the bankruptcy process or had neglected to consummate a
pending contract. Compelling circumstances that might justify an extension might in-
clude, for example, the bona fide illness of any party or the judge or the occur-
rence of an event beyond the parties' control. Such a finding must be balanced with
the legitimate property rights at stake in each particular case. The Committee be-
lieves speedy conclusion of hearings on the automatic stay will reduce the time and
cost of bankruptcy proceedings by preventing unjustified or unwarranted postpone-
ments of final action.

Section 102. Expedited filing of plans under chapter 11.

    Section 1121 of the Code, currently in effect, grants a debtor the exclusive right
to file a plan during the initial 120 days after an order for relief under chapter
11. This exclusive period expires either at the end of the 120 day period if the
debtor has not filed a plan, or, if the debtor has filed a plan and the plan has not
been accepted by creditors, within 180 days after the order for relief. Thereafter,
any party-in-interest may file a plan. The bankruptcy court may extend or shorten
the exclusive period at the request of the debtor or any other party-in-interest
upon a showing of "cause." Exclusivity is intended to promote an environment in
which the debtor's business may be rehabilitated and a consensual plan may be nego-
tiated. However, undue extension can result in excessively prolonged and costly
delay, to the detriment of the creditors. [FN2]
    Under current law, an order extending the debtor's exclusive period to file a plan
is an interlocutory order. 28 U.S.C. S 158(a) provides**3345 that appeals from in-
terlocutory orders of a bankruptcy judge may be made to the district court only upon
leave of the district court, and not as a matter of right. Section 102 of the bill

                                    A101

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                              Page 51
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

would amend 28 U.S.C. S 158 so as to provide for an immediate appeal as of right to
the district court from a bankruptcy court's order extending or reducing that debt-
or's exclusive period in which to file a plan. This will prevent those parties who
feel they were harmed by an extension, or a failure to extend, to obtain possible
recourse in the district court. The Committee intends that the district court care-
fully consider the circumstances of each case so appealed with a view to encouraging
a fair and equitable resolution of the bankruptcy.

Section 103. Expedited procedure for reaffirmation of debts.

   Some uncertainty exists under current law regarding whether a separate hearing is
required for a debtor to reaffirm a debt, even when the debtor is represented by an
attorney who files an affidavit *37 stating that the reaffirmation was voluntary and
that it would not impose an undue hardship on the debtor. [FN3]
   This section clarifies that a separate hearing is not mandatory in order to reaf-
firm a debt where the debtor is adequately represented by counsel. In addition the
section supplements existing safeguards by requiring that the reaffirmation agree-
ments advise the debtor that reaffirmation is not required, and by mandating that
the attorney's affidavit indicate that the debtor has been fully advised of the
ramifications of the reaffirmation agreement and any default thereunder. The Commit-
tee intends that such understandings be appropriately highlighted in the agreement
to ensure adequate notice to the debtor. In each of the above circumstances, the
Committee intends that before the debtor agrees to a reaffirmation, that the debtor
be made fully aware of his or her rights under the Bankruptcy Code to discharge the
debt and of the effect of a reaffirmation to continue the debt obligation as though
a bankruptcy petition had not been filed.

Section 104. Powers of bankruptcy courts.

   This section makes a number of changes to clarify the powers of bankruptcy courts
in managing bankruptcy cases. Several of these changes are based on the recommenda-
tions of the Federal Courts Study Commission. Subsection (a) authorizes bankruptcy
court judges to hold status conferences in bankruptcy cases and thereby manage their
dockets in a more efficient and expeditious manner. Notwithstanding the adoption of
Bankruptcy Rule 7016 (relating to pretrial conferences), some judges have appeared
reluctant to do so without clear and explicit statutory authorization. This provi-
sion clarifies that such authority exists in the Bankruptcy Code in adversary and
nonadversary proceedings. Subsection (b) allows the full appeal of certain bank-
ruptcy court refusals to abstain in State **3346 law proceedings. As with most
other portions of this Act, subsection (b) operates prospectively and applies only
to cases filed after the effective date of the Act. Accordingly, it does not make
existing orders appealable. Any future decisions not to abstain, if made in cases
filed before the effective date of the Act, would also be governed by present law
and thus would not be appealable to the Circuit Court of Appeals. Subsection (c)
provides for the establishment in each judicial circuit of a bankruptcy appellate
panels, composed of sitting bankruptcy judges, to serve in place of the district
court in reviewing bankruptcy court decisions. Under this subsection, the judicial
council of each circuit would be required to establish a bankruptcy appellate panel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 52
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

service for this purpose, unless the council finds that there are insufficient judi-
cial resources available in the circuit or that establishment would result in undue
delay or increased cost to the parties. Subsection (d) provides that all appeals
from bankruptcy courts shall be heard by a bankruptcy appellate panel, if estab-
lished and in operation as provided in 28 U.S.C. 158(b), unless a party makes a
timely election to have an *38 appeal heard by a district court. Subsections (e) and
(f) conform the rulemaking procedure for bankruptcy courts to the existing procedure
for other Federal courts.

Section 105. Participation by Bankruptcy Administrator at meetings of creditors and
equity security holders.

   This section clarifies that for the States in which the bankruptcy system is ad-
ministered by a Bankruptcy Administrator instead of a U.S. Trustee, the Bankruptcy
Administrator would have the same power as a U.S. Trustee to preside at creditors'
meetings and conduct examinations of the debtor.

Section 106. Definition relating to eligibility to serve on chapter 11 committees.

   This section amends the Bankruptcy Code to include pension benefit guarantors and
certain pension plans within the definition of a "person" for purposes of section
1102 of the Code. This section is intended to clarify that the Pension Benefit Guar-
anty Corporation and State employee pension funds are authorized to serve on chapter
11 committees.

Section 107. Increased incentive compensation for trustees.

   Private trustees are responsible for supervising chapter 7 cases, and, in some in-
stances, chapter 11 cases, as well as for distributing funds to creditors. This sec-
tion provides for an increase in the court-approved compensation payable to private
trustees. Under current law, the private bankruptcy trustees may receive 15 percent
of the first $1,000 disbursed in the case; 6 percent of the next $2,000 disbursed;
and 3 percent of any additional monies disbursed. **3347 The section increases the
maximum compensation to 25 percent of the first $5,000 in disbursements to credit-
ors; 10 percent of additional amounts up to $50,000; 5 percent of additional amounts
up to $1 million; and 3 percent of any amounts in excess of $1 million. This in-
creased compensation is not borne by the Federal Treasury, but is to be paid by
those involved in the bankruptcy system. The American Bankruptcy Institute has is-
sued a report recommending increased trustee compensation. [FN4]

Section 108. Dollar adjustments.

   Subsection (a) revises the current debt limits applicable to a chapter 13 filing
from a maximum of $100,000 of unsecured debt and $350,000 of secured debt to
$250,000 of unsecured debt and $750,000 of secured debt. These changes should help
encourage individual debtors to elect chapter 13 repayment over chapter 7 liquida-
tion. Creditors generally benefit when a debtor elects chapter 13. Notwithstanding
the fee increases in chapter 13 cases, the Committee does not intend for debtors to
be able to utilize chapter 13 as an artifice solely to obtain discharge from certain

                                    A103

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

liabilities. For example, it is not contemplated that an individual who committed a
heinous crime would be able in good faith to use chapter 13 solely as a means of
discharging a civil obligation owing to a *39 harmed party. Among other things, the
remaining subsections increase the current dollar limitations applicable to involun-
tary filings, bankruptcy priorities, and bankruptcy exemptions, among other things,
based on recommendations received from the Judicial Conference. This provision also
provides for automatic increases in response to future inflation every 3 years.

Section 109. Premerger notification.

   This section conforms section 363(b)(2) of the Bankruptcy Code more closely to the
requirements for antitrust review of transactions under section 7A of the Clayton
Act (15 U.S.C. 18(a)). Section 7A requires parties to a merger or acquisition to no-
tify the Department of Justice and the Federal Trade Commission and wait a specified
period of time before completing the transaction, to allow for review of its compet-
itive implications. Generally, the waiting period terminates 30 days after the fil-
ing requirement is met, but the period can be extended by a request from the Depart-
ment or the FTC for additional information.
   Under section 363(b)(2) of the Code, however, the section 7A waiting period for
mergers and acquisitions involving assets in bankruptcy is shortened to 10 days, and
could be shortened even further by order of the bankruptcy court. [FN5]
   Section 109 of the bill extends the initial waiting period for transactions in
bankruptcy to 15 days after the Department of Justice and the FTC receive the noti-
fication required under section 7A(a). The provision also clarifies that this wait-
ing period can **3348 never be shortened, but only extended. Finally, the provision
specifies three ways in which the 15-day waiting period can be extended: pursuant to
section 7A(e)(2), if the Justice Department or the FTC makes a "second request";
pursuant to section 7A(g)(2), if the parties fail to comply; and by the court, for
bankruptcy-related or other reasons. The provision also makes a number of other
minor clarifying changes to section 363(b)(2) of the Code.

Section 110. Allowance of creditor committee expenses.

   The current Bankruptcy Code is silent regarding whether members of official com-
mittees appointed in chapter 11 cases are entitled to reimbursement of their out-
of-pocket expenses (such as travel and lodging), and the courts have split on the
question of allowing reimbursement. [FN6]
   This section of the bill amends section 503(b) of the Bankruptcy Code to specific-
ally permit members of chapter 11 committees to receive court-approved reimbursement
of their actual and necessary out-of-pocket expenses. The new provision would not
allow the payment of compensation for services rendered by or to committee members.

*40 Section 111. Bankruptcy court injunctions.

   This section adds a new subsection (g) to section 524 of the Code, establishing a
procedure for dealing in a chapter 11 reorganization proceeding with future personal
injury claims against the debtor based on exposure to asbestos-containing products.
The procedure involves the establishment of a trust to pay the future claims,
coupled with an injunction to prevent future claimants from suing the debtor.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                          Page 55
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

injunction mechanism must be accompanied by explicit requirements simulating those
met in the Manville case.

Seciton 111 requires, in order for present claimants to be bound by a trust/
injunction, that the trust have the capability of owning **3350 a majority of the
shares of the debtor or its parent or of a subsidiary; that the debtor prove that it
is likely to be subject to substantial future asbestos claims, the number of which
cannot be easily predicted; and that the trust is needed in order to deal equitably
with present and future claims; and that a separate creditor class be established
for those with present claims, which must vote by a 75 percent margin to approve the
plan.

In order for future claimants to be bound by a trust/injunction, section 111 re-
quires that the trust operate in a structure and manner necessary to give reasonable
assurance that the trust will value, and be able to pay, similar present and future
claims in substantially the same manner.

The asbestos trust/injunction mechanism established in the bill is available for
use by any asbestos company facing a similarly overwhelming liability. It is writ-
ten, however, so that Johns-Manville and UNR, both of which have met and surpassed
the standards imposed in this section, will be able to take advantage of the cer-
tainty it provides without having to reopen their cases.

Section 112. Authority of bankruptcy judges to conduct jury trials in civil proceed-
ings.

This section would amend title 28 of the United States Code to clarify that bank-
ruptcy judges may conduct jury trials and enter appropriate orders consistent with
those trials if designated by the district court and with the express consent of all
parties to the bankruptcy proceeding.

This amendment would clarify a recent Supreme Court decision and resolve conflict-
ing opinions among the different circuits regarding this issue. The Supreme Court in
Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989), held that in bankruptcy core
proceedings, there is a constitutional right to a trial by jury.

*42 The Granfinanciera court had no finding on whether bankruptcy judges could
conduct civil trials, and the circuits have reached contrary opinions regarding this
issue. Five circuits have held that, in the absence of enabling legislation, bank-
ruptcy judges could not hold jury trials. [FN9]  The Second Circuit has been the
lone circuit to hold that bankruptcy judges have implicit authority to conduct jury
trials. [FN10]

Section 113. Sovereign immunity.

This section would effectively overrule two Supreme Court cases that have held
that the States and Federal Government are not deemed  to have waived their sover-
eign immunity by virtue of enacting section 106(c) of the Bankruptcy Code. In enact-
ing section 106(c), Congress intended to make provisions of title 11 that encom-
passed the words "creditor," "entity," or "governmental unit" applicable to the
States. Congress also intended to make the States subject to a money judgment. But
the Supreme Court in Hoffman v. Connecticut Department of Income Maintenance, 492
U.S. 96 (1989), held that even if the State did not file a claim, the trustee in

A106

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 56
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

bankruptcy may not recover a money judgment from the State **3351 notwithstanding
section 106(c). This holding had the effect of providing that preferences could not
be recovered from the States. In using such a narrow construction, the Court held
that use of the "trigger words" would only bind the States, and not make them sub-
ject to a money judgment. The Court did not find in the text of the statute an "un-
mistakenly clear" intent of Congress to waive sovereign immunity in accordance with
the language promulgated in Atascadero State Hospital v. Scalon, 473 U.S. 234, 242
(1985).

The Court applied this reasoning in United States v. Nordic Village, Inc., 112 S.
Ct. 1011 (1992), in not allowing a trustee to recover a postpetition payment by a
chapter 11 debtor to the Internal Revenue Service. The Court found that there was no
such waiver expressly provided within the text of the statute.

This amendment expressly provides for a waiver of sovereign immunity by govern-
mental units with respect to monetary recoveries as well as declaratory and injunct-
ive relief. It is the Committee's intent to make section 106 conform to the Congres-
sional intent of the Bankruptcy Reform Act of 1978 waiving the sovereign immunity of
the States and the Federal Government in this regard.

Section 114. Service of process in bankruptcy proceedings on an insured depository
institution.

This section operates to amend bankruptcy rule 7004 to require that service of
process to an insured depository institution be accomplished by certified mail in a
contested matter or adversary proceeding. The rule that is presently in operation
only requires that service be achieved by first class mail.

*43 Section 115. Meetings of creditors and equity security holders.

This section requires the U.S. Trustee to orally examine the debtor to ensure that
he or she is informed about the effects of bankruptcy, both positive and negative.
Its purpose is solely informational; it is not intended to be an interrogation to
which the debtor must give any specific answers or which could be used against the
debtor in some later proceeding. No separate record need be kept of the examination
since it will be preserved along with the remainder of the record of the meeting,
which normally is recorded on tape.

The trustee conducting the meeting of creditors is directed to orally inquire
whether the debtor is aware of the consequences of bankruptcy, including protections
such as those provided by the discharge and the automatic stay, as well as the fact
that the bankruptcy filing will appear on the debtor's credit history. Since differ-
ent creditors treat bankruptcy debtors differently, the trustee is not expected to
predict whether the bankruptcy filing will make it **3352 more or less difficult for
the debtor to obtain credit; some creditors may treat the debtor more favorably
after bankruptcy has removed all other debts, and many creditors consider a bank-
ruptcy filing a barrier to new credit only if it occurred in the 2 or 3 years prior
to the credit application. For the same reasons, it is not expected that the trustee
would predict whether a dismissal or conversion of the bankruptcy which has already
been filed would improve the debtor's changes of obtaining credit.

The trustee must also verify that the debtor has knowingly signed the section of

A107

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the bankruptcy petition stating the debtor's awareness of the right to file under
other chapters of the Code.

   Finally, the trustee must make sure the debtor is aware of the effect of reaffirm-
ing a debt. Since section 103 of the bill eliminates for most debtors the warnings
and explanations concerning reaffirmation previously given by the court at the dis-
charge hearing, it is important that trustees explain not only the procedures for
reaffirmation, but also the potential risks of reaffirmation and the fact that the
debtor may voluntarily choose to repay any debt to a creditor without reaffirming
the debt, as provided in Bankruptcy Code section 524(f).

   In view of the amount of information involved and the limits on the time available
for meetings of creditors, trustees or courts may provide written information on
these topics at or in advance of the meeting and the trustee may then ask questions
to ensure that the debtor is aware of the information.

Section 116. Tax assessment.

   This sections expands the tax exception to the automatic stay that is contained in
11 U.S.C. S 362(b)(9). This section will lift the automatic stay as it applies to a
tax audit, a demand for tax returns, assessment of an uncontested tax liability, or
the making of certain assessments of tax and issuance of a notice and demand for
payment for such assessment. The language of this provision is only intended to ap-
ply to sales or transfers to the debtor. It has no application to sales or transfers
to third parties, such as in sales free and clear of tax liens under section 363(f).

*44 Section 117. Additional trustee compensation.

   This section provides an additional $15 compensation for the services of a trustee
in a chapter 7 case in addition to the $45 already provided for in Bankruptcy Code
section 330(b). To obtain the funds to pay the additional fees, the Judicial Confer-
ence of the United States is required to prescribe additional fees payable by
parties as provided in section 1914(b) of title 28, the Judicial Conference of the
United States is also authorized to prescribe fees for notices of appearances filed
by parties-in-interest after a bankruptcy case is filed and fees to be charged
against distributions to creditors. The latter fees would be deducted, by trustees
or other entities making distributions, from the monies payable to creditors, con-
stituting user fees charged to those who participate in bankruptcy cases by receiv-
ing distributions. Since the fees are payable by the creditors from funds to be dis-
tributed to them, such deductions **3353 would not affect the application of the
best interests of creditors test or other tests for confirmation in chapters 11, 12
or 13. No higher payment from the debtor would be necessary to meet these tests due
to the deduction. It is the Committee's intention that the funds for this increase
not be borne by the Federal Treasury or by debtors in chapter 7 or 13 cases.

                    TITLE II. COMMERCIAL BANKRUPTCY ISSUES

Section 201. Aircraft equipment and vessels; rolling stock equipment.

   Section 201 would effectuate a number of changes. It would amend both sections
1110 and 1168 to delete the phrase "purchase-money equipment" in order to clarify

                                    A108

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                     Page 58
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,   1994 U.S.C.C.A.N. 3340)

that these sections protect all lease financing agreements and all debt financings
that involve a security interest, not only security interests obtained at the time
the equipment is acquired. This change would be phased in so that only new equipment
first placed in service after enactment of the amendment would be affected. Once
this rule is fully phased in, the distinction between leases and loans would no
longer be relevant for the purposes of these sections.

During the time before this rule is phased in, a safe harbor definition of the
term "lease" for equipment first placed in service prior to the date of enactment
would apply. Under the safe harbor, a lease would receive section 1110 or section
1168 protection if the lessor and the debtor, as lessee, have expressed in the lease
agreement, or a substantially contemporaneous writing, that such agreement is to be
treated as a lease for Federal income tax purposes. This section also clarifies that
the rights of a section 1110 or section 1168 creditor would not be affected by section 1129 "cram-down."

Section 202. Limitation on liability of non-insider transferee for avoided transfer.

Section 547 of the Bankruptcy Code authorizes trustees to recapture preferential
payments made to creditors within 90 days prior to a bankruptcy filing. Because of
the concern that corporate insiders (such as officers and directors) who are credit-
ors of their own corporation have an unfair advantage over outside creditors, sec-
tion *45 547 of the Bankruptcy Code further authorizes trustees to recapture prefer-
ential payments made to such insiders in their capacity as creditors a full year
prior to a bankruptcy filing. Several recent court decisions have allowed trustees
to recapture payments made to non-insider creditors a full year prior to the bank-
ruptcy filing, if an insider benefits from the transfer in some way. [FN11]   Al-
though the creditor is not an insider in these cases, the courts have reasoned that
because the repayment benefitted a corporate insider (namely the officer who signed
the guarantee) the non-insider transferee should be liable for returning the trans-
fer to the bankrupt estate as if it were an insider as well. This section overrules
the DePrizio line of cases and clarifies that non-insider transferees should not be
subject to the preference provisions of the Bankruptcy Code beyond the 90-day stat-
utory period.

**3354 Section 203. Perfection of purchase-money security interest.

Section 547(c)(3) of the Bankruptcy Code provides that a trustee may not avoid the
perfection of purchase-money security interest as a preference if it occurs within
10 days of the debtor receiving possession of the property. This section conforms
bankruptcy law practices to most States' practice by granting purchase-money secur-
ity lenders a 20-day period in which to perfect their security interest.

Section 204. Continued perfection.

This section sets forth an amendment to sections 362 and 546 of the Bankruptcy
Code to confirm that certain actions taken during bankruptcy proceedings pursuant to
the Uniform Commercial Code to maintain a secured creditor's position as it was at
the commencement of the case do not violate the automatic stay. Such actions could
include the filing of a continuation statement and the filing of a financing state-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                      Page 59
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

ment. The steps taken by a secured creditor to ensure continued perfection merely
maintain the status quo and do not improve the position of the secured creditor.

Section 205. Impact of lease rejection on leases.

   This section clarifies section 365 of the Bankruptcy Code to mandate that lessees
cannot have their rights stripped away if a debtor rejects its obligations as a
lessor in bankruptcy. This section expressly provides guidance in the interpretation
of the term "possession" in the context of the statute. The term has been inter-
preted by some courts in recent cases to be only a right of possession. [FN12]  This
section will enable the lessee to retain its rights that are appurtenant to its
leasehold. These rights include the amount and timing of payment of rent or other
amounts payable by the lessee, the right to use, possess, quiet enjoyment, sublet,
or assign.

*46 Section 206. Contents of plan.

   This amendment conforms the treatment of residential mortgages in chapter 11 to
that in chapter 13, preventing the modification of the rights of a holder of a claim
secured only by a security interest in the debtor's principal residence. Since it is
intended to apply only to home mortgages, it applies only when the debtor is an in-
dividual. It does not apply to a commercial property, or to any transaction in which
the creditor acquired a lien on property other than real property used as the debt-
or's residence. [FN13]

Section 207. Priority for independent sales representatives.

   This section clarifies that independent sales representatives of a bankrupt debtor
are entitled to the same priority as the employees **3355 of the debtor codifying In
re Wang Laboratories, Inc., 164 B.R. 404 (Bankr. Mass. 1994). This section modifies
section 507 of title 11 to include such representatives in the section's third pri-
ority as employees for the purposes of claims of a bankrupt debtor. The section spe-
cifies that in order to be treated as an employee for the purposes of priority, at
least 75 percent of the income of the independent sales representative must have
been earned as an independent contracting entity from the bankrupt debtor.

Section 208. Production payments.

   A production payment is an interest in the product of an oil or gas producer that
lasts for a limited period of time and that is not affected by production costs. The
owner has no other interest in the property or business of the producer other than
the interest in the product that is produced. These payments, often transferred by
way of oil and gas leases, represent a means by which capital-strapped oil producers
may generate income from their property without giving up operating control of their
business. Although a number of states use the ownership theory by treating produc-
tion payments as conveying interests in real property, [FN14] it is not clear that
this treatment will necessarily apply in all States in case of bankruptcy. As a res-
ult, this section modifies section 541 of the Bankruptcy Code to exclude production
payments sold by the debtor prior to a bankruptcy filing from the debtor's estate in

A110

H.R. REP. 103-835                                               Page 60
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

bankruptcy.

Section 209. Seller's rights to reclaim goods.

   Seciton 209 addresses the concerns of trade creditors who claim they often have
insufficient notice to exercise their reclamation rights. Section 209 amends <u>section
546(c)(1) of the Bankruptcy Code</u> to give trade creditors 20 days to utilize reclama-
tion rights after the commencement of a bankruptcy case, rather than the current
statutory grant of 10 days.

Section 210. Investment of money of the estate.

   <u>Section 345</u> of the Code governs investments of the funds of bankrupt estates. The
purpose is to make sure that the funds of *47 a bankrupt that are obligated to cred-
itors are invested prudently and safely with the eventual goal of being able to sat-
isfy all claims against the bankrupt estate. Under current law, all investments are
required to be FDIC insured, collateralized or bonded. While this requirement is
wise in the case of a smaller debtor with limited funds that cannot afford a risky
investment to be lost, it can work to needlessly handcuff larger, more sophisticated
debtors. This section would amend the Code to allow the courts to approve invest-
ments other than those permitted by <u>section 345(b)</u> for just cause, thereby overrul-
ing In re Columbia Gas Systems, Inc., 1994 WL 46314 (3d Cir. Del).

**3356 Section 211. Selection of private trustees in chapter 11 cases.

   This section will conform selection of private trustees in chapter 11 cases to the
selection process in chapter 7 cases, thereby allowing creditors in a chapter 11
case to elect their own trustee under section 1104 of chapter 11.

Section 212. Limited liability partnerships.

   <u>Section 723 of the Bankruptcy Code</u> addresses the personal liability of general
partners for the debts of the partnership. <u>Section 723</u> grants the trustee a claim
against "any general partner" for the full partnership deficiency owing to creditors
to the extent the partner would be personally liable for claims against the partner-
ship. It is unclear how this provision would be construed to apply with regard to
registered limited liability partnerships which have been authorized by a number of
States since the advent of the 1978 Bankruptcy Code. This section clarifies that a
partner of a registered limited liability partnership would only be liable in bank-
ruptcy to the extent a partner would be personally liable for a deficiency according
to the registered limited liability statute under which the partnership was formed.

Section 213. Exclusion from the State of certain accounts and chattel paper.

   This section is intended to clarify that sales of accounts receivable and chattel
paper are to be excluded from the debtor's estate, even though a financing statement
may have been filed. This is intended to overturn the Tenth Circuit decision in <u>Oc-
tagon Gas Systems, Inc. v. Rimmer (In re Meridian Reserve, Inc.), 995 F.2d 948 (10th
Cir.)</u>, cert. denied, <u>114 S. Ct. 554 (1993)</u>. In the Committee's view the Octagon de-
cision is incorrect as a matter of law and policy.

                                    A111

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 214. Impairment of Claims and Interests.

   The principal change in this section is set forth in subsection (d) and relates to
the award of postpetition interest. In a recent Bankruptcy Court decision in In re
New Valley Corp., 168 B.R. 73 (Bankr. D.N.J. 1994), unsecured creditors were denied
the right to receive postpetition interest on their allowed claims even though the
debtor was liquidation and reorganization solvent. The New Valley decision applied
section 1124(3) of the Bankruptcy Code literally by asserting, in a decision grant-
ing a declaratory judgment, that a class that is paid the allowed amount of its
claims in cash *48 on the effective date of a plan is unimpaired under section
1124(3), therefore is not entitled to vote, and is not entitled to receive postpeti-
tion interest. The Court left open whether the good faith plan proposal requirement
of section 1129(a)(3) would require the payment of or provision for postpetition in-
terest. In order to preclude this unfair result in the future, the Committee finds
it appropriate to delete section 1124(3) from the Bankruptcy Code.
   As a result of this change, if a plan proposed to pay a class of claims in cash in
the full allowed amount of the claims, the class would be impaired, entitling cred-
itors to vote for or against the **3357 plan of reorganization. If creditors vote
for the plan of reorganization, it can be confirmed over the vote of dissenting
class of creditors only if it complies with the "fair and equitable" test under sec-
tion 1129(b)(2) of the Bankruptcy Code and it can be confirmed over the vote of dis-
senting individual creditors only if it complies with the "best interests of credit-
ors" test under section 1129(a)(7) of the Bankruptcy Code.
   The words "fair and equitable" are terms of art that have a well established mean-
ing under the case law of the Bankruptcy Act as well as under the Bankruptcy Code.
Specifically, courts have held that where an estate is solvent, in order for a plan
to be fair and equitable, unsecured and undersecured creditors' claims must be paid
in full, including postpetition interest, before equity holders may participate in
any recovery. [FN15]
   With respect to section 1124(1) and (2), subsection (d) would not change the bene-
ficial 1984 amendment to section 1129(a)(7) of the Bankruptcy Code, which excluded
from application of the best interests of creditors test classes that are unimpaired
under section 1124.
   The other subsections deal with the issue of late-filed claims. The amendment to
section 502(b) is designed to overrule In re Hausladen, 146 B.R. 557 (Bankr. D.
Minn. 1992), and its progeny by disallowing claims that are not timely filed. The
amendment also specifies rules relating to the filing of certain governmental
claims. These changes are not intended to detract from the ability of the court to
extend the bar date for claims when authorized to do so under the Federal Rules of
Bankruptcy Procedure. The amendments to section 726(a) of the Code, governing the
distribution of property of the estate in a chapter 7 liquidation, conform to the
amendments to section 1129(b) and 502(b). The amendments to paragraphs (2) and (3)
of section 726(a) assure that the disallowance of late-filed claims under new sec-
tion 502(b)(4) does not affect their treatment under section 726(a).

Section 215. Protection of security interest in postpetition rents.

   Under current section 552 of the Bankruptcy Code, real estate lenders are deemed

A112

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 62
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

to have a security interest in postpetition rents only to the extent their security
interest has been "perfected" under applicable State law procedures. [FN16] Inclu-
sion under section 552, in turn, allows such proceeds to be treated as "cash collat-
eral" under *49 section 363(a) of the Bankruptcy Code, which prohibits a trustee or
debtor-in-possession from using such proceeds without the consent of the lender or
authorization by the court. In a number of States, however, it is not feasible for
real estate lenders to perfect their security interest prior to a bankruptcy filing;
and, as a result, courts have denied lenders having interests in postpetition rents
the protection offered under sections 552 and 363 of the Bankruptcy Code. [FN17]
Section 214 provides that lenders may have valid security **3358 interests in post-
petition rents for bankruptcy purposes notwithstanding their failure to have fully
perfected their security interest under applicable State law. This is accomplished
by adding a new provision to section 552 of the Bankruptcy Code, applicable to
lenders having a valid security interest which extends to the underlying property
and the postpetition rents.

   Section 215 also clarifies the bankruptcy treatment of hotel revenues which have
been used to secure loans to hotels and other lodging accommodations. These revenue
streams, while critical to a hotel's continued operations, are also the most liquid
and more valuable collateral the hotel can provide to its financiers. When the hotel
experiences financial distress, the interests of the hotel operations, including em-
ployment for clerks, maids, and other workers can collide with the interests of per-
sons to whom the revenues are pledged. Section 215 recognizes the importance of this
revenue stream for the two competing interests and attempts to strike a fair balance
between them.

Section 216. Netting of swap agreements.

   Parties active in the foreign exchange market generally document spot and forward
foreign exchange transactions under a netting agreement. The Bankruptcy Code's
definition of "swap agreement" refers only to foreign exchange contracts, but is si-
lent as to whether spot transactions fall within the definition. This section con-
firms the market understanding that spot foreign exchange contracts are included in
the term "swap agreement." It is expected that contracts that mature in a period of
time equalling 2 days or less will fall under the umbrella of "swap agreements."

Section 217. Limitation of avoiding powers.

   This section clarifies section 546(a)(1) of the Bankruptcy Code which imposes a
2-year statute of limitations within which an appointed trustee must bring an avoid-
ance action. The purpose of a statute of limitations is to define the period of time
that a party is at risk of suit. This section defines the applicable statute of lim-
itations as 2 years from the entry of an order of relief or 1 year after the ap-
pointment of the first trustee if such appointment occurs before the expiration of
the original 2-year period. The section is not intended to affect the validity of
any tolling agreement or to have any bearing on the equitable tolling doctrine where
there has been fraud determined to have occurred. The time limits are not *50 inten-
ded to be jurisdictional and can be extended by stipulation between the necessary
parties to the action or proceeding.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 63
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

Section 218. Small business.

   This section amends title 11 to expedite the process by which small businesses may
reorganize under chapter 11. For the purposes of this section, a small business is
defined as one whose aggregate**3359 noncontingent liquidated secured and unsecured
debts are less than $2,000,000 as of the date of the bankruptcy filing. A qualified
small business debtor who elects coverage under this provision would be permitted to
dispense with creditor committees would have an exclusivity period for filing a plan
of 100 days; and would be subject to more liberal provisions for disclosure and so-
licitation of acceptances for a proposed reorganization plan under Code <u>section
1125</u>. The second permits an extension with respect to the debtor's original filing
time if the debtor shows there were circumstances beyond its control.

Section 219. Single asset real estate.

   This section will add a new definition to the Code for "single asset real estate,"
meaning real property that constitutes a single property or project (other than res-
idential property with fewer than four units) which generates substantially all of
the gross income of the debtor and has aggregate noncontingent, liquidated secured
debts in an amount up to $2 million. It amends the automatic stay provision of <u>sec-
tion 362</u> to provide special circumstances under which creditors of a single asset
real estate debtor may have the stay lifted if the debtor has not filed a "feasible"
reorganization plan within 90 days of filing, or has not commenced monthly payments
to secured creditors.

Section 220. Leases of personal property.

   Under current law, when a debtor files for bankruptcy, it has an unspecified peri-
od of time to determine whether to assume or reject a lease of personal property.
Pending a decision to assume or reject, lessors are permitted to petition the court
to require the lessee to make lease payments to the extent use of the property actu-
ally benefits the estate. Section 220 responds to concerns that this procedure may
be unduly burdensome on lessors of personal property, while safeguarding the debtors
ability to make orderly decisions regarding assumption or rejection. The section
amends <u>section 365(d)</u> to specify that 60 days after the order for relief the debtor
must perform all obligations under an equipment lease, unless the court, after no-
tice and a hearing and based on the equities of the case, orders otherwise. This
will shift to the debtor the burden of bringing a motion while allowing the debtor
sufficient breathing room after the bankruptcy petition to make an informed de-
cision. <u>Section 363(e)</u> is also amended to clarify that the lessor's interest is sub-
ject to "adequate protection." Such remedy is to the exclusion of the lessor's being
able to seek to lift the automatic stay under <u>section 363</u>. Finally, <u>section 365(b)</u>
is clarified to provide that when sought by a debtor, a lease can be cured at a
nondefault rate (i.e., it would not need to pay penalty rates).

*51 Section 221. Exemption for small business investment companies.

   This section specifies that small business investment companies are ineligible to
file for bankruptcy protection. This will prevent such filings from being utilized

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 64
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

to subordinate the interests of the Small Business Administration to other credit-
ors.

**3360 Section 222. Payment of taxes with borrowed funds.

   This section makes loans that are used to pay Federal taxes nondischargeable under
section 523. This will facilitate individuals' ability to use their credit cards to
pay their Federal taxes.

Section 223. Return of goods.

   This section clarifies section 546 of the Bankruptcy Code by adding a subsection
(b) permitting a bankruptcy court to hold a hearing and allow a buyer to return to
the seller goods shipped before the commencement of the case if it is in the best
interests of the estate. This will allow debtors to return unsold goods in order to
offset their debts. The notion may only be made by the trustee and must be made
within 120 days after the order for relief.

Section 224. Proceeds of money order agreements.

   This section excludes from the debtor's estate proceeds from money orders sold
within 14 days of the filing of the bankruptcy pursuant to an agreement prohibiting
the commingling of such sale proceeds with property of the debtor. To benefit from
this section, the money order issuer must have acted, prior to the petition, to re-
quire compliance with the commingling prohibition.

Section 225. Airport gate leases.

   This section clarifies the treatment of airport gate leases in bankruptcy, by set-
ting forth a 270-day period within which an airport gate lease is to be assumed or
rejected. This period may only be extended in cases where there are circumstances
for which the debtor should not be held accountable.

Section 226. Trustee duties.

   This section requires the United States Trustee to invoke procedural guidelines
regarding fees in bankruptcy cases and file comments with fee applications. These
changes should help foster greater uniformity in the application for and processing
and approval of fee applications.

Section 227. Notice to creditors.

   This section amends section 342 of the Bankruptcy Code to require that notices to
creditors set forth the debtor's name, address, and taxpayer identification (or so-
cial security) number. The failure of a notice to contain such information will not
invalidate its legal effect, for example, such failure could not result in a debtor
failing to obtain a discharge with respect to a particular creditor.
   The Committee anticipates that the Official Bankruptcy Forms will be amended to
provide that the information required by this section will become a part of the cap-
tion on every notice given in a bankruptcy case. As with other similar requirements,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 65
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

the court retains the authority to waive this requirement in compelling circum-
stances, *52 such as those of a domestic violence victim who must conceal her resid-
ence for her own safety.

                  **3361 TITLE III. CONSUMER BANKRUPTCY ISSUES

Section 301. Period for curing default relating to principal residence.

   Section 1322(b) (3) and (5) of the Bankruptcy Code permit a debtor to cure de-
faults in connection with a chapter 13 plan, including defaults on a home mortgage
loan. Until the Third Circuit's decision in Matter of Roach, 824 F.2d 1370 (3d Cir.
1987), all of the Federal Circuit Courts of Appeal had held that such right contin-
ues at least up until the time of the foreclosure sale. [FN18] The Roach case,
however, held that the doctor's right to cure was extinguished at the time of the
foreclosure judgment, which occurs in advance of the foreclosure sale. This decision
is in conflict with the fundamental bankruptcy principle allowing the debtor a fresh
start through bankruptcy.
   This section of the bill safeguards a debtor's rights in a chapter 13 case by al-
lowing the debtor to cure home mortgage defaults at least through completion of a
foreclosure sale under applicable nonbankruptcy law. However, if the State provides
the debtor more extensive "cure" rights (through, for example, some later redemption
period), the debtor would continue to enjoy such rights in bankruptcy. The changes
made by this section, in conjunction with those made in section 305 of this bill,
would also overrule the result in First National Fidelity Corp. v. Perry, 945 F.2d
61 (3d Cir. 1991) with respect to mortgages on which the last payment on the origin-
al payment schedule is due before the date on which the final payment under the plan
is due. In that case, the Third Circuit held that subsequent to foreclosure judg-
ment, a chapter 13 debtor cannot provide for a mortgage debt by paying the full
amount of the allowed secured claim in accordance with Bankruptcy Code section
1325(a)(5), because doing so would constitute an impermissible modification of the
mortgage holder's right to immediate payment under section 1322(b)(2) of the Bank-
ruptcy Code.

Section 302. Nondischargeability of fine under chapter 13.

   This section adds criminal fines to the list of obligations which may not be dis-
charged pursuant to a chapter 13 case.

Section 303. Impairment of exemptions.

   Because the Bankruptcy Code does not currently define the meaning of the words "im-
pair an exemption" in section 522(f), several court decisions have, in recent years,
reached results that were not intended by Congress when it drafted the Code. This
amendment would provide a simple arithmetic test to determine whether a lien impairs
an exemption, based upon a decision, In re Brantz, 106 B.R. 62 (Bankr.E.D.Pa. 1989),
that was favorably cited by the Supreme Court in Owen v. Owen, 111 S.Ct. 1833, 1838,
n.5.
   The decisions that would be overruled involve several scenarios. The first is
where the debtor has no equity in a property over and **3362 *53 above a lien senior

                                    A116

H.R. REP. 103-835                                                    Page 66
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

to the judicial lien the debtor is attempting to avoid, as in the case, for example,
of a debtor with a home worth $40,000 and a $40,000 mortgage. Most courts and com-
mentators had understood that in that situation the debtor is entitled to exempt his
or her residual interests, such as a possessory interest in the property, and avoid
a judicial lien or other lien of a type subject to avoidance, in any amount, that
attaches to that interest. Otherwise, the creditor would retain the lien after bank-
ruptcy and could threaten to deprive the debtor of the exemption Congress meant to
protect, by executing on the lien. Unfortunately, a minority of court decisions,
such as In re Gonzales, 149 B.R. 9 (Bankr.D.Mass. 1993), have interpreted section
522(f) as not permitting avoidance of liens in this situation. The formula in the
section would make clear that the liens are avoidable.
    The second situation is where the judicial lien the debtor seeks to avoid is par-
tially secured. Again, in an example where the debtor has a $10,000 homestead exemp-
tion, a $50,000 house and a $40,000 first mortgage, most commentators and courts
would have said that a judicial lien of $20,000 could be avoided in its entirety.
Otherwise, the creditor would retain all or part of the lien and be able to threaten
postbankruptcy execution against the debtor's interest which, at the time of the
bankruptcy is totally exempt. However, a few courts, including the Ninth Circuit in
In re Chabot, 992 F.2d 891 (9th Cir. 1992), held that the debtor could only avoid
$10,000 of the judicial lien in this situation, leaving the creditor after bank-
ruptcy with a $10,000 lien attached to the debtor's exempt interest in property.
This in turn will result, at a minimum, in any equity created by mortgage payments
from the debtor's postpetition income-income which the fresh start is supposed to
protect-going to the benefit of the lienholder. It may also prevent the debtor from
selling his or her home after bankruptcy without paying the lienholder, even if that
payment must come from the debtor's $10,000 exempt interest. The formula in the sec-
tion would not permit this result.
    The third situation is in the Sixth Circuit, where the Court of Appeals, in In re
Dixon, 885 F.2d 327 (6th Cir. 1989), has ruled that the Ohio homestead exemption
only applies in execution sale situations. Thus, the court ruled that the debtor's
exemption was never impaired in a bankruptcy and could never be avoided, totally
eliminating the right to avoid liens. This leaves the debtor in the situation where,
if he or she wishes to sell the house after bankruptcy, that can be done only by
paying the lienholder out of equity that should have been protected as exempt prop-
erty. By focusing on the dollar amount of the exemption and defining "impaired," the
amendment should correct this problem. By defining "impairment," the amendment also
clarifies that a judicial lien on a property can impair an exemption even if the li-
en cannot be enforced through an execution sale, thereby supporting the result in In
re Henderson, 18 F.3d 1305 (5th Cir. 1994), which permitted a debtor to avoid a lien
that impaired the homestead exemption even though the lien could not be enforced
through a judicial sale.
    The amendment also overrules In re Simonson, 758 F2d 103 (3d Cir. 1985), in which
the Third Circuit Court of Appeals held that a judicial lien could not be avoided in
a case in which it was senior **3363 *54 to a nonavoidable mortgage and the mort-
gages on the property exceeded the value of the property. The position of the dis-
sent in that case is adopted.

                              A117

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                          Page 67
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

Section 304. Protection of child support and alimony.

This section is intended to provide greater protection for alimony, maintenance,
and support obligations owing to a spouse, former spouse or child of a debtor in
bankruptcy. The Committee believes that a debtor should not use the protection of a
bankruptcy filing in order to avoid legitimate marital and child support obliga-
tions.

The section modifies several provisions of the Bankruptcy Code. Subsection (b)
specifies that the automatic stay does not apply to a proceeding that seeks only the
establishment of paternity or the establishment or modification of an order for ali-
mony, maintenance, and support. Subsection (c) provides a new bankruptcy priority
relating to debts for alimony, maintenance or support obligations. Subsection (d)
provides that section 522(f)(1) of the Bankruptcy Code may not be used to avoid ju-
dicial liens securing alimony, maintenance, or support obligations. (This subsection
is intended to supplement the reach of Farrey v. Sanderfoot, 111 S.Ct. 1825, 114
L.Ed.2d 337 (1991), which held that a former husband could not avoid a judicial lien
on a house previously owned with his wife.)

Subsection (e) adds a new exception to discharge for some debts arising out of a
divorce decree or separation agreement that are not in the nature of alimony, main-
tenance or support. In some instances, divorcing spouses have agreed to make pay-
ments of marital debts, holding the other spouse harmless from those debts, in ex-
change for a reduction in alimony payments. In other cases, spouses have agreed to
lower alimony based on a larger property settlement. If such "hold harmless" and
property settlement obligations are not found to be in the nature of alimony, main-
tenance, or support, they are dischargeable under current law. The nondebtor spouse
may be saddled with substantial debt and little or no alimony or support. This sub-
section will make such obligations nondischargeable in cases where the debtor has
the ability to pay them and the detriment to the nondebtor spouse from their nonpay-
ment outweighs the benefit to the debtor of discharging such debts. In other words,
the debt will remain dischargeable if paying the debt would reduce the debtor's in-
come below that necessary for the support of the debtor and the debtor's dependents.
The Committee believes that payment of support needs must take precedence over prop-
erty settlement debts. The debt will also be discharged if the benefit to the debtor
of discharging it outweighs the harm to the obligee. For example, if a nondebtor
spouse would suffer little detriment from the debtor's nonpayment of an obligation
required to be paid under a hold harmless agreement (perhaps because it could not be
collected from the nondebtor spouse or because the nondebtor spouse could easily pay
it) the obligation would be discharged. The benefits of the debtor's discharge
should be sacrificed only if there would be substantial detriment to the nondebtor
spouse that outweighs the debtor's need for a fresh start.

The new exception to discharge, like the exceptions under Bankruptcy Code section
523(a) (2), (4), and (6) must be raised in an adversary *55 **3364 proceeding during
the bankruptcy case within the time permitted by the Federal Rules of Bankruptcy
Procedure. Otherwise the debt in question is discharged. The exception applies only
to debts incurred in a divorce or separation that are owed to a spouse or former
spouse, and can be asserted only by the other party to the divorce or separation. If
the debtor agrees to pay marital debts that were owed to third parties, those third

A118

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 68
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

parties do not have standing to assert this exception, since the obligations to them
were incurred prior to the divorce or separation agreement. It is only the obliga-
tion owed to the spouse or former spouse-an obligation to hold the spouse or former
spouse harmless-which is within the scope of this section. [FN19]

   Subsection (f) specifies that bona fide alimony, maintenance or support payments
are not subject to avoidance under section 547 of the Bankruptcy Code. Subsection
(g) provides that child support creditors or their representatives are permitted to
appear at bankruptcy court proceedings.

Section 305. Interest on interest.

   This section will have the effect of overruling the decision of the Supreme Court
in Rake v. Wade, 113 S.Ct. 2187 (1993). In that case, the Court held that the Bank-
ruptcy Code required that interest be paid on mortgage arrearages paid by debtors
curing defaults on their mortgages. Notwithstanding State law, this case has had the
effect of providing a windfall to secured creditors at the expense of unsecured
creditors by forcing debtors to pay the bulk of their income to satisfy the secured
creditors' claims. This had the effect of giving secured creditors interest on in-
terest payments, and interest on the late charges and other fees, even where applic-
able laws prohibits such interest and even when it was something that was not con-
templated by either party in the original transaction. This provision will be ap-
plicable prospectively only, i.e., it will be applicable to all future contracts,
including transactions that refinance existing contracts. It will limit the secured
creditor to the benefit of the initial bargain with no court contrived windfall. It
is the Committee's intention that a cure pursuant to a plan should operate to put
the debtor in the same position as if the default had never occurred.

Section 306. Exception to discharge.

   This section extends from 40 to 60 days the period in which a consumer debt to ac-
quire "luxury goods or services" may be presumed nondischargeable in a proceeding
under section 523(a)(2) of the Bankruptcy Code. The section also increases from 20
to 60 days the period in which cash advances under an open end credit plan may be
presumed nondischargeable in such a proceeding. In addition, the dollar amount ne-
cessary to trigger such a presumption is increased to $1,500.

Section 307. Payments under chapter 13.

   Currently, the practice of making payouts under a chapter 13 plan varies from one
court to another. This section clarifies Congressional *56 **3365 intent that the
trustee should commence making the payments "as soon as practicable" after the con-
firmation of the chapter 13 plan. Such payments should be made even prior to the bar
date for filing claims, but only if the trustee can provide adequate protection
against any prejudice to later filing claimants caused by distributions prior to the
bar date.

Section 308. Bankruptcy petition preparers.

   This section adds a new section to chapter 1 of title 11 United States Code to

A119

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 69
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

create standards and penalties pertaining to bankruptcy petition preparers. Bank-
ruptcy petition preparers not employed or supervised by any attorney have prolifer-
ated across the country. While it is permissible for a petition preparer to provide
services solely limited to typing, far too many of them also attempt to provide leg-
al advice and legal services to debtors. These preparers often lack the necessary
legal training and ethics regulation to provide such services in adequate and appro-
priate manner. These services may take unfair advantage of persons who are ignorant
of their rights both inside and outside the bankruptcy system. This section requires
all bankruptcy preparation services to provide their relevant personal identifying
information on the bankruptcy filing. It requires copies of all bankruptcy documents
to be given to the debtor and signed by the debtor. The section also provides that
if the petition is dismissed as the result of fraud or incompetence on the pre-
parer's account, or if the preparer commits an inappropriate or deceptive act, the
debtor is entitled to receive actual damages, plus statutory damages of $2,000 or
twice the amount paid to the preparer, whichever is greater, plus reasonable attor-
ney's fees and costs in seeking such relief. The bankruptcy preparer is also subject
to injunctive action preventing the preparer from further work in the bankruptcy
preparation business.

Section 309. Fairness to condominium and cooperative owners.

   This section amends <u>section 523(a) of the Bankruptcy Code</u> to except from discharge
those fees that become due to condominiums, cooperatives, or similar membership as-
sociations after the filing of a petition, but only to the extent that the fee is
payable for time during which the debtor either lived in or received rent for the
condominium or cooperative unit. Except to the extent that the debt is nondis-
chargeable under this section, obligations to pay such fees would be dischargeable.
See <u>Matter of Rosteck, 899 F.2d 694 (7th Cir. 1990)</u>.

Section 310. Nonavoidability of security interests on tools and implements of trade,
animals, and crops.

   This section adds a limited exception to the debtor's ability to avoid nonpossess-
ory nonpurchase-money security interests in implements, professional books, or tools
of trade of the debtor or a dependent of the debtor, or farm animals or crops of the
debtor or a dependent of the debtor. It applies only in cases in which the debtor
has voluntarily chosen the State exemptions rather than the Federal bankruptcy ex-
emptions or has been required to utilize State exemptions because a State has opted
out of the Federal exemptions. In such cases, if the State allows unlimited exemp-
tion of **3366 *57 property or prohibits avoidance of a consensual lien on property
that could otherwise be claimed as exempt, the debtor may not avoid a security in-
terest on the types of property specified above under <u>Bankruptcy Code section
522(f)(2)</u> to the extent the value of the such property is in excess of $5,000. This
section has no applicability if the debtor chooses the Federal bankruptcy exemp-
tions, which cannot be waived. Like other exemption provisions, the new provision
applies separately to each debtor in a joint case.

Section 311. Conversion of case under chapter 13.

                                  A120

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994                Page 70

U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)

(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

     This amendment would clarify the Code to resolve a split in the case law about
what property is in the bankruptcy estate when a debtor converts from chapter 13 to
chapter 7. The problem arises because in chapter 13 (and chapter 12), any property
acquired after the petition becomes property of the estate, at least until confirma-
tion of a plan. Some courts have held that if the case is converted, all of this
after-acquired property becomes part of the estate in the converted chapter 7 case,
even though the statutory provisions making it property of the estate do not apply
to chapter 7. Other courts have held that property of the estate in a converted case
is the property the debtor had when the original chapter 13 petition was filed.

     These latter courts have noted that to hold otherwise would create a serious dis-
incentive to chapter 13 filings. For example, a debtor who had $10,000 equity in a
home at the beginning of the case, in a State with a $10,000 homestead exemption,
would have to be counseled concerning the risk that after he or she paid off a
$10,000 second mortgage in the chapter 13 case, creating $10,000 in equity, there
would be a risk that the home could be lost if the case were converted to chapter 7
(which can occur involuntarily). If all of the debtor's property at the time of con-
version is property of the chapter 7 estate, the trustee would sell the home, to
realize the $10,000 in equity for the unsecured creditors and the debtor would lose
the home.

     This amendment overrules the holding in cases such as <u>Matter of Lybrook, 951 F.2d</u>
<u>136(7th Cir. 1991)</u> and adopts the reasoning of <u>In re Bobroff, 766 F.2d 797 (3d Cir.</u>
<u>1985)</u>. However, it also gives the court discretion, in a case in which the debtor
has abused the right to convert and converted in bad faith, to order that all prop-
erty held at the time of conversion shall constitute property of the estate in the
converted case.

Section 312. Bankruptcy fraud.

     This section sets out criminal penalties for any person who knowingly, fraudu-
lently, and with specific intent to defraud uses the filing of a bankruptcy petition
or document, or makes a false representation, for the purpose of carrying out a
fraudulent scheme. An essential element of the new fraud action, as with other fraud
actions, is a requirement of proof beyond a reasonable doubt of a specific intent to
defraud. Under no circumstance is this section to be operative if the defendant is
adjudicated as having committed the act alleged to constitute fraud for a lawful
purpose.

     The section would not apply to a person who makes a misrepresentation on a finan-
cial statement, and then subsequently files a **3367 *58 bankruptcy case, so long as
the debtor had not at the time of the misrepresentation planned the bankruptcy fil-
ing as part of a scheme in connection with this misrepresentation. This would be the
case, for example, where the misrepresentation occurred a considerable period of
time before the bankruptcy filing, and the primary motivation for the bankruptcy
filing was not related to the misrepresentation or fraud. It would also not be a
crime under this section for a person to make a false statement or promise concern-
ing a proceeding under title 11, as long as that false statement or promise was not
made as part of a scheme to defraud involving the bankruptcy proceeding. Similarly,
a person who conveys incorrect information about the pendency of a bankruptcy or the
planned filing of a bankruptcy case would not be within the scope of this section

                                   A121

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unless that information was conveyed fraudulently and to further a fraudulent
scheme.

The provision could, however, apply to creditors as well as debtors. For example,
if a creditor as part of a scheme to defraud a debtor or debtors, knowingly made
false statements to a debtor concerning the debtor's rights in connection with a
bankruptcy case, that creditor could be subject to this section.

Section 313. Protection against discriminatory treatment of applications for student
loans.

This section clarifies the antidiscrimination provisions of the Bankruptcy Code to
ensure that applicants for student loans or grants are not denied those benefits due
to a prior bankruptcy. The section overrules In re Goldrich, 771 F.2d 28 (2d Cir.
1985), which gave an unduly narrow interpretation to Code section 525. Like section
525 itself, this section is not meant to limit in any way other situations in which
discrimination should be prohibited. Under this section, as under section 525 gener-
ally, a debtor should not be treated differently based solely on the fact that the
debtor once owed a student loan which was not paid because it was discharged; the
debtor should be treated the same as if the prior student loan had never existed.

TITLE IV. GOVERNMENTAL BANKRUPTCY ISSUES

Section 401. Exception from automatic stay for postpetition property taxes.

Local governments rely on real property taxes to constitute one of their principal
sources of revenue. These taxes are, in turn, typically secured by statutory liens.
Both the property owner and any mortgage holder recognize that their interest in
real property is subject to the local government's right to collect such property
taxes. However, several circuit courts have held the automatic stay prevents local
governments from attaching a statutory lien to property taxes accruing subsequent to
a bankruptcy filing. [FN20] These decisions create a windfall for secured lenders,
who would otherwise be subordinated to such tax liens, and significantly impair the
revenue collecting capability of local governments. This section overrules these
cases and allow local governments to utilize their statutory *59 **3368 property tax
liens in order to secure the payment of property taxes.

Section 402. Municipal bankruptcy.

Under section 901 of the Bankruptcy Code, a municipality may file for bankruptcy
if, among other things, it is "generally authorized" to do so under State law. The
courts have split regarding whether this provision requires express statutory au-
thorization by State law in order for a municipality to file for bankruptcy. [FN21]
This section clarifies the eligibility requirements applicable to municipal bank-
ruptcy filings by requiring that municipalities be specifically authorized by the
State in order to be eligible to file for bankruptcy.

TITLE V. TECHNICAL CORRECTIONS

This title makes a number of technical corrections to the Bankruptcy Code.

A122

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994    Page 72
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

## TITLE VI. BANKRUPTCY REVIEW COMMISSION

This title establishes a National Bankruptcy Review Commission. The Commission is empowered to review the Bankruptcy Code and to prepare a report based upon its findings and opinions. Although no exclusive list is set forth, the Commission should be aware that Congress is generally satisfied with the basic framework established in the current Bankruptcy Code. Therefore, the work of the Commission should be based upon reviewing, improving, and updating the Code in ways which do not disturb the fundamental tenets and balance of current law.

The title mandates a nine-member Commission, with Congress appointing four members, the President appointing three members, and the Chief Justice of the U.S. Supreme Court appointing two members. The members of the Commission should be knowledgeable in bankruptcy law, with diversity of background and opinion considered in their section. The first meeting of the Commission shall be held 210 days after the date of enactment. No Member of Congress may be appointed to serve on the Commission.

## TITLE VII. SEVERABILITY; EFFECTIVE DATE

Section 701 provides that if any provision of the Act is held to be unconstitutional, the remaining provisions shall not be affected thereby. Section 702 provides that the amendments made by the Act shall only apply prospectively, except as otherwise and specifically noted therein.

## COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities *60 **3369 under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

## COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 5116, the following estimate and comparison, prepared by the Director of the Congressional Budget

A123

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 73
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)


Office under section 403 of the Congressional Budget Act of 1974:

     U.S. Congress,

     Congressional Budget Office,

     Washington, DC, October 3, 1994.

Hon. Jack Brooks,
Chairman, Committee on the Judiciary, House of Representatives, Washington, DC.
  Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost
estimate for H.R. 5116, the Bankruptcy Amendments Act of 1994.
  Enactment of H.R. 5116 would affect direct spending and receipts. Therefore, pay-
as-you-go procedures would apply to the bill.
  If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,
     James L. Blum

     (For Robert D. Reischauer, Director).

                    CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

  1. Bill number: H.R. 5116.
  2. Bill title: The Bankruptcy Amendments Act of 1994.
  3. Bill status: As ordered reported by the House Committee on the Judiciary on
September 29, 1994.
  4. Bill purpose: H.R. 5116 would:
     authorize the appropriation of $1.5 million to establish a National Bankruptcy
Review Commission to investigate and study issues relating to the Bankruptcy Code;
     increase the debt limit for filing a chapter 13 case from  $350,000 to $750,000
for secured debt and from $100,000 to $250,000 for unsecured debt;
     **3370 *61 require that bankruptcy trustees, at meetings of creditors, ask debt-
ors a series of questions regarding the consequences of filing for bankruptcy;
     permit bankruptcy courts to conduct jury trials in civil proceedings;
     expand the list of cases for which filing of a bankruptcy petition does not op-
erate as a stay;
     establish civil and criminal penalties for persons who negligently or fraudu-
lently prepare bankruptcy petitions, and establish criminal penalties for persons
who knowingly disregard bankruptcy laws or rules;
     increase the compensation paid to trustees in chapter 7 no-asset cases by in-
creasing miscellaneous bankruptcy fees; and
     make many other changes and additions to the federal laws relating to bank-
ruptcy.
  5. Estimated cost to the Federal Government:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
  The spending effects of this bill fall within budget function 750.


                                    A124


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Basis of Estimate:

Revenues.

  Section 116 of the bill would expand the list of cases for which the filing of a
bankruptcy petition does not operate as a stay. This change would result in the
earlier collection of taxes in certain situations. The Joint Committee on Taxation
estimates that this provision would generate additional revenue of $52 million over
the fiscal years 1995-1997 and small amounts in subsequent years.
  H.R. 5116 also would increase the debt limit for filing a chapter 13 case from
$350,000 to $750,000 for secured debt and from $100,000 to $250,000 for unsecured
debt. These changes could result in a shifting of cases from chapter 7 to chapter
13. To the extent that additional cases are filed under chapter 13, revenues would
increase by $45 per case. CBO does not expect this additional revenue to be signi-
ficant, because the number of additional chapter 13 cases would be small.
  Section 308 would impose civil and criminal penalties for persons who negligently
or fraudulently prepare bankruptcy petitions. Also, section 312 would impose crimin-
al fines for persons who knowingly disregard bankruptcy laws or rules. Both criminal
and civil fines increase receipts to the federal government. Criminal fines would be
deposited in the Crime Victims Fund and would be spent in the following year. CBO
does not expect this additional revenue or direct *62 **3371 spending to be signi-
ficant, however, because the proposed penalties are expected to deter such activity,
which is not widespread.

Spending Dependent on Appropriation Action.

  CBO assumes that the $1.5 million authorized to be appropriated for the National
Bankruptcy Review Commission would be appropriated for fiscal year 1995 and spent in
fiscal years 1995-1997.
  The requirement that bankruptcy trustees ask debtors a series of questions at
meetings of creditors would probably not impose a significant burden on the U.S.
trustees. Currently, private trustees attend meetings of creditors, but U.S. trustee
program personnel generally do not. To the extent that private trustees would be
able to fulfill this requirement, any additional costs to the federal government
would probably not be significant. However, if this provision were interpreted to
require that U.S. trustee program personnel attend all meetings of creditors and ask
debtors the series of questions, the additional staffing costs associated with this
requirement would be $10 million to $20 million annually.
  CBO estimates that any costs associated with jury trials held in bankruptcy courts
would be insignificant. Possible expenses include costs to build jury boxes and to
pay jurors for their services. Because civil proceedings related to bankruptcy can
already be conducted in district courts, CBO does not expect any significant number
of jury trials to be conducted in bankruptcy courts.
  Section 117 would increase the compensation paid to trustees in chapter 7 no-asset
cases from $45 to $60, beginning in fiscal year 1996. This $15 increase in compensa-
tion per case would be funded by increasing various bankruptcy fees; these increases
in fees would be implemented during fiscal year 1995. We expect that they would be
classified as offsetting receipts, and would be available for spending, without ap-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

propriations action, from the Judiciary Automation Fund. CBO estimates that the fed-
eral government would collect about $4 million in fiscal year 1995 and about $9 mil-
lion each year thereafter. These amounts would be spent each year, and the net af-
fect on outlays would be negligible.
   Other provisions of the bill would not result in significant costs to the federal
government.
   6. Pay-as-you-go considerations: Section 252 of the Balanced Budget and Emergency
Deficit Control Act of 1985 sets up pay-as-you-go procedures for legislation affect-
ing direct spending or receipts through 1998. CBO estimates that enactment of H.R.
5116 would affect direct spending and receipts; therefore, pay-as-you-go procedures
would apply to this bill. The following table summarizes the estimated pay-as-you-go
impact of H.R. 5116.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
   7. Estimated costs to State and local governments: None.
   8. Estimate comparison: None.
   9. Previous CBO estimate: None.
   **3372 *63 10. Estimate prepared by: Mark Grabowicz, Susanne S. Mehlman, John
Webb, and Melissa Sampson.
   11. Estimated approved by: C.G. Nuckols, Assistant Director for Budget Analysis.

                        INFLATIONARY IMPACT STATEMENT

   Pursuant to clause 2(1)(4) of rule XI of the Rules of the House of Representat-
ives, the Committee estimates that H.R. 5116 will have no significant inflationary
impact on prices and costs in the national economy.


              CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

   In compliance with clause 3 of rule XIII of the Rules of the House of Representat-
ives, changes in existing law made by the bill, a reported, are shown as follows
(existing law proposed to be omitted is enclosed in black brackets, new matter is
printed in italic, existing law in which no change is proposed is shown in roman):

                        TITLE 11, UNITED STATES CODE

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

                        CHAPTER 1-GENERAL PROVISIONS

Sec.

101. Definitions.

                        * * * * * * *

110. Penalty for persons who negligently or fraudulently prepare bankruptcy peti-
tions.

                                  A126

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 76
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)


S 101. Definitions

  In this title-
    (1)***

                        * * * * * * *
    [(4)] (3) "attorney" means attorney, professional law association, corporation,
or partnership, authorized under applicable law to practice law;
    [(5)] (4) "claim" means-
    (A) right to payment, whether or not such right is reduced to judgment, liquid-
ated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,
legal equitable, secured, or unsecured; or
    (B) right to an equitable remedy for breach of performance if such breach gives
rise to a right to payment, whether or not such right to an equitable remedy is re-
duced to judgment, fixed, contingent, matured unmatured, disputed, undisputed, se-
cured, or unsecured;
    [(6)] (5) "commodity broker" means futures commission merchant, foreign futures
commission merchant, clearing organization, leverage transaction merchant, or com-
modity options with *64 dealer, as defined in sectin 761 of this title, respect to
which there is a customer, as defined in section 761[(9)] of this title;
    [(7)] (6) "community claim" means claim that arose before the commencement of
the case concerning the debtor for which property of the kind specified in section
541(a)(2) of this title is liable, whether or not there is any such property at the
time of the commencement of the case;
    [(8)] (7) "consumer debt" means debt incurred by an individual primarily for a
personal, family, or household purpose;
    [(9)] (8) "corporation"-
    (A) includes-
     (i) association having a power or privilege that a private corporation, but not
an individual or a partnership, possesses;
     (ii) partnership association organized under a law that makes only the capital
subscribed responsible for the debts of such association;
     (iii) joint-stock company;
     (iv) unincorporated company or association; or
     (v) business trust; but
    (B) does not include limited partnership;
    [(10)] (9) "creditor" means-
    (A) entity that has a claim against the debtor that arose at the time of or be-
fore the order for relief concerning the debtor;
    (B) entity that has a claim against the estate of a kind specified in section
348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or
    (C) entity that has a community claim;
    [(11)] (10) "custodian" means-
    (A) receiver or trustee of any of the property of the debtor, appointed in a
case or proceeding not under this title;
    (B) assignee under a general assignment for the benefit of the debtor's credit-
ors; or
    (C) trustee, receiver, or agent under applicable law, or under a contract, that

                              A127

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 77
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

is appointed or authorized to take charge of property of the debtor for the purpose
of enforcing a lien against such property, or for the purpose of general administra-
tion of such property for the benefit of the debtor's creditors;

[(12)] (11) "debt" means liability on a claim;

(12) "debt for child support" means a debt of a kind specified in section
523(a)(5) of this title for maintenance or support of a child of the debtor;

(13) "debtor" means person or municipality concerning which a case under this
title has been commenced;

* * * * * * *

[(21A)] (22) "farmout agreement" means a written agreement in which-

(A) the owner of a right to drill, produce, or operate liquid or gaseous hydro-
carbons on property agrees or has *65 agreed to transfer or assign all or a part of
such right to another entity; and

* * * * * * *

[(3)] (23) "Federal depository institutions regulatory agency" means-

(A) with respect to an insured depository institution (as defined in section
3(c)(2) of the Federal Deposit Insurance Act) for which no conservator or receiver
has been appointed, the appropriate Federal banking agency (as defined in section
3(q) of such Act);

* * * * * * *

[(22)] (24) "financial institution" means a person that is a commercial or sav-
ings bank, industrial savings bank, savings and loan association, or trust company
and, when any such person is acting as agent or custodian for a customer in connec-
tion with a securities contract, as defined in section 741 [(7)] of this title, such
customer;

[(23)] (25) "foreign proceeding" means proceeding, whether judicial or adminis-
trative and whether or not under bankruptcy law, in a foreign country in which the
debtor's domicile, residence, principal place of business, or principal assets were
located at the commencement of such proceeding, for the purpose of liquidating an
estate, adjusting debts by composition, extension, or discharge, or effecting a re-
organization;

[(24)] (26) "foreign representative" means duly selected trustee, administrator,
or other representative of an estate in a foreign proceeding;

[(25)] (27) "forward contract" means a contract (other than a commodity con-
tract) for the purchase, sale, or transfer of a commodity, as defined in section
761(8) of this title, or any similar good, article, service, right, or interest
which is presently or in the future becomes the subject of dealing in the forward
contract trade, or product or byproduct thereof, with a maturity date more than two
days after the date the contract is entered into, including, but not limited to, a
repurchase transaction, reverse repurchase transaction, consignment, lease, swap,
hedge transaction, deposit, loan, option, allocated transaction, unallocated trans-
action, or any combination thereof or option thereon;

[(26)] (28) "forward contract merchant" means a person whose business consists
in whole or in part of entering into forward contracts as or with merchants in a
commodity, as defined in section 761(8) of this title, or any similar good, article,

A128

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 78
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

service, right, or interest which is presently or in the future becomes the subject
of dealing in the forward contract trade;

[(27)] (29) "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government;

*66 [(28)] (30) "indenture" means mortgage, deed of trust, or indenture, under which there is outstanding a security, other than a voting-trust certificate, constituting a claim against the debtor, a claim secured by a lien on any of the debtor's property, or an equity security of the debtor;

[(29)] (31) "indenture trustee" means trustee under an indenture;

[(30)] (32) "individual with regular income" means individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title, other than a stockbroker or a commodity broker;

[(31)] (33) "insider" includes-
(A) if the debtor is an individual-
  (i) relative of the debtor or of a general partner of the debtor;
  (ii) partnership in which the debtor is a general partner;

* * * * * * *

[(32)] (34) "insolvent" means-
(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of-
  (i) ***

* * * * * * *

[(33)] (35) "institution-affiliated party"-
(A) with respect to an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act), has the meaning given it in section 3(u) of the Federal Deposit Insurance Act [(12 U.S.C. 1813(u))]; and
(B) with respect to an insured credit union, has the meaning given it in section 206(r) of the Federal Credit Union Act [(12 U.S.C. 1786(r))];

[(34)] (36) "insured credit union" has the meaning given it in section 101(7) of the Federal Credit Union Act [(12 U.S.C. 1752(7))];

[(35)] (37) "insured depository institution"-
(A) has the meaning given it in section 3(c)(2) of the Federal Deposit Insurance Act [(12 U.S.C. 1813(c)(2))]; and
(B) includes an insured credit union (except in the case of [paragraphs (3) and (33)(A)] paragraphs (23) and (35)(A) of this subsection);

[(56)] (38) "intellectual property" means-
(A) trade secret;
(B) invention, process, design, or plant protected under title 35;
(C) patent application;
(D) plant variety;
(E) work of authorship protected under title 17; or
(F) mask work protected under chapter 9 of title 17;

A129

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 79
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

to the extent protected by applicable non-bankruptcy law; and
   *67 [(36)] (39) "judicial lien" means lien obtained by judgment, levy, sequest-
ration, or other legal or equitable process or proceeding;
   [(37)] (40) "lien" means charge against or interest in property to secure pay-
ment of a debt or performance of an obligation;
   [(38)] (41) "margin payment" means, for purposes of the forward contract provi-
sions of this title, payment or deposit of cash, a security or other property, that
is commonly known in the forward contract trade as original margin, initial margin,
maintenance margin, or variation margin, including mark-to-market payments, or vari-
ation payments; and
   [(57)] (42) "mask work" has the meaning given it in section 901(a)(2) of title
17.
   [(40)] (43) "municipality" means political subdivision or public agency or in-
strumentality of a State;
   (44) "person" includes individual, partnership, and corporation, but does not
include governmental unit, except that a governmental unit that-
   (A) acquires an asset from a person-
   (i) as a result of the operation of a loan guarantee agreement; or
   (ii) as receiver or liquidating agent of a person;
   (B) is a guarantor of a pension benefit payable by or on behalf of the debtor or
an affiliate of the debtor; or
   (C) is the legal or beneficial owner of an asset of-
   (i) an employee pension benefit plan that is a governmental plan, as defined in
section 414(d) of the Internal Revenue Code of 1986; or
   (ii) an eligible deferred compensation plan, as defined in section 457(b) of
the Internal Revenue Code of 1986;
   shall be considered, for purposes of section 1102 of this title, to be a person
with respect to such asset or such benefit;
   [(41) "person" includes individual, partnership, and corporation, but does not
include governmental unit, Provided, however, That any governmental unit that ac-
quires an asset from a person as a result of operation of a loan guarantee agree-
ment, or as receiver or liquidating agent of a person, will be considered a person
for purposes of section 1102 of this title.]
   [(42)] (45) "petition" means petition filed under section 301, 302, 303, or 304
of this title, as the case may be, commencing a case under this title;
   (46) "production payment" means a payment (in cash or in kind) that is-
   (A) contingent on the production of a liquid or gaseous hydrocarbon from partic-
ular real property; and
   (B) attributable to part of a specified volume, or part of a specified value, of
the liquid or gaseous  hydrocarbon produced form such property, and determined
without regard to production costs;
   [(43)] (47) "purchaser" means transferee of a voluntary transfer, and includes
immediate or mediate transferee of such a transferee;
   *68 [(44)] (48) "railroad" means common carrier by railroad engaged in the
transportation of individuals or property or owner of trackage facilities leased by
such a common carrier;
   [(45)] (49) "relative" means individual related by affinity or consanguinity

A130

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

within the third degree as determined by the common law, or individual in a step or
adoptive relationship within such third degree;

[(46)] (50) "repo participant" means an entity that, on any day during the peri-
od beginning 90 days before the date of the filing of the petition, has an outstand-
ing repurchase agreement with the debtor;

[(47)] (51) "repurchase agreement" (which definition also applies to a reverse
repurchase agreement) means an agreement, including related terms, which provides
for the transfer of certificates of deposit, eligible bankers' acceptances, or se-
curities that are direct obligations of, or that are fully guaranteed as to princip-
al and interest by, the United States or any agency of the United States against the
transfer of funds by the transferee of such certificates of deposit, eligible
bankers' acceptances, or securities with a simultaneous agreement by such transferee
to transfer to the transferor thereof certificates of deposit, eligible bankers' ac-
ceptances, or securities as described above, at a date certain not later than one
year after such transfers or on demand, against the transfer of funds;

[(48)] (52) "securities clearing agency" means person that is registered as a
clearing agency under section 17A of the Securities Exchange Act of 1934 [(15 U.S.C.
78q-1)] or whose business is confined to the performance of functions of a clearing
agency with respect to exempted securities, as defined in section 3(a)(12) of such
Act [(15 U.S.C. 78c(12))] for the purposes of such section 17A;

[(49)] (53) "security"-
(A) includes-
(i) note;

* * * * * * *

(xii) investment contract or certificate of interest or participation in a
profit-sharing agreement or in an oil, gas, or mineral royalty or lease, if such
contract or interest is required to be the subject of a registration statement filed
with the Securities and Exchange Commission under the provisions of the Securities
Act of 1933 [(15 U.S.C. 77a et seq.)], or is exempt under section 3(b) of such Act
[15 U.S.C. 77c(b))] from the requirement to file such a statement;

* * * * * * *

(B) does not include-
(i) currency, check, draft, bill of exchange, or bank letter of credit;
(ii) leverage transaction, as defined in section 761 [(13)] of this title;

* * * * * * *

*69 (vi) contract or certificate of a kind specified in subparagraph (A)(xii)
of this paragraph that is not required to be the subject of a registration statement
filed with the Securities and Exchange Commission and is not exempt under section
3(b) of the Securities Act of 1933 [(15 U.S.C. 77c(b))] from the requirement to file
such a statement; or

(vii) debt or evidence of indebtedness for goods sold and delivered or services
rendered;

[(50)] (54) "security agreement" means agreement that creates or provides for a
security interest;

[(51)] (55) "security interest" means lien created by an agreement;

A131

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 81
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

[39)] (56) "settlement payment" means, for purposes of the forward contract pro-
visions of this title, a preliminary settlement payment, a partial settlement pay-
ment, an interim settlement payment, a settlement payment on account, a final set-
tlement payment, a net settlement payment, or any other similar payment commonly
used in the forward contract trade;

(57) "single asset real estate" means real property constituting a single prop-
erty or project, other than residential real property with fewer than 4 residential
units, which generates substantially all of the gross income of a debtor and on
which no substantial business is being conducted by a debtor other than the business
of operating the real property and activities incidental thereto having aggregate
secured debts in an amount no more than $2,000,000;

(58) "small business" means a person engaged in commercial or business activit-
ies (but does not include a person whose primary activity is the business of owning
or operating real property and activities incidental thereto) whose aggregate non-
contingent liquidated secured and unsecured debts as of the date of the petition do
not exceed $2,000,000;

[(52)] (59) "State" includes the District of Columbia and Puerto Rico, except
for the purpose of defining who may be a debtor under chapter 9 of this title;

[(53)] (60) "statutory lien" means lien arising solely by force of a statute on
specified circumstances or conditions, or lien of distress for rent, whether or not
statutory, but does not include security interest or judicial lien, whether or not
such interest or lien is provided by or is dependent on a statute and whether or not
such interest or lien is made fully effective by statute:

[(54)] (61) "stockbroker" means person-

(A) with respect to which there is a customer, as defined in section 741 [(2)]
of this title; and

(B) that is engaged in the business of effecting transactions in securities-

(i) for the account of others; or

(ii) with members of the general public, from or for such person's own account;

[(55)] (62) "swap agreement" means-

(A) an agreement (including terms and conditions incorporated by reference
therein) which is a rate swap agreement, basis swap, forward rate agreement, commod-
ity *70 swap, interest rate option, forward foreign exchange agreement, spot foreign
exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement,
currency swap agreement, cross-currency rate swap agreement, currency option, any
other similar agreement (including any option to enter into any of the foregoing);

(B) any combination of the foregoing; or

(C) a master agreement for any of the foregoing together with all supplements;

[(56)] (63) "swap participant" means an entity that, at any time before the fil-
ing of the petition, has an outstanding swap agreement with the debtor;

[(57)] (64) "timeshare plan" means and shall include that interest purchased in
any arrangement, plan, scheme, or similar device, but not including exchange pro-
grams, whether by membership, agreement, tenancy in common, sale, lease, deed, rent-
al agreement, license, right to use agreement, or by any other means, whereby a pur-
chaser, in exchange for consideration, receives a right to use accommodations, fa-
cilities, or recreational sites, whether improved or unimproved, for a specific
period of time less than a full year during any given year, but not necessarily for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consecutive years, and which extends for a period of more than  three years. A "time-
share interest" is that interest purchased in a timeshare plan which grants the pur-
chaser the right to use and occupy accommodations, facilities, or recreational
sites, whether improved or unimproved, pursuant to a timeshare plan[.];

   [(54)] (65) "transfer" means every mode, direct or indirect, absolute or condi-
tional, voluntary or involuntary, of disposing of or parting with property or with
an interest in property, including retention of title as a security interest and
foreclosure of the debtor's equity of redemption;

   [(55)] (66) "United States" when used in a geographical sense, includes all loc-
ations where the judicial jurisdiction of the United States extends, including ter-
ritories and possessions of the United States;

                          * * * * * * *

S 104. Adjustment of dollar amounts

   (a) The Judicial Conference of the United States shall transmit to the Congress
and to the President before May 1, 1985, and before May 1 of every sixth year after
May 1, 1985, a recommendation for the uniform percentage adjustment of each dollar
amount in this title and in section 1930 of title 28.

   (b)(1) On April 1, 1998, and at each 3-year interval ending on April 1 thereafter,
each dollar amount in effect under sections 109(e), 303(b), 507(a), 522(d), and
523(a)(2)(C) immediately before such April 1 shall be adjusted-

      (A) to reflect the change in the Consumer Price Index for All Urban Consumers,
published by the Department of Labor, for the most recent 3-year period ending imme-
diately before January 1 preceding such April 1, and

   *71 (B) to round to the nearest $25 the dollar amount that represents such
change.

   (2) Not later than March 1, 1998, and at each 3-year interval ending on March 1
thereafter, the Judicial Conference of the United States shall publish in the Feder-
al Register the dollar amounts that will become effective on such April 1 under sec-
tions 109(e), 303(b), 507(a), 522(d), and 523(a)(2)(C) of this title.

   (3) Adjustments made in accordance with paragraph (1) shall not apply with respect
to cases commenced before the date of such adjustments.

S 105. Power of court

   (a) ***

                          * * * * * * *

   (d) The court, in its own motion or on the request of a party in interest, may-
      (1) hold a status conference regarding any case or proceeding under this title
after notice to the parties in interest; and
      (2) unless inconsistent with another provision of this title or with applicable
Federal Rules of Bankruptcy Procedure, issue an order at any such conference pre-
scribing such limitations and conditions as the court deems appropriate to ensure
that the case is handled expeditiously and economically, including an order that-
      (A) sets the date by which the trustee must assume or reject an executory con-

                              A133

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tract or unexpired lease; or
    (B) in a case under chapter 11 of this title-
        (i) sets a date by which the debtor, or trustee if one has been appointed,
shall file a disclosure statement and plan;
        (ii) sets a date by which the debtor, or trustee if one has been appointed,
shall solicit acceptances of a plan;
        (iii) sets the date by which a party in interest other than a debtor may file a
plan;
        (iv) sets a date by which a proponent of a plan, other than the debtor, shall
solicit acceptances of such plan;
        (v) fixes the scope and format of the notice to be provided regarding the hear-
ing on approval of the disclosure statement; or
        (vi) provides that the hearing on approval of the disclosure statement may be
combined with the hearing on confirmation of the plan.
    (e)(1) A court may issue an injunction that requires claims and demands to be
presented for payment solely to a trust or other vehicle that is established for the
purpose of settling such claims and demands and is approved by the court and entered
into pursuant to an order approving a plan of reorganization.
    (2) This subsection applies to any injunction of the nature described in paragraph
(1) in effect, and any trust of the nature described in such paragraph in existence,
on or after the date of the enactment of the Bankruptcy Amendments of 1994.

*72 [S 106. Waiver of sovereign immunity

    [(a) A governmental unit is deemed to have waived sovereign immunity with respect
to any claim against such governmental unit that is property of the estate and that
arose out of the same transaction or occurrence out of which such governmental
unit's claim arose.
    [(b) There shall be offset against an allowed claim or interest of a governmental
unit any claim against such governmental unit that is property of the estate.
    [(c) Except as provided in subsections (a) and (b) of this section and notwith-
standing any assertion of sovereign immunity-
        [(1) a provision of this title that contains "creditor", "entity",
or  "governmental unit" applies to governmental units; and
        [(2) a determination by the court of an issue arising under such a provision
binds governmental units.]

S 106. Waiver of sovereign immunity

    (a) Notwithstanding an assertion of sovereign immunity, except as provided in sub-
section (d)-
        (1) all provisions of this title shall apply to governmental units;
        (2) the court may hear and determine any issue arising with respect to the ap-
plication of such provisions to governmental units; and
        (3) the court may issue and enforce any order, process, or judgment against a
governmental unit, including an order or judgment awarding a money recovery, to the
same extent as against any other entity.
    (b) A governmental unit is deemed to have waived sovereign immunity with respect

A134

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to a claim against such governmental unit that is property of the estate and that
arose out of the same transaction or occurrence out of which the claim of such gov-
ernmental unit arose.

   (c) Notwithstanding any assertion of sovereign immunity by a governmental unit,
there shall be offset against a claim or interest of a governmental unit any claim
against such governmental unit that is property of the estate.

   (d) Except as provided in subsections (b) and (c) or in applicable nonbankruptcy
law, a governmental unit may assert sovereign immunity with respect to a claim of
the estate against such governmental unit only if such claim—

      (1) is not a tax claim or related to a tax claim subject to determination under
section 505; and

      (2)(A) is a claim of the debtor against such governmental unit that arose before
the commencement of the case and became property of the estate only under paragraph
(1) or (2) of section 541(a); or

      (B) arises under nonbankruptcy law after the commencement of the case from the
operation of the business of the debtor.

                              *  *  *  *  *  *  *

*73 S 109. Who may be a debtor

   (a) ***

                              *  *  *  *  *  *  *

   (b) A person may be a debtor under chapter 7 of this title only if such person is
not—

      (1) a railroad;

      (2) a domestic insurance company, bank, savings bank, cooperative bank, savings
and loan association, building and loan association, homestead association, credit
union, or industrial bank or similar institution which is an insured bank as defined
in section 3(h) of the Federal Deposit Insurance Act[, (12 U.S.C. 1813(h)]; or

                              *  *  *  *  *  *  *

   (e) Only an individual with regular income that owes, on the date of the filing of
the petition, noncontingent, liquidated, unsecured debts of less than [$100,000]
$250,000 and noncontingent, liquidated, secured debts of less than [$350,000]
$750,000, or an individual with regular income and such individual's spouse, except
a stockbroker or a commodity broker, that owe, on the date of the filing of the pe-
tition, noncontingent, liquidated, unsecured debts that aggregate less than
[$100,000] $250,000 and noncontingent, liquidated, secured debts of less than
[$350,000] $750,000 may be a debtor under chapter 13 of this title.

                              *  *  *  *  *  *  *

   (h) A small business investment company licensed by the Small Business Administra-
tion under subsection (c) or (d) of section the Small Business Investment Act of
1958 may not be a debtor under chapter 11 of this title.

S 110. Penalty for persons who negligently or fraudulently prepare bankruptcy peti-
tions.

                                    A135

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
**(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)**

    (a) In this section-
    (1) "bankruptcy petition preparer" means a person, other than an attorney or an
employee of an attorney, who prepares for compensation a document for filing; and
    (2) "document for filing" means a  petition or any other document prepared for
filing by a debtor in a United States bankruptcy court or a United States district
court in connection with a case under this title.
    (b)(1) A bankruptcy petition preparer who prepares a document for filing shall
sign the document and print on the document the preparer's name and address.
    (2) A bankruptcy petition preparer who fails to comply with paragraph (1) may be
fined not more than $500 for each such failure unless the failure is due to reason-
able cause.
    (c)(1) A bankruptcy petition preparer who prepares a document for filing shall
place on the document, after the preparer's signature, an identifying number that
identifies the individuals who prepared the document.
    (2) For purposes of this section, the identifying number of a bankruptcy petition
preparer shall be the Social Security account number *74 of each individual who pre-
pared the document or assisted in its preparation.
    (3) A bankruptcy petition preparer who fails to comply with paragraph (1) may be
fined not more than $500 for each such failure unless the failure is due to reason-
able cause.
    (d)(1) A bankruptcy petition preparer shall, not later than the time at which a
document for filing is presented for the debtor's signature, furnish to the debtor a
copy of the document.
    (2) A bankruptcy petition preparer who fails to comply with paragraph (1) may be
fined not more than $500 for each such failure unless the failure is due to reason-
able cause.
    (e)(1) A bankruptcy petition preparer shall not execute any document on behalf of
a debtor.
    (2) A bankruptcy petition preparer may be fined not more than $500 for each docu-
ment executed in violation of paragraph (1).
    (f)(1) A bankruptcy petition preparer shall not use the word "legal" or any simil-
ar term in any advertisements, or advertise under any category that includes the
word "legal" or any similar term.
    (2) A bankruptcy petition preparer shall be fined not more than $500 for each vi-
olation of paragraph (1).
    (g)(1) A bankruptcy petition preparer shall not collect or receive any payment
from the debtor or on behalf of the debtor for the court fees in connection with
filing the petition.
    (2) A bankruptcy petition preparer shall be fined not more than $500 for each vi-
olation of paragraph (1).
    (h)(1) Within 10 days after the date of the filing of a petition, a bankruptcy pe-
tition preparer shall file a declaration under penalty of perjury disclosing any fee
received from or on behalf of the debtor within 12 months immediately prior to the
filing of the case, and any unpaid fee charged to the debtor.
    (2) The court shall disallow and order the immediate turnover to the bankruptcy
trustee of any fee referred to in paragraph (1) found to be in excess of the value
of typing services for the documents prepared. The debtor may exempt any funds so

                                      A136

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 86
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

recovered under <u>section 522(b)</u>.

(3) The debtor, the trustee, a creditor, or the United States trustee may file a motion for an order under paragraph (2).

(4) A bankruptcy petition preparer shall be fined not more than $500 for each failure to comply with a court order to turn over funds within 30 days of service of such order.

(i)(1) If a bankruptcy case or related proceeding is dismissed because of the failure to file bankruptcy forms, the negligence or intentional disregard of this title or the Federal Rules of Bankruptcy Procedure by a bankruptcy petition preparer, or if a bankruptcy petition preparer violates this section or commits any fraudulent, unfair, or deceptive act, the bankruptcy court shall certify that fact to the district court, and the district court, on motion of the debtor, the trustee, or a creditor and after a hearing, shall order the bankruptcy petition preparer to pay to the debtor-

(A) the debtor's actual damages;

(B) the greater of-

(i) $2,000; or

*75 (ii) twice the amount paid by the debtor to the bankruptcy petition preparer for the preparer's services; and

(C) reasonable attorneys' fees and costs in moving for damages under this subsection.

(2) If the trustee or creditor moves for damages on behalf of the debtor under this subsection, the bankruptcy petition preparer shall be ordered to pay the movant the additional amount of $1,000 plus reasonable attorneys' fees and costs incurred.

(j)(1) A debtor for whom a bankruptcy petition preparer has prepared a document for filing, the trustee, a creditor, or the United States trustee in the district in which the bankruptcy petition preparer resides, has conducted business, or the United States trustee in any other district in which the debtor resides may bring a civil action to enjoin a bankruptcy petition preparer from engaging in any conduct in violation of this section or from further acting as a bankruptcy petition preparer.

(2)(A) In an action under paragraph (1), if the court finds that-

(i) a bankruptcy petition preparer has-

(I) engaged in conduct in violation of this section or of any provision of this title a violation of which subjects a person to criminal penalty;

(II) misrepresented the preparer's experience or education as a bankruptcy petition preparer; or

(III) engaged in any other fraudulent, unfair, or deceptive conduct; and

(ii) injunctive relief is appropriate to prevent the recurrence of such conduct,

the court may enjoin the bankruptcy petition preparer from engaging in such conduct.

(B) If the court finds that a bankruptcy petition preparer has continually engaged in conduct described in subclause (I), (II), or (III) of clause (i) and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of this title, or has not paid a penalty imposed under this section, the court may enjoin the person from acting as a bankruptcy petition preparer.

A137

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) The court shall award to a debtor, trustee, or creditor that brings a success-ful action under this subsection reasonable attorney's fees and costs of the action, to be paid by the bankruptcy petition preparer.

(k) Nothing in this section shall be construed to permit activities that are oth-erwise prohibited by law, including rules and laws that prohibit the unauthorized practice of law.

\* \* \* \* \* \* \*

CHAPTER 3-CASE ADMINISTRATION

\* \* \* \* \* \* \*

Subchapter II-Officers

\* \* \* \* \* \* \*

\*76 S 322. Qualification of trustee

(a) Except as provided in subsection (b)(1), a person selected under section 701, 702, 703, 1104, 1163, [1302, or 1202] 1202, or 1302 of this title to serve as trust-ee in a case under this title qualifies if before five days after such selection, and before beginning official duties, such person has filed with the court a bond in favor of the United States conditioned on the faithful performance of such official duties.

\* \* \* \* \* \* \*

S 326. Limitation on compensation of trustee

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed [fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000] 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of se-cured claims.

\* \* \* \* \* \* \*

S 330. Compensation of officers

(a) \*\*\*

(b)(1) There shall be paid from the filing fee in a case under chapter 7 of this title $45 to the trustee serving in such case, after such trustee's services are

A138

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                Page 88
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

rendered.
    (2) The Judicial Conference of the United States shall prescribe additional fees
of the same kind as prescribed under section 1914(b) of title 28, to pay $15 to the
trustee serving in such case after such trustee's services are rendered. Such $15
shall be paid in addition to the amount paid under paragraph (1).

                          * * * * * * *

                    Subchapter III-Administration

S 341. Meetings of creditors and equity security holders

    (a) ***

                          * * * * * * *
    (d) Prior to the conclusion of the meeting of creditors or equity security hold-
ers, the United States trustee shall orally examine the debtor to ensure that the
debtor is aware of-
    (1) the potential consequences of seeking a discharge in bankruptcy, including
the effects on credit history;
    (2) the debtor's ability to file a petition under a different chapter of this
title;
    (3) the effect of receiving a discharge of debts under this title; and
    *77 (4) the effect of reaffirming a debt, including the debtor's knowledge of
the provisions of section 524(d).

S 342. Notice

    (a) ***

                          * * * * * * *
    (c) If notice is required to be given by the debtor to a creditor under this
title, any rule, any applicable law, or any order of the court, such notice shall
contain the name, address, and taxpayer identification number of the debtor, but the
failure of such notice to contain such information shall not invalidate the legal
effect of such notice.

                          * * * * * * *

S 345. Money of estates

    (a) ***

                          * * * * * * *
    (b) Except with respect to a deposit or investment that is insured or guaranteed
by the United States or by a department, agency, or instrumentality of the United
States or backed by the full faith and credit of the United States, the trustee
shall require from an entity with which such money is deposited or invested-
    (1) ***

                               A139

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

     (2) the deposit of securities of the kind specified in section 9303 of title
31[.];
     unless the court for cause orders otherwise.

                              * * * * * * *

S 346. Special tax provisions

   (a) Except to the extent otherwise provided in this section, subsections  (b),
(c), (d), (e), (g), (h), (i), and (j) of this section apply notwithstanding any
State or local law imposing a tax, but subject to the [Internal Revenue Code of 1986
(26 U.S.C. 1 et seq.)] Internal Revenue Code of 1986.

                              * * * * * * *
   (g)(1) Neither gain nor loss shall be recognized on a transfer-
     (A) by operation of law, of property to the estate;
     (B) other than a sale, of property from the estate to the debtor; or
     (C) in a case under chapter 11 or 12 of this title concerning a corporation, of
property from the estate to a corporation that is an affiliate participating in a
joint plan with the debtor, or that is a successor to the debtor under the plan, ex-
cept that gain or loss may be recognized to the same extent that such transfer res-
ults in the recognition of gain or loss under section 371 of the [Internal Revenue
Code of 1986 (26 U.S.C. 371)] Internal Revenue Code of 1986.

                              * * * * * * *

*78 S 348. Effect of conversion

   (a) Conversion of a case from a case under one chapter of this title to a case un-
der another chapter of this title constitutes an order for relief under the chapter
to which the case is converted, but, except as provided in subsections (b) and (c)
of this section, does not effect a change in the date of the filing of the petition,
the commencement of the case, or the order for relief.
   (b) Unless the court for cause orders otherwise, in sections 701(a),  727(a)(10),
727(b), 728(a), 728(b), 1102(a), 1110(a)(1), 1121(b), 1121(c), 1141(d)(4), 1146(a),
1146(b), [1301(a), 1305(a), 1201(a), 1221, and 1228(a)] 1201(a), 1221, 1228(a),
1301(a), and 1305(a) of this title, "the order for relief under this chapter" in a
chapter to which a case has been converted under section 706, 1112. [1307, or 1208]
1208, or 1307 of this title means the conversion of such case to such chapter.
   (c) Sections 342 and 365(d) of this title apply in a case that has been converted
under section 706, 1112. [1307, or 1208] 1208, or 1307 of this title, as if the con-
version order were the order for relief.
   (d) A claim against the estate or the debtor that arises after the order for re-
lief but before conversion in a case that is converted under section 1112. [1307, or
1208] 1208, or 1307 of this title, other than a claim specified in section 503(b) of
this title, shall be treated for all purposes as if such claim had arisen immedi-
ately before the date of the filing of the petition.
   (e) Conversion of a case under section 706, 1112. [1307, or 1208]  1208, or 1307

                                    A140

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                         Page 90
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

of this title terminates the service of any trustee or examiner that is serving in
the case before such conversion.
   (f)(1) Notwithstanding any other provision of this title, the debtor may not con-
vert a case to a case under chapter 13 in bad faith.
   (2) When a case under chapter 13 of this title is converted to another chapter un-
der this title-
      (A) property of the estate in the converted case shall consist of property of
the estate, as of the date of filing of the petition, that remains in the possession
of or is under the control of the debtor on the date of conversion; and
      (B) valuations of property and of allowed secured claims in the chapter 13 case
shall apply in the converted case, with allowed secured claims reduced to the extent
that they have been paid in accordance with the chapter 13 plan.

S 349. Effect of dismissal

   (a) Unless the court, for cause, orders otherwise, the dismissal of a case under
this title does not bar the discharge, in a later case under this title, of debts
that were dischargeable in the case dismissed; nor does the dismissal of a case un-
der this title prejudice the debtor with regard to the filing of a subsequent peti-
tion under this title, except as provided in <u>section [109(f)] 109(g)</u> of this title.

                              * * * * * * *

                      Subchapter IV-Administrative Powers

                              * * * * * * *

*79 <u>S 362</u>. Automatic stay

   (a) Except as provided in subsection (b) of this section, a petition filed under
<u>section 301, 302</u>, or <u>303</u> of this title, or an application filed under section
5(a)(3) of the Securities Investor Protection Act of 1970 [(<u>15 U.S.C. 78eee(a)(3))</u>],
operates as a stay, applicable to all entities, of-
      (1) ***

                              * * * * * * *
   (b) The filing of a petition under <u>section 301, 302</u>, or <u>303</u> of this title, or of
an application under section 5(a)(3) of the Securities Investor Protection Act of
1970 [(<u>15 U.S.C. 78eee(a)(3))</u>], does not operate as a stay-
      (1) ***
   [(2) under subsection (a) of this section, of the collection of alimony, main-
tenance, or support from property that is not property of the estate;]
      (2) under subsection (a) of this section-
      (A) of the commencement or continuation of an action or proceeding for-
      (i) the establishment of paternity; or
      (ii) the establishment or modification of an order for alimony, maintenance, or
support; or
      (B) of the collection of alimony, maintenance, or support from property that is

                                   A141

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

not property of the estate;

   (3) under subsection (a) of this section, of any act to perfect, or to maintain
or continue the perfection of, an interest in property to the extent that the trust-
ee's rights and powers are subject to such perfection under <u>section 546(b)</u> of this
title or to the extent that such act is accomplished within the period provided un-
der <u>section 547(e)(2)(A)</u> of this title;

                              * * * * * * *

   (6) under subsection (a) of this section, of the setoff by a commodity broker,
forward contract merchant, stockbroker, financial institutions, or securities clear-
ing agency of any mutual debt and claim under or in connection with commodity con-
tracts, as defined in <u>section 761[(4)]</u> of this title, forward contracts, or securit-
ies contracts, as defined in <u>section 741 [(7)]</u> of this title, that constitutes the
setoff of a claim against the debtor for a margin payment, as defined in <u>section
101[(34)]</u>, <u>741[(5)]</u>, or <u>761[(15)]</u>, of this title, or settlement payment, as defined
in <u>section 101 [(35)]</u> or <u>741[(8)]</u> of this title, arising out of commodity contracts,
forward contracts, or securities contracts against cash, securities, or other prop-
erty held by or due from such commodity broker, forward contract merchant, stock-
broker, financial institutions, or securities clearing agency to margin, guarantee,
secure, or settle commodity contracts, forward contracts, or securities contracts;

   (7) under subsection (a) of this section, of the setoff by a repo participant,
of any mutual debt and claim under or in connection with repurchase agreements that
constitutes the setoff of a claim against the debtor for a margin payment, as
defined in <u>section 741[(5)]</u> or <u>761 [(15)]</u> of this title, or settlement payment, as
defined in <u>section 741 [(8)]</u> of this title arising out of *80 repurchase agreements
against cash, securities, or other property held by or due from such repo parti-
cipant to margin, guarantee, secure or settle repurchase agreements;

                              * * * * * * *

   [(9) under subsection.(a) of this section, of the issuance to the debtor by a
governmental unit of a notice of tax deficiency;]

   (9) under subsection (a), of-

   (A) an audit by a governmental unit to determine tax liability;

   (B) the issuance to the debtor by a governmental unit of a notice of tax defi-
ciency;

   (C) a demand for tax returns; or

   (D) the making of an assessment for any tax and issuance of a notice and demand
for payment of such an assessment (but any tax lien that would otherwise attach to
property of the estate by reason of such an assessment shall not take effect unless
such tax is a debt of the debtor that will not be discharged in the case and such
property or its proceeds are transferred out of the estate to, or otherwise revested
in, the debtor).

   (10) under subsection (a) of this section, of any act by a lessor to the debtor
under a lease of nonresidential real property that has terminated by the expiration
of the stated term of the lease before the commencement of or during a case under
this title to obtain possession of such property; [or]

                              * * * * * * *

                                  A142

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(12) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under [the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)] section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction held by the Secretary of Transportation under section 207 or title XI of the Merchant Marine Act, 1936 [(46 App. U.S.C. 1117 and 1271 et seq., respectively)], or under applicable State law;

(13) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under [the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)] section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing facility held by the Secretary of Commerce under section 207 or title XI of the Merchant Marine Act, 1936 [(46 App. U.S.C. 1117 and 1271 et seq., respectively)]; or

*81 (14) under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

(15) under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution; [or]

(16) under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 [(20 U.S.C. 1001 et seq.)] or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act.

[(14)] (17) under subsection (a) of this section, of the setoff by a swap participant, of any mutual debt and claim under or in connection with any swap agreement that constitutes the setoff of a claim against the debtor for any payment due from the debtor under or in connection with any swap agreement against any payment due to the debtor from the swap participant under or in connection with any swap agreement or against cash, securities, or other property of the debtor held by or due from such swap participant to guarantee, secure or settle any swap agreement[.]; or

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989[.];

* * * * * * *

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

A143

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

    (A) the debtor does not have an equity in such property; and

    (B) such property is not necessary to an effective reorganization[.]; or

    (3) with respect to a stay of an act against single asset real estate under sub-
section (a), by a creditor whose claim is secured by an interest in such real es-
tate, unless, not later than the date that is 90 days after the entry of the order
for relief (or such later date as the court may determine for cause by order entered
within that 90-day period)-

    (A) the debtor has filed a plan of reorganization that has a reasonable possib-
ility of being confirmed within a reasonable time; or

    (B) the debtor has commenced monthly payments to each creditor whose claim is
secured by such real estate (other than a claim secured by a judgment lien), which
payments are in an amount equal to interest at a current fair market rate on the
value of the creditor's interest in the real estate.

    (e) Thirty days after a request under subsection (d) of this section for relief
from the stay of any act against property of the estate under subsection (a) of this
section, such stay is terminated with *82 respect to the party in interest making
such request, unless the court, after notice and a hearing, orders such stay contin-
ued in effect pending the conclusion of, or as a result of, a final hearing and de-
termination under subsection (d) of this section. A hearing under this subsection
may be a preliminary hearing, or may be consolidated with the final hearing under
subsection (d) of this section. The court shall order such stay continued in effect
pending the conclusion of the final hearing under subsection (d) of this section if
there is a reasonable likelihood that the party opposing relief from such stay will
prevail at the conclusion of such final hearing. If the hearing under this subsec-
tion is a preliminary hearing than such final hearing shall be [commenced] concluded
not later than thirty days after the conclusion of such preliminary hearing, unless
the 30-day period is extended with the consent of the parties in interest or for a
specific time which the court finds is required by compelling circumstances.

* * * * * * *

    (i)(1) An order under this section with respect to singlez asset real estate shall
not issue before the date that is 30 days after the date of entry of the order for
relief, but thereafter shall issue promptly after such a request.

    (2) A hearing shall not be required for the granting of relief under this section
with respect to single asset real estate unless the debtor files an objection to the
request and shows the court extraordinary circumstances requiring such a hearing.

S 363. Use, sale, or lease of property

    (a) In this section, "cash collateral" means cash, negotiable instruments, docu-
ments of title, securities, deposit accounts, or other cash equivalents whenever ac-
quired in which the estate and an entity other than the estate have an interest and
includes the proceeds, products, offspring, rents, or profits of property and the
net fees, charges, accounts or other payments for the use or occupancy of rooms and
other public facilities in hotels, motels, or other lodging properties subject to a
security interest as provided in section 552(b) of this title, whether existing be-
fore or after the commencement of a case under this title.

    (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other

A144

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 94
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,   1994 U.S.C.C.A.N. 3340)

than in the ordinary course of business, property of the estate.
    (2) If notification is required under subsection (a) of section 7A of the Clayton
Act [(15 U.S.C. 18a)] in the case of a transaction under this subsection, then--
    [(A) notwithstanding subsection (a) of such section, such notification shall be
given by the trustee; and
    [(B) notwithstanding subsection (b) of such section, the required waiting period
shall end on the tenth day after the date of the receipt of such notification, un-
less the court, after notice and hearing, orders otherwise.]
    (A) notwithstanding subsection (a) of such section, the notification required by
such subsection to be given by the debtor shall be given by the trustee; and
    *83 (B) notwithstanding subsection (b) of such section, the required waiting
period shall end on the 15th day after the date of the receipt, by the Federal Trade
Commission and the Assistant Attorney General in charge of the Antitrust Division of
the Department of Justice, of the notification required under such subsection (a),
unless such waiting period is extended-
    (i) pursuant to subsection (e)(2) of such section, in the same manner as such
subsection (e)(2) applies to a cash tender offer;
    (ii) pursuant to subsection (g)(2) of such section; or
    (iii) by the court after notice and a hearing.
    (c)(1) If the business of the debtor is authorized to be operated under section
721, 1108, [1304, 1203, or 1204] 1203, 1204, or 1304 of this title and unless the
court orders otherwise, the trustee may enter into transactions, including the sale
or lease of property of the estate, in the ordinary course of business, without no-
tice or a hearing, and may use property of the estate in the ordinary course of
business without notice or a hearing.

                            * * * * * * *

S 364. Obtaining credit

    (a) If the trustee is authorized to operate the business of the debtor under sec-
tion 721, 1108, [1304, 1203, or 1204] 1203, 1204, or 1304 of this title, unless the
court orders otherwise, the trustee may obtain unsecured credit and incur unsecured
debt in the ordinary course of business allowable under section 503(b)(1) of this
title as an administrative expense.

                            * * * * * * *

    (f) Except with respect to an entity that is an underwriter as defined in section
1145(b) of this title, section 5 of the Securities Act of 1933. [(15 U.S.C. 77e)],
the Trust Indenture Act of 1939 [(15 U.S.C. 77aaa et seq.)], and any State or local
law requiring registration for offer or sale of a security or registration or li-
censing of an issuer of, underwriter of, or broker or dealer in, a security does not
apply to the offer or sale under this section of a security that is not an equity
security.

S 365. Executory contracts and unexpired leases

    (a) Except as provided in sections 765 and 766 of this title and in subsections

                                   A145

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 95
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

(b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; [and]

*84 (C) provides adequate assurance of future performance under such contract or lease[.]; and

(D) satisfy any penalty rate or provision relating to a default arising from any failure by the debtor to perform the obligations under the contract or executory lease after the order for relief.

\* \* \* \* \* \* \*

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

\* \* \* \* \* \* \*

(6) For the purpose of paragraph (5) of this subsection and paragraph (f)(1) of this section, the occurrence of a termination event means, with respect to a debtor which is an affected air carrier that is the lessee of an aircraft terminal or aircraft gate-

(A) \*\*\*

\* \* \* \* \* \* \*

(C) the granting of relief from the stay provided under section 362(a) of this title with respect to aircraft, aircraft engines, propellers, appliances, or spare parts, as defined in section 101 of [the Federal Aviation Act of 1958 (49 App. U.S.C. 1301)] section 40102 of title 49, except for property of the debtor found by the court not to be necessary to an effective reorganization.

\* \* \* \* \* \* \*

(10) The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), arising more than 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or house-hold purposes), unless the court, after notice and a hearing and based on cause or the equities of the case, orders otherwise.

(11) Notwithstanding paragraphs (1), (2), and (4), if the trustee in a case under any chapter of this title does not assume or reject an unexpired lease or executory contract with an airport operator under which the debtor has a right to the use or possession of an airport terminal, aircraft gate, or related facility within 270

A146

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                        Page 96
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

days after the date of the order for relief, or within such additional time as the court sets during such 270-day period, such lease or executory contract is deemed rejected unless the court finds in such period (including such additional time) that the debtor's failure to assume or reject such lease or such contract in such period is attributable to circumstances for which the debtor should not be held accountable.

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of *85 the case solely because of a provision in such contract or lease that is conditioned on-

(A) ***

* * * * * * *

This subsection shall apply to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to lift the stay under section 362).

* * * * * * *

(g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease-

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or

(2) if such contract or lease has been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title-

(A) if before such rejection the case has not been converted under section 1112, [1307, or 1208] 1208, or 1307 of this title, at the time of such rejection; or

(B) if before such rejection the case has been converted under section 1112, [1307, or 1208] of this title-

(i) immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or

(ii) at the time of such rejection, if such contract or lease was assumed after such conversion.

[(h)(1) If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, or a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller, the lessee or timeshare interest purchaser under such lease or timeshare plan may treat such lease or timeshare plan as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee or timeshare interest purchaser to treat such lease or timeshare plan as terminated by virtue of its own terms, applicable nonbankruptcy law, or other agreements the lessee or timeshare interest purchaser has made with other parties; or, in the alternative, the lessee or timeshare interest purchaser may remain in possession of the leasehold or timeshare interest under any lease or timeshare plan the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee or timeshare interest purchaser under applicable nonbankruptcy

A147

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law.

[(2) If such lessee or timeshare interest purchaser remains in possession as
provided in paragraph (1) of this subsection, such lessee or timeshare interest pur-
chaser may offset against the rent reserved under such lease or moneys due for such
timeshare interest for the balance of the term after the date of the rejection of
such lease or timeshare interest, and any such renewal or extension thereof, any
damages occurring after such date caused by the nonperformance of any obligation of
the debtor under such lease or *86 timeshare plan after such date, but such lessee
or timeshare interest purchaser does not have any rights against the estate on ac-
count of any damages arising after such date from such rejection, other than such
offset.]

(h)(1)(A) If the trustee rejects an unexpired lease of real property under which
the debtor is the lessor and-

(i) if the rejection by the trustee amounts to such a breach as would entitle
the lessee to treat such lease as terminated by virtue of its terms, applicable non-
bankruptcy law, or any agreement made by the lessee, then the lessee under such
lease may treat such lease as terminated by the rejection; or

(ii) if the term of such lease has commenced, the lessee may retain its rights
under such lease (including rights such as those relating to the amount and timing
of payment of rent and other amounts payable by the lessee and any right of use,
possession, quite enjoyment, subletting, assignment, or hypothecation) that are in
or appurtenant to the real property for the balance of the term of such lease and
for any renewal or extension of such rights to the extent that such rights are en-
forceable under applicable nonbankruptcy law.

(B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may
offset against the rent reserved under such lease for the balance of the term after
the date of the rejection of such lease and for the term of any renewal or extension
of such lease, the value of any damage caused by the nonperformance after the date
of such rejection, of any obligation of the debtor under such lease, but the lessee
shall not have any other right against the estate or the debtor on account of any
damage occurring after such date caused by such nonperformance.

(C) The rejection of a lease of real property in a shopping center with respect to
which the lessee elects to retain its rights under subparagraph (A)(ii) does not af-
fect the enforceability under applicable nonbankruptcy law of any provision in the
lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

(D) In this paragraph, "lessee" includes any successor, assign, or mortgagee per-
mitted under the terms of such lease.

(2)(A) If the trustee rejects a timeshare interest under a timeshare plan under
which the debtor is the timeshare interest seller and-

(i) if the rejection amounts to such a breach as would entitle the timeshare in-
terest purchaser to treat the timeshare plan as terminated under its terms, applic-
able nonbankruptcy law, or any agreement made by timeshare interest purchaser, the
timeshare interest purchaser under the timeshare plan may treat the timeshare plan
as terminated by such rejection; or

(ii) if the term of such timeshare interest has commenced, then the timeshare
interest purchaser may retain its rights in such timeshare interest for the balance
of such term and for any term of renewal or extension of such timeshare interest to

A148

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the extent that such rights are enforceable under applicable nonbankruptcy law.
    (B) If the timeshare interest purchaser retains its rights under subparagraph (A),
such timeshare interest purchaser may offset against the moneys due for such time-
share interest for the balance of the term after the date of the rejection of such
timeshare interest, *87 and the term of any renewal or extension of such timeshare
interest, the value of any damage caused by the nonperformance after the date of
such rejection, of any obligation of the debtor under such timeshare plan, but the
timeshare interest purchaser shall not have any right against the estate or the
debtor on account of any damage occurring after such date caused by such nonperform-
ance.

                              * * * * * * *

    (n)(1) If the trustee rejects an executory contract under which the debtor is a
licensor of a right to intellectual property, the licensee under such contract may
elect-
    (A) to treat such contract as terminated by such rejection if such rejection if
such rejection by the trustee amounts to such a breach as would entitle the license
to treat such contract as terminated by virtue of its own terms, applicable non-
bankruptcy law, or an agreement made by the licensee with another entity; or
    (B) to retain its rights (including a right to [to] enforce any exclusivity pro-
vision of such contract, but excluding any other right under applicable nonbank-
ruptcy law to specific performance of such contract) under such contract and under
any agreement supplementary to such contract, to such intellectual property
(including embodiment of such intellectual property to the extent protected by ap-
plicable nonbankruptcy law), as such rights existed immediately before the case com-
menced, for-
    (i) the duration of such contract; and
    (ii) any period for which such contract may be extended by the licensee as of
right under applicable nonbankruptcy law.

                              * * * * * * *

    (o) In a case under chapter 11 of this title, the trustee shall be deemed to have
assumed (consistent with the debtor's other obligations under section 507), and
shall immediately cure any deficit under, any commitment by the debtor to [the Fed-
eral Deposit Insurance Corporation, the Resolution Trust Corporation, the Director
of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board
of Governors of [the Federal Reserve System, or its predecessors or successors,] a
Federal depository institutions regulatory agency (or predecessor to such agency) to
maintain the capital of an insured depository institution, and any claim for a sub-
sequent breach of the obligations thereunder shall be entitled to priority under
section 507. This subsection shall not extend any commitment that would otherwise be
terminated by any act of such an agency.
    [(p) In this section, "affected air carrier" means an air carrier, as defined in
section 101(3) of the Federal Aviation Act of 1958, that holds 65 percent or more in
number of the aircraft gates at an airport-
    [(1) which is a Large Air Traffic Hub as defined by the Federal Aviation Admin-
istration in Report FAA-AP 92-1, February 1992; and
    *88 [(2) (all of whose remaining aircraft gates are leased or under contract on

                                  A149

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 99
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

the date of enactment of this subsection.]

* * * * * * *

CHAPTER 5-CREDITORS, THE DEBTOR, AND THE ESTATE

* * * * * * *

Subchapter I-Creditors and Claims

* * * * * * *

S 502. Allowance of claims or interests

   (a) ***
   (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this sec-
tion, if such objection to a claim is made, the court, after notice and a hearing,
shall determine the amount of such claim in lawful currency of the United States as
of the date of the filing of the petition and shall allow such claim in such amount,
except to the extent that-
   (1) ***
   (7) if such claim is the claim of an employee for damages resulting from the
termination of an employment contract, such claim exceeds-
   (A) the compensation provided by such contract, without acceleration, for one
year following the earlier of-
      (i) the date of the filing of the petition; or
      (ii) the date on which the employer directed the employee to terminate, or such
employee terminated, performance under such contract; plus
   (B) any unpaid compensation due under such contract, without acceleration, on
the earlier of such dates; [or]
   (8) such claim results from a reduction, due to late payment, in the amount of
an otherwise applicable credit available to the debtor in connection with an employ-
ment tax on wages, salaries, or commissions earned from the debtor [.]; and
   (9) proof of such claim is not timely filed, except to the extent tardily filed
as permitted under paragraph (2) or (3) of section 726(a).

* * * * * * *

   (i) A claim that does not arise until after the commencement of the case for a tax
entitled to priority under section [507(a)(7)] 507(a)(8) of this title shall be de-
termined, and shall be allowed under subsection (a), (b), or (c) of this section, or
disallowed under subsection (d) or (e) of this section, the same as if such claim
had arisen before the date of the filing of the petition.

* * * * * * *

S 503. Allowance of administrative expenses

   (a) An entity may timely file a request for payment of an administrative expense,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 100
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

or may tardily file such request if permitted by the court for cause.
    *89 (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including-
    (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;
    (B) any tax-
    (i) incurred by the estate, except a tax of a kind specified in section 507(a)(7)] 507(a)(8) of this title; or
    (ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case; and

                              * * * * * * *

    (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; [or]
    (E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or
    (F) a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

                              * * * * * * *

S 507. Priorities

    (a) The following expenses and claims have priority in the following order:
    (1) ***

                              * * * * * * *

    [(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay-
    [(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
    [(B) to the extent of $2,000 for each such individual.]
    (3) Third, allowed unsecured claims, but only to the extent of $4,000 for each individual or corporation, as the case may be, earned within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for-
    (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
    (B) sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation *90 earned by acting as an independent contractor in the sale

                                   A151

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                 Page 101
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

of goods or services was earned from the debtor;
    (4) Fourth, allowed unsecured claims for contributions to an employee benefit
plan-
    (A) arising from services rendered within 180 days before the date of the filing
of the petition or the date of the cessation of the debtor's business, whichever oc-
curs first; but only
    (B) for each such plan, to the extent of-
     (i) the number of employees covered by each such plan multiplied by [$2,000]
$4,000; less
     (ii) the aggregate amount paid to such employees under paragraph (3) of this
subsection, plus the aggregate amount paid by the estate on behalf of such employees
to any other employee benefit plan.
    (5) Fifth, allowed unsecured claims of persons-
    (A) engaged in the production or raising of grain, as defined in section
557(b)(1) of this title, against a debtor who owns or operates a grain storage fa-
cility, as defined in section 557(b)(2) of this title, for grain or the proceeds of
grain, or
    (B) engaged as a United States fisherman against a debtor who has acquired fish
or fish produce from a fisherman through a sale or conversion, and who is engaged in
operating a fish produce storage or processing facility-but only to the extent of
[$2,000] $4,000 for each such individual.
    (6) Sixth, allowed unsecured claims of individuals, to the extent of  [$900]
$1,800 for each such individual, arising from the deposit, before the commencement
of the case, of money in connection with the purchase, lease, or rental of property,
or the purchase of services, for the personal, family, or household use of such in-
dividuals, that were not delivered or provided.
    (7) Seventh, allowed claims for debts to a spouse, former spouse, or child of
the debtor, for alimony to, maintenance for, or support of such spouse or child, in
connection with a separation agreement, divorce decree or other order of a court of
record, determination made in accordance with State or territorial law by a govern-
mental unit, or property settlement agreement, but not to the extent that such debt-
    (A) is assigned to another entity, voluntarily, by operation of law, or other-
wise; or
    (B) includes a liability designated as alimony, maintenance, or support, unless
such liability is actually in the nature of alimony, maintenance or support.
    [(7) Seventh] (8) Eighth, allowed unsecured claims of governmental units, only
to the extent that such claims are for-
    (A) ***
    [(8) Eighth] (9) Ninth, allowed unsecured claims based upon any commitment by
the debtor to [the Federal Deposit Insurance Corporation, the Resolution Trust Cor-
poration, the Director of the Office of Thrift Corporation, the Director of the Of-
fice of Thrift Supervision, the Comptroller of the Currency, or the Board of Gov-
ernors of the Federal Reserve System, or their *91 predecessors or successors,] a
Federal depository institutions regulatory agency (or predecessor to such agency) to
maintain the capital of an insured depository institution.

                              * * * * * * *

                              A152

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                      Page 102
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)


   (d) An entity that is subrogated to the rights of a holder of a claim of a kind
specified in subsection (a)(3), (a)(4), (a)(5), [or (a)(6)] (a)(6), (a)(7), (a)(8),
or (a)(9) of this section is not subrogated to the right of the holder of such claim
to priority under such subsection.

                        * * * * * * *

                Subchapter II-Debtor's Duties and Benefits

                        * * * * * * *

S 522. Exemptions

   (a) ***

                        * * * * * * *
   (d) The following property may be exempted under subsection (b)(1) of this sec-
tion:
      (1) The debtor's aggregate interest, not to exceed [$7,500] $15,000 in value, in
real property or personal property that the debtor or a dependent of the debtor uses
as a residence, in a cooperative that owns property that the debtor or a dependent
of the debtor uses as a residence, or in a burial plot for the debtor or a dependent
of the debtor.
      (2) The debtor's interest, not to exceed [$1,200] $2,400 in value, in one motor
vehicle.
      (3) The debtor's interest, not to exceed [$200] $400 in value in any particular
item or [$4,000] $8,000 in aggregate value, in household furnishings, household
goods, wearing apparel, appliances, books, animals, crops, or musical instruments,
that are held primarily for the personal, family, or household use of the debtor or
a dependent of the debtor.
      (4) The debtor's aggregate interest, not to exceed [$500] $1,000 in value, in
jewelry held primarily for the personal, family, or household use of the debtor or a
dependent of the debtor.
      (5) The debtor's aggregate interest in any property not to exceed in
value  [$400] $800 plus up to [$3,750] $7,500 of any unused amount of the exemption
provided under paragraph (1) of this subsection.
      (6) The debtor's aggregate interest, not to exceed [$750] $1,500 in value, in
any implements, professional books, or tools, of the trade of the debtor or the
trade of a dependent of the debtor.
      (7) Any unmatured life insurance contract owned by the debtor, other than a
credit life insurance contract.
      (8) The debtor's aggregate interest, not to exceed in value [$4,000] $8,000 less
any amount of property of the estate transferred in the manner specified in section
542(d) of this title, in any accrued dividend or interest under, or loan value of,
any unmatured life insurance contract owned by the debtor *92 under which the in-
sured is the debtor or an individual of whom the debtor is a dependent.
      (9) Professionally prescribed health aids for the debtor or a dependent of the
debtor.

                            A153

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 103
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


     (10) The debtor's right to receive-
     (A) ***

                              * * * * * * *

     (E) a payment under a stock bonus, pension, profitsharing, annuity or similar
plan or contract on account of illness, disability, death, age, or length of ser-
vice, to the extent reasonably necessary for the support of the debtor and any de-
pendent of the debtor, unless-
     (i) such plan or contract was established by or under the auspices of an in-
sider that employed the debtor at the time the debtor's rights under such plan or
contract arose;
     (ii) such payment is on account of age or length of service; and
     (iii) such plan or contract does not qualify under section 401(a), 403(a),
403(b), [408, or 409] or 408 of the [Internal Revenue Code of 1986 (26 U.S.C.
401(a), 403(a), 403(b), 408, or 409] Internal Revenue Code of 1986.
     (11) The debtor's right to receive, or property that is traceable to-
     (A) ***

                              * * * * * * *

     (D) a payment, not to exceed [$7,500] $15,000, on account of personal bodily in-
jury, not including pain and suffering or compensation for actual pecuniary loss, of
the debtor or an individual of whom the debtor is a dependent; or

                              * * * * * * *

     (f)(1) Notwithstanding any waiver of exemptions But subject to paragraph (3), the
debtor may avoid the fixing of a lien on an interest of the debtor in property to
the extent that such lien impairs an exemption to which the debtor would have been
entitled under subsection (b) of this section, if such lien is-
     [(1)] (A) a judicial lien, other than a judicial a lien that secures a debt-
     (i) to a spouse, former spouse, or child of the debtor, for alimony to, mainten-
ance for, or support of such spouse or child, in connection with a separation agree-
ment, divorce decree or other order of a court of record, determination made in ac-
cordance with State or territorial law by a governmental unit, or property settle-
ment agreement; and
     (ii) to the extent that such debt-
     (I) is not assigned to another entity, voluntarily, by operation of law, or
otherwise; and
     (II) includes a liability designated as alimony, maintenance, or support, un-
less such liability is actually in the nature of alimony, maintenance or support.;
or
     *93 [(2)] (B) a nonpossessory, nonpurchase-money security interest in any-
     [(A)] (i) household furnishings, household goods, wearing apparel, appliances,
books, animals, crops, musical instruments, or jewelry that are held primarily for
the personal, family, or household use of the debtor or a dependent of the debtor;
     [(B)] (ii) implements, professional books, or tools, of the trade of the debtor
or the trade of a dependent of the debtor; or
     [(C)] (iii) professionally prescribed health aids for the debtor or a dependent
of the debtor.
                                A154

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                Page 104
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

(2)(A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of-

(i) the lien,

(ii) all other liens on the property that are equal or greater in seniority to the lien; and

(iii) the amount of the exemption that the debtor could claim if there were no liens on the property,

exceeds the value that the debtor's interest in the property would have in the absence of any liens.

(B) In the case of a property subject to more than 1 lien, a lien that has been avoided shall not be considered in making the calculation under subparagraph (A) with respect to other liens.

(3) In a case in which State law that is applicable to the debtor-

(A) permits a person to voluntarily waive a right to claim exemptions under subsection (d) or prohibits a debtor from claiming exemptions under subsection (d); and

(B) either permits the debtor to claim exemptions under State law without limitation in amount, except to the extent that the debtor has permitted the fixing of a consensual lien on any property or prohibits avoidance of a consensual lien on property otherwise eligible to be claimed as exempt property;

the debtor may not avoid the fixing of a lien on an interest of the debtor or a dependent of the debtor in property if the lien is a nonpossessory, nonpurchase-money security interest in implements, professional books, or tools of the trade of the debtor or a dependent of the debtor or farm animals or crops of the debtor or a dependent of the debtor to the extent such lien exceeds $5,000.

* * * * * * *

S 523. Exceptions to discharge

(a) A discharge under section 727, [1141,,] 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

(1) for a tax or a customs duty-

*94 (A) of the kind and for the periods specified in section 507(a)(2) or [507(a)(7)] 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed;

* * * * * * *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) ***

* * * * * * *

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than [$500] $1,500 for "luxury goods or services" incurred by an individual debtor on or within [forty] 60 days before the order for relief under this title, or cash advances aggregating more than [$1,000] $1,500 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within [twenty] 60 days before the order for relief

A155

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 105
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

under this title, are presumed to be nondischargeable; "luxury goods or services" do
not include goods or services reasonably acquired for the support or maintenance of
the debtor or a dependent of the debtor; an extension of consumer credit under an
open end credit plan is to be defined for purposes of this subparagraph as it is
defined in the Consumer Credit Protection Act [(15 U.S.C. 1601 et seq.)];

* * * * * * *

(11) provided in any final judgment, unreviewable order, or consent order or de-
cree entered in any court of the United States or of any State, issued by a Federal
depository institutions regulatory agency, or contained in any settlement agreement
entered into by the debtor, arising from any act of fraud or defalcation while act-
ing in a fiduciary capacity committed with respect to any depository institution or
insured credit union;

(12) for malicious or reckless failure to fulfill any commitment by the debtor
to a Federal depository institutions regulatory agency to maintain the capital of an
insured depository institution, except that this paragraph shall not extend any such
commitment which would otherwise be terminated due to any act of such agency;

(13) for any payment of an order of restitution issued under title 18, United
States Code[.];

(14) incurred to pay a tax to the United States that would be nondischargeable
pursuant to paragraph (1);

(15) incurred by the debtor in the course of a divorce or separation or in con-
nection with a separation agreement, divorce decree or other order of a court of re-
cord, a determination made in accordance with State or territorial law by a govern-
mental unit unless-

(A) the debtor does not have the ability to pay such debt from income or prop-
erty of the debtor not reasonably necessary to be expended for the maintenance or
support of the debtor or a dependent of the debtor and, if the debtor is engaged *95
in a business, for the payment of expenditures necessary for the continuation, pre-
servation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs
the detrimental consequences to a spouse, former spouse, or child of the debtor; or

(16) for a fee that becomes due and payable after the order for relief to a mem-
bership association with respect to the debtor's interest in a dwelling unit that
has condominium ownership or in a share of a cooperative housing corporation, if
such fee is payable for a period during which-

(A) the debtor physically occupied a dwelling unit in the condominium or cooper-
ative project; or

(B) the debtor rented the dwelling unit to a tenant and received payments from
the tenant for such period,

but nothing in this paragraph shall except from discharge the debt of a debtor
for a membership association fee for a period arising before entry of the order for
relief in a pending or subsequent bankruptcy proceeding.

(b) Notwithstanding subsection (a) of this section, a debt that was excepted from
discharge under subsection (a)(1), (a)(3), or (a)(8) of this section, under section
17a(1), 17a(3), or 17a(5) of the Bankruptcy Act, under section 439A of the Higher
Education Act of 1965 [(20 U.S.C. 1087-3)], or under section 733(g) of the Public

A156

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 106
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

Health Service Act [(42 U.S.C. 294f)] in a prior case concerning the debtor under
this title, or under the Bankruptcy Act, is dischargeable in a case under this title
unless, by the terms of subsection (a) of this section, such debt is not dis-
chargeable in the case under this title.
   (c)(1) Except as provided in subsection (a)(3)(B) of this section, the debtor
shall be discharged from a debt of a kind specified in paragraph (2), (4), [or (6)]
(6), or (13) of subsection (a) of this section, unless, on request of the creditor
to whom such debt is owed, and after notice and a hearing, the court determines such
debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may
be, of subsection (a) of this section.

                          * * * * * * *

   (e) Any institution-affiliated party of a [depository institution or insured cred-
it union] insured depository institution shall be considered to be acting in a fidu-
ciary capacity with respect to the purposes of subsection (a)(4) or (11).

S 524. Effect of discharge

   (a) A discharge in a case under this title-
   (1) ***

                          * * * * * * *

   (3) operates as an injunction against the commencement or continuation of an ac-
tion, the employment of process, or an act, to collect or recover from, or offset
against, property of the debtor of the kind specified in section 541(a)(2) of this
title that is acquired after the commencement of the case, on account of any allow-
able community claim, except a community claim that is excepted from discharge under
section 523, 1228(a)(1), *96 or [1328(c)(1)] 1328(a)(1) of this title, or that would
be so excepted, determined in accordance with the provisions of sections 523(c) and
523(d) of this title, in a case concerning the debtor's spouse commenced on the date
of the filing of the petition in the case concerning the debtor, whether or not dis-
charge of the debt based on such community claim is waived.

                          * * * * * * *

   (c) An agreement between a holder of a claim and the debtor, the consideration for
which, in whole or in part, is based on a debt that is dischargeable in a case under
this title is enforceable only to any extent enforceable under applicable nonbank-
ruptcy law, whether or not discharge of such debt is waived, only if-
   (1) such agreement was made before the granting of the discharge under  section
727, 1141, 1228, or 1328 of this title;
   (2)(A) such agreement contains a clear and conspicuous statement which advises
the debtor that the agreement may be rescinded at any time prior to discharge or
within sixty days after such agreement is filed with the court, whichever occurs
later, by giving notice of rescission to the holder of such claim; and
   (B) such agreement contains a clear and conspicuous statement which advises the
debtor that such agreement is not required under this title, under nonbankruptcy
law, or under any agreement not in accordance with the provisions of this subsec-
tion;

                                A157

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that [such agreement]

(A) such agreement represents a fully informed and voluntary agreement by the debtor; [and]

(B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

(C) the attorney fully advised the debtor of the legal effect and consequences of-

(i) an agreement of the kind specified in this subsection; and

(ii) any default under such an agreement;

(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of [recission] rescission to the holder of such claim;

* * * * * * *

(d) In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141, 1228, or 1328 of this title, the court may hold a hearing at which the debtor shall appear in person. At any such hearing, the court shall inform the debtor that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section and was not represented by an attorney during the course of negotiating such *97 agreement, then the court shall hold a hearing at which the debtor shall appear in person and at such hearing the court shall-

(1) inform the debtor-

(A) that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and

(B) of the legal effect and consequences of-

(i) an agreement of the kind specified in subsection (c) of this section; and

(ii) a default under such an agreement; and

* * * * * * *

(g)(1)(A) After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue an injunction to supplement the injunctive effect of a discharge under this section.

(B) An injunction may be issued under subparagraph (A) to enjoin persons and governmental units from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery of, on, or with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.

(2)(A) If the requirements of subparagraph (B) are met at any time, then, after entry of an injunction under paragraph (1), any proceeding that involves the validity, application, construction, or modification of the injunction or of this subsec-

A158

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 108
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

tion with respect to the injunction may be commenced only in the district court in
which the injunction was entered, and such court shall have exclusive jurisdiction
over any such proceeding without regard to the amount in controversy.
    (B) The requirements of this subparagraph are that-
      (i) the injunction is to be implemented in connection with a trust that, pursu-
ant to the plan of reorganization-
      (I) is to assume the liabilities of a debtor which at the time of entry of the
order for relief has been named as a defendant in personal injury, wrongful death,
or property-damage actions seeking recovery for damages allegedly caused by the
presence of, or exposure to, asbestos or asbestos-containing products;
      (II) is to be funded in whole or in part by the securities of 1 or more debtors
involved in the plan of reorganization and by the obligation of such debtor or debt-
ors to make future payments, including dividends;
      (III) is to own, or by the exercise of rights granted under the plan could own,
a majority of the voting shares of-
        (aa) each such debtor;
        (bb) the parent corporation of each such debtor; or
        (cc) a subsidiary of each such debtor that is also a debtor; and
      (IV) is to use its assets or income to pay claims and demands; and
    *98 (ii) the court, at any time pursuant to its authority under the plan, over
the trust, or otherwise, determines that-
      (I) the debtor may be subject to substantial future demands for payment arising
out of the same or similar conduct or events that gave rise to the claims that are
addressed by the injunction;
      (II) the actual amounts, numbers, and timing of such future demands cannot be
determined;
      (III) pursuit of such demands outside the procedures prescribed by the plan may
threaten the plan's purpose to deal equitably with claims and future demands;
      (IV) as part of the process of seeking approval of the plan of reorganization-
        (aa) the terms of the injunction proposed to be issued under paragraph (1)(A),
including any provisions barring actions against third parties pursuant to paragraph
(4)(A), shall be set out in the plan of reorganization and in any disclosure state-
ment supporting the plan; and
        (bb) a separate class or classes of the claimants whose claims are to be ad-
dressed by a trust described in clause (i) is established and votes, by at least 75
percent of those voting, in favor of the plan; and
      (V) pursuant to court orders or otherwise, the trust will operate through mech-
anisms such as structured, periodic or supplemental payments, pro rata distribu-
tions, matrices, or periodic review of estimates of the numbers and values of
present claims and future demands or other comparable alternates, that provide reas-
onable assurance that the trust will value, and be in a financial position to pay,
present claims and future demands that involve similar claims in substantially the
same manner, except that with respect to a trust in existence on the date of the en-
actment of the Bankruptcy Amendments of 1994 that is subject to a court order stay-
ing it from settling or paying further claims-
        (aa) the requirements of this subclause shall apply as of the date such stay is
lifted or otherwise dissolved; and

                                    A159

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                      Page 109
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

(bb) such a trust that meets the requirements of the subclause as of the date such stay is lifted or dissolved, shall be treated for all legal purposes as being in compliance with this subsection from the date of the enactment of such Act.

(3)(A) If the requirements of paragraph (2)(B) are met and the order approving the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan of reorganization-

(i) the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6);

(ii) no entity that pursuant to the plan of reorganization or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction *99 shall be liable with respect to any claim or demand made against it by reason of its becoming such a transferee or successor; and

(iii) no entity that pursuant to the plan of reorganization or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against it, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason;

(B) Subparagraph (A) shall not be construed to-

(i) imply that an entity described in subparagraph (A) (ii) or (iii) would, if this paragraph were not applicable, have liability by reason of any of the acts described in subparagraph (A);

(ii) relieve any such entity of the duty to comply with, or of liability under, any Federal or State law regarding the making of a fraudulent conveyance in a transaction described in subparagraph (A) (ii) or (iii); or

(iii) relieve a debtor of the debtor's obligation to comply with the terms of the plan of reorganization or affect the power of the court to exercise its authority under sections 1141 and 1142 to compel the debtor to do so.

(4)(A)(i) Subject to subparagraph (B), an injunction under paragraph (1) shall be valid and enforceable against all persons and governmental units that it addresses.

(ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of the injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor by reason of-

(I) the party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the party's provision of insurance to the debtor or a related party; or

(IV) the party's involvement in a transaction affecting the corporate structure or financial condition of the debtor or a related party, including, but not limited to-

(aa) involvement in providing financing (debt or equity), or advice to a person or entity involved in such a transaction; or

A160

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(bb) acquiring or selling a financial interest in an entity as part of such transaction.

(iii) As used in this subparagraph, the term 'related party' means-

(I) a past or present affiliate of the debtor;

(II) a predecessor in interest of the debtor; or

(III) any person or entity that owned a financial interest in-

(aa) the debtor;

(bb) a past or present affiliate of the debtor; or

(cc) a predecessor interest in the debtor.

*100 (B) With respect to a demand (including a demand directed against a third party described in subparagraph (A)(ii)) that is made subsequent to the confirmation of a plan against any person or entity that is the subject of an injunction issued under paragraph (1), the injunction shall be valid and enforceable if, as part of the proceedings leading to its issuance, the court appointed a legal representative for the purpose of protecting the rights of persons that might subsequently assert such a demand.

(5) In this subsection, the term "demand" means a demand for payment, present or future, that-

(A) was not a claim during the proceedings leading to the confirmation of a plan of reorganization;

(B) arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1); and

(C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i).

(6) Paragraph (3)(A)(i) does not bar an action taken by or at the direction of an appellate court on appeal of an injunction issued under paragraph (1) or of the order of confirmation that relates to the injunction.

(7) This subsection applies to any injunction of the nature described in paragraph (1)(B) in effect, and any trust of the nature described in paragraph (2)(B) in existence, on or after the date of enactment of this subsection.

(8) This subsection does not affect the operation of section 1144 or the power of the district court to refer a proceeding under section 157 of title 28 or any reference of a proceeding made prior to the date of enactment of this subsection.

(h) Nothing in subsection (g) shall affect the court's authority to issue an injunction (including an injunction that requires claims and demands to be presented for payment solely to a trust or any other type of court approved settlement vehicle) which is entered pursuant to an order approving a plan of reorganization.

Subchapter III-The Estate

S 541. Property of the estate

(a) ***

(b) Property of the estate does not include-

(1) any power that the debtor may exercise solely for the benefit of an entity other than the debtor;

(2) any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease be-

A161

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 111
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

fore the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case;

(3) any eligibility of the debtor to participate in programs authorized under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.; 42 U.S.C. 2751 et seq.), or any accreditation status or State licensure of the debtor as an educational institution [or];

*101 (4) any interest of the debtor in liquid or gaseous hydrocarbons to the extent that-

(A)(i) the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and

[(B)](ii) but for the operation of this paragraph, the estate could include [such interest] the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3) of this title[.];

(B)(i) the debtor has transferred or has agreed to transfer such interest pursuant to a written agreement to make production payments to a person that does not participate in the production of the liquid or gaseous hydrocarbon with respect to which such payments are made; and

(ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 of this title;

(5) any interest of the debtor in any account or chattel paper to the extent that-

(A) such interest was actually sold under applicable nonbankruptcy law by the debtor before the date of commencement of the case, but without taking into consideration whether the purchaser filed a financing statement before such date; and

(B) but for the operation of this paragraph, the estate could include such interest only by virtue of section 542 of this title; or

(6) any interest in cash or cash equivalents that constitute proceeds of a sale by the debtor of a money order that is made-

(A) on or after the date that is 14 days prior to the date on which the petition is filed; and

(B) under an agreement with a money order issuer that prohibits the commingling of such proceeds with property of the debtor (notwithstanding that, contrary to the agreement, the proceeds may have been commingled with property of the debtor),

unless the money order issuer had not taken action, prior to the filing of the petition, to require compliance with the prohibition.

(e) In this section-

(1) "account" means any right to payment for goods sold or leased or for services rendered that is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance, and includes all rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to such charter or such contract; and

(2) "chattel paper" means-

(A) a writing or writings that evidence both a monetary obligation and a security interest in or lease of specific goods (excluding a charter or other contract involving the use or hire of a vessel); or

A162

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 112
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

     (B) if a transaction described in subparagraph (A) is evidenced both by such a
security agreement or a lease and by *102 an instrument or a series of instruments,
the group of these writings taken together.
     Paragraph (4) shall not be construed to exclude from the estate any considera-
tion the debtor retains, receives, or is entitled to receive for transferring an in-
terest in liquid or gaseous hydrocarbons pursuant to a farmout agreement.

                              * * * * * * *

S 542. Turnover of property to the estate

     (a) ***

                              * * * * * * *

     (e) Subject to any applicable privilege, after notice and a hearing, the court may
order an attorney, accountant, or other person that holds recorded information in-
cluding books, documents, records, and papers, relating to the debtor's property or
financial affairs, to [to] turn over or disclose such recorded information to the
trustee.

S 543. Turnover of property by a custodian

                              * * * * * * *

     (d) After notice and hearing, the bankruptcy court-
     (1) may excuse compliance with subsection (a), (b), or (c) of this section  [,]
if the interest of creditors and, if the debtor is not insolvent, of equity security
holders would be better served by permitting a custodian to continue in possession,
custody, or control of such property, and

                              * * * * * * *

S 546. Limitations on avoiding powers

     (a) An action or proceeding under section 544, 545, 547, 548, or  553 of this
title may not be commenced after the [earlier] later of-
     [(1) two years after the appointment of a trustee under section 702,  1004,
1163, 1302, or 1202 of this title; or
     [(2) the time the case is closed or dismissed.
     [(b) The rights and powers of a trustee under sections 544, 545, and 549 of this
title are subject to any generally applicable law that permits perfection of an in-
terest in property to be effective against an entity that acquires rights in such
property before the date of such perfection. If such law requires seizure of such
property or commencement of an action to accomplish such perfection, and such prop-
erty has not been seized or such action has not been commenced before the date of
the filing of the petition, such interest in such property shall be perfected by no-
tice within the time fixed by such law for such seizure or commencement.]
     (1) 2 years after the entry of the order for relief; or
     (2) 1 year after the appointment or election of the first trustee under  section
702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election

                                    A163

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                      Page 113
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

occurs before the expiration of the period specified in subparagraph (1).

(b)(1) The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that-

*103 (A) permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection; or

(B) provides for the maintenance or continuation of perfection of an interest in property to be effective against an entity that acquires rights in such property before the date on which action is taken to effect such maintenance or continuation.

(2) If-

(A) a law described in paragraph (1) requires seizure of such property or commencement of an action to accomplish such perfection, or maintenance or continuation of perfection of an interest in property; and

(B) such property has not been seized or such an action has not been commenced before the date of the filing of the petition;

such interest in such property shall be perfected, or perfection of such interest shall be maintained or continued, by giving notice within the time fixed by such law for such seizure or such commencement.

(c) Except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, and 549 of this title are subject to any statutory or commonlaw right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but-

(1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before [ten] 20 days after receipt of such goods by the debtors; and

* * * * * * *

(e) Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.

(f) Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in [section 741(5) or 761(15)] section 741 or 761 of this title, or settlement payment, as defined in section 741[(8)] of this title, made by or to a repo participant, in connection with a repurchase agreement and that is made before the commencement of the case, except under section 548(a)(1) of this title.

(g) Notwithstanding the rights and powers of a trustee under sections 544(a), 545, 547, 549, and 553, if the court determines on a motion by the trustee made not later than 120 days after the date of the order for relief in a case under chapter 11 of this title and after notice and a hearing, that a return is in the best interests of the estate, the debtor, with the consent of a creditor, may return goods shipped to the debtor by the creditor before the commencement of the case, and the creditor may offset the purchase price of such goods against any claim of the creditor against the debtor that arose before the commencement of the case.

A164

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 114
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

*104 S 547. Preferences

  (a) ***

                        * * * * * * *
  (c) The trustee may not avoid under this section a transfer-
    (1) ***

                        * * * * * * *
    (3) that creates a security interest in property acquired by the debtor-
    (A) ***
    (B) that is perfected on or before [10] 20 days after the debtor receives pos-
session of such property.

                        * * * * * * *
    (6) that is the fixing of a statutory lien that is not available under  section
545 of this title; [or]
    (7) to the extent such transfer was a bona fide payment of a debt to a spouse,
former spouse, or child of the debtor, for alimony to, maintenance for, or support
of such spouse or child, in connection with a separation agreement, divorce decree
or other order of a court of record, determination made in accordance with State or
territorial law by a governmental unit, or property settlement agreement, but not to
the extent that such debt-
    (A) is assigned to another entity, voluntarily, by operation of law, or other-
wise; or
    (B) includes a liability designated as alimony, maintenance, or support, unless
such liability is actually in the nature of alimony, maintenance or support; or
    [7] (8) if, in a case filed by an individual debtor whose debts are primarily
consumer debts, the aggregate value of all property that constitutes or is affected
by such transfer is less than $600.

                        * * * * * * *
  (e)(1) ***
  (2) For the purposes of this section, except as provided in paragraph (3) of this
subsection, a transfer is made-
    (A) at the time such transfer takes effect between the transferor and the trans-
feree, if such transfer is perfected at, or within 10 days after, such time , except
as provided in subsection (c)(3)(B);

                        * * * * * * *

S 548. Fraudulent transfers and obligations

  (a) ***

                        * * * * * * *

  (d)(1) ***
  (2) In this section-
    (A) "value" means property, or satisfaction or securing of a present or ante-

                            A165

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                          Page 115
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

cedent debt of the debtor, but does not include an unperformed promise to furnish
support to the debtor or to a relative of the debtor;
     *105 (B) a commodity broker, forward contract merchant, stockbroker, financial
institution, or securities clearing agency that receives a margin payment, as
defined in section 741(5) or 761(15) of this title, or settlement payment, as
defined in section 741(8) of this title, takes for value to the extent of such pay-
ment; and
     (C) a repo participant that receives a margin payment, as defined in  section
741[(5)] or 761[(15)] of this title, or settlement payment, as defined in section
741[(8)] of this title, in connection with a repurchase agreement, takes for value
to the extent of such payment.

S 549. Postpetition transactions

   (a) Except as provided in subsection (b) or (c) of this section, the trustee may
avoid a transfer of property of the estate-
     (1) that occurs after the commencement of the case; and
     (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
     (B) that is not authorized under this title or by the court.
   (b) In an involuntary case, the trustee may not avoid under subsection (a) of this
section a transfer made after the commencement of such case but before the order for
relief to the extent any value, including services, but not including satisfaction
or securing of a debt that arose before the commencement of the case, is given after
the commencement of the case in exchange for such transfer, notwithstanding any no-
tice or knowledge of the case that the transferee has.

                        *  *  *  *  *  *  *

S 550. Liability of transferee of avoided transfer

   (a) ***

                        *  *  *  *  *  *  *
   (c) If a transfer made between 90 days and one year before the filing of the peti-
tion-
     (1) is avoided under section 547(b) of this title; and
     (2) was made for the benefit of a creditor that at the time of such transfer was
an insider;
   the trustee may not recover under subsection (a) from a transferee that is not
an insider.
   [(c)] (d) The trustee is entitled to only a single satisfaction under subsection
(a) of this section.
   [(d)] (e)(1) A good faith transferee from whom the trustee may recover under sub-
section (a) of this section has a lien on the property recovered to secure the less-
er of-
     (A) the cost, to such transferee, of any improvement made after the transfer,
less the amount of any profit realized by or accruing to such transferee from such
property; and

                              A166

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)


                          * * * * * * *
    [(e)] (f) An action or proceeding under this section may not be commenced after
the earlier of-
    *106 (1) one year after the avoidance of the transfer on account of which recov-
ery under this section is sought; or

                          * * * * * * *

S 552. Postpetition effect of security interest

    (a) Except as provided in subsection (b) of this section, property acquired by the
estate or by the debtor after the commencement of the case is not subject to any li-
en resulting from any security agreement entered into by the debtor before the com-
mencement of the case.
    (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of
this title, if the debtor and an entity entered into a security agreement before the
commencement of the case and if the security interest created by such security
agreement extends to property of the debtor acquired before the commencement of the
case and to proceeds, product, offspring, [rents,] or profits of such property, then
such security interest extends to such proceeds, products, offspring, [rents,] or
profits acquired by the estate after the commencement of the case to the extent
provided by such security agreement and by applicable nonbankruptcy law, except to
any extent that the court, after notice and a hearing and based on the equities of
the case, orders otherwise.
    (2) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of
this title, and notwithstanding section 546(b) of this title, if the debtor and an
entity entered into a security agreement before the commencement of the case and if
the security interest created by such security agreement extends to property of the
debtor acquired before the commencement of the case and to rents of such property,
then such security interest extends to such rents acquired by the estate after the
commencement of the case to the extent provided in such security agreement, except
to any extent that the court, after notice and a hearing and based on the equities
of the case, orders otherwise.

S 553. Setoff

    (a) Except as otherwise provided in this section and in sections 362 and 363 of
this title, this title does not affect any right of a creditor to offset a mutual
debt owing by such creditor to the debtor that arose before the commencement of the
case under this title against a claim of such creditor against the debtor that arose
before the commencement of the case, except to the extent that-
    (1) the claim of such creditor against the debtor is disallowed [other than un-
der section 502(b)(3) of this title];

                          * * * * * * *
    (b)(1) Except with respect to a setoff of a kind described in section 362(b)(6),
362(b)(7), 362(b)(14), [,] 365(h)[(2)], 546(h), or 364(i)(2) of this title, if a
creditor offsets a mutual debt owing to the debtor against a claim against the debt-

                              A167

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                          Page 117
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

or on or within 90 days before the date of the filing of the petition, then the
trustee may recover from such creditor the amount so offset to the extent that any
insufficiency on the date of such setoff is less than the insufficiency on the later
of-

    (A) 90 days before the date of the filing of the petition; and

    *107 (B) the first date during the 90 days immediately proceeding the date of
the filing of the petition on which there is an insufficiency.

                         * * * * * * *

S 555. Contractual right to liquidate a securities contract

    The exercise of a contractual right of a stockbroker, financial institution, or
securities clearing agency to cause the liquidation of a securities contract, as
defined in [section 741(7)] section 741 of this title, because of a condition of the
kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or
otherwise limited by operation of any provision of this title or by order of a court
or administrative agency in any proceeding under this title unless such order is au-
thorized under the provisions of the Securities Investor Protection Act of 1970 [(15
U.S.C. 78aaa et seq.)] or any statute administered by the Securities and Exchange
Commission. As used in this section, the term "contractual right" includes a right
set forth in a rule or bylaw of a national securities exchange, a national securit-
ies association, or a securities clearing agency.

S 556. Contractual right to liquidate a commodities contract or forward contract

    The contractual right of a commodity broker or forward contract merchant to cause
the liquidation of a commodity contract, as defined in [section 761(4)] section 761
of this title, or forward contract because of a condition of the kind specified in
section 365(e)(1) of this title, and the right to a variation or maintenance margin
payment received from a trustee with respect to open commodity contracts or forward
contracts, shall not be stayed, avoided, or otherwise limited by operation of any
provision of this title or by the order of a court in any proceeding under this
title. As used in this section, the term "contractual right" includes a right set
forth in a rule or bylaw of a clearing organization or contract market or in a res-
olution of the governing board thereof.

                         * * * * * * *

S 559. Contractual right to liquidate a repurchase agreement

    The exercise of a contractual right of a repo participant to cause the liquidation
of a repurchase agreement because of a condition of the kind specified in section
365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by opera-
tion of any provision of this title or by order of a court or administrative agency
in any proceeding under this title, unless, where the debtor is a stockbroker or se-
curities clearing agency, such order is authorized under the provisions of the Se-
curities Investor Protection Act of 1970 [(15 U.S.C. 78aaa et seq.)] or any statute
administered by the Securities and Exchange Commission. In the event that a repo

                               A168

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                Page 118
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

participant liquidates one or more repurchase agreements with a debtor and under the
terms of one or more such agreements has agreed to deliver assets subject to repur-
chase agreements to the debtor, any excess of the market prices received on liquida-
tion of such assets (or if any such assets are not disposed of on the date of li-
quidation of such repurchase agreements, at the prices available at *108 the time of
liquidation of such repurchase agreements from a generally recognized source or the
most recent closing bid quotation from such a source) over the sum of the stated re-
purchase prices and all expenses in connection with the liquidation of such repur-
chase agreements shall be deemed property of the estate, subject to the available
rights of setoff. As used in this section, the term "contractual right" includes a
right set forth in a rule or bylaw, applicable to each party to the repurchase
agreement, of a national securities exchange, a national securities association, or
a securities clearing agency, and a right, whether or not evidenced in writing,
arising under common law, under law merchant or by reason of normal business prac-
tice.

* * * * * * *

CHAPTER 7-LIQUIDATION

* * * * * * *

Subchapter I-Officers and Administration

* * * * * * *

S 706. Conversion

    (a) The debtor may convert a case under this chapter to a case under  chapter 11,
12, or 13 of this title at any time, if the case has not been converted under sec-
tion 1112, [1307, or 1208] 1208, or 1307 of this title. Any waiver of the right to
convert a case under this subsection is unenforceable.

* * * * * * *

Subchapter II-Collection, Liquidation, and Distribution of the Estate

* * * * * * *

S 723. Rights of partnership trustee against general partners

    (a) If there is a deficiency of property of the estate to pay in full all claims
which are allowed in a case under this chapter concerning a partnership and with re-
spect to which a general partner of the partnership is personally liable, the trust-
ee shall have a claim against such general partner [for the full amount of the defi-
ciency] to the extent that under applicable nonbankruptcy law such general partner
is personally liable for the debts of the partnership.

A169

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
**(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)**

* * * * * * *

S 724. Treatment of certain liens

  (a) ***
  (b) Property in which the estate has an interest and that is subject to a lien
that is not avoidable under this title and that secures an allowed claim for a tax,
or proceeds of such property, shall be distributed-
    (1) ***
    (2) second, to any holder of a claim of a kind specified in <u>section 507(a)(1)</u>,
<u>507(a)(2)</u>, <u>507(a)(3)</u>, <u>507(a)(4)</u>, <u>507(a)(5)</u>, [or *109 <u>507(a)(6)</u>] 507(a)(6), or
507(a)(7) of this title, to the extent of the amount of such allowed tax claim that
is secured by such tax lien;

* * * * * * *

  (d) A statutory lien the priority of which is determined in the same manner as the
priority of a tax lien under <u>section 6323</u> of the [Internal Revenue Code of 1954 (<u>26
U.S.C. 6323</u>)] Internal Revenue Code of 1986 shall be treated under subsection (b) of
this section the same as if such lien were a tax lien.

* * * * * * *

<u>S 726</u>. Distribution of property of the estate

  (a) ***
  (b) Payment on claims of a kind specified in paragraph (1), (2), (3), (4),  (5),
(6) [or (7)], (7), or (8) of <u>section 507(a)</u> of this title, or in paragraph (2), (3),
(4), or (5) of subsection (a) of this section, shall be made pro rata among claims
of the kind specified in each such particular paragraph, except that in a case that
has been converted to this chapter under section 1009, <u>1112</u>, <u>1208</u>, or <u>1307</u> of this
title, a claim allowed under <u>section 503(b)</u> of this title incurred under this
chapter after such conversion has priority over a claim allowed under <u>section 503(b)</u>
of this title incurred under any other chapter of this title or under this chapter
before such conversion and over any expenses of a custodian superseded under section
543 of this title.

* * * * * * *

Subchapter III-Stockbroker Liquidation

<u>S 741</u>. Definitions for this subchapter

  In this subchapter-
    (1) ***

* * * * * * *

    (4) "customer property" means cash, security, or other property, and proceeds of
such cash, security, or property, received, acquired, or held by or for the account
of the debtor, from or for the securities account of a customer-

A170

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                            Page 120
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

    (A) including-
    (i) ***

                         * * * * * * *

    (iii) resources provided through the use or realization of a customer's debit
cash balance or a debit item includable in the Formula for Determination of Reserve
Requirement for Brokers and Dealers as promulgated by the Commission under the Se-
curities Exchange Act of 1934 [(15 U.S.C. 78a et seq.)]; and

                         * * * * * * *

S 742. Effect of section 362 of this title in this subchapter

   Notwithstanding section 362 of this title, SIPC may file an application for a pro-
tective decree under the Securities Investor Protection *110 Act of 1970 [15 U.S.C.
78aaa et seq.]. The filing of such application stays all proceedings in the case un-
der this title unless and until such application is dismissed. If SIPC completes the
liquidation of the debtor, then the court shall dismiss the case.

S 743. Notice

   The clerk shall give the notice required by section [342(a)] 342 of this title to
SIPC and to the Commission.

                         * * * * * * *

S 745. Treatment of accounts

    (a) ***

                         * * * * * * *

    (c) Each trustee's account specified as such on the debtor's books, and supported
by a trust deed filed with, and qualified as such by, the Internal Revenue Service,
and under the [Internal Revenue Code of 1954 (26 U.S.C. 1 et seq.)] Internal Revenue
Code of 1986, shall be treated as a separate customer account for each beneficiary
under such trustee account.

                         * * * * * * *

                Subchapter IV-Commodity Broker Liquidation

S 761. Definitions for this subchapter

   In this subchapter-
    (1) "Act" means Commodity Exchange Act [(7 U.S.C. 1 et seq.)];

                         * * * * * * *

    (5) "commodity option" means agreement or transaction subject to regulation un-
der section 4c(b) of the Act [(7 U.S.C. 6c(b))];

                         A171

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                    Page 121
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

* * * * * * *

(13) "leverage transaction" means agreement that is subject to regulation under
section 19 of the Commodity Exchange Act [(7 U.S.C. 23)], and that is commonly known
to the commodities trade as a margin account, margin contract, leverage account, or
leverage contract;

* * * * * * *

CHAPTER 11-REORGANIZATION

* * * * * * *

Subchapter I-Officers and Administration

* * * * * * *

S 1102. Creditors' and equity security holders' committees

(a)(1) [As] Except as provided in paragraph (3), as soon as practicable after the
order for relief under chapter 11 of this title, the United States trustee shall ap-
point a committee of creditors holding unsecured claims and may appoint additional
committees of *111 creditors or of equity security holders as the United States
trustee deems appropriate.

* * * * * * *

(3) On request of a party in interest in a case in which the debtor is a small
business and for cause, the court may order that a committee of creditors not be ap-
pointed.

* * * * * * *

S 1104. Appointment of trustee or examiner

(a) ***
(b) Except as provided in section 1163 of this title, on the request of a party in
interest made not later than 30 days after the court orders the appointment of a
trustee under subsection (a), the United States trustee shall convene a meeting of
creditors for the purpose of electing one disinterested person to serve as trustee
in the case. The election of a trustee shall be conducted in the manner provided in
subsections (a), (b), and (c) of section 702 of this title.
[(b)] (c) If the court does not order the appointment of a trustee under this sec-
tion, then at any time before the confirmation of a plan, on request of a party in
interest or the United States trustee, and after notice and a hearing, the court
shall order the appointment of an examiner to conduct such an investigation of the
debtor as is appropriate, including an investigation of any allegations of fraud,
dishonesty, incompetence, misconduct, mismanagement, or irregularity in the manage-
ment of the affairs of the debtor of or by current or former management of the debt-
or, if-

A172

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                          Page 122
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

   (1) ***

                          * * * * * * *

   [(c)] (d) If the court orders the appointment of a trustee or an examiner, if a
trustee or an examiner dies or resigns during the case or is removed under section
324 of this title, or if a trustee fails to qualify under section 322 of this title,
then the United States trustee, after consultation with parties in interest, shall
appoint, subject to the court's approval, one disinterested person other than the
United States trustee to serve as trustee or examiner, as the case may be, in the
case.

                          * * * * * * *

S 1106. Duties of trustee and examiner

   (a) ***
   (b) An examiner appointed under section 1104[(c)](d) of this title shall perform
the duties specified in paragraphs (3) and (4) of subsection (a) of this section,
and, except to the extent that the court orders otherwise, any other duties of the
trustee that the court orders the debtor in possession not to perform.

                          * * * * * * *

[S 1110. Aircraft equipment and vessels

   [(a) The right of a secured party with a purchase-money equipment security in-
terest in, or of a lessor or conditional vendor of, whether as trustee or otherwise,
aircraft, aircraft engines, propellers, *112 appliances, or spare parts, as defined
in section 40102(a) of title 49, or vessels of the United States, as defined in sec-
tion 30101 of title 46, that are subject to a purchase-money equipment security in-
terest granted by, leased to, or conditionally sold to, a debtor that is an air car-
rier operating under a certificate of convenience and necessity issued by the Sec-
retary of Transportation, or a water carrier that holds a certificate of public con-
venience and necessity or permit issued by the Interstate Commerce Commission, as
the case may be, to take possession of such equipment in compliance with the provi-
sions of a purchase-money equipment security agreement, lease, or conditional sale
contract, as the case may be, is not affected by section 362 or 363 of this title or
by any power of the court to enjoin such taking of possession, unless-
   [(1) before 60 days after the date of the order for relief under this chapter,
the trustee, subject to the court's approval, agrees to perform all obligations of
the debtor that become due on or after such date under such security agreement,
lease, or conditional sale contract, as the case may be; and
   [(2) any default, other than a default of a kind specified in section 365(b)(2)
of this title, under such security agreement, lease, or conditional sale contract,
as the case may be-
   [(A) that occurred before such date is cured before the expiration of such
60-day period; and
   [(B) that occurs after such date is cured before the later of-

                              A173

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 123
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

[(i) 30 days after the date of such default; and
[(ii) the expiration of such 60-day period.
[(b) The trustee and the secured party, lessor, or conditional vendor, as the case
may be, whose right to take possession is protected under subsection (a) of this
section may agree, subject to the court's approval, to extend the 60- day period
specified in subsection (a)(1) of this section.]

S 1110. Aircraft equipment and vessels

(a)(1) The right of a secured party with a security interest in equipment de-
scribed in paragraph (2) or of a lessor or conditional vendor of such equipment to
take possession of such equipment in compliance with a security agreement, lease, or
conditional sale contract is not affected by section 362, 363, or 1129 or by any
power of the court to enjoin the taking of possession unless-
(A) before the date that is 60 days after the date of the order for relief under
this chapter, the trustee, subject of the court's approval, agrees to perform all
obligations of the debtor that become due on or after the date of the order under
such security agreement, lease, or conditional sale contract; and
(B) any default, other than a default of a kind specified in section 365(b)(2),
under such security agreement, lease, or conditional sale contract-
(i) that occurs before the date of the order is cured before the expiration of
such 60-day period; and
(ii) that occurs after the date of the order is cured before the later of-
(I) the date that is 30 days after the date of the default; or
*113 (II) the expiration of such 60-day period.
(2) Equipment is described in this paragraph if it is-
(A) an aircraft, aircraft engine, propeller, appliance, or spare part (as
defined in section 40102 of title 49) that is subject to a security interest granted
by, leased to, or conditionally sold to a debtor that is a citizen of the United
States (as defined in 40102 of title 49) holding an air carrier operating certific-
ate issued by the Secretary of Transportation pursuant to chapter 447 of title 49
for aircraft capable of carrying 10 or more individuals or 6,000 pounds or more of
cargo; or
(B) a documented vessel (as defined in section 30101(1) of title 46) that is
subject to a security interest granted by, leased to, or conditionally sold to a
debtor that is a water carrier that holds a certificate of public convenience and
necessity or permit issued by the Interstate Commerce Commission.
(3) Paragraph (1) applies to a secured party, lessor, or conditional vendor acting
in its own behalf or acting as trustee or otherwise in behalf of another party.
(b) The trustee and the secured party, lessor, or conditional vendor whose right
to take possession is protected under subsection (a) may agree, subject to the
court's approval, to extend the 60-day period specified in subsection (a)(1).
(c) With respect to equipment first placed in service on or prior to the date of
enactment of this subsection, for purposes of this section-
(1) the term "lease" includes any written agreement with respect to which the
lessor and the debtor, as lessee, have expressed in the agreement or in a substan-
tially contemporaneous writing that the agreement is to be treated as a lease for
Federal income tax purposes; and

A174

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                          Page 124
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


    (2) the term "security interest" means a purchase-money equipment security in-
terest.

                          * * * * * * *


S 1112. Conversion or dismissal

    (a) ***
    (b) Except as provided in subsection (c) of this section, on request of a party in
interest or the United States trustee or bankruptcy administrator, and after notice
and a hearing, the court may convert a case under this chapter to a case under
chapter 7 of this title or may dismiss a case under this chapter, whichever is in
the best interest of creditors and the estate, for cause, including-
    (1) ***

                          * * * * * * *

                      Subchapter II-The Plan


S 1121. Who may file a plan

    (a) ***

                          * * * * * * *
    (e) In a case in which the debtor elects to be considered a small business-
    *114 (1) only the debtor may file a plan until after 100 days after the date of
the order for relief under this chapter;
    (2) all plans shall be filed within 160 days after the date of the order for re-
lief; and
    (3) on request of a party in interest made within the respective periods spe-
cified in paragraphs (1) and (2) and after notice and a hearing, the court may-
    (A) reduce the 100-day period or the 160-day period specified in paragraph  (1)
or (2) for cause; and
    (B) increase the 100-day period specified in paragraph (1) if the debtor shows
that the need for an increase is caused by circumstances for which the debtor should
not be held accountable.

                          * * * * * * *


S 1123. Contents of plan

    (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall-
    (1) designate, subject to section 1122 of this title, classes of claims, other
than claims of a kind specified in section 507(a)(1), 507(a)(2), or [507(a)(7)]
507(a)(8) of this title, and classes of interests;

                          * * * * * * *
    (b) Subject to subsection (a) of this section, a plan may-
    (1) ***
                              A175


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 125
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,    1994 U.S.C.C.A.N. 3340)

* * * * * * *

(4) provide for the sale of all or substantially all of the property of the es-
tate, and the distribution of the proceeds of such sale among holders of claims or
interests; [and]
(5) modify the rights of holders of secured claims, other than a claim secured
only by a security interest in real property that is the debtors' principal resid-
ence, or of holders of unsecured claims, or leave unaffected the rights of holder of
any class of claims; and
[(5)] (6) include any other appropriate provision not in consistent with the ap-
plicable provisions of this title.

* * * * * * *

(d) Notwithstanding subsection (a) of this section and sections 506(b),
1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a de-
fault, the amount necessary to cure the default, shall be determined in accordance
with the underlying agreement and applicable nonbankruptcy law.

S 1124. Impairment of claims or interests

Except as provided in section 1123(a)(4) of this title, a class of claims or in-
terests is impaired under a plan unless, with respect to each claim or interest of
such class, the plan-
(1) leaves unaltered the legal, equitable, and contractual rights to which such
claim or interest entitles the holder of such claim or interest; or
(2) notwithstanding any contractual provision or applicable law that entitles
the holder of such claim or interest to demand *115 or receive accelerated payment
of such claim or interest after the occurrence of a default-
(A) ***

* * * * * * *

(D) does not otherwise alter the legal, equitable, or contractual rights to
which such claim or interest entitles the holder of such claim or interest [; or
[(3) provides that, on the effective date of the plan, the holder of such claim
or interest receives, on account of such claim or interest, cash equal to-
[(A) with respect to a claim, the allowed amount of such claim; or
[(B) with respect to an interest, if applicable, the greater of-
[(i) any fixed liquidation preference to which the terms of any security rep-
resenting such interest entitle the holder of such interest; or
[(ii) any fixed price at which the debtor, under the terms of such security,
may redeem such security from such holder.].

S 1125. Postpetition disclosure and solicitation

(a) ***

* * * * * * *

(f) Notwithstanding subsection (b), in a case in which the debtor is a small busi-
ness-
(1) the court may conditionally approve a disclosure statement subject to final

A176

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 126
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

approval after notice and a hearing;
    (2) acceptances and rejections of a plan may be solicited based on a condition-
ally approved disclosure statement so long as the debtor provides adequate informa-
tion to each holder of a claim or interest that is solicited, but a conditionally
approved disclosure statement shall be mailed at least 10 days prior to the date of
the hearing on confirmation of the plan; and
    (3) a hearing on the disclosure statement may be combined with a hearing on con-
firmation of a plan.

                              *  *  *  *  *  *  *

S 1129. Confirmation of plan

    (a) The court shall confirm a plan only if all of the following requirements are
met:
    (1) ***

                              *  *  *  *  *  *  *

    (4) Any payment made or to be made by the proponent, by the debtor, or by a per-
son issuing securities or acquiring property under the plan, for services or for
costs and expenses in or in connection with the case, or in connection with the plan
and incident to the case has been approved by, or is subject to the approval of, the
court as reasonable[;].

                              *  *  *  *  *  *  *

    *116 (9) Except to the extent that the holder of a particular claim has agreed
to a different treatment of such claim, the plan provides that-
    (A) ***
    (B) with respect to a class of claims of a kind specified in section 507(a)(3),
507(a)(4), 507(a)(5) [or 507(a)(6)] , 507(a)(6), or 507(a)(7) of this title, each
holder of a claim of such class will receive-
    (i) ***

                              *  *  *  *  *  *  *

    (C) with respect to a claim of a kind specified in section [507(a)(7)]
507(a)(8) of this title, the holder of such claim will receive on account of such
claim deferred cash payments, over a period not exceeding six years after the date
of assessment of such claim, of a value, as of the effective date of the plan, equal
to the allowed amount of such claim.

                              *  *  *  *  *  *  *

    (12) All fees payable under section 1930 of title 28, as determined by the court
at the hearing on confirmation of the plan, have been paid or the plan provides for
the payment of all such fees on the effective date of the plan.

                              *  *  *  *  *  *  *

    (d) Notwithstanding any other provision of this section, on request of a party in
interest that is a governmental unit, the court may not confirm a plan if the prin-
cipal purpose of the plan is the avoidance of taxes or the avoidance of the applica-

                                    A177

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                              Page 127
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

tion of section 5 of the Securities Act of 1933 [(15 U.S.C. 77e)]. In any hearing
under this subsection, the governmental unit has the burden of proof on the issue of
avoidance.

\* \* \* \* \* \* \*

Subchapter III-Postconfirmation Matters

\* \* \* \* \* \* \* \*

S 1145. Exemption from securities laws

   (a) Except with respect to an entity that is an underwriter as defined in subsec-
tion (b) of this section, section 5 of the Securities Act of 1933 [(15 U.S.C. 77e)]
and any State or local law requiring registration for offer or sale of a security or
registration or licensing of an issuer of, underwriter of, or broker or dealer in, a
security [does] do not apply to-
      (1) \*\*\*

\* \* \* \* \* \* \*

      (3) the offer or sale, other than under a plan, of a security of an issuer other
than the debtor or an affiliate, if-
      (A) such security was owned by the debtor on the date of the filing of the peti-
tion;
      (B) the issuer of such security is-
      \*117 (i) required to file reports under section 13 or 15(d) of the Securities
Exchange Act of 1934 [(15 U.S.C. 78m or 78o(d))]; and

\* \* \* \* \* \* \*

   (b)(1) Except as provided in paragraph (2) of this subsection and except with re-
spect to ordinary trading transactions of an entity that is not an issuer, an entity
is an underwriter under section 2(11) of the Securities Act of 1933 [(15 U.S.C.
77b(11))], if such entity-
      (A) \*\*\*

\* \* \* \* \* \* \*

   (d) The Trust Indenture Act of 1939 [(15 U.S.C. 77aaa et seq.)] does not apply to
a note issued under the plan that matures not later than one year after the effect-
ive date of the plan.

\* \* \* \* \* \* \*

Subchapter IV-Railroad Reorganization

\* \* \* \* \* \* \*

S 1166. Effect of subtitle IV of title 49 and of Federal, State, or local regula-
tions

A178

® 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                          Page 128
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

   Except with respect to abandonment under section 1170 of this title, or merger,
modification of the financial structure of the debtor, or issuance or sale of secur-
ities under a plan, the trustee and the debtor are subject to the provisions of sub-
title IV of title 49 that are applicable to railroads, and the trustee is subject to
orders of any Federal, State, or local regulatory body to the same extent as the
debtor would be if a petition commencing the case under this chapter had not been
filed, but-
     (1) ***
     (2) the provisions of this chapter are subject to section 601(b) of the Regional
Rail Reorganization Act of 1973 [(45 U.S.C. 791(b))].

S 1167. Collective bargaining agreements

   Notwithstanding section 365 of this title, neither the court nor the trustee may
change the wages or working conditions of employees of the debtor established by a
collective bargaining agreement that is subject to the Railway Labor Act [(45 U.S.C.
151 et seq.)] except in accordance with section 6 of such Act [(45 U.S.C. 156)].

[S 1168. Rolling stock equipment

   [(a) The right of a secured party with a purchase-money equipment security in-
terest in, or of a lessor or conditional vendor of, whether as trustee or otherwise,
rolling stock equipment or accessories used on such equipment, including superstruc-
tures and racks, that are subject to a purchase-money equipment security interest
granted by, leased to, or conditionally sold to, the debtor to take possession of
such equipment in compliance with the provisions of a purchase-money equipment se-
curity agreement, lease, or conditional sale contract, as the case may be, is not
affected by *118section 362 or 363 of this title or by any power of the court to
enjoin such taking of possession, unless-
     [(1) before 60 days after the date of the commencement of a case under this
chapter, the trustee, subject to the court's approval, agrees to perform all obliga-
tions of the debtor under such security agreement, lease, or conditional sale con-
tract, as the case may be; and
     [(2) any default, other than a default of a kind specified in section 365(b)(2)
of this title, under such security agreement, lease, or conditional sale contract,
as the case may be-
     [(A) that occurred before such date and is an event of default therewith is
cured before the expiration of such 60-day period; and
     [(B) that occurs or becomes an event of default after such date is cured before
the later of-
     [(i) 30 days after the date of such default or event of default; and
     [(ii) the expiration of such 60-day period.
   [(b) The trustee and the secured party, lessor, or conditional vendor, as the case
may be, whose right to take possession is protected under subsection (a) of this
section, may agree, subject to the court's approval, to extend the 60- day period
specified in subsection (a)(1) of this section.]

S 1168. Rolling stock equipment

                              A179

® 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                      Page 129
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

(a)(1) The right of a secured party with a security interest in or of a lessor or
conditional vendor of equipment described in paragraph (2) to take possession of
such equipment in compliance with an equipment security agreement, lease, or condi-
tional sale contract is not affected by <u>section 362</u>, <u>363</u>, or <u>1129</u> or by any power of
the court to enjoin the taking of possession, unless-
    (A) before the date that is 60 days after the date of commencement of a case un-
der this chapter, the trustee, subject to the court's approval, agrees to perform
all obligations of the debtor that become due on or after the date of commencement
of the case under such security agreement, lease, or conditional sale contract; and
    (B) any default, other than a default of a kind described in <u>section 365(b)(2)</u>,
under such security agreement, lease, or conditional sale contract-
    (i) that occurs before the date of commencement of the case and is an event of
default therewith is cured before the expiration of such 60-day period; and
    (ii) that occurs or becomes an event of default after the date of commencement
of the case is cured before the later of-
    (I) the date that is 30 days after the date of the default or event of default;
or
    (II) the expiration of such 60-day period.
(2) Equipment is described in this paragraph if it is rolling stock equipment or
accessories used on such equipment, including superstructures and racks, that is
subject to a security interest granted by, leased to, or conditionally sold to the
debtor.
    *119 (3) Paragraph (1) applies to a secured party, lessor, or conditional vendor
acting in its own behalf or acting as trustee or otherwise in behalf of another
party.
    (b) The trustee and the secured party, lessor, or conditional vendor whose right
to take possession is protected under subsection (a) may agree, subject to the
court's approval, to extend the 60-day period specified in subsection (a)(1).
    (c) With respect to equipment first placed in service on or prior to the date of
enactment of this subsection, for purposes of this section-
    (1) the term "lease" includes any written agreement with respect to which the
lessor and the debtor, as lessee, have expressed in the agreement or in a substan-
tially contemporaneous writing that the  agreement is to be treated as a lease for
Federal income tax purposes; and
    (2) the term "security interest" means a purchase-money equipment security in-
terest.
    (d) With respect to equipment first placed in service after the date of enactment
of this subsection, for purposes of this section, the term "rolling stock equipment"
includes rolling stock equipment that is substantially rebuilt and accessories used
on such equipment.

                        * * * * * * *

CHAPTER 12-ADJUSTMENT OF DEBTS OF A FAMILY FARMER WITH REGULAR ANNUAL INCOME

                        * * * * * * *

                              A180

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                    Page 130
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


                        Subchapter II-The Plan

                        * * * * * * *


S 1222. Contents of plan

   (a) ***

                        * * * * * * *

   (d) Notwithstanding subsection (b)(2) of this section and sections 506(b) and
1225(a)(5) of this title, if it is proposed in a plan to cure a default, the amount
necessary to cure the default, shall be determined in accordance with the underlying
agreement and applicable nonbankruptcy law.

                        * * * * * * *


S 1226. Payments

   (a) ***
   (b) Before or at the time of each payment to creditors under the plan, there shall
be paid-
      (1) any unpaid claim of the kind specified in section 507(a)(1) of this title;
and
      (2) if a standing trustee appointed under section [1202(d)] 1202(c) of this
title is serving in the case, the percentage fee fixed for such standing trustee un-
der section [1202(e)] 1202(d) of this title.

                        * * * * * * *

   *120 CHAPTER 13-ADJUSTMENT OF DEBTS OF AN INDIVIDUAL WITH REGULAR INCOME

                        * * * * * * *

            Subchapter I-Officers, Administration, and the Estate

                        * * * * * * *


S 1302. Trustee

   (a) ***
   (b) The trustee shall-
      (1) ***

                        * * * * * * *

      (3) dispose of, under regulations issued by the Director of the Administrative
Office of the United States Courts, moneys received or to be received in a case un-
der chapter XIII of the Bankruptcy Act; [and]

                        * * * * * * *

                             A181


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                        Page 131
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


                        Subchapter II-The Plan

                        * * * * * * *

S 1322. Contents of plan

   (a) ***

                        * * * * * * *
   (c) Notwithstanding subsection (b)(2) and applicable non- bankruptcy law-
     (1) a default with respect to, or that gave rise to, a lien on the debtor's
principal residence may be cured under paragraph (3) or (5) of subsection (b) until
such residence is sold at a foreclosure sale that is conducted in accordance with
applicable nonbankruptcy law; and
     (2) in a case in which the last payment on the original payment schedule for a
claim secured only by a security interest in real property that is the debtor's
principal residence is due before the date on which the final payment under the plan
is due, the plan may provide for the payment of the claim as modified pursuant to
1325(a)(5).
   [(c)] (d) The plan may not provide for payments over a period that is longer than
three years, unless the court, for cause, approves a longer period, but the court
may not approve a period that is longer than five years.
   (e) Notwithstanding subsection (b)(2) of this section and sections 506(b) and
1325(a)(5) of this title, if it is proposed in a plan to cure a default, the amount
necessary to cure the default, shall be determined in accordance with the underlying
agreement and applicable nonbankruptcy law.

                        * * * * * * *

S 1326. Payments

   (a)(1) ***
   *121 (2) A payment made under this subsection shall be retained by the trustee un-
til confirmation or denial of confirmation of a plan. If a plan is confirmed, the
trustee shall distribute any such payment in accordance with the plan[.] as soon as
practicable.

                        * * * * * * *

S 1328. Discharge

   (a) As soon as practicable after completion by the debtor of all payments under
the plan, unless the court approves a written waiver of discharge executed by the
debtor after the order for relief under this chapter, the court shall grant the
debtor a discharge of all debts provided for by the plan or disallowed under section
502 of this title, except any debt-
     (1) provided for under section 1322(b)(5) of this title;
     (2) of the kind specified in paragraph [(5) or (8)] (5), (8), or (9) of  section
                        A182

523(a) or 523(a)(9) of this title; or
    [(3) for restitution included in a sentence on the debtor's conviction of a
crime.]

    (3) for restitution, or a fine (other than a fine imposed under subchapter C of
chapter 227 of title 18 of the United States Code) to the extent such fine exceeds
$500,  included in a sentence on the debtor's conviction of a crime.

                              * * * * * * *

                      TITLE 28, UNITED STATES CODE

                   PART I-ORGANIZATION OF COURTS

                              * * * * * * *

                     CHAPTER 6-BANKRUPTCY JUDGES

                              * * * * * * *

S 157. Procedures

    (a) ***

                              * * * * * * *

    (c)(1) ***

                              * * * * * * *

    (3) If the right to a jury trial applies in a proceeding that may be heard under
paragraph (1) or (2) of this subsection by a bankruptcy judge, the bankruptcy judge
may conduct the jury trial if specially designated to exercise such jurisdiction by
the district and with the consent of all the parties.

                              * * * * * * *

S 158. Appeals

    (a) The district courts of the United States shall have jurisdiction to hear ap-
peals [from final judgments, orders, and decrees,]
    (1) from final judgments, orders, and decrees;
    *122 (2) from interlocutory orders and decrees issued under section 1121(d) of
title 11 increasing or reducing the time periods referred to in section 1121 of such
title; and
    (3) with leave of the court, from other interlocutory orders and decrees;
    and, with leave of the court, from interlocutory orders and decrees, of bank-
ruptcy judges entered in cases and proceedings referred to the bankruptcy judges un-
der section 157 of this title. An appeal under this subsection shall be taken only
to the district court for the judicial district in which the bankruptcy judge is
serving.
    (b)[(1) The judicial council of a circuit may establish a bankruptcy appellate

                                     A183

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

panel, comprised of bankruptcy judges from districts within the circuit, to hear and
determine, upon the consent of all the parties, appeals under subsection (a) of this
section.] (1) The judicial council of a circuit shall establish a bankruptcy appel-
late panel service composed of bankruptcy judges of the districts in the circuit who
are appointed by the judicial council in accordance with paragraph (3), to hear and
determine, with the consent of all the parties, appeals under subsection (a) unless
the judicial council finds that-

    (A) there are insufficient judicial resources available in the circuit; or
    (B) establishment of such service would result in undue delay or increased cost
to parties in cases under <u>title 11</u>.

    Not later than 90 days after making the finding, the judicial council shall sub-
mit to the Judicial Conference of the United States a report containing the factual
basis of such finding.

    (2)(A) A judicial council may reconsider, at any time, the finding described in
paragraph (1).

    (B) On the request of a majority of the district judges in a circuit for which a
bankruptcy appellate panel service is established under paragraph (1), made after
the expiration of the 1-year period beginning on the date such service is estab-
lished, the judicial council of the circuit shall determine whether a circumstance
specified in subparagraph (A) or (B) of such paragraph exists.

    (C) On its own motion, after the expiration of the 3-year period beginning on the
date a bankruptcy appellate panel service is established under paragraph (1), the
judicial council of the circuit may determine whether a circumstance specified in
subparagraph (A) or (B) of such paragraph exists.

    (D) If the judicial council finds that either of such circumstances exists, the
judicial council may provide for the completion of the appeals then pending before
such service and the orderly termination of such service.

    (3) Bankruptcy judges appointed under paragraph (1) shall be appointed and may be
reappointed under such paragraph.

    [(2)] (4) If authorized by the Judicial Conference of the United States, the judi-
cial councils of 2 or more circuits may establish a joint bankruptcy appellate panel
comprised of bankruptcy judges from the districts within the circuits for which such
panel is established, to hear and determine, upon the consent of all the parties,
appeals under subsection (a) of this section.

    *123 [(3) No appeal may be referred to a panel under this subsection unless the
district judges for the district, by majority vote, authorize such referral of ap-
peals originating within the district.

    [(4) A panel established under this section shall consist of three bankruptcy
judges, provided a bankruptcy judge may not hear an appeal originating within a dis-
trict for which the judge is appointed or designated under section 152 of this
title.]

    (5) An appeal to be heard under this subsection shall be heard by a panel of 3
members of the bankruptcy appellate panel service, except that a member of such ser-
vice may not hear an appeal originating in the district for which such member is ap-
pointed or designated under section 152 of this title.

    (6) Appeals may not be heard under this subsection by a panel of the bankruptcy
appellate panel service unless the district judges for the district in which the ap-

A184

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

peals occur, by majority vote, have authorized such service to hear and determine
appeals originating in such district.
  (c)(1) Subject to subsection (b), each appeal under subsection (a) shall be heard
by a 3-judge panel of the bankruptcy appellate panel service established under sub-
section (b)(1) unless-
    (A) the appellant elects at the time of filing the appeal; or
    (B) any other party elects, not later than 30 days after service of notice of
the appeal;
  to have such appeal heard by the district court.
  [(c)] (2) An appeal under subsections (a) and (b) of this section shall be taken
in the same manner as appeals in civil proceedings generally are taken to the courts
of appeals from the district courts and in the time provided by Rule 8002 of the
Bankruptcy Rules.

                        CHAPTER 39-UNITED STATES TRUSTEES


                              *  *  *  *  *  *  *


S 586. Duties; supervision by Attorney General

  (a) Each United States trustee, within the region for which such United States
trustee is appointed, shall-
    (1) ***

                              *  *  *  *  *  *  *
    (3) supervise the administration of cases and trustees in cases under  chapter
7, 11, 12, or 13 of title 11, by whenever the United States trustee considers it to,
be appropriate-
    [(A) monitoring applications for compensation and reimbursement filed under sec-
tion 330 of title 11 and, whenever the United States trustee deems it to be appro-
priate, filing with the court comments with respect to any of such applications;]
    (A)(i) reviewing, in accordance with procedural guidelines adopted by the Exec-
utive Office of the United States Trustee (which guidelines shall be applied uni-
formly by the United States trustee except when circumstances warrant different
treatment), applications filed for compensation and reimbursement under section 330
of title 11; and
    *124 (ii) filing with the court comments with respect to such application and,
if the United States Trustee considers it to be appropriate, objections to such ap-
plication.

                              *  *  *  *  *  *  *


                      PART IV-JURISDICTION AND VENUE


                              *  *  *  *  *  *  *


                  CHAPTER 85-DISTRICT COURTS; JURISDICTION


                                A185


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 135
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)


                            * * * * * * *


<u>S 1334</u>. Bankruptcy cases and proceedings

  (a) ***

                            * * * * * * *

  (c)(1) ***
  (2) Upon timely motion of a party in a proceeding based upon a State law claim or
State law cause of action, related to a case under title 11 but not arising under
title 11 or arising in a case under title 11, with respect to which an action could
not have been commenced in a court of the United States absent jurisdiction under
this section, the district court shall abstain from hearing such proceeding if an
action is commenced, and can be timely adjudicated, in a State forum of appropriate
jurisdiction.
  [Any] (d) Any decision to abstain or not to abstain made under this subsection
(other than a decision not to abstain in a proceeding described in subsection
(c)(2)) is not reviewable by appeal or otherwise by the court of appeals under <u>sec-</u>
<u>tion 158(d)</u>, <u>1291</u>, or <u>1292</u> of this title or by the Supreme Court of the United
States under section 1254 of this title. This subsection shall not be construed to
limit the applicability of the stay provided for by <u>section 362 of title 11, United</u>
<u>States Code</u>, as such section applies to an action affecting the property of the es-
tate in bankruptcy.
  [(d)] (e) The district court in which a case under <u>title 11</u> is commenced or is
pending shall have exclusive jurisdiction of all the property, wherever located, of
the debtor as of the commencement of such case, and of property of the estate.

                            * * * * * * *

                        PART V-PROCEDURE

                            * * * * * * *

                    CHAPTER 131-RULES OF COURTS

                            * * * * * * *


<u>S 2073</u>. Rules of procedure and evidence; method of prescribing

  (a)(1) The Judicial Conference shall prescribe and publish the procedures for the
consideration of proposed rules under this section.
  *125 (2) The Judicial Conference may authorize the appointment of committees to
assist the Conference by recommending rules to be prescribed under [section 2072]
<u>sections 2072</u> and <u>2075</u> of this title. Each such committee shall consist of members
of the bench and the professional bar, and trial and appellate judges.

                            * * * * * * *
  (d) In making a recommendation under this section or under <u>section 2072</u> or <u>2075</u>,

                                A186

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                                    Page 136
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835, 1994 U.S.C.C.A.N. 3340)

the body making that recommendation shall provide a proposed rule, an explanatory
note on the rule, and a written report explaining the body's action, including any
minority or other separate views.
   (e) Failure to comply with this section does not invalidate a rule prescribed un-
der section 2072 or 2075 of this title.

                              * * * * * * *

S 2075. Bankruptcy rules

   The Supreme Court shall have the power to prescribe by general rules, the forms of
process, writs, pleadings, and motions, and the practice and procedure in cases un-
der title 11.
   Such rules shall not abridge, enlarge, or modify any substantive right.
   Such rules shall not take effect until they have been reported to Congress by the
Chief Justice at or after the beginning of a regular session thereof but not later
than the first day of May and until the expiration of [ninety] 180 days after they
have been thus reported.

                              * * * * * * *

        RULE 7004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Rule 7004. Process; Service of Summons, Complaint

   (a) ***
   (b) Service by First Class Mail.-[In addition] Except as provided in subdivision
(h), in addition to the methods of service authorized by Rule 4(c)(2)(C)(i) and (d)
F.R.Civ.P., service may be made within the United States by first class mail postage
prepaid as follows:
   (1) ***

                              * * * * * * *

   (h) Service of Process on an Insured Depository Institution.-Service on an insured
depository institution (as defined in section 3 of the Federal Deposit Insurance Act
(12 U.S.C. 1813)) in a contested matter or adversary proceeding shall be made by
certified mail addressed to an officer of the institution unless-
   (1) the institution has appeared by its attorney, in which case the attorney
shall be served by first class mail;
   (2) the court orders otherwise after service upon the institution by certified
mail of notice of an application to permit service on the institution by first class
mail sent to an officer of the institution designated by the institution; or
   *126 (3) the institution has waived in writing its entitlement to service by
certified mail by designating an officer to receive service.

                      TITLE 18, UNITED STATES CODE

                          PART I-CRIMES

                              A187

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

* * * * * * *

CHAPTER 9-BANKRUPTCY


Sec.
151. Definition.

* * * * * * *

(153. Embezzlement by trustee or officer.)
Sec. 153. Embezzlement against estate.

* * * * * * *

Sec. 156. Knowing disregard of bankruptcy law or rule.
Sec. 157. Bankruptcy fraud.


[S 152. Concealment of assets; false oaths and claims; bribery

  [Whoever knowingly and fraudulently conceals from a custodian, trustee, marshal,
or other officer of the court charged with the control or custody of property, or
from creditors in any case under title 11, any property belonging to the estate of a
debtor; or
  [Whoever knowingly and fraudulently makes a false oath or account in or in rela-
tion to any case under title 11; or
  [Whoever knowingly and fraudulently makes a false declaration, certificate, veri-
fication, or statement under penalty of perjury as permitted under section 1746 of
title 28, United States Code, in or in relation to any case under title 11; or
  [Whoever knowingly and fraudulently presents any false claim for proof against the
estate of a debtor, or uses any such claim in any case under title 11, personally,
or by agent, proxy, or attorney, or as agent, proxy, or attorney; or
  [Whoever knowingly and fraudulently received any material amount of property from
a debtor after the filing of a case under title 11, with intent to defeat the provi-
sions of title 11; or
  [Whoever knowingly and fraudulently gives, offers, receives or attempts to obtain
any money or property, remuneration, compensation, reward, advantage, or promise
thereof, for acting or for-bearing to act in any case under title 11; or
  [Whoever, either individually or as an agent or officer of any person or corpora-
tion, in contemplation of a case under title 11 by or against him or any other per-
son or corporation, or with intent to defeat the provisions of title 11, knowingly
and fraudulently transfers or conceals any of his property or the property of such
other person or corporation; or
  [Whoever, after the filing of a case under title 11 or in contemplation thereof,
knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a
false entry in any recorded information, including books, documents, records, and
papers, relating to the property or financial affairs of a debtor; or

A188

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   *127 [Whoever, after the filing of a case under title 11, knowingly and fraudu-
lently withholds from a custodian, trustee, marshal, or other officer of the court
entitled to its possession, any recorded information, including books, documents,
records, and papers, relating to the property or financial affairs of a debtor.
   [Shall be fined not more than $5,000 or imprisoned not more than five years, or
both.

[S 153. Embezzlement by trustee or officer

   [Whoever knowingly and fraudulently appropriates to his own use, embezzles,
spends, or transfers and property or secretes or destroys any document belonging to
the estate of a debtor which came into his charge as trustee, custodian, marshal, or
other officer of the court, shall be fined not more than $5,000 or imprisoned not
more than five years, or both.

[S 154. Adverse interest and conduct of officers

   [Whoever, being a custodian, trustee, marshal, or other officer of the court,
knowingly purchases, directly or indirectly, any property of the estate of which he
is such officer in a case under title 11; or
   [Whoever being such officer, knowingly refuses to permit a reasonable opportunity
for the inspection of the documents and accounts relating to the affairs of estates
in his charge by parties in interest when directed by the court to do so-
   [Shall be fined not more than $500, and shall forfeit his office, which shall
thereupon become vacant.]

S 152. Concealment of assets; false oaths and claims; bribery

   A person who-
      (1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or
other officer of the court charged with the control or custody of property, or, in
connection with a case under title 11, from creditors or the United States Trustee,
any property belonging to the estate of a debtor;
      (2) knowingly and fraudulently makes a false oath or account in or in relation
to any case under title 11;
      (3) knowingly and fraudulently makes a false declaration, certificate, verifica-
tion, or statement under penalty or perjury as permitted under section 1746 of title
28, in or in relation to any case under title 11;
      (4) knowingly and fraudulently presents any false claim for proof against the
estate of a debtor, or uses any such claim in any case under title 11, in a personal
capacity or as or through an agent, proxy, or attorney;
      (5) knowingly and fraudulently receives any material amount of property from a
debtor after the filing of a case under title 11, with intent to defeat the provi-
sions of title 11;
      (6) knowingly and fraudulently gives, offers, receives, or attempts to obtain
any money or property, remuneration, compensation, reward, advantage, or promise
thereof for acting or forbearing to act in any case under title 11;
      (7) in a personal capacity or as an agent or officer of any person or corpora-
tion, in contemplation of a case under title 11 by *128 or against the person or any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other person or corporation, or with intent to defeat the provisions of title 11,
knowingly and fraudulently transfers or conceals any of his property or the property
of such other person or corporation;

(8) after the filing of a case under title 11 or in contemplation thereof, know-
ingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false
entry in any recorded information (including books documents, records, and papers)
relating to the property or financial affairs of a debtor; or

(9) after the filing of a case under title 11, knowingly and fraudulently with-
holds from a custodian, trustee, marshal, or other officer of the court or a United
States Trustee entitled to its possession, any recorded information (including
books, documents, records, and papers) relating to the property or financial affairs
of a debtor,

shall be fined not more than $5,000, imprisoned not more than 5 years, or both.

S 153. Embezzlement against estate

(a) Offense.-A person described in subsection (b) who knowingly and fraudulently
appropriates to the person's own use, embezzles, spends, or transfer any property or
secretes or destroys any document belonging to the estate of a debtor shall be fined
not more than $5,000, imprisoned not more than 5 years, or both.

(b) Person to Whom Section Applies.-A person described in this subsection is one
who has access to property or documents belonging to an estate by virtue of the per-
son's participation in the administration of the estate as a trustee, custodian,
marshal, attorney, or other officer of the court or as an agent, employee, or other
person engaged by such an officer to perform a service with respect to the estate.

S 154. Adverse interest and conduct of officers

A person who, being a custodian, trustee, marshal, or other officer of the court-
(1) knowingly purchases, directly or indirectly, any property of the estate of
which the person is such an officer in a case under title 11;

(2) knowingly refuses to permit a reasonable opportunity for the inspection by
parties in interest of the documents and accounts relating to the affairs of estates
in the person's charge by parties when directed by the court to do so; or

(3) knowingly refuses to permit a reasonable opportunity for the inspection by
the United States Trustee of the documents and accounts relating to the affairs of
an estate in the person's charge,

shall be fined not more than $5,000 and shall forfeit the person's office, which
shall thereupon become vacant.

* * * * * * *

S 156. Knowing disregard of bankruptcy law or rule

(a) Definitions.-In this section-
*129 "bankruptcy petition preparer means a person, other than the debtor's at-
torney or an employee of such an attorney, who prepares for compensation a document
for filing.

"document for filing" means a petition or any other document prepared for filing

A190

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by a debtor in a United States bankruptcy court or a United States district court in
connection with a case under this title.

(b) Offense.-If a bankruptcy case or related proceeding is dismissed because of a
knowing attempt by a bankruptcy petition preparer in any manner to disregard the re-
quirements of title 11, United States Code, or the Federal Rules of Bankruptcy Pro-
cedure, the bankruptcy petition preparer shall be fined under this title, imprisoned
not more than 1 year, or both.

S 157. Bankruptcy fraud

(a) Offense.-A person who, having devised or intending to devise a scheme or arti-
fice to defraud and for the purpose of executing or concealing such a scheme or ar-
tifice or attempting to do so-

(1) files a petition under title 11;

(2) files a document in a proceeding under title 11; or

(3) makes a false or fraudulent representation, claim, or promise concerning or
in relation to a proceeding under title 11, at anytime before or after the filing of
the petition, or in relation to a proceeding falsely asserted to be pending under
such title,

shall be fined under this title, imprisoned not more than 5 years, or both.

(b) Requirement of Intent.-

(1) In general.-The degree of intent required to be shown in the case of an of-
fense described in subsection (a) is that which is generally required to be shown in
cases of fraud.

(2) Violation not established.-A violation of subsection (a) is not established
if the defendant committed the act that is alleged to constitute fraud for a lawful
purpose.

(3) Violation established.-A violation of subsection (a) may be established if
the defendant committed the act that is alleged to constitute fraud with a purpose
of-

(A) preventing the proper application of title 11 in a particular case; or

(B) using a proceeding under title 11 in a manner that, while on its face may
appear to be legitimate, is in fact part of a scheme to defraud.

* * * * * * *

CHAPTER 96-RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

* * * * * * *

S 1961. Definitions

As used in this chapter-

(1) "racketeering activity" means (A) any act or threat involving murder, kid-
naping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or
dealing in narcotic or other dangerous drugs, which is chargeable under State law
*130 and punishable by imprisonment for more than one year; (B) any act which is in-
dictable under any of the following provisions of title 18, United States Code: Sec-

A191

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion 201 (relating to bribery), section 224 (relating to sports bribery), sections
471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from
interstate shipment) if the act indictable under section 659 is felonious, section
664 (relating to embezzlement from pension and welfare funds), sections 891-894
(relating to extortionate credit transactions), section 1029 (relating to fraud and
related activity in connection with access devices), section 1084 (relating to the
transmission of gambling information), section 1341 (relating to mail fraud), sec-
tion 1343 (relating to wire fraud), section 1344 (relating to financial institution
fraud), sections 1461-1465 (relating to obscene matter), section 1503 (relating to
obstruction of justice), section 1510 (relating to obstruction of criminal investig-
ations), section 1511 (relating to the obstruction of State or local law enforce-
ment), section 1512 (relating to tampering with a witness, victim, or an informant),
section 1513 (relating to retaliating against a witness, victim, or an informant),
section 1951 (relating to interference with commerce, robbery, or extortion), sec-
tion 1952 (relating to racketeering), section 1953 (relating to interstate trans-
portation of wagering paraphernalia), section 1954 (relating to unlawful welfare
fund payments), section 1955 (relating to the prohibition of illegal gambling busi-
nesses), section 1956 (relating to the laundering of monetary instruments), section
1957 (relating to engaging in monetary transactions in property derived from spe-
cified unlawful activity), section 1958 (relating to use of interstate commerce fa-
cilities in the commission of murder-for-hire), sections 2251-2252 (relating to
sexual exploitation of children), sections 2312 and 2313 (relating to interstate
transportation of stolen motor vehicles), sections 2314 and 2315 (relating to inter-
state transportation of stolen property), section 2321 (relating to trafficking in
certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to
trafficking in contraband cigarettes), sections 2421-24 (relating to white slave
traffic), (C) any act which is indictable under title 29, United States Code, sec-
tion 186 (dealing with restrictions on payments and loans to labor organizations) or
section 501(c) (relating to embezzlement from union funds), (D) any offense in-
volving fraud connected with a case under title 11, (except a case under section 157
of that title) fraud in the sale of securities, or the felonious manufacture, im-
portation, receiving, concealment, buying, selling, or otherwise dealing in narcotic
or other dangerous drugs, punishable under any law of the United States, or (E) any
act which is indictable under the Currency and Foreign Transactions Reporting Act.

\* \* \* \* \* \* \*

*131 SECTION 207 OF THE FEDERAL CREDIT UNION ACT

PAYMENT OF INSURANCE

Sec. 207. (a) \*\*\*

\* \* \* \* \* \* \*

(c) Provisions Relating to Contracts Entered Into Before Appointment of Conservat-
or or Liquidating Agent.-
    (1) \*\*\*

A192

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835                                    Page 142
H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)

                        * * * * * * *
    (8) Certain qualified financial contracts.-
    (A) ***

                        * * * * * * *
    (D) Certain contracts and agreements defined.-For purposes of this subsection-
    (i) ***
    (ii) Securities contract.-The term "securities contract"-
    (I) has the meaning given to such term in section 741[(7)] of title 11, United
States Code, except that the term "security" (as used in such section) shall be
deemed to include any mortgage loan, any mortgage-related security (as defined in
section 3(a)(41) of the Securities Exchange Act of 1934, and any interest in any
mortgage loan or mortgagee-related security; and

                        * * * * * * *
    (iii) Forward contract.-The term "forward contract" has the meaning given to
such term in section 101[(24)] of title 11, United States Code.
    (iv) Repurchase agreement.-The term "repurchase agreement"-
    (I) has the meaning given to such term in section 101[(41)] of title 11, the
United States Code, except that the items (as described in such section) which may
be subject to any such agreement shall be deemed to include mortgage-related secur-
ities (as such term is defined in section 3(a)(41) of the Securities Exchange Act of
1934, any mortgage loan, and any interest in any mortgage loan; and

                        * * * * * * *
    (v) Transfer.-The term "transfer" has the meaning given to such term in section
101[(50)] of title 11, United States Code.

                        * * * * * * *

            SECTION 11 OF THE FEDERAL DEPOSIT INSURANCE ACT

    Sec. 11. (a) ***

                        * * * * * * *
    *132 (e) Provisions Relating to Contracts Entered Into Before Appointment of Con-
servator or Receiver.-
    (1) ***

                        * * * * * * *
    (8) Certain qualified financial contracts.-
    (A) ***

                        * * * * * * *
    (D) Certain contracts and agreements defined.-For purposes of this subsection-
    (i) ***
    (ii) Securities contract.-The term "securities contract"-
    (I) has the meaning given to such term in section 741[(7)] of title 11, United
States Code, except that the term "security" (as used in such section) shall be

                            A193

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deemed to include any mortgage loan, any mortgage-related security (as defined in
section 3(a)(41) of the Securities Exchange Act of 1934), and any interest in any
mortgage loan or mortgage-related security; and

                              * * * * * * *

    (iii) Commodity contract.-The term "commodity contract" has the meaning given
to such term in section 761 [(4)] of title 11, United States Code.
    (iv) Forward contract.-The term "forward contract" has the meaning given to
such term in section 101[(24)] of title 11, United States Code.
    (v) Repurchase agreement.-The term "repurchase agreement"-
    (I) has the meaning given to such term in section 101[(41)] of title 11, the
United States Code, except that the items (as described in such section) which may
be subject to any such agreement shall be deemed to include mortgage-related secur-
ities (as such term is defined in section 3(a)(41) of the Securities Exchange Act of
1934, any mortgage loan, and any interest in any mortgage loan; and

                              * * * * * * *

    (viii) Transfer.-The term "transfer" has the meaning given to such term in sec-
tion 101[(50)] of title 11, United States Code.

                              * * * * * * *

    FN1 See, e.g., In re ML Barge Pool, 98 B.R. 957 (Bankr. E.D. Mo. 1989);  In re Bo-
gosian, 112 B.R. 2 (Bankr. D.R.I. 1990).

    FN2 See e.g., "When Firms Go Bust," The Economist, August 1, 1992.

    FN3 See In re Richardson, 102 B.R. 254 (Bankr. M.D. Fla. 1989); In re Churchill,
89 B.R. 878 (Bankr. D. Colo. 1988); In re James, 120 B.R. 582 (Bankr. W.D. Okla.
1990) (cases holding reaffirmation hearing is required); In re Carey, 51 B.R. 294
(Bankr. D.D.C. 1985); In re Reidenbach, 59 B.R. 248 (Bankr. N.D. Ohio 1986); In re
Pendlebury, 94 B.R. 120 (Bankr. E.D. Tenn. 1988) (cases holding reaffirmation hear-
ing is not required).

    FN4 See Am. Bankr. Inst., American Bankruptcy Institute National Report on Profes-
sional Compensation in Bankruptcy Cases (G.R. Warner rept. 1991).

    FN5 See, e.g., CNBC/FNN matter, FTC File No. 911-0067.

    FN6 See e.g., In re Lyons Machinery Co., Inc., 28 B.R. 600 (Bankr. E.D. Ark.
1983); In re Mason's Nursing Center, Inc., 73 B.R. 360 (Bankr. S.D. Fla. 1987)
(cases prohibiting reimbursement); In re J.E. Jennings, Inc., 96 B.R. 500 (Bankr.
E.D. Pa. 1989); In re Aviation Technical Support, Inc., 72 B.R. 32 (Bankr. W.D. Tex.
1987) (cases permitting reimbursement).

    FN7 Kane v. Johns-Manville Corp., 843 F.2d 636, 639 (2d Cir. 1988).

    FN8 Kane v. Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd in
part, rev'd in part, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, 843 F.2d 636 (2d Cir.
1988).

                                    A194

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN9 See Official Committee of Unsecured Creditors v. Schwartzman (In re Stansbury Poplar Place, Inc.), 13 F.3d 122 (4th Cir. 1993); In re Grabill Corp., 987 F.2d 1153, reh'g en banc denied, 976 F.2d 1126 (7th Cir. 1992); Rafoth v. National Union Fire Insurance Co. (In re Baker & Getty Financial Services Inc., 954 F.2d 1169 (6th Cir. 1992); Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp., 911 F.2d 380 (10th Cir. 1990); In re United Missouri Bank of Kansas City, N.A., 901 F.2d 1449 (8th Cir. 1990).

FN10 See In re Ben Cooper, Inc., 896 F.2d 1394 (2d Cir. 1990).

FN11 See Levit v. Ingersoll Rand Financial Corp. (In re V.N. DePrizio Construction Co.), 874 F.2d 1186 (7th Cir. 1989); Ray v. City Bank & Trust Co. (In re C&L Cartage Co.), 899 F.2d 1490 (6th Cir. 1990); Manufacturers Hanover Leasing Corp. v. Lowrey (In re Robinson Brothers Drilling), 892 F.2d 850 (10th Cir. 1989).

FN12 See In re Carlton Restaurant, Inc., 151 B.R. 353 (Bankr. E.D. Pa. 1993) (preventing a tenant from assigning the lease); Home Express, Inc. v. Arden Associates, Ltd. (In re Arden and Howe Associates, Ltd.), 152 B.R. 971 (Bankr. E.D. Cal. 1993) (preventing a tenant from enforcing restrictive covenants in the lease); In re Harborview Development d1986 Limited Partnership, 152 B.R. 897 (D.S.C. 1993) (holding that "possession" contemplated by the Code was physical possession of the premises denying a holder of a ground lease protection under the Code).

FN13 See In re Hammond, 27 F.3d 52 (3d Cir. 1994); In re Rameriz, 62 B.R. 668 (Bankr.S.D.Cal. 1986).

FN14 See In re Simasko Production Co., 74 B.R. 947 (D. Colo. 1987) (production payment treated as separate properly interest)

FN15 See, e.g., Consolidated Rock Products Co. v. Dubois, 312 U.S. 510, 527, 61 S.Ct. 675, 685 (1941); Dentureholders Protective Committee of Continental Inv. Corp., 679 F.2d 264 (1st Cir.), cert. denied, 459 U.S. 894 (1982) and cases cited therein.

FN16 Butner v. United States, 440 U.S. 48 (1979).

FN17 See, e.g., In re Multi-Group III Ltd. Partnership, 99 B.R. 5 (Bankr. D. Ariz. 1989); In re Association Center Ltd. partnership, 87 B.R. 142 (Bankr. W.D. Wash. 1988); In re TM Carlton House Partners, Ltd., 91 B.R. 349 (Bankr. E.D. Pa. 1988); In re Metro Square, 93 B.R. 990 (Bankr. D. Minn. 1988).

FN18 See In re Glenn, 760 F.2d 1428 (6th Cir. 1985), cert. denied, 474 U.S. 849 (1985); Matter of Clark, 738 F.2d 869 (7th Cir. 1984), cert. denied, 474 U.S. 849 (1985).

FN19 See In re MacDonald, 69 B.R. 259, 278 (Bankr.D.N.J. 1986).

FN20 See, e.g., In re Paar Meadows, 880 F.2d 1540 (2d Cir. 1989), cert. denied, 110 S.Ct. 869 (1990); Makaroff v. City of Lockport, 916 F.2d 890 (3d Cir. 1990).

A195

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)
(Cite as: H.R. REP. 103-835,  1994 U.S.C.C.A.N. 3340)


   FN21 See In re Pleasant View Utility District, 24 B.R. 632 (Bankr. M.D. Tenn.
1982); In re City of Wellston, 43 B.R. 348 (Bankr. E.D. Mo. 1984); In re Greene
County Hospital, 59 B.R. 388 (Bankr. S.D. Miss. 1986); In re City of Bridgeport, 128
B.R. 688 (Bankr. D. Conn. 1991) (cases not requiring express authorization); but see
In re Carroll Township Authority, 119 B.R. 61 (Bankr. W.D. Pa. 1990); In re North
and South Shenango Joint Municipal Authority, 80 B.R. 57 (Bankr. W.D. Pa. 1982)
(cases requiring express authorization).

 H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, 1994
U.S.C.C.A.N. 3340, 1994 WL 562232 (Leg.Hist.)

END OF DOCUMENT

A196

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

the
lud.
en,
son
act
hat
uld
so-
afe
fies
ac-
the
son
the
The
fi-
ge
ion
rts
ate
hat
rn-
ves
the

535

and

on

lu-
gs

on
In-
pa-
p-
an
in-
c-
to
it
lo-
he
vs,
s.
er.
od
he

ty
g
ry

## BANKRUPTCY REFORM ACT OF 1978
### P.L. 95-598

### IV. WHO MAY PROPOSE A PLAN

Chapters X and XI of current law permit different entities to propose plans of reorganization. Under chapter X, because an independent trustee has been appointed, the debtor has lost control of the business, and the financial standard rules restrict the possibilities for negotiation in the formulation of a plan, any party in interest, including the trustee, creditors, and the debtor, may propose a plan.[49] This feature has been heavily disfavored by debtors when choosing a reorganization chapter, because they lose control over the future of the enterprise.[50]

By contrast, chapter XI gives the debtor the exclusive right to propose a plan.[51] Creditors are excluded. The exclusive right gives the debtor undue bargaining leverage, because by delay he can force a settlement out of otherwise unwilling creditors, and they have little recourse except to move for conversion of the case to chapter X.[52] That is contrary to their interests as it is to the debtor's, and thus is rarely done. The debtor is in full control, often to the unfair disadvantage of creditors.

Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy.[53] At the same time, the bill recognizes the legitimate in-

---

[49] Bankruptcy Act § 169, 11 U.S.C. 569 (1970).
[50] See COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, REPORT, H. DOC. No. 93-137, 93d Cong., 1st Sess., pt. I, at 244 (1973) [hereinafter cited as COMMISSION REPORT].
[51] Bankruptcy Act § 623, 11 U.S.C. 723 (1970).
[52] Hearings, pt. 3, at 1875.
[53] See Hearings, pt. 3, at 1876.

[page 232]

terests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days.[54] In most cases, 120 days will give the debtor adequate time to negotiate a settlement, without unduly delaying creditors. The court is given the power, though, to increase or reduce the 120-day period depending on the circumstances of the case.[55] For example, if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement. If, on the other hand, a debtor delayed in arriving at an agreement, the court could shorten the period and permit creditors to formulate and propose a reorganization plan. Again, the bill allows the flexibility for individual cases that is unavailable today.

### V. APPOINTMENT OF A TRUSTEE

The development of a standard for the appointment of a trustee or examiner in a chapter 11 reorganization case has been one of the more difficult issues in the bill. The difficulty arises in part because there is no comparable provision in current law to rely on. Instead, current law, in chapter X, requires the appointment of a trustee in every case; chapter XI never permits appointment of a trustee. The standard for determining whether a case should be in chapter X or chap-

# EXHIBIT 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                              ) Chapter 11
                                    )
W.R. GRACE & CO., *et al*,          ) Case No. 01-1139 (JKF)
                                    ) Jointly Administered
           Debtors.                 ) Related to Doc. No. 13937

### ORDER GRANTING IN PART AND DENYING IN PART
### W.R. GRACE & CO.'S MOTION FOR RECONSIDERATION

Upon the motion (the "Motion") of the above-captioned debtors and debtors in

possession (the "Debtors") for reconsideration of part of the Court's rulings on December 5,

2006, and cause appearing for the relief sought in the Motion, it is hereby

**ORDERED** that the Motion is **DENIED** and the Status Report shall not be restored to

the record in these cases; and

**IT IS FURTHER ORDERED** that in the event the information in Debtors' status report

is relevant to Debtors' contentions concerning discovery of "consultants," Debtors may, by

December 12, 2006, at 10:00 a.m. (prevailing Eastern time) submit a brief and/or affidavits with

notice to opposing parties who may respond by December 15, 2006, at 3:00 p.m. (prevailing

Eastern time), all with copies e-mailed to jkf@pawb.uscourts.gov.  No replies will be permitted.


**Dated: 12/7/2006**               *Judith K. Fitzgerald*
**14:58:40**                       Judith K. Fitzgerald           rmab
                                   United States Bankruptcy Judge


A198

13947
12-7-06

# EXHIBIT 10

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ( | |
| | ( | |
| W.R. GRACE & CO., <u>et al.</u>, | ( | Bankruptcy No. 01-01139 (JKF) |
| | ( | Jointly Administered |
| | ( | |
| Debtor(s) | ( | Chapter 11 |
| | ( | |
| | ( | Related to Doc. Nos. 4007, 4009, 4012, 4018, 4022, |
| | ( | 4028, 4173, 4175, 4202, 4204, 4205, 4206, 4291, |
| | ( | and 4294. |
| | ( | |

**MEMORANDUM OPINION[1]**

The matters before the court are the opposing Motions for Summary Judgment[2] of the

Debtors, W.R. Grace & Company ("Grace"), and a group of property damage claimants,

Zonolite Attic Insulation Claimants ("ZAI Claimants"), and the ZAI Claimants' Motion for

Partial Summary Judgment[3] regarding the threshold issue of what science demonstrates with

regard to whether or not the presence of ZAI[4] in the home creates an unreasonable risk of harm.

The court has consolidated the actions of the ZAI Claimants pursuant to Fed.R.Civ.P. 42(a) for

---

[1] The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

[2] Doc. Nos. 4009 and 4018.

[3] Doc. No. 4007 and Corrected Zonolite Attic Insulation Claimants' Memorandum in Support of Motion for Partial Summary Judgment, Doc. No. 4028.

[4] ZAI is a brand of vermiculite attic insulation ("VAI"). Where applicable, the use of the terminology "VAI", "vermiculite attic insulation", or "vermiculite insulation" refers to all brands (within which ZAI is included). "ZAI" only refers to Grace's product, Zonolite Attic Insulation.

-1-

14014
12-14-06

purposes of determining this common question.[5]  The ZAI Claimants argue that there is no material issue of fact and that ZAI creates an unreasonable risk.  Grace disagrees that ZAI creates an unreasonable risk and argues that Claimants have not met their burden to proffer valid scientific evidence sufficient to create a genuine issue of material fact on whether ZAI creates unreasonable risk of harm.

At the time Grace filed bankruptcy, a number of putative class actions in various state and federal courts had been filed for property damages against Grace on behalf of homeowners whose properties contained Zonolite Attic Insulation.[6]  Upon filing bankruptcy, Grace proposed that the claims be adjudicated through the filing of individual proofs of claim and counsel for ZAI Claimants argued for a single proof of claim to be litigated on behalf of a class of ZAI Claimants.  Pursuant to §501(c) of the Bankruptcy Code, Grace filed proofs of claim on behalf of the ZAI Claimants.[7]  ZAI Claimants moved to strike these proofs of claim[8] and the court denied their motion at a May 20, 2002, hearing and permitted Claimants to file amended proofs of claim

---

[5] Grace filed a Motion to Consolidate the Actions of ZAI Claimants Pursuant to Fed.R.Civ.P. 42, Doc. No. 4010, and ZAI Claimants filed a response, Doc. No. 4203, in which they did not oppose consolidation.  No written order was entered, but this court orally granted the motion to consolidate, and now confirms that grant.

[6] In *Barbanti, et al. v. W.R. Grace & Co., et al.*, No. 00-2-01756-6 (Super. Court. Wash. Dec. 20, 2000), the court granted plaintiff's motion for class certification pursuant to Fed.R.Civ.P. 23(b)(2).  "The class shall be composed of and defined as:  All owners or occupiers of real property located in the state of Washington in which Zonolite Attic Insulation has been installed." *Id.*

[7] The proofs of claim were dated April 12, 2002, and were filed by Grace on behalf of Marco Barbanti, Ralph Busch, Paul Price, John and Margery Prebil, William Harris, Jan Hunter, Edward Lindholm, John Sufnarowski, James and Doris McMurchie and Stephen Walsh.

[8] Claimants' Motion to Strike Proofs of Claim and Response to Debtors' Proposed Order Setting Initial Schedule for Litigation Concerning Zonolite Attic Insulation Product Risk, Doc. No. 2045.

-2-

if they chose.[9]  Claimants filed amended proofs of claim on May 30, 2002.[10]  Grace filed

objections to ZAI Claimants' proofs of claim[11] and ZAI Claimants filed a response asserting the

validity of their claims.[12]

Prior to a decision on whether to require individual proofs of claim or consider a single

proof of claim on behalf of a class, and in order to determine whether a ZAI claims bar date

should be established and, if so, what type of notice program would be appropriate, this court

decided to address the threshold issue of whether ZAI poses an unreasonable risk of harm, under

the assumption that any property damage claim ultimately arises from the risk of someone

getting sick from the contaminated property.[13]  The court was concerned, based on the alleged

huge number of potential claims (published estimates provided by Claimants put the number of

---

[9] May 20, 2002, Hearing Transcript, Doc. No. 2162, at 93.

[10] Notice of Filing of Amended Proof of Claim of John and Margery Prebil (Zonolite Attic Insulation), Doc. No. 2131; Notice of Filing of Amended Proof of Claim of Paul Price (Zonolite Attic Insulation), Doc. No. 2132; Notice of Filing of Amended Proof of Claim of Marco Barbanti (Zonolite Attic Insulation), Doc. No. 2133; Notice of Filing of Amended Proof of Claim of Ralph Busch (Zonolite Attic Insulation), Doc. No. 2134.  The legal bases alleged for Debtors' liability in the amended claims included strict product liability, negligence, deceit, fraudulent concealment, fraud by non-disclosure, and unfair and deceptive business practices. The amended claims range between $10,000 and $40,000.

[11] Debtors' Omnibus Objection to Zonolite Attic Insulation Proofs of Claim, Doc. No. 2193 (entered on June 10, 2002).

[12] Response of Zonolite Attic Insulation Property Damage Claimants to Debtors' Objections to the Zonolite Attic Insulation Proofs of Claim, Doc. No. 2363 (entered on July 10, 2002).

[13] For further explanation of the reasoning behind the "ZAI Science Trial" see Sept. 23, 2002, Hearing Transcript, Doc. No. 2779, at 83-86; Oct. 18, 2004, Hearing Transcript, Doc. No. 6847 at 93-100; and the Oct. 21, 2002, Order, Doc. No. 2855.

homes with ZAI at 3 million-30 million),[14] that special procedures would be needed to administer this claims process, and the type of process would be informed by the determination of the risk of harm.

On October 21, 2002, this court entered an order setting forth a pretrial discovery and motion practice schedule pertaining to the anticipated science trial ("ZAI Science Trial"). The scope of discovery was limited to what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm.[15] Months of discovery ensued, including scientific testing by numerous experts. The parties engaged in protracted, but unsuccessful, settlement talks. After receiving volumes of evidence and briefs from both sides, a hearing on cross motions for

---

[14] Doc. No. 4204 at 26, n.88, citing Susan Warren, *EPA Plans Asbestos Removal From Homes in Libby, Mont.*, Wall St. J., May 13, 2002, at B2 [Exhibit 79]; Kathleen McLaughlin, *W.R. Grace Urging EPA to Quit Emergency Plan for Libby*, Mont. Forum, Apr. 14, 2002 [Exhibit 80]; Greg Gordon, *Magnitude of Asbestos Scare Grows*, Modesto Bee, Jan. 21, 2003 [Exhibit 81]; Jay Romano, *Lesser-Known Form of Asbestos Lurks in Many Homes*, San Francisco Chronicle, July 14, 2001, at WB-7 [Exhibit 82]. *See also* Corrected Zonolite Attic Insulation Claimants' Memorandum in Support of Motion for Partial Summary Judgment, Doc. No. 4028 at 12-13, n. 36 (ZAI was purchased and installed in as many as 4,486,722 homes in the United States between 1969 and 1984).

[15] On July 7, 2003, Grace filed a Motion to Consolidate the Actions of ZAI Claimants Pursuant to Rule 42, Doc. No. 4010, for the purpose of determining the single common question of whether ZAI creates an unreasonable risk of harm, in accordance with the plan for the ZAI Science Trial set forth by the court. Claimants did not oppose consolidation in their Response to Debtors' Motion to Consolidate the Actions of ZAI Claimants Pursuant to Rule 42, Doc. No. 4203 (filed on August 8, 2003).

-4-

summary judgment (the ZAI Science Trial) was held on October 18, 2004.[16] Additional efforts to settle were unavailing. The matters are now ripe for decision.

Claimants filed a Motion for Partial Summary Judgment (the docket entry reads "Motion for Summary Judgment") requesting that the court issue an order pursuant to Fed.R.Civ.P. 56(d) specifying that there is no material issue of fact but that ZAI is contaminated with asbestos and ZAI releases asbestos fibers into the air when disturbed during foreseeable homeowner activities in the attic.[17] Claimants also filed a Motion for Summary Judgment requesting judgment as a matter of law that "ZAI can contaminate homes/pose an unreasonable danger upon disturbance" and "ZAI Claimants have viable claims under tort and/or other legal theories in this bankruptcy

---

[16] The parties filed various motions regarding the admissibility of evidence for the ZAI Science Trial. *See* Debtors' Motion *In Limine* to Exclude Evidence of Any Alleged Damages From the ZAI Science Trial, Doc. No. 4012; Response of ZAI Claimants to Debtors' Motion *In Limine* to Exclude Evidence of Any Alleged Damages from the ZAI Science Trial, Doc. No. 4202; Reply in Support of Debtors' Motion *In Limine* to Exclude Evidence of Any Alleged Damages from the ZAI Science Trial, Doc. No. 4297; Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments, Doc. No. 4022; United States Statement Regarding Asbestos Analysis Issues in W.R. Grace's Motion for Summary Judgment, Doc. No. 4173; Opposition of W.R. Grace & Co. to Claimants' Motion to Exclude Dr. R.J. Lee's Opinion On Cleavage Fragments, Doc. No. 4206; Claimants' Reply to W.R. Grace's Response to Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments, (the docket entry reads "Brief (Reply) in Support of Motion to Exclude Dr. R. J. Lee's Opinion on Cleavage Fragments"), Doc. No. 4293; Reply of W.R. Grace & Co. to United States' Statement Regarding Asbestos Analysis Issues in W.R. Grace's Motion for Summary Judgment and Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments, Doc. No. 4296.

[17] Doc. No. 4007 (filed on 7/2/2003). Claimants entered a corrected brief at Doc. No. 4028, entitled Corrected Zonolite Attic Insulation Claimants' Memorandum in Support of Motion for Partial Summary Judgment, Re: W.R. Grace's Consumer Protection Liability (Replacing Attachment Nos. 1& 2 to [Doc. No.] 4007) on July 8, 2003, which was docketed as "Memorandum of Law in Support of Motion for Summary Judgment." *See also* Grace's Memorandum in Opposition to ZAI Claimants' Motion for Partial Summary Judgment Regarding Consumer Protection Act Claims, Doc. No. 4175; Zonolite Attic Insulation Claimants' Reply to Grace's Memorandum in Opposition to ZAI Claimants' Motion for Partial Summary Judgment Re: W.R. Grace's Consumer Protection Liability, Doc. No. 4291.

proceeding."[18] Claimants proposed that a claims fund be established to compensate presently

identified claimants and that provisions should be made for not-yet-identified claimants as

homeowners encounter ZAI during foreseeable disturbance activities. Although Claimants have

asked for partial summary judgment pursuant to Fed.R.Civ.P. 56(d), that rule provides that "[i]f

. . . judgment is not rendered upon the whole case . . . the court . . . shall if practicable ascertain

what material facts exist without substantial controversy . . . [and] shall thereupon make an order

specifying the facts that appear without substantial controversy. . . ." Accordingly, we will deny,

without prejudice, the motion for partial summary judgment and will enter an order finding that

there is no material issue of fact but that ZAI is contaminated with asbestos and ZAI releases

asbestos fibers into the air when disturbed during foreseeable homeowner activities.

Grace also filed a Motion for Summary Judgment on the threshold issue of whether ZAI

creates an unreasonable risk of harm, contending that there is insufficient evidence that ZAI

poses such a risk.[19] Grace requested that, in accordance with this finding, the court dismiss the

property damage claims of the ZAI Claimants.

---

[18] ZAI Claimants' Memorandum in Support of . . . Motion for Summary Judgment [Re: issues that: (1) ZAI can Contaminate Homes/Pose an Unreasonable Danger Upon Disturbance; and (2) ZAI Claimants Have Viable Claims Under Tort and/or Other Legal Theories], Doc. No. 4018 at 37. *See also* Opposition of W.R. Grace & Co. to Claimants' Motion for Summary Judgment, Doc. No. 4205; Claimants' Reply to W.R. Grace's Response to Claimants' Motion for Summary Judgment, Doc. No. 4294.

[19] W.R Grace & Co.'s Motion for Summary Judgment, Doc. No. 4009. *See also* United States' Statement Regarding Asbestos Analysis Issues in W.R. Grace's Motion for Summary Judgment and Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments, Doc. No. 4173; Claimants' Response to W.R. Grace's Motion for Summary Judgment, Doc. No. 4204; Reply of W.R. Grace & Co. to United States Statement Regarding Asbestos Analysis Issues in W.R. Grace's Motion for Summary Judgment and Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage, Doc. No. 4296; Reply of W.R. Grace& Co. to ZAI Claimants' Response to Grace's Motion for Summary Judgment, Doc. No. 4298.

-6-

The only issue before the court is the nature of the product - specifically, whether the physical characteristics, use, and location of ZAI in homes creates an unreasonable risk of harm. This determination is a critical factor in assessing the viability of the property damage claims and the practicability of the proposed procedures for administration of the claims process. All three motions at bench are based on this premise and we will discuss collectively unless otherwise indicated in the text. In addressing the threshold question of unreasonable risk, Claimants argued that a finding that ZAI was contaminated with asbestos and released fibers during foreseeable homeowner activities is enough evidence to satisfy state consumer protection statutes and to support a finding of unreasonable risk. Grace argued that contamination and release alone are not enough, but that the fiber release from ZAI must be at levels which pose unreasonable risk of harm to human health. We agree with Debtors' argument as will be explained below.

**BACKGROUND**

Zonolite Attic Insulation ("ZAI") was sold by Grace as a supplemental insulation for unfinished attics of existing homes. The Zonolite Company, which was acquired by Grace in 1963, began sales of the product as early as the 1920s[20] and Grace ceased production and sale of ZAI in 1984.[21] ZAI is comprised of an expanded mineral known as vermiculite. The vermiculite

---

[20] The Zonolite Company, Libby, MT, *Zonolite, As A Heat Loss Insulator in Buildings: Warmer in Winter - Cooler in Summer* (sales pamphlet), (circa 1928), cited in William M. Ewing, *"Zonolite Attic Insulation Report"* (Mar. 19, 2003), Doc. No. 4019 at 6.

[21] "We have reached the point where the returns from [ZAI] are less than the investment required to keep the product going, and we must regretfully announce that Zonolite Attic Insulation will not be available for sale in the 1984 selling season." *Grace Memo to Building*

(continued...)

in ZAI was mined from Zonolite Mountain, located ten miles from Libby, Montana. Vermiculite is not asbestos; however, one of the tramp[22] minerals contained in the vermiculite ore mined at Libby was asbestos. After mining this crude vermiculite ore and prior to furnace expansion, Grace milled the ore to remove impurities such as asbestos. Grace contends that the percentage of asbestos remaining in ZAI is generally less than one percent. It is the asbestos content which is the catalyst for the property damage claims involving ZAI.[23]

The Environmental Protection Agency ("EPA") and the Agency for Toxic Substances and Disease Registry ("ATSDR") acknowledge that the scientific studies thus far fail to establish a scientific basis to show a relationship between ZAI and health risks [24] but recommend that the public take precautions until more is known.[25] They recommend that homeowners leave VAI[26]

---

[21](...continued)
*Products Sales Force* (Jan. 1984). Doc. No. 4009, at 3 and Doc. No. 4018, Exh. 21.

[22] A tramp mineral is an unwelcome impurity in another material.

[23] Claimants contend that the asbestos content of ZAI may reach slightly above one percent. Doc. No. 4018, Memorandum, at 10. Under EPA standards, materials containing less than one percent asbestos are not considered Asbestos Containing Material ("ACM"). EPA, *"National Emission Standards for Hazardous Air Pollutants,"* 40 C.F.R. 61 (April 5, 1984) and EPA, *"Managing asbestos in place: A building owner's guide to operations and maintenance programs for asbestos-containing materials (Green Book),"* EPA 20T-2003 (1990).

[24] Versar, Inc. *Final Draft Pilot Study to Estimate Asbestos Exposure from Vermiculite Attic Insulation,* (May 21, 2003 EPA). Doc. No. 4306, Exh. 5.

[25] EPA, *Background: EPA's Pilot Study to Estimate Asbestos Exposures from Vermiculite Attic Insulation* (May 21, 2003) ("Additional studies are needed to better understand any potential risks from asbestos contaminated vermiculite insulation . . ."). Doc. No. 4306, Exh. 4.

[26] *See* note 4, *supra*, regarding "VAI". Multiple brands of vermiculite attic insulation, one of which was ZAI, were included in the VAI studies and investigations mentioned herein.

-8-

undisturbed and, if homeowners choose to remove it, that they hire professionals.[27]  These

recommendations have been consistent for over 20 years.  "People who have homes with

vermiculite insulation should become informed, not alarmed," said Stephen L. Johnson, EPA's

Assistant Administrator for the Office of Prevention, Pesticides and Toxic Substances ("OPPT"),

in an OPPT study which refused to declare a public health emergency in Libby, Montana,

despite the argument that ZAI has the potential to create additional asbestos exposure risks to the

community.[28]  "If our message of 20+ years is adhered to, the risk is minimal."[29]  The EPA has

been reluctant to make any changes to its longstanding guidance to homeowners.[30]

We note that the EPA's advice to homeowners is not a codified regulation; it is an EPA

advisory issued in connection with a "National Consumer Awareness Program" on VAI.[31]  Even

if it were a regulation, it would not necessarily establish a standard from which to determine

liability for property damage.  As the court stated in *In re Agent Orange Product Liability Litig.*,

---

[27] EPA and ATSDR, *Current Best Practices for Vermiculite Attic Insulation* (May 2003). Doc. No. 4013, Exh. J.

[28] EPA, *"National Consumer Awareness Campaign Launched on Vermiculite Insulation Used in Some Home Attics,"* in *EPA Headquarters Press Release.*  Doc. No. 4013, Exh. I.

[29] OPPT, *OPPT Comments on Action Memorandum Amendment Removal Action at the Libby Asbestos Site (E-mailed to OPPT staff on 02-20-02)* ( Feb. 22, 2002).  Doc. No. 4013, Exh. I.

[30] *Letters from Christine Todd Whitman, EPA Administrator, to Senators Max Baucus and Patty Murray, Responses* (April 4, 2003, and April 18, 2003)("EPA has not changed its longstanding guidance to homeowners [about ZAI] because we do not have the scientific basis to do so at this time. . . [S]o much about the risks posed from asbestos-containing vermiculite attic insulation remains unknown. . .").  Doc. No. 4013, Exh. K, at 1,2.

[31] *See* notes 27 and 28, *supra.*

-9-

597 F.Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied sub nom.*

*Pinkney v. Dow Chemical Co.*, 484 U.S. 1004 (1988):

> The distinction between avoidance of risk through regulation and compensation
> for injuries after the fact is a fundamental one. In the former, risk assessments
> may lead to control of a toxic substance even though the probability of harm to
> any individual is small and the studies necessary to assess the risk are incomplete;
> society as a whole is willing to pay the price as a matter of policy. In the latter, a
> far higher probability (greater than 50%) is required since the law believes it
> unfair to require an individual to pay for another's tragedy unless it is shown that
> it is more likely than not that he caused it.

597 F.Supp. at 781. The EPA has adopted a "just-in-case" policy which does not place a

significant burden or inconvenience on society.[32] In this case, Grace's expert, Dr. Morton Corn,

explained that, while he considers it appropriate to recommend specialists for complete removal,

he would not be concerned if homeowners were to remove ZAI on their own.[33]

Although much is still contested regarding ZAI, the parties do not dispute the several

significant facts that are material to the matters at bench. Both the ZAI Claimants and Grace

acknowledge that ZAI is contaminated with asbestos and releases fibers when disturbed.[34] The

---

[32] *See* notes 27 and 28, *supra.*

[33] ". . . I would not be concerned with once in a lifetime exposure without protection. Q:
Okay. So you wouldn't be concerned if a homeowner went up there and vacuumed the material
out himself or herself without a respirator at all. A: That's correct, for once – for that kind of
frequency of occurrence. Q: Okay. A. I think that's the difference between the tenor of
plaintiffs' experts in this litigation versus the position I'm taking, and plaintiffs have shifted in
their experts. They're tuned now to avoidance of all exposure. Any exposure is hazardous, and
I've addressed that issue in the supplement of my report. I am not taking the position that any
exposure is hazardous, I don't believe it is. And I believe that the risk, which I term hypothetical
risk, from a once in a lifetime removal is very low, if it exists at all." Deposition of Morton Corn
(May 29, 2003), Doc. No. 4018, Attachment 3, at 93-97.

[34] Doc. No. 4028, at 3; Doc. No. 4011, Exh. F, at 18; Doc. No. 4019, Exh. 43, at 24.

-10-

expert reports from both the ZAI Claimants and Grace include this assumption.[35]  Additionally,

because asbestos must be inhaled to pose a risk, the parties agree that ZAI does not pose a risk to

health if left undisturbed because the fibers never become airborne.[36]  What remains at issue are

the conclusions the parties draw from these facts regarding the level and occurrence of

homeowner exposure to asbestos released by ZAI and ultimately what risk this exposure may

pose.

## ANALYSIS

### A. *Applicable Legal Standards*

#### 1. *Admissibility of Scientific Evidence*

---

[35] Grace's expert, Dr. Morton Corn, stated as follows in his Report: "Summary and Conclusion. Review of available investigations of potential homeowner exposure to ZAI, as well as review of an EPA Region VIII risk assessment, associated critiques of this assessment, and other relevant documents, lead to the following conclusions: Zonolite Attic Insulation (ZAI) contains approximately 1% or less asbestos by weight.  The bulk material can release airborne particles and fibers when poured or otherwise intruded upon with energy.  A variety of investigations have been undertaken to measure the concentrations of asbestos-in-air when ZAI does release fibers to the air. . . The measurements are consistent in that airborne asbestos concentrations during disturbance are measurable in the breathing zones of those in the immediate vicinity of the disturbance, but are not elevated throughout the entire home. . ." Doc. No. 4011, Exh F, at 18.
  Claimants' experts, Richard Hatfield and Dr. William E. Longo, stated: "Based on our evaluations of ZAI and the results of the simulation testing, it is our opinion that this material will release asbestos fibers into the air when the material is disturbed  during ordinary and foreseeable disturbance activities." Doc. No. 4019, Exh. 43, at 24.  Claimants' expert, William Ewing, stated: "The data that I have reviewed indicates that ZAI in some homes has tested at more than 1% asbestos ." Doc. No. 4019, Exh. 28, at 7.

[36] Claimants concede this point in their Memorandum in Support of the ZAI Claimants' Motion for Summary Judgment.  Doc. No. 4018, at 17.  Ewing Deposition, Doc. No. 4011, Exh. C, at 58.

-11-

The scientific evidence introduced during the Science Trial is subject to Rule 702 of the Federal Rules of Evidence and the corresponding interpretation provided by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The first of the two requirements contained in Rule 702 addresses the qualifications necessary for a witness to be considered an "expert." The Court of Appeals for the Third Circuit has interpreted this requirement liberally, accepting generalized qualifications and avoiding overly rigorous or formal standards. *See Elcock v. Kmart Corp.,* 233 F.3d 734, 742-44 (3d Cir. 2000); *Hammond v. International Harvester Co.,* 691 F.2d 646, 652-53 (3d Cir. 1982)*; Knight v. Otis Elevator Co.,* 596 F.2d 84, 87-77 (3d Cir. 1979). In the present case, expertise is not an issue. The experts on both sides are qualified.

The second requirement contained in Rule 702 is that the qualified expert must testify to "scientific, technical or other specialized knowledge [that] will assist the trier of fact." Fed.R.Evid. 702. This element was addressed by the Supreme Court in *Daubert* which held that expert opinion testimony is admissible under Rule 702 of the Federal Rules of Evidence only if "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert, supra,* 509 U.S. at 592-93. The *Daubert* court provided a non-exclusive list of four factors to guide the first part of this inquiry, *i.e.,* whether the scientific testimony or evidence is scientifically valid. These factors were subsequently expanded to eight by the Court of Appeals for the Third Circuit:

-12-

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994), *cert. denied*, 513 U.S.

1190 (1995) *("Paoli II"). See also Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000).

"The test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor

exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 142 (1999).

> *Daubert's* requirement that the expert testify to scientific knowledge – conclusions supported by good grounds for each step in the analysis – means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.

*Paoli II*, 35 F.3d at 745.

The second part of the *Daubert* inquiry, whether the reasoning or methodology can be

applied to the facts, was first described as a question of "fit" by Judge Becker in *United States v.*

*Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985). "'Fit' is not always obvious, and scientific

validity for one purpose is not always scientific validity for other, unrelated purposes . . . Rule

702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a

precondition to admissibility." *Daubert, supra*, 509 U.S. at 591. "The proponent of an expert's

opinion has the burden of establishing both branches of this test by a preponderance of the

evidence." *In re Armstrong World Industries, Inc.*, 285 B.R. 864, 870 (Bankr. D. Del. 2002),

citing *Paoli II*, 35 F.3d at 744. But "the focus . . . must be solely on principles and methodology,

-13-

not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, quoted in *Paoli II*, 35 F.3d at 744.

As discussed below, the application of the *Daubert* standards to the evidence submitted in the Science Trial reveals that, in this proceeding, "fit" is more of an issue than reliability.

### 2. *Summary Judgment Standard*

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In particular, summary judgment for defendant is warranted where plaintiffs cannot establish an essential element of their claim. *Id.* at 322; *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998). The moving party bears the initial responsibility of identifying an absence of admissible evidence to support an essential element in a non-moving party's case. *Celotex Corp.*, 477 U.S. at 325.

Once the moving party has shown the absence of a genuine issue of material fact as to an essential element of the non-movant's case, the burden shifts to the non-moving party to set forth affirmative evidence and specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). *See also Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127,1128 (3d Cir. 1990) ("Summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

The non-moving party must do more than express doubt as to the truth of the moving party's factual submissions, but must show "concrete evidence from which a reasonable jury could return a verdict in his favor." *Anderson, supra*, 477 U.S. at 256. This evidence must rise

above casting "metaphysical doubt" as to a material issue of fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). *See also Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990)(neither unsupported claims in pleadings nor conclusory allegations in affidavits establish genuine issues of material fact).

　　Alleged scientific evidence that does not meet the test of reliability set forth in *Daubert* cannot be utilized to artificially create an issue of fact for trial and, thus, cannot be used to defeat a motion for summary judgment. *See Kumho Tire, supra,* 526 U.S. at 148.

## B. *ZAI Claimants' Request for Declaration of Two Facts - Contamination and Release on Disturbance*

　　Claimants requested, in their Corrected Memorandum in Support of Motion for Partial Summary Judgment Re: W.R. Grace's Consumer Protection Liability, that the court issue an order specifying that there is no material issue of fact but that ZAI is contaminated with asbestos and ZAI releases asbestos fibers into the air when disturbed during foreseeable homeowner activities.[37] Because the asbestos contamination of ZAI and the potential for the release of asbestos fibers when ZAI is agitated are undisputed by Grace, the court will make the findings requested in Claimants' motion for partial summary judgment. Grace objected to this motion, arguing that the requested relief is meaningless, that establishing contamination and release alone does not address the question of unreasonable risk.[38] We agree that establishing

---

[37] Doc. No. 4028. This is docketed as "Memorandum of Law in Support of Motion for Summary Judgment."

[38] Doc. No. 4175, at 2.

-15-

contamination and release is not all that Claimants must prove. However, contamination and release are facts essential to a determination of unreasonable risk. Claimants ultimately seek this determination to support the liability of Grace under state consumer protection statutes. Establishing contamination and release alone (while not meaningless) is not enough; Claimants must still establish unreasonable risk of harm to support consumer protection claims.

Although the motion itself addresses only the lack of dispute of two facts, *i.e.* the contamination and release on disturbance, in their Corrected Memorandum in Support of their Motion for Partial Summary Judgment, Claimants also argue that Grace has substantial liability under state consumer protection statutes[39] based on the alleged deceptive marketing of a product it knew was dangerous because it was contaminated with asbestos.[40] However, the question before us is whether ZAI poses an unreasonable risk of harm. Under a typical consumer protection claim, as illustrated by Washington's Consumer Protection Act (CPA), Rev. Code Wash. (RCW) 19.86.010 to 19.86.920, claimants must prove: "(1) an unfair or deceptive act or practice, (2) in the conduct of trade or commerce, (3) that has an impact on the public interest, (4) injury to the plaintiff in their business or property, and (5) a causal link between the unfair or deceptive act and the injury suffered." *Trask v. Butler*, 872 P.2d 1080, 1086 (Wash. 1994), citing *Mason v. Mortgage America, Inc.*, 792 P.2d 142 (Wash. 1990). Claimants have not produced any evidence of a causal link between any deceptive act, assuming there was one, and any injury. As will be seen, the two facts agreed on [that ZAI is contaminated and releases fibers

---

[39] In addition to Washington's statute, Claimants provided an analysis of similar consumer protection statutes in Massachusetts, California, Montana, and Minnesota. *Claimant State CPA Analysis*, Doc. No. 4028, Exh. C.

[40] Doc. No. 4028.

-16-

when disturbed] have not been shown to have caused or to be more likely than not to cause an injury. Therefore, Claimants have not met their burden of proof to a preponderance of the evidence that there is any unreasonable risk of harm from ZAI. The following sections will discuss the particular assertions advocated in this proceeding.

## C. *Unreasonable Risk of Harm*

### 1. *Market Place Aversion: Risk of Harm to Property Value*

Claimants propose that the court's threshold question of whether ZAI creates an unreasonable risk of harm can be answered through a showing of unreasonable risk of harm to the property. They argue that the market place aversion associated with asbestos creates an unreasonable risk of harm to the value of the property. To substantiate this claim, they presented expert real estate valuation testimony from Dr. John A. Kilpatrick,[41] who opined that asbestos-contaminated ZAI poses unreasonable risk to property value through marketplace aversion. Grace filed a motion to exclude this evidence arguing that it was not relevant to the threshold question of unreasonable risk.[42] This court denied the motion and permitted the evidence to be introduced during the Science Trial hearings. We note that diminution in value is an aspect of damages, not of risk. Nonetheless, even under Claimants' construction of the issue, the risk of

---

[41] Expert Report of John Kilpatrick, Doc. No. 4291, Attachment F; Kilpatrick Deposition, Doc. No. 4202, Exh. D at 10, 37. Claimants retained Dr. John Kilpatrick to assess whether ZAI posed an unreasonable risk of harm to real property values. Dr. Kilpatrick is a real estate economist and valuation expert, holding a Ph.D. in real estate finance from the University of South Carolina. He is the managing partner of Mundy Associates, LLC, which specializes in complex real estate valuation problems.

[42] Doc. No. 4012.

-17-

harm to the value of the property is still inextricably tied to the risk of harm to human health. Ultimately, any marketplace aversion stems from fears over hazards to human health. Without any showing of unreasonable risk of harm to human health, the claim most closely resembles a stigma-based property damage claim. Courts, including this court in this case, have been reluctant to accept stigma claims because they are too remote and speculative.[43] Assessing unreasonable risk through market place aversion alone, would make public opinion, not science, the determining factor. As will be discussed below, there has not been a sufficient showing of unreasonable risk to human health. Thus, we find that the testimony of Dr. Kilpatrick does not fit the facts of the case at hand. As a result, we give no weight to his testimony on this issue.

## 2. *No Safe Threshold Argument*

---

[43] The U.S. District Court for the Western District of New York decided that with no actual physical damage to a plaintiff's property, stigma damages alone were too remote and speculative to be recoverable. *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 71 F.Supp.2d 179, 193 (W.D.N.Y. 1999), *vacated in part on other grounds,* 216 F.3d 291 (2d Cir. 2000). The Court of Appeals of Georgia in *Hammond v. City of Warner Robbins*, 482 S.E.2d 422, 428 (Ga. App. 1997), similarly found that "stigma to realty, in and of itself, is too remote and speculative to be a damage and is of first impression." The Supreme Court of Ohio and the Court of Appeals of Ohio both held that "stigma" damages are not recoverable as property damage in the State of Ohio. *Chance v. BP Chemicals, Inc.*, 670 N.E.2d 985, 989 (Ohio 1996), and *Ramirez v. AKZO Nobel Coatings*, 791 N.E.2d 1031, 1032-33 (Ohio App. 5 Dist., 2003)("stigma damages cannot be recovered unless there is actual, physical damage to . . . property"). In *Chance* the Supreme Court of Ohio found that the trial court had not abused its discretion when it denied the plaintiffs the opportunity to present evidence of speculative stigma damages. 670 N.E.2d at 993. In *Leaf River Forest Products, Inc. v. Ferguson*, 662 So.2d 648 (Miss. 1995), plaintiffs filed a property damage claim based on the release of dioxin into the Leaf and Pascagoula Rivers. The Supreme Court of Mississippi in *Leaf River* held that "mere stigma, supported by tests showing dioxin contamination no closer than eighty river miles north of the alleged damage, is not sufficient evidence of compensable injury." *Id.* at 664. This court has joined its sister courts in denying stigma claims. *In re W.R. Grace & Co.*, 346 B.R. 672 (Bankr. D. Del. 2006).

-18-

In their Motion for Summary Judgment, Claimants argue that any exposure to asbestos fibers is an unreasonable risk. Therefore, Claimants assert, because ZAI contains asbestos and releases fibers during foreseeable homeowner activities,[44] there are no issues of material fact remaining. "No science trial is necessary to debate what has already been conceded by Grace's experts and universally recognized by everyone else."[45] They rely primarily on *Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987), *School District of Independence, Mo., No. 30 v. U.S. Gypsum Co.*, 750 S.W.2d 442 (Mo.App. W.D. 1988), and *3250 Wilshire Blvd. Bldg. v. W.R. Grace & Co.*, 1989 WL 260222 at *4 (No. CV 87-6048-WMB, C.D. Cal. July 24, 1989), to apply this "no safe threshold" concept to property damage. The *Greenville* court stated:

> In *Watermark*, we indicated that a manufacturer whose product creates an unreasonable risk of harm may fairly be held liable when the product causes personal injury. We think that the South Carolina courts would be willing to extend tort liability to the manufacturer whose product threatens a substantial and unreasonable risk of harm by releasing toxic substances into the environment, thereby causing damage to the property owner who has installed the harmful product in his building. . . . Such diseases may not develop until decades after exposure to asbestos. We think that a plaintiff such as Greenville should not be required to wait until asbestos-related diseases manifest themselves before maintaining an action for negligence against a manufacturer whose product threatens a substantial and unreasonable risk of harm by releasing toxic substances into the environment.

---

[44] Grace has conceded that ZAI contains asbestos and may release fibers when disturbed. Doc. No. 4009, Brief of W. R. Grace & Co. in Support of Motion for Summary Judgment, at 3. However, there remains a dispute over the percentage of asbestos contained in ZAI and the level of fiber release. *See* Doc. No. 4018, Memorandum in Support of ZAI Claimants' Motion for Summary Judgment, at 10-14.

[45] Doc. No. 4018 at 3.

-19-

*Greenville,* 827 F.2d at 978.[46]  Claimants argue that the substantial and unreasonable risk of

harm is the release of toxic substances into the environment alone, regardless of the levels

released and thus that the ZAI product is unsafe.[47]  Grace, also citing *Greenville,* contends that

*Greenville,* and other cases cited herein, do not hold that a plaintiff may recover damages

without proof that the product creates an unreasonable risk of harm.[48]

Grace relies on *National Bank of Commerce v. Associated Milk Producers, Inc.*, 22

F.Supp.2d 942 (E.D.Ark. 1998), *aff'd*, 191 F.3d 858 (8th Cir. 1999), and *Sutera v. Perrier Group*

*of America, Inc.*, 986 F.Supp. 655 (D.Mass. 1997), to show that courts have rejected the "no

threshold" argument.  In *National Bank*, the court rejected plaintiff's expert testimony because

the expert presented no scientific knowledge or information as to the level of the toxin that

would subject a person who breathes it to an appreciable risk of harm, 22 F.Supp.2d at 946, and

concluded that establishing that the risk of causation "is not zero" falls woefully short of the

degree of proof required by *Daubert* and its progeny.  *Id.* at 961.  In *Sutera*, the district court

held that the EPA goal of 0 ppb[49] for benzene in drinking water, a "no threshold" regulatory

---

[46] *Greenville* focuses on the fact that it can take years for asbestos related diseases to develop.  ZAI has been in use since the 1920s and it has been over two decades since the last sale of ZAI.  *See* notes 20 and 21 and accompanying test, *supra*.  The 20 to 80 years that have passed while ZAI has insulated attics is within the range of time for asbestos related diseases to manifest themselves as a result of exposure to ZAI.  The latency period for asbestos related diseases ranges from 10 to 45 years.  U.S. Environmental Protection Agency, *EPA Publication on Asbestos* (2005), http://www.epa.gov/oppt/asbestos/pubs/asbe.pdf.

[47] Doc. Nos. 4018, 4204, 4291, and 4294.

[48] Doc. No. 4205 at 6, n.4.

[49] Parts per billion ("ppb") denotes one particle of a given substance for every 999,999,999 other particles.  This is roughly equivalent to one drop of ink in an Olympic-sized swimming pool, or one second every 320 centuries.

-20-

standard, was not an appropriate measure of causation, without further evidence such as epidemiological studies, risk assessment, and/or other reliable methodologies used to demonstrate causation.

Grace also cites the fact that the EPA has set standards for acceptable risk[50] which is in direct opposition to the concept of "no threshold."[51]  The use of the no safe level or linear "no threshold" model for showing unreasonable risk "flies in the face of the toxicological law of dose-response, that is, that 'the dose makes the poison,' which refers to the general tendency for a greater dose of a toxin to cause greater severity of responses in individuals, as well as greater frequency of response in populations."  Federal Judicial Center, *Reference Manual on Scientific Evidence* 475 (2d ed. 2000)(hereafter *"Reference Manual on Scientific Evidence"*).  Further, both Grace's experts and Claimants' experts have acknowledged that some levels of exposure pose no risk.  In fact, Dr. Henry Anderson, Claimants' medical expert, testified that individuals in urban areas live with low levels of asbestos exposure their entire lives without risking their health and that there are levels of exposure to asbestos in ZAI that are not medically significant.[52]  ZAI, the product itself, left in place in the attics that it has insulated for up to eight decades, has not been shown to be unsafe on this record.

---

[50] *See* 40 C.F.R. 300.430(e)(2)(i)(A)(2).  For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper count lifetime cancer risk to an individual of between $10^{-4}$ [1 in 10,000 or 0.0001] and $10^{-6}$ [1 in 1,000,000 or .000001] using information on the relationship between dose and response.

[51] The court in *Celotex v. A.I.U. Insurance. Co., et. al (In re Celotex)*, 196 B.R. 973, 981-84 (Bankr. M.D. Fla. 1996), explained that as the understanding of asbestos increased, the EPA backed away from "no threshold" theories and the tear-it-all-out approach.

[52] Henry Anderson Deposition, Doc. No. 4013, Exh. T, at 37.

-21-

Even if the "no threshold concept" was applicable and satisfied *Daubert*'s requirements for admissibility of scientific evidence, the cases cited by Claimants are not apropos. In *Greenville*, 827 F.2d 975, and *Wilshire*, 1989 WL 260222, *supra*, contamination and release were enough to trigger property damage liability. However, the cases are distinguishable. In *Greenville*, the contamination was in living and working areas.

> The evidence further showed that the asbestos material in the City Hall was falling off the beams in some areas and was laying in pieces on top of ceiling tiles. Greenville's experts found invisible asbestos fibers on every building surface tested in amounts of up to millions of fibers per square foot of surface area. Asbestos had contaminated ceiling tiles and carpets.

*City of Greenville v. W.R. Grace & Co.*, 640 F.Supp. 559, 565 (D.S.C. 1986). Asbestos fibers had been released into ceiling tiles, ventilation and elevator shafts, carpets and computer equipment. *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 976 (4th Cir. 1987). Similarly, the court in *Wilshire* explained that to sustain a claim for damages due to asbestos contamination, plaintiffs were required to show that asbestos fibers were released into "other parts of the structure [building]" beyond the areas where asbestos-containing fireproof material had been installed. *Wilshire*, 1989 WL 260222 at *8.

Claimants also look to *Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir. 1993), and a list of "representative cases holding that property contamination is established by proving the release of asbestos fibers or other toxic substances"[53] to support the application of the "no threshold" theory. However, in each of the "representative cases," the release of asbestos or other toxins was in living and work areas, not confined to an attic or similar location

---

[53] Doc. No. 4215, Exh. 6.

-22-

as is ZAI. The location of contamination and other relevant characteristics of "representative cases" cited by Claimants are listed below:

> *Commonwealth v. United States Mineral Products Co.*, 809 A.2d 1000, 1012 (Pa. Cmwlth. 2002). PCBs were first discovered in the elevator and later found "on every floor of the building and . . . there were also 'hot spots,' which contained a heavier concentration of PCBs."

> *80 South Eighth Street Limited Partnership v. Cary-Canada, Inc.*, 486 N.W.2d 393, 395 (Minn. 1992). Product "will release substantial numbers of asbestos fibers into all parts of the IDS Center."

> *Town of Hooksett School District v. W.R. Grace & Co.*, 617 F.Supp. 126, 128 (D.N.H. 1984). The asbestos product released "fibers contaminating its air, walls, floors, carpeting and upholstery as well as students and school personnel."

> *Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 53 Cal. Rptr.2d 887 (Cal. App. 1996). Court awarded damages for costs associated with removal of PCB from residential gas lines in California.

> *U.S. Gypsum v. Admiral Insurance. Co.*,(Ill. App. Court. 1994). Acoustical finishing plasters in schools: tiles fell in rooms and hallways, names carved in tiles, etc.

> *Lac D'Amiante du Quebec*, 613 F.Supp. 1549 (D.N.J. 1985). This company mined and sold asbestos for use in other companies' products and was suing insurance companies.

> *City of Manchester v. National Gypsum Co.*, 637 F.Supp. 646, 651 (D.R.I. 1986). "[T]he asbestos has purportedly contaminated the ceilings, walls, floors, furniture, drapes, and air quality of the buildings."

> *American Alliance Insurance Company v. Jencraft Corp.* 21 F.Supp.2d 485 (D.N.J. 1998). Lead-stabilized vinyl mini-blinds released "hazardous lead dust into surrounding environs."

> *Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir. 1993). Asbestos fiber release from an acoustical plaster product was found "on top of a display case . . . near an information booth . . . in an area near certain lighting fixtures and on carpeting at the entry way to one of the stores."

In the case before us, there is no evidence that asbestos is released into living or working areas absent large scale renovation or demolition. To the contrary, the evidence established just the opposite: even upon disturbance for foreseeable homeowner activities, asbestos concentrations are not elevated throughout the house.

Claimants' expert, Mr. William M. Ewing,[54] explained that the mere presence of ZAI in an attic does not release asbestos fibers into the air of either the attic or the living areas of the home.[55] Dr. Morton Corn, Grace's expert, agreed in his Expert Witness Report that "airborne asbestos concentrations during disturbance are measurable in the breathing zones of those in the immediate vicinity of the disturbance, but not elevated throughout the entire home."[56] Ambient air tests were conducted in twelve homes by Claimants and eighteen air sample stations running in the living areas of the homes tested produced only one single fiber when analyzed using EPA's AHERA protocol, 40 C.F.R., Part 763, Appendix A to Subpart E.[57]

Thus we are faced with an assertion that the mere presence of ZAI in attics poses an unreasonable risk of harm but with no evidence to support that contention. The court in *Wilshire* held that "plaintiffs may not recover damages under their theories that the mere presence of ACFM[58] or the potential future risk of ACFM contamination constitutes actionable harm in tort."

---

[54] Mr. Ewing, Certified Industrial Hygienist (CIH), is an expert at conducting studies involving asbestos in buildings. Over the past 20 years he has conducted numerous industrial hygiene, asbestos management, and indoor air quality studies. Doc. No. 4019, Exh. 28.

[55] Ewing Deposition, Doc. No. 4011, Exh. C at 58.

[56] Dr. Morton Corn Report, Doc. No. 4011, Exh. 2 at 18.

[57] Doc. No. 4013, Exh. G at 33 and Table 4.

[58] Asbestos containing fireproof material ("ACFM").

-24-

*Wilshire*, 1989 WL 260222 at *4. The Court of Appeals for the Tenth Circuit in *Perlmutter*,

*supra*, 4 F.3d at 867, addressed the question of what evidence of contamination was necessary to

maintain a property damage tort claim. The court highlighted the distinction between the

evidence presented in *Adams-Arapahoe School Dist. No.28-J v. GAF Corp.*, 959 F.2d 868 (10th

Cir. 1992), where the court found that the school district did not present sufficient evidence of

contamination to justify sending the case to the jury and directed a verdict in favor of GAF

Corp., and the evidence presented in *Perlmutter*. The court stated:

> The question we are presented under *Adams-Arapahoe* is whether the Developers
> have presented evidence sufficient to overcome USG's motion for directed
> verdict and post-trial motions on this claim. In so doing, we view the evidence in
> the light most favorable to the Developers and draw all inferences in the
> Developers' favor. . . We believe that the Developers have met this burden. . . . At
> trial, the Developers did more than present evidence that the Audicote plaster
> used in the Northglenn Mall contained asbestos or that the plaster could release
> asbestos dust if disturbed or allowed to flake or crumble. The Developers showed
> there were significant amounts of asbestos fibers . . .

in common areas of the mall frequented by shoppers. *Perlmutter*, 4 F.3d at 868. The claimants

in *Adams-Arapahoe*, like those in the pending case, based their claims on the presence of

asbestos contaminated materials in the building, the potential for fiber release, and the risks

associated with asbestos. However, the evidence to support the claims is materially different. In

*Pelmutter*, "significant amounts" of asbestos fibers were proven to exist in the mall. The

evidence in the case before us shows an absence of asbestos fibers (either dormant or airborne)

in the living areas of homes with ZAI attic insulation. Without evidence of the presence of

asbestos fibers, the mere potential for contamination and release alone is insufficient, under

*Adams-Arapahoe* and *Perlmutter*, to substantiate that there is any unreasonable risk of harm.

-25-

However, the matter does not end there.  Attics are not completely isolated in all homes;

some homeowners may enter the attic to make renovations such as adding ceiling light fixtures

or fans.  Others may use the attic for storage.  Because of this potential for limited exposure, the

court will examine the parties' submissions regarding epidemiological studies, risk assessment,

and regulatory standards in order to determine whether ZAI poses an unreasonable risk due to

foreseeable homeowner activities.

### 3. *Evidence Presented Concerning Whether ZAI Creates an Unreasonable Risk*

Grace retained four experts to evaluate the risks of exposure to ZAI when it is disturbed

in an attic through cleaning, renovation, storage or removal activities: Dr. Elizabeth Anderson,[59]

Dr. Morton Corn,[60] Dr. Richard J. Lee,[61] and Dr. William G. Hughson.[62]  Grace also had Dr.

Peter Lees[63] and Dr. Steve Mylnarek[64] perform a series of simulations in a home near Albany,

---

[59] Dr. Anderson is a former director of the EPA's Risk Assessment Programs, past President of the Society of Risk Analysis and Editor of "Risk Analysis:  An International Journal."  Doc. No. 4011, Elizabeth Anderson Report, Appendix, Exh. E.

[60] Dr. Corn is a former Assistant Secretary of Labor in charge of OSHA, former Professor and Director of the John Hopkins University School of Public Health and author of over 100 articles, book chapters and books on industrial hygiene.  Doc. No. 4011, Corn Report and Corn Supplemental Report, Appendix, Exh. F.

[61] Dr. Lee is an expert microscopist and physicist, who has performed analysis of asbestos and other materials (including rocks from the moon) for NASA, the EPA, the United States Navy, the United States Army, the State of California and countless other governmental and private organizations.  Doc. No. 4013, Lee Report, Appendix, Exh. G.

[62] Dr. Hughson is a Board-certified pulmonologist and epidemiologist, a Rhodes scholar, and the Director of the Center for Occupational and Environmental Medicine at the University of California at San Diego.  Doc. No. 4013, Hughson Report, Appendix, Exh. H at 3.

[63] Dr. Lees, Ph.D, is an professor at Johns Hopkins Bloomberg School of Public Health
(continued...)

-26-

New York.[65] This study, along with the EPA simulations in Libby, Montana,[66] a set of

simulations conducted by Versar, Inc., under contract from the EPA,[67] the Pinchin

Environmental Group report on the demolition of military facilities in Canada,[68] and the studies

conducted by Claimants' experts in the State of Washington[69] and Silver Spring, Maryland,[70]

were analyzed by Grace's four experts.  Dr. Lee prepared a report which reviewed "the

mineralogy, form, and exposure potential of the amphibole particles found in installed" ZAI and

reviewed "the testing results reported by Claimants' experts and the opinions expressed by those

---

[63](...continued)
in the Environmental Health Sciences and Engineering departments.

[64] Dr. Mlynarek, Ph.D., CIH, is an associate professor in industrial hygiene at the University of South Florida College of Public Health.

[65] P. Lees and S. Mlynarek (2003). "Report: Assessment of Potential Asbestos Exposure Resulting from Disturbance of Zonolite Vermiculite Attic Insulation", January 9, 2003.  Doc. No. 4013, Exh G, at 34.

[66] EPA Phase 2 Data.  Doc. No. 4013, Exh. G at 35.

[67] Versar (2002). "Preliminary Draft:  Asbestos Exposure Assessment for Vermiculite Attic Insulation", Versar, Inc. Springfield, VA, June 28, 2002.

[68] Pinchin Environmental, "Final Report Site Assessment Vermiculite Removal Building E-12 C.F.B. Shilo, Shilo Manitoba" (Apr. 3, 1977).  Doc. No. 4018, Attachment 25.

[69] The participants in Claimants' Washington simulations and testing were William M. Ewing, Certified Industrial Hygienist (CIH), and Tod A. Dawson of Compass Environmental, Inc.; Mr. Richard Hatfield, Dr. William Longo, and Mr. Paul Liss of Materials Analytical Services, Inc.; and Mr. Steve M. Hays, Professional Engineer (PE), CIH, Mr. Ron V. Gobbell, Fellow of the American Institute of Architects (FAIA), and Mr. Pete Cappel of Gobbell Hays Partners, Inc.

[70] *Barbanti, et al. v. W.R. Grace & Co., et al.*, No. 00-2-01756-6 (Super. Court. Wash. Dec. 20, 2000).

reports."[71] Dr. Anderson analyzed these studies and performed a risk assessment in accordance with current EPA standards.[72] Dr. Corn analyzed the studies from an industrial hygiene perspective[73] and Dr. Hughson evaluated the risk of disease for the exposure levels quantified in these studies.[74]

Claimants commissioned Mr. William M. Ewing to evaluate ZAI; to give his opinion on its friability, fiber release potential, and ability to contaminate buildings; and to opine on federal and state regulations governing asbestos, evaluation of ZAI homes, and appropriate response actions in buildings where ZAI has released fibers.[75] In his report he evaluated the Washington simulations in which he participated and commented on Grace's historical testing and the Pinchin Environmental Report. Mr. Richard Hatfield[76] and Dr. William E. Longo[77] provided a report evaluating the procedures used for dust sampling and air sampling during foreseeable

--------

[71] Richard J. Lee Report. Doc. No. 4013, Appendix, Exh. G.

[72] Elizabeth L. Anderson Report. Doc. No. 4011, Exh. E.

[73] Morton Corn Report. Doc. No. 4011, Exh. F.

[74] William G. Hughson Report. Doc. No. 4013, Exh. H.

[75] William M. Ewing, "Zonolite Attic Insulation Report" (Mar. 19, 2003). Doc. No. 4019, Attachment 28 to Memorandum in Support of Claimants Motion for Summary Judgment (reflected on docket as Main Document).

[76] Mr. Hatfield is a specialist in material analysis and has been actively engaged in asbestos related services since 1979.

[77] Dr. Longo is an expert in the fields of microscopy, materials science and engineering, and asbestos analysis and evaluation; and the primary author of the ASTM method D-5755-95 entitled "Micro-Vacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentration".

-28-

homeowner activities.[78]  Ewing, Hatfield and Longo were the primary participants in the Zonolite Insulation Exposure studies conducted for Claimants in Maryland and Washington.

Additionally, ZAI Claimants offered two case reports of individuals (Harashe and Liebsch) who allegedly contracted mesothelioma from exposure to ZAI. They were introduced in a report by Claimants' medical expert, Dr. Henry Anderson.[79]  His opinions were based on the court opinion in Mr. Harashe's personal injury lawsuit and on the court transcript and some medical records of Mr. Liebsch.[80]  Grace provided a medical study conducted by the EPA in Libby, Montana, which included ZAI.[81]

Claimants also provided additional evidence regarding asbestos contamination in public and commercial buildings[82] and evidence regarding the health effects of asbestos in general. Both parties submitted numerous EPA documents and technical reports, manuals, handbooks and articles covering the various techniques, theories, analyses, concepts and apparatuses employed by the experts in their testing and analysis.

We have considered all of the evidence and base our findings and conclusions from the evidence, as set forth below.

---

[78]   Richard Hatfield & William Longo, Zonolite Attic Insulation Report (April 4, 2003), Doc. No. 4019, Attachment 43.

[79] Excerpts from the April 30, 2003, Deposition of Henry A. Anderson, M.D.,  Doc. No. 4013, Exh. T.  *See also* Affidavit of Henry A. Anderson, Doc. No. 2045, Exh. F.

[80]   Doc. No. 4013, Exh. T, and Doc. No. 2045, Exh. F.

[81]Agency for Toxic Substances and Disease Registry, Year 2000 Medical Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, Montana:  A Report to the Community (August 23, 2001).  Doc. No. 4011, Exh. A.

[82]   Doc. No. 4204 at 18, n. 55.

-29-

a. *Case Studies*

The fundamental scientific limitations of anecdotal evidence have led federal courts to

consistently reject individual case reports as a reliable basis for medical causation opinions. *See*

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11th Cir. 1999); *Hollander v. Sandoz Pharm.*

*Corp.*, 95 F.Supp.2d 1230 (W.D. Okla. 2000), *aff'd in pertinent part*, 289 F.3d 1193 (10th Cir.),

*cert. denied* 537 U.S. 1088 (2002); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F.Supp.2d 1153 (D.

Mont. 1999); *Casey v. Ohio Med. Prod.*, 877 F.Supp. 1380 (N.D. Cal. 1995); *Wade-Greaux v.*

*Whitehall Laboratories, Inc.*, 874 F.Supp. 1441 (D.VI 1994).

> As we shall see, anecdotal reports can provide some information, but they are
> more useful as a stimulus for further inquiry than a basis for establishing
> association. . . . 'Anecdotal evidence' means reports of one kind of event
> following another.  Typically, the reports are obtained haphazardly or selectively,
> and the logic of "*post hoc, ergo propter hoc*" does not suffice to demonstrate that
> the first event causes the second.  Consequently, while anecdotal evidence can be
> suggestive, it can also be quite misleading.

*Reference Manual on Scientific Evidence* 355, Note 20 (2d ed. 2000).  Indeed some courts have

suggested that attempts to infer causation from anecdotal reports are inadmissible as unsound

methodology under *Daubert*.  *See Haggerty v. Upjohn Co.*, 950 F.Supp. 1160, 1163-64 (S.D.

Fla. 1996); *Cartwright v. Home Depot U.S.A., Inc.*, 936 F.Supp. 900, 905 (M.D. Fla. 1996).

As noted earlier, ZAI Claimants' medical expert, Dr. Henry Anderson, based his opinion

that ZAI caused two individuals to contract mesothelioma on the court opinion in Mr. Harashe's

personal injury lawsuit and the court transcript and some medical records of Mr. Liebsch.

Because his evaluation was so limited, Dr. Anderson was unaware of significant alternate

-30-

exposure pathways.[83] Dr. Anderson had no information regarding Mr. Harashe's exposure to asbestos through his job as a maintenance worker for a public school district.[84] Dr. Anderson also assumed that Mr. Liebsch had no occupational exposure to asbestos.[85] However, Mr. Liebsch worked in a boiler room of a hospital and family members testified that he came home from work covered with white dust and that he told his wife to wash his clothing separately.[86] Because Dr. Anderson's opinion was rendered without regard to all relevant facts, it is deficient, thereby calling into question even the marginal utility the case studies may have possessed concerning causation. Thus, use of the individual case studies was not sound methodology, the assumptions made were not scientifically or factually valid, and Dr. Anderson's analysis is unreliable. Dr. Anderson's opinion, therefore, does not satisfy *Daubert* and its progeny and is not admissible. We exclude this evidence. No other evidence of a causal link between ZAI and personal injury was presented. To the extent Dr. Anderson's methodology would pass the *Daubert* test, we give no weight to his opinion because the assumptions upon which it was based did not conform to or account for the evidence of additional sources of asbestos exposure.

---

[83] Doc. No. 4009, Brief of W. R. Grace & Co. in Support of Motion for Summary Judgment, at 29-30.

[84] Deposition of Henry A. Anderson, M.D., Doc. No. 4013, Exh. T at 82-84.

[85] *Id.* at 86-102. Dr. Anderson admitted that he did not review all of the deposition testimony and simply assumed that Mr. Liebsch had no occupational exposure.

[86] *Id.* at 99-100.

-31-

b. *Epidemiological Evidence*

Epidemiological studies examine the incidence, distribution, and etiology of disease in human populations to better understand disease causation and facilitate disease prevention. Federal Judicial Center, *Reference Guide on Epidemiology,* in *Reference Manual on Scientific Evidence* 335 (2d ed. 2000). Courts have increasingly relied on epidemiological studies as an appropriate methodology for demonstrating a causal relationship between a chemical compound and a set of symptoms or disease.

"The primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease" is the use of epidemiological studies. *Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F.Supp.2d 1347, 1356 (N.D. Ga. 2001), *aff'd* 295 F.3d 1194 (11th Cir. 2002). *See also Hollander v. Sandoz Pharms. Corp.*, 95 F.Supp.2d 1230, 1235 n.14 (W.D. Okla. 2000)(quoting *In re Breast Implant Litigation*); *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1224 (D. Colo. 1998).

> Epidemiologic evidence identifies agents that are associated with an increased risk of disease in groups of individuals, quantifies the amount of excess disease that is associated with an agent, and provides a profile of the type of individual who is likely to contract a disease after being exposed to an agent. Epidemiology focuses on general causation (i.e., is the agent capable of causing disease?) rather than specific causation (i.e., did the agent cause disease in a particular individual?).

*Reference Manual on Scientific Evidence* 336 (2d ed. 2000). *See also, In re Breast Implant Litigation, supra,* 11 F.Supp.2d at 1224 (discussion of general and specific causation with line of corresponding cases). Epidemiological studies identify and quantify associations between agents and diseases. These associations support but cannot deductively prove causation; "indeed, all empirically based science cannot affirmatively prove a causal relationship." *Reference Manual*

-32-

*on Scientific Evidence* at 336. Instead, causation can be proven through probabilistic means from epidemiological data which is based on the strength of the association, the strengths and weaknesses of the studies' design and implementation, and an assessment of the studies' fit with other scientific knowledge. *Reference Manual on Scientific Evidence* at 337.

The strength of an association is measured in terms of relative risk, odds ratio, or attributable risk. Relative Risk (RR) is defined as the incidence rate in the exposed divided by the incidence rate in the unexposed. *Id.* at 348, 349. Incidence rate is used to express the risk that, within a specified period of time, a member of the relevant population will develop the disease. *Id.* A risk of 1.0 means that the risk of disease to individuals exposed to an agent is the same as that to unexposed individuals. *Id.* Grace argues that Claimants must establish a 2.0 relative risk for ZAI, which would imply a 50 percent likelihood that an exposed individual's disease was caused by the agent. This is especially true in this case where all experts agree that low levels of exposure do not cause a risk to health.[87] Generally, the greater the relative risk the easier it is to infer causation. *Id.* at 348, 349. Smoking studies have shown that smokers are ten times more likely (RR 10.0) then nonsmokers to have lung cancer. A substantial number of courts have accepted RR of 2.0 in epidemiological studies to show causation as it corresponds to the burden of proof to a preponderance of the evidence; *i.e.*, requiring the finder of fact to find that what is sought to be proved is more likely true than not true. *See DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1320 (9th Cir.), *cert denied*, 516 U.S. 869 (1995). However, some courts have allowed slightly lower rates (*e.g.*, 1.75 or 1.5) when other factors such as genetics combine

---

[87] *See* note 53, *supra*.

-33-

to raise the risk to 2.0. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758-59 (3d Cir. 1994), *cert. denied sub nom. General Elec. Co. v. Ingram*, 513 U.S. 1190 (1995). We have no such evidence on this record and no reason to lower the rate below 2.0. Therefore, we accept Grace's position that Claimants must establish causation by a 2.0 relative risk rate. Claimants have not met that burden of proof.

There are two types of epidemiological studies: experimental and observational. *Reference Manual on Scientific Evidence* at 338-47. Experimental studies include randomized trials and clinical trials and are considered the gold standard for determining the relationship between an agent and a disease. *Id.* In these studies, the subjects are randomly assigned either to a group exposed to the agent in question or to another group exposed to a placebo. *Id.* Generally, experimental studies are used on agents suspected to be helpful, such as new drugs or medical treatments. Therefore, the majority of epidemiological studies are observational, where a group of individuals already exposed to an agent of interest is compared to another group not exposed.

An epidemiological study establishing a relationship between ZAI and asbestos related disease would be extremely useful in demonstrating an unreasonable risk of harm. However, neither party has introduced such a study or even a study involving similar vermiculite products or similar asbestos exposure levels. The evidence most similar to this case was examined in the ATSDR Libby study introduced by Grace,[88] which included ZAI and other vermiculite sources of asbestos exposure. The project resulted from various requests to declare a public health

---

[88] Agency for Toxic Substances and Disease Registry, Year 2000 Medical Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, Montana: A Report to the Community (August 23, 2001). Doc. No. 4011, Exh. A.

emergency in Libby, Montana, based on the allegedly heightened threat these sources of asbestos exposure could pose to a population in Libby which was already heavily exposed because of its involvement with and proximity to the Libby Mine. The results of the study disproved the allegation and showed no heightened or aggravated risk of asbestos disease from the presence of ZAI in residents' attics.[89] The results showed no association between ZAI and asbestos disease and the EPA subsequently rejected the requests to declare a public health emergency in Libby, Montana. However, we note that the observational study was only conducted on Libby residents. Because it lacked a control group, it is distinguishable from an experimental epidemiological study. *See Reference Manual on Scientific Evidence* at 338-47. Another difficulty encountered in conducting an epidemiological study in Libby is the difficulty in isolating one factor, such as ZAI, considering all the other potential exposure pathways.[90] However, even in Libby, the study did not show a heightened risk from ZAI.

In assessing the "unreasonable" risk of harm alleged in this matter, the court notes the lack of an epidemiological link between ZAI and asbestos disease. ZAI has been in use in homes for over 80 years. Claimants argue that studies were never done because Grace concealed contamination for so long.[91] However, the EPA warning surrounding VAI, which includes ZAI, *see* note 26 and accompanying test, *supra,* was published more than 20 years ago. Estimates provided indicate that from 3 million to 30 million homes contain ZAI[92] and that over 80 years

---

[89] *Id.*

[90] *See* Doc. No. 4294 at 3; Doc. No. 4204 at 20, 21.

[91] *See* Doc. No. 4007 at 7-9.

[92] *See* note 14, *supra.*

-35-

have passed with ZAI in use. Thus, a sufficient period of time has passed during which symptoms would manifest.[93] Moreover, the pool of homes with ZAI and the number of individuals exposed are plentiful and sufficient for a complete study to be conducted. Thus, facts to establish causation should be available. Nonetheless, but for Dr. Henry Anderson's opinion based on case studies, which, even if admissible, we do not credit, no such evidence has been produced.

In *Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545 (D. Colo. 1990), the court rejected the plaintiffs' assertion that epidemiological studies are not required as proof in order to establish a contaminant-injury, cause-effect relationship in a toxic tort case. In that case, all the examples plaintiffs cited involved individuals and not identifiable groups or communities. In instances involving individuals, "it is impossible to submit corroborative epidemiological evidence because it is impossible to identify a group or a community which has been exposed to the alleged carcinogen, and an epidemiological study therefore cannot be conducted." *Id.* at 1554. The case studies cited by the defendant, however, involved known exposures of entire communities to alleged carcinogens. The *Renaud* court relied on other cases to find that when read together they require epidemiological evidence to be submitted when the alleged exposures were in an identifiable group or community. *Id.* at 1553-55. Under those conditions, an epidemiological study can be conducted. *Id.* As stated above, the facts in this case lend themselves to an epidemiological study. Considering that ZAI has been in use for over 80 years, it is logical to assume that most homes with ZAI would have had multiple inhabitants and/or owners; thus there is an enormous group from which to conduct an epidemiological study.

---

[93] *See* note 46, *supra.*

-36-

The ATSDR Libby Study introduced by Grace approximates a complete epidemiological study and it supports the Grace's contention that ZAI does not pose an unreasonable risk of harm to homeowners. The analysis showed no heightened risk to the Libby community; however, given that the study lacked a control group the court will also look at other alternatives for assessing risk. Because airborne asbestos is a known carcinogen, evaluations of the risk associated with the presence of ZAI in a homeowner's attic can be calculated using dose-response figures taken from animal toxicity and epidemiological studies that dealt with higher asbestos exposure rates than are present in this case. *See Reference Guide on Toxicology,* in *Reference Manual on Scientific Evidence* at 401 (2d ed. 2000). Toxicological dose response evidence is used in both regulatory standards and risk assessment evaluations in tort litigation. *Id.* at 404.

### c. *Regulatory Standards and Risk Assessment*

Without the benefit of adequate epidemiological evidence, the court next examines regulatory standards and risk assessment studies to evaluate the health risks associated with ZAI. The only regulatory standards addressed or provided by either party were the Occupational Safety and Health Administration (OSHA) standards found in 29 C.F.R. §1910.1001. This section applies to all occupational exposures to asbestos in all industries, except construction and shipbuilding which are covered by other sections.[94] The only risk assessment provided was conducted for Grace by Dr. Elizabeth L. Anderson, a former director of the EPA's Risk

---

[94] 29 C.F.R. §1926.1101 and 29 C.F.R. §1926.1001 respectively.

-37-

Assessment Programs.[95]  Additionally, Dr. Morton Corn conducted an evaluation of the risk

associated with ZAI according to the Industrial Hygiene Paradigm.[96]  The Industrial Hygiene

Paradigm is a well known paradigm or model in the occupational and environmental health field,

and involves recognition, evaluation, and control of potentially hazardous material.  Morton

Corn, *The Role of Control Technologies in Preventing Occupational Disease*, 39 Arch. Env.

Health 235-40 (1984).

    Both OSHA regulatory standards and EPA risk assessment studies require a measurement

of asbestos exposure levels for individuals.  As illustrated by the details of the OSHA standard

and the EPA's risk assessment paradigm, this measurement is conducted by taking air samples

during workplace activities.[97]  The OSHA standard requires a measurement of exposure levels

based on a detailed air sampling procedure and analysis.  The general guideline is published at

29 C.F.R. §1910.1001:

> (c) Permissible exposure limit (PELS)--
>     (1) Time-weighted average limit (TWA).  The employer shall ensure that
> no employee be exposed  to an airborne concentration of asbestos in excess of 0.1
> fiber[98] per cubic centimeter of air as an eight (8)-hour time-weighted average
> (TWA) as determined by the method prescribed in Appendix A to this section, or
> by an equivalent method.
>     (2) Excursion limit. The employer shall ensure that no employee is
> exposed to an airborne concentration of asbestos in excess of 1.0 fiber per cubic

---

[95]  Doc. No. 4009 at 7.

[96]  Addressing Potential Health Concerns Associated With Inhalation of Zonolite Attic
Insulation.  Dr. Morton Corn, (April 7, 2003).  Doc. No. 4011, Exh. F.

[97]  In an attempt to apply OSHA standards to homeowners, both parties used simulations
of homeowner activities in place of workplace activities in their studies.

[98] 29 C.F.R. 1910.1001(b) - "Fiber means a particulate form of asbestos 5 micrometers or
longer, with a length-to-diameter ratio of at least 3 to 1."  This will be significant in the
discussion regarding analysis of air samples.

-38-

centimeter of air (1 f/cc) as averaged over a sampling period of thirty (30) minutes as determined by the method prescribed in Appendix A to this section, or by an equivalent method.
(d) Exposure monitoring–
     (1) General. (I) Determinations of employee exposure shall be made from breathing zone air samples that are representative of the 8-hour TWA and 30 minute short-term exposures of each employee.

The OSHA regulation for workers exposed to asbestos sets limits for both an eight hour time weighted average ("TWA") and a 30 minute excursion limit. *Id.* These standards are based on the number of fibers per cubic centimeter of breathing zone air samples taken during the workday. *Id.* Appendix A to 29 C.F.R. §1910.1001 also gives details and standards for the analysis and counting procedures to be applied to the air samples. The EPA risk assessment paradigm calculates risk using dose theory[99] and exposure levels. The EPA risk assessment paradigm contains the following four factors:

> 1) Hazard Identification: the identification of a compound as a potential hazard based on animal toxicity studies or human epidemiology studies.
> 2) Dose-response assessment: the assessment of the dose required to cause particular health effects.
> 3) Exposure assessment: an estimation of the exposure of the compound from the particular activity in question.
> 4) Risk characterization: characterization of the evidence that an agent might be a human carcinogen (or cause other non-cancer effects) together with a comparison of the exposure and dose-response to estimate the potential risk, accounting for uncertainties. [100]

---

[99] "'The dose makes the poison'; this implies that all chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose. Even water, if consumed in large quantities, can be toxic." *Reference Guide on Toxicology,* in *Reference Manual on Scientific Evidence 403 (2d ed. 2000); see also* Ellen K. Silbergeld, *The Role of Toxicology in Causation: A Scientific Perspective*, 1 Courts. Health Sci. & L. 374, 378 (1991).

[100] The EPA's risk paradigm was first published in 1983 by the National Research Council (NRC) in *Risk Assessment in the Federal Government: Managing the Process* (NRC, 1983). "It is now considered an essential text for health risk assessment." Doc. No. 4011, Exh. E at 8, 9.

-39-

Exposure assessment is an estimation of exposure to a compound from particular activities and can be measured using a protocol similar to that used by OSHA[101] adjusted to accommodate homeowner activities. Both parties used simulations with these adjustments.

*Daubert* objections[102] were raised as to the air sampling results provided by the parties.[103] As explained earlier, *Daubert* requires that the method used to gather the data be scientifically valid and that the reasoning or methodology be properly applied to the facts in issue. Reliability was questioned with regard to how the air sampling was conducted and "fit" was at issue where the results were inconsistent with the requirements of OSHA risk assessment standards. The air sampling results were the most contentious and complex portion of the evidence and testimony presented by the parties. As stated earlier, both parties conducted their own studies and testing of air samples and simulation of foreseeable homeowner activity. The following discussion

---

[101] 29 C.F.R. §1910.1001, Appendix A.

[102] Claimants' objections: Doc. No. 4018, Memorandum, at 29-32, Doc. No. 4204 at 4-8, Doc. No. 4294 at 8. Grace's objections: Doc. No. 4205 at 6-10, Doc. No. 4009 at 24-26, and Doc. No. 4298 at 7-8. Briefs involving Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments: Doc. Nos. 4022, 4173, 4206, 4293, and 4296.

[103] The conflict between the parties during their testimony and in their various briefs was centered around Grace's *Daubert* objections to the use of dust sampling and indirect sampling by Claimants. However, objections involving the air sampling conducted by both parties are more relevant to these proceedings because air sampling provides a better indication of airborne exposure. Grace correctly argued that dust sampling in not an accepted measurement of individuals' exposure levels. *In re Armstrong World Industries, Inc.*, 285 B.R. 864, 867 (Bankr. D. Del. 2002). However, Claimants did not proffer dust sampling as a measurement of airborne exposure, and Grace's objections are misplaced. In asbestos litigation, dust sampling has been a useful tool for confirming asbestos contamination, *In re Armstrong*, 285 B.R. at 867, and identifying a potential for resuspension, *EPA Response to September 11 – WTC Residential Dust Cleanup Program: Modified-Aggressive and Aggressive Sampling* (Aug. 6, 2002), Doc. No. 4019, Exh. 77. Additionally, ZAI Claimants' experts conceded that no regulatory standard relies upon measurements of asbestos in settled dust to determine hazard. *Ewing Deposition*, Doc. 4011, Exh. C at 163; *Hatfield Deposition*, Doc. No. 4013, Exh. N at 24.

-40-

explains the processes used by the parties regarding the risk assessment formula and OSHA

standards and sets forth the court's findings and conclusions.

Although Grace's expert, Dr. R.J. Lee, conducted his own analysis in accordance with

NIOSH 7400 (Asbestos and other fibers by Phase Contrast Microscopy) and NIOSH 7402

(Asbestos by Transmission Electron Microscopy)[104] as required by OSHA,[105] he "slightly

modified" the TEM procedure to exclude certain fibers from his counts. Dr. Lee stated he did so

to "fully identify and enumerate the cleavage fragments."[106] Cleavage fragments are not

asbestiform.[107] The air sampling data provided by Claimants was not analyzed personally or

---

[104] National Institute for Occupational Safety and Health (NIOSH), *NIOSH Manual of Analytical Methods (NMAM)*, 4th ed. DHHS (NIOSH) Publication No. 94-113 (1994). NMAM is a collection of methods for sampling and analysis of contaminants in workplace air, and in the blood and urine of workers who are occupationally exposed. These methods have been developed or adapted by NIOSH or its partners and have been evaluated according to established experimental protocols and performance criteria. NMAN also includes chapters on quality assurance, sampling, portable instrumentation, etc.

[105] Appendix A to 29 C.F.R. 1910.1001 specifies the procedure for analyzing air samples for asbestos. The Appendix requires Phase Contrast Microscopy ("PCM") analysis under the guidelines of the most current version of either OSHA method ID-160 or NIOSH 7400. Because PCM does not positively identify asbestos fibers, the appendix suggests differential counting technique (the practice of excluding certain kinds of fibers from the fiber count because they do not appear to be asbestos) techniques using TEM to achieve a more accurate count. Occupational Safety and Health Administration (OSHA), 29 C.F.R. §1910.1001, Appendix A.

[106] Doc. No. 4011, Exh. G at 34. Asbestos minerals, such as tremolite, have non-asbestos analogs commonly referred to as "cleavage fragments." Lee Report, Appendix, Exh. G at 11; Ilgren Report, Appendix, Exh. S at 4. Cleavage fragments are non-fibrous, non-asbestos minerals formed when amphibloes are crushed. Fragments are cleaved away from the main crystal mass and some long thin fragments may result. ZAI Claimants' experts agree that cleavage fragments are not asbestiform. *Id.* Ewing Deposition, Appendix, Exh. C at 85-86; Hays Deposition, Appendix, Exh. M at 24-25. "Cleavage Fragment: Mineral Particles formed by comminution of minerals, especially those characterized by parallel sides and a moderate aspect ratio (usually less than 20:1). 29 C.F.R. §1910.1001, Appendix A.

[107] Ewing Deposition, Doc. No. 4011, Exh. C at 85-86; Hays Deposition, Doc. No. 4013,
(continued...)

-41-

microscopically by Dr. R.J. Lee. Dr. Lee did not replicate the tests submitted by Claimants. Rather he looked at the analysis of air sample results from a report provided by Claimants and authored by P. Lees and S. Mylnarek.[108] Dr. Lee then modified the results of the Claimants' air sampling data to account for his alteration of NIOSH 7402 TEM procedure from his own tests. This was accomplished by applying a ratio, based on the difference between Dr. Lee's NIOSH 7402 results and modified NIOSH 7402 results, to the other air sampling data. The concept of cleavage fragments is a scientifically valid concept;[109] however, Dr. Lee's alteration of NIOSH has not been peer reviewed or published, and thus fails one of the tests of reliability noted in *Daubert*. In the United States' Statement Regarding Asbestos Analysis Issues in W.R. Grace's Motion for Summary Judgment and Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments, the government recommends that this court reject Dr. Lee's adjustments.[110] Dr. Lee's method regarding cleavage fragments is not generally accepted. Without peer review

---

[107](...continued)
Exh. M at 24-25.

[108] P. Lees and S. Mylnarek (2003) "Report: Assessment of Potential Asbestos Exposure Resulting from Disturbance of Zonolite Attic Insulation, January 9, 2003. Doc. No. 4013, Exh G, at 34.

[109] *See* Dr. E.B. Ilgren, Expert Report re WR Grace - Related Attic Insulation Asbestos Litigation: The Biological Relevance of Tremolite Cleavage Fragments (April 10, 2003), Doc. No. 4013, Exh. S. *See also* Doc. No. 4206, Attachment (Lee Affidavit) at ¶ 47 citing G. Wylie, R.L. Virta and E. Russek (1985), "Characterizing and Discriminating Airborne Cleavage Fragments and Amosite Fibers: Implications for the NIOSH Method," Amer. Ind. Hyg. Assoc. J. 46(4): 197-201. The study itself is Exh. 20 at Doc. No. 4208. *See also* Doc. No. 4206, Attachment (Lee Affidavit) at ¶ 48 citing G. Burdett (1998), "Final Report for R42:70: Quantitative Measurement of Asbestos and Other Fibers in Bulk Materials," IR/K.MF/98/02, Health and Safety Laboratory. The study itself is Exh. 21 at Doc. No. 4209.

[110] Doc. No. 4173 at 3-10.

-42-

or publication of the adjusted counting protocol developed by Dr. Lee,[111] as required by *Daubert*, this court will grant Claimants' Motion to Exclude Dr. R.J. Lee's Opinion on Cleavage Fragments.[112] However, Dr. Lee's report and testimony is not wholly excluded. Only the portions dealing with the adjustment of counting procedures based on cleavage fragments are excluded. Alternatively, this court gives no weight to that portion of Dr. Lee's report.

Claimants presented air sampling data from three sources: their own testing,[113] Pinchinn,[114] and Grace Historical testing.[115] Grace objects to the use of the ZAI Grace historical testing conducted in the 1970s, and it is easily excluded, because the record included with these samples is insufficient to explain the methodology utilized. Claimants failed to include the protocols or standards used to conduct the testing, sampling, or analysis as required by *Daubert* and its progeny.[116] *See Daubert* 509 U.S. at 592-93. Notably, "the existence and maintenance of

---

[111] "Conversion to PCME/Impact of Counting Cleavage Fragments," Doc. No. 4013, Lee Report,, Appendix, Exh. G at 38.

[112] Doc. No. 4022.

[113] William M. Ewing, "Zonolite Attic Insulation Report" (Mar. 19, 2003). Doc. No. 4019, Attachment 28. *See* note 75, *supra*.

[114] Pinchin Environmental, "Final Report Site Assessment Vermiculite Removal Building E-12 C.F.B. Shilo, Shilo Manitoba" (Apr. 3, 1977). Doc. No. 4018, Exh. 26 (reflected on the docket as first Attachment 25).

[115] Grace ZAI Test Notes (July 11, 1977)(one page handwritten note), Doc. No. 4020, Attachment 90; Binder Development Program P-204 Weedsport Spraying Tests (Mar. 1977)(testing results regarding water soluble additives for reducing airborne fibers), Doc. No. 4020, Attachment 91; Memo from R.H. Locke to H.A. Brown (Mar. 11, 1976)(contains three sentences on "Attic Fill" testing), Doc. 4018, Attachment 10.

[116] As stated in the text, the Court of Appeals for the Third Circuit expanded the *Daubert* list of four factors for determining reliability of scientific evidence to the following: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to

(continued...)

-43-

standards controlling the technique's operation" is included in the list of factors used for determining the reliability of scientific evidence.[117] Here, we have no such evidence. Additionally, the internal Grace Memorandum which provided the historical testing results (air sampling conducted on various products, including ZAI ) began with an admission that any conclusions were based on "these very few, hurried tests."[118] Further, much of the ZAI historical testing was conducted during "drop tests," not simulated homeowner exposure. "Drop tests," essentially, analyze asbestos release during the pouring of ZAI material.[119] The allegations involved in this proceeding are releases of fibers after installation is complete, and not during the very different process of initial installation. Thus, these tests do not fit the facts of the matter before us, and we exclude the ZAI Grace historical testing.

---

[116](...continued)
peer review; (3) the known potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology and (8) the non-judicial uses to which the method has been put." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 n.8 (3d Cir. 1994), *cert. denied,* 513 U.S. 1190, 131 L. Ed. 2d 134, 115 S. Ct. 1253 (1995) *("Paoli II").*

[117] *Daubert* , 509 U.S. at 592-93.

[118] Memo from R.H. Locke to H.A. Brown (Mar. 11, 1976), Doc. 4018, Attachment 10.

[119] The tests used were drop tests and were described by Frederick Eaton: "A drop test was . . . a four-sided pyramid hopper mounted a certain distance from the floor. First of all, this drop test was done in an enclosed space, and the hopper was supported by four legs. The bottom of the hopper had a slide gate that could open - - could be opened and adjusted, and there were at least two pumps attached to the legs of the hopper, and then a certain number of bags, and I don't remember exactly, were placed in the hopper, and then to run the test, the pumps were turned on, and the slide gate opened to a predetermined setting and the material flowed from the hopper to the floor." Deposition of Frederick Eaton, at 25, 26 (Feb. 6, 2003), Doc. No. 4018, Attachment 8.

The Pinchinn studies were conducted during gross demolition of ceiling drywall and subsequent dispersement of insulation and abatement-style insulation removal for buildings at a Canadian military base.[120]  The procedural record for these tests show that the tests deviated from protocol[121] and the activities and building types are not consistent with domestic exposure to ZAI at issue in this case.  Again, there is no fit and we sustain Grace's objection to the admissibility of these facts.

The study commissioned by Claimants was the "Zonolite Insulation Exposure Studies" conducted by Claimants' expert, William M. Ewing.[122]  This study involved the most extensive and thoroughly documented simulations of those presented by Claimants, but still has some deficiencies.  The report included only excursion limit[123] results and never examined the other half of the OSHA regulations, the 8-hour time weighted average ("TWA").[124]  Additionally, the

---

[120]    Pinchin Environmental, "Final Report Site Assessment Vermiculite Removal Building E-12 C.F.B.  Shilo, Shilo Manitoba" (Apr. 3, 1977).  Doc. No. 4018, (First) Attachment 25.

[121]  The tests deviated from the protocols of the NIOSH 7402 TEM analysis standards by using an indirect preparation procedure (as indicated by "Fraction Re-filtered" on the data tables).  Indirect preparation is a method of dissolving and sonicating samples prior to analysis.  On each sample, only 10 grid openings were used, rather than the 40 mandated by NIOSH 7402.  Additionally, NIOSH 7402 requires the counting of fibers longer than 5 μm and wider than 0.25 μm, but the Pinchin counts included fibers shorter than 5 μm and thinner than 0.25 μm.  *See* Richard J. Lee Report.  Doc. No. 4013, Appendix, Exh. G.

[122]  William M. Ewing, "Zonolite Attic Insulation Report" (Mar. 19, 2003), Attachment 2 (Zonolite Insulation Exposure Studies).  Doc. No. 4019, Attachment 28.  *See note 75, supra.*

[123]  "Excursion limit.  The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 1.0 fiber per cubic centimeter of air (1 f/cc) as averaged over a sampling period of thirty (30) minutes as determined by the method prescribed in Appendix A to this section, or by an equivalent method."  29 C.F.R. §1910.1001.

[124]  "Time-weighted average limit (TWA).  The employer shall ensure that no employee
(continued...)

-45-

Ewing report did not account for the lifetime exposure component of assessing risk, as did Dr. Morton Corn and Dr. Elizabeth Anderson in their respective reports. Nonetheless, the study, as far as it goes, is relevant to this issue and satisfies *Daubert*.

The results of the excursion limit testing showed some fiber levels above that permitted by OSHA standards but only when the tests were run while asbestos was actually removed. Under the Claimants' calculations, fiber levels for asbestos removal were the only activities which exceeded OSHA standards.[125] No other foreseeable homeowner activity, such as cleaning boxes stored in the attic, produced fiber levels that exceed OSHA regulations. Further, OSHA standards are intended for exposures of up to forty hours a week for up to forty years.[126] These standards far exceed what a typical homeowner would encounter due to ZAI in the attic. At most, ZAI removal would occur only once in a home. Further, major renovations and foreseeable homeowner activities which disturb ZAI, at best, would occur intermittently and not forty hours a week for 40 years. Thus, the Ewing report does not support unreasonable risk of harm due to typical homeowner activities.

---

[124](...continued)
be exposed to an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average (TWA) as determined by the method prescribed in Appendix A to this section, or by an equivalent method." 29 C.F.R. §1910.1001.

[125] "Zonolite Insulation Exposure Studies" Attachment 2, at 9-14, in William M. Ewing, "Zonolite Attic Insulation Report" (Mar. 19, 2003), Doc. No. 4019, Attachment 28. *See* note 75, *supra*.

[126] OSHA regulations are based on a forty hour work week and forty year career. *See* Dr. Morton Corn, *Addressing Potential Health Concerns Associated With Inhalation of Zonolite Attic Insulation*, (April 7, 2003). Doc. No. 4011, Exh. F. Homeowners, on the other hand, would not spend this amount of time in their attics. *See also* 29 C.F.R. §1910.1001.

-46-

The point to exposure data is to assess how often a person would breathe in asbestos fibers. The only known danger from asbestos is based upon respiration. Grace's expert, Dr. Morton Corn, explained that the potential risk posed by inhaling airborne asbestos, according to the fundamental tenets of industrial hygiene and public health, is dependent not only on the concentration of asbestos in the inhaled air, but also on the frequency and duration of such exposures over a person's entire lifetime.[127] Dr. Corn explained that the "dosage of inhaled fibers to the lungs is very low when compared to the historical lifetime dosages of asbestos inhaled in the past by asbestos workers, or to dosages permitted to be inhaled during a working lifetime with current occupational standards.[128] Claimants also point out that OSHA standards were never intended to apply outside the workplace.[129] We agree. However, there are no standards directly applicable to home attics and the OSHA standards provide a base line for assessing risk of harm from exposure to airborne asbestos. The toxicological rule of dose response, a fundamental tenet of industrial hygiene and public health, provides that the potential health risk posed by inhaling airborne asbestos is a function not only of the concentration of asbestos in the inhaled air, but also of the frequency and duration of such exposures to asbestos over a person's lifetime.[130] The OSHA standards account for lifetime exposure of workers, not

---

[127] *See* Corn Report, Doc. No. 4011, Exh. F at 13, 18-19, and Supplemental Report at 4, 6.

[128] Doc. No. 4011, Exh. F at 18.

[129] Ewing Report, Doc. No. 4019 at 16. "The OSHA standards do not apply to homeowners or children."

[130] Doc. No. 4011, Exh. F at 19. *See also*, Dr. Elizabeth Anderson's report, Doc. No. 4011, Exh. E, at 10 ("[T]he cancer risk associated with asbestos exposure is . . . determined as a function of the frequency, magnitude, and duration of exposure oven a lifetime.").

-47-

of homeowners.[131]   The circumstances of exposure (i.e., frequency, duration and in the case of

homeowners, location) must be taken into account in order to determine if the risk, if any, is

unreasonable.  Here, all tests conducted regarding foreseeable homeowner activities other than

removal of ZAI from a home showed virtually no risk, let alone an unreasonable risk.[132]  The

evidence submitted indicates that outside the attic, when disturbed, the risk of exposure is

negligible.[133]  In the attic, even on disturbance, fiber levels did not exceed accepted standards

employed in the workplace.

    The risk assessment conducted by one of Grace's experts, Dr. Elizabeth Anderson, went

beyond Claimants' study and accounted for the lifetime exposure of homeowners.[134]  We accept

her study, which both satisfies *Daubert* and fits this case.

    The risk assessment done by Dr. Elizabeth Anderson, on behalf of Grace, used exposure

assessment data[135] and dose response[136] to calculate risk.  That calculation can be compared to

the EPA's statutory levels for acceptable risk:

---

[131] *See* note 126, *supra.*

[132] *See* Dr. Elizabeth Anderson's report, Doc. No. 4011, Exh. E, at 3 (even contractors
working in homes with ZAI face risks similar to or less than those commonly accepted by
regulatory agencies and individuals in the workplace).

[133] See notes 54-57 and accompanying text, *supra.*

[134] Elizabeth L. Anderson, *Assessment of the Potential Risks to Homeowners and
Residential Contractors From Asbestos Exposure Associated with Vermiculite Attic Insulations*
(Elizabeth L. Anderson Report), Doc. No. 4011, Exh. E.

[135] Dr. Elizabeth Anderson used exposure assessment data provided by both Claimants
and Grace.  "Table IV-3. Summary of the Usefulness of Each VAI Exposure Study for Risk
Assessment," Doc. No. 4011, Exh. E, at 23.

[136] *See* note 99 and accompanying test, *supra.*

-48-

> For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper count lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose and response. The $10^{-6}$ risk level shall be used as the point of departure for determining remediation goals for alternatives when ARARs [Applicable or Relevant and Appropriate Requirements] are not available or are not sufficiently protective because of the presence of multiple contaminants at a site or multiple pathways of exposure.

40 C.F.R. §300.430(e)(2)(i)(A)(2). The EPA's range for acceptable risk of $10^{-4}$ to $10^{-6}$ can also be expressed as 0.01 percent to 0.0001 percent. As a frame of reference, the risk of being struck by lightning is 0.002 percent; the risk of dying from a bicycle accident is 0.019 percent; fire 0.084 percent; drowning 0.11 percent; food poisoning 0.12 percent; homicide 0.45 percent; car accident 1 percent; alcohol 1.1 percent; stroke 14 percent; heart disease 18 percent.[137] Dr. Anderson explained that at the current Permissible Exposure Limit ("PEL"), OSHA estimates that a worker exposed for 40 years would have a risk of contracting an asbestos related disease of $3.4 \times 10^{-3}$ (or 0.34 percent). This risk for workers is above that permitted under EPA regulations, *see* 40 C.F.R. 330.430, but homeowner risk due to exposure to attic insulation is lower than those exposed in the workplace.[138] Dr. Anderson concluded that "the low risks that were estimated for residents and contractors [working in homes with ZAI] are similar to or less than the risks that are commonly experienced and accepted by individuals and regulatory agencies, both as the result of environmental causes or other common activities."[139] For example, the risk Dr. Anderson calculated for living in a home with ZAI was less than the risk of

---

[137] Elizabeth L. Anderson, *Summary of Estimated Lifetime Mortality Risks for Various Causes* in Elizabeth L. Anderson Report, Doc. No. 4011, Exh. E at 55. (values were adapted from data on the Harvard Center for Risk Analysis website. www.hcra.harvard.edu)

[138] Elizabeth L. Anderson Report. Doc. No. 4011, Exh. E at 52.

[139] Elizabeth L. Anderson's Report, Doc. No. 4011, Exh. E, at 3.

-49-

dying in a bicycle accident or by drowning.  The results established by the Anderson risk assessment[140] were all within the acceptable target range of risk, $10^{-4}$ to $10^{-6}$, commonly accepted by EPA, and far below risk levels associated with OSHA standards for worker protection.[141]

Claimants provided no risk assessment, but did object to Dr. Anderson's.  However, Claimants' objection is based on inaccurate information.  Claimants alleged that

> while Dr. Anderson is a qualified risk assessor, her calculations are totally dependent on the data supplied by Grace.  This data is infected with unwarranted assumptions and totters on the three-legged stool of Dr. Lee's 'creative' microscopy.  The old adage 'garbage in, garbage out', is amply proven here.  Indeed, Dr. Anderson's equations condemn Grace's position when more realistic exposure scenarios are modeled.[142]

Claimants argue that because Dr. Anderson used the problematic information provided by Dr. Lee, which excluded cleavage fragments from sample counts, her results are suspect.  However, Dr. Anderson used the exposure levels without Dr. Lee's adjustments for cleavage fragments. She included cleavage fragments in all of the calculations made during her risk assessment.[143] "All of the risks for residents were well within EPA's risk range of $10^{-4}$ and $10^{-6}$, or below, even including cleavage fragments."[144]  Dr. Anderson did not rely on or utilize the cleavage fragment portions of Dr. Lee's report, which this court has excluded from evidence.  Claimants raised other objections based on a dispute with Dr. Anderson's assumptions but provided no

---

[140] Elizabeth L. Anderson Report.  Doc. No. 4011, Exh. E at 44-51.

[141] Doc. No. 4009 at 10 and Doc. No. 4011, Exh. E at 8-9.

[142] Doc. No. 4204 at 21.

[143] Doc. No. 4011, Exh. E at 44-46.

[144] Id. at 44.

-50-

assumptions of their own. We accept Dr. Anderson's assumptions because we have been provided nothing to the contrary and they are reasonable given the facts of this case. Therefore, Claimants' objection to Dr. Anderson's risk assessment has no merit.

The court accepts Dr. Anderson's analysis and findings, which substantiate that Claimants are not exposed to greater health risks from ZAI than otherwise and that ZAI poses no unreasonable risk of harm sufficient to support claims for property damage.[145] Dr. Anderson's methodology is clearly articulated and is capable of repetition and peer review.

## CONCLUSION

For the reasons provided above, Claimants' Motion for Partial Summary Judgment is denied without prejudice although the court will enter an order specifying that there is no dispute regarding the fact that ZAI is contaminated with asbestos and can release asbestos fibers when disturbed during foreseeable homeowner activities. However, the contamination and release adduced from the evidence in this case do not establish an unreasonable risk of harm from ZAI home attic insulation.

Regarding the cross-motions for summary judgment, the law is clear that in order to succeed on a motion for summary judgment, the moving party bears the initial responsibility of identifying an absence of a genuine issue of material fact as to an essential element of the nonmovants' case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Debtors met this burden when they provided risk assessment, industrial hygiene evaluation, and the ATSDR

---

[145] Elizabeth L. Anderson Report, Doc. No. 4011, Appendix, Exh. E.

Libby Study[146] to support a finding that ZAI does not pose an unreasonable risk of harm. The burden then shifted to Claimants to set forth affirmative evidence and specific facts establishing the existence of a material fact in dispute of an element essential to the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1128 (3d Cir. 1990). Claimants were required to show a disputed material fact to establish that ZAI poses an unreasonable risk of harm. Claimants failed to provide any epidemiological evidence or any risk assessment. They have shown no material fact in dispute. Claimants cited to the OSHA standard as an applicable regulatory yardstick, but failed to account for the lifetime exposure differences between the workplace and a home attic insulated with ZAI. In addition, the evidence established that the risk of exposure from ZAI in the home is less than that of dying in a bicycle accident, by drowning, or from food poisoning.

The various *Daubert* objections have been addressed in this opinion and will be incorporated into an order.

Without any scientifically reliable evidence indicating that ZAI poses an unreasonable risk of harm, this court must grant Grace's motion for summary judgment in part and deny Claimants' motion for summary judgment in part, limited to the threshold issue of unreasonable risk of harm as it pertains to all proofs of claim. While the determination made herein may prove to be fatal to the property damage claims, several different theories of liability were proposed in the individual proofs of claim and may still need to be addressed. A status conference will be scheduled to discuss the form of an order regarding disposition of the proofs of claim; that is,

---

[146] Agency for Toxic Substances and Disease Registry, Year 2000 Medical Testing of Individuals Potentially Exposed to Asbestiform Minerals Associated with Vermiculite in Libby, Montana: A Report to the Community (August 23, 2001). Doc. No. 4011, Exh. A.

-52-

which are subject to dismissal based upon the findings herein and what claims, if any, may still remain. Further, if any remain, the status conference will address the need, if any, for class treatment of any claims going forward.

An appropriate order will be issued.

DATE: December 14, 2006

*Judith K. Fitzgerald*                    jmd
Judith K. Fitzgerald
United States Bankruptcy Judge

CC:

James J. Restivo, Jr.
James W. Bentz
Doug Cameron
Reed Smith, LLP
435 Sixth Avenue
Pittsburgh, PA 15210

-53-

A251

Edward J. Westbrook
Robert M. Turkewitz
Richardson, Patrick, Westbrook, and Brickman, LLC
174 East Bay Street
Charleston, SC 29401

David B. Bernick
Janet S. Baer
Kirkland & Ellis
200 Randolph Drive
Chicago, IL 60601

Buchanan Ingersoll Rooney, PC
1000 West Street, Suite 1410
Wilmington, DE 19801

William D. Sullivan
William D. Sullivan, LLC
4 East 8th Street, Suite 400
Wilmington, DE 19801

Darrell W. Scott
Lukins & Annis, PS
1600 Washington Trust Financial Center West
717 Sprague Avenue
Spokane, WA 99201


The case administrator shall send electronic copies of the opinion and order to the parties listed
on the current service list.

-54-

# EXHIBIT 11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR DISTRICT OF DELAWARE

IN RE:                              (
                                    (
W.R. GRACE & CO., et al.,           (      Bankruptcy No. 01-01139 (JKF)
                                    (      Jointly Administered
                                    (
      Debtor(s)                     (      Chapter 11
                                    (
                                    (      Related to Doc. No. 4007, 4009, 4012, 4018, 4022,
                                    (       4028, 4173, 4175, 4202, 4204, 4205, 4206, 4291,
                                    (       and 4294.
                                    (

## ORDER RESOLVING MOTION FOR PARTIAL SUMMARY JUDGMENT, CROSS MOTIONS FOR SUMMARY JUDGMENT, AND SCHEDULING A STATUS CONFERENCE

**AND NOW**, this 14th day of December, **2006**, for the reasons expressed in the foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED, and DECREED** that Claimants' motion for partial summary judgment is **DENIED WITHOUT PREJUDICE.** However, it is **FURTHER ORDERED** that there is no dispute regarding the fact that ZAI is contaminated with asbestos and can release asbestos fibers when disturbed, and the Court so finds.

It is further **ORDERED, ADJUDGED, and DECREED** that, based on the evidence presented during the course of the "ZAI Science Trial," Claimants' motion for summary judgment is **DENIED IN PART** and Debtors' motion for summary judgment is **GRANTED IN PART** as to the threshold issue of unreasonable risk of harm. The court finds that there is no unreasonable risk of harm from ZAI.

It is further **ORDERED** that the Daubert objections are **GRANTED or DENIED** as set forth within the Memorandum Opinion.

-1-

A253

14015
12-14-06

It is further **ORDERED**, that a status conference regarding the remainder of Claimants'

and Debtors' motion for summary judgment will be held on **January 22, 2006,** at **2:00**

*Judith K. Fitzgerald*                    jmd

Judith K. Fitzgerald
United States Bankruptcy Judge

CC:

James J. Restivo, Jr.
James W. Bentz
Doug Cameron
Reed Smith, LLP
435 Sixth Avenue
Pittsburgh, PA 15210

Edward J. Westbrook
Robert M. Turkewitz
Richardson, Patrick, Westbrook, and Brickman, LLC
174 East Bay Street
Charleston, SC 29401

David B. Bernick
Janet S. Baer
Kirkland & Ellis
200 Randolph Drive
Chicago, IL 60601

Buchanan Ingersoll Rooney, PC
1000 West Street, Suite 1410
Wilmington, DE 19801

Dated: 12/14/2006
15:03:49                                -2-

William D. Sullivan
William D. Sullivan, LLC
4 East 8th Street, Suite 400
Wilmington, DE 19801

Darrell W. Scott
Lukins & Annis, PS
1600 Washington Trust Financial Center West
717 Sprague Avenue
Spokane, WA 99201

....

The case administrator shall send electronic copies of the opinion and order to the parties listed
on the current service list.

A255

# EXHIBIT 12

192

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 02-11505 (MFW)
                                .
                                .
NII HOLDINGS, INC. and          . 824 Market Street
NII HOLDINGS (DELAWARE), INC.   . Wilmington, DE  19801
                                .
              Debtors,          . October 22, 2002
. . . . . . . . . . . . . . . . . 12:30 P.M.


TRANSCRIPT OF MOTIONS
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                Richards, Layton & Finger, P.A.
                                By:  DANIEL DeFRANCESCHI, ESQ.
                                     PAUL N. HEATH, ESQ.
                                     REBECCA L. SCALIO, ESQ.
                                One Rodney Square
                                P.O. Box 551
                                Wilmington, DE  19899

                                Bingham, McCutcheon, LLP
                                By:  PATRICK J. TROSTLE, ESQ.
                                     WILLIAM F. GOVIER, ESQ.

For Nextel Communications,
Inc.,:                          Jones, Day, Reavis & Pogue
                                By:  PAUL E. HARNER, ESQ.
                                     JOHN W. EDWARDS, II, ESQ.
                                1900 Huntington Center
                                41 South High Street
                                Columbus, OH  43215-6113

                                Morris, James, Hitchens &
                                Williams, LLP
                                By:  BRETT D. FALLON, ESQ.


Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey  08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311     Fax No.  (609) 587-3599**

394
11-5-02

59

 1  because I think that what that is doing is sort of imposing

 2  some sort of a -- perhaps it's a policy argument.

 3          THE COURT:  There is a policy in the bankruptcy code,

 4  and that is contained in 1125.

 5          MR. DeFRANCESCHI:  Absolutely.

 6          THE COURT:  You don't vote until there's disclosure

 7  in accordance with the code and the Court has approved that

 8  disclosure.

 9          MR. DeFRANCESCHI:  Right.

10          THE COURT:  The Court is not involved in pre-petition

11  negotiations towards a plan.

12          MR. DeFRANCESCHI:  That's right.

13          THE COURT:  So, I have no jurisdiction over pre-

14  petition lock-up agreements unless you're seeking to have them

15  designated a vote.

16          MR. DeFRANCESCHI:  Which we're not.

17          THE COURT:  So -- but I do have --

18          MR. DeFRANCESCHI:  But --

19          THE COURT:  -- jurisdiction over post petition

20  activities.

21          MR. DeFRANCESCHI:  I think I understand where Your

22  Honor's coming out on this, and --

23          THE COURT:  Well, let me make it clear then.

24          MR. DeFRANCESCHI:  Yeah.

25          THE COURT:  There is no room for a post petition

# EXHIBIT 13

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:

STATIONS HOLDING COMPANY,
INC.,

                    Debtor.

. . . . . . . . . . . . . . .

. Case No.  02-10882(MFW)
. Motion No. (if provided)
.
.
. 824 Market Street
. Wilmington, Delaware 19801
.
. September 25, 2002
. 1:13 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Kirkland & Ellis
                                By:  JAMES SPRAYREGEN, ESQ.
                                     GEOFFREY RICHARDS, ESQ.
                                200 East Randolph Drive
                                Chicago, II 60601

                                Pachulski, Stang, Ziehl, Young
                                  & Jones
                                By:  LAURA DAVIS JONES, ESQ.
                                919 North Market Street
                                16th Floor, PO Box 8705
                                Wilmington, DE 19899

For Gray Communications:        Proskauer Rose, LLP
                                By:  MICHAEL FOREMAN, ESQ.
                                1585 Broadway
                                New York, NY 10036

Audio Operator:                 Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

190
10-4-02

1        MR. SPRAYREGEN:  I have to admit, Your Honor, I'm not

2  quite following that in the sense of unless we posit that the

3  market did not operate here what -- and again, we're prepared

4  to at the right time present our evidence and confirmation.

5  But the evidence will be that through a process this was and

6  produced the fair market value.  So --

7        THE COURT:  I'm talking about the terms of the lockup

8  and at the time that they signed the lockup.

9        MR. SPRAYREGEN:  Um-um-hum.

10       THE COURT:  And what rights they had.  The fact that

11  it was conditioned on the debtor filing a disclosure statement

12  is irrelevant because it does not say that they have the right

13  to change their vote if the disclosure statement I approve

14  causes them to want to change their vote.

15       MR. SPRAYREGEN:  But, Your Honor, obviously --

16       THE COURT:  Isn't that the point of the disclosure

17  statement?

18       MR. SPRAYREGEN:  That's exactly the point of the

19  disclosure statement, Your Honor, and what we're submitting and

20  it may be that we disagree, obviously your view is more

21  important than mine, but what we're saying is they were not

22  obligated unless and until their rights -- excuse me, their

23  obligations in essence spun into existence after the time that

24  this Court approved the disclosure statement.

25       THE COURT:  An approval of a disclosure statement is

F1

FILED

2002 OCT -3 AM 10: 12

US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  02-10882 (MFW)
                                . Motion No. (if provided)
                                .
STATIONS HOLDING COMPANY,       .
INC.,                           . 824 Market Street
                                . Wilmington, Delaware 19801
                Debtor.         .
                                . September 25, 2002
. . . . . . . . . . . . . . . . . 1:13 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Kirkland & Ellis
                            By:  JAMES SPRAYREGEN, ESQ.
                                 GEOFFREY RICHARDS, ESQ.
                            200 East Randolph Drive
                            Chicago, Il 60601

                            Pachulski, Stang, Ziehl, Young
                              & Jones
                            By:  LAURA DAVIS JONES, ESQ.
                            919 North Market Street
                            16th Floor, PO Box 8705
                            Wilmington, DE 19899

For Gray Communications:    Proskauer Rose, LLP
                            By:  MICHAEL FOREMAN, ESQ.
                            1585 Broadway
                            New York, NY 10036

Audio Operator:             Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

196
10-3-02

27

1       MR. SPRAYREGEN:  I have to admit, Your Honor, I'm not
2  quite following that in the sense of unless we posit that the
3  market did not operate here what -- and again, we're prepared
4  to at the right time present our evidence and confirmation.
5  But the evidence will be that through a process this was and
6  produced the fair market value.  So --

7       THE COURT:  I'm talking about the terms of the lockup
8  and at the time that they signed the lockup.

9       MR. SPRAYREGEN:  Um-um-hum.

10       THE COURT:  And what rights they had.  The fact that
11  it was conditioned on the debtor filing a disclosure statement
12  is irrelevant because it does not say that they have the right
13  to change their vote if the disclosure statement I approve
14  causes them to want to change their vote.

15       MR. SPRAYREGEN:  But, Your Honor, obviously --

16       THE COURT:  Isn't that the point of the disclosure
17  statement?

18       MR. SPRAYREGEN:  That's exactly the point of the
19  disclosure statement, Your Honor, and what we're submitting and
20  it may be that we disagree, obviously your view is more
21  important than mine, but what we're saying is they were not
22  obligated unless and until their rights -- excuse me, their
23  obligations in essence spun into existence after the time that
24  this Court approved the disclosure statement.

25       THE COURT:  An approval of a disclosure statement is

A261

**J&J COURT TRANSCRIBERS, INC.**